

535 FIFTH AVENUE, FL. 25   NEW YORK, NEW YORK 10017   TELEPHONE 212-658-1455   FACSIMILE 877-607-5419
NEW YORK • VANCOUVER • VICTORIA • CALGARY • EDMONTON • REGINA • SASKATOON • TORONTO • MONTREAL

**VIA CM/ECF**

January 12th, 2016

Hon. Elizabeth A. Wolford
United States District Court
Northern District of New York
Kenneth B. Keating Federal Building
100 State Street
Rochester, New York 14614

    Re: **United States v. Joseph Jenkins**
      **14 Cr. 088 (EAW)**

Dear Judge Wolford:

Earlier today I filed Mr. Jenkins' sentencing memorandum on CM/ECF. Since then Mr. Jenkins instructed me to - and insisted that I - file a copy of the Appeal Books in his related child pornography case for consideration by the Court at sentencing in the above captioned case.

    Respectfully,

    Merchant Law Group LLP


    By:_____/s_____
      Daniel DeMaria, Esq.

    Encl.


cc: AUSA Tamara B. Thomson, Esq.

# 14-4295

## United States Court of Appeals
## for the Second Circuit



UNITED STATES OF AMERICA,

*Appellee,*

v.

JOSEPH VINCENT JENKINS, AKA SEALED DEFENDANT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

### APPELLANT'S APPENDIX
### VOLUME I OF IV (Pages A1-A300)

DANIEL DeMARIA, ESQ.
MERCHANT LAW GROUP LLP
*Attorneys for Defendant-Appellant*
26 Broadway, 21st Floor
New York, New York 10004
(212) 658-1455

STEVEN DAVID CLYMER
ASSISTANT U.S. ATTORNEY
UNITED STATES ATTORNEY'S
OFFICE FOR THE NORTHERN
DISTRICT OF NEW YORK
*Attorney for Appellee*
100 South Clinton Street
Syracuse, New York 13261
(315) 448-0672

DICK BAILEY SERVICE (212) 608-7666 (718) 522-4363 (516) 222-2470 (914) 682-0848 Fax: (718) 522-4024
1-800-531-2028 - Email: appeals@dickbailey.com -Website: www.dickbailey.com

# TABLE OF CONTENTS

*Pages*

District Court Docket Sheet ............................................................................. A1-A29

Indictment, dated December 21, 2011 ........................................................... A30-A33

Search and Seizure Warrant, dated July 6, 2011, with
Affidavit in Support of Special Agent Chad J. Willard ................................. A34-A61

Decision and Order of the Hon. Glenn T. Suddaby, dated
August 24, 2012 .............................................................................................. A62-A73

Decision and Order of the Hon. Glenn T. Suddaby, dated
August 7, 2013 ................................................................................................ A74-A76

Decision and Order of the Hon. Glenn T. Suddaby, dated
December 12, 2013 .......................................................................................... A77-A84

Transcript of Pretrial Conference, held on April 25, 2013 ........................... A85-A100

Transcript of Pretrial Conference, held on January 21,
2014 ................................................................................................................. A101-A125

Trial Transcript, held on February 3, 2014 ................................................... A126-A163

Trial Transcript, held on February 4, 2014 ................................................... A164-A438

Trial Transcript, held on February 5, 2014 ................................................... A439-A684

Trial Transcript, held on February 6, 2014 ................................................... A685-A797

Letter from Joseph Jenkins, dated September 21, 2014 ............................... A798-A831

i

*Pages*

Sentencing Transcript, held on November 12, 2014 ....................................A832-A873

Judgment Appealed From, dated November 12, 2014 ...............................A874-A879

Notice of Appeal, dated November 14, 2014 ........................................................ A880

Sentencing Memorandum Exhibits (Documents Filed
Under Seal and submitted simultaneously with filing of
Appellant's Appendix) ................................................................................A881-A920

Presentence Investigation Report, revised May 20, 2014
(Documents Filed Under Seal and submitted
simultaneously with filing of Appellant's Appendix) .................................A921-A938

ii

## 5:11-cr-00602-GTS All Defendants USA v. Jenkins
**Date filed:** 12/21/2011
**Date terminated:** 11/18/2014
**Date of last filing:** 03/02/2015

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| 1 R | *Filed:*<br>*Entered:* | 09/12/2011<br>09/13/2011 | Complaint (Sealed) |
| | *Docket Text:* COMPLAINT as to Joseph Jenkins (1). (mnm)[7:11-mj-00373-ATB] Modified on 8/6/2012 to add complaint to docket (lmw). | | |
| 2 | *Filed:*<br>*Entered:* | 09/12/2011<br>09/13/2011 | Order to Seal Case |
| | *Docket Text:* Order to Seal Case as to Sealed Defendant. Signed by US Magistrate Judge Andrew T. Baxter on 9/12/11. (mnm)[7:11-mj-00373-ATB] | | |
| | *Filed & Entered:* | 10/04/2011 | Initial Appearance |
| | *Docket Text:* TEXT Minute Entry for proceedings held before U.S. Magistrate Judge Andrew T. Baxter: Initial Appearance as to Joseph Vincent Jenkins held on 10/4/2011. APPEARANCES: Tamara Thomson, AUSA for United States; Melissa Tuohey, Asst. FPD for purposes of this appearance only. Deft. advised of rights and given copy of complaint. Financial affidavit reviewed & Deft. found eligible for assigned counsel - the court will appoint assigned counsel. Maximum penalties stated. Govt. makes a motion for pretrial detention. Detention hearing will be scheduled by the court. [Proceeding FTR recorded]. (kmg)[7:11-mj-00373-ATB] | | |
| | *Filed & Entered:* | 10/04/2011 | Set/Reset Hearings |
| | *Docket Text:* Detention Hearing set for 10/6/2011 at 4:00 P.M. in Syracuse, NY before U.S. Magistrate Judge Andrew T. Baxter. (kmg)[7:11-mj-00373-ATB] | | |
| 3 | *Filed & Entered:* | 10/04/2011 | Order to Unseal Case |
| | *Docket Text:* Order to Unseal Case as to Sealed Defendant. Signed by US Magistrate Judge Andrew T. Baxter on 10/4/11. (mnm)[7:11-mj-00373-ATB] | | |
| 4 | *Filed & Entered:* | 10/04/2011 | Warrant Returned Executed |
| | *Docket Text:* Warrant Arrest Returned Executed on 10/4/11, in case as to Joseph Vincent Jenkins. (mnm)[7:11-mj-00373-ATB] | | |
| | *Filed:*<br>*Entered:* | 10/06/2011<br>10/07/2011 | Detention Hearing |
| | *Docket Text:* TEXT Minute Entry for proceedings held before U.S. Magistrate Judge Andrew T. Baxter: Detention Hearing as to Joseph Vincent Jenkins held on 10/6/2011. APPEARANCES: Tamara Thomson, AUSA for Govt.; Jeffrey R. Parry, Esq. for Deft. Written PTS report received. Govt. renews motion for pretrial detention. Atty. Parry speaks on behalf of Deft. Mag. Judge Baxter grants motion for detention. Preliminary hearing is scheduled for 10/18/11 at 1:00 P.M. Deft. is remanded to the custody of the U.S. Marshal. [Proceeding FTR recorded] (kmg)[7:11-mj-00373-ATB] | | |

| 5 | *Filed & Entered:*   10/11/2011 | Order of Detention |
|---|---|---|
| | *Docket Text:* ORDER OF DETENTION PENDING TRIAL as to Joseph Vincent Jenkins. Signed by US Magistrate Judge Andrew T. Baxter on 10/6/11. (mnm)[7:11-mj-00373-ATB] | |
| 6 | *Filed & Entered:*   10/12/2011 | Letter Request |
| | *Docket Text:* Letter from J. Parry as to Joseph Vincent Jenkins requesting Waiver of Preliminary Hearing (Parry, Jeffrey)[7:11-mj-00373-ATB] | |
| | *Filed & Entered:*   10/13/2011 | Order |
| | *Docket Text:* TEXT ORDER granting waiver of preliminary hearing as to Joseph Vincent Jenkins re [6] Letter Request filed by Joseph Vincent Jenkins. Signed by U.S. Magistrate Judge Andrew T. Baxter on 10/13/11. (kmg)[7:11-mj-00373-ATB] | |
| 7 | *Filed & Entered:*   10/25/2011 | Stipulation |
| | *Docket Text:* STIPULATION by USA (Thomson, Tamara)[7:11-mj-00373-ATB] | |
| 8 | *Filed & Entered:*   10/26/2011 | Order to Continue - Ends of Justice |
| | *Docket Text:* ORDER TO CONTINUE - Ends of Justice as to Joseph Vincent Jenkins Time excluded from 10/26/11 until 12/24/11. Signed by US Magistrate Judge Andrew T. Baxter on 10/26/11. (mnm)[7:11-mj-00373-ATB] | |
| 9 | *Filed & Entered:*   12/14/2011 | Letter Request |
| | *Docket Text:* Letter from Jeffrey Parry, Esq. as to Joseph Vincent Jenkins requesting detention hearing (Parry, Jeffrey)[7:11-mj-00373-ATB] | |
| | *Filed & Entered:*   12/16/2011 | Set/Reset Hearings |
| | *Docket Text:* Detention Hearing set as to Joseph Vincent Jenkins for 1/5/2012 at 2:30 P.M. in Syracuse before US Magistrate Judge Andrew T. Baxter. Atty. Parry is directed to file his brief by 12/22/11 and the Govt. must respond by 12/30/11. (kmg)[7:11-mj-00373-ATB] | |
| | *Filed:*          12/21/2011<br>*Entered:*      12/22/2011 | Grand Jury Return |
| | *Docket Text:* TEXT Minute Entry for proceedings held before Magistrate Judge George H. Lowe:GRAND JURY makes a partial report and returns Indictment. Tally Sheet is ordered sealed. No special requests. (Court Reporter Sue Byrne) (rjb, ) | |
| 10 Ⓡ | *Filed:*          12/21/2011<br>*Entered:*      12/22/2011 | Indictment |
| | *Docket Text:* INDICTMENT as to Joseph Vincent Jenkins (1) count(s) 1, 2. (rjb, ) | |
| 11 | *Filed & Entered:*   12/30/2011 | Letter Request |
| | *Docket Text:* Letter from Tamara B. Thomson as to Joseph Vincent Jenkins requesting motion in opposition to defense's detention motion (Thomson, Tamara) | |
| | *Filed & Entered:*   01/05/2012 | Detention Hearing |
| | *Docket Text:* TEXT Minute Entry for proceedings held before U.S. Magistrate Judge Andrew T. Baxter: Arraignment & Hearing on Defendant's Request to Reopen Detention Hearing held on 1/5/12. APPEARANCES: Tamara Thomson, AUSA for United States; Jeffrey R. Parry, Esq. for Deft. Atty. Parry speaks on behalf of Deft. Atty. Thomson speaks on behalf of Govt. The court denies motion for release. Deft. waives formal reading of Indictment and enters a plea of NOT GUILTY. Maximum penalties stated; scheduling order to be issued. Deft. remanded to the custody of the U.S. Marshal. [Proceeding FTR recorded] (kmg) | |
| 12 | *Filed & Entered:*   01/06/2012 | Criminal Pretrial Scheduling Order |

| | | |
|---|---|---|
| | *Docket Text:* CRIMINAL PRETRIAL SCHEDULING ORDER as to Joseph Vincent Jenkins. Motions to be filed by 2/2/2012. Jury Trial set for 3/5/2012 at 09:30 AM in Syracuse before Judge Glenn T. Suddaby. Signed by US Magistrate Judge Andrew T. Baxter on 1/5/2012. (amt) | |
| 13 | *Filed & Entered:* 01/06/2012 | Order |
| | *Docket Text:* DECISION AND ORDER denying Defendant's motion to reopen the detention hearing. Signed by US Magistrate Judge Andrew T. Baxter on 1/5/2012. (amt) | |
| 14 | *Filed & Entered:* 01/13/2012 | Stipulation |
| | *Docket Text:* STIPULATION by USA (Thomson, Tamara) | |
| 15 | *Filed & Entered:* 01/18/2012 | Order to Continue - Ends of Justice |
| | *Docket Text:* ORDER TO CONTINUE - Ends of Justice as to Joseph Vincent Jenkins Time excluded from 1/18/12 until 3/17/12. Government discovery due by 3/5/12. Defendant discovery due by 3/12/12. Motions to be filed by 3/19/12 and shall be made returnable on 4/19/12 on submit before Judge Glenn T. Suddaby. Any change of plea shall be entered by 4/16/12. All pretrial submissions as set forth in the #[12] criminal pretrial scheduling order are due by 4/23/12. Jury Trial set for 5/7/2012 09:00 AM in Syracuse before Judge Glenn T. Suddaby. Signed by Judge Glenn T. Suddaby on 1/18/12. (lmw) | |
| 16 | *Filed & Entered:* 01/31/2012 | Notice of Attorney Appearance - USA |
| | *Docket Text:* NOTICE OF ATTORNEY APPEARANCE Geoffrey J.L. Brown appearing for USA *for the forfeiture aspect of the case* (Brown, Geoffrey) | |
| 17 | *Filed & Entered:* 03/14/2012 | Stipulation |
| | *Docket Text:* STIPULATION by USA (Thomson, Tamara) | |
| 18 | *Filed & Entered:* 03/16/2012 | Order to Continue - Ends of Justice |
| | *Docket Text:* ORDER TO CONTINUE - Ends of Justice as to Joseph Vincent Jenkins: Time excluded from 3/16/12 until 5/14/12. Government discovery due by 5/7/12. Defendant discovery due by 5/14/12. Motions to be filed by 5/21/12 and shall be made returnable on 6/21/12 on submit before Judge Glenn T. Suddaby. Any change of plea shall be entered by 6/11/12. All pretrial submissions as set forth in the #[12] criminal pretrial scheduling order are due by 6/18/12. Jury Trial set for 7/2/2012 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Signed by Judge Glenn T. Suddaby on 3/16/12. (lmw) | |
| 19 | *Filed & Entered:* 05/11/2012 | Stipulation |
| | *Docket Text:* STIPULATION by USA (Thomson, Tamara) | |
| 20 | *Filed & Entered:* 05/18/2012 | Order to Continue - Ends of Justice |
| | *Docket Text:* ORDER TO CONTINUE - Ends of Justice as to Joseph Vincent Jenkins: Time excluded from 5/18/12 until 7/16/12. Government discovery due by 6/18/12. Defendant discovery due by 6/25/12. Motions to be filed by 7/2/12 and shall be made returnable on 8/2/12 on submit before Judge Glenn T. Suddaby. Any change of plea shall be entered by 7/24/12. All pretrial submissions as set forth in the #[12] criminal pretrial scheduling order are due by 7/31/12. Jury Trial set for 8/14/2012 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Signed by Judge Glenn T. Suddaby on 5/18/12. (lmw) | |
| 21 **R** | *Filed:* 06/25/2012 *Entered:* 06/26/2012 | Letter Request |
| | *Docket Text:* Letter Request from Joseph Jenkins requesting to see full discovery and expedite the case to trial. (sfp, ) | |
| | *Filed & Entered:* 06/29/2012 | Order on Motion for Extension of Time to File |

| | | |
|---|---|---|
| | *Docket Text:* TEXT ORDER granting #[22] Motion for Extension of Time to File Motions as to Joseph Vincent Jenkins (1) until 7/9/12. Authorized by Judge Glenn T. Suddaby on 6/29/12. (lmw) | |
| 22 | *Filed & Entered:* 06/29/2012 *Terminated:* 06/29/2012 | Motion for Extension of Time to File |
| | *Docket Text:* MOTION for Extension of Time to File by Joseph Vincent Jenkins. (Parry, Jeffrey) | |
| 23 | *Filed & Entered:* 07/02/2012 | Notice of Attorney Appearance - USA |
| | *Docket Text:* NOTICE OF ATTORNEY APPEARANCE Gwendolyn E. Carroll appearing for USA as Co-Counsel with/for Attorney: With Attorney Tamara Thomson (Carroll, Gwendolyn) | |
| 24 | *Filed & Entered:* 07/06/2012 | Letter Request |
| | *Docket Text:* Letter from AUSA Tamara Thomson as to Joseph Vincent Jenkins requesting Status Conference to address allegations in defendant's letter - Docket No. 21 (Thomson, Tamara) | |
| 25 | *Filed & Entered:* 07/09/2012 *Terminated:* 08/24/2012 | Motion for Omnibus Relief |
| | *Docket Text:* MOTION for Omnibus Relief by Joseph Vincent Jenkins. (Attachments: # (1) Memorandum of Law)(Parry, Jeffrey) | |
| | *Filed & Entered:* 07/10/2012 | Notice of Hearing on Motion |
| | *Docket Text:* TEXT NOTICE OF HEARING ON #[25] MOTION for Omnibus Relief : Motion Hearing set for 8/9/2012 on submit before Judge Glenn T. Suddaby. No personal appearance. Response to Motion due by 7/23/2012. Reply to Response to Motion due by 7/30/2012. As a result of the filing of this motion, the jury trial scheduled to begin on 8/14/12 is adjourned without date pending a decision on this motion. (lmw) | |
| | *Filed & Entered:* 07/16/2012 | Order |
| | *Docket Text:* TEXT ORDER striking #[26] Letter from Joseph Vincent Jenkins from the record. Defendant is represented by counsel, and all communication with the Court should be made through defendant's attorney. Defendant is reminded that it is inappropriate to have ex parte communication with a Judge, and Defendant should work with his attorney to determine what, if any, information is needed to defend his case. Authorized by Judge Glenn T. Suddaby on 7/16/12. (lmw)(Copy served upon defendant via regular mail at Cayuga County jail, 7445 County House Road, Auburn, NY 13021) | |
| 26 | *Filed & Entered:* 07/16/2012 | Letter Request |
| | *Docket Text:* STRICKEN FROM THE RECORD PURSUANT TO 7/16/12 TEXT ORDER: Letter from Defendant Joseph Vincent Jenkins requesting assistance from Judge Suddaby. (lmw) Modified on 7/16/2012 (lmw). | |
| 27 | *Filed & Entered:* 07/23/2012 | Response to Motion |
| | *Docket Text:* RESPONSE to Motion by USA as to Joseph Vincent Jenkins re [25] MOTION for Omnibus Relief (Attachments: # (1) Exhibit(s) A, # (2) Exhibit(s) B, # (3) Exhibit(s) C, # (4) Exhibit(s) D, # (5) Exhibit(s) E, # (6) Exhibit(s) F, # (7) Exhibit(s) G, # (8) Exhibit(s) H)(Carroll, Gwendolyn) (Attachments 1, 2, 4, 5, 6 replaced on 7/30/2012 with redacted versions.) (amt). | |
| 28 | *Filed & Entered:* 07/24/2012 | Certificate of Service |
| | *Docket Text:* Certificate of Service by USA as to Joseph Vincent Jenkins *Response to Motion* (Carroll, Gwendolyn) | |
| | *Filed & Entered:* 07/30/2012 | Order |

*Docket Text:* TEXT ORDER directing defense counsel, pursuant to Section VII the CJA Policy and Procedure Manual, to provide the expert's hourly rate, the estimated number of hours to complete the work, estimated expenses, a detailed description as to what she will testify to, and a properly prepared CJA Form 21, all required to be submitted in support of #[29] MOTION to Appoint Expert *Tami Loehrs* filed by Joseph Vincent Jenkins. Counsel may provide this information *ex parte* to the Court via email to the Courtroom Deputy. Authorized by Judge Glenn T. Suddaby on 7/30/12. (lmw)

| 29 | *Filed & Entered:*   07/30/2012 *Terminated:*        11/09/2012 | Motion to Appoint Expert |
|----|----|----|
| | *Docket Text:* First MOTION to Appoint Expert *Tami Loehrs* by Joseph Vincent Jenkins. Motion Hearing set for 8/2/2012 10:00 AM in Syracuse before Judge Glenn T. Suddaby Response to Motion due by 7/16/2012 Reply to Response to Motion due by 7/23/2012. (Attachments: # (1) Affirmation Of Jeffrey Parry, Esq., # (2) Exhibit(s))(Parry, Jeffrey) | |
| | *Filed & Entered:*   08/20/2012 | Notice of Hearing on Motion |
| | *Docket Text:* TEXT NOTICE OF HEARING ON #[33] MOTION for disclosure of the defendant's financial affidavit & notice to the Court of facts relevant to the defendant's eligibility for assigned counsel : Motion Hearing set for 9/20/2012 ON SUBMIT before Judge Glenn T. Suddaby. Response to Motion due by 9/4/2012. Reply to Response to Motion due by 9/11/2012. (lmw) | |
| 31 | *Filed & Entered:*   08/20/2012 | Order |
| | *Docket Text:* SEALED ORDER sealing #[30] EX PARTE MOTION (Sealed) filed by USA. Signed by Judge Glenn T. Suddaby on 8/20/12. (lmw) | |
| 32 | *Filed & Entered:*   08/20/2012 | Order |
| | *Docket Text:* SEALED ORDER approving # [30] EX PARTE MOTION (Sealed) filed by USA. Signed by Judge Glenn T. Suddaby on 8/20/12. (lmw) | |
| 33 | *Filed & Entered:*   08/20/2012 *Terminated:*        10/09/2012 | Motion for Miscellaneous Relief |
| | *Docket Text:* MOTION for disclosure of the defendant's financial affidavit & notice to the Court of facts relevant to the defendant's eligibility for assigned counsel by USA as to Joseph Vincent Jenkins. (Attachments: # (1) Attachment A, # (2) Attachment B, # (3) Attachment C, # (4) Attachment D, # (5) Attachment E, # (6) Attachment F)(Thomson, Tamara) | |
| 34 R | *Filed & Entered:*   08/24/2012 | Order on Motion for Omnibus Relief |
| | *Docket Text:* DECISION & ORDER denying #[25] Defendant's Motion to suppress evidence obtained from defendant's devices; defendant's statements made to CBSA officers; request for hearing and motion to compel discovery. Signed by Judge Glenn T. Suddaby on 8/24/12. (lmw) | |
| 35 R | *Filed & Entered:*   09/04/2012 *Terminated:*        09/05/2012 | Motion for Extension of Time to File Response/Reply |
| | *Docket Text:* MOTION for Extension of Time to File Response/Reply by Joseph Vincent Jenkins. (Parry, Jeffrey) | |
| | *Filed & Entered:*   09/05/2012 | Order on Motion for Extension of Time to File Response/Reply |
| | *Docket Text:* TEXT ORDER granting #[35] Defendant's Motion for Extension of Time to File Response to #[33] Government's motion for disclosure until 9/7/12. The government's reply is due by 9/14/12. Authorized by Judge Glenn T. Suddaby on 9/5/12. (lmw) | |
| 36 R | *Filed & Entered:*   09/07/2012 | Response in Opposition |
| | *Docket Text:* RESPONSE in Opposition by Joseph Vincent Jenkins re [33] MOTION for | |

| | | | |
|---|---|---|---|
| | | | disclosure of the defendant's financial affidavit & notice to the Court of facts relevant to the defendant's eligibility for assigned counsel (Parry, Jeffrey) |
| 37 Ⓡ | *Filed & Entered:* | 09/14/2012 | Response in Opposition |
| | *Docket Text:* REPLY to response filed by USA as to Joseph Vincent Jenkins re [33] MOTION for disclosure of the defendant's financial affidavit & notice to the Court of facts relevant to the defendant's eligibility for assigned counsel (Thomson, Tamara) | | |
| 38 | *Filed & Entered:* | 09/17/2012 | Sealed Document |
| | *Docket Text:* SEALED DOCUMENT - Exhibit 1 and Exhibit 2 to #[37] Government's Reply. (lmw) (Exhibit 1: # (1) Financial Records Part 2, # (2) Financial Records Part 3, # (3) Financial Records Part 4, # (4) Financial Records Part 5, # (5) Financial Records Part 6, # (6) Financial Records Part 7) # (7) Exhibit 2 - Lexis/Nexis Report) (lmw) | | |
| 39 | *Filed & Entered:* | 09/17/2012 | Order |
| | *Docket Text:* SEALING ORDER sealing #[38] Exhibits 1 and 2 to the Government's #[37] Reply until further Order of this Court. Signed by Judge Glenn T. Suddaby on 9/17/12. (lmw) | | |
| 40 Ⓡ | *Filed & Entered:* | 10/09/2012 | Order on Motion for Miscellaneous Relief |
| | *Docket Text:* DECISION & ORDER granting in part and denying in part #[33] Motion for disclosure of the Financial Affidavit: The Government's motion for the disclosure of the financial affidavit submitted by Defendant on 10/4/11 is GRANTED; and the Government's motion for a hearing to determine Defendant's financial eligibility for court-appointed counsel is DENIED as moot. The Clerk of the Court is directed to mail counsel a copy of the financial affidavit submitted by Defendant on 10/4/11. Counsel are permitted to submit papers by 10/19/12 on the issue of whether Defendant's appointment of counsel should be terminated. Signed by Judge Glenn T. Suddaby on 10/9/12. (lmw) | | |
| | *Filed & Entered:* | 10/19/2012 | Notice of Hearing on Motion |
| | *Docket Text:* TEXT NOTICE OF HEARING ON #[41] Second MOTION for Omnibus Relief filed by Joseph Vincent Jenkins : Motion Hearing set for 12/6/2012 on submit before Judge Glenn T. Suddaby. Response to Motion due by 11/19/2012.(lmw) | | |
| 41 Ⓡ | *Filed & Entered:* *Terminated:* | 10/19/2012 05/21/2013 | Motion for Omnibus Relief |
| | *Docket Text:* Second MOTION for Omnibus Relief by Joseph Vincent Jenkins. Motion Hearing set for 11/15/2012 10:00 AM in Syracuse before Judge Glenn T. Suddaby Response to Motion due by 10/29/2012 Reply to Response to Motion due by 11/5/2012. (Attachments: # (1) Exhibit(s), # (2) Exhibit(s), # (3) Exhibit(s), # (4) Affidavit, # (5) Affirmation)(Parry, Jeffrey) | | |
| 42 Ⓡ | *Filed & Entered:* | 10/19/2012 | Response in Support |
| | *Docket Text:* SUPPLEMENTAL BRIEF filed by USA in support of #[33] Government's Motion to terminate Defendant's eligibility for assigned counsel: (Attachments: # (1) Exhibit(s) D, # (2) Exhibit(s) E, # (3) Exhibit(s) F)(Carroll, Gwendolyn) | | |
| 43 Ⓡ | *Filed & Entered:* | 10/19/2012 | Response in Opposition |
| | *Docket Text:* SUPPLEMENTAL BRIEF filed by Joseph Vincent Jenkins in Opposition to # [33] Government's Motion to terminate Defendant's eligibility for assigned counsel. (Parry, Jeffrey) | | |
| 44 | *Filed & Entered:* | 10/23/2012 | Sealed Document |
| | *Docket Text:* SEALED DOCUMENT: (Exhibits A & B to #[42] Supplemental Brief filed by USA) (lmw) | | |
| 45 | *Filed & Entered:* | 10/23/2012 | Sealed Document |

| | | |
|---|---|---|
| | *Docket Text:* SEALING ORDER sealing Docket #[44] Exhibits A & B to #[42] Supplemental Brief filed by USA. (lmw) | |
| 46 | *Filed & Entered:* 10/23/2012 | Court Exhibit(s) |
| | *Docket Text:* Exhibit C to #[42] Supplemental Brief filed by USA: CD of recorded jail calls filed traditionally with the Clerk's office.(lmw) | |
| 47 [R] | *Filed & Entered:* 10/29/2012 | Response to Motion |
| | *Docket Text:* RESPONSE to Motion by USA as to Joseph Vincent Jenkins re [41] Second MOTION for Omnibus Relief (Carroll, Gwendolyn) | |
| 48 | *Filed & Entered:* 11/08/2012 | Order |
| | *Docket Text:* MEMORANDUM-DECISION & ORDER granting the Government's motion to terminate Defendant's appointment of counsel under the Criminal Justice Act and to schedule an appearance to determine Defendants intentions with regard to representation (Dkt. No. [42]); and it is further ORDERED that Attorney Parry shall submit to the Court by 11/23/12, a signed CJA-20. Upon approval of Attorney Parry's CJA-20, a separate CJA-7 order terminating appointment of counsel will be issued by the Court indicating the total amount that Defendant will be required to reimburse to the Court for the payment of Mr. Parry's attorneys fees and expenses; and it is further ORDERED that the defendant shall have thirty days from the date of this order to retain an attorney. Defendant may retain either Mr. Parry or an attorney of his choice. Defendant is directed to advise this Court by 12/10/12 as to who his attorney will be by the filing of a notice of attorney appearance. In the event that an attorney has not filed a notice of attorney appearance on behalf of the defendant by 12/10/12, the Court will schedule an immediate pretrial conference requiring the Defendants attendance to determine Defendant's intentions with regard to representation. Signed by Judge Glenn T. Suddaby on 11/8/12. (lmw) (Copy served upon defendant via regular mail at Cayuga County Jail) | |
| | *Filed & Entered:* 11/09/2012 | Order on Motion to Appoint Expert |
| | *Docket Text:* TEXT ORDER denying #[29] Defendant's Motion to Appoint Expert without prejudice for failure to comply with the Court's text order dated 7/30/12. Authorized by Judge Glenn T. Suddaby on 11/9/12. (lmw) | |
| 49 | *Filed & Entered:* 11/12/2012<br>*Terminated:* 04/19/2013 | Notice of Appeal - Interlocutory |
| | *Docket Text:* NOTICE OF APPEAL (Interlocutory) by Joseph Vincent Jenkins No fee paid. (Parry, Jeffrey) | |
| 50 | *Filed & Entered:* 11/13/2012 | Electronic Notice and Certification to USCA of Appeal |
| | *Docket Text:* ELECTRONIC NOTICE AND CERTIFICATION as to Joseph Vincent Jenkins sent to US Court of Appeals re [49] Notice of Appeal - Interlocutory (amt) | |
| | *Filed & Entered:* 11/26/2012 | Order on Motion for Extension of Time to File |
| | *Docket Text:* TEXT ORDER granting #[51] Motion for Extension of Time to submit CJA 20 voucher as to Joseph Vincent Jenkins (1) until 11/28/12. Authorized by Judge Glenn T. Suddaby on 11/26/12. (lmw) | |
| 51 | *Filed & Entered:* 11/26/2012<br>*Terminated:* 11/26/2012 | Motion for Extension of Time to File |
| | *Docket Text:* MOTION for Extension of Time to File by Joseph Vincent Jenkins. (Parry, Jeffrey) | |
| | *Filed & Entered:* 12/13/2012 | USCA Case Number |

| | | |
|---|---|---|
| | *Docket Text:* USCA Case Number is 12-4543 for [49] Appeal filed by Joseph Vincent Jenkins. (cbm ) | |
| 52 **R** | *Filed & Entered:* 01/11/2013 | Letter Request |
| | *Docket Text:* Letter from Joseph Jenkins requesting status of pretrial conference. (lmw) | |
| 53 | *Filed & Entered:* 02/05/2013 | Notice (Other) |
| | *Docket Text:* Letter Brief addressed to AUSA Thompson by Joseph Vincent Jenkins requesting discovery material and also states that defense Atty Parry is no longer representing him. (sfp, ) | |
| 54 | *Filed & Entered:* 03/04/2013 | CJA 7 - Order Terminating Counsel |
| | *Docket Text:* CJA 7 as to Joseph Vincent Jenkins - Order Terminating Appointment of Counsel ; representation by attorney Jeffrey R. Parry terminated. Defendant is directed to pay the CJA fund in the amount of $8,049.12 by 4/4/13. Signed by Judge Glenn T. Suddaby on 3/4/13. (lmw) | |
| 57 **R** | *Filed:* 04/02/2013<br>*Entered:* 04/10/2013 | Letter Request |
| | *Docket Text:* Letter from Defendant Joseph Jenkins requesting detention hearing and pretrial conference. (lmw) | |
| 55 **R** | *Filed & Entered:* 04/09/2013 | Letter Request |
| | *Docket Text:* COPY of Letter to the Court of Appeals from Deft Joseph Vincent Jenkins requesting the appeal be withdrawn (amt) | |
| 56 | *Filed & Entered:* 04/09/2013 | Status Report |
| | *Docket Text:* STATUS REPORT *re: discovery requests by defendant Joseph Jenkins* by USA as to Joseph Vincent Jenkins (Attachments: # (1) Exhibit(s) A (March 31, 2013 correspondence from defendant Joseph Jenkins))(Carroll, Gwendolyn) | |
| 58 **R** | *Filed & Entered:* 04/17/2013<br>*Terminated:* 05/21/2013 | Motion for Hearing |
| | *Docket Text:* MOTION FOR STATUS CONFERENCE AND TRIAL DATE from AUSA Tamara Thomson as to Joseph Vincent Jenkins. (Thomson, Tamara) Modified on 4/18/2013 (lmw). | |
| 59 | *Filed & Entered:* 04/19/2013 | USCA Mandate |
| | *Docket Text:* MANDATE of USCA, issued 4/15/13, granting Joseph Vincent Jenkins' motion to withdraw [49] Appeal. (cbm ) | |
| | *Filed & Entered:* 04/22/2013 | Order |
| | *Docket Text:* TEXT ORDER TO CONTINUE excluding time under the Speedy Trial Act as to Joseph Vincent Jenkins as follows (1): Time excluded from 10/19/12 through 11/12/12 while Defendant's #[41] motion to suppress evidence was under advisement pursuant to 18 U.S.C. 3161(h)(1)(D). Time excluded from 11/12/12 through 4/15/13 from the date #[49] Defendant's Notice of Appeal was filed and while that appeal was under consideration by the Second Circuit Court of Appeals pursuant to 18 U.S.C. 3161(h)(1)(C). This Court, having recently been restored its jurisdiction by the dismissal of Defendant's interlocutuory appeal on 4/15/13, further advises that the Speedy Trial clock remains currently stopped while #[41] Defendant's motion to suppress evidence is once again under advisement by this Court, as well as while the following other motions are under advisement: Defendant's #[56], Motion for a hearing to discuss pretrial release, purported discovery issues, and dismissal of the Indictment; and #[48] Government's Motion for a trial date and a status conference to discuss purported discovery issues and Defendant's representation at trial pursuant to 18 U.S.C. 3161(h)(1)(D). Authorized by Judge Glenn T. Suddaby on 4/22/13. (lmw) (Copy served upon pro se defendant via regular mail) | |

| | | | |
|---|---|---|---|
| | *Filed & Entered:* | 04/22/2013 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Pretrial Conference set for 4/25/2013 at 10:30 AM in Syracuse before Judge Glenn T. Suddaby to discuss defendant's representation status. (lmw) | | |
| 60 Ⓡ | *Filed & Entered:* | 04/24/2013 | Letter Request |
| | *Docket Text:* Letter from Joseph Jenkins requesting production of discovery materials. (lmw) | | |
| | *Filed & Entered:* | 04/25/2013 | Pretrial Conference |
| | *Docket Text:* TEXT Minute Entry for Pretrial Conference held on 4/25/13 before Judge Glenn T. Suddaby for Joseph Vincent Jenkins (1). Defendant advises Court that his family has tried to locate an attorney and has contacted at least 8 different attorneys. Court directs two attorneys to meet with Defendant (Michael Spano and William Sullivan), and defendant may choose one of those attorneys or the Defendant can obviously hire any other attorney he wants, but defendant must locate an attorney by 5/10/13. If defendant does not locate an attorney, the Court will assign the defendant an attorney from the CJA panel and the defendant will be required to pay back the attorneys fees to the CJA fund, unless the Defendant is found to have a change in financial circumstances and is found to be eligible for court-appointed counsel. Mr. Parry is directed to provide a complete copy of his file to Defendants new attorney as soon as he/she has been retained/assigned. APP: Tamara Thomson, AUSA and Gwen Carroll, AUSA; Defendant appears without counsel. CRD: L. Welch (Court Reporter: Eileen McDonough) (lmw) | | |
| 61 | *Filed & Entered:* | 04/25/2013 | Transcript Request |
| | *Docket Text:* TRANSCRIPT REQUEST *of pretrial conference* by USA as to Joseph Vincent Jenkins for proceedings held on April 25, 2013 before Judge Glenn T. Suddaby. (Thomson, Tamara) | | |
| 62 | *Filed & Entered:* | 04/29/2013 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Pretrial Conference held on 4/25/2013 before Judge Suddaby, Court Reporter/Transcriber: Eileen McDonough,Telephone number: 315-234-8546. IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS: In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/20/2013. Redacted Transcript Deadline set for 5/30/2013. Release of Transcript Restriction set for 7/29/2013. Notice of Intent to Redact due by 5/6/2013 (etm, ) | | |
| 63 | *Filed & Entered:* | 05/01/2013 | Letter Request |
| | *Docket Text:* Letter from Defendant Joseph Vincent Jenkins requesting he be allowed to represent himself (amt) | | |
| 64 | *Filed & Entered:* | 05/01/2013 | Motion for Hearing |
| | *Terminated:* | 05/21/2013 | |
| | *Docket Text:* MOTION for Hearing *pursuant to Faretta v. United States* by USA as to Joseph Vincent Jenkins. Motion Hearing set for 6/6/2013 10:00 AM in Syracuse before Judge Glenn T. | | |

| | | |
|---|---|---|
| | Suddaby Response to Motion due by 5/20/2013 Reply to Response to Motion due by 5/28/2013. (Attachments: # (1) Exhibit(s) Certificate of Service)(Thomson, Tamara) | |
| | *Filed & Entered:*   05/02/2013 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Hearing re Pro Se Status set for 5/29/2013 at 10:45 AM in Syracuse before Judge Glenn T. Suddaby. (lmw) | |
| 65 Ⓡ | *Filed:*            05/08/2013  *Entered:*        05/09/2013  *Terminated:*      05/21/2013 | Motion for Discovery |
| | *Docket Text:* MOTION for immediate production of Discovery and RESPONSE IN OPPOSITION to the Govt's [64] Motion by Joseph Vincent Jenkins. (amt) | |
| 66 Ⓡ | *Filed & Entered:*   05/10/2013 | Letter Request |
| | *Docket Text:* Letter from Defendant Joseph Vincent Jenkins re: Faretta Hearing and requesting he be allowed to represent himself (amt) | |
| 67 Ⓡ | *Filed:*            05/15/2013  *Entered:*        05/16/2013  *Terminated:*      05/21/2013 | Motion to Dismiss |
| | *Docket Text:* MOTION to Dismiss by Joseph Vincent Jenkins. (amt) | |
| 68 Ⓡ | *Filed & Entered:*   05/21/2013 | Order on Motion for Omnibus Relief |
| | *Docket Text:* DECISION & ORDER denying #[41] Defendant's second motion for omnibus relief (Dkt. No. 41); granting in part and denying in part #[57] Defendant's motion for a hearing to discuss pretrial release, the dismissal of the Indictment, and purported discovery issues; granting # [58] Government's motion for a trial date, for a status conference to discuss purported discovery issues, and for a Faretta hearing to discuss Defendant's representation at trial; denying without prejudice Defendant's #[60] motion for production of discovery materials; denying without prejudice #[63] Defendant's motion for leave to represent himself; granting #[64] Government's motion for a Faretta hearing; denying without prejudice #[65] Defendant's second motion for the production of discovery material; denying #[67] Defendant's motion to dismiss the Indictment; and that upon the filing of this Decision and Order, the Clerk of the Court shall set a trial date in this action; and it is further Ordered that the parties shall appear before the undersigned for a conference to discuss any discovery issues, to be held after the Faretta hearing scheduled on May 29, 2013. Signed by Judge Glenn T. Suddaby on 5/21/13. (lmw) (Copy served upon Defendant via regular mail) | |
| 69 Ⓡ | *Filed & Entered:*   05/27/2013 | Status Report |
| | *Docket Text:* STATUS REPORT *Regarding Defendant's Discovery Requests* by USA as to Joseph Vincent Jenkins (Carroll, Gwendolyn) | |
| | *Filed & Entered:*   05/29/2013 | Pro Se (Faretta) Hearing |
| | *Docket Text:* TEXT MINUTE ENTRY for Faretta Hearing held on 5/29/13 before Judge Glenn T. Suddaby as to Joseph Vincent Jenkins (1): Defendant is advised of his constitutional right to an attorney and the dangers and disadvantages of proceeding pro se. Defendant is questioned by the Court. Defendant confirms with the Court that he understands the charges against him. Maximum possible penalties are stated for the case. Judge advises the Defendant of the advantages of having an attorney represent him. Defendant provided an opportunity to speak with his family. Defendant advises the Judge that he wishes to represent himself. Judge appoints stand-by counsel for purposes of answering questions at trial. Sole responsibility of trial preparation and defense of the case rests with the Defendant. Outstanding discovery issues discussed. Judge directs | |

Government to provide the Court with discovery that was previously provided to defendant's attorney. Court directs clerk to contact Attorney Parry to turn over his entire file to the Defendant. Court asks Government to request one more time from DHS in Buffalo regarding any spreadsheets or other documents they may have. Jury trial is scheduled for 7/8/13. Final pretrial conference set for 7/1/13 at 11:00 am. Pretrial submissions are due by 6/17/13. Stand-by counsel will be appointed and appear on first day of trial. Defendant will be notified of who is appointed as stand-by counsel. Defendant is remanded to USMS. APP: Gwen Carroll and Tamara Thomson, AUSA; Joseph Vincent Jenkins, Pro se Defendant. CRD: L. Welch (Court Reporter: Eileen McDonough) (lmw) (Copy served upon Pro se Defendant via regular mail)

| 70 | *Filed & Entered:* | 05/29/2013 | Order |
|---|---|---|---|
| | *Docket Text:* TEXT ORDER directing Attorney Jeffrey Parry to turn over his entire file for the legal defense of Joseph Vincent Jenkins to the Defendant at the Cayuga County Jail by 5/31/13. Authorized by Judge Glenn T. Suddaby on 5/29/13. (lmw) | | |
| 71 R | *Filed & Entered:* | 05/29/2013 | Order |
| | *Docket Text:* TRIAL ORDER as to Joseph Vincent Jenkins: Jury Trial set for 7/8/2013 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Final Pretrial Conference set for 7/1/2013 at 11:00 AM in Syracuse before Judge Glenn T. Suddaby. All Pretrial Submissions, including motions in limine, due by 6/17/2013. Responses to motions in limine due by 6/24/13. Signed by Judge Glenn T. Suddaby on 5/29/13. (lmw) (Copy served upon pro se defendant via regular mail) | | |
| 72 R | *Filed & Entered:* | 05/31/2013 | Status Report |
| | *Docket Text:* STATUS REPORT *re: discovery as of 5/29/13* by USA as to Joseph Vincent Jenkins (Carroll, Gwendolyn) | | |
| 73 R | *Filed & Entered:* | 06/04/2013 | Status Report |
| | *Docket Text:* STATUS REPORT *on Delivery of the File* by Joseph Vincent Jenkins (Parry, Jeffrey) | | |
| | *Filed & Entered:* | 06/05/2013 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Due to a conflict with the Court's calendar, the Final Pretrial Conference is RESCHEDULED for 6/27/2013 at 12:00 PM in Syracuse before Judge Glenn T. Suddaby. (lmw) (Copy served upon pro se defendant via regular mail) | | |
| 74 R | *Filed & Entered:* | 06/05/2013 | Motion for Discovery |
| | *Terminated:* | 06/11/2013 | |
| | *Docket Text:* Letter Motion from Defendant Joseph Vincent Jenkins requesting Reconsideration of his #[67] submission and the Court's [68] Order and for a continuance of the trial date. (amt) Modified on 6/11/2013 (lmw). | | |
| 75 | *Filed & Entered:* | 06/10/2013 | Letter Request |
| | *Docket Text:* Letter Response from Government as to Joseph Vincent Jenkins Opposing Defendant's Request for Discovery/Continuance (Attachments: # (1) Exhibit(s) Discovery Bates Stamped 234-265)(Carroll, Gwendolyn) | | |
| | *Filed & Entered:* | 06/11/2013 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Hearing re Pro Se Status and Defendant's motion for continuance set for 6/13/2013 at 1:00 PM in Syracuse before Judge Glenn T. Suddaby. (lmw)(Copy served upon pro se defendant via regular mail) | | |
| 76 | *Filed & Entered:* | 06/11/2013 | Motion to Continue |

| | | |
|---|---|---|
| | *Terminated:* 06/14/2013 | |
| | *Docket Text:* Letter Motion from Deft Joseph Vincent Jenkins stating he would like a third party to review the file given to him from Atty Parry before he accepts it and for a continuance of the trial date. (amt) Modified on 6/11/2013 (lmw). | |
| 77 Ⓡ | *Filed & Entered:* 06/11/2013 | Order on Motion for Discovery |
| | *Docket Text:* DECISION & ORDER denying #[74] Motion for Discovery and for continuance of trial date as to Joseph Vincent Jenkins (1). Signed by Judge Glenn T. Suddaby on 6/11/13. (lmw) (Copy served upon pro se defendant via regular mail) | |
| 78 Ⓡ | *Filed & Entered:* 06/11/2013 | Status Report |
| | *Docket Text:* STATUS REPORT *receipts for file* by Joseph Vincent Jenkins (Parry, Jeffrey) | |
| 79 | *Filed & Entered:* 06/12/2013 | Transcript Request |
| | *Docket Text:* TRANSCRIPT REQUEST *of Faretta Hearing* by USA as to Joseph Vincent Jenkins for proceedings held on May 29, 2013 before Judge Glenn T. Suddaby. (Thomson, Tamara) | |
| 80 | *Filed & Entered:* 06/12/2013 | Transcript Request |
| | *Docket Text:* TRANSCRIPT REQUEST *of Initial Appearance* by USA as to Joseph Vincent Jenkins for proceedings held on October 4, 2011 before Judge Andrew T. Baxter. (Thomson, Tamara) | |
| | *Filed & Entered:* 06/13/2013 | Pro Se (Faretta) Hearing |
| | *Docket Text:* TEXT Minute Entry for Hearing re Pro Se Status and Defendant's motion for continuance held on 6/13/13 before Judge Glenn T. Suddaby as to Joseph Vincent Jenkins: Judge advises defendant that he needs to advise this Court immediately if he is going to hire an attorney or he is going to trial on July 8, 2013. Defendant requests additional time. Defendant moves for a continuance. Government consents. Defendant and Government sign stipulation for enlargement of time. Court will provide Defendant with a list of attorneys and will contact Bill Sullivan to see if he will go see defendant again. Defendant strongly advised to locate an attorney immediately. Defendant to provide status report by 7/15/13 with regard to hiring an attorney. APP: Tamara Thomson, AUSA; Joseph Vincent Jenkins, Defendant Pro se. CRD: L. Welch. (Court Reporter: Diane Martens) (lmw) | |
| 81 Ⓡ | *Filed & Entered:* 06/13/2013 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Initial Appearance held on October 4, 2011 before Magistrate Judge Andrew T. Baxter, Court Reporter/Transcriber: Theresa J. Casal,Telephone number: 518.257.1897. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/5/2013. Redacted Transcript Deadline set for 7/15/2013. Release of Transcript Restriction set for 9/11/2013. Notice of Intent to Redact due by 6/18/2013 (tjc, ) | |
| 82 | *Filed & Entered:* 06/13/2013 | Order to Continue - Ends of Justice |

|   |   |   |   |
|---|---|---|---|
| | *Docket Text:* ORDER TO CONTINUE - Ends of Justice as to Joseph Vincent Jenkins: Time excluded from 6/13/13 until 9/11/13. Change of plea deadline on or before 9/9/13. All pretrial submissions due by 9/16/13. Jury Trial set for 10/7/2013 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Signed by Judge Glenn T. Suddaby on 6/13/13. (lmw)(Copy served upon pro se defendant via regular mail) | | |
| 83 | *Filed & Entered:* | 06/14/2013 | Certificate of Service |
| | *Docket Text:* Certificate of Service by USA as to Joseph Vincent Jenkins re [80] Transcript Request, [79] Transcript Request (Thomson, Tamara) | | |
| 84 | *Filed & Entered:* | 06/14/2013 | Order on Motion to Continue |
| | *Docket Text:* TEXT ORDER denying #[76] Defendant's motion requesting that a 3rd party review the contents of Mr. Parry's file and itemize its contents for the defendant before he will take possession of the file. Defendant's request for a continuance was granted at the hearing on 6/13/13, and trial has been rescheduled for 10/7/13. Authorized by Judge Glenn T. Suddaby on 6/14/13. (lmw)(Copy served upon pro se defendant via regular mail) | | |
| 85 Ⓡ | *Filed & Entered:* | 06/14/2013 | Notice (Other) |
| | *Docket Text:* TEXT NOTICE: A list of CJA attorneys admitted to practice in the Northern District of New York, Syracuse Division, is attached and provided to pro se defendant for purposes of locating an attorney. Defendant's new attorney is directed to file a notice of attorney appearance. Defendant is directed to provide the Court with a status report by 7/15/13 if he has not located an attorney by that date. (lmw)(Copy served upon pro se defendant via regular mail) | | |
| 86 Ⓡ | *Filed & Entered:*<br>*Terminated:* | 06/14/2013<br>08/07/2013 | Motion for Miscellaneous Relief |
| | *Docket Text:* MOTION for Dismissal of Indictment and Suppression of Foreign Evidence by Joseph Vincent Jenkins. (mgh) | | |
| 87 Ⓡ | *Filed & Entered:* | 06/18/2013 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Faretta Hearing held on 5/29/2013 before Judge Suddaby, Court Reporter/Transcriber: Eileen McDonough,Telephone number: 315-234-8546. IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS: In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/9/2013. Redacted Transcript Deadline set for 7/19/2013. Release of Transcript Restriction set for 9/16/2013. Notice of Intent to Redact due by 6/24/2013 (etm, ) | | |
| 88 Ⓡ | *Filed & Entered:* | 06/20/2013 | Letter Request |
| | *Docket Text:* Letter from Defendant Joseph Vincent Jenkins in response to the Govt's [75] Letter. (amt) | | |
| 89 | *Filed & Entered:* | 06/27/2013 | Order |
| | *Docket Text:* TEXT ORDER granting the Government until THIRTY (30) DAYS from the date of this Text Order in which to file a response to Defendant's Third Motion to dismiss the Indictment | | |

and suppress evidence (Dkt. No. [86]), in order to oppose that motion on grounds other than untimeliness. Defendant is advised that his current motion to dismiss is his third such motion, his first two motions to dismiss having been filed on April 2, 2013, and May 15, 2013 (Dkt. Nos. [57], [67]) and his first two motions to suppress having been filed on July 9, 2012 and October 19, 2012 (Dkt. Nos. [25] and [41]). The deadline for such motions expired on July 9, 2012. (Dkt. No. [12], [15], [20], [22].) Defendant was sua sponte granted an extensions of that deadline out of special solicitude to him as a pro se litigant. The extension of that deadline ended on May 21, 2013, when the Court denied Defendant's first two motions to dismiss with prejudice. (Dkt. No. 68) No further such motions to dismiss will be permitted. Authorized by Judge Glenn T. Suddaby on 6/27/13. (lmw)

| | | | |
|---|---|---|---|
| 90 R | *Filed & Entered:* | 07/01/2013 | Letter Request |
| | *Docket Text:* Letter from Defendant Joseph Vincent Jenkins dd 6/26/2013 requesting an immediate hearing for dismissal of all charges. (amt) | | |
| 91 | *Filed & Entered:* | 07/10/2013 | Order |
| | *Docket Text:* TEXT ORDER liberally construing #[90] Defendant's "request[] [for] an immediate hearing for [the] dismissal of all charges" as a supplement to #[86] Defendant's pending motion to dismiss. Because the envelope enclosing Defendant's submission is date-stamped 6/28/13, the Court assumes that he mailed it before receiving the Court's Text Order of 6/27/13. No further supplements or motions to dismiss will be permitted by Defendant. The Government may respond to this supplement when it files its opposition to Defendant's pending motion to dismiss. Authorized by Judge Glenn T. Suddaby on 7/10/13. (lmw) (Copy served upon pro se defendant via regular mail) | | |
| 92 R | *Filed & Entered:*<br>*Terminated:* | 07/12/2013<br>08/07/2013 | Motion for Miscellaneous Relief |
| | *Docket Text:* MOTION for an independent review of the current case by Joseph Vincent Jenkins. (amt) | | |
| 93 R | *Filed:*<br>*Entered:*<br>*Terminated:* | 07/18/2013<br>07/19/2013<br>08/07/2013 | Motion for Return of Property/PostTrial |
| | *Docket Text:* MOTION for Return of Seized Items by Joseph Vincent Jenkins. (amt) | | |
| 94 | *Filed & Entered:* | 07/29/2013 | Response in Opposition |
| | *Docket Text:* RESPONSE in Opposition by USA as to Joseph Vincent Jenkins re [86] MOTION Dismissal of Indictment and Suppression of Foreign Evidence, [93] MOTION for Return of Property/PostTrial *and Response to [90] Supplement to [86]* (Attachments: # (1) Exhibit(s) A: US-Canada MLAT, # (2) Exhibit(s) B: Custody Receipt)(Carroll, Gwendolyn) | | |
| 95 | *Filed & Entered:* | 07/30/2013 | Certificate of Service |
| | *Docket Text:* Certificate of Service by USA as to Joseph Vincent Jenkins re [94] Response in Opposition, (Carroll, Gwendolyn) | | |
| 96 R | *Filed & Entered:* | 08/05/2013 | Status Report |
| | *Docket Text:* STATUS REPORT by Joseph Vincent Jenkins (amt) | | |
| 97 | *Filed & Entered:* | 08/06/2013 | Certificate of Service |
| | *Docket Text:* Certificate of Service by USA as to Joseph Vincent Jenkins re [94] Response in Opposition, *Amended* (Carroll, Gwendolyn) | | |
| 98 R | *Filed & Entered:* | 08/06/2013 | Status Report |

| | | |
|---|---|---|
| | | *Docket Text:* STATUS REPORT by Joseph Vincent Jenkins (amt) |
| 99 Ⓡ | *Filed & Entered:* 08/07/2013 | ~~Order on Motion for Miscellaneous Relief~~ |
| | | *Docket Text:* DECISION & ORDER denying #[86] and #[90] Defendant's third motion to dismiss Indictment and suppress foreign evidence; denying #[92] Defendant's motion for an independent review of the current case; and denying [93] Defendant's Motion for the return of seized items. Signed by Judge Glenn T. Suddaby on 8/7/13. (lmw) (Copy served upon pro se defendant via regular mail) |
| 100 Ⓡ | *Filed & Entered:* 08/07/2013 | Order |
| | | *Docket Text:* DECISION & ORDER as to Joseph Vincent Jenkins committing Defendant to the custody of the U.S. Attorney General for a psychiatric or psychological examination to determine the Defendant's current mental competency pursuant to 18 USC 4142 and 4247. Signed by Judge Glenn T. Suddaby on 8/7/13. (lmw) (Copy served upon Pro Se Defendant via regular mail) |
| 101 | *Filed & Entered:* 08/14/2013 *Terminated:* 12/17/2013 | Notice of Appeal - Interlocutory |
| | | *Docket Text:* NOTICE OF APPEAL (Interlocutory) & EMERGENCY MOTION TO STAY the # [100] Decision & Order pending the Appeal, filed by Joseph Vincent Jenkins, Pro Se appealing the Court's # [99] DECISION AND ORDER. (amt) Modified on 8/15/2013 to add wording about the Emergency Motion. (jmb) |
| 102 | *Filed & Entered:* 08/14/2013 | Electronic Notice and Certification to USCA of Appeal |
| | | *Docket Text:* ELECTRONIC NOTICE AND CERTIFICATION as to Joseph Vincent Jenkins sent to US Court of Appeals re: Deft Jenkins' [101] Notice of Appeal - Interlocutory (amt) [Deft served via reg. mail] |
| 103 | *Filed & Entered:* 08/15/2013 | Supplemental Electronic Certification Sent to USCA |
| | | *Docket Text:* Supplemental Electronic Certification Sent to USCA as to Joseph Vincent Jenkins regarding the # [101] Notice of Interlocutory Appeal, that is appealing the # [99] Decision & Order. The Clerk updates the fee status to DUE, pursuant to the # [54] CJA 7 Order, defendant no longer has CJA Counsel and the fee of $455.00 remains due. The Clerk notes that attached to the appeal is an Emergency Motion to Stay the # [100] Decision & Order pending the Appeal, submitted to the Second Circuit. {Copy mailed to defendant by regular mail} (jmb) |
| 104 | *Filed & Entered:* 08/28/2013 | Notice (Other) |
| | | *Docket Text:* NOTICE by Joseph Vincent Jenkins advising he is not requesting a transcript and advising the filing fee re: [101] Notice of Appeal is being sent by family. (amt) |
| | *Filed:* 08/30/2013 *Entered:* 09/03/2013 | USCA Appeal Fees |
| | | *Docket Text:* USCA Appeal Fees received $ 455, receipt number SYR036435 as to Joseph Vincent Jenkins regarding the # [101] Notice of Appeal - Interlocutory. (nmk) |
| 105 | *Filed & Entered:* 09/03/2013 | Supplemental Electronic Certification Sent to USCA |
| | | *Docket Text:* Second Supplemental Electronic Certification Sent to USCA as to Joseph Vincent Jenkins regarding the # [101] Notice of Appeal - Interlocutory. The Clerk updates the fee status to PAID, as the appeal filing fee of $455.00 was paid on 8/30/2013, receipt number SYR036435. [Copy served upon pro se defendant via regular mail.] (nmk) |
| | *Filed & Entered:* 09/09/2013 | USCA Case Number |
| | | *Docket Text:* USCA Case Number is 13-3067 for [101] Interlocutory Appeal filed by Joseph Vincent Jenkins. (cbm ) |

| 106 | Filed & Entered: | 09/16/2013 | Mail Returned |
|---|---|---|---|
| | Docket Text: Mail Returned as Undeliverable. Copy of the Court's [105] Supplemental Electronic Certification sent to Joseph Jenkins at Cayuga County Jail (amt) ||||
| 107 | Filed & Entered: | 10/08/2013 | Sealed Document |
| | Docket Text: SEALED DOCUMENT - maintained in Clerk's Office and not available for electronic viewing. (lmw) (Copy served upon defendant via regular mail at MDC Brooklyn & Albany County Jail) ||||
| 108 | Filed & Entered: | 10/08/2013 | Order |
| | Docket Text: TEXT ORDER excluding time under the Speedy Trial Act as to Joseph Vincent Jenkins (1): Time excluded from 8/7/13 until 10/8/13 pursuant to 18 USC 3161(h)(1)(A). Change of plea deadline to be entered by 10/14/13; Pretrial submissions, including motions in limine, as set forth in the #[12] Criminal Pretrial Scheduling order due by 10/21/13. Jury Trial set for 11/4/13 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Authorized by Judge Glenn T. Suddaby on 10/8/13. (lmw)(Copy served upon defendant via regular mail at MDC Brooklyn & Albany County Jail) ||||
| 109 | Filed & Entered: | 10/09/2013 | Order |
| | Docket Text: TEXT ORDER as to Joseph Vincent Jenkins: After carefully reviewing the written results of Defendant's competency examination (Dkt. No. [107]), the Court finds that reasonable cause no longer exists to believe that Defendant may be presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, for purposes of 18 U.S.C. § 4241(a). As a result, the competency hearing referenced in the Court's Decision and Order of August 7, 2013 (Dkt. No. [100]), is canceled. See U.S. v. Humphrey, 493 F. App'x 564, 566 (5th Cir. 2012); U.S. v. White, 04-CR-4113, 2009 WL 500606, at *2 (N.D. Iowa Feb. 26, 2009). Signed by Judge Glenn T. Suddaby on 10/9/13. (lmw) (Copy served upon pro se defendant via regular mail at Albany County Jail) ||||
| | Filed & Entered: | 10/10/2013 | Notice of Hearing on Motion |
| | Docket Text: TEXT NOTICE OF HEARING ON #[110] Government's MOTION for Discovery Reciprocal : Defendant is directed to file a response to the Government's Motion due by 10/25/2013. (lmw)(Copy served upon defendant via regular mail at Albany County Jail) ||||
| 110 | Filed & Entered: 10/10/2013<br>Terminated: 11/15/2013 | | Motion for Discovery |
| | Docket Text: MOTION for Discovery Reciprocal by USA as to Joseph Vincent Jenkins. (Attachments: # (1) Exhibit(s), # (2) Exhibit(s))(Thomson, Tamara) ||||
| 111 | Filed & Entered: | 10/15/2013 | Notice of Attorney Appearance - Defendant |
| | Docket Text: NOTICE OF ATTORNEY APPEARANCE: Aaron M. Goldsmith appearing for Joseph Vincent Jenkins (Goldsmith, Aaron) ||||
| 112 | Filed & Entered: | 10/23/2013 | Mail Returned |
| | Docket Text: Mail Returned as Undeliverable. Copies of the Court' s [108] Text Order and [107] Sealed Document sent to Joseph Jenkins. Address sent to MDC Brooklyn (amt) ||||
| 113 | Filed & Entered: | 10/28/2013 | Stipulation |
| | Docket Text: STIPULATION by USA (Thomson, Tamara) ||||
| 114 | Filed & Entered: | 10/29/2013 | Order to Continue - Ends of Justice |

| | | |
|---|---|---|
| | *Docket Text:* ORDER TO CONTINUE - Ends of Justice as to Joseph Vincent Jenkins: Time excluded from 10/29/13 until 1/26/14. Any change of plea shall be entered by 1/6/14. All pretrial submissions as set forth in the #[12] criminal pretrial scheduling order are due by 1/13/14. Jury Trial set for 2/3/2014 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Signed by Judge Glenn T. Suddaby on 10/29/13. (lmw) | |
| 115 | *Filed & Entered:*    10/29/2013 | Order |
| | *Docket Text:* AMENDED TRIAL ORDER as to Joseph Vincent Jenkins: Jury Trial set for 2/3/2014 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Final Pretrial Conference set for 1/24/2014 at 11:00 AM in Syracuse before Judge Glenn T. Suddaby. Pretrial Submissions, including motions in limine, due by 1/13/2014. Responses to motions in limine due by 1/20/14. Signed by Judge Glenn T. Suddaby on 11/29/13. (lmw) | |
| | *Filed & Entered:*    11/08/2013 | Notice of Hearing on Motion |
| | *Docket Text:* TEXT NOTICE OF HEARING ON #[116] MOTION to Suppress filed by Joseph Vincent Jenkins : Motion Hearing set for 12/12/2013 on submit before Judge Glenn T. Suddaby. No personal appearance. Response to Motion due by 11/25/2013. Reply to Response to Motion due by 12/2/2013. Upon receipt and review of the response/repy papers, should the Court determine a suppression hearing is necessary, the Court will *sua sponte* schedule a hearing at that time. (lmw) | |
| 116 | *Filed & Entered:*    11/08/2013<br>*Terminated:*    12/12/2013 | Motion to Suppress |
| | *Docket Text:* MOTION to Suppress by Joseph Vincent Jenkins. (Attachments: # (1) Supporting Documents)(Goldsmith, Aaron) | |
| 117 **R** | *Filed & Entered:*    11/15/2013 | Letter Request |
| | *Docket Text:* Letter from Tamara B. Thomson as to Joseph Vincent Jenkins requesting to withdraw the government's motion for reciprocal discovery (Thomson, Tamara) | |
| 118 | *Filed & Entered:*    11/15/2013 | Order on Motion for Discovery |
| | *Docket Text:* TEXT ORDER granting #[117] Government's letter request withdrawing its #[110] motion for reciprocal discovery as the issue has been resolved. Authorized by Judge Glenn T. Suddaby on 11/15/13. (lmw) | |
| 119 **R** | *Filed & Entered:*    11/24/2013 | Response in Opposition |
| | *Docket Text:* RESPONSE in Opposition by USA as to Joseph Vincent Jenkins re [116] MOTION to Suppress (Carroll, Gwendolyn) | |
| 120 **R** | *Filed & Entered:*    12/12/2013 | Order on Motion to Suppress |
| | *Docket Text:* DECISION & ORDER denying #[116] Defendant's Second Motion to Suppress evidence seized by Canadian officers from his laptop computer and thumb drive on May 24, 2009 at a secondary inspection area at the United States-Canadian border. Signed by Judge Glenn T. Suddaby on 12/12/13. (lmw) | |
| 121 | *Filed & Entered:*    12/17/2013 | USCA Mandate |
| | *Docket Text:* MANDATE of USCA, issued 12/12/13, dismissing Joseph Vincent Jenkins' pro se [101] interlocutory Appeal. (cbm ) | |
| 122 **R** | *Filed & Entered:*    01/12/2014 | Letter Request |
| | *Docket Text:* Letter from Aaron M. Goldsmith as to Joseph Vincent Jenkins requesting Movement of Defendant and One Day Adjournment (Goldsmith, Aaron) | |
| 123 | *Filed & Entered:*    01/13/2014 | Order |

| | | |
|---|---|---|
| | *Docket Text:* TEXT ORDER granting in part and denying in part #[122] Letter Request filed by Joseph Vincent Jenkins in that defendant's request to adjourn the trial date one day is denied given the Court's schedule and Defendant's request to be housed closer to Syracuse for the duration of trial is granted. The Court has put a request into the Marshal that defendant be housed as close to Syracuse as possible for the duration of the trial. Authorized by Judge Glenn T. Suddaby on 1/13/14. (lmw) | |
| 124 R | *Filed & Entered:*   01/13/2014 | Proposed Jury Instructions |
| | *Docket Text:* Proposed Jury Instructions by USA as to Joseph Vincent Jenkins (Carroll, Gwendolyn) | |
| 125 | *Filed & Entered:*   01/13/2014 | Court Ordered Questionnaire |
| | *Docket Text:* Court Ordered Questionnaire as to Joseph Vincent Jenkins (Thomson, Tamara) | |
| 126 R | *Filed & Entered:*   01/13/2014 | Proposed Jury Instructions |
| | *Docket Text:* Proposed Jury Instructions by USA as to Joseph Vincent Jenkins (Thomson, Tamara) | |
| 127 R | *Filed & Entered:*   01/13/2014 | Proposed Verdict Form |
| | *Docket Text:* PROPOSED VERDICT FORM by USA as to Joseph Vincent Jenkins (Thomson, Tamara) | |
| 128 | *Filed & Entered:*   01/13/2014 | Witness List |
| | *Docket Text:* WITNESS LIST by USA as to Joseph Vincent Jenkins (Attachments: # (1) Certificate of Service)(Thomson, Tamara) | |
| 129 | *Filed & Entered:*   01/13/2014 | Exhibit List |
| | *Docket Text:* EXHIBIT LIST by USA as to Joseph Vincent Jenkins (Attachments: # (1) Certificate of Service)(Thomson, Tamara) | |
| 130 R | *Filed & Entered:*   01/13/2014 | Proposed Verdict Form |
| | *Docket Text:* PROPOSED VERDICT FORM by USA as to Joseph Vincent Jenkins (Thomson, Tamara) | |
| 131 | *Filed & Entered:*   01/13/2014 | Proposed Voir Dire |
| | *Docket Text:* Proposed Voir Dire by USA as to Joseph Vincent Jenkins (Attachments: # (1) Certificate of Service)(Thomson, Tamara) | |
| 132 R | *Filed & Entered:*   01/13/2014 | Trial Brief |
| | *Docket Text:* TRIAL BRIEF by USA as to Joseph Vincent Jenkins (Attachments: # (1) Exhibit(s)) (Thomson, Tamara) | |
| 133 | *Filed & Entered:*   01/13/2014 | Court Ordered Questionnaire |
| | *Docket Text:* Court Ordered Questionnaire as to Joseph Vincent Jenkins (Goldsmith, Aaron) | |
| 134 R | *Filed & Entered:*   01/13/2014 | Proposed Jury Instructions |
| | *Docket Text:* Proposed Jury Instructions by Joseph Vincent Jenkins (Goldsmith, Aaron) | |
| 135 R | *Filed & Entered:*   01/13/2014 | Exhibit List |
| | *Docket Text:* EXHIBIT LIST by Joseph Vincent Jenkins (Goldsmith, Aaron) | |
| 136 | *Filed & Entered:*   01/13/2014 | Witness List |
| | *Docket Text:* WITNESS LIST by Joseph Vincent Jenkins (Goldsmith, Aaron) | |
| 137 R | *Filed & Entered:*   01/13/2014 | Proposed Verdict Form |
| | *Docket Text:* PROPOSED VERDICT FORM by Joseph Vincent Jenkins (Goldsmith, Aaron) | |

| 138 R | Filed & Entered: | 01/13/2014 | Proposed Voir Dire |
|---|---|---|---|
| | Docket Text: Proposed Voir Dire by Joseph Vincent Jenkins (Goldsmith, Aaron) | | |
| 139 R | Filed & Entered: | 01/13/2014 | Letter Request |
| | Docket Text: Letter from Aaron M. Goldsmith as to Joseph Vincent Jenkins requesting Clarification on need for Defense to file a Trial Brief (Goldsmith, Aaron) | | |
| 140 | Filed & Entered: | 01/14/2014 | Order |
| | Docket Text: TEXT ORDER in response to #[139] Letter Request filed by Joseph Vincent Jenkins: defendant is not required to file a trial brief. Given that the Government has filed a trial brief, in the event that defendant wishes to file a trial brief, he may do so by 5:00 pm on 1/16/14. Authorized by Judge Glenn T. Suddaby on 1/14/14. (lmw) | | |
| | Filed & Entered: | 01/15/2014 | Notice of Hearing |
| | Docket Text: TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Due to a conflict with the Court's calendar, Final Pretrial Conference is RESCHEDULED for 1/21/2014 at 11:00 AM in Syracuse before Judge Glenn T. Suddaby. Given that no motions in limine have been filed, if defense counsel would prefer to participate via telephone conference, he may do so by advising Chambers no later than 1/17/14.(lmw) | | |
| 141 R | Filed & Entered: | 01/15/2014 | Letter Request |
| | Docket Text: Letter from Aaron M. Goldsmith as to Joseph Vincent Jenkins requesting to Appear Telephonically (Goldsmith, Aaron) | | |
| 142 | Filed & Entered: | 01/16/2014 | Order |
| | Docket Text: TEXT ORDER granting #[141] Defense counsel's Letter Request to appear at the final pretrial conference on 1/21/14 at 11:00 a.m. via telephone conference. Counsel is directed to contact chambers at (315) 234-8580 at the time of the conference. Signed by Judge Glenn T. Suddaby on 1/16/14. (lmw) | | |
| 143 R | Filed & Entered: | 01/20/2014 | Letter Request |
| | Docket Text: Letter from Aaron M. Goldsmith as to Joseph Vincent Jenkins requesting a So-Ordered Subpoena (Goldsmith, Aaron) | | |
| | Filed & Entered: | 01/21/2014 | Pretrial Conference |
| | Docket Text: TEXT Minute Entry for Final Pretrial Conference held on 1/21/2014 before Judge Glenn T. Suddaby as to Joseph Vincent Jenkins: Judge confirms final discovery has been exchanged. Government anticipates 17 witnesses with approximately 4 days of testimony. Defense anticipates 2-3 witnesses with 1/2 day of testimony. Judge discusses other issues that may arise at trial. Judge discusses voir dire and trial schedule. APP: Tamara Thomson, AUSA and Gwen Carroll, AUSA; Aaron Goldsmith, Esq. for Defendant (Via telephone). CRD: L. Welch. (Court Reporter: Jodi Hibbard) (lmw) | | |
| 144 | Filed & Entered: | 01/21/2014 | Order |
| | Docket Text: TEXT ORDER denying #[143] Letter Request filed by Joseph Vincent Jenkins for a subpoena for a witness in Canada as a subpoena to command a witness in Canada would be unenforceable in this manner. Authorized by Judge Glenn T. Suddaby on 1/21/14. (lmw) | | |
| 145 | Filed & Entered: | 01/31/2014 | Witness List |
| | Docket Text: WITNESS LIST by USA as to Joseph Vincent Jenkins (Attachments: # (1) Certificate of Service)(Thomson, Tamara) | | |
| 146 R | Filed & Entered: | 02/02/2014 | Exhibit List |

| | | *Docket Text:* EXHIBIT LIST by USA as to Joseph Vincent Jenkins (Carroll, Gwendolyn) |
|---|---|---|
| [147] **R** | *Filed & Entered:* 02/03/2014 | Jury Trial |
| | *Docket Text:* Minute Entry for Day 1 of Jury Trial held on 2/3/2014 Judge Glenn T. Suddaby as to Joseph Vincent Jenkins: Judge makes introductory remarks. Jury panel is sworn. Judge conducts voir dire of potential jurors. Jury is selected and sworn. Judge gives preliminary charges. Opening Statements by Ms. Thomson and Mr. Goldsmith. Court in recess until 9:00 am on 2/4/14. APP: Tamara Thomson, AUSA and Gwendolyn Carroll, AUSA; Aaron Goldsmith, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Jodi Hibbard) (lmw) | |
| [148] **R** | *Filed & Entered:* 02/04/2014 | Jury Trial |
| | *Docket Text:* Minute Entry for Day 2 of Jury Trial held on 2/4/2014 before Judge Glenn T. Suddaby as to Joseph Vincent Jenkins: Government witnesses: Pedro Sousa-Dias, Melany Boyd, Tristan Garrah, Glen Hache, Jarret Johnston, Marie-Josee Vinette, Laurie Sheridan, Jeff Olear, Michel Boulay, Paul Thompson, Kip Wohlert, Chad Willard and Brian Braisted. APP: Tamara Thomson, AUSA & Gwendolyn Carroll, AUSA; Aaron Goldsmith, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Jodi Hibbard) (lmw) | |
| [149] **R** | *Filed:* 02/05/2014<br>*Entered:* 02/06/2014 | Jury Trial |
| | *Docket Text:* Minute Entry for Day 3 of Jury Trial held on 2/5/2014 before Judge Glenn T. Suddaby as to Joseph Vincent Jenkins: Government witnesses: Brian Braisted, Chad Willard, Joshua Findley, Chris McClellan, Justin Myers, and Michael Wojeski. Defendant moves to dismiss. Motion denied. Defendant's Witness: Joseph Jenkins. Jury excused for day. Charge conference with counsel. Court in recess until 9:00 am on February 6, 2014. APP: Tamara Thomson, AUSA and Gwen Carroll, AUSA; Aaron Goldsmith, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Jodi Hibbard) (lmw) | |
| [150] **R** | *Filed & Entered:* 02/06/2014 | Jury Trial |
| | *Docket Text:* Minute Entry for Day 4 of Jury Trial held on 2/6/2014 before Judge Glenn T. Suddaby as to Joseph Vincent Jenkins: Government's rebuttal witness: Chad Willard. Closing arguments by Ms. Carroll and Mr. Goldsmith. Judge reads jury instructions and review special verdict sheet. Courtroom Security Officers are sworn. Jury retires for deliberation. Jury returns a verdict of guilty as to Counts 1 and 2 of the Indictment. Jury polled. Government Witness with regard to forfeiture: Chad Willard. Closing arguments by Ms. Carroll. Judge reads jury charges as to forfeiture allegations. Jury retires for deliberation. Jury returns and finds the laptop and thumb drives were used to commit or promote the commission of the offenses charged in the indictment. Jury polled. Exhibits returned to counsel. Judge orders presentence report. Sentencing set for 6/17/14 at 10:00 am in Syracuse. Judge advises attorneys of deadlines to file post-trial motions and appeal rights. APP: Tamara Thomson, AUSA and Gwendolyn Carroll, AUSA; Aaron Goldsmith, Esq. CRD: L. Welch (Court Reporter: Jodi Hibbard) (lmw) Modified on 4/2/2014 to correct sentencing date to 6/17/15 (lmw). | |
| [151] **R** | *Filed & Entered:* 02/06/2014 | Jury Verdict |
| | *Docket Text:* JURY VERDICT as to Joseph Vincent Jenkins (1): Guilty on Counts 1 and 2 of the Indictment. (lmw) | |
| [152] **R** | *Filed & Entered:* 02/06/2014 | Exhibit List |
| | *Docket Text:* GOVERNMENT EXHIBIT LIST completed at trial. (lmw) | |
| [153] **R** | *Filed & Entered:* 02/06/2014 | Proposed Jury Instructions |
| | *Docket Text:* Jury Instructions as to Joseph Vincent Jenkins.(lmw) | |

| 154 Ⓡ | *Filed & Entered:* | 02/06/2014 | Jury Verdict on Forfeiture |
|---|---|---|---|
| | *Docket Text:* JURY VERDICT on Forfeiture as to Joseph Vincent Jenkins. (lmw) | | |
| 155 Ⓡ | *Filed & Entered:* | 02/06/2014 | Proposed Jury Instructions |
| | *Docket Text:* Jury Instructions as to forfeiture. (lmw) | | |
| 156 Ⓡ | *Filed & Entered:* | 02/06/2014 | Guideline Order |
| | *Docket Text:* GUIDELINE ORDER as to Joseph Vincent Jenkins: Sentencing set for 6/17/2014 at 10:00 AM in Syracuse before Judge Glenn T. Suddaby. Government Sentencing Memo Deadline 5/27/2014. Defendant Sentencing Memo Deadline 5/27/2014. Signed by Judge Glenn T. Suddaby on 2/6/14. (lmw) | | |
| 157 | *Filed & Entered:* | 03/25/2014 | Transcript Request |
| | *Docket Text:* TRANSCRIPT REQUEST by Joseph Vincent Jenkins for proceedings held on multiple dates before Judge Glenn T. Suddaby. (tab) | | |
| 158 | *Filed & Entered:* | 04/11/2014 | Presentence Investigation Report - Initial Disclosure [LODGED] |
| | *Docket Text:* PRESENTENCE INVESTIGATION REPORT - INITIAL DISCLOSURE [LODGED] as to Joseph Vincent Jenkins. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.**[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (dct, ) | | |
| 159 | *Filed & Entered:* | 04/29/2014 | Order |
| | *Docket Text:* TEXT ORDER as to Joseph Vincent Jenkins : Exhibit C to the Supplemental Brief filed by the USA (CD of recorded jail calls), Dkt. No. 46, was traditionally filed with the court on 10/23/2012. This CD is now being returned to the filing party, Gwendolyn Carroll, AUSA, as it is no longer necessary for the Clerk's Office to maintain this traditionally filed exhibit. Authorized by Chief Judge Gary L. Sharpe on 4/29/14. (Served Gwendolyn Carroll, AUSA w/ Exhibit C, Dkt. No. 46). (sal, ) | | |
| 160 | *Filed & Entered:* | 05/21/2014 | Presentence Investigation Report - Final Disclosure [LODGED] |
| | *Docket Text:* PRESENTENCE INVESTIGATION REPORT - FINAL DISCLOSURE [LODGED] as to Joseph Vincent Jenkins. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (dct, ) | | |
| 161 Ⓡ | *Filed & Entered:* | 05/26/2014 | Motion to Withdraw as Attorney |
| | *Terminated:* | 05/28/2014 | |
| | *Docket Text:* MOTION to Withdraw as Attorney by Aaron M. Goldsmith. by Joseph Vincent Jenkins. (Goldsmith, Aaron) | | |
| 162 | *Filed & Entered:* | 05/27/2014 | Letter Request |
| | *Docket Text:* Letter from Geoffrey J. L. Brown as to Joseph Vincent Jenkins requesting that the proposed Preliminary Order of Forfeiture be signed, and filed, with an electronically certified copy returned. (Attachments: # (1) Proposed Order/Judgment)(Brown, Geoffrey) | | |

| | | |
|---|---|---|
| | *Filed & Entered:* 05/28/2014 | Set/Reset Hearings |
| | *Docket Text:* Set/Reset Hearings as to Joseph Vincent Jenkins: Hearing re Pro Se Status set for 5/30/2014 at 1:00 PM in Syracuse before Magistrate Judge David E. Peebles. (lmw) | |
| 163 | *Filed & Entered:* 05/28/2014 | Order on Motion to Withdraw as Attorney |
| | *Docket Text:* TEXT ORDER granting #[161] Motion to Withdraw as Attorney. Aaron M. Goldsmith withdrawn from case as to Joseph Vincent Jenkins (1). Defense counsel is directed to serve a copy of this text order upon Defendant. Authorized by Judge Glenn T. Suddaby on 5/28/14. (lmw) | |
| | *Filed & Entered:* 05/30/2014 | Pro Se (Faretta) Hearing |
| | *Docket Text:* TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Hearing re Pro Se Status as to Joseph Vincent Jenkins held on 5/30/2014. After a lengthy discussion with the parties, defendant Jenkins agrees to have the court appoint the OFPD as counsel to represent him in this matter, as well as in the 14-CR-88 action. In the interests of justice, Judge Peebles appoints the OFPD as counsel in this action, as well as 14-CR-88. A scheduling order will be issued in 5:14-CR-88. With respect to this action, 11-CR-602, the sentencing date is scheduled for 7/31/2014 at 10:30 AM in Syracuse before District Judge Suddaby and the sentencing memorandum is due by 7/10/2014. APP: Tamara Thomson, AUSA and Gwendolyn Carroll, AUSA. Time: 1:04 PM - 1:15 PM. (Court Reporter Jodi Hibbard). (sal, ) | |
| 164 **R** | *Filed & Entered:* 05/30/2014 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Final Pretrial Conference held on 1/21/2014 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/20/2014. Redacted Transcript Deadline set for 6/30/2014. Release of Transcript Restriction set for 8/28/2014. Notice of Intent to Redact due by 6/4/2014 (jlh, ) | |
| 165 **R** | *Filed & Entered:* 05/30/2014 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Jury Trial - Volume I (Excluding Jury Selection) held on 2/3/2014 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/20/2014. Redacted Transcript Deadline set for 6/30/2014. Release of Transcript Restriction set for | |

| | | |
|---|---|---|
| | 8/28/2014. Notice of Intent to Redact due by 6/4/2014 (jlh, ) | |
| 166 **R** | *Filed & Entered:*    05/30/2014 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Jury Trial (Volume II) held on 2/4/2014 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/20/2014. Redacted Transcript Deadline set for 6/30/2014. Release of Transcript Restriction set for 8/28/2014. Notice of Intent to Redact due by 6/4/2014 (jlh, ) | |
| 167 **R** | *Filed & Entered:*    05/30/2014 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Jury Trial (Volume III) held on 2/5/2014 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/20/2014. Redacted Transcript Deadline set for 6/30/2014. Release of Transcript Restriction set for 8/28/2014. Notice of Intent to Redact due by 6/4/2014 (jlh, ) | |
| 168 **R** | *Filed & Entered:*    05/30/2014 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Jury Trial (Volume IV) held on 2/6/2014 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/20/2014. Redacted Transcript Deadline set for 6/30/2014. Release of Transcript Restriction set for 8/28/2014. Notice of Intent to Redact due by 6/4/2014 (jlh, ) | |
| 169 | *Filed & Entered:*    05/30/2014 | Order Appointing Public Defender |

| | | |
|---|---|---|
| | *Docket Text:* ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Joseph Vincent Jenkins. Signed by Magistrate Judge David E. Peebles on 5/30/14. (sal, ) | |
| | ~~*Filed & Entered:*~~ ~~06/02/2014~~ | ~~Add and Terminate Attorneys~~ |
| | *Docket Text:* Attorney update in case as to Joseph Vincent Jenkins. Randi Juda Bianco, Asst. FPD added as counsel - ntc. of appearance will be filed shortly. (sal, ) | |
| | *Filed & Entered:* 06/02/2014 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Sentencing is RESCHEDULED for 7/31/2014 at 10:30 AM in Syracuse before Judge Glenn T. Suddaby. Sentencing memorandum are due by 7/10/14. (lmw) | |
| <u>170</u> | *Filed & Entered:* 06/03/2014 | Notice of Attorney Appearance - Defendant |
| | *Docket Text:* NOTICE OF ATTORNEY APPEARANCE: Randi Juda Bianco appearing for Joseph Vincent Jenkins (Bianco, Randi) | |
| <u>171</u> | *Filed & Entered:* 06/09/2014 | Transcript Request |
| | *Docket Text:* TRANSCRIPT REQUEST by Joseph Vincent Jenkins for proceedings held on 2/3, 2/4, 2/5 & 2/6/14 before Judge Suddaby. (Peebles, Lisa) | |
| <u>172</u> **R** | *Filed & Entered:* 06/12/2014 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Hearing held on June 13, 2013 before Judge Glenn T. Suddaby, Court Reporter: Diane S. Martens,Telephone number: 315-234-8545. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. <u>Read this policy carefully.</u> If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/3/2014. Redacted Transcript Deadline set for 7/14/2014. Release of Transcript Restriction set for 9/10/2014. Notice of Intent to Redact due by 6/17/2014 (dm2, ) | |
| <u>173</u> | *Filed & Entered:* 06/13/2014 | Order for Forfeiture of Property |
| | *Docket Text:* PRELIMINARY ORDER DIRECTING FORFEITURE OF PROPERTY as to Joseph Vincent Jenkins. Signed by Judge Glenn T. Suddaby on 6/13/2014. (amt) | |
| | *Filed & Entered:* 06/17/2014 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Pursuant to defense counsel's request, Sentencing is RESCHEDULED for 9/25/2014 at 10:15 AM in Syracuse before Judge Glenn T. Suddaby. Sentencing memorandum are due by 9/4/14.(lmw) | |
| <u>174</u> | *Filed & Entered:* 08/05/2014 | Process Receipt and Return Form |
| | *Docket Text:* PROCESS RECEIPT AND RETURN of ICE/HSI Returned Executed. The property set forth in the Preliminary Order of Forfeiture was arrested by ICE/HSI on June 27, 2014, and has been in ICE/HSI custody since 4/1/2011; filed by USA (Brown, Geoffrey) | |
| <u>175</u> **R** | *Filed & Entered:* 09/02/2014 | Deft. Sentencing Memorandum |
| | *Docket Text:* SENTENCING MEMORANDUM by Joseph Vincent Jenkins (Peebles, Lisa) | |
| <u>176</u> | *Filed & Entered:* 09/02/2014 | Sealed Document |

| | | | |
|---|---|---|---|
| | *Docket Text:* SEALED DOCUMENT - Exhibits to #[175] Sentencing Memorandum. (lmw) | | |
| 177 | *Filed & Entered:* | 09/02/2014 | Order |
| | *Docket Text:* TEXT ORDER sealing #[176] Sealed Exhibits to Defendant's Sentencing memorandum until further order of the Court. Authorized by Judge Glenn T. Suddaby on 9/2/14. (lmw) | | |
| 178 | *Filed & Entered:* | 09/04/2014 | Govt. Sentencing Memorandum |
| | *Docket Text:* SENTENCING MEMORANDUM by USA as to Joseph Vincent Jenkins (Attachments: # (1) Certificate of Service)(Thomson, Tamara) | | |
| 180 | *Filed & Entered:* | 09/05/2014 | Sealed Document |
| | *Docket Text:* SEALED DOCUMENTS - Exhibits to #[178] Government Sentencing Memorandum: Exhibit 1 (Attachments: # (1) Exhibit 1A, # (2) Exhibit 1B, # (3) Exhibit 2, # (4) Exhibit 2A, # (5) Exhibit 2B, # (6) Exhibit 2C, # (7) Exhibit 2D, # (8) Exhibit 3, # (9) Exhibit 3A, # (10) Exhibit 4, # (11) Exhibit 4A) (lmw) (Attachment 8 replaced on 9/15/2014 to include additional exhibits) (lmw) | | |
| 181 Ⓡ | *Filed & Entered:* | 09/05/2014 | Service by Publication |
| | *Docket Text:* SERVICE by Publication of Notice of forfeiture; Last publication date 7/17/2014 in the government's official website, www.forfeiture.gov. *Claim deadline was 8/17/2014* - filed by USA (Brown, Geoffrey) | | |
| 182 Ⓡ | *Filed & Entered:* | 09/09/2014 | Deft. Sentencing Memorandum |
| | *Docket Text:* SUPPLEMENT to the [175] SENTENCING MEMORANDUM filed by Joseph Vincent Jenkins (amt) | | |
| 183 Ⓡ | *Filed & Entered:* | 09/12/2014 | Govt. Sentencing Memorandum |
| | *Docket Text:* Supplemental SENTENCING MEMORANDUM by USA as to Joseph Vincent Jenkins (Thomson, Tamara) | | |
| 184 Ⓡ | *Filed & Entered:* | 09/13/2014 | Govt. Sentencing Memorandum |
| | *Docket Text:* Supplemental SENTENCING MEMORANDUM by USA as to Joseph Vincent Jenkins (Thomson, Tamara) | | |
| 185 Ⓡ | *Filed & Entered:* | 09/17/2014 | Letter Request |
| | *Docket Text:* Letter from Lisa A. Peebles, Esq. as to Joseph Vincent Jenkins (Peebles, Lisa) | | |
| 186 Ⓡ | *Filed:*  *Entered:* | 09/23/2014  09/24/2014 | Letter Request |
| | *Docket Text:* Letter from Defendant Joseph Vincent Jenkins requesting the Court accept the attached supplemental memorandum (amt) | | |
| | *Filed & Entered:* | 09/24/2014 | Notice of Hearing |
| | *Docket Text:* TEXT ORDER granting #[185] Defense counsel's request for an adjournment of the sentencing to permit counsel to submit supplemental briefs with regard to restitution. Supplemental briefs with regard to restitution only must be filed by 10/10/14. Upon review of such briefs, the Court will determine at that time as to whether a hearing is necessary with regard to restitution. Sentencing is RESCHEDULED for 11/20/2014 at 11:00 AM in Syracuse before Judge Glenn T. Suddaby. (lmw) | | |
| 187 Ⓡ | *Filed & Entered:* | 10/10/2014 | Govt. Sentencing Memorandum |
| | *Docket Text:* Supplemental SENTENCING MEMORANDUM by Joseph Vincent Jenkins (Peebles, Lisa) | | |

| | | |
|---|---|---|
| | *Filed & Entered:*   10/31/2014 | Notice of Hearing |
| | *Docket Text:* TEXT NOTICE OF HEARING as to Joseph Vincent Jenkins: Sentencing is RESCHEDULED for 11/12/2014 at 10:00 AM in Syracuse before Judge Glenn T. Suddaby. (lmw) | |
| 188 | *Filed & Entered:*   11/05/2014<br>*Terminated:*        11/12/2014 | Motion to Appoint Counsel |
| | *Docket Text:* MOTION for Appointment of New Counsel filed by Joseph Vincent Jenkins, Pro Se. (Attachments: # (1) Cover Letter & Envelope) {Defendant's address updated in CM/ECF pursuant to this filing}(jmb) | |
| | *Filed & Entered:*   11/12/2014 | Sentencing |
| | *Docket Text:* TEXT Minute Entry for Sentencing held on 11/12/14 before Judge Glenn T. Suddaby for Joseph Vincent Jenkins (1). Defendants motion for new counsel denied as all sentencing documents have been submitted and reviewed. Defendant wants to appear pro se for the sentencing and court agrees. Defendant acknowledges receipt of the PSR and addendum and acknowledges that he has reviewed them. Defendant permits Ms. Peebles speak on his behalf. All objections to PSR submitted on the docket via defendant and defense counsel and further objections made by Defendant and defense counsel put on the record. Government, Defense counsel and defendant heard on Government's request for an obstruction of justice enhancement. Court finds there was sufficient evidence at trial to support an obstruction of justice enhancement and will sentence defendant with a total offense level of 37. Defendant sentenced on Counts 1 and 2 of the Indictment to a term of imprisonment of 225 months on Count 1 and 120 months on Count 2 to run concurrently for a total of 225 months and to a term of supervised release for 25 years on each count to run concurrently with standard and special conditions. Defendant acknowledges receipt of special conditions and objects to the conditions. Restitution ordered in the amount of $3,000 for each victim (Vicky, L.S., Cindy and Angela) for a total of $12,000. Special Assessment: $100 on each count for a total of $200; fine: $40,000.00. Defendant advised of appeal rights. Defendant remanded. APP: Tamara Thomson, AUSA and Gwendolyn Carroll, AUSA; Lisa Peebles, Esq., attorney for Defendant; Janna Kulakowski, Probation. CRD: L. Welch (Court Reporter: Diane Martens) (Time: 10:05 am to 11:00 am) (lmw) | |
| 189 **R** | *Filed & Entered:*   11/18/2014 | Judgment |
| | *Docket Text:* JUDGMENT as to Joseph Vincent Jenkins (1) on Counts 1 and 2 of the Indictment: Term of imprisonment: 225 months on Count 1 and 120 months on Count 2 to run concurrently for a total of 225 months. Supervised release: 25 years on each count to run concurrently. Special Assessment: $100 on each count for a total of $200. Total Fine: $40,000.00. Total Restitution: $12,000 ($3,000 each to Victims Vicky, L.S., Cindy and Angela). Signed by Judge Glenn T. Suddaby on 11/18/14. (lmw) | |
| 190 | *Filed & Entered:*   11/18/2014 | Statement of Reasons [LODGED] |
| | *Docket Text:* STATEMENT OF REASONS [LODGED] as to Joseph Vincent Jenkins [This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.] (dictplp, ) | |
| 191 | *Filed & Entered:*   11/18/2014 | Victim/Restitution List [LODGED] |
| | *Docket Text:* VICTIM/RESTITUTION LIST [LODGED] as to Joseph Vincent Jenkins [This document has been electronically lodged with the Court. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.] (dictplp, ) | |

| | | | |
|---|---|---|---|
| 192 | *Filed & Entered:* | 11/18/2014 | Notice of Appeal - Final Judgment |
| | *Docket Text:* NOTICE OF APPEAL by Joseph Vincent Jenkins re [189] Judgment. (hmr) | | |
| 193 Ⓡ | *Filed & Entered:* | 11/18/2014 | Status Report |
| | *Docket Text:* STATUS REPORT *notifying the Court that no ancillary claims have been filed and the Preliminary Order of Forfeiture is now final as to the defendant, and no separate final order will be presented* by USA as to Joseph Vincent Jenkins (Brown, Geoffrey) | | |
| 194 | *Filed & Entered:* | 11/18/2014 | Electronic Notice and Certification to USCA of Appeal |
| | *Docket Text:* ELECTRONIC NOTICE AND CERTIFICATION as to Joseph Vincent Jenkins sent to US Court of Appeals re [192] Notice of Appeal - Final Judgment. Clerk mailed copies of the Notice of Appeal, along with Clerk's Notice and Certification and Criminal Appeals Packet to Defendant Jenkins on November 18, 2014 by regular mail. (Attachments: # (1) Criminal Appeals Packet)(hmr) | | |
| 195 Ⓡ | *Filed & Entered:* | 12/15/2014 | Notice (Other) |
| | *Docket Text:* NOTICE *terminating AUSA's Geoffrey J. L. Brown and Gwendolyn E. Carroll from the case.* by Joseph Vincent Jenkins (Thomson, Tamara) | | |
| 196 Ⓡ | *Filed & Entered:* | 12/31/2014 | Letter Request |
| | *Docket Text:* Letter from Joseph Jenkins requesting Court Transcripts of court proceedings on October 6, 2011. (hmr) | | |
| 197 Ⓡ | *Filed & Entered:* | 01/05/2015 | Notice (Other) |
| | *Docket Text:* LETTER from Court Reporter Jodi Hibbard to Defendant Joseph Vincent Jenkins providing an estimate for production of Detention Hearing transcript in response to [196] Letter Request {Letter sent via regular mail on 1/5/2015.}(jlh, ) | | |
| 198 | *Filed & Entered:* | 02/13/2015 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Digitally-Recorded Detention Hearing held on 10/6/2011 before Judge Andrew T. Baxter, Court Reporter/Transcriber: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/6/2015. Redacted Transcript Deadline set for 3/16/2015. Release of Transcript Restriction set for 5/14/2015. Notice of Intent to Redact due by 2/18/2015 (jlh, ) | | |
| 199 | *Filed & Entered:* | 02/13/2015 | Transcript |
| | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Digitally-Recorded Detention Hearing held on 1/5/2012 before Judge Andrew T. Baxter, Court Reporter/Transcriber: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read | | |

| | | |
|---|---|---|
| | | this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/6/2015. Redacted Transcript Deadline set for 3/16/2015. Release of Transcript Restriction set for 5/14/2015. Notice of Intent to Redact due by 2/18/2015 (jlh, ) |
| 200 | *Filed & Entered:* 02/13/2015 | Transcript |
| | | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Status Conference held on 5/30/2014 before Judge David E. Peebles, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/6/2015. Redacted Transcript Deadline set for 3/16/2015. Release of Transcript Restriction set for 5/14/2015. Notice of Intent to Redact due by 2/18/2015 (jlh, ) |
| 201 R | *Filed & Entered:* 03/02/2015 | Transcript |
| | | *Docket Text:* NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Vincent Jenkins: Sentencing held on November 12, 2014 before Judge Glenn T. Suddaby, Court Reporter: Diane S. Martens,Telephone number: 315-234-8545. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/23/2015. Redacted Transcript Deadline set for 4/2/2015. Release of Transcript Restriction set for 6/1/2015. Notice of Intent to Redact due by 3/9/2015 (dm2, ) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/09/2015 18:24:35 | | |
| **PACER Login:** | ddemaria:4223769:0 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 5:11-cr-00602-GTS |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

CM/ECF LIVE - U.S. District Court - NYND-History/Documents Query



U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
DEC 2 1 2011
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

**************************************

UNITED STATES OF AMERICA

      v.

JOSEPH JENKINS,

                Defendant.

**************************************

Criminal Action No.

5 : 11 - CR - 602 GTS

**I N D I C T M E N T**
Vio:   18 U.S.C. §2252A(a)(1)
       18 U.S.C. §2252A(a)(5)(B)

### THE GRAND JURY CHARGES:
### COUNT ONE
### [TRANSPORTATION OF CHILD PORNOGRAPHY]

On or about May 24, 2009, in the Northern District of New York,

**JOSEPH JENKINS,**

the defendant herein, did knowingly and unlawfully transport child pornography, using a means and

facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by

any means, including by computer, in that the defendant made entry into Canada at the Port of

Lansdowne, Ontario, from Wellesley Island, New York, in Jefferson County, transporting in a

vehicle a Toshiba laptop computer, serial number 78175808W, that contained one or more graphic

image files and multimedia files containing images of a minor and minors engaged in sexually

explicit conduct.

In violation of Title 18, United States Code, Sections 2252A(a)(1) and 2256(8)(A).

Case 5:14-cr-00088-EAW Document 81-02 Filed 01/02/15 Page 35 of 890
A31
Case 5:11-cr-00602-GTS   Document 10   Filed 12/21/11   Page 2 of 4

**THE GRAND JURY FURTHER CHARGES:**
**COUNT TWO**
**[POSSESSION OF CHILD PORNOGRAPHY]**

On or about May 24, 2009, in the Northern District of New York,

**JOSEPH JENKINS,**

the defendant herein, did knowingly possess material that contained one or more images of child pornography, that had been transported using a means and facility of interstate and foreign commerce, and in and affecting such commerce by any means, including by computer, and that was produced using materials that had been shipped and transported in and affecting such commerce by any means, including by computer, that is: (1) a PNY Attache 8GB USB Thumb Drive that contained one or more graphic image files and multimedia files containing images of a minor and minors engaged in sexually explicit conduct; and (2) a PNY Attache 4GB USB Thumb Drive that contained one or more graphic image files and multimedia files containing images of a minor and minors engaged in sexually explicit conduct obtained by use of the Internet.

In violation of Title 18, United States Code, Sections 2252A(a)(5)(B) and 2256(8)(A).

**FORFEITURE ALLEGATION**

The allegations contained in Counts One and Two of this Indictment are hereby realleged and incorporated by reference for the purposes of alleging forfeiture, pursuant to Title 18, United States Code, Section 2253.

Pursuant to Title 18, United States Code, Section 2253, upon conviction of an offense in violation of Title 18, United States Code, Section 2252A, the defendant, JOSEPH JENKINS, shall forfeit to the United States of America:

a.  Any visual depiction described in Title 18, United States Code, Sections 2251, 2251A, 2252 or 2252A, and any book, magazine, periodical, film, videotape, and other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received in violation of Title 18, United States Code, Chapter 110;

b.  Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offenses, and

c.  Any property, real or personal, used or intended to be used to commit or to promote the commission of such offenses, and any property traceable to such property.

The property to be forfeited includes, but is not limited to, the following:

(a)  Toshiba laptop, serial number 78175808W;

(b)  PNY Attache 8GB USB Thumb Drive; and

(c)  PNY Attache 4GB USB Thumb Drive

If any of the property described above, as a result of any act or omission of the defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853 (p), as incorporated by Title 18, United States Code, Section

3

2253(b) and by Title 28, United States Code, Section 2461(c).


Dated: December 21, 2011                          A TRUE BILL,

                                         **REDACTED**
                                         FOREPERSON



            RICHARD S. HARTUNIAN
            United States Attorney
            Northern District of New York

By:  _Tamara B. Thomson_
            Tamara B. Thomson
            Assistant U.S. Attorney
            Bar Roll #515310


4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,
          Plaintiff,

Criminal Number 11-mj- 7 281 (GHL)

v.

GOVERNMENT'S SEALED FILINGS

Joseph Vincent Jenkins
          Defendant.

---

**APPLICATION TO BE FILED UNDER SEAL**

The United States of America, by and through its counsel of record, the United States

Attorney for the Northern District of New York, respectfully requests to file a search warrant,

application, affidavit, and related attachments under seal as the government has reason to believe

that the defendant will ~~will~~ flee to avoid capture if aware of the search warrant.

Respectfully submitted this 6th day of July, 2011.

Richard S. Hartunian
United States Attorney

Tamara B. Thomson
Assistant United States Attorney
Bar Roll 515310

U.S.D.C. FOR THE NORTHERN DISTRICT OF NEW
I, the undersigned Clerk of the Court, do hereby certify that
is a true, correct and full copy of the original document on fi
my custody.
# of pages (text) ___1___ ; # of pages including (exhibits) __1_
Dated 7-6-2011 Lawrence K. Baerman, Cle
by _____, Deputy Clerk.

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the

Northern   District of   New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Toshiba Laptop bearing serial number 78175808W<br>Compaq Laptop bearing serial number CNF3362GPN<br>PNY Attaché 8GB thumb drive (black and blue)<br>PNY Attaché 4GB thumb drive (all black)<br>PNY Attaché 2GB thumb drive (black and yellow)<br>Olympus Digital Camera serial number 408242909<br>Verizon Motorola cell phone (silver color) | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 7 11-MJ-281 (GHL) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _New York_
*(identify the person or describe the property to be searched and give its location)*:
Toshiba Laptop bearing serial number 78175808W, Compaq Laptop bearing serial number CNF3362GPN, PNY Attaché 8GB thumb drive (black and blue), PNY Attaché 4GB thumb drive (all black), PNY Attaché 2GB thumb drive (black and yellow), Olympus Digital Camera serial number 408242909, Verizon Motorola cell phone (silver color). See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
Items evidencing violations of Title 18, United States Code, Section §§ 2252 and 2252A (distributing, transporting, receiving, viewing, or possessing child pornography) as more fully set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      July 20, 2011
                                                                          *(not to exceed 14 days)*

x   in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been
                                                             established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
            George H. Lowe                          .
              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for           days *(not to exceed 30)*.
                                                       ☐ until, the facts justifying, the later specific date of

Date and time issued:      July 6, 2011, at 1:00 p.m.      _____
                                                                                   *Judge's signature*

City and state:     Syracuse, NY                          Judge George H. Lowe, U.S. Magistrate Judge
                                                             _____
                                                                          *Printed name and title*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH | ) |
| OF THE LAPTOPS AND OTHER | ) |
| COMPUTER RELATED MEDIA | ) |
| SEIZED FROM JOSEPH JENKINS: | ) |
| | ) |
| **Toshiba Laptop S/N:78175808W** | ) |
| **Compaq Laptop S/N:CNF3362GPN** | ) |
| **PNY Attaché 8GB thumb drive** | ) |
| **PNY Attaché 4GB thumb drive** | ) |
| **PNY Attaché 2GB thumb drive** | ) |
| **Olympus Digital Camera** | ) |
| **Verizon Motorola Cell Phone** | ) |

U.S.D.C. FOR THE NORTHERN DISTRICT OF NEW YORK
I, the undersigned Clerk of the Court, do hereby certify that this
is a true, correct and full copy of the original document on file in
my custody.
# of pages (text) ___ : # of pages including (exhibits) 53
Dated 12-1 ___
Lawrence K. Baerman, Clerk
by ___ , Deputy Clerk

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Chad J. Willard of United States Immigration and Customs Enforcement

(ICE), being duly sworn under oath, do hereby depose and state:

1.      I am a Special Agent with United States Department of Homeland Security,

Immigration and Customs Enforcement (ICE) and have been so employed since August 6, 2006.

I am currently assigned to the ICE resident agent office in Alexandria Bay, NY. As part of my of

my daily duties as a Special Agent with ICE, I investigate criminal violations involving child

exploitation and child pornography including violations pertaining to the illegal transportation,

production, distribution, receipt, and possession of child pornography, in violation of Title 18,

United States Code, Sections 2251, 2252, and 2252A. I have participated in investigations of

persons suspected of violating child pornography laws and have had the opportunity to observe

and review numerous examples of child pornography as defined under Title 18, United States

Code, Section 2256, in various forms of media including computer media.

1

2.      As a federal agent, your affiant is authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      This affidavit is being made in support of an application for a warrant authorizing the search of a Toshiba Laptop bearing serial number 78175808W, a Compaq Laptop bearing serial number CNF3362GPN, a PNY Attaché 8GB thumb drive, a PNY Attaché 4GB thumb drive, a PNY Attaché 2GB thumb drive, an Olympus Digital Camera and a Verizon Motorola cell phone for evidence, contraband, fruits, and instrumentalities of violations involving the possession and transportation of child pornography, as listed in Attachment A, for the items specified in Attachment B hereto.

4.      The statements in this affidavit are based in part on my investigation of this matter and on information provided by other law enforcement agents. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of a violation of Title 18 United States Code 2252A(a)(1) and 2252A(a)(5)(B), are presently located on the Toshiba laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera and Verizon Motorola cell phone.

## RELEVANT STATUTES

5.      This investigation concerns alleged violations of Title 18, United States Code 2252A, relating to the transportation and possession of child pornography.

6.    Title 18, United States Code, Section 2252A(a)(1) prohibits a person from knowingly mailing or transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography.

7.    Title 18, United States Code, Section 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

8.    The following definitions apply to this Affidavit and Attachment B to this Affidavit:

9.    "Child pornography" is defined in 18 U.S.C. § 2256(8) as any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

3

10. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

11. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

12. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

13. "Sexually explicit conduct" means graphic sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person in exhibited; or graphic or lascivious simulated bestiality, masturbation, sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

14. "Internet Service Providers" or "ISPs" are commercial organizations which provide individuals and businesses access to the internet. ISPs provide a range of functions for their customers, including access to the internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account

4

name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the internet by using his or her account name and password.

15.   "Domain Name" refers to the common, easy to remember names associated with an internet protocol address. For example, a domain name of "www.usdoj.gov" refers to the internet protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

16.   "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and

5

file transfer logs list detailed information concerning files that are remotely transferred.

17.  "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

18.  "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

19.  "Uniform Resource Locator" or "Universal Resource Locator" or "URL" is the unique address for a file that is accessible on the Internet.  For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL.  The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

20.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks "DVD's", Personal Digital Assistants "PDA's," Multi

6

Media Cards "MMC's", memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

21.     Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers, computer technology, and the internet have revolutionized the manner in which child pornography is produced and distributed.

22.     Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

23.     Child pornographers can transpose photographic images from a camera into a computer-readable format with a scanner. With digital cameras, the images can be transferred directly onto a computer. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the internet, electronic contact can be made to literally millions of computers around the world.

24.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

25.     The internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

7

26.    Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by internet portals such as Yahoo! and Hotmail, among others.  Online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

27.    As with most digital technology, communications made from a computer are often saved or stored on that computer.  Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.  Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others.  In addition to electronic communications, a computer user's internet activities generally leave traces in a computer's web cache and internet history files.  A forensic examiner can often recover evidence that shows whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files that were uploaded or downloaded.  Such information is often maintained indefinitely until overwritten by other data.

## PEER TO PEER (P2P) FILE SHARING

8

28.     Peer to Peer (P2P) file-sharing allows individuals to meet each other through the internet, engage in social networking, and trade files.  Publicly available (P2P) software programs allow a user to set up a private network of contacts.  File-sharing through this type of program is limited only to other users who have been added to a private list of "friends."  A new user is added to a list of friends by request.  Acceptance of a friend request will allow that new user to download files from the user who sent the friend request.  The new user can then browse the list of files that the other user has made available to download, select desired files from this list, and download the selected files.  The downloading of a file occurs through a direct connection between the computer requesting the file and the computer containing the file.

29.     One aspect of this type of P2P file sharing is that multiple files may be downloaded in parallel, which permits downloading more than one file at a time.

30.     A P2P file transfer is assisted by reference to an internet protocol (IP) address. This address, expressed as four sets of numbers separated by decimal points, is unique to a particular computer during an online session.  The IP address provides a unique location making it possible for data to be transferred between computers.

31.     Third-party software is available to identify the IP address of the P2P computer sending the file.  Such software monitors and logs Internet and local network traffic.

## BACKGROUND OF INVESTIGATION

32.     On May 24, 2009, at approximately 8:50 a.m., Joseph Vincent JENKINS applied for admission into Canada at the Port of Lansdowne, Lansdowne, Ontario, Canada from

Wellesley Island, New York. JENKINS encountered the Canada Border Services Agency (CBSA), the Canadian agency responsible for administering legislation that governs the admissibility of people, goods, plants, and animals into and out of Canada. JENKINS was the driver and sole occupant of a 2003 Dodge Ram pickup truck bearing New York license plate 19322JL, which was later determined to be registered in his name through checks with the New York State Department of Motor Vehicles.

33.     JENKINS was directed to the secondary inspection area where CBSA Officers Jarret Johnston, Glen Hache, and Tristan Garrah conducted an examination. Officer Johnston located a Toshiba laptop bearing Serial Number (S/N) 78175808W in a box on the right rear passenger seat. Officer Johnston asked JENKINS if the laptop was new and JENKINS stated he has owned it for over a year but keeps it in the original box because he does not have a bag for it. Also discovered during the course of the examination were a Compaq laptop (S/N: CNF3362GPN), one (1)PNY Attaché 8GB USB thumb drive, one (1) PNY Attaché 4GB USB thumb drive, one (1) PNY Attaché 2GB USB thumb drive, six (6) compact discs, one (1) Belkin Notebook card (S/N: 158229302697), one (1) Olympus Digital Camera (S/N: 408242909), one (1) Olympus XD Card (S/N: MXD16P3K57106SSX30421MAD) and one (1) Motorola Cellular phone.

34.     Officer Johnston turned on the laptop and observed a file as a shortcut, when opened up it appeared to be a male holding up a young girl and a video was viewed of two girls who appeared to be pre-pubescent, clothed only in underwear performing suggestive acts.

35.    CBSA Officer Garrah examined the PNY Attaché 8GB USB thumb drive and found a video titled: 9yo_vicky_stripping_and_sucking_kiddy_pedo_illegal_underage_preteen that he reasonably believed to be child pornography. Officer Garrah subsequently place JENKINS under arrest for possession of Child Pornography, a violation of the criminal code of Canada. JENKINS was read his rights to counsel and cautioned according to procedures under Canadian law.

36.    At approximately 9:45 AM, Investigator Maria-Josee Vinette of CBSA Criminal Investigative Division was notified of JENKINS arrest and brought in to assist with the investigation. Investigator Vinette reviewed several videos stored on the PNY Attaché 8GB USB thumb drive, descriptions of two of the videos are as follows:

   a.  **9yo_vicky_stripping_and_sucking_kiddy_pedo_illegal_underage_preteen** the video was of a young girl in a tank top and skirt with black stockings. She appears to be pre-pubescent and is instructed to twirl and undress. The girl removes all of her clothing except for the black stockings. She has no breast or hip development and no pubic hair. She approaches the person holding the video camera, unzips his pants and performs oral sex.

   b.  **Bd-C.avi_1**    the video is of a pre-pubescent girl with no development at all, she is posing for a photo shoot and at times the camera focuses only on her genitalia.

11

37.     Investigator Vinette went to speak with JENKINS and read him his secondary warnings which are the Canadian equivalent of the Miranda warnings used in the United States. JENKINS stated that he understood that he did not have to make any statements. Investigator Vinette asked JENKINS if he knew what child pornography was and JENKINS stated that he did. Investigator Vinette informed JENKINS that some child pornography was found on some media device found in his truck. At this time JENKINS requested to speak with his mother or father and was allowed to speak with his mother Bonnie.

38.     Investigator Vinette then spoke with Detective Constable Kip Wohlert of the Ontario Provincial Police. Detective Wohlert is assigned to the Child Pornography Section, Investigation Bureau, commonly known as "Project P." Detective Wohlert asked that Investigator Vinette send him a summary of the incident described above with a copy of the officer's statements and evidence seized for Wohlert to prepare a warrant.

39.     On or about May 27, 2009, Detective Wohlert applied for and was issued a warrant authorizing a search of the aforementioned Toshiba laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera and Verizon Motorola cell phone under the authority of the Province of Ontario, Canada.

40.     JENKINS was charged under Canada Criminal Code with Importing-Distributing Child Pornography and Possessing Child Pornography.  On October 18, 2010, defendant

JENKINS was scheduled to appear for a trial in Canada on those charges. JENKINS failed to appear and a warrant was issued.

41.     On or about October 21, 2010, Ontario Provincial Police, Detective Constable Kip Wohlert provided Homeland Security Investigations Special Agent Matthew Meyer with police and forensic reports associated with the investigation by Ontario Provincial Police into Joseph JENKINS. These reports received by Special Agent Meyer included image files discovered on the Toshiba laptop and PNY Attaché thumb drives that were seized from JENKINS and searched by the Ontario Provincial Police pursuant to the aforementioned search warrant. Detective Constable Kip Wohlert also advised Special Agent Meyer that a video of child pornography was found in dead space on the Compaq laptop seized from JENKINS.

42.     Some image files contained in Detective Constable Kip Wohlert's report include the following:

a.      One image (9) 713e22fbe3bb7ff appears to depict one unclothed prepubescent female child who is laying on her back. The child has her legs spread apart in a manner clearly exposing her genitals. The child has her hands positioned close to her genitals and is spreading them apart.

b.      A second image (213) a5aabb5ffe5d2f55 appears to depict two unclothed prepubescent female children sitting on the edge of a bath tub. The children have their legs spread apart in a manner clearly exposing her genitals.

13

     c.     A third image (35) 6f7ebf57fe3a7c3d appears to depict one unclothed prepubescent female child who is lying on her back with an adult male penis resting on genital area. The child has her legs spread apart and the male's stomach and penis are covering the child's genital area.

43.     Based on my training and experience, the above referenced image files appear to depict child pornography as defined under Title 18, United States Code, Section 2256 (8).

44.     On April, 1, 2011, the Toshiba laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera and Verizon Motorola cell phone were transferred to the custody of Homeland Security Investigations, located at 46735 US I-81 Alexandria bay, NY 13607, from the Ontario Provincial Police, and no search of said items has been made since taking custody of them in anticipation of obtaining authority pursuant to a search warrant for these items.

## SEARCH AND SEIZURE OF COMPUTERS AND ELECTRONIC MEDIA

45.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

     a.     Electronic storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, usb "thumb" drives, secure digital (sd) cards, and others) can store the

14

equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

46. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In

15

addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

47.    Furthermore, when there is probable cause to believe that the computer and its storage devices are instrumentalities of crimes, within the meaning of 18 U.S.C. §§ 2251 through 2256, they should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

48.    The search procedure of electronic data contained in computer hardware, computer software, and/or other electronic storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.    on-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, as well as a preliminary scan of image files contained on such systems and electronic storage devices to help identify any other relevant evidence or potential victims;

b.    examination of all of the data contained in such computer hardware, computer software, or electronic storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

c.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality

of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d.     surveying various file directories and the individual files they contain;

e.     opening files in order to determine their contents;

f.     scanning storage areas;

g.     performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and

h.     performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## ITEMS TO BE SEARCHED

49.     Based on the foregoing, there is probable cause to believe that at the office of U.S. Immigration and Customs Enforcement, Homeland Security Investigations, located at 46735 US I-81, Alexandria Bay, NY 13607, within **the Toshiba Laptop bearing serial number 78175808W, a Compaq Laptop bearing serial number CNF3362GPN, an PNY Attaché 8GB thumb drive, an PNY Attaché 4GB thumb drive, an PNY Attaché 2GB thumb drive, an Olympus Digital Camera and a Verizon Motorola cell phone,** as described in Attachment A, there is located evidence, fruits and/or instrumentalities of the violations specified in this affidavit.

## CONCLUSION

17

50. Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that a violation of Title 18, United States Code 2252A (a)(1) and 2252A(a)(5)(B), are presently located on the Toshiba laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera and Verizon Motorola cell phone identified in Attachment A. The evidence as listed in Attachment A to this affidavit is contraband, the fruit of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

51. Your affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the Toshiba laptop, Compaq laptop, PNY Attaché 8GB thumb drive, PNY Attaché 4GB thumb drive, PNY Attaché 2GB thumb drive, Olympus Digital Camera and Verizon Motorola cell phone detailed in Attachment A, for those items described in Attachment B.

## REQUEST FOR SEALING

52. It is further respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant and requisite inventory notice (with the exception of one copy of the warrant ). Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

18

Chad J. Willard, Special Agent
Homeland Security Investigations

SUBSCRIBED and SWORN
before me this 6th day of July, 2011

HON. GEORGE H. LOWE
UNITED STATES MAGISTRATE JUDGE

19

**ATTACHMENT A**
**DESCRIPTION OF ITEMS TO BE SEARCHED**

Toshiba Laptop bearing serial number 78175808W
Compaq Laptop bearing serial number CNF3362GPN
PNY Attaché 8GB thumb drive (black and blue)
PNY Attaché 4GB thumb drive (all black)
PNY Attaché 2GB thumb drive (black and yellow)
Olympus Digital Camera serial number 408242909
Verizon Motorola cell phone (silver color)

**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEARCHED FOR**

1.      Any and all visual depictions of minors, child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

3.      Any and all notes, documents, records, or correspondence, in any format and medium pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      In any format or medium, any and all electronic diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of the accounts subscribed to by Joseph JENKINS by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. §

21

2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7. Any and all notes, documents, records, or correspondence, in any format or medium concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8. Any and all notes, documents, records, or correspondence, in any format or medium concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9. Any and all notes, documents, records, or correspondence, in any format or medium concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10. Any and all records, documents, invoices and materials, in any format or medium that concern any accounts with an Internet Service Provider.

11. Any and all records, documents, invoices and materials, in any format or medium that concern online storage or other remote computer storage, including, but not limited to,

22

software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12. Any and all visual depictions of minors.

13. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14. Any and all documents, records, or correspondence, in any format or pertaining to use or ownership of the computers, thumb drives, camera and cell phone.

15. Any and all electronic diaries, notebooks, notes, and any other records, in any medium or format, reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEARCHED FOR**

1.    Any and all visual depictions of minors, child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.    Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

3.    Any and all notes, documents, records, or correspondence, in any format and medium pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.    In any format or medium, any and all electronic diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of the accounts subscribed to by Joseph JENKINS by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. §

21

2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.   Any and all notes, documents, records, or correspondence, in any format or medium identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.   Any and all notes, documents, records, or correspondence, in any format or medium concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.   Any and all notes, documents, records, or correspondence, in any format or medium concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.   Any and all notes, documents, records, or correspondence, in any format or medium concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.  Any and all records, documents, invoices and materials, in any format or medium that concern any accounts with an Internet Service Provider.

11.  Any and all records, documents, invoices and materials, in any format or medium that concern online storage or other remote computer storage, including, but not limited to,

22

software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12. Any and all visual depictions of minors.

13. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14. Any and all documents, records, or correspondence, in any format or pertaining to use or ownership of the computers, thumb drives, camera and cell phone.

15. Any and all electronic diaries, notebooks, notes, and any other records, in any medium or format, reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.                                                    5:11-CR-0602
                                                      (GTS)
JOSEPH JENKINS,

                              Defendant.
_____

APPEARANCES:                          OF COUNSEL:

HON. RICHARD S. HARTUNIAN             TAMARA THOMSON, ESQ.
  United States Attorney for the N.D.N.Y.   GWENDOLYN CARROLL, ESQ.
  Counsel for the Government         GEOFFREY J.L. BROWN, ESQ.
100 South Clinton Street             Assistant United States Attorneys
Syracuse, NY 13261-7198

THE PARRY LAW FIRM                   JEFFREY R. PARRY, ESQ.
  Counsel for Defendant
124 Woodspath Road
Liverpool, NY 13090

GLENN T. SUDDABY, United States District Judge

**<u>DECISION and ORDER</u>**

        Currently before the Court, in this criminal proceeding against Joseph Jenkins

("Defendant") for one count of transporting child pornography in violation of 18 U.S.C.§

2252A(a)(1) and one count of possessing child pornography in violation of 18 U.S.C. §

2252a(a)(5)B), is Defendant's pretrial motion seeking, inter alia, suppression of evidence and

statements obtained by Canadian law enforcement officials.  (Dkt. No. 25.)  The Government has

opposed Defendant's motion.  For the reasons set forth below, Defendant's motion is denied.

## I.      RELEVANT BACKGROUND

Generally, the Government alleges the following facts in its criminal complaint against Defendant.  (Dkt. No. 1.)  On May 24, 2009, Defendant attempted to enter Canada at the Port of Lansdowne in Ontario from Wellesley Island, New York.  (*Id.* at 3.)  Before entering Canada, however, Canadian Border Services Agency ("CBSA") officers stopped Defendant and directed Defendant to a secondary inspection area.  CBSA officers then conducted an examination of the contents of Defendant's vehicle and found the following items: (1) a Toshiba laptop, (2) a Compaq laptop, (3) an Attache 8GB USB thumb drive, (4) an Attache 4GB USB thumb drive, (5) an Attache 2GB USB thumb drive, (6) six compact discs, (7) a Belkin Notebook card, (8) an Olympus digital camera, (9) an Olympus XD card, and (1) a Motorola cellular telephone.[1]  (*Id.* at 4.)  Upon examining the contents of the Attache 8GB USB thumb drive, the CBSA examining officer discovered a video titled "9yo_vicky_stripping_and_sucking_kiddy_pedo_illegal _underage_preteen" that he reasonably believed to be child pornography.  (*Id.*)  Defendant was then arrested and charged with Importing-Distributing Child Pornography and Possessing Child Pornography under the Canadian criminal code.  (*Id.* at 4, 5.)

On May 27, 2009, Ontario Provincial Police Detective Kip Wohlert ("Detective Wohlert") applied for, and was issued, a warrant authorizing a search of the above-described devices.  (*Id.* at 5.)

On October 18, 2010, Defendant failed to appear for trial in Canada, and a warrant was issued for his arrest.  (*Id.*)

---

[1]      In his memorandum of law, Defendant states that "it is uncontested that the vehicle belonged to [Defendant] and that the vehicle contained items personal to [Defendant]." (Dkt. No. 25, Attach. 1 at 4.)

2

On October 21, 2010, Detective Wohlert provided Homeland Security Investigations Special Agent Matthew Myer with police and forensic reports associated with the investigation of Defendant by Canadian officials.  (*Id.* at 6.)  These reports included image files discovered on Defendant's Toshiba laptop and Attache thumb drives.  (*Id.*)  On April 1, 2011, Homeland Security Investigations took custody of seven of the ten of devices originally seized by CBSA officers, including the Toshiba laptop, Compaq laptop, Attache 8GB USB thumb drive, Attache 4 GB USB thumb drive, Attache 2GB USB thumb drive, Olympus digital camera, and Motorola cellular telephone ("Defendant's devices").  (*Id.*)

On July 6, 2011, United States Magistrate Judge George H. Lowe signed a search warrant authorizing a search of Defendant's devices.  (*Id.*)  Subsequently, a Homeland Security Investigation forensic examination of Defendant's devices revealed approximately 3,881 images and 109 multimedia files suspected of child pornography.  (*Id.* at 7.)

In addition to all of these allegations as set forth by the Government, Defendant's attorney's affirmation states that Defendant's devices were "sequestered in a forensic lab many miles from the point of [Defendant's] arrest and neither [Defendant nor his attorney] had access to [Defendant's devices] even at the outset of [Defendant's] Canadian trial."  (Dkt. No. 25, Attach. 1 at 2.)

## II.   THE PARTIES' ARGUMENTS

Liberally construed, Defendant makes the following two arguments in his memorandum of law.  (*See generally* Dkt. No. 25, Attach. 1.)  First, any evidence obtained as a result of a search of Defendant's devices should be suppressed because the search and seizure of those devices violated Defendant's Fourth Amendment right to be free from unreasonable searches and

seizures.  More specifically, Defendant argues that it was unlawful for CBSA officers to confiscate those devices prior to arresting Defendant, transport them "many miles and several hours away," and hold them for sixteen months without allowing Defendant access.  (Dkt. No. 25, Attach. 1 at 7.)  Second, any evidence, including statements by Defendant, obtained by CBSA officers should be suppressed because Defendant was not advised of his *Miranda* rights.  (*Id.* at 10-11.)  In the alternative, Defendant requests a hearing to determine whether suppression of either the evidence obtained from his devices or his statements to CBSA officers is appropriate.  (*Id.* at 9, 11.)   In addition, Defendant asks the Court to compel the Government to disclose any evidence that "would have caused the CBSA [officers] to stop and search" Defendant's vehicle.  (*Id.* at 10.) Finally, Defendant requests "leave to bring any additional motions which may become necessary . . . ."  (*Id.* at 11.)

In response, the Government makes the following five arguments.  (*See generally* Dkt. No. 27.)  First, because Defendant has failed to comply with Rule 12.1(e) of the Local Rules of Criminal Practice for this Court by neglecting to submit an affidavit that sets forth facts which, if proven true, would entitle him to relief, Defendant's motion to suppress any evidence obtained from Defendant's devices must be summarily denied.  (Dkt. No. 27 at 6-8.)  Second, Defendant's motion to suppress any evidence obtained from his devices must be denied because, even assuming that the search violated his Fourth Amendment rights, the exclusionary rule does not apply to law enforcement activities of foreign law enforcement acting in its own country unless the search shocks the conscience, or was the product of a cooperative investigation with United States law enforcement.  (*Id.* at 8-9.)  Third, CBSA officers' search of Defendant's devices was not "so extreme that [it] shock[s] the judicial conscience . . . ."  (*Id.* at 10-13 [internal quotation

marks omitted].)  Fourth, CBSA officers' search of Defendant's devices was not the result of a

joint investigation with United States law enforcement, but even if it was, the search was not

unlawful because CBSA officers were not acting as agents of the United States "with the express

purpose of evading constitutional requirements." (*Id.* at 13- 15.)  Fifth, Defendant's statements

to CBSA officers should not be suppressed for the following four reasons: (1) Defendant failed

to submit an affidavit in support of his request as required by the Local Rules; (2) the Fifth

Amendment protections extended by *Miranda v. Arizona*, 384 U.S.436 (1966), do not apply to

foreign law enforcement investigations; (3) CBSA officers' administered "secondary warnings[,]

which are the Canadian equivalent of the *Miranda* warnings used in the United States"; and (4)

even if *Miranda* applied to foreign law enforcement investigations, Defendant's statements are

not subject to suppression because they were the product of routine border interrogations, which

do not require *Miranda* warnings.  (*Id.* at 15-16.)[2]

## III.   ANALYSIS

### A.   Whether Defendant Is Entitled to Suppression of the Evidence Obtained From His Devices

After carefully considering the matter, the Court answers this question in the negative for

all of the reasons stated in the Government's memorandum of law.  (Dkt. No. 27 at 6-15 [Gov't's

Memo. of Law].)  The Court adds only four brief points.

First, in addition to the Local Rules of Criminal Practice for this Court, courts in the

Northern District of New York have made it clear that motions to suppress require a supporting

---

[2]     The Government did not respond to Defendant's motion to compel discovery or request for leave to bring any additional motions that may become necessary.  (*See generally* Dkt. No. 27.)

affidavit that is based on personal knowledge.  *See e.g., U.S. v. Lonzo*, 793 F. Supp. 57, 58

(N.D.N.Y. 1992) (Cholakis, J.) ("From this day forward, (1) suppression motions made before

this Court must be supported by affidavits based upon personal knowledge, and (2) where such

affidavits contain facts which, if true, would result in suppression, the opposition filed by the

Government must also include affidavits based upon personal knowledge.").  Here, Defendant's

motion does not meet this requirement because his attorney's affirmation does not contain facts,

which if true, would result in suppression of the evidence obtained from Defendant's devices.

(Dkt. No. 25, Attach. 1 at 2.)  More specifically, although Defendant's attorney affirms that he

has personal knowledge that Defendant's devices were "sequestered in a forensics lab many

miles from the point of [Defendant's] arrest," proof of that fact does not result in suppression of

the evidence because, as explained more completely below, Defendant's devices were lawfully

searched under United States constitutional law either (1) pursuant to the border search doctrine,

or (2) pursuant to a warrant obtained within three days of Defendant's arrest.  (Dkt. No. 25,

Attach. 1 at 2.)  Failing to comply with Local Rule 12.1(e) is sufficient grounds for summary

denial of Defendant's motion to suppress.[3]  In any event, as discussed below, Defendant's

motion fails on the merits.

     Second, Defendant's argument focuses on whether it was lawful for Canadian officials to

*hold* and *withhold from Defendant* the seized evidence for sixteen months pending trial in

Canadian courts, rather than whether the *actual search and seizure* of Defendant's devices was

---

     [3]     *See, e.g., U.S. v. Ventura*, 97-CR-1251, 1998 WL 186737, at *1 (S.D.N.Y. Apr.
17, 1998) (denying motion to suppress because the defendant submitted only an attorney's
conclusory affidavit); *U.S. v. Ruggiero*, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993) (denying
motion to suppress because, inter alia, the defendants "submitted attorney's affidavits," which
the court found "completely inadequate to raise a factual issue justifying a hearing").

lawful at the time Defendant attempted to enter Canada.  More specifically, Defendant articulates his argument by saying, "[T]he Defendant respectfully requests that the evidence seized and kept from him for such a protracted period be suppressed and this matter be dismissed."  (Dkt. No. 25, Attach. 1 at 9.)  In addition, Defendant's recitation of the facts emphasize that he was "deprived access to the evidence against him . . . [despite his] Canadian attorney['s] . . . repeated demands

 . . . to produce this material."  (*Id.* at 5-6.)   This argument, however, more closely resembles an argument that the Canadian prosecution did not comply with its discovery obligations (to the extent it had any under domestic Canadian law) rather than an argument that the actual search and seizure was conducted unlawfully.  In any event, however, any failure of the Canadian prosecution to comply with its own domestic law is irrelevant because "[t]he admissibility of evidence in a United States court depends solely on compliance with United States law."  *U.S. v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007) (collecting cases).

Third, to the extent that Defendant's argument *is* grounded in Fourth Amendment principles, it is without merit.  The evidence demonstrates that the searches of Defendant's devices occurred both before and after Defendant was arrested on May 24, 2009; and the Court concludes that any and all searches were lawful under United States constitutional law.

For example, the Will Say Statements of CBSA Border Security Officers ("BSO") Garrah, Johnston, and Hache, and CBSA Investigator Vinette reveal that the pre-arrest searches of Defendant's Toshiba computer, Compaq computer, and the Attache 8GB USB thumb drive revealed videos and pictures of young girls of inconclusive ages, but some definitively prepubescent.  (Dkt. No. 27, Attach. 1 [CBSA BSO Garrah's Will Say Stmnt.]; Dkt. No. 27,

Attach. 2 [CBSA BSO Hache's Will Say Stmnt.]; Dkt. No. 27, Attach. 4 [CBSA BSO Johnston's Will Say Stmnt.]; Dkt. No. 27, Attach. 6 [CBSA Invgr. Vinette].)  These searches occurred at the border crossing immediately upon Defendant's attempt to enter Canada.  (*See, e.g.,* Dkt. No. 27, Attach. 1 at 2-3 [CBSA BSO Garrah describing that, at approximately 9:00 a.m., Defendant reached Port of Landsdowne, at approximately 9:50 a.m., he discovered a video titled "9yo_vicky_stripping_and_sucking_kiddy_pedo_illegal_underage_preteen" containing child pornography on Defendant's Attache 8 GB USB thumb drive, and at 9:55 a.m., Defendant was arrested].)  This search was lawful under the United States border-search doctrine.  *See U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants [to the United States] are not subject to any requirement of reasonable suspicion, probable cause, or a warrant . . . . Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion . . . ."); *U.S. v. Irving*, 452 F.3d 110, 123-24 (2d Cir. 2006) ("[W]e have long ruled that searches of a person's . . . personal belongings are routine searches."); *cf. U.S. v. Nieves*, 609 F.2d 642, 647 (2d Cir. 1979) (finding that the secondary search of the defendant, after she underwent an initial customs inspection, was lawful because the defendant was still in the border-inspection building, a "relatively short time had elapsed since she had undergone the initial . . . inspection," and border officials had "ample grounds" to suspect unlawful activity).

In addition, following Defendant's arrest, Detective Wohlert applied for, and was issued, a search warrant for all of the devices seized by CBSA officers on Mary 24, 2009.  (Dkt. No. 27, Attach. 5.)  Of course, any search conducted pursuant to this search warrant was also lawful under United States constitutional law.

Fourth, the Court finds that the facts of *U.S. v. Cotterman*, 637 F.3d 1068 (9th Cir. 2011), are distinguishable enough from those of the present case to conclude that the outcome of the Ninth Circuit's pending en banc decision will not impact this case.  More specifically, the issue in *Cotterman* was whether the border search doctrine (which allows routine searches of personal belongings at the border) justifies border officials' decision to transport a person's personal belongings away from the border, without reasonable suspicion or probable cause, to adequately complete the border search.  *Cotterman*, 637 F.3d at 1074.  Here, however, the searches of Defendant's devices that gave rise to his arrest occurred directly at the border within hours of Defendant's attempt to cross the border, and it was only after Defendant was arrested that his devices were transported from the border.  (Dkt. No. 27, Attach. 1 at 2; Dkt. No. 27, Attach. 2 at 3-4; Dkt. No. 27, Attach. 4 at 2; Dkt. No. 27, Attach. 6 at 3.)

For all of these reasons, Defendant's motion to suppress the evidence obtained from his devices is denied.  In addition, Defendant's motion for an evidentiary hearing on this issue is denied.

### B.      Whether Defendant Is Entitled to Suppression of His Statements Made to CBSA Officers

After carefully considering the matter, the Court answers this question in the negative for all of the reasons stated in the Government's memorandum of law.  (Dkt. No. 27 at 15-16.)  The Court adds only two brief points.

First, in addition to being a procedural violation of the Local Rules of Criminal Practice for this Court, Defendant's failure to support his motion to suppress with an affidavit (as required by Local Rules 12.1[e]) makes it impossible to discern with any degree of certainty which statements Defendant seeks to suppress, or whether the questioning that induced those

statements was undertaken lawfully by CBSA officers. Defendant has only submitted an attorney affirmation, and it does not contain any facts regarding the statements Defendant seeks to suppress.

Second, only involuntary statements made to foreign law enforcement will be inadmissible in a United States court as a result of foreign law enforcement's failure to give a defendant his *Miranda* warnings. *See U.S. v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003) ("As for [the defendant's] claim that his statements should be suppressed because he was not read *Miranda* warnings, the law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary."); *see also U.S. v. Abu Ali*, 528, F.3d 210, 227 (4th Cir. 2008) ("[V]oluntary statements obtained from a defendant by foreign law enforcement officers, even without *Miranda* warnings, generally are admissible."); *U.S. v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971) ("[T]o exclude this confession, [the defendant] had to argue that the Miranda requirements are applicable to custodial interrogations performed by the police of foreign countries. We are convinced that they are not . . . . [S]o long as the trustworthiness of the confession satisfies legal standards, the fact that the defendant was not given Miranda warnings before questioning by foreign police will not, by itself, render his confession inadmissible.").

Here, instead of arguing that his statements to CBSA officers were involuntary, Defendant argues that the "secondary warnings" given by CBSA officers at the time of his arrest were not an adequate substitute *Miranda* warnings. (Dkt. No. 25, Attach. 1 at 10-11.) Because the Court has found no legal authority to support this position, and because Defendant has not cited any authority in support, the Court finds this argument meritless.

For all of these reasons, Defendant's motion to suppress his statements made to CBSA officers is denied.  In addition, Defendant's motion for an evidentiary hearing on this issue is denied.

### C.    Whether Defendant Is Entitled to a Order to Compel Discovery

After carefully considering the matter, the Court answers this question in the negative, because Defendant has not met his burden for a motion to compel discovery by failing to comply with the Local Rules of Criminal Practice for this Court.  More specifically, Local Rule 14.1(g) states that "[n]o attorney shall file a discovery motion without first conferring with opposing counsel, and the Court will not consider a motion unless it is accompanied by a certification of such conference and a statement of the moving party's good faith efforts to resolve the subject matter of the motion by agreement with opposing counsel."  L.R. Cr. P. 14.1(g); *see also* L.R. Cr. P. 12.1(b) ("The Court shall not hear a motion to compel discovery unless the attorney for the moving party files with the Court, simultaneously with the filing of the moving papers, a notice stating that the moving party has conferred and discussed in detail with the opposing party the issues between them in a good faith effort to eliminate or reduce the area of controversy and to arrive at a mutually satisfactory resolution.")

Here, Defendant's attorney has submitted an affirmation that makes no mention of either a conference with opposing counsel, or his good-faith effort to resolve the discovery matter by agreement with opposing counsel.  (Dkt. No. 25, Attach. 1 at 2.)  For this reason, Defendant's motion to compel discovery is denied.

### D.    Whether Defendant Is Entitled to Leave to File Future Motions

After carefully considering the matter, the Court answers this question in the negative

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 77 of 890
A73
Case 5:11-cr-00602-GTS   Document 34   Filed 08/24/12   Page 12 of 12

because, at this time, Defendant has not identified any specific motions.  However, the Court

denies this motion without prejudice for refiling in this action upon a showing of good cause.

> **ACCORDINGLY**, it is

> **ORDERED** that Defendant's motion to suppress the evidence obtained from his devices
(Dkt. No. 25) is **<u>DENIED</u>**; and it is further

> **ORDERED** that Defendant's motion to suppress his statements made to CBSA officers
(Dkt. No. 25) is **<u>DENIED</u>**; and it is further

> **ORDERED** that Defendant's requests for a hearing on his motions to suppress (Dkt. No.
25) are **<u>DENIED</u>**; and it is further

> **ORDERED** that Defendant's motion to compel discovery (Dkt. No. 25) is **<u>DENIED</u>**; and
it is

> **ORDERED** that Defendant's motion for leave to file any other motion that may become
necessary (Dkt. No. 25) is **<u>DENIED</u> without prejudice** for refiling in this action upon a
showing of good cause.

Dated: August 24, 2012
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.                                                              5:11-CR-0602
                                                                 (GTS)
JOSEPH VINCENT JENKINS,

                                    Defendant.

_____

APPEARANCES:                                          OF COUNSEL:

HON. RICHARD S. HARTUNIAN               TAMARA THOMSON, ESQ.
  United States Attorney for the N.D.N.Y.     GWENDOLYN CARROLL, ESQ.
  Counsel for the Government                      GEOFFREY J.L. BROWN, ESQ.
100 South Clinton Street                           Assistant United States Attorneys
Syracuse, NY 13261-7198

JOSEPH VINCENT JENKINS
  Defendant, *Pro Se*
Cayuga County Jail
7445 County House Road
Auburn, NY 13021

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

          Currently before the Court in the above-captioned criminal proceeding, charging Joseph

Jenkins ("Defendant") with possessing and transporting child pornography in violation of 18

U.S.C. §§ 2252A(a)(5)(B) and 2251A(a)(1), are the following three pre-trial motions: (1)

Defendant's third motion to dismiss the Indictment and suppress foreign evidence (Dkt. Nos. 86,

90); (2) Defendant's motion for the return of seized items (Dkt. No. 93); and (3) Defendant's

motion for an independent review of the current case (Dkt. No. 92).  For the reasons set forth

below, all three motions are denied.

Defendant's third motion to dismiss the Indictment and suppress foreign evidence (Dkt. Nos. 86, 90) is denied on each of two alternative grounds.  First, that motion is untimely, for the reasons specified in the Court's Text Order of June 27, 2013.[1]  Second, that motion is unsupported by a showing of cause, for the reasons articulated in the Government's opposition papers.  (Dkt. No. 94, at 3-13 & Attach. 1.)

Defendant's motion for the return of seized items (Dkt. No. 93) is denied as unsupported by a showing of cause, for the reasons articulated in the Government's opposition papers.  (Dkt. No. 94, at 13-17 & Attach. 2.)

Finally, Defendant's motion for an independent review of the current case is based on the following two grounds: (1) the prosecutorial misconduct to which he has been subjected (e.g., through the wrongful interference in and mischaracterization of a Canadian criminal proceeding, the illegal acquisition of foreign evidence and use of it to institute these proceedings, the false claim of jurisdiction over Defendant, the failure to disclose discovery in a timely matter, the purposeful concealment of paperwork from computer forensic examinations, and the manufacturing of false computer examinations, etc.); and (2) the judicial misconduct to which he has been subjected (e.g., through the turning of a blind eye to the prosecutorial misconduct in this action, the exhibition of bias, the abuse of discretion, the deprivation of proper discovery, the denial of the right to a fair trial, and a conspiracy with the prosecution to ignore or purposely misconstrue defense requests, etc.).  (Dkt. No. 92.)  Underpinning both of these grounds is a reassertion of the arguments that Defendant asserted in his third motion to dismiss the Indictment

---

[1]     Because this Decision and Order is intended primarily for the review of the parties, the Court will assume the reader's familiarity with the procedural history of this action.

and suppress foreign evidence, and his motion for the return of seized items (as well as several other motions previously made, and denied, by the Court).  As a result, that motion is denied as unsupported by a showing of cause, for the reasons articulated in the Government's opposition papers (Dkt. No. 94 & Attach. 1-2), as well as the Court's previous Decisions and Orders.

Defendant is advised that, just as the deadline has closed on the filing of motions to dismiss and motions to suppress (*see* Text Order filed June 27, 2013), the deadline has now closed on motions for the return of seized items, motions for an independent review of the current case, motions for recusal, motions for a third-party review of his legal file, motions for release, motions to reopen the pretrial detention proceeding, motions to compel the discovery of items requested and denied in prior motions, and motions for grand jury investigations.  No such further motions will be permitted.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's third motion to dismiss the Indictment and suppress foreign evidence (Dkt. Nos. 86, 90) is **DENIED**; and it is further

**ORDERED** that Defendant's motion for the return of seized items (Dkt. No. 93) is **DENIED**; and it is further

**ORDERED** that Defendant's motion for an independent review of the current case (Dkt. No. 92) is **DENIED**.

Dated:  August 7, 2013
            Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

3

Case 5:14-cr-00088-EAW Document 42 Filed 01/12/16 Page 81 of 890
**A77**
Case 5:11-cr-00602-GTS   Document 120   Filed 12/12/13   Page 1 of 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.                                                             5:11-CR-0602
                                                                  (GTS)
JOSEPH JENKINS,

                              Defendant.

_____

APPEARANCES:                                    OF COUNSEL:

HON. RICHARD S. HARTUNIAN          TAMARA THOMSON, ESQ.
   United States Attorney for the N.D.N.Y.    GWENDOLYN CARROLL, ESQ.
   Counsel for the Government            GEOFFREY J.L. BROWN, ESQ.
100 South Clinton Street                      Assistant United States Attorneys
Syracuse, NY 13261-7198

OFFICE OF AARON M. GOLDSMITH         AARON M. GOLDSMITH, ESQ.
   Counsel for Defendant
225 Broadway, Suite 715
New York, NY 10007

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this criminal proceeding against Joseph Jenkins

("Defendant") for one count of transporting child pornography in violation of 18 U.S.C.§

2252A(a)(1) and one count of possessing child pornography in violation of 18 U.S.C. §

2252a(a)(5)B), is Defendant's second motion to suppress evidence seized by Canadian officers

from his laptop computer and thumb drive on May 24, 2009, at a secondary inspection area at the

United States-Canadian border.  (Dkt. No. 116.)  The Government has opposed Defendant's

motion.  (Dkt. No. 119.)  Defendant was afforded the opportunity to file a reply but chose not to

do so.  (*See* Docket Sheet.)  For the reasons set forth below, Defendant's motion is denied.

## I.    RELEVANT PROCEDURAL BACKGROUND

Because this Decision and Order is intended primarily for the parties, the Court will not recite in detail the action's procedural history, but will merely highlight the most-recent portions of that history.

On July 9, 2012, after receiving an extension of time in which to do so, Defendant filed (through counsel) his first motion to suppress evidence seized by Canadian officers from his laptop computer and thumb drive on May 24, 2009, at a secondary inspection area.  (Dkt. No. 25; Text Order filed June 29, 2012.)  On August 24, 2012, the Court denied that motion.  (Dkt. No. 34.)  In that motion, Defendant also requested, inter alia, leave to "bring any additional motions which may become necessary based upon any possible new developments in the Government's prosecution of the case, the Government's response to the present motions or new facts uncovered by the Defendant's ongoing investigations."  (Dkt. No. 25.)  The Court denied that particular request without prejudice to "refiling in this action upon a showing of good cause."  (Dkt. No. 34, at 11-12.)

On June 27, 2013, the deadline for motions to suppress closed, after being extended nunc pro tunc for nearly a year, out of special solicitude to Defendant.  (Text Order filed June 27, 2013.)  The expiration of that deadline on June 27, 2013, was expressly acknowledged by the Court on August 7, 2013.  (Dkt. No. 99.)

On October 15, 2013, new counsel appeared for Defendant.  (Dkt. No. 111.)  On November 8, 2013, Defendant filed his second motion to suppress evidence seized by from his laptop computer and thumb drive on May 24, 2009, at the secondary inspection area.  (Dkt. No. 116.)

## II.     GOVERNING LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Generally, a search conducted without a warrant is *per se* unreasonable. *United States v. Irving*,

452 F.3d 110, 123 (2d Cir. 2006).  However, one of the exceptions to the warrant requirement is

searches conducted at the border, or its functional equivalent. *Irving*, 452 F.3d at 123.[1] The main

rationale for this exception is "the long-standing right of a sovereign to protect itself by stopping

and examining persons and property crossing into [the] country."  *United v. Ramsey*, 431 U.S.

606, 616 (1977).  It is this decision of a person to enter into the country that makes the

suspicionless search of his belongings reasonable.  *See United States v. Asbury*, 586 F.2d 973,

975 (2d Cir. 1978) ("Routine searches of a person's belongings and effects are made reasonable

by his decision to cross the border."); *Irving*, 452 F.3d at 123 ("[R]outine border searches of a

person's belongings are made reasonable by that person's decision to enter this country . . . .");

*United States v. Maigar*, 568 F. Supp.2d 245, 247 (N.D.N.Y. 2008) (Kahn, J.) ("[B]order

searches are made reasonable by the person's decision to cross the border . . . .").

Pursuant to this border-search exception, the Second Circuit has long held that "routine"

searches conducted at the border do not require probable cause or even reasonable suspicion.

*Irving*, 452 F.3d at 123; *United States v. Charleus*, 871 F.2d 265, 267 (2d Cir. 1989).  "Routine"

border searches include searches of personal belongings, such as luggage.  *Charleus*, 871 F.2d at

267-68.  Generally, these personal belongings also include electronic devices (so long as the

---

[1]     The "border" includes the secondary inspection area as well as "a reasonable
extended geographic area in the immediate vicinity of any entry point."  *Irving*, 452 F.3d at 123-
24.

search is cursory in nature).  *See, e.g., United States v. Young*, 12-CR-0210, 2013 WL 885288, at

*2 (W.D.N.Y. Jan. 16, 2013) ("Searches of computers and electronic devices are likewise

considered routine searches that may be conducted in the absence of reasonable suspicion. . . .

Therefore, I conclude that the review of the contents of defendant's cellular telephones was a

permissible border search."); *cf. United States v. Borello*, 766 F.2d 46, 58-59 (2d Cir.1985)

("[T]he opening of the cartons and the screening of the films were plainly permissible steps in a

reasonable border search."); *see also United States v. Pickett*, 598 F.3d 231, 234-35 (5th Cir.

2010) (holding that border search of thumb drives, portable hard drives, and laptop memory card

was permissible without a warrant); *United States v. Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008)

(holding that border search of laptop computer, separate hard drive, computer memory stick, and

six compact discs found in vehicle was permissible without a warrant); *United States v.

Linarez-Delgado*, 259 F. App'x 506, 508 (3d Cir. 2007) (holding that border search of contents

of camcorder during search of belongings was permissible without a warrant); *United States v.

Ickes*, 393 F.3d 501, 504 (4th Cir. 2005) (holding that border search of computer and disks found

in vehicle was permissible without a warrant).

      With regard to whether a forensic examination of such an electronic device (revealing

password-protected files, deleted files, etc.) can be a "routine" search, it appears possible that it

can be–unless it is destructive of the device, or carried out in a "particularly offensive manner."

*See United States v. Flores-Montano*, 541 U.S. 149, 152 (2004); *United States v. Montoya de

Hernandez*, 473 U.S. 531, 540 (1985).  However, at least one Circuit Court has held that a

forensic examination of such an electronic device is not "routine," thus requiring reasonable

suspicion.  *See United States v. Cotterman*, 709 F.3d 952, 960-68 (9th Cir. 2013) (distinguishing

4

between a cursory manual inspection of a laptop conducted at a border and a comprehensive "forensic examination" conducted at a different time and place, which requires reasonable suspicion).

## III.  ANALYSIS

After carefully considering the matter, the Court denies Defendant's second motion to suppress based on each of the following three alternative grounds: (1) the violation of the Court's Scheduling Order; (2) the law-of-the-case doctrine; and (3) the merits.

### A.  Violation of Court's Scheduling Order

As a threshold matter, Defendant's motion is denied as untimely.  The deadline for motions to suppress closed on June 27, 2013 (*see* Text Order dated June 27, 2013; Dkt. No. 99). As a result, the motion is four-and-a-half months late.  Ordinarily, the Court might grant an extension to the deadline, given defense counsel's appearance in the case on October 15, 2013. However, the Court will not do so because Defendant has not shown that he was unable to retain counsel before October 15, 2013.  Indeed, Defendant was found to be able to afford counsel on November 8, 2012 (Dkt. No. 48), and he subsequently acknowledged that his delay in obtaining counsel was his inability to find a lawyer that "wants to do what I want them to do" (*see, e.g.,* Dkt. No. 87, at 5).

### B.  Law-of-the-Case Doctrine

In the alternative, Defendant's motion is denied based on the law-of-the-case doctrine. Contrary to what Defendant argues, the Court's denial of Defendant's previous motion requesting this relief (Dkt. No. 34) was not "without prejudice."  Rather, the denial was with prejudice.  (Dkt. No. 34, at 12.)  *Cf. Shockley v. Vermont State Colleges*, 793 F.2d 478, 481 (2d

Cir. 1986) (applying point of law that dismissal of action for failure to state claim is with

prejudice where district court fails to state that it is without prejudice).  What Defendant is

referring to is the disposition of Defendant's separate request for leave to "bring any additional

motions which may become necessary based upon any possible new developments in the

Government's prosecution of the case, the Government's response to the present motions or new

facts uncovered by the Defendant's ongoing investigations." (Dkt. No. 25, Attach. 1, at 11.)  It

was *that* motion which the Court denied "without prejudice," requiring Defendant to both renew

that motion and show good cause, if he wanted to file another motion to suppress the evidence in

question.  (Dkt. No. 34, at 11-12.)  This he has not even attempted to do.

Moreover, contrary to defense counsel's suggestion, the prior denial was not based

exclusively, or even "largely," on procedural grounds.  (Dkt. No. 116, Attach. 1, at ¶¶ 14, 16.)

Rather, the denial was based on the merits.  Granted, the prior denial was partially based on the

lack of an affidavit based on personal knowledge.  However, the prior denial was also expressly

based on the following grounds: (1) the fact that the exclusionary rule does not apply to the law

enforcement activities of foreign law enforcement officials acting in its own country, where

those activities neither shock the conscience nor result from a cooperative investigation with

United States law enforcement; (2) the fact that the search was lawful under the United States

border-search doctrine; and (3) the fact that the *Cotterman* case is distinguishable from the

current case.  (Dkt. No. 34, at 4-9.)

As a result, the Court's rejection of the issues presented by the current motion is the law

of the case, and Defendant has not even attempted to move for reconsideration with regard to the

decision.

### C.    The Merits

In the alternative, Defendant's second motion to dismiss is denied on the merits. Contrary to Defendant's suggestion, the search of the laptop and thumb drive was not materially distinct from the search of the vehicle.  Rather, the search of those personal belongings–which were found *inside* Defendant's vehicle–was part of the search of the vehicle, occurring at the same approximate time and place as the search of the vehicle (i.e., a forty-five minute period at the secondary inspection area).  (Dkt. No. 27, Attach. 1, at 2 [attaching CBSA BSO Garrah's Will Say Stmnt., stating that search of vehicle began at 9:00 a.m., search of laptop found inside vehicle began at 9:10 a.m., and search of thumb drive found inside vehicle occurred at 9:50 a.m.]; Dkt. No. 27, Attach. 2, at 2-4 [attaching CBSA BSO Hache's Will Say Stmnt., stating that search of vehicle began at 8:59 a.m., search of laptop found inside vehicle began at 9:10 a.m., and search of thumb drive found inside vehicle occurred at 9:45 a.m.]; Dkt. No. 27, Attach. 4, at 2 [attaching CBSA BSO Johnston's Will Say Stmnt., stating that search of vehicle began at 9:00 a.m., search of laptop found inside vehicle began at 9:05 a.m., and search of thumb drive found inside vehicle occurred at 9:50 a.m.].)

Stated differently, the search of Defendant's non-password-protected laptop and thumb drive was both routine and cursory under the relevant law.  *See, supra,* Part II of this Decision and Order (citing cases).  The Court notes that *Cotterman* is distinguishable in the three ways described by the Government.  (Dkt. No. 119, at 2-3; *see also* Dkt. No. 34, at 9.)  In any event, the case is not controlling in this Circuit.

The Court notes also that it rejects any suggestion of impropriety regarding the post-arrest search, on May 24, 2009, of the computers and/or thumb drives found in Defendant's

7

vehicle, due to the inventory-search exception, the inevitable-discovery doctrine, and/or the independent-source doctrine. *See, e.g., United States v. McCargo*, 464 F.3d 192, 201 (2d Cir. 2006) ("[N]on-discretionary inventory searches of vehicles are constitutional, without any quantum of suspicion, in order to protect the police from the potential danger posed by items left behind."); *United States v. O'Brien*, 498 F. Supp.2d 520, 547 (N.D.N.Y. 2007) (Sharpe, J.) ("Despite the unlawful seizure of the notes and correspondence on the desktop and given the material left behind in the desk drawers, it was inevitable that Schatzel would do as Sheeley did–obtain a search warrant and seize all of those items."); *United States v. Howe*, 09-CR-6076, 2011 WL 2160472, at *13 (W.D.N.Y. May 27, 2011) ("Although Howe's privacy interests were violated by the warrantless searches, I find that suppression of the evidence seized from the laptop is not required. Under the independent source doctrine, evidence originally discovered by illegal means, but seized later pursuant to lawful means will not be suppressed.").

     **ACCORDINGLY**, it is

     **ORDERED** that Defendant's second motion to suppress evidence seized by Canadian officers from his laptop computer and thumb drive on May 24, 2009, at a secondary inspection area at the United States-Canadian border (Dkt. No. 116) is **<u>DENIED</u>**.

Dated: December 12, 2013
     Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------x
UNITED STATES OF AMERICA

vs.                              11-cr-602

JOSEPH VINCENT JENKINS,

                              Defendant.
------------------------------------------x

                  Transcript of *Pretrial Conference* held on

April 25, 2013, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Court Judge, Presiding.


                  A P P E A R A N C E S

For Government:      OFFICE OF THE UNITED STATES ATTORNEY
                     P.O. Box 7198
                     100 South Clinton Street
                     Syracuse, New York  13261-7198
                       BY:  TAMARA THOMSON, AUSA
                            GWENDOLYN E. CARROLL, AUSA

For Defendant:       JOSEPH VINCENT JENKINS
                     Cayuga County Jail
                     7445 County House Road
                     Auburn, NY 13021



                  *Eileen McDonough, RPR, CRR*
                 *Official U.S. Court Reporter*
                     *100 S. Clinton Street*
                   *Syracuse, New York 13260*
                       *(315)234-8546*

2

1              THE CLERK:  5:11-cr-602; United States of

2     America versus Joseph Vincent Jenkins.  Counsel, can you

3     please note your appearance?

4              MS. THOMSON:  Good morning, Your Honor.

5     Tamara Thomson on behalf of the United States.

6              MS. CARROLL:  Good morning, Your Honor.  Gwen

7     Carroll on behalf of the United States.

8              THE COURT:  And we have Mr. Jenkins here this

9     morning.  Good morning, Mr. Jenkins.  How are you?

10             THE DEFENDANT:  Good.

11             THE COURT:  We're here for a pretrial

12    conference.  I need to determine the status of where you are

13    in trying to hire an attorney, if you've made any attempts,

14    what those attempts are, and then we're going to talk about

15    moving this case forward.

16             Now, there is some things you need to

17    understand.  I've received letters that you've written and

18    discovery demands that you've made of the government.  First

19    of all, when you were making those demands, this Court was

20    divested of any jurisdiction over your case because you had

21    filed an appeal to the Second Circuit.  You have since

22    withdrawn that appeal, which is why you're before me today.

23    I now have jurisdiction over your case again, so I intend to

24    get it moving, and make sure that you have counsel and move

25    this case forward.  Okay, sir?

3

1          So, first of all, have you made any attempts

2   to hire an attorney, and if you have, what have you done?

3          THE DEFENDANT:  I've informed -- I can't

4   really look for an attorney myself because I'm in jail.  My

5   parents have been looking and we haven't -- being where this

6   case is right now and the condition it's in, we're having

7   trouble trying to find someone.  I guess they went through

8   eight, eight attorneys.

9          THE COURT:  How recently have they done that,

10  Mr. Jenkins?  Do you know over what period of time?

11         THE DEFENDANT:  Definitely since last

12  November, December I guess.

13         THE COURT:  Over the last few months?

14         THE DEFENDANT:  Yeah.

15         THE COURT:  Do you know, are they continuing

16  to try and secure someone to represent you at this point?

17         THE DEFENDANT:  Yes.

18         THE COURT:  They are, okay.  Well, you need to

19  tell me what you want to do.  I don't want to let your case

20  languish, and I know you don't want that.  You want to get

21  going as well, I read that in your letters, the frustration.

22  And you, obviously, need an attorney to advise you of all

23  these things, either a lot of procedural things and different

24  rules and laws, that's clear anybody would need assistance

25  with, even attorneys.  You know, they say an attorney that

4

1   tries to represent himself has a fool for a client.  It's

2   something you never want to do because you're too emotionally

3   involved and there are too many rules, and certainly without

4   any legal training, you're at a huge disadvantage.  So, I

5   want to make sure you have an attorney.

6            Let me ask you this question.  Do you feel

7   that your parents are going to be able to assist you in

8   getting an attorney in a timely manner?  I'm talking about in

9   a week or two, I can't let it go any longer than that.   When

10  is the last time you talked to your parents?

11           THE DEFENDANT:  I talk to them a couple times

12  a week.

13           THE COURT:  A couple times a week?

14           THE DEFENDANT:  They said that's pretty much

15  all they can.

16           THE COURT:  Here's what I'm going to do,

17  here's what I suggest.  I'm going to give you two names of

18  local attorneys that I know are good attorneys, competent and

19  would have the ability to represent you in a very

20  professional and adequate manner, more than adequate manner,

21  and you can talk to your parents about interviewing them.

22  I'll ask them to come to the jail to see you.  Because if you

23  don't retain an attorney within a week to two weeks, at the

24  most, that's the most I want to give you, I'm going to assign

25  somebody to you and we're going to get started and then the

5

1   government can go after any assets you may have to try to pay

2   for that attorney afterwards, because I don't want to let

3   your case languish any longer.  Like I said, we haven't had

4   any authority over it or jurisdiction over the case for

5   several months now because of your appeal.

6          THE DEFENDANT:  By the way, I didn't ask for

7   that appeal.

8          THE COURT:  Well, it was filed, all right.

9   And that divested this court of any jurisdiction, so there is

10  no reason to argue about it now, it's water over the dam.  I

11  want to move forward from here.

12         So, I'm going to ask Mike Spano and William

13  Sullivan to come and see you and you give them your parents'

14  information as far as contacting your parents.  You decide

15  which one you would like to have represent you.  If you

16  haven't -- and, of course, you can hire anybody you want,

17  obviously.

18         THE DEFENDANT:  That was the thing, too, I've

19  been advised not to hire an attorney.  Parry advised me not

20  to hire an attorney because of the possibility of a perjury

21  charge or something like that, I don't know.

22         THE COURT:  You've got to have an attorney.

23  Okay?  I mean, you've got to have an attorney, so we're going

24  to get you one one way or another.  I'm giving you these two

25  names.  I'm going to have my courtroom deputy contact these

6

1   lawyers, I'm going to ask them to come see you, that way I'm

2   giving you at least some type of a choice.  And, of course,

3   as I indicated, you hire anybody you want, but I don't want

4   this process to languish, so I'm going to assist you here.

5   And if you tell me my parents found somebody and hired them,

6   then I'll tell these gentlemen they don't need to come see

7   you.  But I want it to happen within the next week.

8           THE DEFENDANT:  I did have one attorney come

9   see me and she didn't seem to -- we just didn't seem to

10  connect.

11          THE COURT:  Well, it's important that you

12  connect, all right.  At least you have got to have an open

13  line of communication, you've got to -- we're going to get

14  this moving.  Okay?

15          So, that's what we'll do at this point then.

16  I'm going to ask these two gentlemen to come see you, unless

17  I hear otherwise from you.  And you can contact us.  I'm

18  going to ask the marshals to give you an opportunity, you're

19  going to have to notify them, but, look, I need to talk to

20  the courtroom deputy of Judge Suddaby to let them know I have

21  an attorney or that I've met with these two individuals and

22  this is the one I would like to proceed with.  Okay?  And

23  that's what we're going to do.

24          And you can always have your parents contact

25  my court directly as well.  Tell them if they found somebody

7

1  that they're comfortable with that you want to proceed with,

2  have your parents contact us and I'll tell the two attorneys

3  that I've mentioned that they don't need to come see you.

4  Okay?

5              THE DEFENDANT:  So, the discovery requests I

6  made aren't any good then?

7              THE COURT:  Well, they were made during a time

8  period when this court didn't have any jurisdiction.  And

9  please understand something, you can make all sorts of

10  discovery requests about Canada and all the rest of it, but

11  they can only provide you with what they have.  Okay?  What

12  they're in possession of and what they intend to use on their

13  case.  I don't imagine, and I'm not going to speak for the

14  government, but I don't imagine that they have anything from

15  Canada that they're going to use.  The way I understand your

16  case, sir, is that you were charged at the border with having

17  certain materials, so that's what they're interested in, and

18  I'm sure that's what these charges are they're going to

19  pursue.

20              So, you know, I've seen all your theories

21  about the Canadian government and the U.S. government and

22  some kind of conspiracy, but please understand, their job is

23  whatever you were charged with, that's the information that

24  they're responsible for and that they have and that's what

25  they can provide copies of to you or whatever the information

(8)

```
 1    they intend to use.  They have no responsibility to go to
 2    Canada and try to get any type of information.  Okay?  And
 3    I'm quite certain they don't have any interest in that.
 4              THE DEFENDANT:  That's the problem, my stuff
 5    in Canada is a lot of interest to me, and I haven't been able
 6    to contact my Canadian attorney because I'm stuck here.  I
 7    was told that he sent Mr. Parry everything that he had and
 8    Mr. Parry has been kind of playing games with what he wants
 9    to show me.
10              THE COURT:  What we'll do is we'll have
11    Mr. Parry turn over his entire file to whoever your new
12    lawyer is, and we can ask him to do that and I will ask him
13    to do that.  You say you talk to your parents a couple times
14    a week.  If you want to have communication with your lawyer
15    in Canada, have your parents get ahold of him.
16              THE DEFENDANT:  He won't talk to them.
17              THE COURT:  I can't help you with that and
18    they can't help you with that; that's your business.  You can
19    ask your parents to call him and ask him to call you directly
20    at the jail, there is ways to get it done if you need to talk
21    to him.
22              But, again, these Assistant United States
23    Attorneys, I'm quite certain, unless they tell us otherwise,
24    are not really interested in what happened in Canada.
25    They're interested in what happened at the United States
```

9

1    border.   And I think that's the crux of their case.   So

2    that's what you need to focus on.   Okay?   Do you have any

3    questions?

4                    THE DEFENDANT:   Yeah, but I don't think -- I

5    don't think you can tell me at this point.

6                    THE COURT:   I think what's really important,

7    Mr. Jenkins, is to get you a lawyer and let's get going,

8    let's move this case forward.   I'll do everything in my power

9    to make sure that happens.

10                    THE DEFENDANT:   Is there any way we can talk

11   about pretrial release?

12                    THE COURT:   That's not going to happen, not

13   under these circumstances, no.   And you should have an

14   attorney if you want to make an argument like that.   That's

15   something that should be submitted to the court through an

16   attorney, because there is a procedure for that.   Again,

17   which I've seen your letters and the rest of it, you want to

18   be released.   Under these circumstances and what you've been

19   charged with, that's not going to happen.

20                    Mr. Jenkins, my courtroom deputy is telling me

21   that we've already heard back from Mike Spano, one of the

22   attorneys that I'm recommending talk to you.   He is in trial

23   next week so he probably won't be able to meet with you next

24   week, but we're going to contact this other one, William

25   Sullivan, and see if he can meet with you next week.   We're

Done

*4-25-13        Charges        All evidence*
*Sought Matter Considered*

(10)

```
 1    going to keep this process moving forward.
 2                  Please understand, you can retain whoever you
 3    want.  Okay?  You can retain either one of these gentlemen if
 4    you like one of them.  If you don't retain them, and you
 5    don't have an attorney within the next week, two weeks at the
 6    most is what I'm going give you, I'm going to assign somebody
 7    to you to get this case moving and then they'll try and
 8    seek -- they'll try and go after whatever assets you have to
 9    get payment for those attorneys.
10                  So, I'm giving you an opportunity to make your
11    own decision to retain somebody with your parents, however
12    you want to do it.  I'm supplementing this process by having
13    these attorneys meet with you.  You tell me, yeah, I like one
14    of these guys and I'll retain them with my parents, or if you
15    don't, I need to hear that, and at that point if you don't
16    have somebody within the next week, two at the most, I'm
17    going to assign somebody and we're going to get started and
18    move this case forward.
19                  THE DEFENDANT:  I'm just not sure I'm going to
20    be able to work with a lawyer.  I can see how everybody wants
21    to focus on what happened in the United States here, but it's
22    not the whole case.  There is a two year history before that,
23    and it's got to factor in somewheres.
24                  THE COURT:  The charges are about what
25    happened in the United States.  These prosecutors have no
```

*No*
*incompetence, gives*

(11)

 1   interest, I have no interest what happened two years ago in
 2   Canada, none whatsoever.  That's not with what this case is
 3   about.  You may be obsessed about it and think that it's
 4   important.  It has nothing to do with your case here and
 5   you've got to accept that.
 6            I understand that was some of the problems
 7   that you had with Mr. Parry because motion papers he was
 8   asking for stuff in Canada, which they don't have and they
 9   don't have control over.  So, you need to accept that.  And
10   you got to have a lawyer.  You're at a huge disadvantage and
11   you cannot proceed without somebody who knows the rules and
12   knows the laws, can help you and assist you in your defense.
13   It just isn't going to work.
14            So, we're going to focus on getting you a
15   lawyer that you want and that you can work with, and that's
16   what I'm trying to do, sir.  And I'll do whatever I can to
17   assist you in that regard.  But you've got to be willing to
18   understand and accept their counsel and their advice because
19   they're the ones that are trained and understand what these
20   charges are about and what you need to do, so you need to
21   work with somebody and listen to them.  Okay?
22            THE DEFENDANT:  Okay.
23            THE COURT:  All right, sir.  So, we're going
24   to try and get Mr. Sullivan to see you right away.  Please
25   contact your parents, work with your parents as much as

12

1   possible to get this done.  But you understand my timetable

2   and the way I'm moving forward?

3                  THE DEFENDANT:  Right.

4                  THE COURT:  Okay?

5                  THE DEFENDANT:  All right.

6                  THE COURT:  All right.  The government, would

7   you like to be heard on any of this?

8                  MS. THOMSON:  No, Your Honor.  I guess just

9   one point.  If the defendant at some point believes that he

10  is eligible for court-appointed counsel, of course that

11  option is also available to him.  The Court had referenced

12  the government going after his assets.  If the defendant's

13  position has changed, he always has that right to make that

14  application to the court.

15                 THE COURT:  Of course.  And I've indicated,

16  you know, that's why if he doesn't retain someone pretty

17  quickly, I'm going to assign somebody and that determination

18  can be made after.  If he is now eligible somehow, well then

19  fine, but my understanding is he had assets and therefore he

20  wouldn't be entitled.  But if that has changed, then we'll

21  take a look at that and we're going to make sure he has a

22  lawyer so this case can proceed.

23                 THE DEFENDANT:  If I do qualify it wouldn't be

24  one of those lawyers, it would be somebody else?

25                 THE COURT:  No, it could be one of those

13

1   lawyers.  I didn't want to just give you one and say this is

2   who you're going to have to deal with.  I'm sending at least

3   two to see you so you have an option to say I like this guy a

4   little better than the other and you connect with him.

5   They're both very good lawyers.  I know them both, worked

6   with them both, they're good gentleman.  And I'm convinced

7   that they can help you and that's why I'm asking them to come

8   see you.

9                   THE DEFENDANT:  Thank you.

10                  THE COURT:  Anything else from the government?

11                  MS. THOMSON:  No, Your Honor, thank you.

12                  THE COURT:  All right, Mr. Jenkins, we'll talk

13  to you soon.

14                  THE DEFENDANT:  Okay, thank you.

15                  THE COURT:  All right.

16                  THE CLERK:  Court is adjourned.

17                  *              *              *

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, EILEEN MCDONOUGH, RPR, CRR, Official Court Reporter in and for the United States District Court, Northern District of New York, DO HEREBY CERTIFY that I attended the foregoing proceedings, took stenographic notes of the same, and that the foregoing is a true and correct transcript thereof.

EILEEN MCDONOUGH, RPR, CRR
Official U.S. Court Reporter

563

 1    number of witnesses regarding the chain of custody in this

 2    case that did provide certain vouchers related to it, we did

 3    not hear from Detective Sergeant Harrington who was the

 4    forensic expert and had possession of them, at least the

 5    physical evidence materials for some period of time during

 6    the Canadian investigation is not present.  Accordingly,

 7    while I do certainly understand the chain of custody

 8    arguments are viewed in light of the preponderance standard

 9    and light most favorable to the government, I do think there

10    was a significant gap that was not appropriately established

11    and therefore would continue my objection and feel that the

12    evidence should not be deemed properly admissible.

13              THE COURT:  Who wants to be heard?

14              MS. CARROLL:  I can be heard.  Your Honor, we

15    actually have a completely accurately documented chain of

16    custody with no missing links.  Harrington does not appear on

17    the chain of custody forms because he was not the evidence

18    custodian.  It was signed into the forensic lab by Michel

19    Boulay, who assigned the numbers to it and it stayed in the

20    custody, during that part of the chain of custody it was only

21    logged out of the forensic lab to be stored by Paul Thompson

22    in another secure facility.  Harrington actually could not

23    provide evidence on the chain of custody because he doesn't

24    appear in it.

25              THE COURT:  So what was Harrington's role with

564

1    regard to the evidence?

2              MS. CARROLL:  He performed the imaging.

3              THE COURT:  Okay.

4              MR. GOLDSMITH:  He was the Canadian forensic.

5              THE COURT:  You're saying it never left the lab, it

6    was never signed out, it was always in the custody of the

7    lab.

8              MS. CARROLL:  Exactly.

9              THE COURT:  Okay.  Yeah, I'm going to overrule the

10   objection, I feel that there's sufficient factual basis to

11   establish, legally establish chain of custody that's

12   acceptable to this court to receive all the items that have

13   been received subject to connection into evidence so they

14   will be received into evidence.  Now of course the chain of

15   custody arguments that you'd like to make or choose to make

16   to this jury are still something that you can do, that's a

17   fact question for this jury as well.  You can make those

18   arguments but I find that it's legally sufficient so it will

19   be received.

20             MR. GOLDSMITH:  Thank you.

21             THE COURT:  Okay.  Anything else?  You're going to

22   rest?

23             MS. CARROLL:  Yes.

24             THE COURT:  I'll have you rest in front of the

25   jury, I'll excuse the jury, I'll let you talk to your client

```
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                              5:11-CR-602

JOSEPH VINCENT JENKINS,

                     Defendant.
-------------------------------------------x
```

       Transcript of a Final Pretrial Conference

held on January 21, 2014, at the James Hanley

Federal Building, 100 South Clinton Street,

Syracuse, New York, the HONORABLE GLENN T. SUDDABY,

United States District Judge, Presiding.


         A P P E A R A N C E S

```
For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWENDOLYN CARROLL, ESQ.

For Defendant:      AARON GOLDSMITH, ESQ.
(Via Telephone)     Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007
```

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 106 of 890
**A102**
Case 5:11-cr-00602-GTS Document 164 Filed 05/30/14 Page 2 of 25

2

```
 1              (In Chambers, Mr. Goldsmith present via
 2              telephone, 11:15 a.m.)
 3         THE CLERK:  Mr. Goldstein -- Goldsmith, I'm sorry.
 4         MR. GOLDSMITH:  That's okay.
 5         THE CLERK:  I'm here with the Judge and Tamara
 6    Thomson and the court reporter.
 7         MS. THOMSON:  Hello.
 8         MR. GOLDSMITH:  Good morning, everyone.
 9         THE COURT:  Good morning, how are you today?
10         MR. GOLDSMITH:  Doing all right, got one of those
11    rare days where we got the snowstorm but I think you guys are
12    clear.
13         THE COURT:  Yeah, that's very rare, but trust me, I
14    think you'd rather be where you are based on the
15    temperatures.
16         MR. GOLDSMITH:  We're already at 20, we're supposed
17    to be at 10 the next few days.
18         THE COURT:  I was driving in this morning, my car
19    said 1.
20         MR. GOLDSMITH:  I think we'd all rather be in
21    Florida.
22         THE COURT:  Yeah.  Well, maybe we'll move this
23    case, what do you think?  All right, we'll move down there.
24    Okay.  I just have a list we need to go through, make sure
25    that we're all set to proceed with the trial in an
```

3

1   expeditious manner and we'll do that.  So the first thing I'd

2   like to cover, are there any outstanding discovery issues,

3   has all the documentation been exchanged, all that sort of

4   stuff?  I'll start with the prosecution and then we'll hear

5   from you, Mr. Goldsmith.

6           MS. THOMSON:  From our end, we're all set.  We were

7   asked to show the evidence to the defendant and we've offered

8   a couple different dates, I don't know where we stand with

9   that but the evidence is available for inspection and we're

10  ready to go.

11          THE COURT:  Okay.  Mr. Goldsmith?

12          MR. GOLDSMITH:  Yeah, that's correct, I've notified

13  that I just did want to see the originals and I think we'll

14  be able to arrange that certainly if not beforehand, then

15  I'll try to get up there, you know, during jury selection

16  just to take a quick preview, but I'm not concerned about

17  getting that done and I don't think it will be an impediment

18  in any way to our proceeding.

19          MS. THOMSON:  Just for clarification, and I asked

20  for this clarification in an e-mail, is it that you wish to

21  see, to view the original evidence or did you --

22          MR. GOLDSMITH:  Yeah.

23          MS. THOMSON:  Okay, so you wish to view it.  With

24  regard to looking at any of the electronic evidence, anything

25  that you want to look at is available for you but we would

4

1    work off of the image because we don't touch the original, we

2    work off of the image that was done.  So I just want to make

3    sure you understood that.

4              MR. GOLDSMITH:  Yeah, I do.

5              MS. THOMSON:  Okay, great.

6              THE COURT:  Very well.  Then the next thing we want

7    to talk about is the length of the trial and I'll start again

8    with the government as far as number of witnesses and what

9    you anticipate and, you know, length of time to put your case

10   in.

11             MS. THOMSON:  I don't believe there's going to be

12   any stipulations, so we will have a couple of extra

13   witnesses, they should be very brief, I think we're at about

14   17, tops.

15             THE COURT:  Seventeen witnesses.  And any experts

16   included in that?

17             MS. THOMSON:  We do have one expert that we've

18   given notice of, that is Brian Braisted, he's the American

19   agent who did the forensic examination of the computer.  I

20   will let the court know to the extent that it should become

21   an issue, Kip Wohlert is the Canadian forensic examiner for

22   this evidence, we have not noticed him as an expert because

23   we don't expect him to provide expert testimony.  His

24   testimony, his expertise would be as it relates to Canadian

25   law, he will testify about the actual examination that he

5

1    did, but we're not seeking any expert opinion from him.

2              THE COURT:  Okay.  So how many days do you

3    anticipate in your case?

4              MS. THOMSON:  I don't believe it will be more than

5    four.

6              THE COURT:  Four days.  Okay.  Mr. Goldsmith?

7              MR. GOLDSMITH:  Yeah, I have -- I've provided

8    notice of the two potential character witnesses I may have.

9    I have no expert witnesses, if the defendant chooses to

10   testify, I think even with character witnesses, if we decide

11   to use that, maybe half day.

12             THE COURT:  Half a day?  Okay, so we can get it

13   done in a week which is good.  Any issues with regard to --

14   we've already talked about the evidence being available.  Any

15   other issues with regard to exchange of documents, exhibits,

16   diagrams, anything like that that we need to be concerned

17   with?

18             MS. THOMSON:  Nothing.

19             THE COURT:  Nothing, okay.  Mr. Goldsmith.

20             MR. GOLDSMITH:  The only thing that I have, your

21   Honor, is I requested by e-mail the government's witness list

22   because I wasn't able to access it by ECF.  That's not

23   necessarily an issue concerning discovery or documentation

24   but I would like to have it.

25             MS. THOMSON:  We can do that, that's no problem.

1           THE COURT:  Okay.  All right.

2           THE CLERK:  I can check why, he should have access

3     to that, too.

4           THE COURT:  Okay.  The next thing is stipulations

5     and I've just heard the government say they don't anticipate

6     any stipulations.  I would encourage such things as

7     foundation witnesses and it's a little, you know, I

8     appreciate the fact that it's a criminal case and, you know,

9     Mr. Jenkins may want to be trying to preserve as much of his

10    appellate rights as possible and put the government to their

11    task, but Mr. Goldsmith, wherever you can, and you have the

12    consent of your client, where you feel it's appropriate to

13    save us time when there's real, really no need that you see

14    to challenge foundational type issues, I encourage you to

15    talk with the government, the Assistant United States

16    Attorneys and see if there's any places where you think you

17    can save us some time.  But obviously that's up to you and

18    your client, but I do encourage you to take a look at that

19    stuff and see if there's anyplace that you can --

20          MR. GOLDSMITH:  Yes, your Honor, I'll certainly be

21    mindful of that.  Ms. Thomson and I have previously discussed

22    those issues relative to this case before, and while I

23    certainly want the court to understand that I appreciate the

24    judicial economy of making stipulations, I do so generally

25    when they're appropriate, I think in a case like this,

7

1    foundational witnesses relative to Mr. Jenkins and his

2    desires are probably not going to end up in a stipulation,

3    but I will of course keep an open dialogue with the

4    government as we progress throughout the case and see if we

5    can help along the duration.

6            THE COURT:  Understood.  And appreciate whatever

7    efforts you can do because it just, you know, saves us all

8    time if you know that there isn't really any real issue or

9    appropriate challenge to that type of evidence, it saves the

10   jury time, saves everybody time, so okay.  Any questions

11   about exhibits and how they should be marked and tabbed in a

12   binder, one for the court and one for the clerk, and, you

13   know, providing one to opposing counsel, that, that's

14   expected to be done and be delivered the day we start jury

15   selection.  Any issues with that?

16           MS. THOMSON:  The only issue, your Honor, is as

17   some of our exhibits involve child pornography, at the end of

18   the day we would just ask that the exhibits, you know, stay

19   with either the government or the court, so they don't leave

20   the courtroom.

21           THE COURT:  Okay.

22           MS. CARROLL:  I think the other thing, your Honor,

23   is that we're anticipating doing jury binders so that we

24   don't have to publish the images on the display screens so

25   we'll also have 14 binders for the jury.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

8

1        THE COURT:  Okay.  Okay.  Well, just as long as

2   whatever you have prepared for the jury, as long as there's

3   an understanding that nothing will be displayed until they're

4   admitted and they should be available for review by defense

5   counsel prior to getting to that point in the trial when

6   you're anticipating that testimony, whether you do it the

7   first day, I know the first day can be very busy but, you

8   know, at the end of the first day or the second day, whenever

9   it is, before we get to that point, to make sure

10  Mr. Goldsmith has an opportunity to review those binders so

11  he has seen what will be provided to the jury or published to

12  the jury, okay?

13        MS. THOMSON:  Your Honor, we do have a couple of

14  videos and it's my understanding in other trials, the

15  equipment has been able to be set up so that the portion that

16  would normally be seen by the folks who are watching the

17  trial can be taken out and so we would darken the screens,

18  the attorney screens and darken the screen that the gallery

19  would see and so we will attempt to do the same for this

20  trial, coming up of course with a methodology for the

21  defendant to be able to, to view it but perhaps not at the

22  angle where those in the gallery can see the video.

23        THE COURT:  Okay.  And I anticipate that one of

24  your tech people are going to be working with you?

25        MS. THOMSON:  Yes.

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 113 of 890
**A109**
Case 5:11-cr-00602-GTS  Document 164  Filed 05/30/14  Page 9 of 25

9

1        THE COURT:  Mr. Kittleson?

2        MS. THOMSON:  We're anticipating Mr. Kittleson.

3        THE CLERK:  Because I have no idea how to do that.

4   I can block it out from the jury but I can't block it out

5   from the gallery.

6        THE COURT:  And Mr. Goldsmith, you know, obviously

7   we will make appropriate accommodations so that you and your

8   client can be viewing anything that is being shown to the

9   jury at any time, so we'll just -- I'll ask you to be, to

10  make yourself available and we'll seek your input on how

11  we're going to do that so we can make sure that you have

12  access without the public, anybody that might be attending

13  the trial viewing this material, okay?

14       MR. GOLDSMITH:  Very good, your Honor, and I'll

15  just take one step back to the jury binders, I have no

16  objection to a jury binder system, and I certainly appreciate

17  the government's request of the evidence not leaving the

18  court in the evening, but just as a means of preparation, if

19  needed, if I could find some opportunity, either U.S.

20  Attorney's office or in the court to be able to review any

21  evidence of the following day if I think I need to.

22       THE COURT:  Yeah, that's certainly a reasonable

23  request, and I'm sure that accommodation can be made.

24       MS. THOMSON:  It will be.

25       THE COURT:  You know, that's not an issue.

10

1          MR. GOLDSMITH:  Thank you.

2          THE COURT:  All right.  There's no evidence to

3    anticipate of prior convictions or anything like that?

4          MS. THOMSON:  The only thing that could come up is

5    the defendant when he went to the criminal check which would

6    be his first real checkpoint after driving through the lane,

7    he encountered Melany Boyd and Melany Boyd asked the

8    defendant if he had ever had any arrests, any convictions and

9    he indicated he did not.  The computer was down at that

10   point, and at some point a couple of hours later the computer

11   came back up and it did reveal that the defendant did have an

12   arrest for aggravated harassment in the second degree.  So

13   we're not going to attempt to elicit that specific fact, that

14   was a factor in their encounter with the defendant in

15   believing that he was being deceptive, so we'll be careful

16   about that, but that is a factor.

17         THE COURT:  Well, Mr. Goldsmith, you want to be

18   heard?

19         MR. GOLDSMITH:  Yes, your Honor.  I think it's

20   probably most reasonable that if, you know, in terms of

21   circumstances like this, it be treated like 404(b) material

22   or prior conviction, certainly would go to credibility, not

23   going to be able to argue that but I think it's probably

24   reasonable balance that the court preclude that information

25   unless Mr. Jenkins were to testify in which case then his

1  credibility would be an appropriate issue for the government

2  to explore.

3          THE COURT:  There's a number of different ways I

4  can handle it and it will depend on how the evidence is going

5  in, whether Mr. Jenkins decides to testify, whether you, as

6  you've indicated, you know, anticipate possibly calling some

7  character witnesses, all those things play in, obviously, but

8  certainly if there's any cross-examination or question about

9  why Mr. Jenkins may have been held for secondary or further

10  questioning, that kind of stuff, possibly not, you know, I

11  would do the balancing act and maybe limit what the arrest

12  was but the fact that he may have provided inaccurate

13  information regarding prior involvement with law enforcement,

14  you know, would be something that would be relevant, and I

15  may allow, or I would allow them to get into depending on how

16  this testimony comes out and what the cross-examination is.

17  So if, just so that everybody is advised of that and aware of

18  that, that's the way I would proceed and I'll hear you at the

19  time and I'll do what I believe is the appropriate balancing

20  that I'm required to do in this area.  Okay.

21          MR. GOLDSMITH:  Very well.

22          THE COURT:  All right.  Okay.  And everybody

23  understands the preparation of trial briefs, that they should

24  be prepared and provided.  Is there anything that the

25  government would like to address or any issues that you think

12

1    we need to address as far as the expeditious proceedings of

2    this trial and the way we're going to move through things?

3    Are there any issues that you see that we need to be aware of

4    or that we should address?

5              MS. THOMSON:  We pretty much spelled out the issues

6    as we see them in the trial brief.  One of the issues would

7    be the audio recording of the defendant in jail where he's

8    talking about the existence of child pornography on the media

9    being less than the government indicates so we intend to

10   introduce that evidence, we've put that in the trial brief.

11   We also intend to introduce evidence of the defendant's

12   internet history, data that was found in unallocated space on

13   the other computer that he's not charged with but it does

14   relate to child pornography, it's in our trial brief so we

15   tried to let the court know those issues.

16             We previously litigated flight as consciousness of

17   guilt as our intention to put into evidence the fact that he

18   didn't show up in Canada.  I think it helps the jury

19   understand why we're here and how the case came to be here.

20   And that was previously opposed and made the subject of

21   motion, I believe it was docket 41, I put it in my trial

22   brief, it is our intention to elicit that type of testimony.

23             THE COURT:  Okay, Mr. Goldsmith, you want to be

24   heard?

25             MR. GOLDSMITH:  Yes, your Honor.  I don't

13

1    particularly think that it's necessary for a narrative under

2    what sounds to be described as more of like a 404(b) or

3    background narrative application by the government, I don't

4    think that it is particularly probative on his possession or

5    trafficking of alleged child pornography which are the two

6    counts in the indictment.  If the government is confident in

7    the evidence that it has, I think that the discussion of a

8    Canadian -- of him allegedly evading Canadian authorities is

9    simply going to be more prejudicial than it's probative.  If

10   the government has its case, it can simply rest on the

11   evidence of him traveling at the border and what the

12   forensics they believe are going to show.  I think that any

13   evidence that they have discussing evasion is going to

14   lengthen the case unnecessarily as well.

15          THE COURT:  Well, I'm not going to anticipate what

16   that testimony may be other than what the government's

17   advised me but, you know, certainly these cases shouldn't be

18   and can't be tried in a vacuum where information such as this

19   is not highly prejudicial to the defendant and certainly

20   isn't going to be any secret that, you know, all, how this

21   all happened, you know, U.S.-Canadian border, so again, I'll

22   hear you, you know, I'll expect you to make whatever

23   objections you want as the testimony is coming in or prior to

24   the testimony's coming in.  I don't want to prejudge anything

25   at this point until I've heard it, and I'll give you, you

1  know, my ruling at that time.  So we'll deal with it as we

2  get to it.  So the important thing is that you're, you know,

3  you're aware of it, you've been advised and everybody will be

4  prepared to make their arguments, okay?

5          MR. GOLDSMITH:  Thank you, your Honor.  While we're

6  on the topic, I did file electronically yesterday at the

7  request of my client a request for a so-ordered subpoena for

8  his Canadian counsel that is only appropriate if the

9  government pursues this area of evasion.  As a proffer to the

10  government and the court, simply his barrister in Canada

11  would -- sent him a couple letters describing the warrant

12  issued without any exigency whatsoever for him to reappear in

13  Canada and simply discussed really the return of bail to the

14  barrister to pay off his legal fees.  I recognize the

15  jurisdictional difficulty.

16          THE COURT:  I'm glad you do, because that's the

17  biggest hurdle you have.  I mean you can attempt to get this

18  individual to appear voluntarily, but certainly I'm not going

19  to sign something that has no legal force or effect.  And

20  which it does not.  In Canada.

21          MR. GOLDSMITH:  Right.

22          THE COURT:  You can sign your subpoena and send it

23  up there, if he chooses to, you know, make himself available

24  and come into the jurisdiction to testify, that's completely

25  up to him, but otherwise, there's all sorts of procedures

1      that need to be followed, to attempt to get a witness from

2      another country.  There's MLAT procedures and there's

3      treaties and there's all sorts of stuff that, you know, I

4      just can't help you with.  That's something that needs to be

5      done well in advance and, you know, in anticipation, so I

6      would -- and it sounds like you're aware, Mr. Goldsmith,

7      unless this person wants to be cooperative and make himself

8      available, there's really nothing I can do to assist you.

9              MR. GOLDSMITH:  And what I will do just so that

10     everyone is in the loop, I will notify the government and the

11     court if I make any headway with this voluntary production of

12     that witness.  If I'm able to make any headway with it, I

13     will provide copies of the relevant correspondence to the

14     government immediately, but I'm going to wait to do that work

15     to prevent unnecessary and extra work on behalf of the court

16     and the government unless or until I know I've got somebody

17     who's willing to cooperate.

18              THE COURT:  Government want to be heard?  No, okay.

19     Mr. Goldsmith, sounds perfectly appropriate to me, and

20     that's -- we'll proceed on that basis.

21              MR. GOLDSMITH:  Very good.

22              THE COURT:  Okay.  Jury selection, any questions,

23     requests, anything?  I'll start with the government, as far

24     as, I mean, I anticipate a standard round method of jury

25     selection, nothing out of the ordinary, unless there's

16

1    something that I'm unaware of that you want to make me aware

2    of.

3                MS. CARROLL:  Do you allow back strikes, your

4    Honor?

5                THE COURT:  No.

6                THE CLERK:  Are you limiting per round?

7                THE COURT:  What do you mean limiting per round?

8                THE CLERK:  Doing 4-3-3, 4-2-2, then the fourth

9    round there's nothing left?

10               THE COURT:  Well, I'll hear you, requests with

11   regard to that?

12               MS. THOMSON:  Can we think on it?

13               THE COURT:  Yeah.

14               MS. THOMSON:  Let you know?

15               THE COURT:  Let me know, I'm flexible.  I don't

16   want to waste time, though, I want to be as expeditious as

17   possible in picking this jury but I'll listen to you before

18   we get started.  Mr. Goldsmith, anything?

19               MR. GOLDSMITH:  I have no particular request, I

20   provided my proposed voir dire.  Just being unfamiliar with

21   your Honor's court just for a quick description of how you

22   run it because certainly district courts throughout the

23   country, you run things a bit differently, I want to be

24   prepared.

25               THE COURT:  Yeah.  What I'll do is at the start of

1    jury selection, I'll ask you to, as well as the government

2    attorneys, to introduce yourself to the jury, give you an

3    opportunity to talk to them a little bit about, you know,

4    where you're from, what your practice is, that sort of thing,

5    how long you've been practicing, and I'll do the majority of

6    the questioning if not all.  I will hear you if there's

7    issues that I haven't covered that you feel should be covered

8    or if you want to do some questioning.  I would just say

9    this, that I really don't like to waste time, and if

10   you're -- if you have an area that you think is kind of

11   unique that you feel is most appropriate for you to ask some

12   questions, I'll hear you, but I wouldn't anticipate that

13   you're going to be doing a lot of questioning.  If I allow

14   it, it will be limited.  And other than that, I don't know if

15   you have other questions that you want to ask.

16           MR. GOLDSMITH:  Are there -- certain districts have

17   like an electronic preprinted juror sort of a demographic

18   questionnaire that will be published to counsel, does the

19   Northern District adopt that policy?

20           THE COURT:  We do.  The juror questionnaires will

21   be provided to you at the start of jury selection, so that

22   you have them in front of you, and you're expected to, you

23   know, turn them back into the courtroom deputy as soon as

24   we're done with them, as we move through jury selection, so

25   that's the process that we follow.  You'll have that

1   information.

2          MR. GOLDSMITH:  Very good.

3          THE CLERK:  I also ordered extra jurors in this

4   case in anticipation of maybe going through a few.

5          THE COURT:  Okay.  And we'll do the regular round

6   method, you know, moving through it, let you pick, I'm not --

7   as I've indicated, I won't allow back strikes so you should

8   use your perempts in that round.  So that once we have a

9   juror sworn, they're sworn and they're going to be there.

10  Okay?

11         MR. GOLDSMITH:  Very good.

12         THE COURT:  All right.  Oh, I'll give you an idea

13  of the way I conduct my trials, trial schedule.  The first

14  day jurors usually aren't available until 9:30, but I will

15  take the bench at 9:00, just so that if there's any

16  last-minute issues we need to cover on the record, we can do

17  that.  And depending on how long that takes, you know, we'll

18  either have a jury before we're done or they'll be available

19  to us shortly thereafter and we'll start with jury selection

20  as soon as that jury's ready to come downstairs, usually

21  about 9:30.  And the daily schedule is, we'll always start at

22  9:00, and we'll take an hour for lunch, you know, I look to

23  break around noon.  If there's a witness on that we can

24  finish in 10, 15 minutes or 20 minutes, we'll finish that

25  witness and may not break till 12:20, 12:30, whenever it is.

19

1    Whenever we break we'll have an hour from the time we break

2    for lunch and then for the afternoon, I usually try to get

3    the jury out of the courtroom by around 4:30.  And again, the

4    same thing applies, if there's a witness that we can finish

5    up and we have to go till quarter of 5 or whatever, we'll do

6    that but you should understand that about, you know, 3:30,

7    4:00, I'm starting to understand where we are witness wise,

8    how much longer, don't want to waste time, we're going to

9    work right up to 4:30, and we'll go longer if necessary but I

10   look to excuse the jurors and get them on the road by 4:30.

11   Regular, you know, morning break, afternoon break, and of

12   course if the jurors, I feel like they need a break or they

13   need to stand up and move around, we might take one just to

14   keep them alert, but generally, morning break, afternoon

15   break, and with those time parameters, starting at 9 and

16   finishing at 4:30 with an hour for lunch.  Okay?

17            MR. GOLDSMITH:  Okay.

18            THE COURT:  Mr. Goldsmith, the government has

19   mentioned that they're going to have their courtroom

20   technology person available to assist them in doing what they

21   need to do video wise and evidence presentation.  Do you

22   anticipate any courtroom technology that you're going to

23   need?

24            MR. GOLDSMITH:  I do not anticipate any courtroom

25   technology at this point, and I'm sure that if I need a

20

1    little extra help referring to one of their exhibits, they'll

2    help me pull it up.

3              THE COURT:  Yeah, the government's always been very

4    good and they have -- well, if they have Mr. Kittleson, he's

5    great, I've had him in other trials and very accommodating as

6    far as making sure that whatever they've used on their direct

7    is available to you and he'll assist you in getting up

8    whatever you need, so -- but I didn't know if there was

9    anything that evidentiary wise that you had that you say, you

10   know, I'm going to need this or this, some other piece of

11   equipment to present, but it doesn't sound like that.

12             MR. GOLDSMITH:  No, your Honor, and to the ends of

13   technology, will the court require that I have an order from

14   the court permitting me to bring my laptop in?

15             THE COURT:  You can bring your laptop in, you don't

16   need an order for you to do that.  You can bring it in and

17   there's, you can check with -- Lori will show you how to,

18   there is a method to hook it up, right?

19             THE CLERK:  If he wants to display something.

20             THE COURT:  If you want to display something, but

21   other than that, you can have it at counsel's table and have

22   access to it to use it.

23             THE CLERK:  But we don't have internet access, just

24   so you know.

25             MR. GOLDSMITH:  I guess that's appropriate.

1          THE COURT:  Okay.

2          MR. GOLDSMITH:  Okay.  Your Honor, I did have one

3   final issue.  My client did want me to revisit filing a

4   motion regarding impropriety of the treaty and the joint

5   investigation, more specifically, transfer of the case from

6   the Canadian authorities to the United States authorities.  I

7   believe the motion had been filed previously by him on pro se

8   basis if not with the prior counsel, I wanted to verify that

9   with the court before I even sought leave to file.

10          THE COURT:  Um, I believe -- it's been awhile since

11   I've looked at this stuff, but I think we've addressed it at

12   least once, maybe more than once.

13          MR. GOLDSMITH:  Yeah.

14          THE COURT:  So that, you know, whatever the ruling

15   is, there isn't going to be any change, let's put it that

16   way.

17          MR. GOLDSMITH:  Okay, very good.

18          THE COURT:  It's very clear in the court's view as

19   to what those issues are and that it's been addressed and

20   it's been addressed appropriately, so unless there's some new

21   evidence or some new wrinkle, Mr. Goldsmith, I would say, you

22   know, I wouldn't waste your time, I would focus on the issues

23   at trial that you need to focus on.  And again, if there's

24   some new wrinkle or something different that the court hasn't

25   seen, fine, but if it's the same old motion or same issue,

1    that's been addressed, I'd say, you know, don't waste your

2    time.

3              MR. GOLDSMITH:  Very good.

4              THE COURT:  Okay.  Anything else?

5              MS. CARROLL:  Your Honor, the only other thing is

6    the issue of forfeiture which the government discussed

7    briefly in its trial memo.  As the court and Mr. Goldsmith

8    are aware, the forfeiture allegation names the digital media

9    that the defendant is alleged to have possessed child

10   pornography using.  Mr. Goldsmith, I don't know if you have a

11   position regarding whether you want, if there's a conviction,

12   if you want the jury to hear the forfeiture issue or if your

13   client, in the event of conviction, will be willing to have

14   that be a bench determination, but that might be something

15   that would save some judicial resources if we can agree on

16   judicial determination rather than jury determination on the

17   forfeitability of the property.

18             MR. GOLDSMITH:  Well, my position is that I

19   actually, a little over a year ago was trying a case in

20   District Court in Southern Ohio when several rulings had come

21   out in circuits around the country on this issue and we sort

22   of briefed it all out and made a determination that a jury

23   finding on the special verdict was required unless

24   specifically waived by a defendant, so what I've done in

25   other trials is just gone forward with the special finding by

23

1    the jury, only because I -- while it certainly takes a little

2    bit more time, my experience is that they are very swift,

3    there's really typically only one witness that's relevant to

4    it, and that testimony is accomplished very quickly and if

5    under those circumstances the jury has already found a

6    finding of guilt, they are pretty quick to make a

7    determination as to any forfeiture.

8              MS. CARROLL:  Okay.

9              THE COURT:  Has there been submissions with regard

10   to this?

11             MS. CARROLL:  There's reference in the trial memo

12   to the fact that, yes, a waiver by the defendant is required

13   or a jury determination so I --

14             THE COURT:  Sounds like you're not going to get a

15   waiver.

16             MS. CARROLL:  Sounds like there's not going to be a

17   waiver, that was really my question.

18             THE COURT:  Okay.  So that's -- you know what you

19   have to do.  Okay.  Anything else?

20             MR. GOLDSMITH:  Just on a personal note, your

21   Honor, I note in the court's decision for the motion that I

22   filed for the suppression of evidence seized at the border

23   that it was certainly not my intent to be unduly litigious

24   and repetitive in the litigation.  My particular reading,

25   apparently I read it wrong, was that there was leave to

24

1    refile the motion, certainly wouldn't want to, not being a

2    regular attorney before the court, have the court believe

3    that I was just sort of litigating for the sake of

4    litigating.

5            THE COURT:  I appreciate your comment on that, and

6    we're all set, we're just going to move ahead.

7            MR. GOLDSMITH:  Very good.

8            THE COURT:  Okay.  All right.  Stay warm, travel

9    safe, and we'll see you soon.

10           MR. GOLDSMITH:  Very good.

11           THE COURT:  Okay, thank you.

12           MS. THOMSON:  Thank you.

13               (Proceedings Adjourned, 11:45 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3           I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

 4    Realtime Court Reporter, in and for the United States

 5    District Court for the Northern District of New York, DO

 6    HEREBY CERTIFY that pursuant to Section 753, Title 28, United

 7    States Code, that the foregoing is a true and correct

 8    transcript of the stenographically reported proceedings held

 9    in the above-entitled matter and that the transcript page

10    format is in conformance with the regulations of the Judicial

11    Conference of the United States.

12

13                     Dated this 23rd day of May, 2014.

14

15

16                     /S/ JODI L. HIBBARD
                       _____

17                     JODI L. HIBBARD, RPR, CRR, CSR
                       Official U.S. Court Reporter
18

19

20

21

22

23

24

25
```

                               VOLUME I (EXCERPT)
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                              5:11-CR-602

JOSEPH VINCENT JENKINS,

                         Defendant.

-------------------------------------------x

     Transcript of a Jury Trial held on February 3,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


                     A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWENDOLYN CARROLL, ESQ.

For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007


                 *Jodi L. Hibbard, RPR, CSR, CRR*
             *Official United States Court Reporter*
                   *100 South Clinton Street*
                *Syracuse, New York  13261-7367*
                      *(315) 234-8547*

100

 1              (Jury Selection was conducted and the jury was

 2              duly sworn.)

 3          THE CLERK:  Thank you, you may be seated.

 4          THE COURT:  Okay.  First order of business, I'm

 5   going to give you a break, I'm going to have Bruce, our court

 6   security officer, show you back into that jury room, that's

 7   where you're going to be reporting every day, you can keep

 8   your things there, that's going to be your home away from

 9   home this week.

10          Trial schedule.  Here's what I do.  I start every

11   day at 9:00.  We'll endeavor to start on time.  Sometimes

12   there might be a short delay if we have some legal argument

13   with the attorneys before you come out here but we are going

14   to ask you to be in that jury room to start at 9:00 in the

15   morning.  And there is always some sort of breakfast food in

16   there, not always going to promise you it's the most healthy

17   thing, doughnuts, bagels, muffins, all that kind of stuff but

18   it's there for you if you want it.  And I go every day until

19   4:30, I try and get you out of here by 4:30 so that, you

20   know, you can beat some of the rush hour traffic, get out of

21   downtown and it's still getting dark kind of early so I try

22   to get you out of here a little bit early.  One caveat.  That

23   is, if we have a witness on the stand that these attorneys

24   tell me, Judge, if you spend five, ten minutes more, we can

25   finish this witness up and they don't have to come back

1    tomorrow morning, I'm probably going to do that, all right.

2    But have in mind that I'm looking to break at 4:30 or shortly

3    thereafter.  There will be a morning break, an afternoon

4    break.

5           You always, please, let the court security officer

6    know, let the court staff know if you need a break, just let

7    us know, give us a high sign, something, we'll give you a

8    break, okay.  If you need to stand up and stretch, there's

9    going to be times when the attorneys are up here talking to

10   me at the bench the way they have today, that's a time, feel

11   free to stand up and stretch.  I want you to be comfortable

12   in this courtroom.  Your tax dollars pay for it, okay, this

13   is your courthouse, this is your courtroom, I want you to be

14   comfortable.  There's obviously rules that we follow like no

15   food in here, you can bring bottles of water in which we will

16   provide for you, and I'll give you some other preliminary

17   instructions in a few minutes, but first of all, we're going

18   to take a break, let you do that.  If you have any things in

19   the back, please collect them and take them into the jury

20   room with you if you don't have them with you.

21          And please, as I admonished earlier today, don't

22   talk about this case at all, with anybody.  If anybody

23   approaches you and tries to talk to you about this case, I

24   need to know about it immediately.  Now, that doesn't mean

25   that you can't talk with your fellow jurors, I encourage you

1    to be friendly, talk about anything under the sun that you

2    want to talk about except for this case, okay.  We'll move it

3    right along.  So we're going to take a break, bring you out

4    here, I'm going to give you a preliminary charge on the law

5    and then we're going to have these attorneys give their

6    opening statements on this criminal case.  And once we're

7    done with those opening statements, we'll see what time it is

8    and decide whether we want to call any witnesses today or if

9    it's time to send you home, okay, with that 4:30 rule.  All

10   right.  Any questions?  All right.  We'll take about a

11   five-minute break.  Go ahead.

12              (Jury Excused, 3:27 p.m.)

13              THE COURT:  Mr. Jenkins, the same thing, if you

14   ever need a break or something, please just let Mr. Goldsmith

15   know.  The only difference is that if we're going to move

16   you, we have to do it with the jury out of the room, so I

17   just, and if you need to just get to him, let me know, he can

18   ask to take a break, I'll get the jury out of the room and

19   let you go use the facilities whenever you need to, okay?

20              THE DEFENDANT:  All right.

21              THE COURT:  All right.

22              (Court in recess, 3:29 p.m. to 3:41 p.m.)

23              (Open Court, Jury Out.)

24              THE COURT:  Is the government ready?  We're going

25   to bring this jury in, I'm going to do a preliminary

1    instruction, and then we will go on to opening statements.

2    Defense counsel all set?

3              MR. GOLDSMITH:  Ready.

4              THE COURT:  Okay.  And it doesn't look like --

5    we'll see what time it is, but I don't know that it makes any

6    sense to try to start a witness, but we'll see, okay.  Please

7    bring them in.

8              (Jury Present.)

9              THE COURT:  Please be seated.  We're missing

10   somebody.  Looks like it's fine except for one juror.  There

11   we go, we found them.

12             Okay.  The record should reflect we have the ladies

13   and gentlemen of the jury, government and defense counsel and

14   the defendant.  One more housekeeping issue.  As I indicated,

15   you can bring water in here, nothing else, but when you come

16   into the courtroom, you're going to notice that everybody's

17   standing up in the courtroom, okay.  You come in and sit

18   right down.  The reason they're standing, it's an old

19   tradition and it's a very nice one that I agree with firmly,

20   they stand in honor of your service, the fact that you're

21   here performing a service as citizens of this country, so

22   when a jury comes into a courtroom, the litigants and

23   attorneys all stand until you're here and seated.  So come

24   right in and sit right down, okay.  Sometimes I have jurors

25   come in the courtroom and say, am I supposed to be standing

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 135 of 890
**A131**
Case 5:11-cr-00602-GTS Document 165 Filed 05/30/14 Page 6 of 38

104

1    or sitting?  Come right in and sit down, okay, that's what

2    that's about.

3           Now first thing we're going to do is preliminary

4    instructions for this criminal case.  Before we begin the

5    trial, I'd like to tell you about what will be happening.  I

6    want to describe how the trial will proceed and be conducted

7    and explain what we'll be doing, that is the lawyers, the

8    court, and even you.  At the end of the trial we'll give you

9    more detailed guidance on how you are to go about reaching

10    your decision, I'll explain to you how the trial will proceed

11    and give you an overview of the claims.

12           In this case, the defendant is charged with two

13    felony counts for violating 18 U.S.C. Section 2252 and 2256,

14    transportation of child pornography and possession of child

15    pornography.  I will give you detailed instructions on the

16    law at the end of the case on those, those instructions will

17    control your deliberations and decision.  But in order to

18    help you follow the evidence, I will now give you a brief

19    summary of the elements of the offense that the government

20    must prove to make its case.

21           Generally, to prove the defendant guilty of

22    transportation of child pornography, the government must

23    prove each of the four following elements beyond a reasonable

24    doubt:  First, that the defendant knowingly transported a

25    visual depiction as that term will later be defined; and two,

1 that that visual depiction was transported in or affecting

2 interstate or foreign commerce, or as the visual depiction

3 was produced using materials that had been transported in or

4 affecting interstate commerce; three, that that visual

5 depiction was child pornography as that term will later be

6 defined for you; and four, that the defendant knew of the

7 sexually explicit nature of the material and that the visual

8 depiction was of an actual minor engaged in that sexually

9 explicit conduct.

10    Generally to prove that the defendant is guilty of

11 possession of child pornography, the government must prove

12 each of the following four elements beyond a reasonable

13 doubt.  This is the second count.  First of all, the first

14 element, that the defendant knowingly possessed a visual

15 depiction as that term will later be defined; two, that that

16 visual depiction was transported in or affecting interstate

17 or foreign commerce; or usual depiction, the usual depiction

18 was produced using materials that had been transported in or

19 affecting interstate or foreign commerce; and three, that the

20 visual depiction was child pornography as that term will

21 later be defined; and fourth, excuse me, that the defendant

22 knew of the sexually explicit nature of the material, and

23 that the visual depiction was of an actual minor engaged in

24 that sexually explicit conduct.

25    In addition, the government seeks pursuant to 18

1   U.S.C. Section 2253(a)(3), the criminal forfeiture of three

2   items of the defendant's personal property that were

3   allegedly used or intended to be used in the course of

4   committing the previously described offenses.  Those three

5   items are a Toshiba laptop computer, an 8-gigabyte USB thumb

6   drive and a 4-gigabyte USB thumb drive.  The government's

7   burden of proof with regard to the criminal forfeiture of

8   these three items is by a preponderance of the evidence.  And

9   I'll explain the different burdens that you must follow.

10          What's the duty of the jury?  It will be your duty

11   to find from the evidence what the facts are.  You and you

12   alone are the judges of the facts.  You will then have to

13   apply those facts to the law as the court will give it to

14   you.  You must follow the law whether you agree with it or

15   not.  Nothing the court may say or do during the course of

16   the trial is intended to indicate or should be taken by you

17   as indicating what your verdict should be.  That is solely in

18   your province.

19          Now evidence, what's evidence?  Evidence from which

20   you will find the facts will consist of the testimony of

21   witnesses, documents, or other things received into the

22   record as exhibits, and any facts the lawyers agree or

23   stipulate to, or that the court may instruct you to find.

24   Certain things are not evidence and must not be considered by

25   you and I will list them for you now.  Statements, arguments,

1    and questions by the lawyers are not evidence.  Objections to

2    questions are not evidence.  Lawyers have an obligation to

3    their clients to make an objection when they believe evidence

4    being offered is improper under the Rules of Evidence.  You

5    should not be influenced by the objection or by the court's

6    ruling on it.  If the objection is sustained, that means the

7    witness does not have to answer the question.  In that case,

8    you must disregard the question and any response that was

9    given to that question.  If the objection is overruled, that

10   means the witness will then be required to answer the

11   question.  In that case you should treat the answer like any

12   other.

13            If you are instructed that some item of evidence is

14   received for a limited purpose only, you must follow that

15   instruction.  Testimony that the court has excluded or told

16   you to disregard is not evidence and must not be considered.

17   Anything you have seen or heard outside the courtroom is not

18   evidence and must be disregarded.  You are to decide the case

19   on the evidence presented here in this courtroom, and in this

20   courtroom alone.

21            There are two kinds of evidence, direct and

22   circumstantial evidence.  Direct evidence is direct proof of

23   a fact such as testimony of an eyewitness.  Circumstantial

24   evidence is proof of facts that which you -- from which you

25   may infer or conclude other facts exist.  I will give you

108

1    further instruction on these as well as other matters at the

2    end of the case but have in mind that you may consider both

3    kinds of evidence.

4            It will be up to you to decide which witnesses to

5    believe, which witnesses not to believe, and how much of any

6    witness' testimony to accept or reject.  I will give you some

7    guidelines for determining the credibility of witnesses at

8    the end of the case.

9            Now direct and circumstantial evidence.  I'm going

10   to talk a little bit more about this because it's important

11   that you understand first of all that you can accept both

12   kinds of evidence.  One is not given more weight than

13   another.  But the difference is direct evidence is evidence

14   of an eyewitness so to speak, somebody who was present, saw,

15   heard, smelled, can give some direct testimony about some

16   observation that they made by their senses.  They saw it,

17   they heard it, they smelled it, something, okay.  And

18   circumstantial evidence is a little different.  It's facts

19   inferred from facts that lead to a logical conclusion.

20           Here's an example.  The weather's warmed up.  The

21   snow on your front lawn may have melted, you look out there,

22   you see the brown somewhat dark grass or whatever might be on

23   your front lawn.  You look out there tonight, that's the

24   situation, you go to bed.  You wake up in the morning, you

25   look out on your lawn and it's covered with white fluffy

1   stuff, which is supposed to happen over the next couple days

2   as a matter of fact.  Now, you did not see it snow because

3   you were in bed sleeping.  But circumstantially, you can

4   infer at some time during the night when you were sleeping,

5   it snowed.  A logical conclusion based on what you've seen in

6   your life's experiences, okay, circumstantial evidence.

7          Now let's take it a step further.  Let's say you

8   have a paper boy, if they exist anymore, and they deliver

9   your paper in the morning in your door at like 6:00 in the

10  morning.  You're up at 5:30, quarter to 6, check your door,

11  no paper.  You look out, you look out across your lawn,

12  there's fresh snow, there's no footprints, there's no

13  footprints up your walk to your front door, no paper.  So

14  circumstantially you say, I guess the paper boy hasn't come

15  yet.  You go back to your door at 6:30, you open it, there's

16  a paper.  You look out across your lawn, footprints across

17  your lawn right up to your front walk to your front door, so

18  circumstantially, based on the two things, you didn't see

19  anybody deliver that paper but you know based on what you've

20  seen from the footprints, the fact that the paper's in the

21  door, that somebody delivered that paper.

22          You may not know who it was unless you have some

23  further evidence like your, you know, paper boy is of a

24  certain size, may wear certain type of boots where you could

25  compare the footprints in the snow to his boots, maybe a

1    neighbor says I saw the paper boy down the street from your

2    house just a few minutes later and you put all those facts

3    together and circumstantially you can infer that it was a

4    particular individual, maybe your paper boy that delivered

5    your paper.  Okay.  So you get what I mean, that's the idea

6    of circumstantial evidence, facts that lead you to some

7    logical conclusion, okay, based on your life's experiences.

8            Now, let's talk about rules of a criminal case.  As

9    you know this is a criminal case.  There are three basic

10   rules about a criminal case that you must keep in mind.

11           First, the defendant is presumed innocent until

12   proven guilty.  The indictment against the defendant brought

13   by the government is only an accusation, nothing more.  It is

14   not proof of guilt or anything else.  The defendant therefore

15   starts out with a clean slate.

16           Second, the burden of proof is on the government

17   until the very end of the case.  The defendant has no burden

18   to prove his or her innocence or to present any evidence or

19   to testify.  Since the defendant has a right to remain

20   silent, the law prohibits you from arriving at your verdict

21   by considering that the defendant may not have testified.  No

22   inference for or against in any way, okay.

23           Third, the government must prove the defendant's

24   guilt beyond a reasonable doubt.  Now what do I mean by

25   beyond a reasonable doubt?  It is not some vague,

1   speculative, imaginary or inconceivable doubt.  Nor is it a

2   doubt based upon emotion, sympathy, prejudice, or upon some

3   of you -- what some of you may consider to be an unpleasant

4   duty.  The government is not required to prove a defendant

5   guilty beyond every conceivable or every possible doubt.  But

6   you should review all the evidence as you remember it, sift

7   out what you believe, discuss it, analyze it, compare your

8   views of the evidence with that of your fellow jurors and if

9   that process produces in your mind some belief or conviction

10  that you would be willing to accept without further

11  hesitation if it was a matter of importance to you, then you

12  may say that you have been convinced beyond a reasonable

13  doubt.  On the other hand, if going through that same process

14  in your mind, your mind is wavering, or you are so uncertain

15  that you would hesitate before acting if it were an important

16  matter of your own, then you have not been convinced beyond a

17  reasonable doubt and your verdict must be not guilty.  I will

18  give you further instructions on this point of law later, but

19  bear in mind that in this respect, a criminal case is

20  different than a civil case, different type of burden and the

21  burden always remains with the government.

22          Let's talk about the course of the trial.  In a few

23  minutes we're going to begin this trial.  First, the

24  government will make an opening statement which is simply an

25  outline to help you understand the evidence as it comes in.

1     Next, defendant's attorney may, but does not have to, make an

2     opening statement.  Opening statements are neither evidence

3     nor argument.  Now I say he may but does not have to because,

4     once again, defendant has no burden, he can sit there and do

5     nothing.  It's up to him and his attorney to decide whether

6     they want to do opening statements, whether they want to

7     examine witnesses, or you know, whatever they want to do is

8     totally within a defendant's right to decide.  The government

9     will then present its witnesses and counsel for the defendant

10     may cross-examine them.  Following the government's case, the

11     defendant may, if he decides to, present witnesses or

12     evidence and those witnesses, the government may

13     cross-examine.  After all the evidence is in, the attorneys

14     will present their closing arguments to summarize and

15     interpret the evidence for you, and the court will instruct

16     you on the law.  After that, you will retire to deliberate

17     and render a verdict.

18         What's the conduct of a jury?  Our law requires

19     jurors to follow certain instructions in order to help assure

20     a just and fair trial.  I will now give you those

21     instructions.  Do not converse either among yourselves or

22     with anyone else about anything related to the case.  You may

23     tell the people with whom you live and your employer that you

24     are jurors and give them the information about when you will

25     be required to be in court, but you may not talk with them or

1    anyone else about anything related to this case.

2            Do not at any time during the trial request,

3    accept, agree to accept or discuss with any person the

4    receipt or acceptance of any payment or benefit in return for

5    supplying any information concerning this trial.  You must

6    promptly report directly to me any incident within your

7    knowledge involving an attempt by any person to improperly

8    influence you or any other member of this jury.

9            Do not visit or view the premises or place where

10   the charged crime was allegedly committed or any other

11   premise or place involved in this case.  You must not use

12   internet maps or Google Earth or any other program or device

13   to search for or view any location discussed in the

14   testimony.  Do not read, view, or listen to any accounts or

15   discussions of the case reported by newspapers, television,

16   radio, the internet, or other news media.  Excuse me.  Do not

17   attempt to research any fact, issue, or law related to this

18   case whether by discussion with others, by research in a

19   library or on the internet or by any other source.

20           In this age of instant electronic communication and

21   research, I want to emphasize that in addition to not

22   conversing face-to-face with anyone about the case, you must

23   not communicate with anyone about the case by any other

24   means, including by telephone, text message, e-mail, internet

25   chat, chat rooms, blogs, social websites, such as Facebook,

1    MySpace or Twitter.  You must not provide any information

2    about the case to anyone by any means whatsoever.  And that

3    includes the posting of information about the case or what

4    you are doing in the case on any device or internet site

5    including blog, chat rooms, social websites, and any other

6    means.  You must also not Google or otherwise search for any

7    information about the case or the law which applies to the

8    case, or the people involved in the case, including the

9    defendant, the witnesses, the lawyers, or even me, the judge.

10   You can do any and all of that after the case is over, but

11   not during this case.

12           Now ladies and gentlemen, I want you to understand

13   why these rules are so important.  First of all, our law does

14   not permit jurors to converse with anyone else about the case

15   or permit anyone to talk to them about the case, excuse me,

16   because only jurors are authorized to render a verdict and

17   only you have been found to be fair and impartial and only

18   you have promised to be fair.  No one else has been so

19   qualified.  Our law does not permit jurors to converse among

20   themselves about the case until the court tells them to begin

21   deliberations because premature discussion can lead to

22   premature final decisions.  We want to avoid that.  Our law

23   also does not permit you to visit a place discussed in the

24   testimony.  First of all, you cannot always be sure that the

25   place is in the same condition as it was on the day in

1    question; second, even if it were in the same condition, once

2    you go to a place discussed in the testimony to evaluate the

3    evidence in light of what you see, you become a witness, not

4    a juror.  As a witness you may now have an erroneous view of

5    the scene that may not be subject to correction by either

6    party and that is just not fair.

7            Finally, our law requires that you not read or

8    listen to any news accounts of the case and that you not

9    attempt to research any fact, issue, or law related to the

10   case because your decision must be based solely on the

11   testimony and other evidence presented in this courtroom.  It

12   would not be fair to the parties for you to base your

13   decision on some reporter's view or opinion or upon

14   information you acquire outside of this courtroom.

15           Now these rules are designed to help guarantee a

16   fair trial and our law accordingly sets forth serious

17   consequences if the rules are not followed.  I trust you

18   understand and appreciate the importance of following these

19   rules in accordance with your oath and promise, I know you

20   will do so.

21           Finally, do not form any opinion until all the

22   evidence is in.  Keep an open mind until you start your

23   deliberations at the end of the case.

24           If you wish, you may take notes, but if you do,

25   please leave them in the jury room when you leave at night.

116

1    And remember, they are for your own personal use, they are

2    not to be given or read to anyone else and if you do take

3    notes, please do not let those note taking, that note taking

4    distract you from what the witnesses have to say or how they,

5    the witnesses may answer questions.  Notes are not entitled

6    to any greater weight than the memory or impression of each

7    juror as to what the testimony may have been.  Whether you

8    take notes or not, each of you must form and express your own

9    opinion as to the facts of the case.  If you do not take

10   notes, you should rely upon your own memory of what was said

11   and not be overly influenced by the notes of other jurors.

12          Now, excuse me, note taking.  Relatively new thing,

13   we never, when I was trying cases, jurors were never allowed

14   to keep notes.  And there were some good reasons for it, I'm

15   going to tell you about those.  First of all, we have a court

16   reporter, a professional whose responsibility is to take down

17   each and every thing that's said in this courtroom and going

18   to make sure people talk one at a time for that very purpose.

19   We're a court of record, and if we have a question about some

20   aspect of testimony, we can always have it read back.  We can

21   have Jodi go and find it for us, and she'll read it back for

22   us, okay.

23          Secondly, it is very important when you're watching

24   a witness testify, that you not only hear what they say, but

25   you watch how they testify.  People's demeanor is important.

1    When you're trying to decide, even if it's a couple of kids

2    who may have broken something in your house, and you're

3    asking them questions about what happened, it's not only what

4    they say, it's how they say it that's important, right, and

5    it's making a determination of what happened and who did

6    what.  That's how we decide things.  So people's demeanor,

7    the way they answer questions, their reactions on the witness

8    stand are important and we don't want note taking to

9    interfere with you making those observations, because that's

10   how we make decisions about who is telling us the truth,

11   okay.

12          Now, so why do we allow note taking?  Because in

13   recent years I think the courts have recognized that some

14   people just remember things better if they have a notepad and

15   they jot things down.  A lot of people just listen that way,

16   and are able to retain things that way.  If you're one of

17   those people, that's fine.  But just understand, don't let it

18   interfere with you observing the witnesses well and

19   understand that they'll be kept here in the jury room at

20   night, they're not to leave this courthouse, they're court

21   exhibits which will stay here and will be locked up at night

22   and they're for your own personal use only.

23          And I would say this.  We don't expect this to be a

24   long trial.  If there was a trial that was going on for

25   weeks, then maybe note taking becomes more important for you,

118

1   because there's going to be a long list of multiple witnesses

2   just to keep track in your own head, but if you're one of

3   those people who feel more comfortable listening and paying

4   attention and hearing what's being said by having a notepad

5   to jot down, feel free to do it.  Okay.  That's your choice.

6   Any questions?  About your role or what we're going to be

7   doing?  Okay.  We're going to proceed now with opening

8   remarks and we're going to start with the government.

9   Ms. Thomson, when you're ready.

10           MS. THOMSON:  Thank you, your Honor.  On May 24,

11   2009, Joseph Jenkins entered Canada from Jefferson County.

12   He had with him a Toshiba laptop and two thumb drives and on

13   that laptop and on those thumb drives together were a total

14   of 30 -- over 3800 images of child pornography, and over a

15   hundred videos of child pornography.  His laptop.  His thumb

16   drives.  His collection that he was taking with him on his

17   trip to Canada.

18           Good afternoon.  As you may recall earlier, my name

19   is Tamara Thomson and together with Gwen Carroll, we

20   represent the United States of America.  And it is our

21   pleasure to present this case to you.  Sitting at trial table

22   is Chad Willard, he's a special agent with Homeland Security.

23   Also his pleasure to bring this case before this jury.

24           At Alexandria Bay, there begins the border to

25   Canada at the Port of Lansdowne and at that border point,

1    there is a border checkpoint, and when we were talking in

2    voir dire, I believe most of you actually indicated that you

3    had crossed a border so you have some familiarity with a

4    border checkpoint.

5            Now the purpose of those border checkpoints are to

6    inspect people and things that go into Canada.  And so

7    Canadian Border Service Agency officers look to see what's

8    coming in and who's coming in, and the purpose is they want

9    to make sure that for the people, they don't allow anyone in

10   who's unauthorized and for the goods, they don't allow any

11   goods that are unauthorized or illegal or may be subject to

12   taxation.  So as a result, they have a border checkpoint.

13   That border checkpoint at the Port of Lansdowne begins with a

14   primary inspection.  On May 24, 2009, morning hours, at

15   primary inspection lane number 5, was Border Services Officer

16   Pedro Sousa-Dias and you'll hear testimony from him that that

17   morning he was working inspection lane number 5 and at

18   approximately 9 a.m., a Navy 2003 Dodge pickup truck carrying

19   a trailer that had on its bed two ATV vehicles in tow came

20   into his lane and he encountered the defendant Joseph

21   Jenkins.

22           Now the defendant was the only one in that vehicle.

23   He was the driver, sole occupant of the truck.  And so when

24   he identified himself as Joseph Jenkins, Officer Sousa-Dias

25   did what you do at a border checkpoint and he asked some

1   questions.  When he asked those questions, he noticed,

2   because it's his job to do, to pay attention to the people

3   and the things that are coming into Canada, he noticed that

4   the defendant appeared to be nervous.  He noticed that the

5   defendant was avoiding eye contact.  And as a result, he

6   decided that he should defer him into immigration to have a

7   check to make sure everything was okay.  So the defendant was

8   directed to go inside to immigration for a criminal check, to

9   make sure that he was permitted to enter Canada.

10          And when he went inside, he encountered Melany Boyd

11   who at that time was another border services officer who was

12   at the immigration counter in the secondary building.  Joseph

13   Jenkins presented her with his passport and the slip that he

14   received from Officer Sousa-Dias for the in -- for the

15   secondary, and she began her interview, again basic

16   questions, basic questions that these officers do routinely.

17   She asked him his citizenship, he indicated he was a United

18   States citizen, she asked him the purpose of his trip, he

19   indicated he was going to visit his parents who had a cottage

20   in Quebec and were summer residents there.  Asked how long he

21   was going to stay, he indicated one week.  And they asked --

22   Officer Boyd asked him what his occupation was and he

23   indicated he was a self-employed electrician.  You'll hear

24   testimony from Officer Melany Boyd, when she was asking him

25   these questions and trying to get this information from

121

1    Mr. Jenkins, that he appeared nervous, that he was evasive

2    with his answers and he also wasn't making eye contact.  She

3    also made an observation that the defendant, when he pulled

4    into that secondary area, was driving the truck with a

5    trailer attached and she noticed that he had a lot of

6    personal belongings.

7              Now given his answers about his purpose for the

8    trip and how long he was going to stay, and knowing that she

9    heard him say he was a self-employed electrician, she thought

10   that perhaps he intended to stay in Canada for longer and she

11   decided it would be prudent for a vehicle examination because

12   of those factors.  His behaviors plus all of the things that

13   he was bringing into Canada.  And so she directed him for a

14   vehicle examination.

15             Now three officers came to perform that vehicle

16   examination.  These are also border services officers and

17   you'll hear testimony from these officers, Officers Tristan

18   Garrah, Jarret Johnston, and Glen Hache, and their job was to

19   conduct a vehicle inspection.  And in the course of doing

20   that job, they also had an opportunity to talk to the

21   defendant.  And when one of the officers did talk to Joseph

22   Jenkins, he stated he was the owner of the truck, he was

23   aware of what was inside it, and that he had in fact packed

24   it himself, and so the vehicle inspection began.

25             Toshiba laptop was located in the rear passenger's

1   seat, and he was asked about that laptop and the defendant

2   indicated that the laptop was new, that he had had it for

3   over a year, he used it for personal use and he had it stored

4   in a box and he indicated that he had it in the box because

5   he didn't possess a carrying case for it.  So Officer

6   Johnston, with the authority to do so, opened up that Toshiba

7   laptop and when he opened it up, he clicked on a file

8   shortcut, you'll hear testimony about what that is, clicked

9   on that file shortcut, and what he saw gave him some pause.

10  He saw a video of a young female and she wasn't wearing any

11  clothing.  He viewed another video, gave him more pause for

12  concern and he realized that perhaps out in this open area

13  wasn't appropriate to really see this stuff where the public

14  could see and he thought it was appropriate for further

15  examination to be done because what was on that computer may

16  be prohibited.  And so he brought that laptop inside the

17  building for further inspection.  And while he was viewing

18  those items, other officers also viewed items on that laptop

19  and they also had been doing the search of Mr. Jenkins'

20  truck, and while doing the search they recovered other items

21  that became significant.  Those items included another

22  laptop, three thumb drives, testimony that those thumb drives

23  included a thumb drive with a storage capacity of 2

24  gigabytes, 4 gigabytes, and 8 gigabytes.  Recovered some

25  compact disks, a Belkin notebook card, an Olympus camera and

1    Motorola cellular phone.  Those were the items that were

2    recovered from the truck and they were brought inside, again,

3    for further examination.

4             Now at this point, defendant asked why his laptops

5    were being brought inside.  And the officers asked

6    Mr. Jenkins if he had child pornography on his computer, and

7    he stated, not to my knowledge.  I don't think so.  He was

8    asked, have you ever downloaded child pornography?  And again

9    his response was, no, I don't think so.

10            Now inside that building an examination was

11   conducted of an 8-gigabyte thumb drive, and when that was

12   examined, officers found a video whose title gave them a

13   sneak preview of what they were to see.  That video, and

14   you'll also hear it called multimedia so those two words

15   you'll hear throughout this trial, but that video was titled

16   "9YO Vicky stripping and sucking kiddie pedo legal underage

17   preteen" is the title of the video.  And the officers watched

18   the video, a minute and 39 seconds in length.  The video

19   began of a girl fully dressed and that girl was prepubescent,

20   meaning she hadn't hit puberty yet, it was a young girl, and

21   as the video continued she began to undress until she got all

22   the way down to just stockings.  And as the video ended, the

23   young girl approaches the camera, man unzips his pants

24   exposing his penis and performs oral sex.  That's the video

25   the officers saw from that 8-gigabyte thumb drive.  They

1    watched others and you'll hear the testimony about those

2    other videos that they viewed and as a result of watching

3    that video and others, the defendant Mr. Jenkins was taken

4    into custody and charged with violating Canadian law.

5          You will hear testimony that a Canadian Border

6    Service Agency officer, criminal investigator, sat with the

7    defendant and she asked him if he knew what child pornography

8    was and he said that he did.  And when she told him that some

9    child pornography was found on the media devices found in his

10   truck, the defendant's reply was to ask to speak to his

11   parents.

12         You'll hear testimony that a trial was set in

13   Canada, that trial for October 2010, but the defendant did

14   not appear for that trial, and therefore, the trial did not

15   go forward.

16         Now, we talked a little bit about the port of entry

17   at Lansdowne.  Before you hit that port of entry, you come

18   through Jefferson County and Alexandria Bay, and also on that

19   side are United States investigators including special agents

20   with Homeland Security.  Homeland Security has this side of

21   the border, American side of the border, and when the

22   defendant did not appear for those charges in Canada and when

23   that trial did not go forward, U.S. authorities went forward

24   here, and set about to do so.  Agents began their own

25   investigation and took steps to obtain that evidence from

1   Canada.  And they were able to retrieve the items from Canada

2   and in July of 2011, an agent appeared before a federal

3   magistrate judge and obtained a search warrant to search each

4   of the items that was recovered from the defendant at the

5   Port of Lansdowne after he had crossed into the Port of

6   Lansdowne from Jefferson County, and they obtained those

7   items that had been seized from the defendant from the

8   Ontario Provincial Police.

9          Once in the custody of HSI, those items were

10  examined and you will hear testimony from the forensic agent

11  who examined the items, and that is Brian Braisted.  He is a

12  computer forensic agent and he is trained to do forensic

13  examinations of computer and other electronic media and cell

14  phones and the like.

15         In this trial he will testify as to what his

16  analysis found, and he will testify in the area of computer

17  forensics regarding how he did the examination, and all of

18  the results that he found.  You will hear testimony that that

19  examination involved him finding over 3,800 images and over

20  100 video files on each of those three items that I've

21  indicated, the Toshiba laptop, the 8-gigabyte thumb drive,

22  and the 4-gigabyte thumb drive, and each of those three

23  items, the laptop and the thumb drives, are electronic media

24  that's not made in the state of New York.

25         You will hear testimony with regard to where those

1    image files were found, where the video files were found.

2    You will hear testimony about the registry information for

3    that laptop computer, that it was registered to a user by the

4    name of Joe.  You will hear testimony about web pages that

5    were saved to the Toshiba laptop as favorites.  You will hear

6    testimony that a photograph was recovered from that Toshiba

7    laptop, photograph of the defendant, because as he

8    acknowledged at the border, it was his laptop.

9            Agent Braisted will show you the evidence, you'll

10   see the laptop computer and he will also walk through various

11   dates that were forensically significant, dates that show

12   activity on that computer, not just activity that involved

13   saving and where child pornography was saved but activity

14   that was going on concurrently with the child pornography,

15   such as e-mail accounts that were being accessed.  Listen to

16   the names of those e-mail accounts that were accessed on or

17   around the same time the child pornography was detected on

18   that computer.  Agent Braisted will also show you not just

19   what that computer was in its form, you've all seen a laptop,

20   he'll show you what it looked like when he examined it.  He

21   will show you screen shots of what was on that computer.  He

22   will show you screen shots of the information that was saved

23   into that computer, and he will explain the significance of

24   his findings.  In summary, you will hear that on the Toshiba

25   laptop, there were multiple video files containing child

1    pornography in a folder that was called New Folder 2, a

2    folder that was saved to the desktop.

3         On the desktop's user account Joe, you will hear

4    testimony of the graphic files, again we often call them

5    graphic or image or picture files, and you'll hear testimony

6    where it was found in the system volume information and he'll

7    explain to you what that means.  You'll also hear testimony

8    that installed on that Toshiba laptop and on the Compaq

9    laptop was file wiping software.  CCleaner, and you'll hear

10   what that means forensically.

11        You'll hear testimony about registration of thumb

12   drive use, how looking at the Toshiba laptop, it's possible

13   to establish whether or not any particular thumb drive had

14   ever been mounted to the laptop and you will hear testimony

15   that both the 8-gigabyte and the 4-gigabyte thumb drives both

16   had child pornography on it, were mounted into the Toshiba

17   laptop.  You will also hear internet history artifacts

18   showing websites that were accessed by the user of that

19   computer.  Most of the titles of those websites give the

20   subject away.  You will also hear from Agent Brian Braisted

21   that on that 8-gigabyte thumb drive he located 96 videos and

22   15 picture files of child pornography, and on the 4-gigabyte

23   thumb drive, 10 videos, 3,266 images of child pornography.

24   Also on that 4-gigabyte thumb drive you'll hear about a

25   document that was saved to that thumb drive, that document,

1    you'll receive testimony, you'll get to see it contained a

2    phrase "Lolita House XXX", and again, oftentimes the title

3    lets you know exactly what you might expect to find.  There's

4    a file name referenced in that text document of a Sasha_S3,

5    and you'll also hear testimony that that video file was found

6    on the 8-gigabyte thumb drive and you will get to see a clip

7    of that video.

8                Where there was no child pornography found on

9    particular media, Agent Braisted will testify to that as

10   well.  He'll tell you exactly what he found and exactly which

11   pieces he analyzed.  And Agent Braisted will take you through

12   that forensic examination.  It will be lengthy testimony, but

13   it's very important because it explains exactly how that

14   child pornography came to that laptop and exactly what was

15   contained on that laptop.

16               And there's one more thing that you're going

17   to see.  We talked a little bit about it in the voir dire.

18   The court forewarned you about it and so now I'd like to

19   forewarn you about it as well.  You're going to see the

20   pictures and you're going to see the videos themselves.  And

21   we understand they are difficult to view, and just so you

22   know, we are not going to show all 3,800, and a hundred

23   videos to you.  We are going to show you a very, very small

24   portion.  We will show you respect, and we will show the

25   children depicted in those images and those videos respect

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 160 of 890
A156
Case 5:11-cr-00602-GTS Document 165 Filed 05/30/14 Page 31 of 38
129

1   and we'll show you a very small portion.  We will show them

2   to you because they are the evidence in this case, and as

3   difficult as it is to have to look at it and watch it, it's

4   the evidence in this case.

5           The images themselves will be given to you in

6   a binder, each one of you will have your own copy of a

7   binder.  On the front page of the binder we'll show you where

8   that image was found and on the reverse side will be the

9   image itself.  As I indicated, we will limit it as much as

10  possible, but as we bear the burden of proof in this case, we

11  must show you what the defendant had on his laptop, and on

12  his thumb drives.

13          As a result of what he had, and going from

14  Alex Bay going into Canada, he was charged with two counts in

15  the United States of transporting child pornography and

16  possessing child pornography, and that first count is that on

17  or about May 24, 2009, the defendant violated Title 18,

18  Section 2252A(a)(1), 2256(8)(a), by knowingly and unlawfully

19  transporting child pornography, and Count 2 charges on or

20  about May 24, 2009, Joseph Jenkins violated Title 18, United

21  States Code, Section 2252A(a)(5)(B) and 2256(8)(a).

22          On May 24, 2009, the defendant, Joseph

23  Jenkins, transported and possessed child pornography.  He

24  drove his truck to Canada with his laptops and his thumb

25  drives.  All that he packed and all that he acknowledged were

1   his, including that Toshiba laptop and including those two

2   thumb drives.  He transported that collection from Jefferson

3   County into Ontario, Canada.

4               After the last witness has testified and after

5   all the evidence has been presented to you, we will stand

6   before you again and on behalf of the United States of

7   America, we will ask you to return a verdict of guilty on

8   those two counts, because he transported it, and he possessed

9   it.  Thank you.

10              THE COURT:  Okay, thank you, Counsel.  Defense

11  counsel, do you choose to make an opening statement?

12              MR. GOLDSMITH:  We do, your Honor.

13              THE COURT:  Okay, proceed when you're ready.

14              MR. GOLDSMITH:  Thank you.  May I approach?

15              THE COURT:  You may.

16              MR. GOLDSMITH:  Not to my knowledge.  Not to my

17  knowledge.  A phrase that the government has just told you it

18  is going to have witnesses testify Mr. Jenkins said on

19  May 24th, 2009.  Knowledge, as the government, as the court

20  has also explained briefly, and as you're going to hear

21  several instructions later on, the key element in the crimes

22  charged against Mr. Jenkins before this court that you as the

23  jury will be deciding.  The government meets its burden of

24  proof if it can establish all of the elements beyond a

25  reasonable doubt.

1              Ladies and gentlemen, I will reintroduce myself.

2      I'm Aaron Goldsmith, and I have the pleasure of representing

3      Joseph Jenkins in this trial today.  I want to thank you for

4      all of the time and attention that you spent already in this

5      process, and certainly for the time and attention that we

6      expect from you in the coming week.

7              As you've heard some discussion about, by the

8      government, by the court, you will hear more about the

9      presumption of innocence.  In a court of law in the United

10     States of America, an individual facing criminal charges is

11     presumed innocent until proven guilty beyond a reasonable

12     doubt.  Ladies and gentlemen, that means that right now,

13     4:30 p.m. on February 3rd, 2014, as we, the lawyers in this

14     case, have been presenting opening arguments to you, Joseph

15     Jenkins stands before you an innocent man.  He remains

16     innocent in this courtroom, unless you the jury find that the

17     government proves each and every element of the crimes

18     charged against him beyond a reasonable doubt.  And the court

19     at the close of this case will instruct you further, as to

20     what those -- that means legally, as to what those elements

21     are.

22             The government, as the court has also instructed

23     you, bears the burden of proof at this trial.  As the court

24     has discussed a bit during our jury selection process,

25     Mr. Jenkins bears absolutely no burden whatsoever.  But it's

1    that burden of proof that brings me into what I want you as

2    the jury to focus on at this trial.  As part of your role,

3    responsibilities, as your jobs as the jurors, seek out that

4    burden that the government is saddled with.  By that burden,

5    every witness that takes that stand, listen to them, watch

6    them, read any documents that the government may try to

7    introduce at this case.  Watch and look and examine every

8    piece of evidence that the government is going to try and

9    introduce in this case through those witnesses.  Listen to

10   what those witnesses saw, what they heard, what they did, and

11   scrutinize every one of those witnesses, every one of those

12   documents, every piece of evidence that comes into this

13   courtroom.  Does that evidence show, does that testimony show

14   Mr. Jenkins did what the government has to prove beyond a

15   reasonable doubt or what they claim he did?  Can they

16   establish all of the elements of their case with what those

17   witnesses and what that evidence is going to prove?

18           As we have also discussed, as the court, the

19   government, myself, this evidence is unpleasant, and it is

20   necessary to look past the unpleasantness of what that

21   evidence is, to scrutinize whether the government has proven

22   its case.  It is difficult and we all acknowledge that.  But

23   again, it must be looked past.  When you're looking at the

24   evidence, when you're watching the witnesses, when you are

25   listening to the witnesses, when you are weighing what those

1    witnesses say, when you scrutinize them, scrutinize them not

2    only for what they saw and heard and did, but for what they

3    did not see, did not hear, did not do in their capacity, what

4    difference was it in what they saw or did or were able to

5    achieve that is different from what another agent or

6    different authority was able to produce in this case.

7              I submit to you the evidence will show that there

8    are differences in what law enforcement agents and agencies

9    were able to produce in the investigation of this case.  That

10   will bear out at this trial, and that will bear into your

11   analysis of whether the government has met its burden.  Which

12   again, I submit to you, they will not be able to do.

13             The court provided an example to you not too long

14   ago in discussing the nature of circumstantial evidence.  The

15   paper boy delivering the paper every morning.  Paper on the

16   front porch, footsteps in the snow.  Time frame in which seen

17   before and there was nothing, only a short while later, there

18   was something.  Paper, the footprints, the snow that would

19   show the footprints.  In this particular case, I submit to

20   you that when the government finishes all of its witnesses,

21   finishes bringing in all of its evidence and testimony,

22   there's not going to be footprints, there's not going to be

23   the footprints of Mr. Joseph Jenkins.  Without any other

24   possibility of who those footprints were, who left them

25   there, when they left them there, and the circumstances that

1   they left those footprints, when the witness comes up and

2   testifies Mr. Joseph Jenkins said, not to my knowledge,

3   you'll remember that.  And you'll remember that you didn't

4   see the footsteps of Mr. Joseph Jenkins in the snow.  And at

5   the close of this case, I believe that after due deliberation

6   and scrutiny of every witness that you see and hear, scrutiny

7   of the evidence that you see, that you will find Mr. Jenkins

8   not guilty.  Thank you.

9           THE COURT:  Thank you, Counsel.  Ladies and

10  gentlemen, I have 4:38, eight minutes past my time to get you

11  home.  So I'm going to let you go home, we'll have our first

12  witness called tomorrow morning.  Please do not discuss the

13  case with anyone.  If anyone approaches you, tries to talk to

14  you about this case, I need to know about it immediately.  As

15  I indicated, please be in the jury room so we can start at

16  9:00, there will be some breakfast food in there for you.  Do

17  not view, read, or listen to anything to do with this case.

18  Should it be reported anywhere, put it aside, shut it off,

19  turn it off, whatever, and you can do all that stuff after

20  the case is over with but we do not want you improperly

21  influenced during the pendency of this trial.  Okay.  Have a

22  good night, travel safe, and we'll see you tomorrow morning.

23          (Jury Excused, 4:38 p.m.)

24          THE COURT:  Okay.  The jury's been excused for the

25  night.  Government will start at 9:00, have your first

1    witness here ready to go and we'll get started.  Is there

2    anything else we need to address before we adjourn for the

3    night?  Government, no?

4              MR. GOLDSMITH:  Just as a simple matter of

5    courtesy, I wonder if the government might tell me the first

6    few witnesses they plan on calling tomorrow.

7              THE COURT:  That's between you and them.  I'll let

8    you do it off the record after I've concluded proceedings

9    here and you can talk to them about it.  Whatever you guys

10   want to work out is fine with me.  Anything else,

11   Mr. Goldsmith?

12             MR. GOLDSMITH:  Not from defense, no.

13             THE COURT:  Okay.  We will see you tomorrow

14   morning.

15             THE CLERK:  Court's in recess.

16                  (Court Adjourned, 4:39 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

 4    Realtime Court Reporter, in and for the United States

 5    District Court for the Northern District of New York, DO

 6    HEREBY CERTIFY that pursuant to Section 753, Title 28, United

 7    States Code, that the foregoing is a true and correct

 8    transcript of the stenographically reported proceedings held

 9    in the above-entitled matter and that the transcript page

10    format is in conformance with the regulations of the Judicial

11    Conference of the United States.

12

13                    Dated this 23rd day of May, 2014.

14

15

16                    /S/ JODI L. HIBBARD
                      _____

17                    JODI L. HIBBARD, RPR, CRR, CSR
                      Official U.S. Court Reporter
18

19

20

21

22

23

24

25
```

```
                          VOLUME II
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                            5:11-CR-602

JOSEPH VINCENT JENKINS,

                       Defendant.

-------------------------------------------x
```

Transcript of a Jury Trial held on February 4,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


```
                A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWENDOLYN CARROLL, ESQ.


For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007
```

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

137

I N D E X   O F   T E S T I M O N Y

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Pedro Sousa-Dias | 141 | 156 | -- | -- |
| Melany Boyd | 160 | 179 | 190 | -- |
| Tristan Garrah | 191 | 221 | 238 | -- |
| Glen Hache | 240 | 245 | -- | -- |
| Jarret Johnston | 254 | 264 | 271 | -- |
| Marie-Josee Vinette | 274 | 289 | 296 | -- |
| Laurie Sheridan | 297 | -- | -- | -- |
| Jeffrey Olear | 300 | 302 | -- | -- |
| Michel Boulay | 303 | 312 | 316 | 317 |
| Paul Thompson | 319 | 323 | -- | -- |
| Kip Wohlert | 327 | 341 | 352 | 354 |
| Chad Willard | 357 | 367 | 375 | -- |
| Brian Braisted | 377 | -- | -- | -- |

138

1

2                    (Open Court, Jury Out, 9:01 a.m.)

3              THE COURT:  Okay.  We're in the courtroom outside

4     the presence of the jury.  Government ready to proceed?

5              MS. THOMSON:  Yes, your Honor.

6              THE COURT:  Okay.  All set?

7              MR. GOLDSMITH:  Ready.

8              THE COURT:  Okay.

9              MR. GOLDSMITH:  Before we bring the jury out, just

10    one quick issue, your Honor.  As the government's going to

11    start its witness testimony today, just wanted to inquire as

12    to whether they're going to bring up, excuse me, Mr. Jenkins'

13    conviction in state court.

14             MS. THOMSON:  Your Honor, as we'd indicated during

15    the conference, we are not intending to introduce it.  I will

16    say that on Exhibit 2C which will be admitted through our

17    second witness today, I can show the court a copy, we --

18    there's a box that the defendant had to fill out, an

19    application for admission to Canada, this is on 2C towards

20    the bottom, we did white that box out showing that he had the

21    prior conviction that was written in there.

22             THE COURT:  Which box is it?

23             MS. THOMSON:  It would be the box towards the

24    bottom, the third box up from the bottom, it's a five-line

25    box.

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/02/16 Page 173 of 890
**A167**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 4 of 275

139

1          THE COURT:  Yes.

2          MS. THOMSON:  The way the court has it and the way

3     the defendant has it presently, it's whited out.

4          THE COURT:  That's right.

5          MS. THOMSON:  The original does indicate what that

6     conviction is.  If there is testimony elicited during

7     cross-examination as we mentioned in the conference, then the

8     witness may answer, we're not eliciting it but to the extent

9     that a question's asked about it or that answer is produced

10    as a result of the type of questions that are asked, we will

11    produce the original one.

12         THE COURT:  We've talked about that, defense

13    counsel's aware, you know what the situation is, they're not

14    going to ask about it, it's been whited out on this form so

15    we'll proceed on that basis.

16         MR. GOLDSMITH:  Okay, thank you.

17         THE COURT:  All right.  Let's bring the jury in,

18    please.

19              (Jury Present, 9:04 a.m.)

20         THE COURT:  Okay.  Good morning, ladies and

21    gentlemen.  Hopefully you had a restful night, and easy trip

22    in this morning.  May not be so easy tomorrow from what I'm

23    hearing.  You can be seated.  How many of you are coming from

24    the south, south of Syracuse, anybody?  Nobody.  Okay.  The

25    reason I ask is it is supposed to be worse the further south

1    you go, all right.  We're going to monitor the situation, the

2    weather during the day, keep an eye on it, see what the most

3    recent reports are and then based on that, depending on what

4    I think we're looking at, we'll make some decisions, if it

5    looks like it's going to -- it's supposed to start after

6    11:00 tonight, which generally if it starts that early, they

7    have an opportunity to clean it up in the morning.  If that's

8    the case we're just going to proceed on a regular basis.  If

9    it looks like it's going to continue and we get into the

10   morning hours where they have more difficulty cleaning it up,

11   what we're going to do before you leave is we'll get your

12   phone numbers and I'm going to make a decision by the end of

13   the day based on the most recent information they can provide

14   us whether we'll start late or not.  I might push it till

15   10:00 or something if it looks like they're going to have a

16   hard time in the morning with the morning commute, but

17   otherwise we're going to -- we're hardy Central New Yorkers,

18   we're going to forge through it and start on time if at all

19   possible, okay?  So I know some of you were asking about it,

20   so we're going to keep an eye on the situation and we'll act

21   accordingly.  Okay?

22          All right.  We've concluded opening statements

23   yesterday before you went home, government's prepared to call

24   their first witness.

25          MS. THOMSON:  Thank you, your Honor.  The

Pedro Sousa-Dias - Direct                                    141

```
1    government calls to the stand Pedro Sousa-Dias.

2            THE CLERK:  Good morning.  Can you please state

3    your full name for the record and spell it, please.

4            THE WITNESS:  Pedro Sousa-Dias.  P-e-d-r-o,

5    S-o-u-s-a, hyphen, D-i-a-s.

6

7            P E D R O   S O U S A - D I A S , called

8    as a witness and being duly sworn, testifies as

9    follows:

10

11           DIRECT EXAMINATION BY MS. THOMSON:

12   Q    Good morning.

13   A    Good morning.

14   Q    Could you please introduce yourself to the members of

15   the jury.

16   A    My name is Pedro Sousa-Dias.

17   Q    And if you could please keep your voice up because we

18   want to make sure that everybody can hear you.

19   A    Absolutely.

20   Q    Where do you work?

21   A    I work at the Port of Lansdowne, it's a port of entry

22   into Ontario, Canada.

23   Q    When you say port of entry, what do you mean by that?

24   A    Basically a port of entry is a designated area for

25   foreign nationals to gain access into Canada.  It could be a
```

Pedro Sousa-Dias – Direct                              142

1    land border such as the Port of Lansdowne, or it could be an

2    airport or even a marine port.

3    Q    Who is your employer?

4    A    My employer is the Canada Border Services Agency.

5    Q    Do you go by the initials CBSA?

6    A    Yes, we do.

7    Q    How long have you been with CBSA?

8    A    I've been with CBSA since May 7th, 2007.

9    Q    What is your current position?

10   A    My current position is border services officer.

11   Q    What does a border services officer do?

12   A    Basically, we regulate the movement of goods and people

13   into the country.

14   Q    In May of 2009, were you a border services officer?

15   A    Yes, I was.

16   Q    Were you stationed at the Port of Lansdowne?

17   A    Yes, I was.

18   Q    Have you always been stationed at the Port of

19   Lansdowne?

20   A    Yes.

21   Q    Prior to holding your position as a border services

22   officer, did you have any other prior law enforcement

23   experience?

24   A    I worked as a correctional officer between 1993 and

25   2000.

Case 5:14-cr-00088-EAW Document 77 filed 04/12/16 Page 175 of 890
A171
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 8 of 275

Pedro Sousa-Dias - Direct                    143

1          MS. THOMSON:  May I approach the witness, your

2    Honor?

3          THE COURT:  You may.

4    Q    At this time I'm handing you what's been previously

5    marked as Government's Exhibit Number 1C.  I'm going to ask

6    you if you recognize Exhibit 1C.

7    A    Yes, I do.

8    Q    What is that?

9    A    That is the Port of Lansdowne, an image of the Port of

10   Lansdowne.

11   Q    Does that photo fairly and accurately depict the Port

12   of Lansdowne as you saw it on May -- May of 2009?

13   A    Yes, it does.

14   Q    And is that how it looks today?

15   A    It looks the same, yes.

16          MS. THOMSON:  At this time, your Honor, I would

17   offer into evidence Government's Exhibit 1C.

18          THE COURT:  Any objection?

19          MR. GOLDSMITH:  Briefly, your Honor, may I have

20   voir dire?

21          THE COURT:  You want to voir dire on the

22   photograph?

23          MR. GOLDSMITH:  Sure.

24          THE COURT:  Okay, go ahead.

25          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

Pedro Sousa-Dias – Voir Dire                      144

1    Q    Sergeant Dias, this is an aerial photograph?

2    A    Yes, it is.

3    Q    When you testified a moment ago, this is how the port

4    of entry, that's how you view it, you want to clarify you're

5    viewing it from the ground, correct?

6    A    I'm viewing it from the ground, however, we do have

7    aerial images on the walls in the commercial building.

8    Q    And this photographic depiction is exactly in terms of

9    structures of the buildings as the port of entry was in May

10   of 2009, is that correct?

11   A    As far as I can tell, that's correct.

12   Q    And the flow of the primary and secondary inspection

13   sites is also the same as it was in 2009?

14   A    Yes, as far as I can tell it is.

15        MR. GOLDSMITH:  No further objection.

16        THE COURT:  Exhibit will be received.

17        MS. THOMSON:  Thank you, your Honor.

18

19        CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

20   Q    Since you've worked there, have you had any major

21   renovations in the time that you've worked there?

22   A    No, we have not.

23   Q    And you've been working there since 2007?

24   A    I've been working there since 2007.  I would like to

25   clarify just quickly that there, under the canopy, they have

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 177 of 890
A173
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 10 of 275

Philip Sousa-Dias - Direct                          145

1     added a garage to that area.

2     Q     And when was that addition?

3     A     It was I believe around 2010, if I'm not mistaken.

4     Q     Where does the Port of Lansdowne connect with the

5     United States?

6     A     It connects with the Port of Alexandria Bay, there's a

7     highway that runs from U.S. Customs Alexand -- Port of

8     Alexandria Bay to the Port of Lansdowne.

9     Q     If we could publish 1C, please.  Is that depicted in

10    Exhibit 1C?

11    A     The bridge, yes, that goes from the Port of Lansdowne

12    into Alexandria Bay.

13    Q     So the port that's noted where there are flags on the

14    part where you see the Canadian flag, is that where the

15    border is?

16    A     Yes.

17    Q     If we could go back and talk a little bit more about

18    some of your duties as a border services officer.  I believe

19    you described that there are some immigration and some custom

20    functions?

21    A     Yes, there are.

22    Q     Can you tell us about that?

23    A     Basically our duties are divided into what best be

24    described as three different areas.  We work in the office,

25    the office is divided into two counters, there's a customs

Case 5:14-cr-00088-EAW Document 77 filed 01/12/16 Page 178 of 890
**A174**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 11 of 275

Philip Sousa-Dias - Direct                146

1    counter and an immigration counter.  In the customs area, or

2    customs counter, we collect tax and we also do different

3    documentation in terms of goods that are being imported by

4    travelers and whatnot.  The immigration trained officers, I'm

5    not immigration trained, in their side of the counter, they

6    attempt to determine the admissibility of foreign nationals

7    into the country so they do things such as background checks,

8    criminal background checks and whatnot.  They also do

9    documentation for work purposes, work permits, school

10   permits, people want to either study or work in Canada.  That

11   would be our office duties.

12              The second area would be what we refer to as

13   the secondary area, that's the area where we do examinations

14   of vehicles and goods being brought into the country, and the

15   third area would be the primary area, and that would be the

16   primary interview lanes that lead to the booths where

17   travelers present themselves in the vehicles and are

18   interviewed by the officers.

19   Q    Do you work shifts, are there particular set hours that

20   you work?

21   A    We work shift work, yes.

22   Q    During a shift do you stay at one fixed location or do

23   you rotate?

24   A    We rotate pretty much on an hourly basis.

25   Q    I want to take you back to May 24 of 2009.  Were you

Philip Sousa-Dias - Direct                          147

1   working on that day?

2   A    Yes, I was.

3   Q    Do you recall what shift you were working?

4   A    I was working day shift which ran from 730 to 1630.

5   Q    What is 1630?

6   A    It's 4:30 p.m.

7   Q    Where were you stationed?

8   A    I was stationed -- originally I was supposed to be

9   stationed with the VACIS unit but due to operational

10  requirements, I was reassigned to the traveler side.

11  Q    What does that mean, traveler's side?

12  A    Our port, there's two streams to our port, one's the

13  commercial side of things for commercial importations and

14  whatnot, business goods, and the other is the traveler, what

15  we refer to as traffic, and it's just people coming to visit,

16  visit family, on vacation and whatnot.

17  Q    When you began your shift, where did you begin it,

18  where were you stationed?

19  A    I was stationed, at 8:00 I was stationed in interview

20  lane number 5.

21  Q    What are your primary duties in a lane?

22  A    My primary duties in a lane is to make a determination,

23  basically a vehicle pulls up with individuals in it, and I

24  have to interview those individuals and make a decision that

25  I'm satisfied.  Once I'm satisfied of the purpose of their

Philip Sousa-Dias - Direct                                    148

1    travel, and of what they are bringing in, I may make a

2    decision to allow them entry to Canada or refer them for

3    further examination.

4    Q     What happens when a vehicle approaches your lane?

5    A     First thing I do when a vehicle approaches my lane is I

6    compare the license plate to the license plate that comes up

7    on our screen.  We have a -- we have cameras that capture the

8    license plate from the vehicles that pull up and

9    automatically insert them into a database and it runs,

10   compares that license plate to any other license plate that

11   may have had prior enforcement against it.

12   Q     And then once you've made the check of the license

13   plate, what's the next step?

14   A     The next step is I request the driver to hand me his

15   ID, passport in this case, and I ask the driver how many

16   people are in the vehicle.

17   Q     At approximately 8:50 a.m., can you tell us what

18   happened?

19   A     At 8:50, approximately 8:50 a.m., a Navy blue Dodge Ram

20   truck pulling a trailer, and I believe there were a couple of

21   ATVs on that trailer, pulled into my lane.  There was only

22   one occupant in that vehicle, it was the driver himself.  I

23   follow the same process I always do, I compare the license

24   plate to what I had in front of me in the monitor, I then

25   requested that the driver hand me his passport to which he

Philip Sousa-Dias - Direct                    149

1    did.  I compare the image on the passport to the driver in

2    front of me, and scan the passport.  The name on the passport

3    was Joseph Jenkins.  I scanned the passport on our database

4    to see again if there was any prior enforcement either from

5    an immigration or customs-based prior charge, and there was

6    none.

7                I then proceeded to interview this individual.

8    I went through my set of mandatory questions, questions such

9    as whether he was leaving anything behind in Canada, whether

10   he had $10,000 in currency or monetary instruments, whether

11   he was carrying any firearms, pepper spray, mace, tasers, any

12   weapons of any sort, prohibited items in Canada.  I asked him

13   whether he had pets, plants, animal products, there's

14   concerns with cross-contamination of pests.  I asked him if

15   he had alcohol or tobacco, if he had gone into duty free,

16   there's regulations with reporting alcohol and tobacco into

17   Canada.  So I went through my mandatory questions with him.

18   I noticed that the driver was avoiding making eye contact

19   with me, he was very rigid.  He kept both hands on the

20   steering wheel, he faced, pretty much was looking straight

21   out of the windshield, straight ahead rather than turning

22   towards me and seemed to be focused primarily on the exit to

23   the port of entry which would allow him entry to Canada.

24                My past experience with seasonal residents,

25   that's how we refer to, lot of U.S. citizens own cottages in

Philip Sousa-Dias - Direct                           150

1    Canada, particularly in and around the Thousand Islands, my

2    experience with them has been that they're very friendly,

3    they're very -- they're used to crossing the border, they

4    tend to be very talkative and you know, they're -- they face

5    you and tend to chat, if anything.  Mr. Jenkins was

6    completely the opposite of my past experiences.  As such, I

7    felt that he had a concern, the impression I was left with

8    was that he had a concern about crossing the border.  I

9    decided that I would send Mr. Jenkins into our immigration

10   department for a criminal background check.  There's certain

11   criminal charges that will make an individual inadmissible to

12   Canada, and as such, I thought that a background check was

13   due.

14             So I went and I filled out a form, it's a

15   referral form, we refer to it also as an E67, that's the

16   number on the form, and I filled out the information on this

17   form, included the number of individuals in the vehicle which

18   in this case was one, the length of stay, I then checked no

19   for all the mandatory questions that I had previously asked

20   Mr. Jenkins.  I then put his license plate, the state that

21   the license plate was from, my badge number and the time that

22   I was doing this, and on the immigration box in this form, I

23   wrote down "1 x CC," which meant one individual for criminal

24   check.

25   Q    At this time I'm going to approach the witness, your

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 183 of 890
A179
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 16 of 275

Philip Sousa-Dias – Direct                          151

1    Honor, and I'll show you what's been previously marked as

2    Government's Exhibit 2A.  I'll ask you if you recognize

3    Exhibit 2A.

4    A     Yes, I do.

5    Q     Can you tell me what that is?

6    A     This is the referral form I handed Mr. -- or a copy of

7    the referral form I handed Mr. Jenkins.

8    Q     Is that the form that you use when you're making a

9    referral?

10   A     Yes, it is.

11   Q     Is there a title of that form, is there a way that it's

12   referred to?

13   A     It's referred as an E67, that's the number on the

14   bottom of the form, it's a government-issued form.

15   Q     That's the form that you use every time you make that

16   type of referral?

17   A     Yes, it is.

18   Q     And is that the form that you used on May 24, 2009?

19   A     Yes, it is.

20   Q     Is that your writing on the form?

21   A     Yes, it is.

22         MS. THOMSON:  At this time, your Honor, I would

23   offer into evidence Government's Exhibit 2A.

24         THE COURT:  Any objection?

25         MR. GOLDSMITH:  No objection.

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 184 of 890
**A180**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 17 of 275

Philip Sousa-Dias - Direct                                152

1          THE COURT:  It will be received.

2          MS. THOMSON:  And if we could publish that, please.

3          The box that's highlighted, can you see on the

4    screen in front of you?

5    A     Yes, I can.

6    Q     Is this the top portion of the E67?

7    A     Yes, it is.

8    Q     At the top part, I notice that there's a box that

9    indicates length of stay, is that your handwriting, the word

10   indicates one week?

11   A     Yes, it is.

12   Q     Where did you get that information?

13   A     I asked Mr. Jenkins how long he was staying in Canada.

14   Q     Did you ask him anything else about his trip to Canada?

15   A     I asked the purpose of his trip to Canada.

16   Q     What did he indicate?

17   A     He stated that he was coming to stay at -- at a family

18   cottage for the time period of one week.

19   Q     Did he indicate where that family cottage was?

20   A     I can't recall.

21   Q     Was it in Canada?

22   A     Yes, it was.

23   Q     Is that why you perceived him to be a seasonal

24   resident?

25   A     Yes, it is.  It was -- he indicated to me at the time

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 185 of 890
A181
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 18 of 275

Philip Sousa-Dias - Direct                          153

1    that it was a family-owned cottage.

2    Q     That he was going to?

3    A     That he was going to.

4    Q     So the questions that you asked him with regard to

5    goods declared and currency and whatnot, there's a series of

6    boxes, do the boxes reflect that when you asked him that

7    question, he didn't declare any of those items?

8    A     That's correct.

9    Q     Now at the bottom where it's indicated 1 x CC, is that

10   where you indicated that there was one person present and you

11   wished to have a criminal check?

12   A     Criminal check on that individual.

13   Q     Where it indicates no AIT, what does that refer to?

14   A     It's actually no A/T and it indicates no alcohol and

15   tobacco.

16   Q     Moving down on the form, did you note on the form the

17   license plate of the vehicle that you dealt with?

18   A     Yes, I did.

19   Q     And what is that plate number?

20   A     It's 19322JL, New York.

21   Q     And did you also indicate the time that you made the

22   referral?

23   A     Yes.

24   Q     And what time was that?

25   A     It was at 0853.

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 186 of 890
**A182**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 19 of 275

Philip Sousa-Dias - Direct 154

1  Q    Is the lane that you were working in referenced on the

2  form?

3  A    Yes, it is, it's lane number 5.

4  Q    Once you completed that form and made your decision

5  that he should go inside, what did you tell Mr. Jenkins?

6  A    I handed him the referral form and I just directed him

7  to park in front of the building, the office building in

8  front of immigration, and I directed him to leave the

9  vehicle, take his passport with him, the referral, the E67

10  referral document I just filled out and head towards the

11  immigration counter and present himself to an officer.

12  Q    Did you have an opportunity to see the person that had

13  come through lane 5 that you made that referral for again

14  later that day?

15  A    Yes, I did.

16  Q    And can you tell us how that came to pass?

17  A    As I've stated before, we only tend to spend an hour

18  out in the booth and then we're assigned to a different area

19  and we rotate through these posts throughout the day or

20  throughout the shift.  At 9:00, I was relieved from lane 5

21  and I was assigned to the office so I was actually in the

22  office in the customs counter, the counters are perpendicular

23  to each other, and I was in the customs counter while

24  Mr. Jenkins was sitting, while the immigration officers were

25  running database checks on him.  So I could face him.  I was

Philip Sousa-Dias - Direct                          155

1   probably maybe 10 feet away from him at that point.

2   Q    At this time if I could approach the witness and I'm

3   handing you Government Exhibit 1D.  I'm going to ask you if

4   you recognize 1D.

5   A    Yes, I do.

6   Q    What is that?

7   A    That's the primary inspection lanes at the Port of

8   Lansdowne.

9   Q    Does that represent the booth that you were working in

10  and the lane you were working in in May 2009?

11  A    All eight lanes are in this image, I was working lane

12  number 5 which would be in the center of those eight lanes.

13       MS. THOMSON:  Your Honor, at this time the

14  government would move into evidence Government's Exhibit 1D.

15       THE COURT:  Any objection?

16       MR. GOLDSMITH:  No objection.

17       THE COURT:  It will be received.

18       MS. THOMSON:  If we could publish that, please.

19  Q    You indicated that lane 5 would be somewhat in the

20  center that's depicted as this image?

21  A    Yes.

22  Q    Officer Sousa-Dias, do you see the person that

23  presented themselves to lane 5 on May 24, 2009 at

24  approximately 8:53 a.m., do you see them in the courtroom?

25  A    Yes, I do.

Philip Sousa-Dias - Direct                           156

1    Q    And if you could please indicate where you see them and

2    describe them by an article of clothing.

3    A    He's sitting right there with the blue shirt on.

4         MS. THOMSON:  And your Honor, if the record could

5    reflect the witness identified the defendant?

6         THE COURT:  It will so reflect.

7         MS. THOMSON:  That's all I have, if I could

8    retrieve the exhibits.  Thank you.

9         THE COURT:  Mr. Goldsmith, any cross-examination?

10        MR. GOLDSMITH:  May I approach.

11        THE COURT:  You may.

12        CROSS-EXAMINATION BY MR. GOLDSMITH:

13   Q    Officer Sousa-Dias, you said you started that morning

14   at 7:30?

15   A    Yes.

16   Q    And approximately 8:50 you saw a blue Dodge Ram

17   approach carrying or towing a trailer, is that correct?

18   A    Yes, it is.

19   Q    When the Dodge truck came to your booth you said you

20   ran a plate check of the vehicle, is that correct?

21   A    Yes, it is.

22   Q    Plate check did not have any returns whatsoever as to

23   in the Canadian criminal system?

24   A    It doesn't check the Canadian criminal system.  The

25   only database attached to that plate check are a customs

Pedro Sousa-Dias - Cross                           157

1    database for any infractions against customs regulations and

2    immigration database.

3    Q    And there were no positive results on the plate check?

4    A    There were none.

5    Q    When you asked the driver to produce identification he

6    did so?

7    A    Yes, he did.

8    Q    And traffic that morning at that time of day, you

9    recall?

10   A    Yes, it was pretty light, we only had two lanes open.

11   Q    Lot of cars lined up behind the Dodge Ram?

12   A    Not really, no, it was -- it was early in the morning,

13   traffic is light.

14   Q    Many cars before the Dodge Ram within the last few

15   minutes?

16   A    Within the last few minutes, no, there was no line, it

17   may be two or three cars, tops.

18   Q    Now you said that you had a referral slip that you

19   prepared in order to send the driver of the vehicle to a

20   secondary inspection point, is that correct?

21   A    Yes, it is.

22   Q    And you had that slip that you had to handwrite out, is

23   that correct?

24   A    That's right.

25   Q    And those slips typically will have some information

Pedro Sousa-Dias - Cross                    158

1   already on them so that you can facilitate filling them out

2   easier and quicker?

3   A      I'm not sure I understand the question.

4   Q      As a vehicle approaches will you be able to fill out

5   some of the information on it already as the vehicle's

6   approaching?

7   A      No, we do not.  I do not.

8   Q      So you did not fill out any paperwork until you,

9   after -- withdrawn.  You did not fill out any of the referral

10  slip until after you had already began interviewing the

11  driver of the vehicle?

12  A      That's correct.

13  Q      You said that the -- that you filled out the referral

14  based solely upon the driver's behavior, is that correct?

15  A      Once I made a decision to refer him, I filled out the

16  referral.

17  Q      Okay.  When you made the decision to refer him, was it

18  based solely on what you described as his behavior?

19  A      Yes, it was.

20  Q      And what you described was him staring straight ahead

21  in the vehicle, correct?

22  A      That was part of it, yes.

23  Q      Holding onto the steering wheel of a vehicle, correct?

24  A      Correct, with both hands.

25  Q      All right.  So the basis that you had in referring him

Case 5:14-cr-00088-EAW Document 71 Filed 01/12/16 Page 191 of 890
**A187**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 24 of 275

Pedro Sousa-Dias - Cross                                         159

1    was essentially that he was staring ahead and kept his hands

2    on the wheel, right?

3    A    Not really, there's more to it than that.

4    Q    Well, you also testified that he didn't seem as

5    "friendly" as you classified the regional -- or I'm sorry,

6    vacation residents in the area, is that correct?

7    A    That's correct.

8    Q    All right.  And that's your experience with every

9    single vacation homeowner in the area?

10   A    I couldn't -- I can't recall if it's with every single

11   but the majority of them.

12   Q    So you made a judgment based upon a generalization of

13   other drivers that you see, is that correct?

14   A    It's not a perfect science, it's -- we can only go by

15   our experience.

16   Q    All right.  And at the time when you were asking the

17   driver questions, he responded to all your questions, is that

18   correct?

19   A    Yes, he did.

20   Q    Didn't have any outbursts or refuse to answer any of

21   your questions, correct?

22   A    That's correct.

23   Q    Was otherwise compliant with your interview?

24   A    Yes, he was.

25           MR. GOLDSMITH:  No further questions.

Melany Boyd - Direct                                    160

1          THE COURT:  Any redirect?

2          MS. THOMSON:  No.

3          THE COURT:  You may step down, sir, thank you.

4              (Whereupon the witness was excused.)

5          MS. THOMSON:  At this time, your Honor, the

6     government calls to the stand Melany Boyd.

7          THE CLERK:  Good morning.  Step right up here,

8     please.  State your full name and spell it for the record.

9          THE WITNESS:  Melany Boyd, M-e-l-a-n-y, Boyd,

10    B-o-y-d.

11         THE CLERK:  Thank you, raise your right hand.

12

13         M E L A N Y   B O Y D , called as a

14    witness and being duly sworn, testifies as follows:

15         <u>DIRECT EXAMINATION BY MS. THOMSON:</u>

16    Q    Good morning.

17    A    Good morning.

18    Q    Could you please introduce yourself to the members of

19    the jury?

20    A    I'm Melany Boyd.

21    Q    Where do you work?

22    A    I work for Canada Border Services Agency in Ottawa,

23    Ontario.

24    Q    How long have you worked for Canada Border Services

25    Agency?

Case 5:14-cr-00088-EAW Document 77-1 Filed 01/12/16 Page 193 of 890
**A189**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 26 of 275

Melany Boyd – Direct                                    161

1   A      Since May of 2006.

2   Q      Does that agency also refer to itself as CBSA?

3   A      Yes, it does.

4   Q      And what positions have you held with CBSA?

5   A      I've been a border services officer and I'm currently a

6   hearings officer.

7   Q      How long have you been a hearings officer?

8   A      Since August of 2013.

9   Q      Prior to getting a position of hearing officer, what

10  position did you hold?

11  A      A border services officer.

12  Q      What does a hearing officer do?

13  A      We represent the Canada Border Services Agency when it

14  comes to immigration matters, so we would represent the

15  agency when we're seeking a removal order against someone

16  who's inadmissible to Canada.

17  Q      In May of 2009, can you tell us what position you held?

18  A      I was a border services officer.

19  Q      What are some of the duties of a border services

20  officer?

21  A      We examine both people and goods that are seeking entry

22  to Canada.

23  Q      Why do you make an examination of people and goods that

24  are seeking entrance into Canada?

25  A      For people, we determine if they have the right to

                              Melany Boyd – Direct                    162

1    enter Canada and if they don't, be considered a foreign

2    national, we would determine if they're admissible to Canada,

3    and for goods we determine if the goods are permissible to

4    enter the country.

5    Q    When you're talking about people, that determination,

6    is there a name that you call that process?

7    A    Yes, it's called immigration secondary.

8    Q    And when you're talking about goods, is there a name

9    that you refer to that as?

10   A    Yes, it's customs.

11   Q    On May 24, 2009, can you please tell us where you were

12   assigned.

13   A    I was assigned to immigration secondary.

14   Q    And where?

15   A    At the Port of Lansdowne in Hill Island, Ontario.

16   Q    On that day, what shift were you working?

17   A    I was on day shift which is 7 a.m. until 7 p.m.

18   Q    At this time I'm going to show you what's been

19   previously marked as Government's Exhibit 1B.  I'm going to

20   ask you if you recognize what 1B is.

21   A    Yes, I do.

22   Q    And what is that?

23   A    It's a map of the Canadian and U.S. border.

24   Q    Are you familiar with that map?

25   A    Yes, I am.

Melany Boyd - Direct                                    163

1   Q    And does that map fairly and accurately depict the

2   items that are contained therein?

3   A    Yes.

4        MS. THOMSON:  At this time, your Honor, I would

5   offer into evidence Government's Exhibit 1B.

6        THE COURT:  Any objection?

7        MR. GOLDSMITH:  No objection.

8        THE COURT:  It will be received.

9        MS. THOMSON:  And if we could publish 1B, please.

10  Q    Would it be fair to say that this is an aerial of the

11  Port of Lansdowne?

12  A    Yes.

13  Q    And if you could with your finger touch where you could

14  see the Port of Lansdowne on this photograph, on this aerial

15  photograph, and you could touch the screen.

16  A    On the screen, so this here is the Port of Lansdowne.

17  Q    Is that function working?

18       THE CLERK:  Yes, she's doing it.

19  Q    It didn't come up right away on mine.  That's where you

20  just -- where the pink arrows are, that's the Port of

21  Lansdowne?

22  A    Yes.

23  Q    The Port of Lansdowne on the Canadian side, where does

24  it connect on the American side?

25  A    This here is the bridge, so when you cross over that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 196 of 890
**A192**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 29 of 275

Melany Boyd - Direct                                          164

1   waterway, you're entering Canada.

2   Q     From New York?

3   A     Yes, Alexandria Bay.

4         MS. THOMSON:  At this time I'm approaching the

5   witness and handing the witness Government's Exhibit 1E.

6         Do you recognize Government's Exhibit 1E?

7   A     Yes, I do.

8   Q     What is Government's Exhibit 1E?

9   A     It's the secondary area at the Port of Lansdowne.

10  Q     And is that -- does that photograph fairly and

11  accurately depict the secondary area as you are familiar with

12  it?

13  A     Yes.

14  Q     Both in 2009 and presently?

15  A     Yes.

16        MS. THOMSON:  At this time, your Honor, I would

17  offer into evidence Government's Exhibit 1E.

18        THE COURT:  Any objection?

19        MR. GOLDSMITH:  No objection.

20        THE COURT:  It will be received.

21  Q     If we could publish that, please.  Is this the area you

22  were working in on May 24, 2009?

23  A     Yes.

24  Q     Now during your shift on that day, what were your

25  particular duties?

Melany Boyd – Direct                                     165

1    A    I was assigned to immigration secondary, so I was in

2    the office and I was dealing with travelers that were

3    referred for immigration processing.

4    Q    Where are these travelers referred from?

5    A    They're referred from the primary inspection booth.

6    Q    What do you do when you're doing an interview, if you

7    could just describe that.

8    A    I would talk to the client to determine the purpose of

9    their trip to Canada, and to assess their admissibility to

10   Canada.

11   Q    At approximately 9 a.m., can you tell us where you

12   were?

13   A    Yes, I was assigned to the immigration secondary

14   office.

15   Q    Can you tell us what happened.

16   A    Yes, a male gentleman came into the office, he

17   approached the immigration counter.  He handed an American

18   passport as well as a CBSA referral slip.

19   Q    Is there a particular name for the CBSA referral slip?

20   A    Yes, it's called an E67.

21   Q    So when a person's referred from primary, they are

22   referred with an E67?

23   A    Yes.

24   Q    So once that referral comes in, what happens?

25   A    Then I would interview the client.

Melany Boyd – Direct

166

1    Q    What types of things do you do during the interview?

2    A    I start with a general, general questioning to

3    determine the purpose of their trip and then any questions

4    following that would ultimately determine if they're

5    admissible to Canada or not.

6    Q    I believe you indicated approximately 9 a.m. a

7    gentleman came in for this type of immigration interview; do

8    you recall that event?

9    A    Yes, I do.

10   Q    And when he came in, were you handed that E67?

11   A    Yes, I was.

12   Q    And if we could publish Exhibit 2A which has already

13   been received into evidence, you'll see the exhibit in front

14   of you on the screen.  Do you recognize that exhibit?

15   A    Yes, I do.

16   Q    What is that exhibit?

17   A    It's a CBSA referral slip, known as an E67.

18   Q    Is that the referral slip that you were handed?

19   A    Yes, it was.

20   Q    Who handed that to you?

21   A    It was Mr. Joseph Jenkins.

22   Q    Did you do an interview with Joseph Jenkins?

23   A    Yes, I did.

24   Q    Can you tell us about that interview?

25   A    I asked Mr. Jenkins what his citizenship was, he stated

Melany Boyd - Direct                                    167

1    American.  I asked him where he lives, he stated Geneva,

2    New York.  I asked him how long he was going to be staying in

3    Canada, he stated one week.  I asked him the purpose of his

4    trip to Canada, he stated he was on vacation.  I asked him

5    where he was going, he stated to his parents' place.  I asked

6    him where that was, and he stated in Quebec.  I asked him

7    what his parents' status was in Canada, he stated that they

8    were seasonal residents.  I asked him what he did for a

9    living, he stated that he was self-employed.  I asked him

10   what he did, he stated that he was an electrician.  I asked

11   him if he had ever been to Canada before and he stated yes.

12   I asked him if he ever had any problems crossing the border,

13   he stated no.  I also asked him if he had ever had any

14   problems with the law before, ever been arrested, charged or

15   convicted of any criminal offenses and he stated no.  So this

16   ended my interview and I asked him to have a seat in the

17   lobby, and I went to my desk to conduct database checks.

18   Q    When you encountered Mr. Jenkins with the E67, did you

19   also obtain from him any other documentation?

20   A    Yes.  He handed me his American passport.

21   Q    At this time I'm going approach the witness and hand

22   you Exhibit 2B and ask you if you recognize Government's

23   Exhibit 2B.

24   A    Yes, I do.

25   Q    What is that?

Melany Boyd – Direct                    168

1   A     It's an American passport for Mr. Jenkins.

2   Q     Is that a copy of an American passport?

3   A     Yes, it is.

4   Q     When you were handed the passport, were you handed an

5   actual passport or a copy of it?

6   A     No, the original passport.

7   Q     Is that copy a true and accurate copy of the passport

8   that you were handed?

9   A     Yes, it is.

10          MS. THOMSON:  At this time, your Honor, I would

11   offer into evidence Government's Exhibit 2B.

12          MR. GOLDSMITH:  May I briefly voir dire?

13          THE COURT:  You may.

14          MR. GOLDSMITH:  Thank you.

15          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

16   Q     Agent Boyd, did you make a photocopy of the passport on

17   that morning?

18   A     Yes, I did.

19   Q     And photocopy of the passport under Government

20   Exhibit 2B, is that a version of the photocopy that you made

21   that morning?

22   A     Yes.

23          MR. GOLDSMITH:  No further questions, no objection.

24          THE COURT:  It will be received.

25          CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

Melany Boyd – Direct                          169

1   Q      When you make a copy of the passport, is it to be kept,

2   is it, the copy to be kept in your files?

3   A      Yes.

4   Q      And the Government Exhibit 2B, was that from your

5   files?

6   A      Yes.

7   Q      What was the next step in your process of doing an

8   interview?

9   A      I conducted database checks.

10  Q      While you were conducting the database checks, where

11  was the defendant?

12  A      He was sitting in the lobby of the office.

13  Q      Do you see the person in this courtroom that you

14  encountered at approximately 9 a.m. on May 24, 2009, that

15  presented the passport that's depicted in Exhibit 2B?

16  A      Yes, I do.

17  Q      And if you could please identify him by his location

18  and article of clothing.

19  A      He's seated at the table to my left in a blue-collared

20  golf shirt.

21          MS. THOMSON:  If the record could reflect the

22  witness has identified the defendant Mr. Jenkins.

23          THE COURT:  It will.

24  Q      When you encountered the defendant, could you describe

25  any observations that you made about him, during your entire

Melany Boyd – Direct                                    170

1    encounter with him?

2    A     I did notice Mr. Jenkins' behavior, he appeared to be

3    nervous when I was asking him questions, he avoided eye

4    contact when I was asking him the questions, as well as he

5    was evasive when I was asking questions.  For example, he

6    would only provide the direct answer to my question, he would

7    never provide additional information.  He also was fidgeting

8    with his hands when I was conducting my interview as well, so

9    I noticed this behavior when I was speaking with Mr. Jenkins.

10   Q     When you're conducting these interviews, are you

11   attempting to make those observations, are you trying to

12   gauge what the answers are to the questions and how they're

13   being answered?

14   A     Yes.

15   Q     Why?

16   A     They're -- well, they're called indicators and our

17   training just gives us indicators if someone may be possibly

18   not answering truthfully or -- just gives us reason to

19   further the examination.

20   Q     As a result of your interview, what steps, if any, did

21   you take?

22   A     I had deferred the secondary examination to customs.

23   Q     Why?

24   A     Because of the observations I made, when I was

25   conducting the interview with Mr. Jenkins.

Melany Boyd - Direct                                              171

1    Q    When you made those observations and decided to defer

2    him, what were you seeking to have done?

3    A    A examination of Mr. Jenkins' vehicle.

4    Q    Why his vehicle?

5    A    To determine his admissibility to Canada.  I had

6    concerns that because Mr. Jenkins did have his parents in

7    Canada, I was concerned that he possibly could stay in Canada

8    longer.  He'd also, he informed me in the interview that he

9    was self-employed so I was concerned that he could possibly

10   be staying in Canada longer than his one-week trip that he

11   had stated to me.

12   Q    When he presented himself to you to do this interview,

13   had you made any observations of his vehicle?

14   A    Yes, the office is all glass, you can see all the

15   vehicles that are parked in the secondary area so I did see

16   Mr. Jenkins' vehicle.  It was -- he was driving a pickup

17   truck so you could see in the bed of the truck there were a

18   lot of belongings as well as he was pulling a trailer and it

19   was an open trailer so I did observe a lot of belongings in

20   the trailer as well so noticing this also made me want his

21   vehicle to be examined as well.

22   Q    When you made the decision that his vehicle should be

23   examined, how did you start that process?

24   A    I made a radio call to customs secondary.

25   Q    Did anyone respond to that radio call?

Melany Boyd - Direct                                    172

1    A     Yes, it was Officer Glen Hache.

2    Q     The inspection that you were calling for, is that part

3    of your duties as well, do you do -- do you perform those

4    inspections?

5    A     Yes, I do.

6    Q     On that particular day, did you participate in the

7    inspection of his vehicle?

8    A     No.

9    Q     Why is that?

10   A     Myself and a colleague of mine, we were the only ones

11   working in immigration secondary, it was a very busy day, and

12   noticing the amount of belongings in the vehicle that I had

13   observed, I knew it was going to take longer and there were

14   other clients waiting to be examined for immigration

15   secondary, so I had deferred the secondary to customs for --

16   just for time, time restraints.

17   Q     But you yourself do perform custom functions in

18   addition to immigration functions?

19   A     Yes.

20   Q     At this time I'm approaching the witness and handing

21   the witness what's been previously marked as Government's

22   Exhibit 2C.  I'm going to ask you if you recognize

23   Exhibit 2C.

24   A     Yes, I do.

25   Q     What is Government Exhibit 2C?

Melany Boyd – Direct                                    173

1    A    It's a immigration form, it's an application for

2    admission to Canada form.

3    Q    Were you present when that form was filled out?

4    A    Yes, I was.

5    Q    What is the purpose of that form?

6    A    It's to collect standard information from someone that

7    is seeking entry to Canada.

8    Q    On that particular form, who was seeking entry on that

9    form?

10   A    It was Mr. Jenkins.

11   Q    And you were present when Mr. Jenkins was filling out

12   that form?

13   A    Yes, I was.

14        MS. THOMSON:  At this time, your Honor, the

15   Government would move into evidence Exhibit 2C.

16        THE COURT:  Any objection?

17        MR. GOLDSMITH:  Very brief voir dire, your Honor.

18        THE COURT:  Go ahead.

19        MR. GOLDSMITH:  Thank you.

20   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

21   Q    Agent Boyd, when you said that he was in your presence

22   when he filled it out, did he fill it out at the counter in

23   front of you?

24   A    No.

25   Q    He filled it out in a waiting area?

Melany Boyd – Direct                                        174

```
 1   A     It was in an interview room.

 2   Q     All right.  Where was the interview room located

 3   relative to the counter that he approached you at?

 4   A     It was the other end of the office.

 5   Q     All right.  And you were in the interview room with him

 6   when he filled it out?

 7   A     Yes.

 8   Q     And you presented him with the forms?

 9   A     Yes.

10   Q     You watched him fill it out?

11   A     Yes.

12   Q     You took the form from him?

13   A     Yes.

14   Q     And this form's a copy of your records?

15   A     Yes.

16             MR. GOLDSMITH:  No objection.

17             THE COURT:  Received.

18         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

19   Q     If we could publish 2C, please.  In relation to the

20   time that you spent with him at the counter when he first

21   presented himself, when was this form filled out?

22   A     It was approximately 1620.

23   Q     Is that 4:20 p.m.?

24   A     Yes.

25   Q     I always have trouble with that.  So at 4:20 p.m., you
```

Melany Boyd - Direct                                    175

1   were still in the presence of the defendant?

2   A     Yes.

3   Q     Okay.  And do you know why?

4   A     Yes.  He was in custody of CBSA, he had been arrested.

5   Q     And so when you sat -- you sat with him and he filled

6   this out?

7   A     Yes.

8   Q     Where it's indicated for name it indicates Joseph

9   Jenkins, correct?

10  A     Yes.

11  Q     Is there a birth date associated on the form?

12  A     Yes, January 22nd, 1970.

13  Q     And if we could scroll down and see the bottom half of

14  the form, please.  Where it indicates accompanied by, can you

15  tell us what is written in there?

16  A     No one.

17  Q     And that would be what Mr. Jenkins filled out on this

18  form?

19  A     Yes.

20  Q     And what is indicated for purpose of trip?

21  A     Vacation.

22  Q     And destination?

23  A     Lac-des-Seize-îles (phonetic), Quebec.

24  Q     Length of stay?

25  A     Week.

Case 5:14-cr-00088-EAW Document 77 Filed 04/12/16 Page 208 of 890
**A204**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 41 of 275

Melany Boyd – Direct                                    176

1   Q     And if we could move down to the bottom of the form,

2   please.  Did defendant sign this form?

3   A     Yes, he did.

4   Q     And date it May 24, 2009?

5   A     Yes.

6   Q     Did he also indicate his vehicle information?

7   A     Yes.

8   Q     Would that be the vehicle that he -- that you observed?

9   A     Yes, it was.

10          MS. THOMSON:  One moment, your Honor.

11  Q     At this time I'm handing the witness what's been

12  previously marked as Government Exhibit 2D.  I'm going to ask

13  you if you recognize Government's Exhibit 2D.

14  A     Yes, I do.

15  Q     What is Exhibit 2D?

16  A     It's a photograph of Mr. Jenkins.

17  Q     Did you take that photograph?

18  A     Yes, I did.

19  Q     At what point did you take that photograph?

20  A     It was approximately 4:20 in the afternoon.

21  Q     Did you retain the photograph and copies of the

22  photograph in your file?

23  A     Yes, I did.

24  Q     Is this a true and accurate copy of the photograph and

25  the copies of the photograph that you maintained in your

Melany Boyd – Direct                                      177

1    file?

2    A    Yes, it is.

3              MS. THOMSON:  Your Honor, at this time I would

4    offer into evidence Government's Exhibit 2D.

5              MR. GOLDSMITH:  May I actually briefly see the

6    exhibit?

7              THE COURT:  You may.

8              MS. THOMSON:  It's in your exhibit binder.

9              MR. GOLDSMITH:  The exact copy.

10             MS. THOMSON:  You want to see this one?

11             MR. GOLDSMITH:  Thank you.

12   Q    Did you maintain the original in your file?

13   A    Yes, I did.

14   Q    And is that part of your Canadian file?

15   A    Yes.

16             THE COURT:  Any objection to the offer?

17             MR. GOLDSMITH:  Just a very brief voir dire?

18             THE COURT:  Go ahead.

19             VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

20   Q    There's handwriting at the top right of the page, Agent

21   Boyd, is that your handwriting?

22   A    Yes, it is.

23   Q    And you wrote that, approximately the same time that

24   the photograph was produced?

25   A    Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW   Document 72   Filed 01/12/16   Page 210 of 890
**A206**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 43 of 275

Melany Boyd – Direct                                        178

1    Q     And the page with the note taking in the photograph was

2    kept in your records?

3    A     Yes.

4          MR. GOLDSMITH:  No objection.

5          THE COURT:  Received.

6          MS. THOMSON:  If we could publish that, please.

7          CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

8    Q     Is that the person that you encountered on May 24,

9    2009?

10   A     Yes, it is.

11   Q     Have you seen Joseph Jenkins since the time that you

12   encountered him on May 24, 2009?

13   A     Yes.

14   Q     When was that?

15   A     It was on September 13th, 2010.

16   Q     Where was that?

17   A     It was at the Brockville Courthouse in Brockville,

18   Ontario.

19   Q     On that date was there a proceeding involving Canadian

20   charges that you've described?

21   A     Yes.

22   Q     And so you saw the defendant at that proceeding?

23   A     Yes, I did.

24   Q     Did that proceeding that you attended, did it get

25   turned over to a later date?

Melany Boyd - Direct                                    179

1   A    Yes, it did.

2   Q    And do you recall the date that it was continued until?

3   A    It was October 2010.

4   Q    Did you appear in Canadian court in October of 2010?

5   A    Yes, I did.

6   Q    When you appeared, did you see the defendant at that

7   time?

8   A    No, I didn't.

9   Q    What were you appearing for?

10  A    For a trial in Canada for the Canadian charges.

11  Q    Was the defendant present for that trial?

12  A    No, he wasn't.

13  Q    Did that trial go forward?

14  A    No, it didn't.

15       MS. THOMSON:  I have no further questions for this

16  witness.

17       THE COURT:  Cross-examination, Counsel?

18       MR. GOLDSMITH:  May I inquire?

19       THE COURT:  You may.

20       MR. GOLDSMITH:  Thank you.

21       CROSS-EXAMINATION BY MR. GOLDSMITH:

22  Q    Officer Boyd, you testified that Mr. Jenkins came into

23  the office where you were with a referral slip, is that

24  correct?

25  A    Yes, it is.

Melany Boyd – Cross                    180

1   Q    And that was at about 9:00 in the morning on May 24th

2   of 2009?

3   A    Yes.

4   Q    When he presented the referral slip to you, you began

5   to interview him, is that correct?

6   A    Yes.

7   Q    And you asked him several questions about his length of

8   stay, purpose of stay, et cetera?

9   A    Yes.

10  Q    And he provided you with answers to all those

11  questions, correct?

12  A    Yes.

13  Q    He answered all of your questions, is that correct?

14  A    Yes.

15  Q    And when he was at the counter, he did not have any

16  outburst toward you, is that correct?

17  A    That's right.

18  Q    Was -- you characterized him as compliant during the

19  interview, is that correct?

20  A    Yes.

21  Q    You testified a few moments ago that you made a

22  decision to ask for an inspection of his vehicle, do you

23  recall that?

24  A    Yes.

25  Q    And you said that you made that decision based upon

Case 5:14-cr-00088-EAW Document 77 Filed 04/12/16 Page 213 of 890
A209
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 46 of 275

Melany Boyd — Cross                                181

1    your view of his vehicle, is that correct?

2    A      Yes.

3    Q      Now the view of the vehicle was outside of the building

4    that you were in, correct?

5    A      Yes.

6    Q      And you testified that the building has a lot of

7    windows in it, but it was still outside of where you were,

8    correct?

9    A      Yes.

10   Q      The vehicle was approximately how many feet from where

11   you were standing?

12   A      Say approximately 15 feet.

13   Q      So it was 15 feet to where the windows were and then an

14   additional amount of feet to where the car was or where the

15   car was?

16   A      No, sorry, that's from where I was standing to the

17   vehicle.

18   Q      Okay.  And in between obviously the vehicle and you

19   there was a wall of -- all glass, is that correct?

20   A      Yes.

21   Q      Well, let me rephrase, is it all glass or does it have

22   some structure in between the windows?

23   A      Some structure.

24   Q      Does it have any blinds or shades over the windows?

25   A      No.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Melany Boyd – Cross                                    182

1    Q    All right.  So you were able, about 15 feet away from

2    behind your counter, to see the truck, is that correct?

3    A    Yes.

4    Q    And you observed the truck while you were interviewing

5    Mr. Jenkins, correct?

6    A    Yes.

7    Q    And so at the time that you're interviewing him, you're

8    taking any notes down?

9    A    No.

10   Q    Filling out any paperwork?

11   A    No.

12   Q    But you are paying attention to him and his demeanor

13   towards you, correct?

14   A    Yes.

15   Q    So then you see, I guess is it over his shoulder where

16   the truck would be?

17   A    No, it would be to my right.

18   Q    So while you're staring and paying attention to

19   Mr. Jenkins, you are also looking in a different direction

20   toward the truck, correct?

21   A    Well, what had happened was I was standing at the

22   counter waiting for the referral to be sent inside, so I saw

23   the vehicle pull into the secondary area, and I watched

24   Mr. Jenkins get out of the vehicle and come into the office,

25   but while I was conducting my interview, I was focused on

Case 5:14-cr-00088-EAW   Document 77   Filed 01/12/16   Page 215 of 890
A211
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 48 of 275

Melany Boyd - Cross                                          183

1   Mr. Jenkins.

2   Q     All right, let me stop you there.

3   A     Not on the vehicle.

4   Q     So, your testimony is that you observed the vehicle

5   prior to interviewing Mr. Jenkins?

6   A     Yes.

7   Q     So, you had the moments in time where the vehicle

8   pulled up, he got out of the vehicle and entered into the

9   building when you were observing it, correct?

10  A     Yes.

11  Q     All right.  So you had observed the vehicle prior to

12  interviewing him and having reviewed the referral slip,

13  correct?

14  A     Yes.

15  Q     So then, when he's in the building with you, that's

16  when you're paying attention to him rather than looking at

17  the vehicle?

18  A     Yes.

19  Q     Now the vehicle you recall was a blue truck, correct?

20  A     Yes.

21  Q     You recall a cab on the back?

22  A     Yes.

23  Q     And you recall a tow trailer behind it?

24  A     Yes.

25  Q     So you saw articles you testified before that were on

Melany Boyd - Cross                                    184

1    the trailer, correct?

2    A     Yes.

3    Q     All right.  And those were ATVs?

4    A     Yes.

5    Q     All-terrain vehicle, right?

6    A     Yes.

7    Q     You remember if they're three wheels or four wheels?

8    A     I don't recall.

9    Q     Do you remember color or anything about them?

10   A     No.

11   Q     You remember how many there were?

12   A     I believe there were two.

13   Q     All right.  So there were two ATVs on the back; any

14   other vehicles or other objects?

15   A     There were totes in the trailer that I had observed.

16   Q     When you say totes, why don't you describe what that

17   is?

18   A     Large plastic containers with lids on them.

19   Q     Kind of like a cooler?

20   A     Yes, that size.

21   Q     Something somebody might take out if they were camping

22   or fishing or something like that?

23   A     Yes.

24   Q     So then there was the truck and you were able to see

25   through the glass through the cab on the back of the truck,

Case 5:14-cr-00088-EAW Document 71-3 Filed 01/12/16 Page 217 of 890

**A213**

Melany Boyd – Cross                                185

1    right?

2    A     Like the bed, the bed of the truck, I saw.

3    Q     So you were able to see -- so the cap on the bed of the

4    truck had glass on it or windows?

5    A     No, it was open.

6    Q     All right.  And you were able to see down into what was

7    in the bed of the truck from your position 15 feet away

8    inside the building?

9    A     I couldn't see in it but I could see that it was full

10   to the top of the bed, so it appeared to be full from where I

11   was standing.

12   Q     And you were able to see any objects that were inside

13   the cab of the truck?

14   A     No, I didn't.

15   Q     The cabin, I should say?

16   A     No.

17   Q     But based upon what you saw you made a determination

18   that that looked like too much stuff for a one-week vacation?

19   A     It wasn't a determination, it was an indicator.

20   Q     Okay.  But you used that indicator of the amount of

21   stuff versus a one-week vacation to refer him for an

22   additional inspection, correct?

23   A     Yes.

24   Q     You yourself did not perform the actual inspection of

25   the vehicle?

Melany Boyd – Cross                    186

1   A    No.

2   Q    And again, this all took -- what we've talked about

3   thus far only took place at about 9:00 in the morning, right?

4   A    Yes.

5   Q    And the interview that you did with Mr. Jenkins early

6   on took a matter of minutes?

7   A    Yes.

8   Q    At that point you referred him for an inspection of the

9   vehicle itself?

10  A    Yes.

11  Q    All right.  Then you took any identification or other

12  documentation from Mr. Jenkins?

13  A    Yes, his passport.

14  Q    Had him take a seat in the building?

15  A    Yes.

16  Q    That's all an open area lobby, correct?

17  A    Yes.

18  Q    And you said that it was very busy that morning?

19  A    Yes.

20  Q    It was only yourself and one other individual working

21  in the immigration building?

22  A    Yes.

23  Q    And you said there were other individuals that had

24  already been waiting there to have their vehicles inspected,

25  is that correct?

Melany Boyd - Cross                                          187

1    A       No, it was for immigration processing.

2    Q       Okay.  So it was -- those were other people that had

3    come in on the border that morning and had to have some

4    processing to allow their entry, right?

5    A       Yes.

6    Q       And do you recall specific issues that those

7    individuals had for immigration?

8    A       I don't recall.

9    Q       All right.  And there were several individuals though

10   that had already been waiting, correct?

11   A       Yes.

12   Q       You did say it was pretty busy because there were only

13   two of you working, right?

14   A       Yes.

15   Q       Now you also testified about the application for entry

16   that you observed Mr. Jenkins fill out?

17   A       Yes.

18   Q       And you said that you observed him fill that paperwork

19   out, correct?

20   A       Yes.

21   Q       And you said that he filled that paperwork out in the

22   afternoon?

23   A       Yes.

24   Q       Excuse me.  About 4:20 in the afternoon?

25   A       Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Melany Boyd - Cross                               188

1    Q     So after he had been sitting there for about seven

2    hours, you had him fill out an application for entry?

3    A     Yes.

4    Q     And you didn't have him fill that paperwork out when he

5    arrived at 9:00 in the morning?

6    A     No.

7    Q     You didn't have him fill that paperwork out midday at

8    all?

9    A     No.

10   Q     You waited until about 4:20 in the afternoon to have

11   him fill that paperwork out?

12   A     Yes.

13   Q     And it was also about that time that you were informed

14   that he would be taken into custody?

15   A     No, I knew Mr. Jenkins was in custody prior, but it was

16   at approximately 4:20 that I was advised that he was being

17   taken into custody into Canada so these are standard forms

18   that we fill out when someone is being taken into custody so

19   leaving the border.

20   Q     So you have -- so you have an individual that you know

21   is going to be taken into custody by Canadian authorities

22   fill out an application to be admitted into the country?

23   A     Yes.

24   Q     All right.  Now you also testified that you saw

25   Mr. Jenkins at about September 13th of 2010?

Case 5:14-cr-00088-EAW Document 77-2 Filed 01/12/16 Page 221 of 890
A217
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 54 of 275

Melany Boyd - Cross                                    189

1    A       Yes.

2    Q       And you said you saw him at the Brockville courthouse?

3    A       Yes.

4    Q       And there was a legal proceeding that was going to take

5    place there?

6    A       Yes.

7    Q       And you also testified that that got adjourned to

8    October of 2010, correct?

9    A       Yes.

10   Q       I believe you testified that was for a trial?

11   A       Yes.

12   Q       Okay.  And the trial, was that also supposed to take

13   place in September of 2010?

14   A       Yes.

15   Q       All right.  Did it take place on that day?

16   A       No.

17   Q       Did not -- withdrawn.  Trial did not take place when

18   Mr. Jenkins was there on September 13th of 2010?

19   A       No.

20   Q       Do you recall why?

21   A       No.

22   Q       So again, I just want to run through one more time,

23   Mr. Jenkins came in about 9:00 in the morning, is that

24   correct?

25   A       Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Melany Boyd – Redirect                    190

1    Q    You observed the truck with the belongings from about

2    15 feet away before he entered the building, correct?

3    A    Yes.

4    Q    He was compliant when you asked him questions at the

5    counter, correct?

6    A    Yes.

7    Q    And you also categorized that it was very busy in your

8    building that morning?

9    A    Yes.

10            MR. GOLDSMITH:  Thank you, no further questions.

11            MS. THOMSON:  Just one followup.

12        REDIRECT EXAMINATION BY MS. THOMSON:

13    Q    When a person ordinarily presents themselves at an

14    inspection lane and they're allowed to go through, that's

15    their admission to Canada, correct?

16    A    Yes.

17    Q    So when that doesn't happen, the paperwork that you had

18    them fill out, that just notes that they applied for

19    admission to Canada?

20    A    Yes, what happens is the -- his admissibility had not

21    been determined at that point so the paperwork allows the

22    person to physically enter Canada without actually being

23    admitted to Canada because his admissibility hadn't been

24    fully assessed yet.

25            MS. THOMSON:  Understood.  Thank you.

Tristan Garrah – Direct                              191

1          THE COURT:  Okay, thank you.  Any further cross on

2    that?

3          MR. GOLDSMITH:  Nothing, your Honor.

4          THE COURT:  You may step down, thank you.

5              (The witness was excused.)

6          MS. CARROLL:  Your Honor, the government calls

7    Officer Tristan Garrah.

8          THE CLERK:  Can you state your full name, spell it

9    for the record, please.

10          THE WITNESS:  Tristan, T-r-i-s-t-a-n, Mathieu,

11   M-a-t-h-i-e-u, G-a-r-r-a-h.

12

13          T R I S T A N   M .   G A R R A H , called

14   as a witness and being duly sworn, testifies as

15   follows:

16          DIRECT EXAMINATION BY MS. CARROLL:

17   Q    Good morning, Officer Garrah.

18   A    Good morning.

19   Q    Where are you employed?

20   A    I'm employed by Canada Border Services Agency out of

21   Port of Lansdowne.

22   Q    Is Canada Border Services Agency also known as CBSA?

23   A    That's correct.

24   Q    What is your position with CBSA?

25   A    I'm a border services officer.

Case 5:14-cr-00088-EAW Document 77-2 Filed 01/02/16 Page 224 of 890
A220
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 57 of 275

Tristan Garrah – Direct                                192

1    Q    What are your duties as a border services officer?

2    A    We facilitate the influx of goods and people into

3    Canada and also the catching of contraband and things of that

4    nature.

5    Q    Do you work in both primary inspection and secondary

6    inspection sites at the Port of Lansdowne?

7    A    I do.

8    Q    Could we please pull up Exhibit 1C.  Officer Garrah, do

9    you recognize what's depicted in Exhibit 1C?

10   A    Yes, it's the Port of Lansdowne.

11   Q    And could you indicate on the screen where it is that

12   the secondary inspection agency is located at the Port of

13   Lansdowne?

14   A    It's the larger building on the top of the screen

15   underneath the longer rectangular section there, that's a

16   canopy and vehicles park underneath it.

17   Q    How long have you worked for CBSA?

18   A    Since May of 2008.

19   Q    Have you received any special training in your capacity

20   as a CBSA officer?

21   A    Yes.

22   Q    What kind of training?

23   A    We get all sorts of training, we go to customs college

24   initially before you're given your full duties as officer,

25   given a badge and things like that, we're trained all the

Tristan Garrah – Direct                                    193

1    time on various interdiction techniques, interview

2    techniques, search techniques for vehicles, in addition to

3    control and defensive tactics and things of that nature.

4    Q     What do you mean by interdiction techniques?

5    A     How to -- we're brought up on trends on what's

6    happening for various types of contraband, how it's smuggled

7    into the country, what other countries are seeing, what

8    different regions are seeing, and if you come across these

9    trends are indicators in the field how to, you know, take the

10   search into a more in-depth level and where things could be

11   concealed in a vehicle or device.

12   Q     Does the secondary inspection area give you the

13   opportunity to do what you called more in-depth searches?

14   A     Yes and no, it depends on the type of search.  We can

15   get into more depth in the vehicle.  In terms of electronic

16   media, we usually bring into an office, it's more private

17   setting, public doesn't have to see what's on the person's

18   private goods.  There's a desk that we can work at, things of

19   that nature.

20   Q     Were you on duty on May 24th of 2009?

21   A     Yes, I was.

22   Q     What shift were you working that day?

23   A     I was working day shift.

24   Q     What are the times for the day shift?

25   A     It's 8 a.m. to 6 p.m.

Case 5:14-cr-00088-EAW Document 71 Filed 01/12/16 Page 226 of 890
A222
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 59 of 275

Tristan Garrah - Direct

194

1   Q      Were you working at the Port of Lansdowne at about

2   9 a.m. on May 24th, 2009?

3   A      Yes, I was.

4   Q      Where were you stationed at that point in time?

5   A      I was in secondary duties.

6   Q      Could we pull up 1C again.  Were you inside the

7   secondary inspection area that we see on 1C or were you under

8   the outside canopy at around 9 a.m.?

9   A      I was underneath the outside canopy, there's a bench

10  there that's located right underneath the bank of windows

11  that you can see on the screen there.

12  Q      Were you asked to do a vehicle inspection at about

13  9 a.m. on May 24th?

14  A      Yes, I was.

15  Q      Was that a referral you got from a customs agent or --

16  A      It was from the immigration portion of our office.

17  Q      What was the vehicle you were asked to inspect?

18  A      It was a blue Dodge Ram, the license plate was 19322JL

19  New York.

20  Q      Were you given any specific directives about what you

21  were looking for or was it just a general inspection?

22  A      We treat everything general, in most senses, you never

23  know what you're going to find but in this case he had

24  already begun an immigration process and we knew that he was

25  self-employed, he was an electrician and he had some tools

Tristan Garrah - Direct                                    195

1    with him so there was a chance that he was working in Canada

2    so that was part of the search at the beginning.

3    Q    When you say he, are you referring to the driver of the

4    vehicle?

5    A    Yes, Joseph Jenkins.

6    Q    Did you see the driver of the vehicle during the

7    vehicle inspection that you were doing?

8    A    Yes.

9    Q    Do you see the driver of the vehicle in the courtroom

10   today?

11   A    Yes, he's seated there.

12   Q    Can you describe him using an article of clothing?

13   A    He's wearing a blue polo-style shirt.

14        MS. CARROLL:  Your Honor, may the record reflect

15   that the witness has identified the defendant?

16        THE COURT:  It will so reflect.

17   Q    How did you begin your inspection of the blue Dodge Ram

18   vehicle driven by defendant Joseph Jenkins?

19   A    I started my inspection in the driver's side area at

20   the driver's seat, begin in the center console, the dash,

21   underneath the seat, things like that.  When I finished there

22   I proceeded back to the rear passenger on the driver's side

23   so the bench seat in the back of the truck.  When I finished

24   there I went around to the back of the truck and looked

25   briefly in the bed of the truck and then at that point,

Tristan Garrah – Direct                          196

1   Officer Johnston called me over to see a laptop that he had

2   found.

3   Q    Was Officer Johnston, another CBSA officer, conducting

4   the vehicle inspection?

5   A    Yes, he was.

6        MS. CARROLL:  Your Honor, permission to approach?

7        THE COURT:  You may.

8   Q    Officer Garrah, I'm handing you what's been marked for

9   identification as Government's Exhibit 3A.  Before your

10  testimony today -- I'm also going to hand you what's been

11  marked for identification as Government's Exhibit 18.  Before

12  your testimony today, have you had the opportunity to examine

13  Exhibit 3A?

14  A    Yes, I have.

15  Q    What is Exhibit 3A?

16  A    It's a Toshiba laptop that was present in the vehicle

17  we searched.

18  Q    How do you recognize it as the Toshiba laptop that was

19  in the vehicle?

20  A    I had an opportunity to compare the serial number on

21  the Toshiba to my exhibit control sheet that I filled out at

22  the time of occurrence.

23  Q    I'm going to ask you to refer to what's been marked for

24  identification as Government's Exhibit 18.

25  A    Okay.

Tristan Garrah – Direct                           197

1    Q      Do you recognize Government's Exhibit 18?

2    A      I do.

3    Q      What is it?

4    A      It's a exhibit control form.  Whenever we seize a large

5    number of goods in a case that we believe will be going to

6    prosecution or we'll have some further process attached to

7    it, we fill out this sheet that would be the exhibit to

8    basically account for all of the goods that we are taking

9    from the subject at that time.

10   Q      Did you personally fill out that sheet?

11   A      I did, yes.

12   Q      Does your signature appear on it?

13   A      It does, yes.

14   Q      Is that an accurate copy of the property control sheet

15   you filled out on May 24th, 2009?

16   A      It is, yes.

17          MS. CARROLL:  Your Honor, move to admit

18   Government's Exhibit 18.

19          THE COURT:  Any objection?

20          MR. GOLDSMITH:  Brief voir dire, your Honor?

21          THE COURT:  Go ahead.

22          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

23   Q      Officer Garrah, that's a form that you filled out

24   yourself?

25   A      Yes, it is.

Case 5:14-cr-00088-EAW  Document 77  Filed 01/12/16  Page 230 of 890
A226
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 63 of 275

Tristan Garrah – Direct                          198

1   Q      And it's in your handwriting?

2   A      It is, yes.

3   Q      It's a photocopy that you provided to the U.S.

4   government?

5   A      I believe our Justice Department did at some point too

6   but we did as well, yes.

7   Q      When was the last time you saw that document?

8   A      It would have been roughly a week ago I suppose.

9   Q      Prior to one week ago, what was the previous time that

10  you saw that document?

11  A      It would have been at the time of occurrence so I guess

12  May 2009.

13  Q      So between May 2009 and approximately a week ago, you

14  had not seen that document?

15  A      No, it would have been filed in our warehouse.

16  Q      All right.  And you had not been holding that document

17  during the time?

18  A      No.

19          MR. GOLDSMITH:  Your Honor, object.

20          THE COURT:  Basis?

21          MR. GOLDSMITH:  Basis, foundation.

22          THE COURT:  It's overruled.  The document will be

23  received.

24          MS. CARROLL:  Could we please publish that.  And if

25  you could zoom in on, going down to number 1.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Tristan Garrah – Direct                                                199

1      CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

2   Q     Officer Garrah, is this your name that appears in the

3   box just below the last name Jenkins?

4   A     Yes.

5   Q     And is this the date May 24th, 2009 that you took the

6   property into custody?

7   A     Yes.

8   Q     If you look at item number 1, could you describe what's

9   listed as item number 1?

10   A     Toshiba laptop, serial number 78175808W.

11   Q     Is that the serial number on the laptop that is

12   Government's Exhibit 3A?

13   A     It is, yes.

14   Q     And does that laptop appear to be in substantially the

15   same condition that it was when you took it into custody on

16   May 24th, 2009?

17   A     Yes, it's in the same condition.

18           MS. CARROLL:  Your Honor, move to admit

19   Government's Exhibit 3A.

20           THE COURT:  Any objection?

21           MR. GOLDSMITH:  Just a brief voir dire, your Honor.

22           THE COURT:  Go ahead.

23      VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

24   Q     Officer Garrah, when was the last time you saw the

25   laptop?

Tristan Garrah – Direct                                     200

1    A      It was yesterday prior to testimony.

2    Q      Are there any markings on the particular laptop that

3    would indicate that it's the same laptop that you took

4    possession of on May 24th, 2009?

5    A      Yes, on the underside it bears the same serial number

6    on my exhibit control sheets.

7    Q      Other than the serial number, are there any other

8    indications or markings that would show that it was the same

9    laptop?

10   A      It's the same make and model.

11   Q      Did you place the laptop into some sort of a secured

12   envelope?

13   A      At the time of seizure?

14   Q      Yes.

15   A      Yes, I did.

16   Q      And is the envelope present with the laptop?

17   A      No, it is not currently.

18   Q      Have you -- when was the last time you saw the envelope

19   that you placed the laptop into?

20   A      On the day of occurrence when it was placed in our

21   secure warehouse.

22   Q      Did you operate the laptop within the last week or so?

23   A      I've not.

24   Q      Are there any markings on it that are in addition to

25   what you recall on May of 2009?

Tristan Garrah – Direct                    201

1    A     No, there are not.

2          MR. GOLDSMITH:  No objection.

3          THE COURT:  I'm sorry?

4          MR. GOLDSMITH:  I'm sorry, no objection.

5          THE COURT:  It will be received.

6    CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

7    Q     Officer Johnston, I believe you testified that --

8    Officer Garrah, you testified that you came around to the

9    passenger side of the vehicle and observed this laptop,

10   please continue, what did you see?

11   A     Officer Johnston had called me over to view the laptop,

12   he had turned it on and I was standing behind him, he had the

13   laptop on the seat of the truck, I noticed that there was an

14   icon present on the desktop screen, the home screen.  He

15   clicked the icon and media file began to play, it was a video

16   depicting two very young girls, prepubescent, dancing around

17   in their underwear.  About halfway through the video they

18   would face away from the camera, bend over and manipulate,

19   sort of manipulate the buttocks with their hands, they were

20   not nude at this time.

21   Q     What did you do after viewing that video on the black

22   Toshiba laptop?

23   A     There were two more laptop bags in the truck, I grabbed

24   those laptop bags and we headed into the traffic office to

25   our exam room inside.

Case 5:14-cr-00088-EAW Document 71-1 Filed 01/12/16 Page 234 of 890
**A230**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 67 of 275

Tristan Garrah – Direct                                    202

1   Q     Who is we?

2   A     Myself, Officer Johnston, and Officer Hache.

3   Q     Did you open the laptop bags you took into the traffic

4   office?

5   A     I did.  One was empty and the other contained a Compaq

6   laptop, various USB keys, a few burned CDs and other

7   electronic equipment, like a computer mouse and things of

8   that nature.

9   Q     Why did you take the laptop bags and computers into the

10  office?

11  A     As I stated earlier, it's a more private setting, the

12  general public won't see what we have playing on the laptop,

13  it can be disturbing in nature sometimes.  There's a desk

14  that we can sit at to properly manipulate a computer, power

15  sources and things like that.

16  Q     Officer Garrah, I'm handing you what's been marked for

17  identification as Government's Exhibit 4A, 5A, 6, and 7.  Do

18  you recognize those exhibits?

19  A     I do, yes.

20  Q     Prior to your testimony today, have you had the

21  opportunity to view those exhibits?

22  A     I did, yes.

23  Q     What is Exhibit 4A, 5A, and 6?

24  A     They're --

25  Q     Hold them up to the jury.

Tristan Garrah – Direct                    203

1    A      They are the three USB keys that were found alongside

2    the Compaq computer in the laptop bag.

3    Q      Do they appear to be in substantially the same

4    condition they were on May 24th, 2009?

5    A      They do, yes.

6    Q      If we could pull up Government's 18.  Are those USB

7    sticks reflected on your property custody sheet in

8    Government's 18?

9    A      Yes, they are.

10   Q      Could you explain to the jury where they're reflected

11   on that sheet?

12   A      Yes, they're items 3, 4, and 5.

13   Q      Are there gigabyte designations on your property

14   custody sheet?

15   A      Yes, 8-gigabyte, 4-gigabyte, and 2-gigabyte.

16   Q      Do the USB sticks that are in Government's Exhibits 4A,

17   5A, and 6, do those have gigabyte designations on them

18   physically?

19   A      They do, yes.

20   Q      And do those gigabyte designations correspond to what's

21   on your property sheet?

22   A      Yes, that's correct.

23          MS. CARROLL:  Your Honor, move to admit

24   Government's Exhibits 4A, 5A, and 6.

25          THE COURT:  Any objection?

Case 5:14-cr-00088-EAW Document 77-1 Filed 01/12/16 Page 236 of 890
A232
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 69 of 275

Tristan Garrah – Direct

1      MR. GOLDSMITH:  Brief voir dire, your Honor?

2      THE COURT:  Go ahead.

3      <u>VOIR DIRE EXAMINATION BY MR. GOLDSMITH:</u>

4    Q    Officer Garrah, when was the last time you saw these

5    objects?

6    A    Yesterday.

7    Q    Prior to yesterday, when was the last time you saw

8    these objects?

9    A    It would be the time of occurrence in May 2009.

10   Q    Between May of 2009 and yesterday, were they ever in

11   your custody or control?

12   A    No.  After I put them in the warehouse, that was the

13   end of my involvement.

14   Q    Other than the markings that are printed onto the

15   device themselves that you testified about indicating the

16   gigabytes, are there any other markings on the objects that

17   would identify themselves as the same object that you took on

18   May 24th of 2009?

19   A    They have the same branding, same model and the same

20   colors.

21   Q    Any markings that you placed there or other Customs

22   Border Service agents?

23   A    No, we did not.

24   Q    Did you place it in a sealed evidence envelope on

25   May 24th of '09?

Tristan Garrah - Direct

1    A      Yes, I did.

2    Q      Is the evidence envelope that you placed the objects

3    into present?

4    A      It is not, no.

5    Q      And again, you have not seen it in the period of time

6    between May 24th of '09 and yesterday, correct?

7    A      That's correct.

8           MR. GOLDSMITH:  I object by foundation, your Honor.

9           THE COURT:  Do you want to be heard?  Why don't you

10   come on up here.

11              (At Side Bar.)

12          THE COURT:  Okay, the nature of the objection is

13   foundation, what is it that you feel is lacking, Counsel?

14          MR. GOLDSMITH:  Chain of custody, we have no known

15   chain of custody, we have five years that the witness was not

16   the custodian, had no control, had not seen the device, the

17   items in question.

18          MS. CARROLL:  First, your Honor, chain of custody

19   is an issue of weight, not admissibility, and it's a matter

20   of authentication, but further, the defendant -- the witness

21   has testified that the make, model, color, gigabyte

22   designation, and physical appearance of the evidence all

23   appears substantially the same as it did on May 24th, 2009,

24   and that all of the make, model, and gigabyte information on

25   his property custody form is identical to the evidence he's

Tristan Garrah - Direct

206

1    looking at now.  He further testified that that evidence was

2    placed in a secure evidence storage facility.  I believe to

3    the extent that there is further chain of custody which

4    obviously there is, we will have witnesses who do that but I

5    think that that will go to authentication, not admissibility.

6            THE COURT:  That was my question, there's going to

7    be further testimony as to where it's been since 2009?

8            MS. CARROLL:  Yes.

9            THE COURT:  Okay.  Well, I'll receive it subject to

10   that testimony, connection to that testimony.  Okay?

11           MS. CARROLL:  Okay.

12           THE COURT:  So I'm assuming you want to use it with

13   this witness?

14           MS. CARROLL:  We want to use a video that was drawn

15   from the 8-gigabyte.

16           THE COURT:  Okay.  It's conditionally received

17   subject to connection with this further testimony with regard

18   to the chain of custody where it's been since 2009 until he

19   saw it again, okay?

20           MR. GOLDSMITH:  My only concern, your Honor, is if

21   they're going to attempt to show videos that are clearly

22   going to be prejudicial within the scope of the case, I

23   understand that it's subject to connection, we may have

24   difficulty if they're unable to fulfill their -- to fulfill

25   the other foundational requirements in order for the court to

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 239 of 890
**A235**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 72 of 275

                     Tristan Garrah - Direct                    207

 1    permit the admission of the evidence at the end of trial,

 2    substantially and unduly prejudice Mr. Jenkins.

 3              THE COURT:  Well, counsel has told me that they

 4    have witnesses who are going to testify about where this

 5    particular -- these pieces of evidence were between 2009,

 6    when they were taken into custody, I'm satisfied with that.

 7    I'm satisfied that this witness has identified them

 8    sufficiently at this point that they can be conditionally

 9    received.  So I'm going to allow them to proceed the way they

10    want to proceed.

11              MR. GOLDSMITH:  Thank you, thank you, your Honor.

12                   (Open Court.)

13              MS. CARROLL:  Your Honor, we're going to move for

14    the admission of Exhibits 6, 4A and 5A.

15              THE COURT:  The exhibits will be received

16    conditionally subject to further testimony regarding chain of

17    custody.  So go ahead, Counsel.

18    CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

19    Q    Officer Garrah, you testified that you also brought

20    another laptop into the office besides the black Toshiba.  Do

21    you see that laptop in front of you now?

22    A    Yes, it's a silver Compaq.

23    Q    Is that Government's Exhibit 7 that's been marked for

24    identification?

25    A    Yes.

Case 5:14-cr-00088-EAW Document 77 filed 01/12/16 Page 240 of 890
A236
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 73 of 275

Tristan Garrah – Direct                          208

1    Q     Does that silver Compaq have a serial number on it?

2    A     It does, yes.

3    Q     Prior to your testimony today, have you had the

4    opportunity to examine that serial number?

5    A     Yes, I did.

6    Q     Is that serial number the same as the serial number

7    reflected on the Compaq identified on Government's 18?

8    A     Yes, it's line 2.

9    Q     Does the Compaq that's listed on your property receipt

10   form and as Government's Exhibit 7, does it appear to be in

11   substantially the same condition as it was when you seized it

12   on May 24th, 2009?

13   A     Yes, it's in the same condition.

14         MS. CARROLL:  Move to admit Government's Exhibit 7,

15   your Honor.

16         MR. GOLDSMITH:  Same objection, your Honor.

17         THE COURT:  Your objection is, basis?

18         MR. GOLDSMITH:  Same objection as my previous

19   objection as to the other evidence presented that we

20   discussed at side bar moments ago.

21         THE COURT:  Lack of foundation or --

22         MR. GOLDSMITH:  Yes.

23         THE COURT:  -- chain of custody?

24         MR. GOLDSMITH:  I believe they would both go

25   together.

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 241 of 890
**A237**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 74 of 275

Tristan Garrah – Direct                                      209

1          THE COURT:  Okay.  Objection's overruled, it will

2     be received.

3     Q    Officer Garrah, what did you do once you got the

4     electronic media, the Compaq and the USB sticks, to the

5     office?

6     A    I searched the Compaq laptop manually.

7     Q    What does it mean to manually search the laptop?

8     A    To physically power it on and to look through it as you

9     would any normal computer.

10    Q    What, if anything, were you searching for?

11    A    Searching for contraband media, in this case it would

12    be child pornography.

13    Q    How long did you search the silver Compaq manually?

14    A    I would say about 10 to 12 minutes.

15    Q    Did you find anything you considered to be contraband?

16    A    No, I did not.

17    Q    What did you do next?

18    A    I plugged in the 8-gigabyte USB key and began to search

19    that.

20    Q    When you say you plugged it in, what do you mean?

21    A    I inserted it into the USB drive on the Compaq.

22    Q    Why did you put the 8-gigabyte USB into the defendant's

23    laptop as opposed to into a CBSA computer?

24    A    It was in line with our training, and we were not

25    allowed to insert any foreign media, whether it be CDs, USB

Case 5:14-cr-00088-EAW Document 71 Filed 01/02/15 Page 242 of 890
**A238**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 75 of 275

Tristan Garrah – Direct                                    210

1    keys or anything of that nature into our work computers for

2    security reasons, for us to operate our computers, we're

3    behind our fire walls, we're logged into all our profiles and

4    things like that so we could expose our mainframe to viruses,

5    malware, things of that nature.

6    Q     How did you go about searching the 8-gigabyte USB

7    stick?

8    A     Manually.

9    Q     What did you do?

10   A     I put it in, I opened up the drive on the Compaq and

11   began to open media files that were present on the

12   8-gigabyte.

13   Q     When you say media files, what do you mean?

14   A     They were video files on the USB key.

15   Q     How many video files did you examine?

16   A     I believe it was one initially that we found, or that I

17   found, it was titled 9-year-old Vicky kiddie pedo illegal

18   preteen, or something along those lines.

19   Q     Did you open the file that had that 9-year-old Vicky

20   preteen title?

21   A     I did, yes.

22   Q     How long did you view that video?

23   A     I viewed it until the child that was depicted in it was

24   in a state of undress.

25   Q     Did you subsequently during your search on May 24th,

Case 5:14-cr-00088-EAW  Document 71-10  Filed 01/12/16  Page 243 of 890
**A239**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 76 of 275

Tristan Garrah - Direct                                    211

1    2009 view the entirety of the video?

2    A    I did, yes, after I arrested the subject.

3    Q    Officer Garrah, I'm handing you what's been marked for

4    identification as Government's Exhibit 4G.  Do you recognize

5    4G?

6    A    I do, yes.

7    Q    What is 4G?

8    A    It's a CD-ROM that I had the opportunity to view

9    yesterday to view the file that I just mentioned.

10   Q    What is the title of the file that you viewed on

11   Government's 4G?

12   A    It is "9-year-old Vicky stripping and sucking kiddie

13   pedo illegal underage preteen."

14   Q    Was that the title of the file that you viewed on the

15   8-gigabyte USB on May 24th, 2009?

16   A    It was, yes.

17   Q    Did you have the opportunity to view that file on

18   Government's Exhibit 4G?

19   A    I did, yes.

20   Q    Was it the same as the file that you viewed on

21   May 24th, 2009?

22   A    Yes, it was the same file.

23   Q    And was the title accurately reflected in the file

24   title on Government's 4G?

25   A    Yes, it's the same title.

Tristan Garrah – Direct                                    212

1    Q      Do your initials appear on Government's 4G?

2    A      They do, yes.

3    Q      And is there a date?

4    A      Yes.

5    Q      What is that date?

6    A      It's February 3rd, 2014.

7    Q      Is that the date that you viewed the file contained on

8    Government's 4G?

9    A      Yes, that's correct.

10           MS. CARROLL:  Your Honor, move to admit

11   Government's 4G, the first video.

12           MR. GOLDSMITH:  Very brief voir dire?

13           THE COURT:  Go ahead.

14           VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

15   Q      Agent Garrah, did you create the CD?

16   A      I did not create the CD.

17   Q      Do you know who created it?

18   A      I believe the U.S. government.

19   Q      You don't know exactly who?

20   A      No, I'm not privy to that.

21   Q      You had not seen this CD prior to yesterday?

22   A      That's correct.

23   Q      With the exception of your initials on it, and viewing

24   it, do you have anything to do with the creation of this CD?

25   A      No, I have nothing to do with the creation of the CD.

Case 5:14-cr-00088-EAW Document 71-2 Filed 04/12/16 Page 245 of 890
A241
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 78 of 275

Tristan Garrah – Direct                                    213

1        MR. GOLDSMITH:  All right.  I object based upon

2   foundation, it wasn't created by this witness.

3        THE COURT:  Doesn't have to be, Counsel.

4   Objection's overruled.

5        MR. GOLDSMITH:  Thank you.

6        THE COURT:  It will be received.

7        CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

8   Q    Officer Garrah, can you describe what you saw in the

9   video file you've given the title of previously?

10  A    The video depicts a young girl who appears to be around

11  9 to 10 years of age, she is wearing like a cardigan and some

12  black stockings, she's in a bedroom, some Britney Spears

13  music is playing, there's a man filming her, you don't see

14  the man initially.  The girl is told to disrobe, she does so,

15  but she leaves her stockings on, she's then beckoned forth by

16  the man filming her and told to administer oral sex and she

17  does.

18       MS. CARROLL:  Your Honor, at this time the

19  government would like to publish two very brief segments from

20  this video to the jury.  First the segment from the zero

21  minute mark to the 12-second mark, and second, from the

22  1-minute-and-7-second mark to the 1-minute-and-14-second

23  mark.

24       THE COURT:  Okay.  Before we do that, I'm going to

25  have some questions about how we're going to display this, so

Case 5:14-cr-00088-EAW Document 81-20 Filed 01/12/16 Page 246 of 890
A242
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 79 of 275

Tristan Garrah – Direct

1    ladies and gentlemen, I'm going to give you a brief break,

2    about five minutes or so, back in the jury room, stretch,

3    relax, use the facilities if you need to and then we'll get

4    you back out here, okay.  Please don't discuss the case.

5                    (Jury Excused, 10:36 a.m.)

6              THE COURT:  Okay.  We're in the courtroom outside

7    the presence of the jury.  Where are you going to display

8    this?

9              MS. CARROLL:  It's our intention to turn off all

10   the public gallery monitors and just have it go on the jury's

11   monitor and your monitor and the defendant's monitor.

12             THE COURT:  And we're all set with that?

13             COMPUTER TECHNICIAN:  Got to turn them off.

14             THE COURT:  You can turn them off?  They've been

15   powered down?

16             COMPUTER TECHNICIAN:  Not yet.

17             THE COURT:  Not yet, we're going to do that.  What

18   about counsel's table?

19             MR. GOLDSMITH:  I have no objection to it being

20   turned off at my location as long as I can move to a place

21   where I can see it.

22             THE COURT:  That's what I'm getting at, Counsel, I

23   want you to be able to see it.

24             MS. CARROLL:  If you want to join me at the podium.

25             MR. GOLDSMITH:  Well, I guess we should probably

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Tristan Garrah – Direct                                    215

1   move the podium.

2          THE COURT:  We should be turning that podium away

3   from the gallery then, towards the windows, at an angle

4   towards the bench even, so it can't be viewed by the gallery.

5          MR. GOLDSMITH:  Will the monitors at your computer

6   station reflect what will be played?  I also ask then under

7   the circumstances if Mr. Jenkins could also.

8          THE COURT:  Move his chair to the side so he can

9   see if that's what you want him to do.

10         THE DEFENDANT:  I don't want to see them.

11         THE COURT:  Mr. Jenkins, is that what you want to

12  do, you want to move into a position?

13         THE DEFENDANT:  I don't care to see it.

14         THE COURT:  You don't want to see it, all right,

15  fine.  So Counsel, you just position yourself up with the

16  government's attorney so that you can view this and that's

17  the way we'll handle it, okay?

18         MR. GOLDSMITH:  Okay, thank you.

19         THE COURT:  Okay.  And the monitors on both

20  attorneys' tables will not be on, correct, or all the

21  monitors back there?

22         COMPUTER TECHNICIAN:  They're all off.

23         THE COURT:  They're all off.  If you need to use

24  the facilities, go ahead, and we'll get -- please come right

25  back and we'll get this jury right back out here and publish

Tristan Garrah – Direct                          216

1   this, publish this exhibit.

2                        (A recess was taken.)

3                        (Open Court, Jury Out.)

4            THE COURT:  Counsel, you all set?

5            MS. CARROLL:  We're all set.

6            THE COURT:  Everybody's ready, okay, just going to

7   give the jury a couple more minutes and we'll get them out

8   here.

9            MS. CARROLL:  Okay.

10           THE COURT:  Wanted to make sure everybody had an

11   opportunity to do what they needed to do.  Okay.

12           Counsel, can I see you for a minute at the bench.

13                        (A discussion was held at side bar off the

14                         record.)

15                        (Open Court, Jury Present, 10:50 a.m.)

16           THE COURT:  Okay.  The record should reflect we

17   have the ladies and gentlemen of the jury, they look

18   refreshed and ready to proceed.  So Counsel, go ahead.

19           MS. CARROLL:  We're going to publish minute 00 to

20   second 12 of Government's Exhibit 4G, the first video file,

21   and then a clip that runs from minute 1:07 to 1:14 also from

22   Government's 4G, the first video file.

23           MR. GOLDSMITH:  Permission to move freely, your

24   Honor.

25           THE COURT:  You may, you may.  Go ahead, you may

Tristan Garrah – Direct                                    217

1    proceed.

2                    (Video Clip from Government's Exhibit No. 4G

3                     played.)

4              MS. CARROLL:  We're now going to play the clip that

5    runs from minute 1:07 to minute 1:14.

6                    (Video Clip from Government's Exhibit No. 4G

7                     played.)

8    Q     Officer Garrah, if you could just describe, what

9    happens after that video clip terminates at minute 1:14?

10   A     She takes his erect penis and puts it in her mouth and

11   begins to provide oral sex.

12   Q     After viewing that video, what did you do?

13   A     We only viewed it initially until she was disrobed, at

14   that point I arrested the subject Joseph Jenkins, I read him

15   his right to duty counsel and cautioned him not to say

16   anything.  I then frisked him and placed him in the cell at

17   the Port of Lansdowne.

18   Q     What was your next step?

19   A     We notified the criminal investigations division of

20   Canada Border Services Agency, the responding agent was

21   Marie-Josee Vinette.

22   Q     And did you meet with Marie-Josee Vinette?

23   A     Yes, I spoke with her on the phone originally and then

24   she did come to the border itself.

25   Q     What did you do when she arrived at the Port of

Tristan Garrah - Direct                                    218

1    Lansdowne?

2    A      I briefed her on what we had found, who the subject

3    was, his vehicle, and then I showed her the video that you

4    just watched.  We then proceeded to further view videos on

5    the 8-gigabyte USB.

6    Q      Approximately how many videos did you watch on the

7    8-gigabyte USB?

8    A      I believe it was around five to six.

9    Q      And without having to walk through each individual

10   video, what was depicted in the videos?

11   A      It was further depiction of young girls, prepubescent

12   girls in various states of undress performing sexually

13   suggestive acts and poses.

14   Q      Officer Garrah, did you take the defendant's property

15   into custody after you met with Investigator Vinette?

16   A      I did, yes, I placed it all in secure evidence bags.

17   Q      Officer Garrah, I'm handing you what's been marked for

18   identification as Government's Exhibits 8 and 9.  Do you

19   recognize Government Exhibits 8 and 9?

20   A      I do, yes.

21   Q      What is Government's 8?

22   A      It is the Olympus camera on line 8 of the exhibit

23   control.

24   Q      Pull up Exhibit 18.  And Officer Garrah, does

25   Government's Exhibit 8 appear to be in substantially the same

Tristan Garrah - Direct                            219

1    condition that it was when you described it and listed it on

2    the property seizure form in Government's 18?

3    A    It does, yes.

4    Q    And did you have the opportunity to compare the serial

5    number of that digital camera with the serial number

6    identified on your property custody form?

7    A    I did not, no.

8    Q    Could you do that now?

9    A    Yes.  I just have to find it.  Yes, it's the same

10   number.

11   Q    Is there a picture card contained in Government's

12   Exhibit 8?

13   A    There is, yes.

14   Q    Is that the picture card reflected on your evidence

15   custody form?

16   A    It is, yes.

17         MS. CARROLL:  Your Honor, move to admit

18   Government's Exhibit 8.

19         MR. GOLDSMITH:  Very brief voir dire?

20         THE COURT:  You may, go ahead.

21         VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q    Officer Garrah or Agent Garrah, when was the last time

23   you saw these two objects prior to today?

24   A    The date of occurrence in May 2009.

25   Q    Were you in charge of any of the custody or control of

Tristan Garrah – Direct                    220

1    these two objects prior to today?

2    A    I was, yes, I placed them in the evidence bags.

3    Q    Was it your responsibility to maintain those objects

4    between May 24 of '09 and today?

5    A    It was not, no.

6            MR. GOLDSMITH:  Same objections as before at side

7    bar.

8            THE COURT:  And the same ruling, they'll be

9    conditionally admitted subject to connection with the chain

10   of custody, but based on the testimony we have at this point,

11   I'll allow you to continue.  They are received conditionally.

12           CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

13   Q    Officer Garrah, Government's Exhibit 9, do you

14   recognize Government's Exhibit 9?

15   A    Yes, it's the cell phone on line 10.

16   Q    Is that line 10 of the property custody form that's

17   Government's Exhibit 18?

18   A    That's correct, yes.

19   Q    Where did you seize the camera and cell phone from?

20   A    It was in the subject's personal effects in his

21   vehicle.  The phone I believe may have been on the subject.

22   Q    And is the subject Joseph Jenkins?

23   A    That's correct, yes.

24   Q    Did the seizure of the evidence conclude your

25   involvement in the investigation?

Tristan Garrah - Cross                              221

1    A      It did, yes.  I put it in the bags and brought it to

2    the secure warehouse to the superintendent on shift.

3               MS. CARROLL:  No further questions.

4               THE COURT:  Counsel, when you're ready,

5    cross-examination.

6               MR. GOLDSMITH:  Thank you.

7               CROSS-EXAMINATION BY MR. GOLDSMITH:

8    Q      Agent Garrah, or should I say Officer Garrah, which do

9    you prefer?

10   A      Either/or is fine.

11   Q      Agent Garrah, on May 24th of 2009, you were asked to

12   perform the inspection of the blue Dodge truck and trailer,

13   is that correct?

14   A      That's correct, yes.

15   Q      And now you testified earlier that you performed an

16   inspection of the cab of the truck, is that it?

17   A      Primarily just the driver's side, but yes.

18   Q      So you inspected the driver's side of the cab and then

19   did you proceed to the trailer portion of the cab?

20   A      I did not, no.

21   Q      Did you inspect the rear seat of the cab?

22   A      On the driver's side, yes.

23   Q      So there were other individuals that were performing

24   the search with you, is that correct?

25   A      That's correct, Hache and Johnston.

Tristan Garrah - Cross

1   Q    So there were three individuals that were performing

2   the search of the truck, is that correct?

3   A    That's correct, yes.

4   Q    And you all did that contemporaneously?

5   A    As in together?

6   Q    I'll rephrase.  You all did that at the same time

7   together?

8   A    Yes, that's correct.

9   Q    Based upon your inspection of the vehicle, you did not

10  see anything that was out of the ordinary?

11  A    Not until Officer Johnston called me over to view the

12  laptop.

13  Q    Just focusing on the portion of the inspection that you

14  performed.

15  A    Okay.  Generally we would refer during our protocols

16  that when we're searching together, it's all of our

17  inspection.

18  Q    Okay.  Based upon what you personally saw, you didn't

19  see anything out of the ordinary?

20  A    I did not.

21  Q    Other than the laptop that Officer Johnston brought to

22  your attention, are you aware if Officer Hache saw anything

23  out of the ordinary or concerning?

24  A    I'm not aware of what Officer Hache found.

25  Q    Other than the laptop that was presented to your

Case 5:14-cr-00088-EAW Document 77 Filed 01/02/16 Page 255 of 890
A251
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 88 of 275

Tristan Garrah - Cross                                223

1    attention by Officer Johnston, was there any other items out

2    of the vehicle and trailer that were brought to your

3    attention immediately?

4    A    By Officer Johnston?

5    Q    Yes.

6    A    No.

7    Q    So the laptop that was found, was that initially --

8    withdrawn.

9              Did you initially question the driver,

10   Mr. Jenkins, as to the laptop?

11   A    No, I had very little contact with officer -- or sorry,

12   Mr. Jenkins until I arrested him.

13   Q    Okay.  When you say very little interaction with him,

14   what interaction did you have with him prior to placing him

15   under arrest?

16   A    When we were called by the immigration officer for the

17   deferred secondary exam, I would have spoken to him briefly

18   in passing as I left the office to go to his vehicle.

19   Q    You don't recall the sum and substance of that

20   conversation?

21   A    No.

22   Q    So you took the keys from him?

23   A    I don't believe I took the keys, no.

24   Q    Took the keys from another officer?

25   A    Another officer would have had the keys.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 71-10 Filed 01/12/16 Page 256 of 890
A252
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 89 of 275

Tristan Garrah – Cross                    224

1    Q    So at that point you are given your instructions to go

2    inspect the vehicle, is that correct?

3    A    Yes.

4    Q    Are you given the instructions to inspect the vehicle

5    with the two other officers, Officers Johnston and Hache, or

6    are you given those instructions separately?

7    A    We do it all together, we were all scheduled for

8    secondary examination.

9    Q    Now are you all, prior to the inspection of this

10   vehicle you were conducting inspections of other vehicles?

11   A    I believe it was the first inspection of the morning.

12   Q    All right.  So the three of you all walked out to the

13   truck together?

14   A    That's correct.

15   Q    All right.  And at that point you decide which portion

16   of the vehicle you guys are each going to inspect, is that

17   it?

18   A    Yes.

19   Q    So you walked to the vehicle, you each do your

20   inspections and it's at that point where Officer Johnston

21   presents you with the laptop that he found?

22   A    Yes.

23   Q    And this is outside the presence of Mr. Jenkins?

24   A    I believe he may have been sitting outside.

25   Q    Sitting inside the building?

Tristan Garrah - Cross                                     225

1   A    He may have been sitting outside, there's a bench right

2   on the front porch.

3   Q    And the bench where he was -- where you believe he may

4   have been sitting, was that a matter of a few feet away or

5   was it far away?

6   A    20, 25 feet.

7   Q    Now the 25-foot distance between the bench and where

8   the vehicle was parked, is the bench directly against the

9   wall of the building where the windows are?

10  A    It is, yes.

11  Q    All right.  So there's -- so there's the windows where

12  the bench is and then about another 25 feet to where the

13  vehicle was parked?

14  A    Right.

15  Q    Okay.  And the vehicle was parked in some sort of a

16  parking spot or space?

17  A    Yes, underneath the canopy.

18  Q    All right.  And you said it was 25 feet or

19  approximately more or less, something like that?

20  A    Approximately, yes.

21  Q    All right.  So at that point, when you're inspecting

22  the vehicle, were there any conversations with Mr. Jenkins

23  during the physical inspection?

24  A    I had no conversations.

25  Q    Officer Johnston have any conversations?

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 258 of 890
A254
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 91 of 275

Tristan Garrah - Cross

1   A    Don't recall.

2   Q    Officer Hache have any conversations?

3   A    Don't recall.

4   Q    Do you recall Mr. Jenkins making any statements during

5   that time?

6   A    Not to myself, no.

7   Q    Do you recall if he made any statements or conversation

8   to anyone present during that time?

9   A    I don't recall.

10  Q    So now you've been presented with the laptop and that

11  was the Compaq laptop, correct?

12  A    I was presented the Toshiba.

13  Q    I'm sorry, Toshiba.  And once it's presented to you,

14  that's when you made the determination to turn it on?

15  A    I did not turn it on, Officer Johnston did.

16  Q    Okay.  You were present when Officer Johnston turned on

17  the laptop?

18  A    I was on the other side of the vehicle at the time.

19  Q    Okay.  Do you recall noting that Officer Johnston had

20  turned on a laptop?

21  A    When he called me over to look at the laptop, it was

22  already turned on.

23  Q    All right.

24  A    I don't know if he turned it on or if it was already

25  on.

Tristan Garrah - Cross                                227

1   Q      Did you see Officer Johnston turn the laptop on?

2   A      I know that he opened it.

3   Q      You saw him open it up, when you say open, do you mean

4   that he opened the viewing monitor away from the keyboard?

5   A      Right, he unfolded it.

6   Q      And you don't recall seeing him push any buttons to

7   operate the machine?

8   A      I don't recall, no.

9   Q      You don't recall him plugging the machine in?

10  A      I don't believe so.

11  Q      All right.  You don't recall him removing the laptop

12  from any storage items?

13  A      It was in a cardboard box I believe.

14  Q      Do you recall whether the cardboard box was located

15  within the vehicle?

16  A      It would be the rear passenger area.

17  Q      You saw Officer Johnston remove it from the box?

18  A      Yes.

19  Q      At this point you saw Officer Johnston remove it from

20  the box from the back seat and then unfold it so that it

21  could be viewed, correct?

22  A      Correct.

23  Q      At some point afterwards Officer Johnston calls your

24  attention over to view the contents with him, is that

25  correct?

Case 5:14-cr-00088-EAW Document 77 filed 01/12/16 Page 260 of 890
**A256**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 93 of 275

Tristan Garrah – Cross                                    228

1   A     Yes.

2   Q     You're not aware of what he may have viewed or not

3   viewed prior to your coming over to him?

4   A     That's correct.

5   Q     He didn't make any commentary to you prior to asking

6   you to come over to view it?

7   A     Well, he had opened up a video and paused it and showed

8   me and then showed me where it had come from.

9   Q     You said that he opened up a video?

10  A     Yes.

11  Q     Did you watch him open up whatever files on the

12  computer in order to access that video?

13  A     He told me that he'd begun to watch it and then he

14  closed it and opened it up again from the same icon on the

15  desktop.

16  Q     But again, you didn't actually watch him perform any

17  functions to open that video or file up, correct?

18  A     I did watch him do it the time that he showed me the

19  video.

20  Q     Okay.  Did he make any commentary to you about

21  requesting your assistance to view something prior to that

22  point?

23  A     I believe as soon as he had found the video, that was

24  the time that he called us over to look at it.

25  Q     And is it your custom and practice in inspecting

Case 5:14-cr-00088-EAW Document 77-10 Filed 01/12/16 Page 261 of 890
A257
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 94 of 275

Tristan Garrah – Cross

229

1    computers to do so in the presence of more than one officer?

2    A    Yes.

3    Q    That's what you're trained to do, correct?

4    A    Yes, it's not abnormal in any sense.

5    Q    And you're trained to do that to ensure the accuracy of

6    what's being opened and viewed on the computers?

7    A    It would really just be a second person involved for

8    the opinion at the time what you're looking at.

9    Q    So to make sure that something may be proper or

10   inappropriate, correct?

11   A    Yes.

12   Q    And you've also received training on how to open and

13   receive certain items that are being inspected in vehicles,

14   correct?

15   A    Yes.

16   Q    And I've heard you discuss the training about --

17   withdrawn.

18           You received some training about indications

19   of what to look for in vehicles as to what might be inspected

20   for further review, correct?

21   A    Yes.

22   Q    And the fact that the -- that a laptop was inside a

23   cardboard box is an indication that something might be afoul?

24   A    I would not say so.

25   Q    And the cardboard box that the laptop was in, did that

Case 5:14-cr-00088-EAW Document 71 Filed 01/12/16 Page 262 of 890
A258
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 95 of 275

Tristan Garrah – Cross                              230

1   have any markings on it?

2   A     I do not recall.

3   Q     You don't recall what the cardboard box looked like?

4   A     No.

5   Q     Was that the only item that Officer Johnston pulled out

6   of the truck and asked for your assistance to view at that

7   time?

8   A     Yes.

9   Q     So from that moment you're outside next to the vehicle,

10  correct?

11  A     Yes.

12  Q     And Officer Johnston opens up a file on the computer,

13  correct?

14  A     That's correct.

15  Q     It's on the hard drive?

16  A     I don't know where the file was located, it was just an

17  icon on the home screen that he clicked on.

18  Q     You're not aware if Officer Johnston inserted any media

19  files into the computer prior to turning it on and showing

20  you the file?

21  A     I don't believe he did.

22  Q     Well, you don't believe or you don't know?

23  A     I'm not -- can't be certain.

24  Q     You didn't see him plug in any flash drives?

25  A     No, I did not see him plug in anything.

Tristan Garrah - Cross                                    231

1   Q      Just by way of clarity, you understand flash drive?

2   A      USB key.

3   Q      USB key or thumb drive or otherwise, okay.  You didn't

4   see him insert any CDs or DVRs into the machine?

5   A      I did not witness that, no.

6   Q      All right.  So at this point you viewed a portion of

7   the file, is that correct?

8   A      Correct.

9   Q      You called it to the attention of Officer Hache at that

10  time?

11  A      I did not call for Officer Hache.

12  Q      All right.  And at that point, you viewed a brief

13  amount of the file, correct?

14  A      Correct.

15  Q      All right.  I believe you testified that you viewed

16  only up to the point where the subject started to get

17  undressed, is that correct?

18  A      That's a different file.

19  Q      Okay.  So in this particular file you viewed it for a

20  few moments until you determined what you believed that it

21  may be improper, is that correct?

22  A      We believed it to be indication that further review of

23  the computer and any other media devices would be required

24  due to the nature of the content.

25  Q      So based upon that, you wanted to look at what else was

Case 5:14-cr-00088-EAW Document 78 Filed 01/12/16 Page 264 of 890
A260
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 97 of 275

Tristan Garrah - Cross

232

1   on the computer?

2   A     That's correct.

3   Q     At that point you brought it into the building?

4   A     We did, yes.

5   Q     You brought other objects with you into the building to

6   review?

7   A     I brought two laptop bags into the building.

8   Q     And the two laptop bags, they were situated next to the

9   cardboard box?

10  A     I believe they were on the floor of the cab in the rear

11  passenger area.

12  Q     All right.  And the contents of those two laptop bags

13  was a second laptop and three flash drives, is that correct?

14  A     Yes, and the CDs listed on the exhibit control form.

15  Q     Okay.  And at that point you testified that you plugged

16  the machine in -- withdrawn.  Did you plug the machine in

17  when you brought it inside?

18  A     I don't recall.  If it needed power, I would have

19  plugged it in.

20  Q     When you were viewing the -- were viewing the files on

21  the Toshiba computer inside, do you recall reviewing files on

22  the hard -- on the hard drive or -- withdrawn.  Do you recall

23  reviewing files from the desktop?

24  A     I reviewed the Compaq when I brought it inside.

25  Q     All right.  So you reviewed the Compaq inside.  Did you

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 265 of 890
**A261**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 98 of 275

Tristan Garrah - Cross                                     233

1    find any files that were of concern to you at that time?

2    A     In the Compaq I found no files.

3    Q     All right.  And your review of the Compaq was that

4    you -- well, withdrawn.  Walk us through what you did to

5    investigate the Compaq.

6    A     Opened up the device and just looked through things,

7    recently viewed places, My Pictures, My Videos, things of

8    that nature.

9    Q     When you say recently viewed places, was that on an

10   internet application?

11   A     No, you open up My Computer and it will be a tab there.

12   Q     Okay.  So you took a look at the desktop to see if

13   there were any icons that you needed to investigate?

14   A     Yes, I would have.

15   Q     And then you looked at a few of the different files

16   before you made a determination that there was nothing

17   suspect on it?

18   A     On the Compaq, yes.

19   Q     And that was done by yourself or in the presence of

20   other officers?

21   A     Within the office was myself, Officer Johnston, the

22   shift superintendent and I believe Officer Hache.

23   Q     After you reviewed the Compaq you then started to

24   review the Toshiba more?

25   A     Officer Johnston was reviewing the Toshiba.  After I

Tristan Garrah - Cross

234

1    reviewed the Compaq I began to immediately review the

2    8-gigabyte USB key.

3    Q    So essentially when you brought the computers in, you

4    split up who was going to look at which computer?

5    A    There was two desks, and yes.

6    Q    All right.  After reviewing the Compaq, you then

7    proceeded to inspect the contents of the flash drives?

8    A    The 8-gigabyte, yes.

9    Q    Did you look at the 4-gigabyte or the 2-gigabyte at all

10   that day?

11   A    After, with Investigator Vinette.

12   Q    All right.  But your determination to place Mr. Jenkins

13   under arrest was only based upon the file that you

14   purportedly viewed on the desktop of the Toshiba and on the

15   file that you reviewed from the 8-gigabyte flash drive?

16   A    The file that we viewed on the Toshiba was not the

17   grounds for arrest, that was just what we would refer to as

18   an indication or an indicator that further review would be

19   needed.  The grounds for arrest were solely brought from the

20   Vicky file that was shown earlier.

21   Q    So in other words, the file that you initially viewed

22   with Officer Johnston outside the vehicle was only used as a

23   basis to look further at the articles that were there?

24   A    We use -- it was indication for us for further review,

25   yes.

Tristan Garrah - Cross                                    235

1    Q     And the arrest was only based upon the file that was on

2    the 8-gigabyte flash drive that you viewed, correct?

3    A     That's correct.

4    Q     And prior to placing him under arrest, you only viewed

5    that one file on the 8-gigabyte?

6    A     Yes.

7    Q     And then once he was placed under arrest, in the

8    presence of the investigator you continued to view

9    approximately five to six other videos you testified?

10   A     That's correct.

11   Q     All right.  Have you been, as part of your training

12   within the CBSA, given any training on computer forensics

13   whatsoever?

14   A     No.

15   Q     Have you been -- do you have any certificates or

16   education in computer sciences?

17   A     No.

18   Q     Are you aware of anything that may be created by

19   turning on a computer and looking at files?

20   A     No, I'm not.

21   Q     Are you aware of any changes to those files that may be

22   created by turning the computer on and viewing those files?

23   A     No.

24   Q     Now you also discussed that there was a camera and card

25   and a cell phone that were taken at the time?

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 268 of 890
A264
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 101 of 275

Tristan Garrah - Cross                          236

1   A     Yes.

2   Q     All right.  Did you investigate at the time the

3   contents of the camera or the photograph card in the camera?

4   A     I did not, no.

5   Q     So you did not conduct any -- you didn't try to turn

6   the camera on?

7   A     I didn't myself, no.

8   Q     Are you aware if any officers tried to turn the camera

9   on that morning?

10  A     I'm not aware, no.

11  Q     Anybody try to -- withdrawn.  Was the cell phone

12  already on?

13  A     I don't recall.

14  Q     You don't recall investigating the cell phone at all?

15  A     I did not.

16  Q     Describing the truck that you investigated was a blue

17  Dodge truck, is that correct?

18  A     That's correct, yes.

19  Q     Was a pickup truck?

20  A     Yes.

21  Q     And it had a cab, within the cabin that you inspected,

22  there was a cap on the flatbed?

23  A     On the bed of the truck, yes, I believe so.

24  Q     Could you describe the cap on the flatbed of the truck?

25  A     I don't recall the color.

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 269 of 890
**A265**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 102 of 275

Tristan Garrah - Cross
                                                                            237

1  Q     All right.  Did it have any windows in it?

2  A     I don't recall.

3            MR. GOLDSMITH:  One moment, your Honor.

4                 (Pause in Proceedings.)

5  Q     Just very briefly, Officer Garrah, did you have any

6  other contact with this material between May 24th of 2009 and

7  within the last week?

8  A     Sorry, which material are you referring to?

9  Q     The two laptops and the flash drives and the camera.

10 A     I had no other contact, no.

11 Q     Did you have any contact with Mr. Jenkins between

12 May 24 of 2009 and today?

13 A     I was in his presence at two court dates or one court

14 date, I apologize, in Canada.

15 Q     Was that in September of 2009 -- I'm sorry, September

16 of 2010?

17 A     Yes, that was the court date.

18 Q     The purpose of that was for a trial?

19 A     Yes, for the trial stemming from the occurrence in

20 Canada.

21 Q     Did the trial go forward that day?

22 A     The subject, or Mr. Jenkins made a motion for charter

23 infringement I believe and trial did not proceed that day, we

24 ran out of time.

25            MR. GOLDSMITH:  Right.  No further questions.

Tristan Garrah - Redirect                                238

1          THE COURT:  Any further direct, Counsel?

2          MS. CARROLL:  Yes.

3          THE COURT:  Okay, go ahead.

4          <u>REDIRECT EXAMINATION BY MS. CARROLL:</u>

5     Q    Officer Garrah, after the defendant made a charter

6     motion, was a new trial date set?

7     A    Yes, I believe in October of that year.

8     Q    Were you present for that trial date in October of

9     2010?

10    A    Yes, I was.

11    Q    Was the defendant present at that time?

12    A    No, he did not show up.

13    Q    Did the trial commence in October of 2010?

14    A    Inasmuch as it could.  A bench warrant was issued.

15    Q    Officer Garrah, is it standard protocol when you're

16    doing a search of a laptop for you to begin by clicking on

17    icons that appear on the laptop screen?

18    A    Yes, you can do that, as long as you notate what you're

19    doing, that was our training at the time.

20    Q    Are you trained about altering data on the laptops or

21    digital media you're searching?

22    A    We're not trained on the specifics of it, no.

23    Q    When you were reviewing the defendant's laptop and the

24    8-gigabyte USB, did you create any video files?

25    A    No, I created no files and didn't delete anything or

Tristan Garrah - Redirect                                      239

1    anything of that nature.

2    Q     Did you do anything to alter any of the videos you

3    viewed on the defendant's 8-gigabyte USB drive?

4    A     No, I did not alter anything.

5    Q     Did you do anything to create or alter any images on

6    the defendant's Compaq computer or 8-gigabyte USB drive?

7    A     No, I did not.

8    Q     Did you see Officer Johnston create any video files

9    during the search of the Toshiba laptop?

10   A     No, I did not.

11          MS. CARROLL:  No further questions.

12          THE COURT:  Any recross, Counsel?

13          MR. GOLDSMITH:  None, your Honor.

14          THE COURT:  You may step down, thank you.

15               (The witness was excused.)

16          THE COURT:  Please call your next witness.

17          MS. CARROLL:  Your Honor, the government calls

18   Officer Glen Hache.

19          THE CLERK:  Good morning, sir.  Can you state your

20   full name, spell it for the record.

21          THE WITNESS:  Glen Hache, G-l-e-n, last name

22   H-a-c-h-e.

23

24          G L E N   H A C H E , called as a witness

25   and being duly sworn, testifies as follows:

Case 5:14-cr-00088-EAW Document 71-12 Filed 01/12/16 Page 272 of 890
A268
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 105 of 275

Glen Hache – Direct

240

| | |
|---|---|
| 1 | DIRECT EXAMINATION BY MS. CARROLL: |
| 2 | Q     Good morning, Officer Hache. |
| 3 | A     Good morning. |
| 4 | Q     Where do you work? |
| 5 | A     Canada Border Services Agency, Port of Lansdowne, |
| 6 | Ontario, opposite of Alexandria Bay, New York. |
| 7 | Q     How long have you worked there? |
| 8 | A     Since October 2005. |
| 9 | Q     What are your job duties? |
| 10 | A     Primary inspection, secondary examination of vehicles, |
| 11 | commercial traffic stream, examining goods coming into Canada |
| 12 | as well as people. |
| 13 | Q     Were you on duty on May 24th, 2009? |
| 14 | A     Yes, I was. |
| 15 | Q     Where were you stationed on that day? |
| 16 | A     The whole shift was between 7:30 and 4:30, and between |
| 17 | 8 and 9 a.m., I was stationed secondary examinations, traffic |
| 18 | stream. |
| 19 | Q     Were you referred a vehicle examination on that |
| 20 | morning? |
| 21 | A     Yes, I was. |
| 22 | Q     Whose vehicle were you asked to examine? |
| 23 | A     It was a dark blue Dodge Ram pickup truck pulling a |
| 24 | trailer, a couple of ATVs, single male occupant Joseph |
| 25 | Jenkins right over there, the defendant. |

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Glen Hache – Direct                              241

1   Q     And how do you know that the defendant was the driver

2   of the vehicle?

3   A     He's the only person in the car.  I approached the

4   vehicle as it pulled into secondary, it was referred over the

5   radio by Officer Pedro Sousa-Dias from the primary inspection

6   line and I just approached the vehicle, looked at the

7   referral slip which is a yellow E67 referral slip, stated his

8   declaration to the officer in the booth, his U.S. --

9   presented U.S. passport with that name on it, and it was

10  marked for immigration secondary so I instructed him to go

11  inside the traffic office and door number 1, turn left, talk

12  to immigration officer.

13  Q     How did you begin the vehicle inspection?

14  A     I began the vehicle inspection, he was -- Joseph

15  Jenkins was at the immigration counter talking to BSO Melany

16  Boyd, and once she was finished with her preliminary

17  interview, some of the things that he said, being

18  self-employed and electrician, I decided to talk to him a

19  little bit there and I instructed, told him I was going to

20  verify his declaration for compliance verification, asked for

21  the keys to his vehicle.  I asked him if he owned the

22  vehicle, he said yes.  Did he pack it himself?  He said yes.

23  Was he aware of all the contents, and he said yes.  That's

24  how we started the -- then went outside, so did he, stood

25  sort of on the sidewalk there and I started searching the

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 274 of 890
A270
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 107 of 275

Glen Hache – Direct

242

1    car.

2    Q    Are those standard questions, whether he owned the

3    vehicle, whether he packed the vehicle?

4    A    Those are other questions we ask everyone before we

5    throw ourselves into searching a vehicle, everyone gets asked

6    those questions.

7    Q    Did you have any assistance in the vehicle inspection?

8    A    Yeah, it was top of the hour so like closer to 9:00 so

9    Officer Garrah and Officer Johnston were also standing

10   outside, they were scheduled secondary between 9 and 10 so

11   they offered to help.  And as soon as I saw the truck the

12   first time, I said, you know what, there's a lot of stuff in

13   here, so sure, I'll accept the help, and they helped out.

14   Q    What was your first step in examining the vehicle?

15   A    Which is the same thing I always do, start at the

16   driver's side.  Front seat driver's side, rear, rear driver's

17   side, while Officer Garrah I believe was in the back of the

18   truck, and Officer Johnston started the trailer, the trailer,

19   examined the goods there.

20   Q    Was anything discovered during the inspection of the

21   vehicle?

22   A    Yeah, a few minutes in, like less than 10 minutes into

23   the examination, Officer Johnston turned on a laptop that he

24   saw in a box on the passenger side, rear passenger side and

25   sort of made a reference to a media file that he saw, couple

Case 5:14-cr-00088-EAW Document 71-10 Filed 01/12/16 Page 275 of 890
A271
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 108 of 275

Glen Hache – Direct

243

1    of girls, appeared to be 11, 12, 13 years old, title that

2    said Sexy Girl 95, was like, you know, these girls are, you

3    know, little tank tops, wearing little shorts, they're sort

4    of posing, looking like there's a web cam that they're

5    looking at, they're pausing, look like they're following

6    instructions.  There's no -- there's no sound to it, so they

7    were -- they seemed like they were trying to be seductive for

8    the camera.  So that's when Johnston decided, okay, you know

9    what, we're going to take this inside the office, we're not

10   going to do this outside, we're going to have to do a

11   progressive examination of the laptop.

12   Q    What did you do once the progressive examination in the

13   office had begun?

14   A    Well, Johnston and Garrah were in the office, I was --

15   they were in the closed office, I was outside like in the

16   main office, there was obviously other people there.  And the

17   defendant came into the office and looked at me, made eye

18   contact and like, you know, why are they taking my laptop in,

19   so I went outside with him, and I explained to him, you know,

20   because he asked why are you taking my laptop in, the

21   examination of electronic media, laptop, cell phones,

22   anything like that is subject to the examination, it's the

23   same as examining the contents of the vehicle, luggage, so

24   on, so forth.  He just, you know, I told him, I explained to

25   him, I told him quickly what we saw, what I observed with

Glen Hache – Direct                              244

1   that media file and that was a concern to us so we were going

2   to do a progressive examination.  He sort of looked away and

3   I said, do you have, like basically we're looking for

4   prohibited images, child pornography, anything like that on

5   your laptop?  He looked away and he said, not to my

6   knowledge, I don't think so.  I looked at him, I said, well,

7   rephrase it then for you, because that was alarming to me

8   that he would answer that way.  So I repeated --

9            MR. GOLDSMITH:  Objection.

10   A     Sort of rephrase --

11           THE COURT:  You have an objection, Counsel?

12           MR. GOLDSMITH:  Yes, objection.  The qualification

13   of alarm.

14           THE COURT:  No, I'll take the testimony, it's

15   overruled, go ahead.

16   A     All right.  Rephrased the question, I mean it was

17   pretty direct, you know, I'm not going to sugarcoat anything,

18   I said, listen, have you ever downloaded images of nude

19   children, 12, 13, 14, teenagers?  I don't think so.  Just red

20   in the face, looked like he wanted to curl up in a ball.  I

21   said, okay, well, that's what we're doing, and the rest of

22   the conversation was just sort of, you know, him saying, I'm

23   just going to my parents' cottage and cross all the time,

24   never had to go through this, you know, said, well -- asked

25   me how long it was going to take, I said, as long as it

Case 5:14-cr-00088-EAW Document 71-3 Filed 04/12/16 Page 273 of 890
**A273**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 110 of 275

Glen Hache - Cross                                    245

1    takes, I don't know, we'll see.

2    Q    When you say it looked like the defendant wanted to

3    curl up into a ball, what do you mean?

4    A    Because he was almost halfway there just because, I

5    know he's a little bit shorter than I am but he was just sort

6    of like doing this, and hands in his pocket and he was

7    looking away, I mean, that's just an observation.

8              MS. CARROLL:  No further questions.

9              THE COURT:  Cross-examination.

10             MR. GOLDSMITH:  Thank you.

11             CROSS-EXAMINATION BY MR. GOLDSMITH:

12   Q    Officer Hache, you said that you approached the truck

13   as it pulled up, is that correct?

14   A    Yes.

15   Q    And as it pulled up, it was -- withdrawn.  You wait for

16   it to come to a complete stop and then you wait for the

17   driver to come out, is that correct?

18   A    Yes.

19   Q    All right.  At that point you asked for the keys?

20   A    No.

21   Q    All right.  Directed the driver inside?

22   A    Yeah.

23   Q    And then you waited for direction from Officer Boyd to

24   start inspecting the truck, is that correct?

25   A    No, I just waited for her to talk to him.

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 278 of 890
A274
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 111 of 275

Glen Hache - Cross

246

1    Q    So you waited for her to talk for a few minutes and

2    then you began the inspection?

3    A    That's right.

4    Q    So Officer Boyd didn't have the discretion to tell you

5    to inspect the truck or not?

6    A    She can, but she didn't.

7    Q    She didn't?

8    A    No.

9    Q    Okay.  At that point you had inspected the truck with

10   two other officers, correct?

11   A    Afterwards, yes.

12   Q    Now so initially, did you perform any inspection on

13   your own?

14   A    No, we just started together, I went to the driver's

15   side and they were standing there right before I could begin.

16   As I opened the door they offered so -- and that's -- they

17   started the same time pretty much.

18   Q    So let me back you up.  So Officer Johnston and Garrah

19   were with you as you approached the truck?

20   A    At which time that I approached?

21   Q    When you initially approached the truck.

22   A    No, they were in the office.

23   Q    Okay.  Then you went back to the office?

24   A    Yeah.

25   Q    And then the point where you've been notified you

Glen Hache - Cross

247

1    needed to inspect the truck, then all three of you came out

2    together?

3    A      No, I went out, they were already outside, I went out

4    afterwards and then I went and started searching the truck

5    and they offered and then they started searching with me.

6    Q      All right.  And you searched the driver's side?

7    A      Yes.

8    Q      And you recall Officer Garrah searching the rear of the

9    vehicle?

10   A      Officer Garrah -- yeah, it's a pickup truck so he was

11   doing -- it was a covered cab so he was going inside the cab

12   looking at all the stuff that was in there and Johnston

13   was -- started the trailer.

14   Q      Now Officer Johnston recovered a laptop initially, is

15   that correct?

16   A      Yes.

17   Q      Did he recover that from the trailer?

18   A      No.

19   Q      So the time he recovered the laptop, he recovered it

20   from somewhere else in the truck, is that correct?

21   A      Yes.

22   Q      And at a point, do you recall where he recovered it

23   from?

24   A      Yes, the back seat, passenger's side in a box.

25   Q      All right.  And so when he recovered the laptop from

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Glen Hache - Cross

248

1    the back seat, did he just immediately, do you recall him

2    immediately opening it up to view what the contents were?

3    A    No.

4    Q    Do you recall him pulling out other items from the back

5    seat to inspect?

6    A    Yeah, he inspected a few things while I was finishing

7    up.  When he saw the laptop in the box I guess he had

8    expressed some concern that it looked, appeared to be new, he

9    went over and talked to the defendant there and then came

10   back to the truck and then opened up the laptop.

11   Q    And you were still investigating -- withdrawn.  You

12   were still inspecting the driver's side of the vehicle?

13   A    Yes, there were a few bags in there, just, you know --

14   Q    Officer Garrah still in the back?

15   A    Yes, finishing up.

16   Q    And at that point Officer Johnston then approached

17   Mr. Jenkins?

18   A    Yes, when he discovered the laptop in the box he had a

19   short conversation with Mr. Jenkins and then came back to the

20   truck.

21   Q    Were you present for the conversation between Officer

22   Johnston and Jenkins?

23   A    No, it happened about 10, 15 feet away on the sidewalk

24   but I wasn't listening.

25   Q    Then Officer Johnston returned to the truck with the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 77-10 Filed 01/02/16 Page 281 of 890
A277
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 114 of 275

Glen Hache - Cross

249

1    laptop, is that correct?

2    A    No.

3    Q    So he -- I'm sorry.  He left the truck to go speak with

4    Mr. Jenkins?

5    A    He went to speak to him, yes, and then came back.

6    Q    He didn't have the laptop with him when he went over to

7    speak --

8    A    I don't recall if he had the laptop in his hands.

9    Q    Then he came back to the truck and that's when you saw

10   him open up to start to review the contents?

11   A    Yes.

12   Q    At that point you were still conducting your search of

13   the driver's side?

14   A    Yep.

15   Q    And then Officer Johnston made a remark about something

16   that he had found in a file on the laptop, is that correct?

17   A    Yep.

18   Q    At that point, you and the other officers decided to

19   inspect the laptop inside, is that correct?

20   A    Yes, we weren't going to -- well, Officer Johnston and

21   Garrah, at that time Officer Garrah came over to the front

22   passenger side and there were, there was another laptop

23   there, laptop bag and some thumb drives and at the time that

24   he was -- Officer Johnston was showing me quickly that media

25   file, they decided to go inside the office for privacy

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 282 of 890
A278
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 115 of 275

Glen Hache - Cross

250

1    because this outside secondary exposed to other people

2    possibly coming in and parking their vehicles and seeing

3    this.

4    Q    So all three of you went inside at that point, correct?

5    A    We went inside the office, yes.

6    Q    And Mr. Jenkins was on a bench outside?

7    A    Yes, yes, he was.

8    Q    It's at that point where you testified that he

9    addressed you, some concern about why they were looking at

10   his laptop?

11   A    Yeah.  When Officer Johnston and Garrah went inside the

12   office and then they went inside the superintendent's office

13   with some media equipment there, couple of laptops, that's

14   when the defendant Joseph Jenkins opened the door of the

15   traffic office and made eye contact with me because I was

16   behind the counter.  I was -- I didn't actually immediately

17   go into the superintendent's office, I stayed in the traffic

18   office.

19   Q    All right.  And that's when he engaged you?

20   A    Yeah, I mean that's when I went and I took the

21   conversation outside.  And I explained to him exactly what we

22   were looking for and what we're doing.

23   Q    And when you explained to him what was going on, that's

24   when you asked him a question about child pornography?

25   A    Yeah.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Glen Hache - Cross                                  251

1    Q     And he wasn't under arrest at that point, correct?

2    A     No.

3    Q     But you asked him, and he gave you a response, not to

4    my knowledge, correct?

5    A     That's right.

6    Q     It wasn't a long drawn-out pause before that or

7    anything, he just responded in normal conversation, correct?

8    A     No, there was a pause.

9    Q     It wasn't him looking around trying to appear as though

10   he's figuring out what to say?

11   A     I would say about three seconds to me is a pause enough

12   that he's trying to figure out what to say.

13   Q     Okay, so three seconds, one-one-thousand,

14   two-one-thousand, three-one-thousand, not to my knowledge,

15   okay?

16   A     Something, something to that effect.

17   Q     Asked him again, he said I don't think so, right?

18   A     That's right.

19   Q     At that point then you proceeded back into the office

20   area to conduct further inspection, correct?

21   A     I proceeded inside -- well, after short conversation

22   with him outside, I went back inside the office, yes.

23   Q     All right.  Now do you recall Officer Johnston --

24   withdrawn.  You recall the location inside the truck where

25   the -- where Officer Johnston pulled the laptop out of?

Case 5:14-cr-00088-EAW Document 77 Filed 01/12/16 Page 284 of 890
**A280**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 117 of 275

Glen Hache - Cross

252

1    A    Yes, it was the -- as I stated, the rear passenger

2    side.

3    Q    Do you recall if it was in any kind of containers?

4    A    As I stated, inside a box.

5    Q    What kind of a box?

6    A    At the time it looked like a laptop box, like if you

7    buy a laptop at the store, it comes in a box, markings on it.

8    I didn't take note of every little marking on the box but --

9    Q    Sure, but it looked to you like it was the box the

10   laptop probably came in when it got purchased?

11   A    Yes.

12   Q    No other questions of Mr. Jenkins when you were outside

13   inspecting the vehicle?

14   A    No.

15   Q    You didn't see -- well, you weren't there for Officer

16   Johnston's conversation with him?

17   A    No, I just -- yeah, I didn't overhear the conversation,

18   that's all.

19        MR. GOLDSMITH:  Okay.  One moment, your Honor.

20        THE COURT:  Okay.

21   Q    Officer Hache, had you received any specialized

22   training as a CBSA agent in computer forensics?

23   A    No.

24   Q    Have you received any training regards to computer

25   sciences at all?

Case 5:14-cr-00088-EAW Document 77-17 Filed 01/12/16 Page 285 of 890
A281
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 118 of 275

Glen Hache - Cross

253

1   A      No.

2   Q      Had you received any training in regards to evidence

3   collection?

4   A      No, just the basic training as an officer, what we're

5   to do if we arrest someone.

6   Q      And would you categorize it as pretty busy that

7   morning?

8   A      No.

9   Q      Pretty light?

10  A      Light, yeah.

11          MR. GOLDSMITH:  Okay, no further questions.

12          THE COURT:  Any redirect?

13          MS. CARROLL:  No redirect, your Honor.

14          THE COURT:  Thank you, sir, you may step down.

15          THE WITNESS:  You're welcome.

16              (The witness was excused.)

17          MS. CARROLL:  Your Honor, the government calls

18  Officer Jarret Johnston.

19          THE COURT:  Everybody okay?  Let me know.

20          THE CLERK:  Good morning, sir, can you state your

21  full name and spell it for the record, please.

22          THE WITNESS:  Jarret Johnston, J-a-r-r-e-t,

23  Johnston, J-o-h-n-s-t-o-n.

24

25          J A R R E T    J O H N S T O N , called as

Jarret Johnston - Direct                    254

1    a witness and being duly sworn, testifies as

2    follows:

3        DIRECT EXAMINATION BY MS. CARROLL:

4    Q    Good morning, Mr. Johnston.

5    A    Good morning.

6    Q    Where are you currently employed?

7    A    I'm employed in Lindsay, Ontario for two different law

8    practices as well as Legal Aid Ontario.

9    Q    Are you a lawyer?

10   A    I am.

11   Q    When were you admitted to the bar?

12   A    June of 2013.

13   Q    And that's the Canadian bar?

14   A    The Ontario Bar Association, correct.

15   Q    Congratulations.

16   A    Thank you.

17   Q    Where were you working in May of 2009?

18   A    I was working for Canada Border Services Agency at the

19   Port of Lansdowne.

20   Q    What was your position there?

21   A    I was a border services officer.

22   Q    What were your responsibilities as a border services

23   officer?

24   A    To process travelers and examine goods for any

25   contraband, prohibited material.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

                    Jarret Johnston – Direct                    255

1    Q    In May of 2009, how long had you been working as a

2    border services officer?

3    A    I started there as a student in May of 2006, I was

4    hired as indefinite full-time employee in March of 2008 and

5    continued my employment until then.

6    Q    Were you on duty on May 24th, 2009?

7    A    I was.

8    Q    Where were you positioned on the morning of May 24th,

9    2009?

10   A    I was scheduled to the traffic office at the Port of

11   Lansdowne on 7:30 a.m. to 4:30 p.m. shift.

12   Q    Were you asked to participate in a vehicle inspection

13   during that shift?

14   A    I was.

15   Q    About what time were you asked to help out with the

16   vehicle inspection?

17   A    Approximately 9 a.m.

18   Q    Who was participating with you in the vehicle

19   inspection?

20   A    Officer Hache and Officer Garrah.

21   Q    What car were you asked to look at?

22   A    I was asked to examine a 2003 Dodge Ram pickup truck,

23   Dodge Ram 1500, blue in color.

24   Q    Who was the driver of that vehicle?

25   A    Joseph Jenkins.

Jarret Johnston – Direct                                    256

1    Q      Do you see the driver here in court today?

2    A      I do.

3    Q      Could you identify him using an article of clothing?

4    A      Sorry, an article of clothing on the day in question or

5    article of clothing in the courtroom today?

6    Q      Courtroom today.

7    A      He's wearing short sleeve, appears to be a collared

8    golf shirt attire, type shirt, blue in color, with a little

9    insignia on the chest.

10           MS. CARROLL:  Your Honor, may the record reflect

11   that the witness has identified the defendant?

12           THE COURT:  It will.

13   Q      Mr. Johnston, what did you do as part of your

14   obligations to inspect the vehicle, the 2003 Dodge Ram?

15   A      When I first approached the vehicle, I did a cursory

16   examination of the trailer, there was a utility trailer

17   attached to the blue pickup truck that contained two ATVs.  I

18   did a cursory examination of the trailer at that time and

19   then proceeded to begin searching the rear passenger side of

20   the pickup truck.

21   Q      What, if anything, did you find in the rear passenger

22   side of the pickup truck?

23   A      I first located laptop, a black Toshiba laptop that was

24   in a cardboard package, it appeared to be the original

25   packaging of the laptop.

Case 5:14-cr-00088-EAW Document 71-1 Filed 01/12/16 Page 289 of 890
**A285**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 122 of 275

Jarret Johnston – Direct                                    257

1  Q      Mr. Johnston, I'm handing you Government's Exhibit 3A.
2  Do you recognize 3A?
3  A      I do.
4  Q      What is it?
5  A      It's a black Toshiba laptop.
6  Q      Is it the laptop you searched on May 24th, 2009?
7  A      Yes, it is.
8  Q      What did you do after finding the laptop in the
9  passenger's side of the truck?
10 A      I approached Mr. Jenkins who was standing on the
11 sidewalk of our traffic building which would be about 10 to
12 15 feet approximately in front of the vehicle that we were
13 searching.  I asked who owned the laptop, Mr. Jenkins
14 indicated that he owned the laptop, Mr. Jenkins also
15 indicated that he had owned it for over a year.  I then asked
16 him why he carried the laptop in cardboard packaging and he
17 indicated that it was because he didn't possess a carrying
18 case for the laptop.
19 Q      What, if any, observations did you make about
20 Mr. Jenkins' demeanor while you were asking him about the
21 laptop?
22 A      When I asked him who owned the laptop I noticed signs
23 of nervousness, indicators of nervous, I noticed perspiration
24 on his forehead and I noticed he was evasive with his eye
25 contact which means basically he was looking at the ground

Jarret Johnston – Direct                          258

1    when I was asking him the questions.  Due to those

2    indicators, I decided to return to the rear passenger side of

3    the truck and further examine the laptop.

4    Q     How did you go about further examining the laptop?

5    A     When I returned to the passenger, rear passenger side

6    of the vehicle, I placed the laptop on the back seat, I

7    opened it, I pressed the power button and turned the laptop

8    on.  When the laptop turned on, the desktop appeared.  I did

9    a brief cursory examination of the desktop of the laptop and

10   noticed a desktop icon that appeared to be a young female in

11   the nude.

12   Q     When you say desktop icon, what does that mean?

13   A     Little picture on the screen of the laptop and if you

14   click on them, it leads to a file.  So I clicked on the icon

15   of the, what appeared to be a young nude female, it led me to

16   a media folder with other files in it, and I clicked on

17   another file which was a video file.  When the video opened,

18   it was a video of what appeared to be two young females of

19   children's age, prepubescent, performing sexual suggestive

20   acts in front of a camera.

21   Q     What did you do after witnessing that?

22   A     I immediately closed the laptop and informed Officers

23   Hache and Garrah that I'd be taking the laptop into the

24   superintendent's office in the traffic building to continue

25   my examination.

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 291 of 890
**A287**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 124 of 275

Jarret Johnston – Direct                                259

1    Q     Why did you continue your examination in the office

2    traffic building?

3    A     For two reasons.  The first reason being that our

4    secondary designated area for searching vehicles is open to

5    other travelers coming and going and so I didn't want to do a

6    further examination with searching for prohibited material

7    and someone might walk by and see it.  Second reason being we

8    use a program called I See What You See to search for

9    contraband on laptops and it is located in the

10   superintendent's office.

11   Q     What is I See What You See?

12   A     It's a CD-ROM program disk we use for searching

13   electronic devices.  It creates a write block that preserves

14   the integrity of the laptop so there can't be any alterations

15   once we use the program.

16   Q     What does that mean, preserves the integrity of the

17   laptop?

18   A     Anything that's currently stored, the data currently

19   stored on it when we insert the CD is preserved and there

20   can't be any modifications, add-ons or changes to that data

21   at the time.

22   Q     Why do you use that software when you're doing a laptop

23   examination?

24   A     To search in a rapid form for any images that are

25   stored on the cache of the laptop, the storage unit of the

Case 5:14-cr-00088-EAW Document 71 Filed 01/02/16 Page 292 of 890
**A288**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 125 of 275

Jarret Johnston – Direct

260

1    laptop.  It allows us to observe any photos that have been

2    viewed using that device in, I wouldn't say a quick manner,

3    but certainly sometimes if there's thousands of images, it

4    allows us to observe them in a more expediated manner.

5    Q    Did you use I See What You See, that software during

6    your examination of the black Toshiba laptop?

7    A    I did.

8    Q    I'm handing you what's been marked for identification

9    as Government's Exhibit 3B, page 22; do you recognize what

10   I've just handed you, 3B, page 22?

11   A    Yes, I do.

12   Q    What is 3B, page 22?

13   A    It's a photograph of Joseph Jenkins and a young female

14   child sitting to his right on a couch in a residence

15   somewhere.

16   Q    How do you recognize that photograph?

17   A    I recognize the photograph from doing my observations

18   using I See What You See in the superintendent's office.

19   Q    Was that photograph located on the black Toshiba that

20   you were searching?

21   A    Yes, it was.

22   Q    Does it appear to be in substantially the same

23   condition as the image was when you saw it on May 24th, 2009?

24   A    Yes.

25           MS. CARROLL:  Your Honor, move to admit page 22 of

Case 5:14-cr-00088-EAW Document 77-1 10/30/15 Filed 01/12/16 Page 293 of 890
A289
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 126 of 275

Jarret Johnston – Direct                     261

1    Government's 3B.

2              THE COURT:  Any objection?

3              MR. GOLDSMITH:  I just want to be clear, are we

4    moving only for page 22 or the entire exhibit?

5              MS. CARROLL:  Only page 22.

6              MR. GOLDSMITH:  Brief voir dire.

7              THE COURT:  Go ahead.

8         VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

9    Q    Officer Johnston, when was the last time you saw this

10   particular photograph prior to today?

11   A    May 20 -- yesterday.

12   Q    Prior to yesterday?

13   A    Prior to yesterday was May 24th, 2009.

14   Q    Were you the agent or officer in charge of the custody

15   and control of this object between May 24th of '09 and

16   yesterday?

17   A    No, I was not.

18             MR. GOLDSMITH:  Same objection as before, your

19   Honor.

20             THE COURT:  Okay.  It will be received, go ahead.

21        CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

22   Q    Publish page 22.  Officer Johnston, was this photograph

23   discovered by you during your use of the I See What You See

24   software?

25   A    It was.

Jarret Johnston – Direct                                    262

1   Q     What is the I See What You See software designed to

2   find on a computer?

3   A     Any image that's been stored on the cache of the

4   laptop, so whether it be saved on a hard drive, whether it be

5   viewed on some other form, any image that's been viewed on

6   that electronic device.

7   Q     Was Government's 3B, page 22 the only image that I See

8   What You See found on the defendant's black Toshiba?

9   A     No, it was not.

10  Q     Were other images located during your search of the

11  black Toshiba?

12  A     Yes, they were.

13  Q     Without describing all of them specifically, what was

14  the nature of the images you saw on the black Toshiba?

15  A     Mainly videos and images of young females performing

16  sexually suggestive acts and behavior in the nude.

17  Q     As a result of your search of the black Toshiba, did

18  you have a conversation with Investigator Marie-Josee

19  Vinette?

20  A     I did.

21  Q     When did that conversation take place?

22  A     Investigator Vinette arrived at the Port of Lansdowne

23  approximately 1:40 p.m. that day.  At the time she arrived I

24  was in the process of searching using I See What You See, it

25  was at that time that Officer Garrah and myself debriefed

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 295 of 890
**A291**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 128 of 275

Jarret Johnston – Direct

263

1   Investigator Vinette on what was occurring in the incident up
2   to that point.
3   Q    During your briefing of Investigator Vinette did you
4   view a video that had the name Vicky in the title?
5   A    Yes, I did.
6   Q    What did you see in the video that had the name Vicky
7   in the title?
8   A    It was a video of a young girl with brown hair, pale
9   skin, appeared to be prepubescent, no hip development, no
10  pubic hair, no breast development, she undressed in the
11  bedroom and then approached the adult male and began
12  performing oral sex.
13  Q    Did you take any other steps in your investigation on
14  May 24th, 2009?
15  A    I did.
16  Q    What was the next step you took?
17  A    The next step we took after viewing the video was
18  Superintendent Cook advised myself and Officer Hache to
19  further examine the vehicle in the secondary area.
20  Q    What did you find during your further examination of
21  the vehicle?
22  A    I found a Verizon Motorola cell phone in the console of
23  that vehicle and Officer Garrah -- or sorry, Officer Hache
24  found an Olympus digital camera.
25  Q    Were those items taken into custody?

Case 5:14-cr-00088-EAW Document 77-1 Filed 01/12/16 Page 296 of 890
A292
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 129 of 275

Jarret Johnston – Cross                    264

1    A    They were.

2    Q    Did you give those items to Officer Garrah?

3    A    I did.

4    Q    Did that conclude your involvement in the

5    investigation?

6    A    Yes, it did.

7              MS. CARROLL:  No further questions.

8              THE COURT:  Cross-examination.

9              MR. GOLDSMITH:  Thank you, your Honor.

10   CROSS-EXAMINATION BY MR. GOLDSMITH:

11   Q    Officer Johnston, on that morning you approached the

12   vehicle with Officers Hache and Garrah, correct?

13   A    That's correct.

14   Q    And you took the assignment of looking first toward the

15   trailer of the vehicle and then walking forward, correct?

16   A    That's correct.

17   Q    Nothing out of the ordinary in the trailer of the

18   vehicle, correct?

19   A    Nothing I observed during my cursory review.

20   Q    You then moved to the cab of the truck, said you found

21   a laptop inside of a cardboard box, correct?

22   A    That's correct.

23   Q    At that point you pulled the laptop out of the box?

24   A    Yes, I did.

25   Q    As you opened it up, or unfolded in order to view the

Case 5:14-cr-00088-EAW Document 71-21 Filed 01/12/16 Page 297 of 890
A293
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 130 of 275

Jarret Johnston - Cross                    265

1    contents?

2    A      Not at that time.

3    Q      Did you turn it on?

4    A      Not at that time.

5    Q      You notified Officers Garrah and Hache that you had

6    found a laptop, is that correct?

7    A      That's correct.  What time are you directing?

8    Q      Shortly after you picked it up out of the back seat.

9    A      Right, when I first found the laptop, though, I walked

10   up to Mr. Jenkins and asked him who owned the laptop.

11   Q      Right.

12   A      That was prior to the questions you're asking me.

13   Q      You asked him who owned it, correct?

14   A      Correct.

15   Q      He responded.  He responded he did?

16   A      That's correct.

17   Q      And you asked him if he had packed it in the vehicle,

18   correct?

19   A      That's not correct.

20   Q      All right.  What else did you ask him?

21   A      I asked him who owned it, he indicated that he did, he

22   indicated that he'd owned it for over a year.  My second

23   question was why is it still in its original packing, his

24   answer was that he didn't possess a carrying case.  Those

25   were the only questions I asked Mr. Jenkins.

Jarret Johnston - Cross                          266

1    Q    Okay.  And you didn't ask him if any other people used

2    it, right?

3    A    I did not ask him that question.

4    Q    You didn't ask him if he bought it new or used,

5    correct?

6    A    That's correct.

7    Q    You didn't ask him if he used it for work or for

8    personal purposes, correct?

9    A    That's correct.

10   Q    So no responses to -- well, withdrawn.  No questions

11   along the lines of how it was used and by whom, right?

12   A    That's correct.

13   Q    At that point you returned to the vehicle, was it

14   powered on?

15   A    At that time I turned the power on.

16   Q    You hit the power button?

17   A    That's correct.

18   Q    And it turned on itself?

19   A    That's correct.

20   Q    Did you have to plug it in at all?

21   A    No.

22   Q    So you're outside by the truck, it's powered on, and

23   you started to examine files that were on the desktop,

24   correct?

25   A    File, single, yes.

Jarret Johnston – Cross

267

1    Q     Based upon that one file, you decided to take it inside

2    to the offices, correct?

3    A     If you're referring to the video file that I observed,

4    correct.

5    Q     Yeah.  When you brought it into the office, that's when

6    you started to install the I See What You See program on it?

7    A     No, that's not correct.  I continued a manual search at

8    that time.

9    Q     So at that point you started to look through the files

10   of the computer for other images that were contained on it or

11   other media files, correct?

12   A     That's correct.

13   Q     And you were investigating the contents of the computer

14   for about how long before you turned on the I See What You

15   See program?

16   A     I manually searched it for approximately 15 to 20

17   minutes that time when I first entered the superintendent's

18   office, it was at that time that I was interrupted when

19   Officer Garrah made the arrest for possession of child

20   pornography.  I reattended the laptop following the arrest,

21   frisk, handcuff, and placing of Mr. Jenkins in the cell, and

22   I searched it for a further approximate hour, twenty minutes

23   being manual, and then inserted the I See What You See CD,

24   searched it for further approximate 40 minutes until

25   Officer -- Investigator, sorry, Vinette arrived.

Jarret Johnston - Cross

268

1  Q    Okay.  So all in all, you manually investigated for

2  about 40 minutes prior to turning on the I See What You See

3  software, correct?

4  A    That's correct.

5  Q    All right.  And during that 40 minutes, you were able

6  to investigate a number of files that were on the computer,

7  correct?

8  A    That's correct.

9  Q    Photographs and videos?

10  A    Correct.

11  Q    As well as looking into other programs on the computer,

12  noting what, what information was on the computer, is that

13  correct?

14  A    That's not correct.

15  Q    All right.  You simply stuck to what the media files

16  were?

17  A    Various files, yes.

18  Q    All right.  Other than the media files, what other

19  files did you look at?

20  A    I looked at files known as -- that he had entitled FLV

21  files, not sure what the FLV stands for but they were named

22  under FLV files, mostly various files within the media for

23  the document.

24  Q    You didn't ask him what FLV meant, correct?

25  A    No, I did not.

Jarret Johnston – Cross                                                269

1   Q      Now you testified earlier about a photograph of

2   Mr. Jenkins with, looks like a fairly young girl sitting next

3   to him, is that correct?

4   A      That's correct.

5   Q      That's a file you found on the computer?

6   A      Using I See What You See, correct.

7   Q      And you didn't ever question Mr. Jenkins as to who the

8   girl was in the photograph?

9   A      I did not.

10  Q      Have no idea the relation between Mr. Jenkins and that

11  girl?

12  A      I found that specific picture in a folder named "My New

13  Camera Pictures" on the laptop.

14  Q      Okay.  But no questions about who the girl was and his

15  relation?

16  A      No, that's correct.

17  Q      Now you did say that you were interrupted briefly for

18  the arrest procedures?

19  A      That's correct.

20  Q      So then you came back out to witness the frisking,

21  reading of certain rights and placing him into the cell, is

22  that correct?

23  A      I observed that, correct.

24  Q      You didn't actually participate in it, though?

25  A      No, that's correct.

Case 5:14-cr-00088-EAW Document 81-1 Filed 01/12/16 Page 302 of 890

Jarret Johnston – Cross

1    Q    Then you went back to manually reviewing the contents

2    of the computer, correct?

3    A    That's correct.

4    Q    Plug any flash drives into the computer?

5    A    I did not.

6    Q    You just reviewed what was on the hard drive?

7    A    That's correct.

8    Q    Do you recall if you had to plug the computer in during

9    that time?

10   A    I don't recall.

11   Q    As part of your training as a CBSA agent, have you

12   received any computer forensics training?

13   A    No.

14   Q    Did you receive any training or education in computer

15   sciences prior to the inspection of Mr. Jenkins' laptop?

16   A    No, I did not.

17   Q    Have any idea how or why or any means possible that

18   your inspection may have changed any qualities of the files

19   on the computer prior to installing the I See What You See

20   software?

21   A    I'm not aware of any.

22   Q    And when you used the I See What You See software, is

23   that something you have to manually install onto the computer

24   device?

25   A    I wouldn't say install but we insert a CD into the

Jarret Johnston - Cross

271

1   CD-ROM of the electronic device.

2   Q    So you insert the CD on and then I assume there's a

3   prompt and you have to start running the program?

4   A    That's correct.

5   Q    Is that something that stays on the computer forever?

6   A    I'm not aware of the logistics of how the program

7   works.

8   Q    You've been instructed on how to use it, though?

9   A    Yes.

10  Q    And so when you start the program, it proceeds to do

11  searches on its own, is that it?

12  A    It has a prompt so you have to start the program

13  running but once it starts running, it automatically brings

14  the pictures that are stored on the hard drive to view it.

15  Q    And again, that was only after about 40 minutes of

16  manual search?

17  A    That's correct.

18       MR. GOLDSMITH:  No further questions.

19       THE COURT:  Go ahead.

20       REDIRECT EXAMINATION BY MS. CARROLL:

21  Q    Mr. Johnston, during your search of the black Toshiba,

22  did you create any video files?

23  A    No, I did not.

24  Q    Did you download any child pornography to the

25  defendant's computer?

Jarret Johnston - Redirect                                    272

1   A      No, I did not.

2   Q      Did you upload any child pornography from the CD-ROM or

3   internet or memory sticks to defendant's computer?

4   A      No, I did not.

5   Q      Did you alter or create any video or image files during

6   your search of the defendant's black Toshiba?

7   A      No, I did not.

8             MS. CARROLL:  Thank you.

9             THE COURT:  Any further cross on that,

10  Mr. Goldsmith?

11            MR. GOLDSMITH:  None, your Honor.  None, your

12  Honor.

13            THE COURT:  Okay, thank you.  Thank you, sir, you

14  may step down.

15                 (The witness was excused.)

16            THE COURT:  Anybody hungry?  No response.  Okay,

17  it's 11:59, all right.  So what I think we're going to do

18  instead of starting another witness, we're going to take our

19  lunch break.  One hour, please be back in the jury room to

20  start at 1:00.  Please don't discuss the case.  If anybody

21  approaches you, tries to discuss this case with you, I need

22  to know about it immediately.  I did see some reporters in

23  here this morning, please do not read, listen, or view

24  anything dealing with anything at all about this case in any

25  media, put it aside, turn it off, do not listen or watch.

# 14-4295

## United States Court of Appeals
## for the Second Circuit



UNITED STATES OF AMERICA,

*Appellee,*

v.

JOSEPH VINCENT JENKINS, AKA SEALED DEFENDANT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## APPELLANT'S APPENDIX
## VOLUME II OF IV (Pages A301-A600)

DANIEL DEMARIA, ESQ.
MERCHANT LAW GROUP LLP
*Attorneys for Defendant-Appellant*
26 Broadway, 21st Floor
New York, New York 10004
(212) 658-1455

STEVEN DAVID CLYMER
ASSISTANT U.S. ATTORNEY
UNITED STATES ATTORNEY'S
OFFICE FOR THE NORTHERN
DISTRICT OF NEW YORK
*Attorney for Appellee*
100 South Clinton Street
Syracuse, New York 13261
(315) 448-0672

# TABLE OF CONTENTS

*Pages*

District Court Docket Sheet ................................................................................ A1-A29

Indictment, dated December 21, 2011 ............................................................ A30-A33

Search and Seizure Warrant, dated July 6, 2011, with
Affidavit in Support of Special Agent Chad J. Willard .................................. A34-A61

Decision and Order of the Hon. Glenn T. Suddaby, dated
August 24, 2012 ............................................................................................... A62-A73

Decision and Order of the Hon. Glenn T. Suddaby, dated
August 7, 2013 ................................................................................................. A74-A76

Decision and Order of the Hon. Glenn T. Suddaby, dated
December 12, 2013 .......................................................................................... A77-A84

Transcript of Pretrial Conference, held on April 25, 2013 ........................... A85-A100

Transcript of Pretrial Conference, held on January 21,
2014 ............................................................................................................. A101-A125

Trial Transcript, held on February 3, 2014 ................................................. A126-A163

Trial Transcript, held on February 4, 2014 ................................................. A164-A438

Trial Transcript, held on February 5, 2014 ................................................. A439-A684

Trial Transcript, held on February 6, 2014 ................................................. A685-A797

Letter from Joseph Jenkins, dated September 21, 2014.............................. A798-A831

i

*Pages*

Sentencing Transcript, held on November 12, 2014....................................A832-A873

Judgment Appealed From, dated November 12, 2014 ...............................A874-A879

Notice of Appeal, dated November 14, 2014........................................................ A880

Sentencing Memorandum Exhibits (Documents Filed
Under Seal and submitted simultaneously with filing of
Appellant's Appendix)...............................................................................A881-A920

Presentence Investigation Report, revised May 20, 2014
(Documents Filed Under Seal and submitted
simultaneously with filing of Appellant's Appendix) .................................A921-A938

ii

Case 5:14-cr-00088-EAW Document 76-20 Filed 04/12/16 Page 308 of 890
A301
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 138 of 275

Jarret Johnston – Redirect                         273

```
1    Okay.  Have a good lunch hour and we'll see you at 1:00.

2                   (Jury Excused, 11:59 a.m.)

3              THE COURT:  Okay, enjoy your lunch break, please be

4    back here ready to start at 1:00.

5              MR. GOLDSMITH:  Thank you.

6              THE COURT:  Thank you.

7              THE CLERK:  Court's in recess.

8                   (Luncheon recess, 11:59 a.m. to 1:00 p.m.)

9                   (Open Court, Jury Out.)

10             THE COURT:  We all set?

11             MS. CARROLL:  We are.

12             THE COURT:  Defense counsel good to go,

13   government's ready?

14             MS. CARROLL:  Yes, your Honor.

15             THE COURT:  Okay.  Bring the jury in, please.

16                  (Jury Present, 1:00 p.m.)

17             THE COURT:  Okay.  The record should reflect we

18   have the ladies and gentlemen of the jury, hopefully you had

19   a great lunch, refreshed, nourished, ready to go.  We have

20   defendant, defense counsel.  Government, please call your

21   next witness.

22             MS. CARROLL:  Your Honor, the government calls

23   Marie-Josee Vinette.

24             THE CLERK:  Good morning -- or afternoon.  Can you

25   state your full name and spell it for the record.
```

Marie-Josee Vinette - Direct                    274

1          THE WITNESS:  It's M-a-r-i-e, hyphen, J-o-s-e-e,

2    Vinette, V-i-n-e-t-t-e.

3

4          M A R I E - J O S E E   V I N E T T E ,

5    called as a witness and being duly sworn, testifies

6    as follows:

7          <u>DIRECT EXAMINATION BY MS. CARROLL:</u>

8    Q     Good afternoon, Investigator Vinette.

9    A     Good afternoon.

10   Q     Where do you work?

11   A     I work for the Canada Border Services Agency located in

12   Ottawa.

13   Q     What is your position there?

14   A     I work as a criminal investigator.

15   Q     How long have you been a criminal investigator with the

16   Canada Border Services Agency?

17   A     Since September 2004.

18   Q     What are your duties as a criminal investigator?

19   A     I respond to the port of entries whenever there's an

20   incident that occurs that requires more than just a civil

21   sanction, then they'll call in an investigator to review the

22   case.

23   Q     How do you participate in the prosecution process in

24   Canada?

25   A     I, um, take all of the evidence and the notes they will

Marie-Josee Vinette - Direct                          275

1    say and I present a Crown brief to the Crown prosecutor.

2    Q     Are you ever called upon to testify?

3    A     I am.

4    Q     Were you on duty on May 24th, 2009?

5    A     I was on standby duty.

6    Q     What is standby duty?

7    A     Criminal investigators work -- are day workers,

8    however, our ports are open 24 hours a day; therefore,

9    there's an investigator that rotates through with a pager at

10   that time, so that if something does occur, that you're

11   available to respond at any time.

12   Q     Did you receive any duty calls on May 24th, 2009?

13   A     I did, that morning I did.

14   Q     Where did you receive a duty call from?

15   A     I received a call from the Port of Lansdowne.

16   Q     And what did you do in response to that call?

17   A     I attended to the Port of Lansdowne.

18   Q     About what time did you arrive?

19   A     1340.

20   Q     What did you do once you got there?

21   A     I spoke to all the officers that had been involved in

22   the case up until the time I got there.

23   Q     Who did you speak to?

24   A     I spoke with Pedro Sousa-Dias, Melany Boyd, Glen Hache,

25   Jarret Johnston, and Tristan Garrah.

Marie-Josee Vinette - Direct

276

1   Q      As a result of those conversations, what did you do?

2   A      Well, I was advised that the subject had been arrested

3   for possession of child pornography, therefore I asked to

4   view the video for which he had been arrested.

5   Q      I'm handing you Government's Exhibit 4A.  Do you

6   recognize that exhibit?

7   A      I do.

8   Q      What is it?

9   A      Well, it's the three USB drives.  The one I viewed was

10  the one that had 8 gigabytes.

11  Q      Do you recognize that 8-gigabyte USB?

12  A      I do.

13  Q      Does it appear to be in the same condition it was in

14  when you viewed videos on it on May 24th, 2009?

15  A      Yes.

16  Q      How many videos did you view on the 8-gigabyte USB

17  stick?

18  A      Six.

19  Q      How did you select the videos that you were going to

20  view?

21  A      They were just in a thumbnail and the first one was the

22  one for which he had been arrested and I just continued to

23  sample a few more to ensure that we met our threshold.

24  Q      Could you describe the video that led to the

25  defendant's arrest?

Case 5:14-cr-00088-EAW Document 76-11/10-20 Filed 04/12/16 Page 312 of 890
A305
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 142 of 275

Marie-Josee Vinette - Direct

1    A    I'll refer to it as the 9-year-old Vicky, it was of a

2    young prepubescent girl, she was wearing, at the beginning of

3    the video she was wearing a tank top with a skirt and black

4    stockings.  As she's being filmed, it appears she's being

5    instructed to twirl and then to undress, she undresses except

6    for the black stockings.  She has no development, no breast

7    development, no hip development, no pubic hair, and she

8    approaches whoever's filming her and proceeds to perform oral

9    sex.

10   Q    I'm handing you Government's Exhibit 4G.  Do you

11   recognize 4G?

12   A    I do.

13   Q    What is it?

14   A    It's the video that I viewed yesterday.

15   Q    Do your initials appear on Government's 4G?

16   A    On the right-hand corner they do.

17   Q    Did you make those initials on 4G?

18   A    I did.

19   Q    Is there a date?

20   A    February 3rd, 2014.

21   Q    Did you view the contents of the video on 4G on the

22   date that's listed on that disk?

23   A    Yes.

24   Q    What was the video you viewed on 4G?

25   A    The 9-year-old Vicky video that I had seen on the day

Marie-Josee Vinette - Direct

278

1   of the arrest.

2   Q    Was that video the same video that you watched on

3   May 24th, 2009?

4   A    It was.

5   Q    You said that you watched other videos; what was the

6   second video you saw on the 8-gigabyte USB drive?

7   A    It was a video, there was a text marking on it that

8   said Sun Dolls, it was of a young girl in a shower, she had

9   no pubic hair but she had some budding of the breasts.

10  Q    What was the next video you saw?

11  A    There was a text marking LS Magazine, female appeared

12  to be under 18 but she did have some development.

13  Q    And the next video?

14  A    The next three videos referred to as BD.  The first one

15  was two young females, one had no development, the other one

16  had some development, and the one with no development was

17  film -- was taking pictures of the other female.

18        The fifth video was, I referred to it as

19  9-year-old Marina, it was a prepubescent girl in a state of

20  undress who was posing, and the sixth video was also a BD

21  video, and it was a young prepubescent girl, she had no

22  development, and she's also posing and at times the video was

23  focusing specifically on her genitalia.

24  Q    When you say BD or LS Magazine, are you referring to

25  file names?

Case 5:14-cr-00088-EAW Document 78 Filed 01/12/16 Page 314 of 890
A307
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 144 of 275

Marie-Josee Vinette - Direct

279

1    A    I'm referring to a marking, a text marking on the video

2    itself, not the file.

3    Q    How did you go about accessing the videos when you were

4    viewing them?

5    A    Just by clicking on the thumbnail.

6    Q    After you finished viewing the videos, what did you do?

7    A    I just scrolled down through, through the other

8    thumbnails and noticed they were -- they appeared to be all

9    of the same range as what I had just seen, and I stopped

10   viewing.

11   Q    What do you mean by range that you had just seen?

12   A    Well, it all seemed like teenagers or prepubescent

13   girls.

14   Q    What action did you take after you finished reviewing

15   the images and videos?

16   A    I went to speak with Mr. Jenkins.

17   Q    Where did that conversation take place?

18   A    In an interview room, a small interview room.

19   Q    Was that at the border services office, Port of

20   Lansdowne?

21   A    Yes, it was.

22   Q    About what time did you go speak to the defendant?

23   A    I can't recall specifically.  I viewed the video around

24   3:00 so shortly thereafter, within the hour, I would guess.

25   Q    What happened when you went to talk to the --

Case 5:14-cr-00088-EAW Document 75 Filed 01/12/16 Page 315 of 890
A308
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 145 of 275

Marie-Josee Vinette - Direct

1    A    Identified myself to Mr. Jenkins, I asked him if he

2    knew what child pornography was, he stated that he did, and I

3    advised him that we had found child pornography on some of

4    his media device that was found in his truck.  And you know,

5    I explained the process, that he would be taken to a local

6    jail and appearing before a justice of the peace in the

7    morning.

8    Q    How did the defendant respond?

9    A    He didn't.  He remained silent.  He seemed to be

10   pondering what it is I had just told him and he appeared

11   somewhat flushed and he asked me if he could call his mother

12   or his father, so I placed the call and allowed him to speak

13   to his mother.

14   Q    Did that conclude your interview with the defendant?

15   A    It did.

16   Q    Did you have any other interactions or conversations

17   with him on May 24th?

18   A    No.  Not that I recall.

19   Q    When was the next time you saw the defendant?

20   A    On September 13th.  No, actually he appeared for a bail

21   hearing the next day, saw him in court that day.

22   Q    After the bail hearing, when was the next time you saw

23   him?

24   A    On September 13th, 2010.

25   Q    Where did you see the defendant then?

Case 5:14-cr-00068-EAW Document 70 Filed 01/12/16 Page 316 of 890
A309
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 146 of 275

Marie-Josee Vinette - Direct                    281

1    A    In the Brockville courthouse, he was scheduled for a

2    trial.

3    Q    Why were you at the Brockville courthouse?

4    A    In order to testify.

5    Q    Did the trial proceed on September 13th?

6    A    No, it did not.

7    Q    Why not?

8    A    Mr. Jenkins' defense lawyer had brought forward a

9    motion for unreasonable delay so that motion was heard by the

10   judge that day.

11   Q    Did you see the defendant any point after

12   September 13th, 2010?

13   A    No, I did not.

14   Q    Did you make any other further appearances at the

15   Brockville courthouse in connection with this case?

16   A    On October 18th, 2010, the date of the trial --

17   actually I went on September 17th when Judge Waugh rendered

18   his decision and he placed it to trial for October 18th, 2010

19   which I attended.

20   Q    Was the defendant present at the courthouse on

21   October 18th, 2010?

22   A    No, he was not.

23   Q    Did the trial proceed as it was scheduled to do so?

24   A    No.

25   Q    What happened?

Marie-Josee Vinette - Direct                                    282

1   A    The judge rendered his reasoning for dismissing the

2   motion and then issued a bench warrant.

3   Q    I'm handing you what's been marked as Government's

4   Exhibit 16.  Could you identify what Government's Exhibit 16

5   is?

6   A    It's a warrant for arrest, a bench warrant.

7   Q    And is that a fair and accurate copy of the bench

8   warrant that was issued on that day?

9   A    It is.

10          MS. CARROLL:  Your Honor, move to admit

11  Government's Exhibit 16.

12          THE COURT:  Any objection?

13          MR. GOLDSMITH:  Brief voir dire, your Honor?

14          THE COURT:  Go ahead.

15      VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

16  Q    Investigator Vinette, you describe this document as a

17  bench warrant, is that correct?

18  A    Correct.

19  Q    Is this prior -- withdrawn.  Prior to today, when was

20  the last time you saw it?

21  A    I don't recall.

22  Q    Did you author this document at all?

23  A    No.

24  Q    Were you there when it was issued by any court?

25  A    Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Marie-Josee Vinette - Direct

283

1    Q     Is it your job to be the custodian of this document as

2    part of your roles and responsibilities?

3    A     No, it's not.

4    Q     And again, you say you have no idea or you don't recall

5    when the last time was you saw this document?

6    A     I don't recall if I saw the document.  I know the

7    document was issued on that day in court.

8    Q     Is there any markings on it -- withdrawn.  Did you see

9    this document when it was issued that day in court?

10   A     No.

11   Q     Is there any markings on the document that would

12   indicate to you that it is a -- that it is an official

13   document that's kept in the ordinary course of business of

14   the courts?

15   A     Can you repeat the question.

16   Q     Is there any markings on the document that would

17   indicate to you that this is an official document that is

18   kept in the ordinary course of business within the court

19   system?

20   A     No, I'm unfamiliar, the CBSA does not deal with the ...

21              MR. GOLDSMITH:  I object to the admission, your

22   Honor.

23              THE COURT:  Sustained.

24              MS. CARROLL:  Your Honor, may I ask some additional

25   foundational questions?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00068-EAW Document 120 Filed 01/12/16 Page 319 of 890
A312
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 149 of 275

Marie-Josee Vinette - Direct

284

```
 1          THE COURT:  Go ahead.

 2          CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

 3    Q     Investigator Vinette, if you remove that document from

 4    the plastic sleeve it's contained in, is there a raised seal

 5    on that document?

 6    A     There is.

 7    Q     Are you able to read any text that appears on the

 8    raised seal?

 9    A     Ontario Court of Justice.  (Speaking French).  It's in

10    French.

11    Q     Is there red text that appears on top of the raised

12    seal?

13    A     Yes.

14    Q     What does the red text say?

15    A     "Certified to be a true and correct copy of the

16    original."

17    Q     Is that -- go ahead.

18    A     Sorry.  Clerk of the Court, Ontario Court of Justice.

19    Q     Is there a signature on the red text?

20    A     There is.

21    Q     Is there a date attached to that signature?

22    A     There is.

23    Q     What is the date attached to the signature?

24    A     January 29th, 2014.

25    Q     And is there a serial number at the top of the document
```

Case 5:14-cr-00068-EAW Document 78 Filed 01/12/16 Page 320 of 890
A313
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 150 of 275

285

1   under the language modified form?

2   A    There's a case file number.

3   Q    Have you ever seen bench warrants, or warrants issued

4   by a court?

5   A    Yes.

6   Q    Does this appear to be in the same format of the

7   warrants that you've seen previously?

8   A    Yes.

9   Q    Does it appear to contain the same language and the

10  same contents of the warrants you previously viewed?

11  A    It does.

12          MS. CARROLL:  Your Honor, we would submit this as a

13  self-authenticating public record.

14          THE COURT:  Why don't you -- why don't you come on

15  up here with defense counsel, retrieve the document, I'd like

16  to see it, please.

17              (At Side Bar.)

18          THE COURT:  So your submission now is that it's

19  self authenticating based on the raised seal and it's a

20  certified copy of a court document?

21          MS. CARROLL:  That's correct, your Honor.

22          THE COURT:  You want to be heard?  You want to see

23  it?

24          MR. GOLDSMITH:  I have my copy, it doesn't have the

25  raised seal on it, is there -- have any information, it's

Marie-Josee Vinette - Direct

1    only dated a few days ago, who got it, who brought it down,

2    how it came down here?

3           MS. THOMSON:  That really wouldn't go towards

4    admissibility, but certainly --

5           THE COURT:  It wouldn't, but go ahead, go ahead and

6    answer the question if you can.

7           MS. THOMSON:  We do have a witness that retrieved

8    it.

9           THE COURT:  Okay, but when was it retrieved and who

10   brought it down?

11          MS. CARROLL:  It was retrieved the day that it was

12   dated, it was retrieved on January 29th of this year.

13          THE COURT:  Okay.

14          MS. CARROLL:  And it was retrieved by Investigator

15   Kip Wohlert.

16          THE COURT:  With what agency?

17          MS. CARROLL:  He's with Ontario Provincial Police.

18          THE COURT:  You expect him to testify?

19          MS. CARROLL:  We do.

20          THE COURT:  Okay.  Well, any other further

21   objection?  I mean based on the submission as a

22   self-authenticating document.

23          MR. GOLDSMITH:  Based on self-authenticating, no.

24          THE COURT:  Okay.

25          MR. GOLDSMITH:  But I mean, it's -- I don't know, I

Marie-Josee Vinette - Direct

1    think if Mr. Wohlert's going to come in, it might be a

2    cleaner record if he testifies he brought it down.

3           MS. CARROLL:  I think the government would be happy

4    to have it admitted subject to further testimony by

5    Investigator Wohlert.

6           THE COURT:  I don't know that it's necessary, quite

7    honestly, because if you had offered it as a

8    self-authenticating document without laying out the record

9    about the raised seal and certified copy, my ruling probably

10   would have been different, but now that you've done that, I'm

11   going to admit the document at this time and then if you want

12   to have the investigator talk about it when he comes in, he

13   can do that.

14          MR. GOLDSMITH:  Okay, thank you.

15          THE COURT:  All right.  Thank you.

16              (Open Court.)

17          THE COURT:  I guess you don't like my music, either

18   that or you don't want to dance in public.

19          The document's going to be received, you may

20   continue your examination, go ahead.

21   Q    Investigator Vinette, could you please read to the

22   jury -- you can go ahead and publish 19 -- the caption that

23   begins, "This warrant is issued for the arrest of," at the

24   top of the document here.

25   A    "This warrant is issued for the arrest of Joseph

Marie-Josee Vinette - Direct

288

1   Vincent Jenkins."

2           MR. GOLDSMITH:  Objection, your Honor, document

3   speaks for itself.

4           THE COURT:  No, she can use it with the witness,

5   it's in evidence.  Go ahead.

6   A     Date of birth, 22 January 1970.

7   Q     And beginning with, "Whereas the accused," can you read

8   that paragraph?

9   A     "Whereas the accused has been charged that he, on or

10  about the 24th of May, 2009, at the customs port of entry of

11  Lansdowne in the said region."

12  Q     And what are the numbered and lettered sections that

13  appear on the lines below that text?

14  A     Section 163.1, subsection 3 of the Criminal Code of

15  Canada, Section 163.1, subsection 4 of the Criminal Code of

16  Canada, Section 160 times 2 of the Customs Act, and Section

17  160.1 of the Customs Act.

18  Q     If you know, what do those provisions govern, what kind

19  of offenses are outlined there?  Do they relate to the

20  possession of child pornography?

21  A     Possession under the Criminal Code, Customs Act,

22  failure to report possession and smuggling.

23  Q     And if you could look at the paragraph that begins,

24  "And whereas," and the checked paragraph at the bottom, could

25  you read that, please?

Case 5:14-cr-00088-EAW Document 120-1 Filed 01/12/16 Page 324 of 890
A317
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 154 of 275

Marie-Josee Vinette - Cross

289

1    A    "Subsection J, failed to attend court on October 18th,
2    2010 at 10 a.m. in courtroom number 3 at 41 Courthouse
3    Square, Brockville, Ontario, case 6V7N3 for his trial."
4    Q    And what is the date that appears at the bottom of the
5    document, handwritten?
6    A    The 18th day of October, 2010.
7    Q    Was that the day that you were at the Brockville
8    Courthouse to testify against the defendant?
9    A    It was.
10   Q    And was that testimony going to relate to your
11   investigation into possession the defendant was found to have
12   at the Port of Lansdowne?
13   A    It was.
14        MS. CARROLL:  No further questions.
15        THE COURT:  Cross-examination.
16        CROSS-EXAMINATION BY MR. GOLDSMITH:
17   Q    Officer Vinette, or is it Vinette?
18   A    Vinette.
19   Q    Vinette.  On May 24th of '09, you responded to a call
20   to the port of entry at Lansdowne, correct?
21   A    Correct.
22   Q    And at that time you spoke with several of the officers
23   that had conducted an inspection of a vehicle, correct?
24   A    Correct.
25   Q    As part of your investigation, you also reviewed

Case 5:14-cr-00088-EAW Document 70 filed 01/12/16 Page 325 of 890

Marie-Josee Vinette - Cross

290

1    certain evidence -- withdrawn.  Reviewed certain files within

2    an 8-gigabyte hard drive, correct?

3    A    USB stick, yes.

4    Q    Flash drive, I'm sorry.  And you only confined your

5    search or your review to that 8-gigabyte flash drive,

6    correct?

7    A    Correct.

8    Q    You didn't review anything on the desktop, correct?

9    A    No, I did not.

10   Q    Didn't search the laptop itself, correct?

11   A    No, I did not.

12   Q    You're aware there was a second laptop?

13   A    Correct.

14   Q    All right.  You didn't look into any of the contents of

15   the hard drive of the second laptop, correct?

16   A    I did not.

17   Q    Didn't review any of the contents of two additional

18   flash drives that had been recovered that morning, correct?

19   A    Correct.

20   Q    Only confined to one 8-gigabyte flash drive, correct?

21   A    That's correct.

22   Q    Now you said that at one point, after reviewing a

23   couple of -- withdrawn.  After reviewing about five or six

24   videos, you then approached Mr. Jenkins, is that correct?

25   A    That's right.

Marie-Josee Vinette - Cross                              291

1   Q    At that point, you notified him he was going to be
2   under arrest?
3   A    He was already under arrest, I read him a secondary
4   warning.
5   Q    And when you -- by that secondary warning, you advised
6   him of his right to have an attorney?
7   A    Secondary warning is when somebody's already been
8   arrested, if he comes into contact with any other officers,
9   it's just to remind him of his right to remain silent, that
10   he doesn't have to speak if he doesn't wish to make any
11   statements.
12   Q    And when you issued that secondary warning to him about
13   his right to remain silent, he didn't make any comments to
14   you about the case itself, correct?
15   A    No.
16   Q    And you informed him that he was under arrest for
17   possession of child pornography, correct?
18   A    Correct.
19   Q    You informed him that you found child pornography or
20   what you believed to be child pornography on the flash drive,
21   correct?
22   A    I stated on the media device.
23   Q    Okay.  And in response to that, you testified earlier
24   that he appeared to be pondering what you told him, right, so
25   he didn't have any sort of an outburst?

Marie-Josee Vinette - Cross                                    292

```
 1    A     No, he did not.

 2    Q     He didn't ask to have a lawyer present with him once

 3    you stated that?

 4    A     No, he did not.

 5    Q     He seemed to really be thinking about what you told

 6    him?

 7    A     Correct.

 8    Q     At that point you later said he asked to call his

 9    mother, right?

10    A     His mother or his father.

11    Q     And you were aware at the time based upon the

12    investigation that his destination was at his parents'

13    cottage?

14    A     Yes, I was.

15    Q     He made no other comments to you at all, correct?

16    A     No.

17    Q     You said that you had also followed up with the court

18    appearance the following day, is that it?

19    A     Correct.

20    Q     That was a bail hearing?

21    A     It was.

22    Q     Was he issued bail?

23    A     The next day he was.  Or --

24    Q     Sorry?

25    A     If I remember correctly it was $10,000 bail so they're
```

Marie-Josee Vinette - Cross                    293

1    not released, person under custody isn't released until the

2    money arrives.

3    Q     Are you aware if he was released?

4    A     Not on that day.

5    Q     Eventually?

6    A     Yes, yes.

7    Q     As part of your duties, did you have any other contact

8    with the CBSA officers that had conducted the initial search

9    of the vehicle, laptop and flash drives?

10   A     No.

11   Q     Did you have contact with any other law enforcement

12   personnel?

13   A     Yes.

14   Q     Did you have contact with the United States law

15   enforcement personnel?

16   A     No.

17   Q     On May 25th of 2009, you didn't have any contact with

18   law enforcement personnel in the United States?

19   A     Not that I recall.

20   Q     You didn't have any contact with any law enforcement

21   personnel in Canada?

22   A     On the 25th?

23   Q     25th of 2009.

24   A     No.

25   Q     Once the arrest had taken place, did you take

Case 5:14-cr-00068-EAW Document 202 Filed 01/12/16 Page 329 of 890

Marie-Josee Vinette - Cross

294

1   possession of any of the physical evidence?

2   A     They were locked into the Queen's warehouse, located at

3   the Port of Lansdowne.

4   Q     Did you perform that locking activity or no?

5   A     I went with the goods into the lockup.

6   Q     So you witnessed it but you didn't actually perform it?

7   A     No.

8             THE COURT:  No, you didn't actually perform it, or

9   no, you didn't witness it, which is it?  I want the record to

10  be clear, what did you do?

11            THE WITNESS:  I -- the items were itemized and

12  myself and Tristan with the superintendent on duty, I don't

13  recall who that was, went upstairs to the Queen's warehouse

14  because the superintendent on duty is the one who has access

15  to that room.

16  Q     Okay.  So Mr. Jenkins was already under arrest at the

17  time you arrived, is that correct?

18  A     Yes, that's correct.

19  Q     And as part of your investigative duties, did you have

20  to contact or seek further guidance from any other law

21  enforcement personnel within Canada?

22  A     I did advise the Ontario Provincial Police.

23  Q     Did you have to seek any information from any

24  particular investigative units at the time?

25  A     I'm sorry, could you repeat the question?

Marie-Josee Vinette - Cross

295

1   Q    Sure.  Did you have to seek any guidance from any

2   additional investigative departments or units on May 24th of

3   2009?

4   A    I spoke with Sergeant Terry Paton from the Ontario

5   Provincial Police.  As far as guidance, I mean we work in

6   conjunction with one another, so we discussed the case and

7   what would be the next steps.

8   Q    That didn't change the course of action that you were

9   going to take that day in any way?

10  A    No.

11  Q    Again, you weren't present for the actual removal of

12  the articles from the truck, correct?

13  A    No.

14  Q    As part of your education and training within the

15  Ontario Province Police, have you been given any computer

16  forensics training?

17  A    No, I have not.

18  Q    Have you received any training regarding computer

19  sciences?

20  A    No.

21  Q    Are you aware of the I See What You See program?

22  A    I've never used it.  That's the port that would deal

23  with that.  I'm aware that it's out at the ports.

24  Q    Are you aware if the program had been installed or

25  running at the time that you were reviewing the files on the

Marie-Josee Vinette - Redirect                        296

1    laptop computer -- I'm sorry, withdrawn.  On the 8-gigabyte

2    hard drive?

3    A    It was not.

4    Q    And you're aware it was not running at the time that

5    you were reviewing the materials?

6    A    Correct.

7    Q    Are you aware of any effects that your review of the

8    files or any other officer's review of the files at the Port

9    of Lansdowne that day may have had on the files themselves?

10   A    No.

11              MR. GOLDSMITH:  No further questions.

12              THE COURT:  Any redirect?

13       REDIRECT EXAMINATION BY MS. CARROLL:

14   Q    Investigator Vinette, during your review of the

15   8-gigabyte hard drive, did you create any videos containing

16   child pornography?

17   A    No, I did not.

18   Q    Did you create any image files containing child

19   pornography?

20   A    No, I did not.

21   Q    Did you create any files of any kind other than those

22   you were reviewing?

23   A    No, I did not.

24   Q    And you didn't create the files you were viewing,

25   right?

Laurie Sheridan - Direct                              297

```
1    A      No.

2    Q      You were just viewing them on the 8-gigabyte hard

3    drive?

4    A      Correct.

5              MS. CARROLL:  That's all.

6              THE COURT:  Anything further based upon that

7    redirect?

8              MR. GOLDSMITH:  No, your Honor.

9              THE COURT:  You may step down.  Thank you.

10                 (The witness was excused.)

11             THE COURT:  Next witness, please.

12             MS. CARROLL:  Your Honor, the government calls

13   Laurie Sheridan.

14             THE CLERK:  State your full name and spell it for

15   the record, please.

16             THE WITNESS:  Laurie, L-a-u-r-i-e, Sheridan,

17   S-h-e-r-i-d-a-n.

18

19             L A U R I E   S H E R I D A N , called as

20   a witness and being duly sworn, testifies as

21   follows:

22

23             DIRECT EXAMINATION BY MS. CARROLL:

24   Q      Good afternoon, Ms. Sheridan.

25   A      Hello.
```

Laurie Sheridan – Direct                                    298

1    Q      Where do you work?

2    A      I work for New York State Department of Motor Vehicles.

3    Q      How long have you worked for the Department of Motor

4    Vehicles?

5    A      Almost 25 years.

6    Q      What's your position with the Department of Motor

7    Vehicles?

8    A      I'm a supervisor.

9    Q      Are you familiar with the process by which abstracts of

10   vehicle registration are maintained?

11   A      Yes.

12   Q      Are those records created and maintained in the regular

13   course of the Department of Motor Vehicles business?

14   A      Yes, they are.

15   Q      I'm handing you what's been marked for identification

16   as Government's Exhibit 11.  What is that record?

17   A      It's an abstract of a registration record.

18   Q      And does it have any insignia on it to indicate to you

19   that it was produced by the Department of Motor Vehicles?

20   A      It was, it has the state insignia and also signed by

21   the Commissioner.

22   Q      So is that an accurate copy of the record it contains?

23   A      It is.

24          MS. CARROLL:  Your Honor, move to admit

25   Government's Exhibit 11.

Laurie Sheridan – Direct

299

```
 1              THE COURT:  Counsel, any objection?

 2              MR. GOLDSMITH:  No objection.

 3              THE COURT:  It will be received.

 4    Q    Ms. Sheridan, could you describe for the jury what this

 5    record reflects; what information is contained here?

 6    A    It's the abstract of, you know, just like you would get

 7    if you were to register your car, it gives you the name of

 8    the registrant, the plate number, year, make, vehicle number.

 9    Q    What is the make and model of the vehicle identified on

10    this record?

11    A    It's a 2003 Dodge pickup truck.

12    Q    And what color is that Dodge pickup truck?

13    A    Blue.

14    Q    To whom is that vehicle registered?

15    A    Joseph V. Jenkins.

16    Q    What is indicated on this record about the license

17    plate of that blue Dodge pickup?

18    A    It did have a previous plate on it, would you like that

19    plate number?

20    Q    Yes, what was the plate number?

21    A    Okay, it was 19322JL, and then those same plates were

22    replaced with plate number 78367MA.

23    Q    So in 2009, what would the plate on this vehicle have

24    been?

25    A    It would have been the 19322JL.
```

Jeffrey Olear – Direct

1          MS. CARROLL:  No further questions.

2          MR. GOLDSMITH:  No questions.

3          THE COURT:  Thank you.  You may step down.

4               (The witness was excused.)

5          THE COURT:  Next witness, please.

6          MS. THOMSON:  Government calls Jeff Olear.

7          THE CLERK:  Good afternoon.  Can you please state

8    your full name, spell it for the record.

9          THE WITNESS:  Jeffrey Olear, J-e-f-f-r-e-y,

10   O-l-e-a-r.

11

12          J E F F R E Y   O L E A R , called as a

13   witness and being duly sworn, testifies as follows:

14          <u>DIRECT EXAMINATION BY MS. THOMSON:</u>

15   Q     Good afternoon.

16   A     Good afternoon.

17   Q     Could you please introduce yourself to the members of

18   the jury.

19   A     Yes.  My name is Jeff Olear, I'm VP of supply chain for

20   a company called PNY Technologies in Parsippany, New Jersey.

21   Q     What does PNY Technologies, what type of company is it?

22   A     We manufacture and distribute electronics computer

23   accessories to the retail market in the United States,

24   Canada, and North America and our world headquarters is in

25   Parsippany, New Jersey.

Jeffrey Olear – Direct                                301

1    Q      Does that include thumb drives?

2    A      Yes, it does.

3    Q      At this time -- your Honor, if I may approach the

4    witness and show him what's been previously marked as

5    Government's Exhibit 4A, 5A, and 6.  Just have you take a

6    look at what's contained in the exhibit that I've just

7    identified and can you tell me if you recognize what's inside

8    that bag?

9    A      Yes, I do.  These are PNY USB drives, also known as

10   thumb drives.

11   Q      Would that be thumb drives that PNY manufactured?

12   A      Yes.

13   Q      You indicated Parsippany, New Jersey I believe is where

14   you're located?

15   A      That's correct.

16   Q      Where does PNY manufacture its thumb drives?

17   A      Everything for U.S. and North American distribution is

18   manufactured and distributed out of our Parsippany,

19   New Jersey facility.

20   Q      Are there any -- are any of those items manufactured

21   elsewhere?

22   A      Not these, no.

23   Q      So those would have been manufactured in New Jersey?

24   A      Yes.

25   Q      Do you have any manufacturing plants or locations in

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Jeffrey Olear – Cross                    302

1    the state of New York?

2    A     No, we do not.

3    Q     How long have you been with the company?

4    A     Nineteen years.

5    Q     Have you ever had a location in New York?

6    A     No.

7              MS. THOMSON:  I have no further questions.

8              THE COURT:  Any cross-examination?

9              MR. GOLDSMITH:  Very brief.

10             CROSS-EXAMINATION BY MR. GOLDSMITH:

11   Q     Mr. Olear, take a look at 4A, 5A, and 6 if you have

12   them in front of you.  Those objects, they appear in

13   substantially the same condition as those objects might leave

14   the PNY manufacturing facility?

15   A     Yes.

16   Q     Any way to look at them to see if they're damaged from

17   the outside?

18   A     They don't appear to be.

19   Q     Any way to determine just by viewing them who or how

20   many people may have used them?

21   A     Not that I can tell, no.

22             MR. GOLDSMITH:  No further questions.

23             THE COURT:  Anything else?

24             MS. THOMSON:  No, your Honor.

25             THE COURT:  Thank you, sir, you may step down.

Michel Boulay - Direct                              303

1              (The witness was excused.)

2              MS. THOMSON:  If I can retrieve the exhibit.  The

3      government calls its next witness, Kip Wohlert.

4              We're going to switch.  We'll call Michel Boulay.

5              THE CLERK:  State your full name and spell it for

6      the record.

7              THE WITNESS:  First name Michel, M-i-c-h-e-l, last

8      name Boulay, B like Bob, o-u-l-a-y.

9

10             M I C H E L   B O U L A Y , called as a

11      witness and being duly sworn, testifies as follows:

12             <u>DIRECT EXAMINATION BY MS. CARROLL:</u>

13      Q      Good afternoon, Mr. Boulay.

14      A      Good afternoon.

15      Q      Where do you work?

16      A      I work for the Ontario Provincial Police, it's a large

17      police service in Ontario, Canada.

18      Q      How long have you worked there?

19      A      I've been a police officer for 25 years.

20      Q      What is your job title?

21      A      I'm a detective sergeant right now with the electronic

22      crime section.

23      Q      How long have you been assigned to the electronic crime

24      section?

25      A      Thirteen years.

Michel Boulay - Direct

304

1    Q      What are your duties as a detective sergeant with the

2    electronic crime section?

3    A      Duties, I'm a team leader so beside the administrative

4    duties of a team leader, I also have to make sure in terms of

5    evidence about the security, the continuity and integrity of

6    evidence.  I perform forensic examinations of the digital

7    evidence, that includes the acquisition, the imaging of the

8    evidence, also doing forensic analysis, and then I also

9    prepare forensic reports based on any examinations, and the

10   forensic reports are for disclosure and also for court

11   presentation.

12   Q      I'm handing you Government's Exhibit 13A.  Do you

13   recognize Government's 13A?

14   A      Yes, I do.

15   Q      What is it?

16   A      It's a property report.  When investigators bring

17   evidence to the electronic crime section, we prepare a

18   property report, that lists the property, and then I see my

19   signature as being the person that received it.

20   Q      What is the date that appears on the signature line for

21   you having received the evidence?

22   A      The date is the 18th of June, 2009.

23   Q      Is that an accurate copy of the property custody report

24   you prepared?

25   A      Yes, it is.

Michel Boulay - Direct

305

1    Q    And do you prepare that report as a regular part of

2    your duties with the Ontario Provincial Police?

3    A    Yes.

4              MS. CARROLL:  Your Honor, move to admit

5    Government's Exhibit 13A.

6              THE COURT:  Any objection?

7              MR. GOLDSMITH:  Brief voir dire.

8              THE COURT:  Go ahead.

9              VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

10   Q    Agent Boulay?

11   A    Yes.

12   Q    You said you received the document on -- or at least

13   that you signed it on June 18, 2009?

14   A    That's correct, yes.

15   Q    Did you possess the document prior to June 18th, 2009?

16   A    Well, the document was brought by another officer with

17   the evidence so I'm not sure when they brought the document

18   but I received the evidence on the 18th of June.

19   Q    Would you have any knowledge as to the status of the

20   evidence prior to June 18 of 2009?

21   A    No.

22   Q    But the document itself, that is your handwriting and

23   your signature at the bottom?

24   A    It's my signature, it's not my handwriting, it's

25   probably handwriting of whoever prepared it.

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 341 of 890
A334
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 171 of 275

Michel Boulay – Direct

1   Q     So where it indicates June 18 of '09, that is your

2   handwriting?

3   A     That line is my handwriting, all the way across

4   including my signature and then my designation, my rank,

5   badge number and then the fact that it's the E-crime section.

6   Q     Is this a copy that is true and accurate?

7   A     Yes, it is.

8   Q     It is not the original though?

9   A     No, the original, because it's so old, what we do after

10  a period of time is we scan the original and then we destroy

11  the original.

12  Q     All right.  So do you have any idea when the original

13  was destroyed?

14  A     This is 2009 so probably last year because our

15  government policy in Ontario, it's two years plus current

16  year you retain the original.  So this is 2009, you would

17  have 2010, 2011, and then any time in 2012 or after, you can

18  dispose of it.

19  Q     Did you ... once you received the items that are

20  included on this list, did you keep them in a particular area

21  associated with a method for safekeeping of evidence?

22  A     Well, I was the intake officer, at the time I was

23  receiving the evidence I would have been in my office and

24  then you can see there's certain numbers, we haven't covered

25  yet but any evidence coming to the electronic crime section,

Case 5:14-cr-00088-EAW Document 78 Filed 01/12/16 Page 342 of 890

Michel Boulay - Direct                                    307

1   we have evidence bar codes, bar codes just like a grocery

2   store, they're affixed to each piece of evidence and once

3   that's done, the evidence is moved to our vault and then the

4   evidence -- the bar codes are scanned, and then the shelf and

5   the vault where the evidence is placed is also scanned so

6   this way we have an idea at all times of where the evidence

7   is as well as who handled the evidence.

8   Q     And as far as you're aware from the review of this

9   document, you only received two laptop computers, three flash

10  drives, a camera with a digital card and a cell phone,

11  correct?

12  A     That's correct, yes.

13         MR. GOLDSMITH:  All right.  No further questions.

14  No objection to the document.

15         THE COURT:  Document will be received.

16         CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

17  Q     Detective Sergeant Boulay, I'm handing you Government's

18  Exhibits 4A, 5A, 6, 8, 3A, and 7.

19  A     Okay.

20  Q     Have you --

21         THE CLERK:  Say that again, please, I'm sorry.

22         MS. CARROLL:  8, 4A, 5A, 6, 3A, 7.

23  Q     Have you had an opportunity to previously review those

24  exhibits?

25  A     Yes, I did this morning.

Michel Boulay - Direct                           308

1   Q     Do those exhibits contain electronic media that's

2   reflected on the property custody sheet that's Exhibit 13A?

3   A     Yes, they do, and they still have the original bar

4   codes from our section.

5   Q     Could you explain to the jury about the bar codes?

6   A     The bar codes are just -- it's a piece of, a sticker

7   that we put on each piece of evidence and has a number of

8   lines just like a bar code again, grocery store when the

9   grocery store, they scan the items for at the cash register,

10  we have the same thing, the number and all the information we

11  need is on the bar code.  And then instead of writing it

12  manually, we just have a scanner so I would put -- once I

13  have the description entered of this piece of evidence, I

14  would scan that number, go in the vault and then each shelf

15  in the vault also has the bar code and I would scan it and

16  then it goes in our system that that piece of evidence is on

17  a certain shelf in our vault.

18  Q     Were you responsible for assigning the bar codes to the

19  evidence?

20  A     I put the bar codes myself, I scanned them and I put

21  the evidence in the vault.

22  Q     Are those bar code numbers reflected in the column on

23  the right side of Exhibit 13A, should be on your screen?

24  A     Yes, they are.

25  Q     And do those correspond to each of the items of media

Michel Boulay – Direct

1   that are reflected in the exhibits before you?

2   A     Yes, they do, and I would have written those numbers

3   myself as I processed the evidence.

4   Q     And based on your comparison of your property custody

5   sheet and the bar codes that appear on those government

6   exhibits, do they correspond?

7   A     Yes, they do.

8   Q     What happens once the evidence is assigned a bar code?

9   A     Then I enter the information about the description of

10  the evidence, where it was seized from, the original

11  location, and then I put the bar code number, I'll scan it

12  and I move it from my office to the vault, it's just in the

13  same -- in the same section, the same office, section of

14  where we are, and then I scan it inside the vault and then

15  put it on the shelf.

16  Q     If you look at the lower half of the Exhibit 13A, your

17  property custody form, could you read the text that's dated

18  June 18th, '09, and just the line across there, what does

19  that say?

20  A     Okay.  It says number 1, 2, 3, 4, and 5.  And that

21  corresponds with the numbers, the evidence were listed on

22  this property report as line number 1, line number 2, line

23  number 3, so at that point when I receive it, we don't have

24  the bar codes yet, so I'm telling the officer that I'm

25  receiving these five lines, these exhibits on those five

Michel Boulay - Direct

1    lines, I sign for them, as a receipt, and then I sign and

2    then put my badge number in the next line and the fact it's

3    from the E-crime section, and as I processed them after,

4    that's when I put our bar code evidence number next to it.

5    Q    Is that bar code assigned once the digital media is

6    taken to the forensic laboratory, is that the stage?

7    A    It's assigned at the time I receive it, so they're just

8    numerical sequence so the next piece of evidence that comes

9    would have the next number in line and then I just use them

10   one after another.

11   Q    You testified earlier that one of your functions with

12   the Ontario Provincial Police is that you work with the

13   imaging and examination of digital media?

14   A    That's correct.

15   Q    Are you familiar with the process by which digital

16   media is imaged and examined by OPP or Ontario Provincial

17   Police?

18   A    Yes, I am.

19   Q    How are you familiar with that process?

20   A    From training, I have been in that section for 13 years

21   so I have formal training in computer and then I also in

22   forensic examination of digital evidence, I have a number of

23   certifications from classes I've attended, certification

24   exams that I've passed.  I also have some formal

25   certification in -- as computer forensic examiner.

Michel Boulay – Direct                                    311

1    Q      Did you personally image and examine Government's

2    Exhibits 3A, 4A, 5A, 6, and 7?

3    A      These ones, no, another officer from our section did

4    the imaging.

5    Q      Does your section use a uniform set of policies and

6    procedures for imaging and examination?

7    A      Yes, we do.

8    Q      How are digital media items imaged?

9    A      What we do is, we never work off of the original piece

10   of evidence, any time you connect to a device, whether it's a

11   hard drive or other digital evidence, you end up changing

12   dates and time, information on the piece of evidence so what

13   we do is we use a device, it's called a write blocker, it

14   prevents us from writing to that device, and then we put that

15   between our equipment and the device that we're -- and by

16   device, again, I mean either a hard drive or it could be a

17   thumb drive, could be anything that's in a digital format.

18   So between our equipment, that device, we have a blocker, it

19   prevents us from writing to the original evidence.  And then

20   we make an exact copy.  In the digital world everything is in

21   a binary format, it's either 0 or 1, so we copy every 0 and

22   every 1 from the hard drive to another location, that becomes

23   our image, and then we work off of the image after, so we

24   never actually work off or touch the original evidence except

25   when it's time to image it to make a copy of it.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 347 of 890

Michel Boulay - Direct                                  312

1    Q    Why don't you work off the original evidence to do an

2    examination?

3    A    So you don't end up changing any of the information.

4    At that point we could give that piece of evidence to

5    somebody else, to another agency, another examiner and that

6    person would come up with the same result that we have.

7    Q    Does the imaging process itself change or in any way

8    alter or create data on the digital media devices?

9    A    No, not if it's done properly.

10   Q    Would any examination have been done of the digital

11   media that you checked into the property custody form or

12   would the examination have been done on the image?

13   A    The examination would have been done on the image.

14   Q    Is that the standard practice of the OPP?

15   A    It is the practice, yes, not just the OPP, of the

16   forensic world.

17        MS. CARROLL:  No further questions.

18        THE COURT:  Go ahead, Counsel.

19        MR. GOLDSMITH:  Thank you.

20   CROSS-EXAMINATION BY MR. GOLDSMITH:

21   Q    Officer Boulay, on June 18th of 2009, you received the

22   items that were listed on the voucher form, correct?

23   A    That's correct, yes.

24   Q    Do you recall who you received those items from?

25   A    Detective Constable Kip Wohlert of the child sexual

Michel Boulay - Cross                          313

1    exploitation section.

2    Q      And you were the intake officer that day, correct?

3    A      At that time, I was, yes.

4    Q      At the time that you received -- well, withdrawn.  Did

5    you have any contact with those items prior to June 18th of

6    2009?

7    A      I don't recall.  All I know is based on the property

8    report, that it was entered in our system and signed on the

9    18th of June.

10   Q      So, and again, based upon the report, would you have

11   had any contacts with those items prior to June 18th of

12   2000 --

13   A      No.

14   Q      Now you noted that there were several items in there;

15   do you recall if there were the bricks or the chargers for

16   those laptops included?

17   A      If they're not there, they would not have been

18   included, no.

19   Q      That would have been listed separately?

20   A      Yes, or at least as an attachment as part, they would

21   have listed the laptop and a charger or they would have been

22   put separately.

23   Q      Did you attempt to turn the laptops on when it was in

24   your presence?

25   A      No.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Michel Boulay – Cross                                          314

1    Q      Do you recall ever having attempted to turn the laptops
2    on?
3    A      No, I recall not attempting.
4    Q      Now you made a statement a few moments ago about the
5    use of getting images of the original equipment so you're not
6    working on the originals, correct?
7    A      It's a copy, it's not just the images, we copy the
8    entire content of the hard drive or the digital evidence to
9    another device.
10   Q      You call it a mirror image?
11   A      We can call it a mirror, it's not really mirror because
12   mirror would be the opposite but it's an exact copy.
13   Q      Are you familiar with any other terms that is used
14   other than just a copy?
15   A      Forensic copy, or ...
16   Q      Okay.  And you said that you and other forensic
17   investigators make that copy so that the original is not
18   altered, correct?
19   A      That's correct, yes.
20   Q      And you specifically testified that when you are
21   attempting to access those files, it can change the dates and
22   times that are recorded of that file, correct?
23   A      On the original one?
24   Q      Yes.
25   A      If you didn't have a write blocker device, yes.

Case 5:14-cr-00068-LEK Document 78 Filed 01/12/16 Page 350 of 890
A343
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 180 of 275

Michel Boulay - Cross

315

1   Q    And a write blocking device, is that a program that

2   will specifically be used so that nothing could be added or

3   deleted onto the original?

4   A    It's not a program, it's an actual physical device that

5   prevents communication to the original device.

6   Q    Okay.  Why don't you explain a little bit more then how

7   the write block works?

8   A    The write block, once you connect to an operating -- if

9   you use a Windows-based operating system which most people

10  use Microsoft Windows, any time you connect to a device, that

11  operating system will write to the device, it will change

12  dates and time.  Each file on a computer device, on a hard

13  drive or -- will have certain dates, certain times.  Any time

14  you access that file, you change the date, you change the

15  time.  So for us to keep it in the same state as it was at

16  the time it's seized from an accused or suspect, then you use

17  this physical box, it's a box that sits between that, we'll

18  take a hard drive, for example, between a hard drive and our

19  storage device.  And then what that box will do, it tricks

20  the device, it tricks the operating system as saying, okay,

21  when you communicate with me with that hard drive, it's not

22  really going to the hard drive, it's only going to that

23  device.  And those devices are tested of course once we get

24  them to make sure that they function.  The manufacturer will

25  say that they won't -- they won't write to whichever device

Michel Boulay – Cross                                    316

1    you're connected to, so we do test to make sure that it's a

2    fact, it's a statement, and then we use them after.

3    Q    And but for the use of one of those write block pieces

4    of equipment, then if you went in and you accessed a file,

5    then the computer operating software would automatically

6    change some of the dates and times coded onto that file?

7    A    If you didn't use a write blocker?

8    Q    Yes.

9    A    Yes.

10   Q    Okay.

11   A    Now once we have -- once we work off of the image, then

12   it doesn't matter how many times you access it, you don't

13   change any dates or times after.

14   Q    Right, but when you're working with the original, if

15   you don't have the write block software engaged, I'm sorry,

16   the write block equipment engaged, then it could change the

17   dates and times encoded onto the files?

18   A    Certain files, yes.

19   Q    And it's not, as you stated it's not a piece of

20   software that you upload into the original?

21   A    No, it's an actual physical device.

22        MR. GOLDSMITH:  Thank you, no further questions.

23        THE COURT:  Redirect.

24        REDIRECT EXAMINATION BY MS. CARROLL:

25   Q    Detective Sergeant Boulay, if a user opens a video file

Michel Boulay - Redirect/Recross                           317

```
1    without using write block software or write block hardware,

2    will anything other than the date accessed be altered if the

3    user takes no further steps beyond opening the file?

4    A    Well, you definitely have the last access time would be

5    changed, but no, if you don't change the size of the file,

6    nothing else would be changed.

7    Q    So the video itself would remain unaltered just by

8    opening it?

9    A    That's right, you can view it as many times as you

10   want, it's not going to change the video or the picture.

11   Q    Is the same thing true for images that are not videos?

12   A    Yes.

13        MS. CARROLL:  No further questions.

14        MR. GOLDSMITH:  One question.  I mean one.

15        RECROSS-EXAMINATION BY MR. GOLDSMITH:

16   Q    Officer Boulay, if you access that file without the use

17   of the write block equipment, will it accumulate to cache?

18   A    Accumulate to cache.

19   Q    Will there be a notation in the cache of the computer

20   that it had been accessed?

21   A    Probably not likely today because there's so much

22   memory, the RAM memory, the Random Access Memory in your

23   computer would basically buffer, wouldn't have to, it

24   wouldn't get cached on the actual computer on the hard drive.

25   Q    Same in 2009?
```

Michel Boulay - Recross                                    318

1   A      2009 is still fairly recent computers, we're talking

2   like a long time ago when there was so little RAM in the

3   computer, lots of stuff have to be cached to hard drive

4   because there wasn't enough RAM to contain the entire file,

5   but now you have so much RAM in the computer that you don't

6   need to cache information anymore.

7   Q      And other than the -- other than the intake on that

8   particular day, do you recall if you ran any forensic testing

9   on this equipment?

10  A      No, not at that time, another person did.

11             MR. GOLDSMITH:  Thank you.

12             THE COURT:  And the RAM is what?

13             THE WITNESS:  Random Access Memory.

14             THE COURT:  Random Access Memory, okay.

15             THE WITNESS:  It's the memory, your Honor, that

16  goes from the Central Processing, the CPU of the computer and

17  then anything from your hard drive gets cached to the RAM

18  first and then from the RAM to the CPU and back.

19             THE COURT:  Okay.  Thank you.  Any follow-up?

20             MS. CARROLL:  No, your Honor.

21             THE COURT:  I just wanted that explained.  Thank

22  you, you may step down.

23                   (The witness was excused.)

24             MS. CARROLL:  Your Honor, the government calls Paul

25  Thompson.

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 354 of 890
A347
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 184 of 275

Paul Thompson - Direct

319

 1          THE COURT:  Okay.

 2          THE CLERK:  Good afternoon.  Please state your full

 3     name and spell it for the record.

 4          THE WITNESS:  Paul Gerard Thompson,

 5     T-h-o-m-p-s-o-n.

 6

 7          P A U L   T H O M P S O N , called as a

 8     witness and being duly sworn, testifies as follows:

 9          DIRECT EXAMINATION BY MS. CARROLL:

10     Q    Good afternoon, Mr. Thompson.

11     A    Good afternoon.

12     Q    Where are you employed?

13     A    With the Ontario Provincial Police.

14     Q    How long have you been with the Ontario Provincial

15     Police?

16     A    Since June of 1996.

17     Q    What is your job title?

18     A    Detective sergeant.

19     Q    What are your duties as detective sergeant?

20     A    I'm one of a team that is in the child sexual

21     exploitation unit.  Our mandate is to investigate child

22     sexual abuse offenses including child pornography and child

23     luring offenses.

24     Q    How long have you been with the child exploitation

25     unit?

Case 5:14-cr-00068-EAW Document 70 Filed 01/12/16 Page 355 of 890

**A348**

Paul Thompson – Direct

320

1  A     I first started there in 1999.

2  Q     Is one of your responsibilities with the child

3  exploitation unit to maintain custody of evidence?

4  A     Yes, it is.

5  Q     Could we go ahead and publish 13A.  I'm handing you

6  Government's Exhibit 13A.  Do you recognize it?

7  A     Yes, I do.

8  Q     What is it?

9  A     This is a property report, it's official property

10  document, established by the Ontario Provincial Police to

11  record any property that comes into the custody of our police

12  department.

13  Q     Does this document reflect whether property ever came

14  into custody and was signed in by you?

15  A     I received -- when it first came into my custody was

16  the date indicated on the left side of the document beside my

17  signature, the 19th of April, 2010.

18  Q     Where was that property transferred from to come to

19  you?

20  A     Our offices are situated in OPP general headquarters

21  building in Ontario, it's in the same office building as the

22  forensic unit.  They're situated on the fourth floor and our

23  storage room is also on the fourth floor which is literally

24  down the hall a couple hundred feet, storage area.

25  Q     Prior to your testimony today, have you had the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Paul Thompson - Direct

1   opportunity to review the physical property that's reflected

2   on that custody sheet?

3   A     Yes, last evening I attended the offices here to review

4   some of these bags of evidence.

5   Q     I'm handing you Government's Exhibit 8.  Does

6   Government's Exhibit 8 appear on the property custody form?

7   A     Yes.

8   Q     What is Government's Exhibit 8 on the property custody

9   form?

10  A     Easiest identifier is the pink label from our

11  electronic crimes section with the number 6620, 006620 which

12  indicates number 3 on the list, Olympus camera and card.

13  Q     Handing you Government's Exhibits 4A, 5A, and 6.  Are

14  those reflected on the property custody receipt that you

15  signed for?

16  A     Yes, they are.

17  Q     And what are 4A, 5A, and 6?

18  A     They're referred to on here as jump drives, I call them

19  thumb drives but three thumb drives are contained in the bag

20  with the label.  006622.

21  Q     I'm handing you Government's Exhibit 3A, very heavy

22  laptop.  Does Government's Exhibit 3A appear anywhere on your

23  property custody sheet?

24  A     It's number 1 indicated, Toshiba laptop, bearing OPP

25  label 006618.  Consistent with the document.

Paul Thompson – Direct                    322

1    Q      And finally, handing you Government's 7, does

2    Government's 7 show up anywhere on that property sheet?

3    A      Yes, it does, Compaq laptop, and it's bearing OPP label

4    006619 which is consistent with the document.

5    Q      If you look at the top of 13A, that property receipt

6    form, there appears to be a cell phone reflected on that

7    form, is that right?

8    A      Correct.  Indicated item number 4, a Verizon cell

9    phone, bearing OPP label, indicated on here 006621 which

10   wasn't part of the previous four exhibits.

11   Q      If you look down at the bottom half of the form to

12   where you signed the property custody receipt, did you take

13   custody of the Verizon cell phone?

14   A      No.

15   Q      Why didn't you take custody of the Verizon cell phone?

16   A      It wasn't with the exhibits, which isn't uncommon.  The

17   procedure for conducting forensic examination on laptops and

18   thumb drives, they go to a separate area of the OPP forensic

19   lab.  Handheld devices such as cell phones go to another

20   area, generally taking longer to examine, it's not always

21   that they come back with these, exhibits come back to our

22   custody, generally because they're not finished with the

23   process of the actual device.

24   Q      What do you do with the property once you take it into

25   custody?

Paul Thompson - Direct                                   323

1   A      I take it, I verify that all the items that I'm signing

2   for are physically there, I confirm who the officer in charge

3   of the case is, and I place it on a shelving unit within our

4   vault indicating that particular police officer.

5   Q      How is the vault secured?

6   A      Vault secured by locking and electronic swipe card.

7   It's programmed through our general security.

8   Q      Is that vault also located within a secured building?

9   A      Absolutely, yes, it is.

10  Q      How is the building itself secured?

11  A      It's our general headquarters building, only police

12  personnel is allowed behind the secured doors at the front of

13  the building.  This particular area is also on a secure

14  floor, the fourth floor, you need electronic credentials or

15  swipe card to access the main fourth floor of that building.

16  You need further credentials to get in our particular vault,

17  with electronic swipe card.

18          MS. CARROLL:  No further questions.

19          THE COURT:  Any cross?

20          MR. GOLDSMITH:  Yes, your Honor, thank you.

21          CROSS-EXAMINATION BY MR. GOLDSMITH:

22  Q      Mr. Thompson -- I'm sorry, Officer Thompson, you

23  receive the items on April 19th of 2010, is that correct?

24  A      Yes, sir.

25  Q      As the markation next to the dates says quitclaim;

Paul Thompson - Cross

324

1    could you describe what that means?

2    A      Yeah, quitclaim is normally in a situation when perhaps

3    a complainant or victim no longer wants custody of it.  This

4    was brought to my attention last night, quitclaim, it should

5    have been marked off as receipt, I'm in receipt of the item

6    and it was marked off quitclaim, in error by myself.

7    Q      Okay.  And does that document reflect who you received

8    the items from?

9    A      Not in this occasion, no.

10   Q      Now you stated that you were working in the Olean --

11   pronounce the name, Oleana (phonetic), is that the correct?

12   A      I think you mean Orillia, sir.

13   Q      Orillia headquarters of the OPP.  And that is a place

14   where a lot of the investigatory forensic work is performed?

15   A      For the OPP, yes, sir.

16   Q      Did you perform any forensic investigation on these

17   items after you received it?

18   A      No.

19   Q      Now do you have any knowledge as to where it had been

20   prior to the April 19th day that you received it?

21   A      Specifically, no.  Generally, it's the OPP forensic

22   lab, yes.

23   Q      All right, but you have no specific knowledge?

24   A      No, sir.

25   Q      And within the OPP headquarters, how many different

Paul Thompson - Cross                                    325

1    officers are there like yourself, within the -- within your

2    particular division?

3    A     In the child sexual exploitation unit, there's 11

4    detective constables, two detective sergeants, and one

5    detective inspector.

6    Q     Is it within your roles and responsibilities for all of

7    you to take and receive evidence as indicated on Exhibit 13A?

8    A     If I can explain just a bit of procedure, what happens

9    in this particular case, a number of exhibits, the storage

10   facility in the forensic lab is small so they have a number

11   of exhibits that are moved over at once so it wouldn't be one

12   particular case that's moved over at that particular date and

13   time, sometimes 100 to 200 exhibits could come over simply

14   because it's a storage issue.

15   Q     Okay.  So then likely at the time that you received

16   these particular items, you may have been receiving up to

17   hundreds more of similar kinds of items?

18   A     It's possible, sir, yes.

19   Q     Okay.  And you probably then are engaged in hundreds of

20   investigations at any given time?

21   A     Well, when it comes to a particular property when they

22   transfer in property over to our office, come over in two or

23   three trollies at a time, make sure they're separated and I

24   sign and verify that the items listed on a particular report

25   such as the property report, they're all there and I simply

Case 5:14-cr-00088-EAW Document 20 Filed 01/12/16 Page 361 of 890

Paul Thompson - Cross

326

1    put it on the officer's shelf, just try to keep it very

2    organized when I do this.  That wouldn't be an uncommon time,

3    I do that six times a year so to speak.

4    Q    So on this particular day of April 19th of 2010, do you

5    recall performing any activity other than accepting these

6    particular items and placing them in the vault?

7    A    No, I don't, sir.

8    Q    Do you have any knowledge of any activities that you

9    performed related to those particular items after April 19th

10   of 2010?

11   A    I didn't touch them at all, sir.

12          MR. GOLDSMITH:  No further questions.

13          MS. CARROLL:  No redirect, your Honor.

14          THE COURT:  Thank you, you may step down.

15          THE WITNESS:  Thank you.

16              (The witness was excused.)

17          THE COURT:  Everybody okay?  All right.  We're

18   going to do at least one more witness and then we'll give you

19   a break, go ahead.

20          MS. THOMSON:  The government calls to the stand

21   Detective Constable Kip Wohlert.

22          THE CLERK:  Good afternoon.  Please state your full

23   name and spell it for the record.

24          THE WITNESS:  Kip Wohlert, W-o-h-l-e-r-t, first

25   name Kip, K-i-p.

Kip Wohlert - Direct                              327

1

2          K I P   W O H L E R T , called as a

3    witness and being duly sworn, testifies as follows:

4          DIRECT EXAMINATION BY MS. THOMSON:

5    Q     Good afternoon.

6    A     Good afternoon.

7    Q     Would you please introduce yourself to the members of

8    the jury.

9    A     Ladies and gentlemen, my name is Kip Wohlert.  I am a

10   detective constable with the Ontario Provincial Police in

11   Ontario, Canada.

12   Q     How long have you been with provincial police?

13   A     I'm in my 26th year of service.

14   Q     Can you please tell us about your position.

15   A     My position is with the child sexual exploitation unit,

16   it is housed in our general headquarters in Orillia in

17   Canada.  My specific duties are online luring, I do the

18   undercover online investigations.  Our unit is set up with a

19   number of investigators which investigate any internet-based

20   child exploitation, the possession, distribution,

21   manufacturing of images of child pornography and also of

22   luring.

23   Q     Is there a particular unit that you are involved with,

24   is it Project P; do you know what Project P is?

25   A     Project P is one of our original names of our unit, the

Kip Wohlert - Direct

328

1    unit now is called the child sexual exploitation unit, we

2    still go by our original name of Project P, the P standing

3    for pornography.

4    Q    Was it called Project P in 2009?

5    A    In 2009, we were called the child pornography section,

6    it's changed over the years.  When we have a new

7    commissioner, chief of police they sometimes like to change

8    the names on us.

9    Q    I want to direct your attention to May 29, 2009.  Did

10   you become involved in an investigation with a subject by the

11   name of Joseph Jenkins?

12   A    Yes, I did.

13   Q    How did you become involved in that investigation?

14   A    At approximately 4 p.m. on that date, I received

15   information that a person was being detained at the border

16   crossing, Thousand Islands, at Lansdowne.  I contacted the

17   border crossing and spoke with the Investigator MJ Vinette,

18   she provided information that was located on the computer

19   which formed grounds for me to start a criminal

20   investigation.  Based on that, I contacted the local uniform

21   police of jurisdiction and explained to them the grounds for

22   an arrest and criminal investigation.  Those officers came

23   and transported Mr. Jenkins to the Brockville detachment

24   which was the area for lockup.  I then created a, what is

25   called a show cause brief in Canada, it's a bail hearing, and

Kip Wohlert - Direct                                    329

1   information laying out the charges of possession and

2   importation of images of child pornography.

3   Q     Once you received that phone call, can you tell the

4   jury what you did?

5   A     I followed up by contacting the members of Canada

6   customs that had intercepted Mr. Jenkins, and based on the

7   information that they provided me, I had reasonable grounds

8   to believe that an offense had been committed.  I organized

9   the arrest and the bail hearing brief, I then started writing

10  a search warrant.  The items that were seized were placed

11  into a -- called the Queen's warehouse which is a locked

12  facility.  I formed up a search warrant which I took to a

13  justice on the 27th of May at 1:20 p.m. I presented my search

14  warrant to Justice -- I apologize to her because I'm going to

15  slaughter her name, Aubray Spring -- Springjinger (phonetic),

16  words to that effect, she reviewed the grounds for my search

17  warrant and at 2:50 p.m. authorized the search warrant.

18              On the 28th of May, I drove from my office to

19  the border crossing and attended to Superintendent Brady.  At

20  2:12 p.m. on that date, the superintendent took me to the

21  warehouse, the vault where I proceeded to take the exhibits

22  that were seized.  Those exhibits were removed from that

23  vault, secured by myself, and returned to our office in

24  Toronto.  Those exhibits remained in my custody until the

25  17th of June where I attended at our headquarters in Orillia,

Case 5:14-cr-00088-EAW Document 72 filed 01/12/16 Page 365 of 890
A358
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 195 of 275

Kip Wohlert - Direct

330

1    our electronic crime section has an intake, those exhibits

2    were turned over to the intake.  On the 17th of June, the

3    electronic tracking system was not functional so they were

4    secured there.  I was advised on the 18th that the electronic

5    tracking system was operable and those items were logged into

6    the vault and then placed in cue for forensic examination.

7    Q    If I could approach the witness, show you Exhibit 13B.

8    Ask you if you recognize Exhibit 13B.

9    A    This exhibit on the top right-hand -- top left-hand

10   corner is the Ontario Provincial Police, that is a property

11   report that we use when logging in exhibits.  It has the file

12   number, which was assigned to this case, it lists out the

13   items that were seized from the Port of Lansdowne, year, it

14   states the date property received on here.  I will apologize,

15   it states the 24th of May which was actually the date of the

16   offense, not the date that I acquired the materials which was

17   on the 28th as part of my search warrant.  It's signed by

18   myself.  In the boxes below, it states different times of

19   when the items were received and moved.  Here on the 18th of

20   June, exhibit signed by Michel Boulay, detective sergeant,

21   E-crime, was moved on the 19th of April, 2010, by Detective

22   Sergeant Paul Thompson, and then item was removed from

23   E-crimes on the 31st of March, 2011 by myself.

24           MS. THOMSON:  At this time, your Honor, I would

25   offer into evidence Exhibit 13B.

Kip Wohlert - Direct                                      331

1          THE COURT:  Any objection to the document?

2          MR. GOLDSMITH:  No objection.

3          THE COURT:  It will be received.

4          MS. THOMSON:  If we could publish that, please.

5    Q    Looking at this form, where you had indicated there was

6    a date that you had noted incorrectly, was that the bottom

7    right-hand corner?

8    A    That is the bottom right-hand corner, it says the 24th

9    of May, and again, the items were seized as part of my search

10   warrant on the 28th, the 24th being the date of the offense.

11   It was just an oversight by myself.

12   Q    If we could go back up, please.  Right next to that

13   line where the date is, are those your initials?  You don't

14   need to highlight.

15   A    Right beside the CSES is our unit name, then there is

16   my signature, D/C is for Detective Constable and then 7253,

17   if you interpret my scratching, that is my badge number

18   assigned to me.

19   Q    At this time I'm going to approach the witness, your

20   Honor.  If you could take a look at exhibit -- Government

21   Exhibit 3A.  Is that the exhibit that you noted on Government

22   Exhibit 13B?

23   A    This is a Toshiba laptop as stated on line number 1,

24   Toshiba laptop, and you can see the numbers 006618, which

25   identifies as per the property report.

Kip Wohlert - Direct                                    332

1  Q    And so that's the item that you retrieved?

2  A    That is, yes.

3  Q    And I'm showing you now Government's Exhibit Number 8.

4  Ask you, is that the exhibit you also retrieved relative to

5  this investigation?

6  A    On line number 3, the Olympus camera and card,

7  Exhibit 006620. Which corresponds with that Olympus camera.

8  Q    I'm now handing you Government's Exhibit 4A, 5A, and 6,

9  and can you tell me if those are the thumb drives that you

10 retrieved from CBSA?

11 A    Three jump drives, Exhibit number 006622, corresponds

12 line number 5, yes, that is correct.

13 Q    And Government Exhibit Number 7, could you also verify

14 that's the item that you retrieved and noted on Government

15 Exhibit 13B?

16 A    Line number 2, Compaq laptop, Exhibit Number 006619

17 which corresponds with one Compaq Presario.

18 Q    As part of this investigation, you retrieved these

19 items from the CBSA officers who initiated the investigation?

20 A    That is correct.

21 Q    And that's what you noted on the top half of

22 Exhibit 13B?

23 A    Yes.

24      THE COURT: The jury's going to have a hard time

25 hearing you if you're standing up talking so close.

Kip Wohlert – Direct                          333

1          MS. THOMSON:  I'm done.

2          THE COURT:  Okay.

3     Q    I'll leave that there.  Once you retrieved those items

4     from CBSA, the items that are in front of you and you've just

5     given testimony about, where did you take them after you

6     retrieved them?

7     A    When these items were obtained from the vault, they

8     were secured in my vehicle, I have a lockbox.  Our unit

9     covers the entire province of Ontario other than some of the

10    larger municipal policing that had their own units so we

11    travel a great distance.  From our office to the border

12    crossing is approximately four hours' drive, so we travel all

13    over so we have a locked secure box in our vehicles for

14    exhibits.  These were obtained from the vault, returned to

15    our office, at that time they were in the city of Toronto,

16    they were secured until I was able to bring them up to

17    headquarters Orillia to our electronic crime section.

18    Q    So then once -- then you turned them into the

19    electronic crime unit, crime section?

20    A    Yes.  Once it's turned in, it is secured into their

21    vaults and then those exhibits along with all the other

22    exhibits that they're analyzing go into cue and then as the

23    cases proceed, then comes down to this case, then they're

24    retrieved and their forensic examination is done at that

25    time.

Kip Wohlert – Direct                                    334

1   Q     Now after you logged that evidence into the vaults, did

2   you have occasion to have further involvement with this case?

3   A     Once the exhibits are lodged into our electronic crime

4   section and then at certain points they are removed and

5   forensically examined, the data that is retrieved from that

6   forensic examination is then provided to me.  I then take

7   that data and place it into a software program that we have,

8   it's the initials at that time in 2009 C for P which is for

9   pictures, C for M which is for movies.  This software assists

10  us in categorizing the images that are located.  These images

11  are then viewed and then placed into one of six different

12  categories.  These categories are number 1, child

13  pornography; number 2 is child nudity; number 3 is child,

14  other; number 4 is adult pornography; number 5 is obscenity;

15  and number 6 is other.  In that software, there are

16  categories 7, 8, and 9, which are blank.  I use category 7

17  sometimes for a court presentation, if I have a large number

18  of images, those aren't available to show all the images at

19  court, so I'll take a sampling of an entire collection and

20  show maybe between 50 and 100 images.  Category 8, I've used

21  for an investigative file, if there's something that catches

22  my eye that's saying I need to look further into this image,

23  I'll place it into that category; and category 9 I use

24  sometimes if there are maps on the computer just in case that

25  corresponds with something else that I locate on the

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 370 of 890
A363
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 200 of 275

Kip Wohlert - Direct

335

1    computer.

2    Q    I'm going to take you several steps back, okay.  When

3    you began this investigation, after you retrieved the

4    evidence, were you given an image of that evidence, were you

5    provided with an image copy of that evidence?

6    A    What I received from the electronic crime section is an

7    image copy of the hard drive or other exhibit, that comes to

8    me in a folder, and I use that folder, the data from there,

9    it goes into the software that we categorize.

10   Q    Would that include an image for the Toshiba laptop,

11   Compaq laptop, and the thumb drives?

12   A    That is correct.

13   Q    And so do you do some type of work off of that image?

14   A    Off of the image side that's provided to me, that's

15   where all the images or movie clips are and then that goes

16   into the software which allows us to categorize and it's just

17   a large folder with everything in there and then from there I

18   just piece and place things into whichever category is

19   appropriate.

20   Q    To perform your job in presenting cases under Canadian

21   law, do you then take and review items off of that image copy

22   and categorize them according to Canadian law of whether or

23   not they meet the definition of Canadian law for child

24   pornography?

25   A    Yes, category 1 is for child pornography, we have a

Kip Wohlert - Direct

336

1    criminal code which states out what the definition of

2    pornography -- child pornography is in Canada.  When the

3    image data is put into the software, images have what is

4    known as a hash value, it's like electronic serial number to

5    that image.  No two images can have the same hash value, so

6    it's kind of like the DNA of that image.  So using a -- those

7    hash values, this program can pre-categorize some images that

8    have been previously categorized in other investigations.  So

9    on completion of categorizing all of the images, I would then

10   go back into category 1 because that's the only category

11   which is a criminal offense, and review the images to see

12   that I'm comfortable with what images are placed in there.

13   Q    With regard to your involvement in this case, were you

14   consulted as a computer forensic expert?

15   A    I am not a forensic expert, I am a police investigator,

16   so I get this information, this data, from the forensics

17   units, I have training on viewing images and categorizing it

18   as per the Canadian law, and then within our unit, we have a

19   working methodology that when you view images, especially

20   when you get into the teens because of the development of the

21   teen body, puberty is about benchmark so prepubescent is

22   classified as child pornography in Canada.  When we get into

23   the pubescent, the puberty stages of development, that is

24   usually given credit to the accused that it's classified as

25   an adult, unless it's a known person that we know is under

Kip Wohlert - Direct

337

1   the age of 18, but if you look at a female, specifically

2   females that are into the mid-teens and that, to say with the

3   development of the body, there's certain things we look at

4   whether or not that is, so if there is a question, then it is

5   classed as an adult, that's how we do it in Canada.

6   Q    As your involvement in this case went forward, did you

7   become involved in a trial of the matter of Joseph Jenkins?

8   A    Yes.

9   Q    Were you called to come to court for a trial of Joseph

10  Jenkins?

11  A    Yes.

12  Q    Was that in September of 2010?

13  A    That is correct.

14  Q    Did you appear for that trial in September 2010?

15  A    I appeared for the trial in September 13th, 2010.

16  Q    At that trial was a motion made by defense?

17  A    Defense counsel brought forward a charter application

18  that the accused charter was breached, the trial was heard

19  and at that time the presiding judge deemed that there were

20  no breaches incurred.

21  Q    And then was a subsequent trial date set for October of

22  2010?

23  A    That is correct.

24  Q    Did you attend that trial?

25  A    I attended at that time as well.

Kip Wohlert – Direct                                    338

1    Q     Was the defendant present for that trial?

2    A     At that time, the accused before the court did not

3    appear.

4    Q     Did the court issue a bench warrant as a result of his

5    failure to appear?

6    A     As I attended on that date, procedure in Canada is to

7    call the name three times on the PA system, there was no

8    response.  Defense counsel could not offer any reason why the

9    accused was not before the court, and the judge then issued a

10   bench warrant for Mr. Jenkins.

11   Q     I'm going to approach and hand you Government's

12   Exhibit Number 16, ask you if you recognize Government

13   Exhibit Number 16.

14   A     What I have before me is on the top, a warrant for the

15   arrest [bench warrant] in the name of Joseph Vincent Jenkins,

16   22nd of January 1970 is his date of the birth, town of

17   Geneva, state of New York.  The offense on the 24th of May,

18   2009, port of entry, Lansdowne, the offense is listed of

19   possession, importation under the Criminal Code and two

20   Custom Act charges as well.  And listed here, failed to

21   attend court on October the 18th, 2010 at 10 a.m. in

22   courtroom number 3 at 41 Courthouse Square, Brockville,

23   Ontario for his trial, dated the 18th of October, 2010 at the

24   city of Brockville, and it is signed by Justice Waugh.

25   Justice Waugh was the judge that was hearing this matter and

Case 5:14-cr-00088-EAW Document 102-01 Filed 01/12/16 Page 374 of 890
**A367**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 204 of 275

Kip Wohlert - Direct                                    339

1   I was in attendance at this time.

2   Q    The item that's in your hand, did you retrieve that

3   from the court?

4   A    I requested from the court to have a certified copy,

5   this has been stamped and signed as a certified copy of the

6   bench warrant.  The original bench warrant which I observed

7   yesterday had the attachment is a copy here and I retrieved

8   this and brought it to court.

9           THE COURT:  Brought it to this court?

10          THE WITNESS:  This court, yes, your Honor, this

11  court.

12  Q    After that October 2010 trial date, did you then notify

13  American authorities of the fact that a bench warrant had

14  been issued for Joseph Jenkins?

15  A    Once the bench warrant was issued, I contacted Homeland

16  Security to inform them that a citizen in their area was

17  arrested and charged with the offenses of possession of child

18  pornography, this is who this person is, this is where he

19  resides and of any interest for, again, the criminal offense

20  of -- any offense against a child is quite serious, and so I

21  notified them if they were interested in obtaining any

22  further information or anything from my case that they could

23  review.

24  Q    I want to direct your attention now to March 31 of

25  2011.  On that date, did you retrieve evidence relative to

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 375 of 890
A368
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 205 of 275

Kip Wohlert - Direct

340

1    this case?

2    A    On that date, I retrieved the exhibits before me here,

3    from our vault, and then I attended our electronic crime

4    section to obtain the cell phone which is also here.  In our

5    electronic crime section, there are two units, there's the

6    mobile device unit that reviews like cell phones and iPads

7    and things like that, and then the crime section which deals

8    with the storage devices and laptops and computers.  So

9    exhibits are in two separate areas within the vault.  So when

10   this stuff was retrieved, it was in our vaults, and then I

11   went back to get the cell phone which was still at the

12   electronic crime section of the vault.

13   Q    Once you retrieved those items, what did you do?

14   A    They were secured in my vehicle until I could meet with

15   Special Agent Chad ... Willard and hand them over to him.

16   Had to pause there for his last name.

17   Q    What day did you turn them over to him?

18   A    That was on the 1st of April, the next day.

19   Q    And on April 1, 2011, did you turn over to Agent Chad

20   Willard a Toshiba laptop, Compaq laptop, an Olympus camera

21   and card, Verizon cell phone, and three thumb drives?

22   A    Yes, I did.

23   Q    Is that the evidence in front of you?

24   A    The evidence in front of me.

25        MS. THOMSON:  I have no further questions.

Case 5:14-cr-00088-EAW Document 78 Filed 01/12/16 Page 376 of 890
A369
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 206 of 275

Kip Wohlert - Cross

341

1    THE COURT:  Any cross?

2    MR. GOLDSMITH:  Yes.

3    CROSS-EXAMINATION BY MR. GOLDSMITH:

4  Q    Officer Wohlert, I'll give you a minute to drink.

5  A    Thank you.

6  Q    What was your role in the investigation?

7  A    My role in this -- my role in this investigation is as

8  an investigator to view what images were located, to see if

9  they fit within the Criminal Code definition and then form

10 together the brief to bring this matter to court to be heard.

11 Q    So essentially you evaluated the evidence once it had

12 been imaged, is that correct?

13 A    That is correct.

14 Q    So you yourself did not perform any of the forensic

15 imaging?

16 A    I am not a forensic person, I am not super technology

17 inclined.  I have a scope of investigation.

18 Q    All right.  You don't know who exactly performed the

19 imaging?

20 A    The imaging was performed by Detective Sergeant Mike

21 Harrington.

22 Q    When did you learn that Detective Sergeant Harrington

23 had performed the imaging?

24 A    I received the data back in September 2009 and as a

25 result of the work by Detective Sergeant Mike Harrington.

Case 5:14-cr-00088-EAW Document 70-1 Filed 01/12/16 Page 377 of 890
**A370**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 207 of 275

Kip Wohlert - Cross                                    342

1    Q      And you took that imaging to then perform your duties

2    in relation to evaluating it, correct?

3    A      That is correct.

4    Q      Now, you asked -- answered some questions a few moments

5    ago about proceedings in September of 2010 in which you were

6    called, is that correct?

7    A      That is correct.

8    Q      All right.  And you testified about a defense motion at

9    that time, is that correct?

10   A      That is correct.

11   Q      And at that time, had your office provided disclosure

12   of its findings to the defense counsel?

13   A      That is correct.

14   Q      Wasn't that the basis of defense counsel's motion at

15   that time?

16   A      The motion that was brought, the charter argument that

17   was brought is the time that it took for that disclosure to

18   be brought to courts and then disclosed to defense lawyer.

19   Q      Essentially it was that it took too long to do, is that

20   the reason for everybody being in court that day?

21   A      The court matter was to hear that, and the judge made a

22   decision that there was no such breach.

23   Q      Now, you testified that you had been notified of

24   Mr. Jenkins' arrest, April 24th, 2009, is that correct?

25   A      Sorry?

Case 5:14-cr-00068-EAW Document 72 Filed 01/12/16 Page 378 of 890
A371
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 208 of 275

Kip Wohlert - Cross

343

1    Q    I'm sorry, May 24th, 2009.

2    A    Yes, that is correct.

3    Q    And it was part of your job to draw up paperwork as

4    part of the arrest process and the bail hearing, is that

5    correct?

6    A    Because the province is large and we drive all over,

7    sometimes it's not physically able to be -- from where I

8    resided to the border crossing is approximately four hours

9    drive, to drive down for a court hearing, drive back and

10   drive down for the proceeding, court hearing sometimes is

11   not -- we rely on other officers to assist us.

12   Q    Okay, but you did testify it was part of your

13   responsibilities to draw up that paperwork?

14   A    Yes, and I created those briefs.

15   Q    Okay.  You also testified that within the following

16   couple of days you traveled down to Lansdowne to receive the

17   evidence, is that correct?

18   A    That is correct.

19   Q    All right.  And at the time that you received the

20   evidence at Lansdowne, you placed them in a secure box in

21   your vehicle and drove it back to Toronto?

22   A    That is correct.

23   Q    And are you based out of Toronto or are you based out

24   of headquarters?

25   A    In 2009, our office was in Toronto.  Since then we have

Kip Wohlert - Cross

1   moved up to headquarters.  The building that we were in at

2   that time is now a parking lot.

3   Q    When you retrieved the items, you brought them back to

4   Toronto for safekeeping, is that correct?

5   A    That is correct.

6   Q    And you transferred them to the forensics unit?

7   A    I transferred them to the forensics unit, yes.

8   Q    Do you recall when you transferred them to the

9   forensics unit?

10  A    On the 17th of June I brought the exhibits to the

11  forensic unit, at that time they were lodged in that unit.

12  Q    You said the 17th of June?

13  A    17th of June they were physically brought up, on the

14  sheet it states the 18th of June, that's when the electronic

15  tracking device actually logged them into the system.

16  Q    All right.  So one would hand write into the voucher

17  forms when the electronic tracking devices kick in?

18  A    No, those -- that was written on there, there's a

19  tracking system that's placed on the bar codes and stuff and

20  the numbers that's placed into electronic tracking system.

21  That wasn't available on the 17th, it was placed in the next

22  day and then that was handwritten in on that form.

23  Q    Okay.  So in other words, even though you brought it up

24  on the 17th, had to be listed as being received on the 18th?

25  A    That's what's on the form is listed on the 18th.  I'm

Kip Wohlert - Cross                        345

1    saying that it was brought up, secured in their offices and

2    then logged in with the device.

3    Q     But there's no record of that one-day lapse?

4    A     In my notes I have that written and that is my

5    recollection from what had occurred.

6    Q     But not on the voucher form, correct?

7    A     On the property form it is stated the 18th of June.

8    Q     Now, between the 18th of June of 2009 and March 31st of

9    2011, were you in possession of any of the materials that

10   were vouchered?

11   A     Between those dates?

12   Q     Yes.

13   A     The exhibits themselves I was not, no.

14   Q     You were in possession of the image, is that correct?

15   A     The image that was forensically obtained is what I

16   worked off of, yes.

17   Q     You recall when you received that image?

18   A     2nd of September, 2009.

19   Q     Do you recall who you received it from?

20   A     Detective Sergeant Mike Harrington.

21   Q     March 31st of 2011, you obtained the original items

22   that were secured at headquarters, correct?

23   A     That is correct.

24   Q     And on the voucher form were you supposed to list out

25   every number corresponding to the items that you took?

Kip Wohlert - Cross                                    346

1    A     On the form, there is one exhibit number that is the

2    cell phone that was obtained from electronic crime section,

3    the other exhibits were in our vault and I obtained those off

4    of my shelf.

5    Q     Okay.  So the physical items then traveled from the

6    electronic crimes unit into your particular unit, is that

7    correct?

8    A     That is correct.

9    Q     All right.  And that's not reflect -- that travel was

10   not reflected on Exhibit 13B that you testified, the voucher

11   form that you testified about a few minutes ago?

12   A     May I see that form?

13   Q     Sure.

14         MR. GOLDSMITH:  May I approach.

15         THE COURT:  You may.

16   A     So again your question, please, sir.

17   Q     The travel of the laptops and the flash drives, camera

18   and camera image card from the electronic unit to your

19   particular unit is not reflected on that voucher?

20   A     It states here on the 19th of April 2010 that it was

21   removed from the electronic crime section by Detective

22   Sergeant Paul Thompson and he moved that into our vaults and

23   placed on my shelf.

24   Q     And then that would then reveal that the one remaining

25   unit was the cell phone?

Kip Wohlert - Cross

347

1   A      The cell phone remained in the electronic crime

2   section.

3   Q      And that's why on that form you only list the one

4   serial number?

5   A      That is correct.

6          MR. GOLDSMITH:  May I approach?

7          THE COURT:  You may.

8   Q      Now as part of the process or investigating this

9   particular matter in Canada, were you charged with

10  maintaining these particular items until the case was closed?

11  A      The items remain in police custody as part of a court

12  order.

13  Q      Well, within your roles and responsibilities were you

14  charged with the responsibility of oversight to ensure that

15  the items were safe kept until the close of the case?

16  A      That is correct.

17  Q      And as you testified to a few moments ago, you then

18  brought the items to a member of United States law

19  enforcement, is that correct?

20  A      That is correct.

21  Q      At this point you took the items, you placed them in

22  the safe box in your vehicle and drove them to the U.S.

23  border, is that correct?

24  A      That is correct.

25  Q      Is that where you met with the U.S. law enforcement

Kip Wohlert - Cross                                    348

1    agencies?

2    A     I apologize, I don't recall exactly where we met.

3    Q     Okay.  But you then did hand them directly to U.S. law

4    enforcement?

5    A     That is correct.

6    Q     And that event was precipitated by your phone call to

7    U.S. law enforcement after the issuance of the bench warrant

8    in Canada, correct?

9    A     Correct.

10   Q     Approximately how long between that phone call by you

11   until the day where you delivered those items to U.S. law

12   enforcement?

13   A     I don't recall that, that time frame.

14   Q     In addition to the physical evidence of the laptops and

15   the flash drives, et cetera, did you provide any paperwork to

16   U.S. law enforcement officials?

17   A     I don't recall but I believe that there has been some

18   paperwork that was associated with the investigation that was

19   also turned over.

20   Q     Okay.  At that time in March 31st of 2011, excuse me,

21   did you provide a copy of any of your findings from your

22   investigation?

23   A     I would have provided the charts that -- the software

24   that I used to categorize the images.

25   Q     And did you provide -- withdrawn.  When you said that

Case 5:14-cr-00088-EAW Document 70-2 Filed 01/12/16 Page 384 of 890
A377
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 214 of 275

Kip Wohlert - Cross                                    349

1    there are charts, so does that constitute a final report of

2    your findings?

3    A    The reports and charts that we have that the software

4    creates as we use it to categorize the line where all those

5    images fall.  Within those charts there were still

6    approximately 10,000 images that were not categorized.

7    Q    Okay.  Within -- withdrawn.  If you recall it, do you

8    recall approximately how many images were classified by the

9    software as category 1?

10   A    There were a number of exhibits and in different

11   exhibits there were different numbers, the exact ones I can't

12   recall.  I can say that on one of the flash drives there was

13   in excess of 1600 images located.  On some of the other items

14   there were one or -- I remember 13 on one specific item,

15   which one it falls into, I'd have to refer to my charts.

16   Q    That were specifically categorized as category 1?

17   A    What I categorize as pertaining to Canadian law, that's

18   how it fell into category 1.  The other categories are

19   noncriminal so category 1 is all that we determined.

20   Q    And again that's -- that was based upon your particular

21   evaluation, correct?

22   A    The evaluation as per Canadian law and the training and

23   expertise that I have within our unit.

24   Q    Based upon the imaging that had been done by Detective

25   Sergeant Harrington, correct?

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 385 of 890
A378
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 215 of 275

Kip Wohlert - Cross                                    350

1    A       That is correct.

2    Q       Detective Sergeant Harrington produced a report related

3    to his imaging?

4    A       Detective Sergeant Harrington would produce a forensic

5    report on what he had completed.  That's not something that I

6    can read and understand, it's a lot of technical stuff.  I

7    receive the images and I do what my job specifies.

8    Q       You testified earlier that you are not a forensic

9    expert, is that correct?

10   A       That is correct.

11   Q       Within your role and responsibility at the Ontario

12   Province Police, have you received any special training

13   regarding computers?

14   A       We have computer training, yes.  Forensic based, no.

15   Q       So even as an investigator charged with evaluating

16   items removed from computers, you have not been given any

17   specific computer training?

18   A       Not in regards to forensic examination, no, I have not.

19   Q       So, if forensic -- withdrawn.  One moment.

20           Just a couple more questions, Officer Wohlert.

21   Are you aware of any other items in addition to those listed

22   on the voucher that you signed off on that were taken from

23   Mr. Jenkins at the time of his stop and arrest?

24   A       There are some other items and they remain in the

25   vaults of our general headquarters as per the court order.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 386 of 890
A379
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 216 of 275

Kip Wohlert - Cross                           351

1   Q      Those other items still are there today?

2   A      The items are there, yes.

3   Q      Okay.  To your knowledge, was there ever a file

4   forensic report produced by your office?

5   A      If you can specify my office as in the categorization

6   imaging that I would do or are you saying forensic as in

7   from --

8   Q      By your specific office.

9   A      There is still just over 10,000 images that have not

10  been categorized.  They have not been categorized because

11  they're ones that have to be individually viewed to determine

12  where they fall in the categories.  Sometimes it is just

13  physically impossible to go through all images and in this

14  particular case, we were at a saturation point of --

15  Q      Let me stop you, all right.  A specific answer to my

16  question is, was there ever a final report that was generated

17  by your office?

18  A      There is not a final report of a completed

19  categorization.

20  Q      Okay.  Was there ever a final report generated by the

21  forensics department of the Ontario Province Police?

22  A      That is a question I'm not in a position to answer.  I

23  don't know.

24  Q      Okay.  Since you handled the materials on March 31 of

25  2011, have you seen the materials prior to today?

Kip Wohlert - Redirect                                    352

1   A      I have not.

2          MR. GOLDSMITH:  No further questions.

3          REDIRECT EXAMINATION BY MS. THOMSON:

4   Q      You were asked a bunch of questions about a person by

5   the name of Mike Harrington.  What unit did he work in

6   Ontario Provincial Police in May of 2009?

7   A      In May of 2009, Detective Sergeant Mike Harrington

8   worked as a forensic investigator with electronic crime

9   section.

10  Q      Would that be the same section as Michel Boulay?

11  A      Same section as Detective Sergeant Boulay.

12  Q      Is he presently working?

13  A      Sergeant Harrington?

14  Q      Sergeant Harrington, yes.

15  A      Sergeant Harrington is not working right now.

16  Q      What is his status with regard to work, is he -- is he

17  out for any particular reason?

18  A      Sergeant Harrington is on long-term sick leave right

19  now.

20  Q      When you turned those items over, you were asked

21  about -- turned the items that were shown to you over, did

22  you turn them over to Agent Chad Willard?

23  A      That is correct.

24  Q      And you were asked about the images that you did

25  include and whether you had come up with a final report, you

Kip Wohlert - Redirect

353

1    indicated you had found I believe in excess of 1600 images?

2    A    On this specific jump drive I did.

3    Q    But you did not continue your investigation because you

4    indicated you had reached a point of saturation.  What do you

5    mean by that?

6    A    In Canada, there is -- in this particular one we had in

7    excess of 1600 images.  Continuing through the 10,000

8    outstanding images, if there was another 500 or another

9    thousand images, the point's been made, it's a large

10   collection of child pornography, whether it's 1600, whether

11   it's 2,000, it's still a large collection of child

12   pornography.

13   Q    And you were also just asked about whether all the

14   items were contained on Exhibit 13B that you were previously

15   shown, did you also receive, OPP that is, receive CDs

16   relative to this investigation?

17   A    There were six CDs also seized, those were reviewed by

18   me and there was nothing illegal contained on those CDs.

19   Q    So did you keep them in OPP custody?

20   A    Those items and all items seized when we execute any

21   search warrants, we're required by law to make a report to

22   the signing justice to say this is what we've seized, he then

23   signs an order saying that those items will remain in police

24   custody until completion of all court proceedings.

25   Q    I have the same question with regard to Belkin wireless

Kip Wohlert - Recross                                    354

1    notebook card, was that given to you as part of this

2    investigation?

3    A    That is correct.

4    Q    And was that turned over to Chad Willard?

5    A    No, that remains in my custody.

6    Q    Why wasn't it turned over to Chad Willard?

7    A    There is nothing illegal on that device, there's no

8    evidentiary value to it.

9            MS. THOMSON:  I have nothing further.

10           THE COURT:  Any further cross?

11           MR. GOLDSMITH:  Briefly.

12           RECROSS-EXAMINATION BY MR. GOLDSMITH:

13   Q    You said Sergeant Harrington, Detective Sergeant

14   Harrington is on long-term sick leave, is that correct?

15   A    That is correct.

16   Q    You have the ability to contact him?

17   A    I personally do not, no.

18   Q    Does your office, meaning the OPP, have the ability to

19   contact him?

20   A    I would imagine that they would, yes.

21   Q    Now you just testified on redirect about your

22   obligations to maintain the items that were seized until the

23   end of all proceedings in the case in Canada, is that

24   correct?

25   A    That is correct.

Kip Wohlert - Recross

355

1   Q     Now you testified earlier on cross-examination that you

2   had, as well as on direct, that you had contacted United

3   States law enforcement when the bench warrant was issued by a

4   judge in Canada, is that correct?

5   A     That is correct.

6   Q     So upon the issuance of the bench warrant, that was the

7   close of all proceedings?

8   A     That is not correct.

9   Q     All right.  So then if you are obligated to maintain

10  the evidence until the close of all proceedings, were you

11  directed by the supervisors to transfer the evidence to

12  United States law enforcement?

13  A     I was not directed by any of my supervisors, no.

14  Q     Were you directed by any members of the Crown's

15  prosecution?

16  A     I was not directed by anyone from Crown prosecution.

17  Q     To your knowledge is there still an open case?

18  A     There is an outstanding bench warrant for Mr. Jenkins'

19  arrest to return to complete the Canadian trial.

20          MR. GOLDSMITH:  No further questions.

21          MS. THOMSON:  Just one quick follow-up.

22      FURTHER REDIRECT EXAMINATION BY MS. THOMSON:

23  Q     With regard to Mr. Harrington, is he expected to return

24  to work?

25  A     I am unaware of that, I know that he's on long-term

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

```
 1    sick.
 2              MS. THOMSON:  That's it.
 3              THE COURT:  Anything else?
 4              MR. GOLDSMITH:  Nothing.
 5              THE COURT:  Okay, thank you, sir, you may step
 6    down.
 7              THE WITNESS:  Thank you, your Honor.
 8                  (The witness was excused.)
 9              THE COURT:  Okay, ladies and gentlemen of the jury,
10    we're going to take a break, an afternoon break of about 10
11    minutes, try and get you back out here about 3:10, it's
12    almost 3:00 now.  Go ahead, stretch out, and please don't
13    discuss the case, we'll see you in a few minutes.
14                  (Jury Excused, 2:57 p.m.)
15              THE COURT:  Okay, we'll stand in recess for about
16    10 minutes.
17                  (Court in recess, 2:57 p.m. to 3:24 p.m.)
18                  (Open Court, Jury Out.)
19              THE COURT:  Let's bring in the jury.
20    Mr. Goldsmith, you're ready, sir?
21              MR. GOLDSMITH:  Yes.
22              THE COURT:  Okay.  We're going to get started.
23                  (Jury Present.)
24              THE COURT:  Okay, the record should reflect we have
25    the ladies and gentlemen of the jury after a nice long break,
```

Case 5:14-cr-00088-EAW Document 78-1 Filed 01/12/16 Page 392 of 890

Chad Willard – Direct

357

1   double than what I told you at the time, so hopefully that

2   got you good and refreshed for the rest of the afternoon, and

3   we're going to continue with the government's case.  Go

4   ahead.

5            MS. THOMSON:  Thank you, your Honor.  The United

6   States calls to the stand Special Agent Chad Willard.

7            THE CLERK:  Good afternoon.  Can you state your

8   full name for the record, please.

9            THE WITNESS:  Chad Jeremy Willard.

10

11            C H A D   J .   W I L L A R D , called as

12   a witness and being duly sworn, testifies as

13   follows:

14            DIRECT EXAMINATION BY MS. THOMSON:

15   Q     Good afternoon.

16   A     Good afternoon.

17   Q     Could you please introduce yourself to the members of

18   the jury.

19   A     My name's Chad Willard, I'm a special agent with

20   Homeland Security Investigations in Alexandria Bay, New York.

21   Q     How long have you been a special agent?

22   A     Since August 6, 2006.

23   Q     And always with Homeland Security?

24   A     Yes, correct.

25   Q     Could you describe briefly some of your duties and

Case 5:14-cr-00088-EAW Document 78 Filed 01/12/16 Page 393 of 890
A386
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 223 of 275

Chad Willard - Direct                                358

1   responsibilities?

2   A     I investigate crimes against the United States

3   government that have to do with immigration and customs

4   enforcement mostly and the laws related to immigration and

5   customs.

6   Q     Is there a particular area that you spend a lot of your

7   time on?

8   A     Yes, I've primarily focused on child exploitation

9   investigations over the last two and a half, three years.

10  Q     Child exploitation, would that include crimes involving

11  child pornography?

12  A     That would.

13  Q     Did you become involved in an investigation regarding

14  Joseph Jenkins?

15  A     Yes, I did.

16  Q     How did you become involved in that investigation?

17  A     I received a call from Special Agent Matt Myers

18  notifying me that an incident had happened up in Canada and

19  that there was a gentleman who didn't return to face justice

20  in Canada and that there's potential for us to bring him to

21  justice in the United States.

22  Q     Was an investigation opened?

23  A     It was.  My investigation was opened in March of 2011.

24  Q     Were you the agent in charge of that investigation?

25  A     Yes, I was the lead case agent.

Case 5:14-cr-00088-EAW Document 202-1 Filed 01/12/16 Page 394 of 890
A387
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 224 of 275

Chad Willard - Direct

359

1    Q    As part of your investigation, did you seek to obtain

2    physical evidence from Canada?

3    A    Yes, I did.

4    Q    What evidence did you seek to obtain?

5    A    There was a Toshiba laptop, Compaq laptop, several

6    thumb drives, three, and there was Motorola cell phone, and

7    a -- help me here.  I forget what the last item was.

8    Q    Were those items that were identified to you in the

9    course of learning about the investigation that may be

10   involved in incidents of child pornography?

11   A    Yes.

12   Q    At this time I'm going to approach the witness and hand

13   the witness Government's Exhibit Number 12.  I'm going to ask

14   you if you recognize Exhibit Number 12, please.

15   A    I do recognize Exhibit 12.

16   Q    What is Exhibit 12?

17   A    Exhibit 12 is our custody receipt and seized property

18   in evidence form, we call it a Form 6051S for seized

19   property, it is line items 3 through 7 which are the

20   8-gigabyte Attache thumb drive, 4-gigabyte Attache thumb

21   drive, 2-gigabyte Attache thumb drive, Olympus camera, and

22   Verizon Motorola cell phone.  In addition, line item 1 on the

23   second page is a Toshiba laptop and line item 2 on the third

24   page is a Compaq laptop.

25   Q    Are those items that came into the custody of the

Chad Willard - Direct                                    360

1   Department of Homeland Security?

2   A      Yes, on -- they were seized by the Department of

3   Homeland Security on April 1st, 2011.

4   Q      Did you receive them on behalf of the Department of

5   Homeland Security?

6   A      Yes, I did.

7   Q      Who did you receive them from?

8   A      Kip -- Detective Sergeant Kip Wohlert of the Ontario

9   Provincial Police.

10  Q      At this time I'm going to hand you a bunch of

11  government exhibits.  If you could start with the first

12  government exhibit and my question for you, if you could

13  identify the government exhibit, identify if that's noted on

14  Government Exhibit Number 12.

15  A      So I will go through line item 1 through 7.  Line item

16  1 is the Toshiba laptop, and this is the Toshiba laptop that

17  I received from Kip Wohlert at the Port of Lansdowne on

18  April 1st, 2011 and this is the bag I created with it with my

19  handwriting on it.

20  Q      Have you reviewed that item?

21  A      Yes.

22  Q      Is that the same item that you recovered from Kip

23  Wohlert?

24  A      It is the exact item, yes.

25  Q      And if you could continue with each item.

Chad Willard - Direct                                    361

1        THE COURT:  Exhibit numbers as you go, please, for

2   the record.

3   Q    Can you -- if you could tell us what the exhibit number

4   is.

5   A    Sure.

6        THE COURT:  The Toshiba laptop, what's the exhibit

7   number?

8        THE WITNESS:  That is Exhibit 3A.

9        THE COURT:  Okay.

10  A    And now I'm on my line item number 2 which is

11  Government Exhibit 7, and it is the Compaq laptop, and this

12  is the Compaq laptop that I received from Kip Wohlert on

13  April 1st, 2011 at the Port of Lansdowne, Ontario.  Line item

14  3 is the 8-gigabyte thumb drive, Government Exhibit 4 --

15  let's just do all the jump drives at once, 4A, 5A, and 6, 6

16  is going to be the 2-gigabyte thumb drive, this is the

17  2-gigabyte thumb drive I received from Kip Wohlert and the 8

18  and the 4 on April 1st, 2011 in Lansdowne, Ontario.

19  Q    And those particular exhibits are contained in the bag

20  that has which government exhibits noted on them?

21  A    4A, 5A, and 6.  And Government Exhibit 8 is a Olympus

22  digital camera, and this is the camera and the bag that I

23  created on April 1st, 2011, when I received that from Kip

24  Wohlert.  And this is the Verizon Motorola cell phone,

25  Exhibit Number -- bag is missing for, camera.  Yes, this is

Case 5:14-cr-00088-EAW Document 76 Filed 01/12/16 Page 397 of 890

Chad Willard - Direct                                362

1   the bag, my handwriting, and that's Government

2   Exhibit Number 9.

3           THE COURT:  And that is again the phone?

4           THE WITNESS:  This is the Motorola cell phone that

5   I received from Kip Wohlert, OPP, April 1st, 2011, Lansdowne,

6   Ontario.

7   Q    Did you create the receipt reflecting that you had

8   received these items?

9   A    Yes, I did.

10           MS. THOMSON:  At this time, your Honor, the

11   government would move into evidence Government

12   Exhibit Number 12.

13           THE COURT:  That's the form, any objection?

14           MR. GOLDSMITH:  Brief voir dire, your Honor?

15           THE COURT:  Go ahead.

16   VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

17   Q    Special Agent Willard, you filled out this form

18   yourself?

19   A    Yes, I did.

20   Q    You filled it out on April 1st, 2010 -- I'm sorry,

21   2011?

22   A    2011, correct.

23   Q    And the items that are noted both -- on all three pages

24   have corresponding serial numbers to labels placed on the

25   bags, on the evidence bags of those items, is that correct?

Chad Willard - Direct                                363

```
 1   A     No, the serial numbers that are listed above the
 2   description would be the actual serial numbers for the device
 3   like the serial number on the Toshiba, the serial number on
 4   the Compaq, and you can see like the thumb drives which do
 5   not contain serial numbers don't have any serial number
 6   listed.
 7   Q     And within your roles and responsibilities as a special
 8   agent and case agent on this matter, have you held custody of
 9   the original voucher in this particular matter?
10   A     This original document?
11   Q     Yes.
12   A     Yes, I have.
13         MR. GOLDSMITH:  No further questions.  No
14   objection.
15         THE COURT:  It will be received.
16   CONTINUED DIRECT EXAMINATION BY MS. THOMSON:
17   Q     If we could publish Exhibit 12, please.  Is this your
18   custody receipt showing that you received those items of
19   evidence that you've just given testimony on?
20   A     Yes, it is.
21   Q     Once you had the evidence in your possession, did you
22   take any other steps with regard to furthering an
23   investigation involving Joseph Jenkins?
24   A     Yes, I did, I wrote a search warrant for the items that
25   I received from Kip Wohlert.
```

Case 5:14-cr-00088-EAW Document 120-1 Filed 01/12/16 Page 399 of 890
A392
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 229 of 275

Chad Willard - Direct

364

1    Q    What was the purpose of that search warrant?

2    A    To be able to forensically examine the computers and

3    other digital media received from Kip Wohlert.

4    Q    And just to go back a moment, Exhibit Number 12, is

5    that a three-page exhibit?

6    A    Yes, it is.

7    Q    If we could just briefly show page 2 and page 3.

8    Page 2, does that reflect the Toshiba laptop?

9    A    Yes, it does.

10   Q    And if we could see page 3, does that reflect the

11   Compaq laptop?

12   A    Yes, it does.

13   Q    So that custody receipt is for all of the evidence that

14   you received?

15   A    That is correct.

16   Q    Now I think where I just cut myself off on was the

17   search warrant I believe you indicated you sought?

18   A    Yes.

19   Q    Okay.  Tell us what steps you took in your

20   investigation.

21   A    I drafted a search warrant and submitted it to United

22   States Attorney's office who maybe refined it a bit and then

23   I took it before federal magistrate on July 6, 2011, in this

24   building.

25   Q    And did that give you authorization to search all of

Case 5:14-cr-00088-EAW Document 172-1 Filed 01/12/16 Page 400 of 890

Chad Willard – Direct

365

1  the electronic media that is in front of you?

2  A    It was signed by the federal magistrate and authorized,

3  correct.

4  Q    Once that search warrant was signed, authorizing a

5  search of those items, did you take the items, did you keep

6  them into Homeland Security custody?

7  A    Yes.  They went to Computer Forensic Agent Brian

8  Braisted for examination along with the copy of the search

9  warrant.

10  Q    At that point then was all of the evidence turned over

11  to Brian Braisted?

12  A    Yes, it was.

13  Q    And he's also employed by the Department of Homeland

14  Security?

15  A    Yes, he is.

16  Q    Did there come a point when you had an opportunity to

17  be face to face with the defendant, Joseph Jenkins?

18  A    Yes, on October 4th of 2011, myself and colleagues

19  executed an arrest warrant with the defendant.

20  Q    As part of that arrest warrant, did you take him into

21  custody?

22  A    Yes, I did.

23  Q    When you took him into custody, did you have an

24  opportunity to speak with Joseph Jenkins?

25  A    Yes, I did.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 401 of 890
A394
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 231 of 275

Chad Willard – Direct

366

1   Q     And tell us where you spoke with him.

2   A     A tiny bit in his home as we secured him and then

3   mostly in transporting him from Geneva, New York to this

4   building for his initial appearance in court.

5   Q     During that process that you've described, the total

6   time that you were with Joseph Jenkins, did you have the

7   opportunity to hear his voice?

8   A     Yes, I did.

9   Q     And are you familiar with the sound of his voice?

10  A     Yes, I am.

11  Q     Are you familiar with it because you've heard it

12  before?

13  A     I'm familiar with it, yeah, because I spoke with him on

14  the way and he had questions for us and, you know, he had

15  40-some-minute drive in the car and words were exchanged,

16  yes.

17  Q     I'm now approaching the witness and handing the witness

18  Government Exhibit 10A for identification purpose only.  Do

19  you recognize Government Exhibit 10A?

20  A     Yes, I do.

21  Q     What is that?

22  A     This is a disk that we created for -- it contains calls

23  from the Cayuga County Jail of the defendant, his calls out

24  of the jail.

25  Q     Did you listen to that audio?

Chad Willard - Direct

367

1  A      Yes, I have.

2  Q      And when you listened to that audio, were you able to

3  recognize the voice on the audio?

4  A      Yeah, I recognize it to be the defendant, Joseph

5  Jenkins.

6  Q      In the course of listening to that audio, was there

7  also -- did the voice identify itself in terms of a name, did

8  you hear a name?

9  A      Yeah, there's a prerecording that goes along with it,

10  and you have a call from, and you say your name, he says

11  Joseph Jenkins on the tape.  Most of the time.  Not all the

12  time, sometimes he just says Joe, sometimes towards the end

13  he just says nothing but I think in all these calls he

14  probably uses his full name or at least Joe.

15          MS. THOMSON:  I have nothing further for this

16  witness and if I could just have a moment to collect the

17  things.

18          THE COURT:  You may.

19          MR. GOLDSMITH:  May I inquire?

20          THE COURT:  You may.

21          MR. GOLDSMITH:  Thank you.

22          CROSS-EXAMINATION BY MR. GOLDSMITH:

23  Q      Special Agent Willard, you testified that approximately

24  March of 2011, you took over the investigation of

25  Mr. Jenkins, is that correct?

Chad Willard - Cross

368

1    A      I learned of the -- I opened an investigation into

2    Mr. Jenkins.

3    Q      So there was no formal investigation by the U.S. prior

4    to that?

5    A      No, there was not.

6    Q      But the United States government had been made aware by

7    Canadian authorities?

8    A      Yeah, they had been made aware of -- by Canadian

9    authorities but without original evidence, there's not a lot

10   to do with an investigation.

11   Q      Then as part of the -- well, let me put it this way,

12   the file would have been started by Homeland Security prior

13   to your opening the investigation?

14   A      No, the first investigation into Mr. Jenkins was opened

15   on March 7th, 2011 by myself.

16   Q      But there were records indicating that Homeland

17   Security had been made aware by Canadian authorities,

18   correct?

19   A      I am aware that an attache office in Ottawa was

20   notified of his arrest, but no formal investigation had

21   opened by my office in the United States.

22   Q      Okay.  And as part of your responsibilities and review

23   of all pertinent records in Homeland Security, you're aware

24   as you stated that the Homeland Security attache in Ottawa

25   had been notified by Canadian law enforcement, correct?

Case 5:14-cr-00088-EAW Document 78 Filed 01/12/16 Page 404 of 890
**A397**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 234 of 275

Chad Willard - Cross

369

1    A      Notified of the arrest, yep.

2    Q      Notified by Investigator Vinette as we heard testimony

3    from earlier today, correct?

4    A      I'm speaking to a time that predates my existence in

5    the RAC Syracuse AOR, I started here in January of 2010 and

6    that would have been in January 2009 so I don't know who

7    notified our attache, I couldn't say if it was OPP or CBSA.

8    Q      But there are records in Homeland Security's possession

9    that would indicate that?

10   A      Yeah, there was one record that I am aware of that the

11   attache in Ottawa sent down to Syracuse, it's called a

12   collateral request, and it's a request to open an

13   investigation but that investigation was never opened in the

14   Syracuse office because lack of original evidence means a

15   lack of a case, in Northern District New York.

16   Q      That document would have indicated the source of which

17   law enforcement agent notified the Homeland Security attache

18   in Ottawa, correct?

19   A      It's been awhile since I read it, but I would bet that,

20   yeah, that's in the report.

21   Q      If you were to take a look at some of those reports it

22   might refresh your recollection?

23   A      Sure.

24          MR. GOLDSMITH:  May I approach.

25          THE COURT:  You may.  Is it marked?

Case 5:14-cr-00088-EAW Document 70-10 Filed 01/12/16 Page 405 of 890
**A398**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 235 of 275

Chad Willard - Cross

1    MR. GOLDSMITH:  It's not.

2    THE COURT:  For identification, why don't you do

3  that first.

4  Q    Let the record reflect I'm handing to Special Agent

5  Willard what's been marked as Defense Exhibit 1 for

6  identification only.  Take a look at the, just the first

7  sentence of the narrative of the report.

8  A    Yes.

9    THE COURT:  Well, first of all, do you recognize

10  what it is?

11    THE WITNESS:  I do recognize what it is.

12    THE COURT:  What is that?

13    THE WITNESS:  Report of investigation from the

14  Department of Homeland Security.

15  Q    Okay.

16    THE COURT:  Go ahead, Counselor.

17  Q    Does that refresh your recollection as to the agent who

18  contacted the Homeland Security attache in Ottawa?

19  A    Yeah, it does say as you said, Marie-Josee Vinette

20  notified HSA attache Ottawa.

21  Q    You received the evidence from Detective Sergeant Kip

22  Wohlert on April 1st of 2011, is that correct?

23  A    That is correct.

24  Q    It was not on March 31st, 2011, correct?

25  A    No, it was April 1st, 2011.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 406 of 890
A399
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 236 of 275

Chad Willard - Cross

371

1   Q      Once you received those materials, you kept them within

2   a Homeland Security vault, is that correct?

3   A      That is correct.  It's a government, Homeland Security

4   approved drawer vault, it's not a huge room or anything like

5   that, it's a huge safe essentially in our office.

6   Q      Based upon information that you had at the time, you

7   drafted a -- withdrawn.

8                   After April 1st of 2011, that's when you began

9   your investigation, correct?

10  A      That is correct.

11  Q      And you based your investigation on terms that were

12  provided to you by Detective Sergeant Kip Wohlert, correct?

13  A      Correct.

14  Q      And you based your investigation on documents in

15  addition to the hard evidence being two laptops, the three

16  flash drives, the camera, and the cell phone that were

17  provided, correct?

18  A      Correct.

19  Q      In fact prior to the -- withdraw it.  You took that

20  evidence, or that information and you used it to apply for a

21  search warrant in the United States, correct?

22  A      Correct.

23  Q      And you apply for that search warrant in July of 2011,

24  correct?

25  A      Yes.

Chad Willard – Cross                                    372

1    Q     It was executed by a magistrate in this particular

2    court, is that correct?

3    A     That is correct.

4    Q     All right.  So in the intervening time of April 1st to

5    July of 2011, the specific evidence of the two laptops, the

6    three flash drives, cell phone, and camera were maintained in

7    the Homeland Security vault, correct?

8    A     That is correct.

9    Q     At that time, did you also execute an arrest warrant?

10   A     No, we didn't execute the arrest warrant until October

11   of 2011.

12   Q     And between July of 2011 to October of 2011 when you

13   executed the search warrant, you transfer possession of the

14   two laptops, three thumb drives, and other evidence to an

15   Agent Brian Braisted, is that correct?

16   A     That is correct.

17   Q     After you transferred that hard evidence to

18   Mr. Braisted, how long approximately until you received that

19   evidence back from him?

20   A     It was not until, I would say two weeks ago that we

21   decided to move the evidence back from Buffalo, keep it in

22   the Syracuse office in preparation for this trial.

23   Q     Now you testified a few moments ago about an audio

24   recording CD?

25   A     Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 408 of 890
**A401**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 238 of 275

Chad Willard - Cross                                    373

1    Q     And you testified specifically about the -- about the

2    content of those CDs being recordings of phone calls of

3    Mr. Jenkins, is that correct?

4    A     I did.

5    Q     As part of your training practice as a special agent,

6    have you received any training related to voice recognition?

7    A     No, I have not.

8    Q     Have you been qualified in this or any court of being a

9    voice analyst or voice specialist?

10   A     No.

11   Q     And you did state that only on some of the calls is

12   there some sort of a recognition of who the caller is, is

13   that correct?

14   A     Most of the calls, yes.

15   Q     Not all?

16   A     Not all.

17   Q     Now, in Exhibit 12 which was the voucher of the

18   evidence that you took from Detective Kip -- Sergeant

19   Detective Kip Wohlert, you included a camera in there; that

20   camera also have a picture card in it or a memory card?

21   A     It does.

22   Q     Was the memory card of the camera subject to any

23   forensic evaluation under your investigation?

24   A     CFA Braisted looked at the camera, not myself.

25   Q     You had originally been -- withdrawn.  Are you aware of

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 409 of 890
**A402**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 239 of 275

Chad Willard - Cross

374

1   whether your office had originally been informed of the

2   Canadian proceedings prior to the transfer of evidence to you

3   on April 1st of 2011?

4   A      If my office had been informed of?  I'm --

5   Q      The Canadian proceedings.

6   A      Of the Canadian proceedings?

7   Q      Yes.

8   A      Not my office, no.

9   Q      Have you -- are you aware as to whether Detective

10  Sergeant Kip Wohlert had notified agents of your office prior

11  to April 1st of 2011 of the ongoing court proceedings in

12  Canada?

13  A    I can't say for sure when exactly a dialogue began

14  between Detective Wohlert and the people in the Buffalo area

15  responsible for my agency.

16  Q    Were you informed ever by other agents -- withdrawn.

17  Do you recall being informed by other agents of your office

18  of phone calls or contacts from Detective Sergeant Wohlert

19  dating back to October of 2010?

20  A    I -- that's the exact time period I believe that I was

21  contacted from Special Agent Matt Myers of the SAC Buffalo

22  which is special agent in charge Buffalo office for my agency

23  that Joseph Jenkins existed and this was kind of what

24  happened and they were looking into it at that time, or began

25  looking into it at that time.

Case 5:14-cr-00088-EAW   Document 210-15   Filed 01/12/16   Page 410 of 890
**A403**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 240 of 275

Chad Willard – Cross

375

```
 1   Q     So between October of 2010 and April 1st of 2011, you

 2   personally took no action in regards to this case?

 3   A     No, no, no evidence, I took no action.

 4   Q     Are you personally aware of any action that was taken

 5   by your office between October of 2010 and April 1st of 2011?

 6   A     I think there was some e-mails that went back and forth

 7   requesting the original evidence or at least a copy of the

 8   original evidence to see what we were looking at here, but

 9   there was no success until the April 1st, 2011 date when I

10   met Kip Wohlert at the Lansdowne Ontario port of entry.

11            MR. GOLDSMITH:  One moment.

12                  (Pause in Proceedings.)

13   Q     One other question.  The execution of the arrest

14   warrant, was that the first time you met Mr. Jenkins?

15   A     Yes, it was.

16   Q     First time you had any interaction with him whatsoever?

17   A     That is correct.

18   Q     You never had any interaction with him at the U.S.

19   border?

20   A     That is correct.

21            MR. GOLDSMITH:  No further questions.

22            MS. THOMSON:  Just briefly.

23   REDIRECT EXAMINATION BY MS. THOMSON:

24   Q     I believe you were asked a question in regard to

25   whether there was attache notification made to HSI; do you
```

Chad Willard - Redirect                              376

1   recall being asked that question?

2   A    Yes, I do.

3   Q    Is that routine to be notified when an American citizen

4   is arrested abroad?

5   A    Yeah, it's pretty routine.  I wouldn't say it happens

6   every time, but a lot of times it does, yes.

7   Q    Is that separate from HSI opening an investigation?

8   A    Yeah, it's a courtesy between law enforcement partners,

9   it's done to, you know, notify in case, you know, anybody

10  down here is looking for that person because they're MIA and

11  their family's worried about them, and then in addition to

12  that, you know, we would think about, you know, the case and

13  if it was something that we would be interested in following

14  through with, maybe open an investigation or seek more

15  information about what actually took place.

16  Q    And you were asked about a report number, too, that was

17  prepared.  Does that report reflect that there was attache

18  notification?

19  A    Yes, it did.

20  Q    And does it also reflect that there were Canadian

21  charges that had been put forward?

22  A    I believe it did.  I didn't read the whole -- just

23  focused on the first line.

24  Q    I'm now handing you what's been marked for

25  identification purposes as Defendant's Exhibit D1.  Does that

Case 5:14-cr-00088-EAW  Document 102-1  Filed 01/12/16  Page 412 of 890
A405
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 242 of 275

Brian Braisted - Direct                                377

1   refresh your recollection as to whether or not it is noted

2   that there were Canadian charges at that time?

3   A     Yes.

4   Q     And does it note if there were?

5   A     Yes, CBSA arrested Jenkins for nonreport, evading

6   compliance, and smuggling child pornography under Section

7   1211, 53C and 159 of the Customs Act.

8           MS. THOMSON:  Thank you.  I have nothing further.

9           MR. GOLDSMITH:  Nothing further.

10          THE COURT:  You may step down, sir, thank you.

11              (The witness was excused.)

12          MS. THOMSON:  At this time, the government calls to

13  the stand Forensic Analyst Brian Braisted.

14          THE CLERK:  Good afternoon.  State your full name

15  and spell it for the record.

16          THE WITNESS:  Brian Braisted, B-r-i-a-n,

17  B-r-a-i-s-t-e-d.

18

19          B R I A N   B R A I S T E D , called as a

20  witness and being duly sworn, testifies as follows:

21          DIRECT EXAMINATION BY MS. THOMSON:

22  Q     Good afternoon.

23  A     Good afternoon.

24  Q     Could you please introduce yourself to the members of

25  the jury.

Brian Braisted - Direct

378

1   A     My name is Brian Braisted, I'm a special agent with

2   Homeland Security Investigations in Buffalo, New York.

3   Q     How long have you been with Homeland Security

4   Investigations?

5   A     Since their creation in 2003.

6   Q     How long in Buffalo?

7   A     I arrived in Buffalo in 2004.

8   Q     And you indicated since their creation; what predated

9   that?

10  A     I started with Immigration and Naturalization Service

11  and then in 2003 they created the Department of Homeland

12  Security, they took all the special agents from Immigration

13  and Naturalization Service and special agents from Customs

14  and they threw us all together and we're now Homeland

15  Security Investigations.

16  Q     Your present position is a special agent?

17  A     Yes.

18  Q     Can you tell us some other positions you've held within

19  your agency?

20  A     I started off as an immigration inspector in 1992, I

21  moved -- I was in Pittsburgh, Pennsylvania, then I moved to

22  the Boston office, and in 1995 I became a special agent

23  there.  I was there for about five years and I went to U.S.

24  embassy in Rome, Italy, I was a special agent there for

25  Immigration and Naturalization Service until I returned to

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 414 of 890
**A407**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 244 of 275

Brian Braisted - Direct

379

1   the U.S. and was assigned to the Buffalo office in 2004.

2   Q     What is your present assignment?

3   A     I am currently working in a immigration benefit fraud

4   group in HSI Buffalo.

5   Q     Within that group, do you have a particular title?

6   A     I'm a special agent there.

7   Q     Are you a computer forensic agent as well?

8   A     Yes, I am.

9   Q     What do computer forensic agents do?

10  A     We examine digital media, looking for evidence

11  contained on the digital media.

12  Q     What is computer forensics?

13  A     It's the examination of digital media in a way that can

14  be replicated at a later date.

15  Q     How long have you performed forensic analyses of

16  various media, of electronic data?

17  A     For about six and a half years now.

18  Q     What training have you had in order to do that

19  position?

20  A     In 2007, they were looking for a computer forensics

21  agent from my office so I volunteered and was selected and I

22  went down to the Federal Law Enforcement Training Center in

23  Glynco, Georgia and I received my initial training there,

24  six-week period.

25  Q     Can you tell us about that training, please?

Brian Braisted – Direct                              380

1    A      The training, it began with A-Plus certification which

2    is basically a computer technician training, it showed that I

3    was qualified in basic computer hardware, replacing hardware,

4    removing hardware, sharp shooting little bit on the computer,

5    also a little bit of networking contained within the

6    computer.

7    Q      From your time at Glynco forward, did you receive any

8    other type of training, and if so, could you tell us what

9    that was?

10   A      Sure.  Like I said, my initial training was in 2007.

11   Subsequent to that, every year I get about two weeks of

12   additional training, it varies in what the course is.  The

13   first year, 2008, I went down to Washington, D.C. and I was

14   trained by AccessData which is a company that makes forensic

15   software.  That was two weeks of training and then subsequent

16   to that I received my certification, AccessData certified

17   examiner.  In 2010 and 2012 I received training through the

18   cyber crimes unit down in Washington, two weeks at a time for

19   advanced computer evidence recovery training.  In 2011 I went

20   to training with the International Association of Computer

21   Investigative Specialists, I attended basic computer forensic

22   examiner training there, and subsequent to that I earned a

23   certificate, computer forensic certified examiner

24   certificate.

25   Q      And I believe you've indicated that you've earned some

Brian Braisted – Direct                          381

1    certifications.  Are there any other certifications that you

2    haven't just spoken to?

3    A      My A-Plus certification, my CFCE certification from

4    IACIS, IACIS which is AccessData certified examiner training.

5    Q      You gave a couple of acronyms prior to that last one.

6    Can you explain what they are and what type of certification

7    that that is?

8    A      CFCE, it's Certified Forensic Computer Examiner, and

9    it's issued by the International Association of Computer

10   Investigative Specialists, it's an organization, an

11   international organization that specializes in computer

12   forensics.  So to obtain that certification, I went through a

13   one-year process of taking some at-home exams, I submitted

14   those exams to a mentor who did peer review.  He critiqued my

15   analysis, returned it to me for corrections, we went back and

16   forth.  Following the four at-home examinations and I did one

17   final examination which was evaluated and ultimately I

18   received my certification.

19   Q      And that certification includes a computer forensic

20   certified examiner?

21   A      Yes.

22   Q      What is the first certificate that you received in

23   computer forensics?

24   A      That was my A-Plus certification.

25   Q      You did mention briefly I believe AccessData?

Case 5:14-cr-00088-EAW Document 110-1 Filed 01/12/16 Page 417 of 890
**A410**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 247 of 275

Brian Braisted – Direct

1    A    Yes.

2    Q    Can you tell us what AccessData makes as it relates to

3    types of tools that you use?

4    A    AccessData makes FTK which is forensic software, it's

5    one of the leading forensic products on the market today,

6    they prepare the software and they also provide training on

7    that software.

8    Q    You've been certified to use that software?

9    A    I have.

10   Q    Is that the software that's used in computer forensics?

11   A    It's one of the two or three primary tools, yes.

12   Q    Are there any other types of programs that are used?

13   A    Another one would be EnCase which is made by a

14   competitor.  Each one will tell you that theirs is the best

15   but working side by side, they both do a pretty good job.

16   Q    Have you received training in EnCase?

17   A    I have, yes.

18   Q    Is that something that you've used?

19   A    Yes, it is.

20   Q    Do you periodically take continuing education type

21   courses?

22   A    I do.  I take webinars and other things that are

23   available online.

24   Q    How often?

25   A    Whenever they're available.  Most recent was, there was

Case 5:11-cr-00602-EAW-TWD Document 102 Filed 01/12/16 Page 418 of 890
A411
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 248 of 275

Brian Braisted – Direct                                383

1    a couple of classes by Guidance Software which produces

2    EnCase in December and January of this year.

3    Q    Can you tell us about how many forensic examinations

4    you've performed?

5    A    Roughly 100 exams to date.

6    Q    And within that 100, does that mean you've performed a

7    hundred exams on a hundred pieces of electronic media?

8    A    No, each case is different.  Some cases, a few cases

9    might only consist of one laptop, many of the cases consist

10   of multiple items.  For example, this case was two laptops,

11   three thumb drives, a digital camera and a cell phone.  Some

12   cases are as many as 20 or 25 computers, additional hard

13   drives, hundreds of DVDs so all of that total into -- would

14   be one exam.

15   Q    With regard to those 100 exams that you've performed,

16   can you tell us what type of crimes they involved?

17   A    Child pornography, human trafficking, alien smuggling,

18   document fraud, financial crimes, international property

19   right violations.

20   Q    And if you could say among that hundred, what

21   percentage, if you can say, deal -- dealt with child

22   pornography?

23   A    Roughly 75 percent.

24   Q    Have you ever testified in federal court before as an

25   expert in computer forensics?

Case 5:14-cr-00088-EAW Document 110-2 Filed 01/12/16 Page 419 of 890
**A412**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 249 of 275

Brian Braisted – Direct                                          384

1   A     Yes, I have.

2   Q     And can you tell us how many times?

3   A     Once last year for a trial in Buffalo, New York and

4   several times for suppression hearings in Buffalo and

5   Rochester.

6   Q     Were you accepted as an expert in that trial?

7   A     Yes, I was.

8         MS. THOMSON:  At this time, your Honor, offer

9   Special Agent Brian Braisted as an expert in the area of

10  computer forensics.

11        THE COURT:  Any objection, any voir dire?

12        MR. GOLDSMITH:  Brief voir dire?

13        THE COURT:  Go ahead.

14        VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

15  Q     Special Agent Braisted, the multiple suppression

16  hearings that you testified about, those in state or federal

17  court?

18  A     All federal court.

19  Q     And so far only one trial or multiple trials?

20  A     Just one trial.

21        MR. GOLDSMITH:  I have no objection to his

22  qualification as an expert.

23        THE COURT:  Okay.  He'll be received as an expert.

24  You may continue your examination.

25        MS. THOMSON:  Thank you, your Honor.

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 420 of 890
A413
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 250 of 275

Brian Braisted – Direct

385

1    CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

2    Q    Now I believe you indicated about 75 percent of the

3    hundred investigations you've done involve child pornography,

4    is that right?

5    A    Yes.

6    Q    Did you perform an examination of electronic media as

7    it relates to an investigation of Joseph Jenkins?

8    A    I did.

9    Q    And how did that come to pass?

10   A    First I was contacted by Special Agent Willard who was

11   the case agent for the case, he works out of the Alexandria

12   Bay and Syracuse offices.  They don't have a computer

13   forensics agent so the Buffalo office provides support to

14   them and Agent Willard asked me if I'd be available to

15   conduct an examination of some items he had in a case.

16   Q    And once he asked you if you were available, what did

17   you indicate?

18   A    I said, yeah, sure I could do that.

19   Q    And what was the next step?

20   A    Then we coordinated to get the evidence.  I believe he

21   received the search warrant on the 6th of July and so we

22   coordinated to meet on July 7th to basically pass the

23   evidence.  I was going out to Central New York to conduct a

24   search warrant and so he met me halfway basically and gave me

25   the evidence.

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 423 of 890
A414
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 251 of 275

Brian Braisted - Direct

386

1    Q    At this time I'm approaching the witness and handing
2    him what's been received into evidence as Government's
3    Exhibit Number 12.  Do you recognize Exhibit Number 12?
4    A    Yes, I do.
5    Q    And that is the three-page document?
6    A    Yes, it is.
7    Q    On Exhibit 12, does it indicate that you received the
8    evidence from Agent Chad Willard?
9    A    Yes, it does.
10   Q    And did you make any notation that you received it?
11   A    Yes, I signed for them and I dated it, initially I
12   dated it 7/6/11 and then I crossed it out and dated it 7/7/11
13   and I initialed above to show that I made the correction.
14   Q    Was that an error writing 7/6/11?
15   A    Yeah, it was about 6:00 in the morning on the 7th, I'd
16   been up very early to get out to Honeoye to do the search
17   warrant so I just had -- I just screwed up on my date
18   basically.
19   Q    So you received it on?
20   A    On the 7th.
21   Q    At this time I'm going to hand you a series of exhibits
22   and I'm going to ask you, sir, if these exhibits are the
23   exhibits that are reflected in Government Exhibit Number 12,
24   and if you could, please, just so we make a record, if you
25   could when you're talking about an exhibit, identify it by

Brian Braisted - Direct

387

1    the yellow government exhibit sticker number and tell us if

2    that is reflected on Exhibit Number 12 and if that was the

3    item that you received from Special Agent Chad Willard.

4    A      The first one says Exhibit 9, and it's a cell phone,

5    and it's line item 007 contained on the chain of custody

6    form.

7                THE COURT:  And you received that when?

8                THE WITNESS:  That was received on July 7th.

9                THE COURT:  It's reflected on the --

10               THE WITNESS:  Exact --

11               THE COURT:  -- on the exhibit somewhere.  Where?

12               THE WITNESS:  On the exhibit.

13               THE COURT:  Or just on the sheet?

14               THE WITNESS:  It's just on the sheet, sir.

15               THE COURT:  Okay.  Thank you.  Go ahead.

16   A      The next one is an Olympus camera, it's marked as

17   Government Exhibit 8, and on here, I received it on July 7th

18   as line item 006.  The third is Government Exhibits 4A, 5A,

19   and 6, they're three thumb drives, and they're annotated as

20   line items 3, 4, and 5 that I received on July 7th.

21   Government Exhibit 7 is a Compaq computer, and I signed for

22   it as line item 002 on July 7th of 2011.  And finally,

23   Government Exhibit 3A is line item 001, a Toshiba laptop

24   computer that I received on July 7th of 2011.

25   Q      So the items in front of you, those are the items that

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 423 of 890
A416
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 253 of 275

Brian Braisted - Direct

388

1    you received from Agent Chad Willard?

2    A      Yes.

3    Q      And they're noted properly on the exhibit that you've

4    just gone over?

5    A      They are.

6    Q      I believe you indicated that you completed a search,

7    you received those items after a search warrant had been

8    sought?

9    A      Yes.

10   Q      And did that search warrant authorize you reviewing

11   those items?

12   A      Yes, it did.

13   Q      So once you had the search warrant and once you had the

14   items, what did you do?

15   A      I returned to the Buffalo computer forensics lab and I

16   began my analysis of the items.

17   Q      How did that analysis begin?

18   A      My first step is to make an exact copy of each of the

19   pieces of digital media so that means I create an image,

20   what's called an image file for each of the items, the thumb

21   drives, the laptop, the hard drives contained within the

22   laptops.

23   Q      How do you create that image?

24   A      What I do is I take the piece of media, be it a thumb

25   drive or hard drive, and I connect it to something called a

Case 5:14-cr-00088-EAW Document 107 Filed 01/12/16 Page 424 of 890
A417
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 254 of 275

Brian Braisted – Direct

1    write block, it's a little black box that I have, and then I

2    connect that little black box to my computer, and what that

3    does is it allows me to look at all of the contents of the

4    media, the thumb drives or the hard drives and the write

5    block stops any changes being made to those items so

6    basically isolates the hard drive or the thumb drives from

7    any other user activity, and then once I do, once I'm

8    connected to my computer through this write block, I use a

9    program called FTK imager which makes an exact bit-for-bit

10   copy of all of the data that's contained on the hard

11   drives -- or the thumb drives, it copies it to an evidence

12   file that I have connected to my computer.

13   Q    When you indicate it makes a bit-by-bit copy, are there

14   values that are determined in that bit-by-bit copy?

15   A    Yes, one of the things that the program will do is it

16   will run a hash algorithm and what a hash algorithm is is a

17   computation which will assess all of the contents in the

18   media, be it the hard drive or the thumb drive and it would

19   assign to that a hash value, and in this case I used two

20   different hash algorithms, one called an MD5 hash and the

21   other one is shaw 1 hash.  The MD5 hash computes hash value,

22   it's 32 characters in length, and it precisely defines the

23   contents of that particular device, be it a hard drive or a

24   thumb drive.  It's kind of like a fingerprint for a digital

25   media.

Brian Braisted – Direct

390

1   Q     What is done with that hash value?

2   A     Well, I've hashed the original media, then I do the

3   same hash analysis of the created images.  And then I compare

4   the hash values for the created images with the hash values

5   for the original evidence, and if there's any deviation at

6   all on the image from what was contained on the hard drive or

7   the thumb drive, then that hash value will be different, but

8   in this case I compared them and found them to be identical

9   indicating to me that the images were exact bit-for-bit

10  copies of the original evidence.

11  Q     When you made this image, did you save it to a piece of

12  media?

13  A     Yes, I took a sterilized hard drive that had no other

14  contents on it and I saved it to that hard drive.

15  Q     At this time I'm approaching the witness and handing

16  him Government Exhibit Number 15.  I'll ask you if you

17  recognize Exhibit Number 15.

18  A     Yes, Exhibit 15 is the hard drive that contains the

19  images of the thumb drives and the laptop hard drives.

20  Q     When you make that image, do you go back to the

21  original media at all or do you work off of the image?

22  A     No, once I've created the image I remove the original

23  evidence from the write block and I seal it up and I put it

24  into evidence.

25  Q     So when you were doing your forensic examination, is it

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 426 of 890
A419
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 256 of 275

Brian Braisted – Direct

391

1    fair to say that you work off of what's contained in

2    Government Exhibit 15 which is the saved image that you

3    created?

4    A      Exclusively off of that, yes.

5    Q      Why is that?

6    A      Because I don't want to touch the original evidence

7    anymore, I want to make sure that it does not get compromised

8    so I put it away, never use it again.  I've already got an

9    exact copy on my images, I don't need this anymore.

10   Q      When you create an image of original evidence like you

11   did here, is there any change that's made to that original

12   evidence?

13   A      No.

14   Q      Did you create an image of both the Toshiba and the

15   Compaq laptop?

16   A      Yes, I did.

17   Q      And did you write block it before you created the image

18   or was that part of the process?

19   A      You write block them all, yes.

20   Q      And did you also create the image of the three thumb

21   drives?

22   A      I did.

23   Q      And all of those items are contained on Exhibit 15?

24   A      Yes.

25          MS. THOMSON:  I would move into evidence

Case 5:11-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 427 of 890
**A420**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 257 of 275

Brian Braisted - Direct                    392

1    Exhibit 15.

2         THE COURT:  Any objection, any voir dire?

3         MR. GOLDSMITH:  Brief voir dire.

4    VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

5    Q    Special Agent Braisted, are there any markings on the

6    outside of Government Exhibit 18, or I'm sorry, 15 that would

7    indicate the source of your using it in your capacity as a

8    forensic analyst?

9    A    Markings, I put a label on there saying Jenkins working

10   copy EO1 files exam product, just handwritten, is that what

11   you're indicating?

12   Q    Yes.

13   A    Yes.

14   Q    And is that item kept with you throughout the scope of

15   your investigation?

16   A    Yes, it stays in the lab which is a secured facility.

17   Q    Where is the lab?

18   A    It's in Buffalo, New York.

19   Q    Is that where you perform your activities?

20   A    Yes.

21   Q    Is there -- withdrawn.  When was the last time prior to

22   today that you saw Exhibit 15?

23   A    Well, yesterday I drove it out, Monday morning I drove

24   it out to Batavia, handed it off to an agent to bring out to

25   here.

Brian Braisted – Direct                                    393

1    Q     Okay.  So from Buffalo on Monday, meaning yesterday?

2    A     Yes.

3    Q     You drove that particular item to an agent in Batavia?

4    A     Right.

5    Q     Is there anything about the item as it stands here

6    today that appears to be different from when you dropped it

7    off to that agent in Batavia?

8    A     No, I don't, I had actually sealed it with evidence

9    tape, I don't even think the evidence tape has been tampered

10   with.  I sealed this on Monday morning when I got it ready to

11   drive it out of the lab.

12   Q     And prior to your transporting it yesterday morning,

13   it's been in your offices within an evidence vault since your

14   possession of it?

15   A     It's been in my custody constantly, yes.

16              MR. GOLDSMITH:  No further questions, no objection.

17              THE COURT:  It will be received.

18        CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

19   Q     I believe you already indicated how you create the

20   image of the laptop computers; how do you image the thumb

21   drives?

22   A     The same way, I use a write block.  The write block is

23   a little bit different than the write block I use for the

24   laptop computers because the connector is different but I use

25   a write block that's got a USB port and the USB port is the

Brian Braisted - Direct

394

```
1    little shape that a thumb drive has when you plug it into a
2    computer, it's the same shape I have on my write block for
3    thumb drives.
4    Q     When you're write blocking the thumb drives and when
5    you did in this case, does that make it so there are no
6    changes, alterations, modifications?
7    A     Exactly.
8    Q     Do you also then make a bit-by-bit image of thumb
9    drives?
10   A     I do.
11   Q     And again, why do you do that?
12   A     Well, because I want to be able to work off the copy as
13   opposed to working off of the original.
14   Q     Prior to your forensic examination on the items that
15   are in front of you, the two laptops and the three thumb
16   drives, that's what we'll be talking about, so prior to your
17   examination of those particular items, are you aware if the
18   items were examined by Canadian authorities?
19   A     Yes, I was told they were examined in Canada as well.
20   Q     Can you tell us, please, what impact if any will a
21   prior forensic examination have on a future examination?
22   A     None whatsoever.
23   Q     Did the prior Canadian forensic examination have any
24   impact on your examination?
25   A     No, it didn't.
```

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 430 of 890
**A423**
Case 5:11-cr-00602-GTS   Document 166   Filed 05/30/14   Page 260 of 275

Brian Braisted – Direct

395

1    Q    How do you know?

2    A    Well, because I did an independent exam, I did an exam

3    from soup to nuts without regard to what they had done.

4    Q    You earlier talked about a hash algorithm; did you use

5    a hash algorithm for the image that you created?

6    A    Each of the devices I imaged, I had a hash algorithm

7    for each one of those, yes.

8    Q    And does that algorithm give you hash values for the

9    item that you image?

10   A    Yes.

11   Q    Did you do a hash algorithm of the original evidence?

12   A    Yes.

13   Q    Once you had those hash values, what did you do?

14   A    I compared them one to the other to determine and

15   verify that I had true images, true copies.

16   Q    Did you review the Canadian hash algorithms for the

17   Toshiba and the Compaq?

18   A    Yes.

19   Q    Were you provided those?

20   A    Yes.

21   Q    And what was the result of that comparison?

22   A    They were a match for what I had created as well.

23   Q    After you imaged the items that we're going to be

24   talking about, again, the two laptops and the three thumb

25   drives, what was the next step?  Did you analyze what you

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 431 of 890
**A424**
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 261 of 275

Brian Braisted - Direct

396

1   imaged?

2   A     Exactly.  What I then do is I process the created

3   images using special forensic software FTK and EnCase.

4   Q     Can you describe that process?

5   A     Well, basically I put the evidence, the original

6   evidence away, I'm now working off of a hard drive that

7   contains the images and I have, on my forensic machine I have

8   EnCase and FTK installed so I begin processing the images

9   using those pieces of software and, for example, FTK will

10  open up the image and will begin looking at each individual

11  file and categorize that file as to what kind of content it

12  is, whether it's a document, a graphic file being a picture,

13  a movie file, a spread sheet, and it will, once processed, it

14  will put those in containers for me and so I can look at them

15  in a systematic manner.

16  Q     When you looked at the image that you made, did you

17  also look to see what the BIOS information is and was?

18  A     The BIOS actually comes off of the two laptops, and

19  yes, I checked the BIOS information as well.

20  Q     What is BIOS information?

21  A     BIOS is the basic input/output system on a computer.

22  When you turn a computer off, basically it goes dead except

23  for a little tiny piece of software that's located on the

24  motherboard and that's the BIOS and when you turn the

25  computer on again, the motherboard looks at this BIOS and the

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 432 of 890
A425
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 262 of 275

Brian Braisted – Direct

397

1    BIOS tells it, okay, go to the mouse, and go to the keyboard

2    and then go to a hard drive, and once the computer knows

3    where to go to on the hard drive, it starts booting up the

4    operating system, in this case the Windows operating system.

5    So the BIOS is just the very preliminary piece of software

6    just to get the computer started and pointing in the right

7    direction.

8    Q    Were you able to confirm date and time information by

9    reviewing the BIOS information?

10   A    Yes, the BIOS has a date and time clock, a system clock

11   and I looked in the BIOS and saw that the date was correct,

12   was a valid date for the date that I checked, and the time

13   was about 10 minutes ahead of the actual local time.

14   Q    When conducting your examination, do you like to

15   determine whether that BIOS information is correct, so that

16   you can report what's on the media as the date that's on the

17   media?

18        MR. GOLDSMITH:  Objection, form.

19        THE COURT:  Why don't you rephrase it.

20   Q    What do you look at the BIOS information for?

21   A    I like to know if the system clock is accurate so I can

22   then say the file create dates, modified dates and last

23   accessed dates actually reflect a true date.

24   Q    And in this case, your finding was it was off by about

25   10 minutes?

Brian Braisted - Direct

1    A    For the Toshiba I said.

2    Q    Starting with the Toshiba laptop, how did you analyze

3    the image that you created off of the hard drive?

4    A    I processed it in FTK and EnCase and then I looked

5    through there for evidence of the charges that were alleged

6    on the search warrant.

7    Q    What were those charges?

8    A    It related to child pornography, possession,

9    distribution, transportation, receipt, and production.

10   Q    So when you were doing your analysis, were you looking

11   for evidence of child pornography?

12   A    Yes, I was.

13   Q    Did you find any evidence of child pornography on the

14   Toshiba laptop?

15   A    Yes, I did.

16   Q    What did you find?

17   A    I found about 594 graphic files, picture files of child

18   pornography, and I believe I identified initially three

19   multimedia video files of child pornography.

20   Q    When you indicate you initially identified three, did

21   you do more than one examination?

22   A    Yes, I did.

23   Q    And on -- after having done more than one examination,

24   did you identify other multimedia files as child pornography?

25   A    Yes, I did.

Brian Braisted - Direct

399

1    Q    And some -- let's start, please, if we could with the

2    images of child pornography.  Do we use interchangeably image

3    and picture?

4    A    Graphic file or picture would probably be best.

5    Q    Can you tell us where you found those graphic files?

6    A    They were two basic locations, one was in system volume

7    information and one was in thumb cache.

8    Q    Can you describe for us what both of those are.

9    A    The system volume information on the Windows operating

10   system.  Windows is a pretty sophisticated operating system

11   and what it will do while you're using the computer is

12   periodically it will take a snapshot of the computer and that

13   snapshot captures the computer settings, files and folders

14   that are contained on that computer, and then it saves all of

15   that data into the system volume information folder in what's

16   called a restore point.  So you're using the computer for

17   months and months and months and at some point maybe your

18   computer starts to act badly.  There's some kind of a

19   conflict between the operating system and something that's

20   been installed on the computer.  What you can do is you can

21   go into your control panel on your computer and there's a

22   button in there for restore to an earlier date and if you

23   select that restore to an earlier date, it will show you a

24   calendar on the computer of all the restore points that were

25   captured by the snapshots of the operating system, and you

Brian Braisted – Direct                                    400

1   click on one of those restore points and the Windows

2   operating system will pull all the data out of system volume

3   information and it will restore your computer back to the

4   configuration it was, that it was at that particular date,

5   and the idea is that if you somehow picked something up, not

6   necessarily a virus but just a downloaded program that's not

7   operating properly with the Windows operating system, by

8   going to one of these previous dates when things were working

9   right, you're going to alleviate your problems.

10  Q    I believe you indicated that you found images, graphic

11  files in another location besides the system volume

12  information?

13  A    Yes.

14  Q    Can you explain that as well?

15  A    There were also pictures in thumb cache and what thumb

16  cache is in Windows Vista operating system, if you have a

17  folder that contains pictures or movies or audio files and

18  you look at your folder in the thumbnail view, that will make

19  a little tiny picture of each one of those files within your

20  folder.  And so let's say you have a folder with a hundred

21  pictures and the pictures are just made by your digital

22  camera, six-digit identifier, really doesn't help you when

23  you're looking for a particular picture.  So the thumbnail

24  view will create a tiny little thumbnail picture of what that

25  file contains.  Now rather than looking at a file name,

Brian Braisted - Direct                    401

1    you're looking for that particular picture.  Thumb cache,

2    that's where all these little tiny pictures are stored, is

3    the thumb cache.

4    Q    I'm now handing you what's previously been marked as

5    Government's Exhibit 3B and I've taken it out of the sleeve.

6    For the record it does contain 25 pages.  You take a look at

7    Exhibit 3B, those pages, and tell me if you recognize what

8    they are.

9    A    Yes, I do.

10   Q    What's in Exhibit 3B?

11   A    Exhibit 3B, these are screen captures I made of the

12   subject's Toshiba laptop computer.

13   Q    What's a screen capture?

14   A    A screen capture is a digital picture of what was on

15   the screen on the laptop.

16   Q    Is that a computer-generated document?

17   A    Yes, it is.

18   Q    Did you create these 25 pages from a computer-generated

19   document?

20   A    Yes, I did.

21   Q    These were printed from the computer?

22   A    Exactly.

23   Q    And this is information that was stored by the

24   computer?

25   A    Yes.

Brian Braisted – Direct                                    402

1    Q    How did you create Exhibit 3B, pages 1 through 25?

2    A    Well, I wanted to see what exactly the Toshiba laptop

3    computer would look like in use but I don't want to actually

4    use the original hard drive, so what I did was I took a clean

5    laptop hard drive and I took the image of the Toshiba laptop

6    and I used a piece of software to restore the image over onto

7    this clean laptop hard drive, and I removed the laptop from

8    evidence, I opened it up and I removed the original hard

9    drive, I replaced it with this restored hard drive and I

10   turned the computer on.  And when I turned the computer on,

11   these are the pictures that appeared on the computer.

12   Q    And do pages 1 through 25 fairly and accurately depict

13   the screens as you saw them on the Toshiba?

14   A    Yes, they do.

15        MS. THOMSON:  At this time, your Honor, I would

16   move to admit Government Exhibit 3B, pages 1 through 25.

17        THE COURT:  Any objection or voir dire?

18        MR. GOLDSMITH:  Brief voir dire if I may, your

19   Honor?

20        THE COURT:  You may.

21        VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q    Special Agent Braisted, is there any qualities or

23   coding on the hard drive that was used to create the screen

24   caps that would indicate if the files had been changed in any

25   way since May 24th of 2009?

Brian Braisted - Direct

403

1    A    I'm -- one more time, please.

2    Q    Sure.  Is there anything within the hard drive that was

3    used to create the screen caps, any information that would

4    indicate if any of the files had been changed on that hard

5    drive from May 24th of 2009 to the date when you examined it?

6    A    Yeah, there were no indications of any files being

7    created or changed in any way subsequent to the 24th.

8    Q    And there was -- and that would be reported during the

9    imaging process, or at a different point?

10   A    Well, as I said, the hard drive that I put into the

11   Toshiba laptop was based off of a restored image.  That

12   restored image is a bit-for-bit copy of the original hard

13   drive, so all the file dates, everything is as reported in

14   the original, the FTK report, and looking through the FTK

15   report there were no files created after the 24th.

16   Q    And so essentially this was -- there was no indication

17   of any changes from the point that you made your image copy,

18   correct?

19   A    Exactly, yes.

20   Q    All right.  But it could not report to you whether or

21   not there were any changes provided prior to your making the

22   imaged copy, in other words there's no indications that you

23   have as to any changes or whether there were changes prior to

24   when you made your image copy?

25   A    Well, I can compare my -- the hash value for my image

Case 5:14-cr-00088-EAW Document 103-1 Filed 01/12/16 Page 439 of 890
A432
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 269 of 275

Brian Braisted - Direct

404

1   copy to the hash values that the Canadians obtained I believe

2   in August of 2009, so there were no changes from those.

3   Q     So you did, as part of your process, do a comparison of

4   your hash values to that of the Canadians?

5   A     Not initially but very recently they provided their

6   hash values and I then compared them to mine.

7   Q     And that was done, your comparison was done prior to

8   the creation of these screen caps?

9   A     No, no, these screen caps were done probably in October

10  of this year, of 2013.

11  Q     And when approximately did you perform this comparison

12  of the hash values between your study and the Canadian study?

13  A     Well, the Canadian -- for the images we're talking now?

14  Q     Yes.

15  A     That would have been last week I believe I received

16  those hash values.

17  Q     How did you perform your comparison between your hash

18  values and the Canadians'?

19  A     It's a 32-character-long value, so I just looked at my

20  value, compared it to their value.

21  Q     Did you do that manually or with computer software?

22  A     No, to look at the hash value itself, it's just looking

23  at it manually.

24        MR. GOLDSMITH:  No objection.

25        THE COURT:  It will be received.  Counsel, would

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 440 of 890
**A433**
Case 5:11-cr-00602-GTS Document 166 Filed 05/30/14 Page 270 of 275

405

1     you please approach the bench.  Please feel free to stand up

2     and stretch if you'd like.

3                  (A discussion was held off the record at side

4                   bar.)

5         THE COURT:  Is this a good place to break as far as

6     you're concerned?

7         MS. THOMSON:  Sure.

8         THE COURT:  Okay.  Here's the situation.  I was

9     going to try and finish up this witness, keep you a little

10     longer so that we could finish up this witness before the end

11     of the day, because we're about at break time, but I'm being

12     informed both by the Assistant United States Attorney and the

13     defense counsel, I'm going to make my jury happy because

14     they're going to get to go home but I'm not going to make you

15     happy.  It's going to be an extensive period of time, we're

16     talking at least another hour, hour and a half, so I can't

17     keep you or court personnel here.  So we're going to break

18     for the day now, let you go home, we're going to come back in

19     the morning.  I apologize, I tried but it's just not going to

20     work.

21         And here's what we're going to do.  As of right

22     now, the reports that we're getting, is in the Syracuse area

23     6 to 10, and I think you're all in the Syracuse area or

24     north, is that right, show of hands, is that correct?

25     Everybody is Syracuse or north, correct?  All right.  And

1   people that are north are damn tough because you deal with it

2   all the time.  Depending how far north you are, Pulaski I

3   heard, I remember that.  So here's what we're going to do, as

4   of right now, the snow is supposed to hit around midnight

5   tonight, get started, okay, are the reports.  There's no

6   indication how long it's going to last that I've heard, so

7   unless it snows all night which for 6 to 10, that's not

8   really possible, unless it's in dribs and drabs, they should

9   have it cleaned up in the morning and you should be able to

10  get here.  So I was thinking about starting at 10 but I don't

11  think we need to do that.  I'm going to say 9:00 in the jury

12  room.  And lookit, I don't want anybody getting hurt.  If the

13  roads are bad, Lori's got all your numbers or you can call

14  in, she will give you a number, and let us know what's going

15  on, if you're having a problem.  I don't want you in any type

16  of -- putting yourself in any sort of dangerous situation if

17  the roads are not passable, okay.  But as of right now,

18  unless you hear something different from us, we will contact

19  you if there's something that's really changing in the

20  forecast.  And what we're looking at for the morning hours,

21  we're going to try and start at 9:00, okay.  I ask you to get

22  here, try and be here at 9:00, and if anything changes, we'll

23  call you, okay.  Or you can call and check in if you're

24  concerned about what the roads look like, coming from

25  wherever you're coming from, okay, just call us and let us

1   know.  And if we have to wait a little bit for some of you to

2   get here, we can do that, all right.  Obviously we don't like

3   to do that, but if it's a dangerous situation, we will do it.

4   Okay.  No problem.  Safety, number one.  All right?

5           Second issue.  As I indicated earlier today, I did

6   notice at least one reporter in here, again, please, please,

7   please, understand under your oath, do not read, listen, or

8   view anything to do with this case.  If you check the

9   computer for news or whatever you do, you know, notice that

10  there's something about it, shut it off, put it away, don't

11  view it, don't listen to it, okay.  Don't want you influenced

12  by somebody else's view of what's going on in this courtroom.

13  It's your view that matters and counts, okay.  Don't discuss

14  the case with anybody.  If anybody approaches you, tries to

15  talk to you about this case, I need to know about it

16  immediately.  All right.  I don't think you'll have any

17  trouble getting home, so have a good night, safe travels in

18  the morning, and we'll see you then, okay.

19               (Jury Excused, 4:38 p.m.)

20          THE COURT:  Okay.  We'll pick it up with direct

21  examination in the morning.  Unless there's anything else

22  before we break, we'll see you tomorrow morning.

23  Approximately how many more witnesses?

24          MS. CARROLL:  Your Honor, we only have four more

25  witnesses and they are all very brief.  They're witnesses who

1    identified the children in the images.  And we have the

2    corporal from the jail who will authenticate the jail call.

3    So we were wondering about the possibility of a charging

4    conference.

5               THE COURT:  Yeah, well, that's why I'm asking.  I'm

6    trying to find out, so sounds like you're going to be done in

7    the morning.

8               MS. CARROLL:  I believe so.

9               THE COURT:  Okay.  And you don't have to tell me a

10   thing about what you're going to do or not going to do, but

11   if that's the case, we should look at doing a charge

12   conference, sounds like we might have to do it before then.

13   You know what we'll do, depending on where we are, if we're

14   getting close to lunch, that's perfect, there's not an

15   extensive amount of charges in this case, it's pretty

16   straightforward, we have two counts, and I think we can

17   expedite this, we can get done pretty quickly a charge.

18   We'll try and have a proposed charge prepared for you to give

19   to you in the morning so you can take a look at it, on breaks

20   or whenever you get a chance, and then we'll just look for a

21   time to do a charge conference.  If we have to keep the jury

22   available to come back for closings, we'll do that.

23              But I think if things work out the right way,

24   saying that our witness here is going to be an hour and a

25   half to two hours, you do the calculation, going to be pretty

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 444 of 890
A437
Case 5:11-cr-00602-GTS  Document 166  Filed 05/30/14  Page 274 of 275

409

1    close to lunchtime, so this could work out fine, even if I

2    have to send the jury to lunch a little early, we'll do our

3    charge conference, have a lunch break, we'll sum up, if

4    that's the way it's working out, and then we can go from

5    there.  Okay?  Just so everybody's prepared, so you should be

6    prepared, sounds like barring whatever defense decides to do

7    or not do, that we're going to be doing summations tomorrow.

8    Okay?  Anything else?

9              MS. CARROLL:  That's it.

10             THE COURT:  Counsel?

11             MR. GOLDSMITH:  Nothing.

12             THE COURT:  All good?  Okay, we'll see you in the

13   morning.  Hopefully at 9:00.

14             THE CLERK:  Court's in recess.

15             (Court Adjourned, 4:40 p.m.)

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

 4      Realtime Court Reporter, in and for the United States

 5      District Court for the Northern District of New York, DO

 6      HEREBY CERTIFY that pursuant to Section 753, Title 28, United

 7      States Code, that the foregoing is a true and correct

 8      transcript of the stenographically reported proceedings held

 9      in the above-entitled matter and that the transcript page

10      format is in conformance with the regulations of the Judicial

11      Conference of the United States.

12

13                        Dated this 23rd day of May, 2014.

14

15

16                        /S/ JODI L. HIBBARD
                          _____
17                        JODI L. HIBBARD, RPR, CRR, CSR
                          Official U.S. Court Reporter
18

19

20

21

22

23

24

25
```

```
                         VOLUME III
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                         5:11-CR-602

JOSEPH VINCENT JENKINS,

                         Defendant.

-------------------------------------------x
```

     Transcript of a Jury Trial held on February 5,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


                     A P P E A R A N C E S

```
For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWEN CARROLL, ESQ.


For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007
```

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

411

I N D E X   O F   T E S T I M O N Y

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Brian Braisted | 412 | 497 | 524 | -- |
| Chad Willard, recalled | 530 | 533 | -- | -- |
| Joshua Findley | 537 | 542 | 543 | -- |
| Christopher McClellan | 545 | -- | -- | -- |
| Justin Myers | 548 | -- | -- | -- |
| Michael Wojeski | 552 | 561 | -- | -- |
| Joseph Vincent Jenkins | 577 | 608 | -- | -- |

412

```
 1              (Open Court, Jury Out, 9:08 a.m.)

 2         THE COURT:  Good morning.  We're in the courtroom

 3   outside the presence of the jury.  Are you all set, your

 4   witness make it back or did he stay or whatever?

 5         MS. THOMSON:  He traveled back from Buffalo this

 6   morning.

 7         THE COURT:  Good for him.  You ready to go?  We've

 8   got all our jurors so we'll go ahead and get started.

 9              (Jury Present, 9:09 a.m.)

10         THE COURT:  Okay.  The record should reflect that

11   we have our complete group of hardy jurors that had no issue

12   this morning, right?  Little slippery maybe, but not bad.

13   I'm glad to see that you all got here safe.  We were on

14   direct examination and we'll continue with the government's

15   examination.  Go ahead.

16         MS. THOMSON:  Thank you, your Honor.  At this time

17   I'm going to approach the witness with what has been received

18   into evidence as Government's Exhibit 3B.

19

20         B R I A N   B R A I S T E D , recalled as

21   a witness and being previously duly sworn, testifies

22   as follows:

23         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

24   Q    Agent Braisted, since we've had a break since the

25   beginning of your testimony I just would like to cover a few
```

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 449 of 890
A442
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 4 of 246

Brian Braisted – Direct

1    things before we start looking at Exhibit 3B.  I believe

2    yesterday during your testimony you identified that you as

3    part of your examination computed hash values for the items

4    that you examined, is that correct?

5    A    Correct.

6    Q    So if I understand when you made the image of the items

7    that were in evidence, you computed the hash values of each

8    of the image and video file that you found on the Toshiba and

9    all the other electronic media, is that right?

10   A    Well, initially when I image it, I create a hash value

11   of the totality of the hard drive, the thumb drive, and the

12   totality of the image created.  So those hash values are just

13   for the overall products.  Then when I process the evidence,

14   the image file within FTK or in EnCase, those two programs

15   actually create a hash value for each individual file within

16   there.

17   Q    And so when you have that hash value, do you do a

18   comparison of the image that you created against the original

19   evidence?

20   A    Yes.

21   Q    And what was that, what did that comparison result in?

22   A    It showed that the image was a bit-for-bit copy of the

23   original evidence.

24   Q    Did you also have the opportunity with the Toshiba

25   laptop to do a hash comparison to the image that the

Brian Braisted – Direct                          414

1    Canadians made of the Toshiba?

2    A      Yes.

3    Q      And what was that hash comparison result?

4    A      Again, the hashes were identical indicating that my

5    image copy was the same as their image copy, the same as the

6    original evidence.

7    Q      Now as we were talking about the Toshiba, if we could

8    discuss the Toshiba at length.  If we could look at

9    Exhibit 3B, please.  Can you tell me if you recognize page 1

10   of 3B.

11   A      Yes, I do.

12   Q      What is that?

13   A      This is a screen shot of the desktop for the user

14   account Joe on the Toshiba laptop.

15   Q      How do you know it's the user account Joe?

16   A      When I first booted up the system, it goes through, you

17   see the Windows booting up, go through a splash screen for

18   Windows and then once the program is totally booted up you'll

19   have a blue page and you'll have a little icon for each user

20   account that's installed on the computer, and in this case

21   there was a single icon, and it was labeled underneath it Joe

22   so that was the only user account on this computer.

23   Q      So if I understand page 1, Exhibit 3B, this is what the

24   computer looked like when it's powered up?

25   A      Once you click on the user account, Joe, it opens up to

Brian Braisted - Direct                    415

1   this desktop page.

2   Q     The items that are located on here, particularly in the

3   rows on the left-hand side, is there a word for those little

4   picture images?

5   A     They're called icons.

6   Q     How do icons get on a desktop?

7   A     Some icons are created at the time of the program, or

8   the operating system is installed.  For example, up in the

9   very top left, you see Recycle Bin, that's a

10  Windows-installed icon.  Some of the icons are installed by

11  the user, for example, New Folder 2, 2 MB, these were folders

12  that were created on the desktop at a later date.  Then there

13  are also icons that are created by programs installed on the

14  computer.

15  Q     You indicated that a user can add icons to their

16  desktop; how does that happen?

17  A     Just by moving your curser anywhere on the desktop and

18  right click and you'll get a little box opening up, give you

19  some choices and one of the choices will be to create a

20  folder.

21  Q     You mentioned there are some that are added as a result

22  of -- is it internet activity?

23  A     Internet activity.

24  Q     Right.  Can you give some examples of some icons that

25  are on here that would show internet activity?

Brian Braisted - Direct                    416

1    A     Well, they don't really show internet activity.  I can

2    specify the icons, I pointed out Recycle Bin would be an icon

3    that's created automatically by the operating system, there's

4    several here, see if I can -- if I touch the screen I don't

5    know if it will bring it up to the jury, but up along the top

6    rows you'll see Toshiba, Toshiba offers, underneath that

7    Toshiba registration, so those are all icons that were loaded

8    in the operating system bundled with the operating system and

9    when the operating system was installed, they were

10   automatically put on this desktop.

11   Q     And if we could see page 2, please.  Looking at page 2,

12   do you see an icon that you've already described as New

13   Folder 2?

14   A     Yes, right in the center of this screen shot.

15   Q     Now is New Folder 2 an icon that was there at setup or

16   was that added by a user?

17   A     That would be added by a user.

18   Q     And did you examine the contents of New Folder 2?

19   A     Yes, I did.

20   Q     Were you able to establish when New Folder 2 was added

21   to the desktop?

22   A     As I recall New Folder 2 was created on January 19th,

23   2009.

24   Q     Is New Folder 2 visible to any user of the desktop?

25   A     Yes.

Brian Braisted – Direct                                    417

1    Q      And forensically, is that significant to you?

2    A      It is because it means that anyone who uses this

3    computer would have ready knowledge and access to that

4    folder.

5    Q      Knowledge and that it's visible?

6    A      Absolutely.

7    Q      So when you're looking at it, you can see New Folder 2?

8    A      Right.

9    Q      And if we could see page 3, please.  Looking at page 3,

10   can you tell us what that is?

11   A      Yes, if you look at the very top of the screen, this is

12   Windows Explorer view and it shows that this is the contents

13   of New Folder 2, and within New Folder 2 you'll see that

14   there's four subfolders labeled Homework, New Folder 98, Zoe,

15   and New Folder, and in addition to these folders is also 33

16   video files, they're spread throughout this page, Blue System

17   Laila, there's a number of video files in here, and when I

18   opened up Homework, New Folder 98, Zoe, and New Folder, I

19   found additional video files.  So in total within this

20   New Folder 2, there were 55 video files contained on the

21   computer.

22   Q      If we could look at the first row, over towards the

23   end, the third icon from the right, I'm looking at the screen

24   now and it indicates four files, and the two middle ones, the

25   names KP432 Bate 215 and KP432 Bate 15, are those videos that

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct

418

1    are contained on this desktop saved in New Folder 2?

2    A     Yes, they are.

3    Q     And the screen that we're looking at, page 3, is that

4    the screen of what you see when you click on New Folder 2?

5    A     Yes, it is.

6    Q     And if we could go to page 4, please.  Can you tell us

7    what page 4 is?

8    A     One of the folders, subfolders contained in New Folder

9    2 is a folder created by the user and named Zoe and when you

10   open up the Zoe folder, you'll see that there's 10 video

11   files all with the word Zoe in them and I viewed those files.

12   Each one of them depicts the same girl, presumably named Zoe,

13   or at least that's the name she's using on these, in these

14   videos, and four of them were categorized as child

15   pornography.

16   Q     And if we could blow it up a little bit so that you can

17   see the titles of each of these files and you can tell us

18   what the titles are?

19   A     From left to right the file titles, and these are

20   descriptive of what was found in the videos, the first one is

21   Zoe Down Top, and two are Zoe pj1 and pjs2, Zoe First Ever

22   Bate Part 1, Zoe's First Ever Bate Part 2 --

23   Q     Let me stop you for a moment.  You've reviewed these

24   video files?

25   A     Yes.

Case 5:14-cr-00088-EAW Document 70 filed 01/12/16 Page 455 of 890
**A448**

Brian Braisted - Direct                         419

1   Q     And with regard to Zoe's First Ever Bate and First Ever

2   Bate Part 2, what is depicted in the files?

3   A     It -- the girl starts out clothed and through the video

4   she takes her clothes off and then she masturbates for the

5   video.

6   Q     Is that what you understood bate to refer to?

7   A     Exactly.

8   Q     Have you seen bate shortened in that capacity before in

9   your examinations of child pornography?

10  A     It's not unusual, yes.

11  Q     If we could continue on with the icons.

12  A     There's Zoe Show, Zoe Show 2, Zoe Tit Flash, Zoe Tits

13  Arse 2, and Zoe Tits Vag.

14  Q     And if we could see page 5, please.  And if I

15  understand correctly, page 5 is what the computer looks like

16  when you turn it on?

17  A     That's the desktop, yes.

18  Q     Did you find in your examination any evidence of any

19  type of file wiping software installed?

20  A     Yes, there's a file program named CCleaner and it's

21  actually, there's a shortcut file to that right on the

22  desktop.

23  Q     And do you see that displayed in front of you?

24  A     It is down to the lower left on the screen, it would be

25  a big C and then underneath it says CCleaner.

Brian Braisted - Direct                         420

1   Q      What happens when you click on CCleaner?

2   A      That launches the program.

3   Q      If we could see page 6, please.  Does this screen

4   depict what you see when you click on the CCleaner program?

5   A      Exactly, when the screen is opened you'll see a screen

6   like this and you'll see up here there's two tabs, Windows

7   and applications, and when I launched this program, the

8   Windows tab was already open, and underneath the Windows tab

9   there are file categories for Internet Explorer, Windows

10  Explorer, and System and for each one of those file

11  categories the user can designate by a check which files he

12  wants to be wiped from the computer, and in this case the

13  user indicated that he wanted all files created through

14  Internet Explorer, that would be temporary internet files,

15  cookies, history, recently typed URLs, URL is Uniform

16  Resource Locater, that's basically the website, when you want

17  to go to a website on the computer, you type a website into

18  your, into your -- the search bar, and last download location

19  and auto complete form history.

20          For Windows Explorer, he wanted recent

21  documents deleted, under System he wanted the empty Recycle

22  Bin, temporary files, et cetera.  So once you check those

23  blocks, if you go down to the bottom of the page you'll see

24  over to the left of that, please, it says analyze, and when

25  you click on analyze, CCleaner will search through the hard

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 457 of 890
A450
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 12 of 246

Brian Braisted - Direct                                     421

1    drive for all files that fit these categories that are blue

2    checked.  And then it will give you a display within that

3    open window, it will tell you all the files that it found

4    that fit those categories, and how much space they take up on

5    the computer.  And then if you go to the very bottom right,

6    where it says run cleaner, when you click that button, then

7    the program starts to wipe all of the files that fit those

8    categories.

9    Q    Did the presence of the CCleaner have any significance

10   to you in your forensic examination?

11   A    It deleted files that would indicate certain internet

12   activity, yes.

13   Q    And if we could see page 7, please, going again to the

14   start page of the desktop, do you see an icon on that start

15   page for 2 MB?

16   A    Yes, down at the bottom, very bottom row.

17   Q    Did you view the contents of 2 MB?

18   A    Yes, I did.

19   Q    And to view the contents, do you click on that icon?

20   A    Just click on the icon and it will open up a window

21   showing you the contents of the folder.

22   Q    When you click on an icon such as 2 MB, and you do no

23   more than click on it, you open it and view it and then close

24   out of it, does that change the content of 2 MB?

25   A    No, it does not.

Brian Braisted - Direct                            422

1   Q     If we could look at page 8, please.  Can you tell me

2   what page 8 is?

3   A     Page 8 shows that within the folder 2 MB there were 21

4   subfolders, and each one has a unique name below the folder,

5   these were all user-added folders within 2 MB.

6   Q     And was 2 MB a user-added folder to the desktop?

7   A     Yes, it was.

8   Q     So within 2 MB there were also added folders?

9   A     Exactly.

10  Q     If we can just look at the first row, perhaps the first

11  couple of files.  Can you tell me just the names of the first

12  couple files in 2 MB?

13  A     They're labeled 6, ATV trip, and D Load.

14  Q     The one that's labeled ATV Trip, ATV, is that shortened

15  for all-terrain vehicle?

16  A     Yes.

17  Q     And if we could look at the second row as well, third

18  from -- second from the right.  You also see a trip ATV?

19  A     Yes, I do.

20  Q     And that was located in a folder on the 2 MB folder?

21  A     Correct.

22  Q     And if we could see page 9, please.  Do you recognize

23  page 9?

24  A     Yes, one of the subfolders to the 2 MB folder is a

25  folder labeled Estimates and when I opened the Estimates

Brian Braisted - Direct                                423

1    folder, this is what I see.  There's a long list of files

2    within that folder, primarily text documents or spreadsheet

3    documents.

4    Q    Go ahead.

5    A    One of the documents on there, I opened up, it says

6    Ciccino's Service material quote and when I opened it, I see

7    that there's a spreadsheet and in the top of the spreadsheet

8    there's Jenkins Electric with a business address and a phone

9    number and a fax number and it looks like it's a request for

10   quote for electrical service, so it appeared to me that

11   within this folder, Mr. Jenkins was storing business records.

12   Q    Or the user of this computer was storing records?

13   A    Yes.

14   Q    And one of those records appears to be Jenkins

15   Electric.  Can you tell us what that address is?

16   A    4072 Dwyer Lane, Geneva, New York.

17   Q    And that came from the -- I'm not sure how to say it,

18   Ciccino's?

19   A    Ciccino's Services material quote.

20   Q    And that was located within the Estimates file in the

21   2 MB folder?

22   A    Yes.

23   Q    If we could see page 10, please.

24   A    This is another file that I opened within that

25   Estimates folder, the file name is RR Info, and then you open

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 460 of 890
A453
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 15 of 246

Brian Braisted - Direct                      424

1    it, you'll see it opens in Notepad and the top of the Notepad

2    shows RR info which I believe it's referring to Road Runner

3    info.

4    Q      Why do you think Road Runner?

5    A      Well, I'm looking underneath there and there appear to

6    be three e-mail addresses with rochester.rr.com which is the

7    Road Runner e-mail, the way that Road Runner e-mail structure

8    is.

9    Q      And so within the Notepad folder, can you tell us the

10   three e-mail addresses that you can see in Notepad?

11   A      Yes, there's a gjenkins@rochester.rr.com.  And then

12   below that, jjenkins70@ and below that, jenkinselectric@, and

13   underneath each of those e-mail addresses appear to be

14   passwords for each individual account.

15   Q      Looking at the jenkinselectric@, what's the item that

16   you describe to be as something that appeared to be a

17   password?

18   A      Joseph70.

19   Q      And if we could see page 11, please.  Can you tell us

20   what page 11 is?

21   A      Page 11, this is another file I found within the

22   Estimates folder, the file name itself is LNK, and when I

23   opened up LNK it opens up in Notepad and it has some

24   terminology in there that would indicate to me that this is

25   designed for a user to be able to access websites that have

Brian Braisted – Direct                                              425

1   child pornography content.

2   Q     Why?

3   A     At the very top it reads, "Gateways Read All New

4   Added."  Underneath that, "Please remember some of our

5   gateways.  If the BBS is delete, you will find us using these

6   gateways."  And the term BBS stands for bulletin board

7   system.  Below that there is a web page, www.bbznet.com, and

8   to the far right of that there's a user and then this would

9   be a password to get into that particular board, and the user

10  password would be lollybbs.  One of the most common terms in

11  child pornography is Lolita, which refers to an underage

12  female who's sexually attractive to some males, so Lolly

13  would be an abbreviation of Lolita.

14  Q     Have you seen in the forensic examinations you've done

15  related to child pornography that term Lolly before?

16  A     Yes, I have.

17  Q     Looking at the first couple of entries where it says

18  HTTP, could you tell us some of the entries at the end?

19  A     Yes.  These are all to one website called tymisk.com

20  and then there's subfolders to that.  One of them is Lillie

21  Planet, below that would be mylollybbs and further down,

22  yourloplace, those are all terms that I would say would

23  indicate child pornography.

24  Q     If we could look at page 12, please.  Do you recognize

25  page 12?

Case 5:14-cr-00088-EAW Document 70 Filed 04/12/16 Page 462 of 890

Brian Braisted – Direct                    426

```
1    A     Yes, I do.

2    Q     What is page 12?

3    A     Within the 2 MB folder, there's a subfolder called 6

4    and this is the contents of folder 6, and it contains 10

5    stickam videos.  A stickam is a web camera that feeds

6    directly into your computer and then can be fed into the

7    internet.  And each of these stickam videos depicts one or

8    two females engaged in sexual activity.

9    Q     Did you review each of the files that are shown?

10   A     Yes, I did.

11   Q     What are some of the names of these files?

12   A     Stickam_ Gina, stickam_ Gretchy, stickam_Nicole,

13   stickam_Rach, stickam_Sammylove, stickam_Shelb,

14   stickam_sosexy, stickam_Taylor15, stickam_tragedy, and

15   stickam_xoKatieox.

16   Q     If we could see page 13, please.  Do you recognize

17   page 13?

18   A     Yes, I do.

19   Q     What is page 13?

20   A     Page 13 is the Favorites folder for the user account

21   Joe.

22   Q     What is a Favorites folder?

23   A     A Favorites folder, it's created by the Vista operating

24   system when a user account is created, and the Favorites

25   folder is where all internet shortcuts or bookmarks for the
```

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 463 of 890
**A456**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 18 of 246

Brian Braisted - Direct                                    427

1   internet are stored for that particular user account.

2   Q     And would that be user directed so that the user

3   created that favorite?

4   A     Well, the Favorites itself is created by the operating

5   system, so there's a folder created as soon as a user account

6   is installed, and then if you look at the top of this page,

7   it shows there's some yellow boxes underneath the title name

8   and for example Microsoft websites, and MSN websites, those

9   would have been already stored in the operating system and

10  created automatically when this Favorites folder was created.

11  Then below that you'll see icons, those would all have been

12  user-created icons.

13  Q     So below the Windows Live items that are located there,

14  the user would have taken an action to get them there?

15  A     Exactly.

16  Q     And do each of these Favorites below the Windows Live

17  represent, if you click on them you would go to a website?

18  A     If you're connected to the internet and you clicked on

19  them, you would go to that particular website.

20  Q     Do you see one referred to anonib stickam girls?

21  A     Yes.

22  Q     Could you read the full title of that?

23  A     "Anonib stickam girls and cam whores."

24  Q     And the one under that, please.

25  A     "Anonibteensnorules."

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct

428

1    Q      And the one on -- directly under, below that.  ATV?

2    A      "ATV horsepower ratings."

3    Q      Below that?

4    A      "ATV 2007 Can-Am Outlander Max 800 HOEFIXT."

5    Q      At the very bottom, second one from the bottom, can you

6    tell us what that one is?

7    A      Yes, that one will be relevant in a few slides,

8    there's -- it's titled, "Elweb Lolita photos BBS gateways."

9    Q      If we could see page 14, please.  Can you tell us what

10   page 14 is?

11   A      Page 14 shows additional bookmarks that were located in

12   the Favorites folder.  There are some bookmarks that would be

13   suggestive to me of child pornography, there's Great Lolita

14   B, Great Lolita BBS, Great Lolita BBS with Chinese characters

15   followed by freeforum.tw.  TW would be indicative of Taiwan

16   and then additional Chinese characters.  Further down you'll

17   see jailbait, underneath that, Lolitafix, below that, Lolita

18   BBS.

19   Q      And if we could see page 15, please.  Can you tell us

20   what page 15 is?

21   A      Page 15 is what I see when I open the Joe Documents

22   folder.  In Documents is another file, it's another folder

23   that's automatically created by the Vista operating system

24   when a user account is created and that's where Microsoft

25   recommends you store personal documents.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 465 of 890
A458
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 20 of 246

Brian Braisted - Direct                                    429

1    Q    And did you see anything within page 15 that had

2    forensic significance to you?

3    A    Yes, down about two-thirds of the way down there's a

4    Word document that's titled Links, l-i-n-k-s.

5    Q    Did you view the Links file?

6    A    Yes, I did.

7    Q    And can you take a look at page 16, please.  Do you

8    recognize page 16?

9    A    Yes.  When I clicked on the Links file it opens up in

10   Microsoft Word and at the very top it says L Web Lobbs, which

11   is close to the bookmark which said L Web Lolita Photos

12   Gateways BBS.  And within this document further down, it

13   shows gateways to include one of the top, extremetracking.com

14   with a login of lobbsgtw, which I would take to be an

15   abbreviation for Lolita bulletin board system gateway.

16   Q    If we could see page 17, please.  Do you recognize

17   page 17?

18   A    Page 17 is the photographs of the pictures, the graphic

19   files that were contained within the Joe Pictures folder when

20   I examined the computer.

21   Q    When it indicates Joe Pictures, is Joe for the user on

22   the desktop?

23   A    User account.

24   Q    And Pictures is the folder that would open up pictures

25   that are stored in that folder?

Brian Braisted - Direct                                 430

1    A      Exactly.

2    Q      What did you find when you opened up the Pictures

3    folder?

4    A      I found there were only seven pictures in there.  Each

5    one of them was received at the computer on May 23rd in the

6    evening, roughly 10:10 at night, so close to the end of the

7    evening before the computer was taken by the Canadians, and

8    each picture depicts a young girl at a beach scene, basically

9    an adolescent female at a beach.

10   Q      And if we could see the next page, please, page 18.  Do

11   you recognize page 18?

12   A      Yes, one of the files when I clicked it to enlarge,

13   that's one of the pictures contained on the hard drive.

14   Q      And were you able to determine the create date?

15   A      It was May 23rd, 2009.

16   Q      Do you know, recall a time?

17   A      It was between 10:10 and 10:15 at night.

18   Q      Were all of those pictures created around the same

19   time?

20   A      Yes, they were.

21   Q      If we could see page 20, please.  I'm sorry, I skipped.

22   Page 19.  Is page 19 what the user sees when they open up the

23   user Joe?

24   A      Exactly, this is the desktop again.

25   Q      Within the desktop, is there an icon that can direct

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 467 of 890
**A460**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 22 of 246

Brian Braisted - Direct                                    431

1   you to mail, e-mail?

2   A      There is, at the very top there is an icon, it says

3   Windows Mail, it's a shortcut icon, and when you click it, it

4   launches a Windows Mail program.

5   Q      And if we could see now page 20.  Is this what you see

6   when you launch the Windows Mail?

7   A      Yes, it is.

8   Q      Could you tell us what's contained in Exhibit 3B,

9   page 20?

10  A      What happened, Windows Mail is a program offered by

11  Vista and you can configure it to receive your e-mail

12  content, you can designate multiple e-mail addresses,

13  multiple e-mail accounts to handle your e-mails.  So this

14  page here shows the last e-mail that was accessed by the

15  computer, it was dated 5/23/2009, and went to the jjenkins70

16  e-mail address and it's addressed to Joseph, it confirms

17  receipt of a payment to My Nationwide for $99.95.

18  Q      And that's addressed to Dear Joseph?

19  A      Dear Joseph, yes.  Now I think what's important here is

20  you also see there's a Windows security box that pops up

21  indicating that a person has to have a user name and password

22  in order to receive these e-mails coming in.

23  Q      And to also go in and look at the e-mails that are

24  contained -- that are received to that e-mail address, would

25  you need a password?

Case 5:14-cr-00088-EAW Document 102-15 Filed 01/12/16 Page 468 of 890
A461
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 23 of 246

Brian Braisted - Direct                                    432

1   A     You would have to have a password to receive them the

2   first time.  Once they're stored on the hard drive you can

3   then look at them on your own.

4   Q     And if we could see page 21, please.  Is this what the

5   user Joe, once you click on user Joe, what the desktop looks

6   like?

7   A     Yes.

8   Q     And looking at page 21, do you see an icon that's

9   called New Camera?

10  A     Yes, on the very bottom, four rows from the left.

11  Q     Would that be a preinstalled icon or would that be one

12  that was added?

13  A     That's added by the user.

14  Q     Did you click on the New Camera?

15  A     I did.

16  Q     And when you clicked on it, can you tell us what

17  happened?

18  A     When I clicked on it, there's a number of pictures

19  contained within that folder; one of those pictures was a

20  picture of the defendant.

21  Q     And can I see page 22, please.  Was this the folder

22  that you found, or the picture of the picture depicted, was

23  that found in the New Pictures icon?

24  A     In the New Camera icon?

25  Q     New Camera icon.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW  Document 70-9  filed 01/12/16  Page 469 of 890
A462
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 24 of 246

Brian Braisted - Direct                              433

1    A      Yes.

2    Q      So this picture was saved on the Toshiba laptop?

3    A      Yes.

4    Q      If we could see page 23, please.  Do you recognize

5    Exhibit 23 -- or page 23 of Exhibit 3B?

6    A      Yes, I do.

7    Q      What is that?

8    A      This is a screen shot of the registry, Windows registry

9    which maintains system settings for the computer, user

10   settings, software settings.  This particular page shows

11   information that would have been received when the operating

12   system was first installed, down near the middle of the page,

13   when the operating system was installed, the user would be

14   prompted to enter a register organization and in this case

15   the user chose not to enter any information there.  It would

16   also be prompted to enter information for a registered owner

17   and in this case the person entered the name Joe, J-o-e.

18   Q      So a user for this Toshiba laptop would have had to

19   enter the name Joe to have it become the registered owner?

20   A      Exactly.

21   Q      Can we see page 24, please.  Can you tell us what

22   page 24 is?

23   A      Page 24 is -- it's a two-part, over on the left, that

24   is the registry information for USB devices that were

25   attached to the Toshiba laptop.  You'll see the key, USB

Brian Braisted – Direct                434

1   store and I opened that and found that there were multiple

2   USB devices that were attached to the computer at one time.

3   Down near the very bottom, seven folders down, seven folders

4   below the USB store it says disk and then PNY Prod USB 2.0.

5   And I opened that folder below that and I found a folder

6   that's labeled 6E741E120B3A.  That would be the serial number

7   for a USB device that was attached to the Toshiba computer.

8   Q     Now when you say serial number, is there an external

9   serial number on the thumb drives that you've examined in

10  this case?

11  A     No, there's not.

12  Q     When you say serial number, where does that number come

13  from?

14  A     That serial number is hard coded into the device when

15  it's made by the manufacturer.

16  Q     So this particular serial number is not visible when

17  you look at the thumb drive?

18  A     Exactly.

19  Q     But it's registered to the computer when it's mounted

20  to the computer?

21  A     The operating system is able to see the serial number

22  that's encoded on the thumb drive.

23  Q     And so if I understand your testimony correctly on the

24  left-hand side of this exhibit, show that, the laptop that

25  the thumb drive is mounted to will store information about

Brian Braisted – Direct                           435

1    what devices were mounted into it?

2    A    Exactly.

3    Q    And so the Toshiba laptop, did it store that this

4    particular thumb drive was mounted to it?

5    A    Yes, it did.

6    Q    Is that a thumb drive that you examined in the course

7    of this investigation?

8    A    Yes, it is.

9    Q    Do you recall which gigabyte thumb drive?

10   A    That is the -- make sure here.  That is the 4-gigabyte

11   thumb drive.

12   Q    And if he could see page 25, please.  Do you recognize

13   page 25?

14   A    25 is again the same user key, same registry key from

15   the Toshiba laptop computer and it shows that two files down,

16   there's a disk and Prod USB flash memory with a serial number

17   of 5B8506000016.

18   Q    And did you see that in any other place, that number?

19   A    Yes, that's the same serial number as the serial number

20   for the 8-gigabyte thumb drive.

21   Q    So looking at, in total, page 24 and page 25, were you

22   able to establish the two thumb drives that you examined as

23   part of this investigation were connected to the Toshiba

24   laptop?

25   A    Yes, I was.

Brian Braisted - Direct                                    436

1   Q      Did you make a CD of the image files that you located

2   of child pornography on the Toshiba laptop?

3   A      Yes, I did.

4   Q      At this time I'm showing you what's been previously

5   marked as Government's Exhibit 3C.  I'm going to ask you if

6   you recognize what Exhibit 3C is.

7   A      Yes.

8   Q      What is Exhibit 3C, please?

9   A      This is child pornography, I initialed and dated it

10  yesterday when I reviewed it.

11  Q      And are those images of child pornography?

12  A      They're graphic files, yes.

13  Q      Did you -- you initialed the CD indicating you reviewed

14  it?

15  A      Yes.

16  Q      Were those images created from your forensic

17  examination of the Toshiba laptop?

18  A      Yes.

19  Q      So that's a copy of the images that were located on the

20  Toshiba laptop?

21  A      Exactly.

22  Q      And is that the images of child pornography?

23  A      Yes, it is.

24  Q      Is that CD a true and accurate copy of the images that

25  you recovered on the Toshiba laptop?

Brian Braisted - Direct                                437

1   A      Yes, it is.

2          MS. THOMSON:  Your Honor, I would at this time move

3   into evidence Government's Exhibit 3C.

4          MR. GOLDSMITH:  Brief voir dire, your Honor?

5          THE COURT:  Go ahead.

6          VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

7   Q      Agent Braisted?

8   A      Yes, sir.

9   Q      You created the CD, correct?

10  A      I created a CD.  The official CD was then created by

11  the U.S. Attorney's office here.

12  Q      Okay.  The CD that you have in front of you, is that

13  the CD that you created or that the U.S. Attorney's office

14  created?

15  A      That the U.S. Attorney's office created.

16  Q      The CD that you created, when was the last time that

17  you saw it?

18  A      Friday.

19  Q      Was it within your roles and responsibilities to take

20  the custody of that CD within this investigation?

21  A      No, I don't believe so.

22  Q      After you created it -- withdrawn.  From last Friday to

23  the time that you created it, was it in your possession?

24  A      This one here?

25  Q      No, the one that you created.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 474 of 890
A467
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 29 of 246

Brian Braisted - Direct                          438

1    A      The one that I created, no, I believe I had -- it

2    remained with the U.S. Attorney's office.

3    Q      Did you have the opportunity to create -- withdrawn.

4    When was the last time you saw the CD that you created?

5    A      Would have been last Friday.

6    Q      Prior to last Friday, when was the last time you saw

7    the CD that you created?

8    A      I created it on Friday from my laptop computer with the

9    contents of the FTK report.

10   Q      All right.  And were you present when the U.S.

11   Attorney's office created the CD that is in front of you now?

12   A      I was -- no, I gave it to them in one office, they went

13   to another machine to create it.

14   Q      Did you have the opportunity to compare the CD that you

15   created with the CD that's in front of you?

16   A      Yes.

17   Q      All right.  Are they the same or substantially the same

18   condition?

19   A      Yes, they are.

20          MR. GOLDSMITH:  No objection.

21          THE COURT:  It will be received.

22          MS. THOMSON:  Your Honor, may we approach briefly.

23          THE COURT:  You may.

24          (At Side Bar.)

25          MS. THOMSON:  We had decided I would flag you when

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 70-1 Filed 01/12/16 Page 475 of 890
**A468**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 30 of 246

Brian Braisted – Direct

439

```
 1   it was time for images and the time's here.  What I intend to

 2   do is to have the witness look at a binder and then see if he

 3   recognizes those images and whatnot and then once they're

 4   received in evidence, I'll give a binder to each member of

 5   the jury.

 6            THE COURT:  Oh, so it won't be on the screens?

 7            MS. THOMSON:  We're not going to use screens for

 8   the images.  We have to for videos, right now we'll be doing

 9   images and then switch to the videos.  Before I switch to

10   video, I will need to --

11            THE COURT:  And we'll take a break at that point

12   and get the jury out of the room, shut those videos off and

13   get set so everybody knows where they're going to be standing

14   to see what's going on, be all set.

15            MR. GOLDSMITH:  Can I have a copy of the images.

16   Okay.

17                 (Open Court.)

18            THE COURT:  Hold on for just a moment.

19            MS. THOMSON:  Would it be okay if I grab the

20   binders.

21                 (Pause in Proceedings.)

22            MS. THOMSON:  May I approach the witness?

23            THE COURT:  You may.

24            CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

25   Q    At this time I'm showing you what's been previously
```

Brian Braisted - Direct                                   440

1    marked as Government Exhibit 3D, 3E, and 3F.  I'm going to

2    ask you if you recognize each of those three exhibits.

3    A    Yes, I do.

4    Q    Can you tell us what those exhibits are?

5    A    These are graphic files that I designated as child

6    pornography that were contained on the Toshiba laptop.

7    Q    Starting with Exhibit 3D, can you tell us what's on the

8    front page of Exhibit 3D?

9    A    On the front page is a file panel of where I found the

10   image.

11   Q    And what is on the reverse side?

12   A    The picture itself.

13   Q    Same question for 3E and 3F, what's on the front page?

14   A    Again, the file path, where the file was located and

15   where I found it on the Toshiba.

16        MS. THOMSON:  Your Honor, at this time the

17   government would move into evidence Exhibits 3D, 3E, and 3F.

18        THE COURT:  Any objection or voir dire?

19        MR. GOLDSMITH:  Briefly voir dire.

20        THE COURT:  Go ahead.

21        VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22   Q    Agent Braisted, file pathway on the front indicates a

23   system volume information?

24   A    Yes, sir.

25   Q    Were these alive files on the computer?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:11-cr-00088-EAW Document 70-21 Filed 01/12/16 Page 477 of 890
A470
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 32 of 246

Brian Braisted - Direct                441

1    A    They are contained as a compressed volume within system

2    volume information.

3    Q    So in other words, were these files that were readily

4    accessible to the user?

5    A    No.

6              MS. THOMSON:  I'm going to object, that's not

7    really the scope of a voir dire.  It's certainly a subject he

8    can talk about during his cross-examination.

9              THE COURT:  During cross-examination, yes.

10             MR. GOLDSMITH:  All right.  I'll reserve for same,

11   thank you.

12             THE COURT:  Okay.  Go ahead.

13             MS. THOMSON:  Are they admitted, your Honor?

14             MR. GOLDSMITH:  No objection under the

15   circumstance.

16             THE COURT:  Okay, received.

17             MS. THOMSON:  At this time, your Honor, I will seek

18   to publish the exhibits and I'll hand each juror a binder

19   that contain the exhibits.

20             THE COURT:  And we've established with defense

21   counsel that each binder contains the same material, is that

22   right, Mr. Goldsmith?

23             MR. GOLDSMITH:  That is correct, your Honor.

24             THE COURT:  Okay.  You've had an opportunity to

25   review those?

Case 5:14-cr-00088-EAW   Document 102-1   Filed 01/12/16   Page 478 of 890
A471
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 33 of 246

Brian Braisted – Direct                          442

1          MR. GOLDSMITH:  I have had the opportunity to

2    review the set before me, I will take two moments to review

3    the set that the U.S. Attorney's office has presented.

4          THE COURT:  Is handing out to the jury, just so

5    that you can be satisfied they're all being given the same

6    exhibit.

7          MR. GOLDSMITH:  I appreciate the same, your Honor.

8               (Pause in Proceedings.)

9          THE COURT:  Ladies and gentlemen, I'm going to have

10   the Assistant U.S. Attorney start passing out the binders.

11   I'm going to ask you to just hold onto them until everybody

12   has them and then you'll have an opportunity to review them.

13         MR. GOLDSMITH:  Thank you, your Honor.

14         THE COURT:  Mr. Goldsmith, you've had an

15   opportunity to review each one of the binders that are being

16   handed to the members of the jury?

17         MR. GOLDSMITH:  I have had the opportunity to

18   review them, they are consistent with what was discussed at

19   side bar and the evidence being discussed currently with the

20   witness.

21         THE COURT:  Okay.  And you're satisfied that

22   they're all identical to the exhibits that have been admitted

23   as 3D, 3E and 3F?

24         MR. GOLDSMITH:  Upon my inspection, I am satisfied

25   that they are the appropriate exhibits.

Brian Braisted - Direct                                    443

1          THE COURT:  Very well.  You may publish, and ladies

2     and gentlemen of the jury, you can now review those exhibits.

3          MS. THOMSON:  Beginning with 3D, your Honor.  Just

4     so the court knows, there are other exhibits starting with 4,

5     so the jury should not look at them until they are admitted.

6     Only 3D, 3E, and 3F are admitted so if we could begin with

7     3D.

8          THE COURT:  Okay.  Everybody hear that?  We're

9     going to end with 3D.

10          MS. THOMSON:  3F.

11          THE COURT:  3F.

12          MS. THOMSON:  So what's been admitted as 3D, 3E,

13     and 3F.

14          THE COURT:  Just look at those, please, at this

15     point.

16          CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

17     Q    Agent Braisted, if we could talk about Exhibit 3D,

18     please.  Were you able to determine where Exhibit 3D was

19     located on the Toshiba laptop?

20     A    Yes, it came from system volume information.

21     Q    You did already once explain that but as it was

22     yesterday, can you just give us a reminder what the system

23     volume information is?

24     A    System volume information is the place where the

25     Windows operating system stores information that would be

Brian Braisted - Direct                     444

1    used to restore the computer to a previous date.  So

2    contained within there are settings for the computer as well

3    as backups of files and folders.

4    Q    And Exhibit 3D, what does that depict?

5    A    It's a prepubescent female sitting with her knees up

6    and her legs spread, naked.

7    Q    And if you could look at Exhibit 3E, please.  Can you

8    tell me, Exhibit 3E, where this particular image was located?

9    A    3E came from system volume information as well.

10   Q    And looking at the image on the reverse side, can you

11   tell us what's depicted in this image?

12   A    It looks to be a prepubescent female bound with her

13   hands and legs tied together, her legs spread and exposing

14   her vagina.

15   Q    And if we could look at Exhibit 3F, please, where did

16   you locate 3F?

17   A    3F came from thumb cache on -- in the Windows operating

18   system.

19   Q    What is thumb cache?

20   A    Thumb cache is when you have a folder containing video,

21   picture, movie, an audio file and if you look at it in

22   thumb's view, it will create a small thumbnail icon for that

23   particular file, and that thumbnail icon is stored in thumb

24   cache.

25   Q    So for it to arrive there, what had to have happened?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct

1   A     The file itself would have had to have been on the

2   computer.

3   Q     And if you could look at the image on reverse and tell

4   me what's depicted in the image?

5   A     It's two prepubescent females, looks like there's an

6   object penetrating their vaginas.

7   Q     And we're done with the binders just for the moment,

8   you can set the binders down.  As we're still talking about

9   the laptop, the Toshiba laptop, did you find any other

10  evidence of child pornography on the laptop besides graphic

11  image files?

12  A     I also found video files of child pornography.

13  Q     Where did you find those video files?

14  A     In New Folder 2 and in subfolders to New Folder 2.

15  Q     Is that the folder that we looked at in Exhibit 3B?

16  A     Yes.

17  Q     And if we could have, please, page 3 of Exhibit 3B.

18  Can you tell us what page 3 is again?

19  A     Page 3 shows the video files that are contained within

20  New Folder 2.

21  Q     And those files, would they have arrived there because

22  the user saved them there?

23  A     Yes.

24  Q     I'm now handing you what's been previously marked for

25  identification purposes as Exhibit 3G and I'm going to ask

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 482 of 890
A475
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 37 of 246

Brian Braisted - Direct                                    446

1   you if you recognize Exhibit 3G.

2   A    Yes, this is CD containing video files from the Toshiba

3   laptop.

4   Q    How do you recognize that CD?

5   A    I reviewed it yesterday and I initialed and dated it.

6   Q    Is that CD -- does that contain a true and accurate

7   copy of the multimedia video files that you found on the

8   Toshiba laptop?

9   A    Yes, it does.

10  Q    And you reviewed those video files to ensure that they

11  were a true and accurate copy of the ones that you recovered

12  from the Toshiba laptop?

13  A    Yes.

14       MS. THOMSON:  At this time, your Honor, we would

15  move to admit Exhibit 3G.

16       MR. GOLDSMITH:  Brief voir dire, your Honor?

17       THE COURT:  You may.

18  VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

19  Q    Agent Braisted, did you create this particular CD that

20  is in front of you?

21  A    I did not.

22  Q    U.S. Attorney's office create it?

23  A    Exactly.

24  Q    Did you, or rather, did they make a copy of one that

25  you had created?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 110-1 Filed 01/12/16 Page 483 of 890
**A476**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 38 of 246

Brian Braisted - Direct                              447

```
 1    A     Yes.

 2    Q     Did you have the opportunity to compare the CD that you

 3    created with the CD that is directly in front of you?

 4    A     I did.

 5    Q     Were they the same or substantially the same?

 6    A     Yes, they were.

 7              MR. GOLDSMITH:  No objection.

 8              THE COURT:  It will be received.

 9              MS. THOMSON:  Your Honor, it would be that time.

10              THE COURT:  It's your intention to show these

11    videos?

12              MS. THOMSON:  Yes.

13              THE COURT:  Ladies and gentlemen, I'm going to give

14    you a short morning break, about 5, 10 minutes, we're going

15    to get the courtroom situated so we can show the video, and

16    we'll get you right back out here.  Please don't discuss the

17    case.  You can leave those binders right on your seat or on

18    the rail, that's fine, and then we'll get you back out here.

19                    (Jury Excused, 10:02 a.m.)

20              THE COURT:  Anybody needs to use the facilities,

21    Mr. Jenkins, whoever, let's do it now, including our witness,

22    if you need to step down, that's fine.  Ron, you're going to

23    take care of these monitors, okay.  And Mr. Goldsmith, before

24    you go away, would you please consult with Mr. Jenkins and

25    see if he wants to be in a position to be able to view these.
```

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 484 of 890
A477
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 39 of 246

Brian Braisted – Direct                                    448

1          MR. GOLDSMITH:  No, he does not want to see them.

2          THE COURT:  On the record.  Mr. Jenkins, you have

3  an absolute right to see all evidence that's being introduced

4  and shown to this jury.  You've had an opportunity to consult

5  with your attorney, we can have you positioned in a place

6  where you can view one of these screens as the evidence is

7  being played.  Is that something you want to do?

8          THE DEFENDANT:  Just give me a minute.

9          MR. GOLDSMITH:  Your Honor, he's decided he wants

10  to think about it for another minute or two.

11          THE COURT:  Okay that's fine, let us know after the

12  break.

13                  (Court in recess, 10:03 a.m. to 10:13 a.m.)

14                  (Open Court, Jury Out.)

15          THE COURT:  We're going to turn it towards the

16  windows, he can slide around to the side of the table,

17  exactly.  Mr. Jenkins, that screen needs to be turned so it

18  can't be seen by the gallery so you're going to have to move.

19  I know there's no one there now, but if someone comes in, it

20  has to be in a position where it can't be seen.

21          Okay, Mr. Goldsmith, you all set?

22          MR. GOLDSMITH:  Yes, I'm fine.

23          THE COURT:  Okay.  And government's counsel, ready

24  to go?

25          MS. THOMSON:  Yes.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 485 of 890
A478
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 40 of 246

Brian Braisted - Direct

449

```
 1              THE COURT:  Okay.  Please bring the jury in.
 2                   (Jury Present.)
 3              THE COURT:  Okay.  The record should reflect we
 4     have all the ladies and gentlemen of the jury after a break
 5     and we're prepared to go ahead.
 6              Ms. Thomson, it's your intention to publish
 7     Exhibit 3G which contains video files, is that correct?
 8              MS. THOMSON:  Momentarily, your Honor.  I do have
 9     the individual clips on 3H and the witness --
10              THE COURT:  Okay, go ahead.
11         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:
12     Q    Agent Braisted, I'm handing you now what's been marked
13     for identification purposes as 3H.  Do you recognize
14     Exhibit 3H?
15     A    It's another disk with video files.
16     Q    Agent Braisted, did you assist in compiling three
17     videos off of Exhibit 3G which contain all of the multimedia
18     files on the Toshiba to narrow them down to three which are
19     contained on Exhibit 3H?
20     A    Yes, I did.
21     Q    Did you review the three videos that are on 3H?
22     A    Yes.
23     Q    Are these three videos that are contained on 3H true
24     and accurate copies of what's on 3G?
25     A    Yes, they are.
```

Brian Braisted - Direct                              450

1    Q     And also what you found on the Toshiba laptop?

2    A     Exactly.

3               MR. GOLDSMITH:  No objection.

4               MS. THOMSON:  Move to admit.  It's received?

5               THE COURT:  No objection, it will be received.

6               MS. THOMSON:  At this time, your Honor, the

7    government would move to publish what's been called clip 1 on

8    Exhibit 3H.

9               THE COURT:  Proceed.

10              MS. THOMSON:  And your Honor, for the record, this

11   clip, clip 1 is, and I discussed, informed the jury of this,

12   with counsel, it's a video of 23 minutes in length and the

13   government's playing only a portion of clip 1, only a few

14   seconds portion, and that would be at 1401 to 1409.

15              THE COURT:  Okay, Counsel, go ahead.

16              MS. THOMSON:  Computer problems.  Bear with us.

17                   (A video clip was played from Government's

18                   Exhibit No. 3H.)

19              MS. THOMSON:  If the record could reflect we have

20   played that 8-second portion of the video for the court and

21   for the jury.

22              Agent Braisted, did you review the entire video

23   that was just shown portion of?

24   A     Yes, I did.

25   Q     Is that the video of KP_Nancy 432 Bate 15?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct                    451

1  A     On the Toshiba it was KP_432 Bate.

2  Q     And was that the same file that was located in New

3  Folder 2?

4  A     Yes.

5  Q     Did you watch the entirety of the video?

6  A     I did.

7  Q     And can you just briefly describe what happens in the

8  video?

9  A     It starts out, the girl is clothed, as the film

10  progresses she takes her clothes off, she exposes herself,

11  she displays her genitals, I believe she masturbates later on

12  in the video.

13         MS. THOMSON:  We're at this time, your Honor, going

14  to play what's been identified as clip 2 from Exhibit 3H.

15             (A video clip was played from Government's

16             Exhibit No. 3H.)

17  Q     And for the record, the clip that was shown is of a

18  17-minute-and-39-second-long video and the clip was shown

19  from 9:55 to 10:12.  Did you review the entire video?

20  A     I did.

21  Q     Can you just give us a general idea of what's on the

22  video?

23  A     Similar to the first, it's a young girl, she starts out

24  in the video, she's fully clothed, she takes her clothes off,

25  she displays herself for the video, she ends up masturbating

Case 5:11-cr-00088-EAW Document 70 Filed 01/12/16 Page 488 of 890
A481
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 43 of 246

Brian Braisted - Direct

452

1    in the video as well.

2    Q    And the name of that video, is that Sierra.avi?

3    A    Yes.

4    Q    Was that Sierra.avi also found in New Folder 2 on the

5    Toshiba laptop?

6    A    Yes, it is.

7    Q    If we could see clip 3, please.

8                 (A video clip was played from Government's

9                 Exhibit No. 3H.)

10   Q    And for the record, the portion that was played of that

11   video -- was this video in excess of three hours?

12   A    Yes, it was.

13   Q    And the portion that was played for the jury was at

14   1:54:24 to 1:54:29.  Did you watch the entire three hours?

15   A    I clicked through it so I saw segments from beginning

16   to end.

17   Q    Could you tell us briefly what you saw when you were

18   clicking through it?

19   A    Appears to be a video taken at a girl's bedroom, at

20   times there's no one in the display, at other times the girl

21   shows up dressed, she undresses, then she does things to

22   herself while naked, displaying herself to the video camera.

23   Q    Each of these three videos, are they three videos that

24   you identified as child pornography?

25   A    Yes.

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 489 of 890
A482
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 44 of 246

Brian Braisted - Direct

453

1 Q     Did you do more than one examination in this case?

2 A     Yes.

3 Q     Of the media?

4 A     Yes, I did.

5 Q     Would you tell us a little bit about that?

6 A     Well, my initial examination, once I received the items

7 from the case agent, I brought them back to the lab, I

8 created images and then I processed the images and worked off

9 of those images.  When I started my exam, the first thing I

10 did was I went through the thumb drive devices.  I found no

11 evidence of child pornography on one of the thumb drives, the

12 2-gigabyte thumb drive.  The other two thumb drives had very

13 large quantity of child pornography, both pictures and videos

14 on them.  It took me probably 10 days going through there to

15 identify the child pornography and to bookmark it.  At that

16 point I started examining the Toshiba laptop and the Compaq

17 laptop computers.  My primary goal at that point was to

18 establish that those computers were used to receive or

19 otherwise transmit the information that was found on the

20 thumb drives; in other words, that the computers had those

21 images on them as well.

22 Q     Did you also do an analysis to find out if you could

23 see any other activity that was going on on the computer that

24 was connected or in close proximity to child pornography

25 presence on the computer?

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 490 of 890
A483
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 45 of 246

Brian Braisted - Direct                          454

1    A    Yes, I did.

2    Q    At this time I'm handing you what's been marked as

3    Government's Exhibit 3I.  I'm going to ask you if you

4    recognize 3I and if we could --

5    A    Yes, I recognize it.

6    Q    Is everyone's monitor on?  Can we turn the monitors

7    back on?  We're not going to publish it yet but there will be

8    a series of documents we're publishing.

9              THE COURT:  The monitors are on.  They should be.

10   Q    Can you tell us what Exhibit 3I is?

11   A    3I is a screen shot of file activity on the Toshiba

12   laptop, and it's -- it was sorted for date and time.

13   Q    And is this a two-page document?

14   A    Yes, it is.

15   Q    What's on the second page?

16   A    The second page is an e-mail that was a file that was

17   created in close proximity to files that I looked at in the

18   first page.

19   Q    Exhibit 3I, is this information that you were able to

20   extract from the Toshiba laptop --

21   A    Yes, it is.

22   Q    -- during your examination?

23   A    Exactly.

24             MS. THOMSON:  At this time, your Honor, I would

25   move to admit Exhibit 3I.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 491 of 890
A484
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 46 of 246

Brian Braisted - Direct

455

1      THE COURT:  Mr. Goldsmith, any objection or voir

2  dire?

3      MR. GOLDSMITH:  No objection.

4      THE COURT:  It will be received.

5  Q    If we could publish page 1, please.  Can you please

6  explain what's depicted on page 1?

7  A    This is basically a snippet of a spreadsheet, the

8  left-hand column would be a file name, the middle column

9  would be a date and time that that file was created on the

10 Toshiba laptop, and the column to the right would be the file

11 path where that particular file was found, and what I did was

12 I focused on a particular period of time, in this case at

13 January 19th, 2009, beginning at 6:00 in the evening.  The

14 highlighted line shows that New Folder 2 was created to the

15 desktop at that time, and immediately following that, the

16 five files below that, 13.flv, 14, 15, 29, and 30.flv were

17 all saved to that folder.

18          Now each of those, the .flv indicates that

19 they're video files.  I looked at those video files, I found

20 that they were all video files of the same two females, ages

21 approximately 10 to 12 years of age, was not child

22 pornography, it was child erotica, they were dancing and

23 gyrating to the camera, hugging each other, that kind of

24 thing.  When I played the videos it took about 32 and a half

25 minutes to play them in their entirety from one video to

Brian Braisted – Direct

1    another, total up to 32 and a half minutes.  And then 33

2    minutes after the folder was created and these files were

3    created, then an e-mail, was a long string and then .eml,

4    that indicates an e-mail file was created on the laptop.

5    Q    Is that reflected in the entry that's immediately below

6    what's highlighted in yellow after 30.flv?

7    A    Exactly.

8    Q    So that denotes that an e-mail --

9    A    That's a file, that's an e-mail file, exactly.

10   Q    FLV, can you tell us if you are familiar with that

11   extension?

12   A    It's an extension, I believe these were Stickam videos

13   but it's just a multimedia file extension.

14   Q    So the entry immediately under 30.flv, that string,

15   were you able to produce what was observed at that time?

16   A    Yes, just by clicking on that file name, it launched

17   the file.

18   Q    And is that contained in page 2?

19   A    Yes, it is.

20   Q    If we could see page 2, please.  Can you tell us what

21   it is?

22   A    So page 2, this is the e-mail that was created

23   immediately following the child erotica videos, and it went

24   to the Joe Jenkins -- I'm sorry, the

25   jjenkins70@rochester.rr.com account.  The common name for

Case 5:14-cr-00088-EAW Document 70-1 Filed 01/12/16 Page 493 of 890
A486
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 48 of 246

Brian Braisted - Direct                                    457

1    that account is indicated as Joe Jenkins and it's just an

2    e-mail from Trailer Parts Super Store advertising some sales.

3    Q    The entry on the first page, does that entry show that

4    that's when this e-mail was accessed?

5    A    Exactly, it was -- when it was actually created on the

6    Toshiba was 6:33:52 p.m.

7    Q    And to be created, does that mean that this e-mail was

8    opened?

9    A    That was when it was opened on the computer, yes.

10   Q    So if I understand the totality of your testimony, the

11   new folder was created at 6 p.m., there were five videos

12   approximately 32 minutes and 21 seconds in length, and then

13   at 33 minutes, we have this e-mail being accessed and opened?

14   A    Exactly.

15   Q    At this time, your Honor, I'm handing the witness

16   what's been previously marked as Government's Exhibit 3J.

17   I'm going to ask you if you recognize Exhibit 3J.

18   A    Yes, I do.

19   Q    What is Exhibit 3J?

20   A    3J is similar to what I described in 3I.  3J shows

21   files that were created on the Toshiba laptop on

22   January 20th, 2009 between 6:57 in the morning and 7:16 in

23   the morning.

24   Q    Does this document, or exhibit contain three pages?

25   A    Yes, it does.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 494 of 890
A487
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 49 of 246

Brian Braisted - Direct                    458

1   Q      Do you recognize each of the three pages?

2   A      Yes, I do.

3   Q      And did you produce these three pages from your

4   examination of the Toshiba laptop?

5   A      I did.

6          MS. THOMSON:  Your Honor, at this time I would seek

7   to admit Government Exhibit 3J.

8          THE COURT:  Any objection or voir dire?

9          MR. GOLDSMITH:  No objection.

10         THE COURT:  It will be received.

11  Q      If we could publish page 1, please.  Can you tell us

12  what page 1 shows?

13  A      Page 1, the highlighted file, if you look at the file

14  date and time, this is the beginning of the activity that I'm

15  noting and it's a file named meekrab.mpg, mpg would indicate

16  that it's a video file.  I viewed it and found that

17  meekrab.mpg contains child pornography.  The video itself is

18  roughly five and a half minutes in length.  Shortly after

19  that file was created on the computer, there's a file called

20  start.txt and when I looked at the file path that indicates

21  that that's a file that was created when the user accessed

22  the IKEA home planner program that's installed on the

23  computer.  Then 12 minutes after that, an e-mail is created

24  on the computer, long string with the extension .eml.

25  Q      If we could see page 2, please, if you could explain

Case 5:14-cr-00088-EAW   Document 110-2   Filed 01/12/16   Page 495 of 890
**A488**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 50 of 246

Brian Braisted - Direct                                    459

1    what page 2 is.

2    A      Page 2 is just a screen capture of the child

3    pornography video file that I found labeled meekrab, this was

4    taken a minute and seven seconds into the video and this

5    shows the two adolescents who were contained within the

6    video.

7    Q      And meekrab, that's on the New Folder 2?

8    A      Exactly.

9    Q      And if we could see page 3, please.

10   A      Page 3, that depicts the e-mail file that was created

11   on the Toshiba laptop at 7:16, it's from a company

12   generic.com and it's addressed to

13   jenkinselectric@rochester.rr.com.

14   Q      The entry that's noted on Exhibit 3J, page 1, is that

15   entry created when that e-mail for jjenkinselectric is

16   opened, is accessed?

17   A      Exactly.  Exactly.

18   Q      So that e-mail was opened at that time that you

19   described?

20   A      Yes.

21   Q      And that's the jjenkinselectric@rochester.rr.com?

22   A      Right.

23   Q      I'm now handing you what's previously been marked as

24   Government's Exhibit 3K and I'm going to ask you if you

25   recognize Government Exhibit 3K.

Brian Braisted - Direct                                    460

1    A    Yes, I do.

2    Q    Are those -- is it four pages that you're looking at?

3    A    Yes, it is.

4    Q    Those four pages, what are they?

5    A    The first page is similar to the previous ones, I'm

6    looking at file activity on Toshiba laptop on January 24th,

7    2009, at approximately 11:49 a.m.  When I looked at that, I

8    found an e-mail was created to -- on that, at that time and

9    date, it was to the jjenkins70@rochester.rr.com account.

10   Q    Are each of the pages that are depicted in Exhibit 3K

11   pages that you recovered from the Toshiba laptop?

12   A    Page 1 was from the Toshiba, page 2 is from the

13   8-gigabyte thumb drive, page 3 is from the 8-gigabyte thumb

14   drive, and page 4 is back from the Toshiba.

15   Q    Did you create each of the images that are depicted in

16   pages 1 through 4?

17   A    Yes, I did.

18        MS. THOMSON:  At this time, your Honor, I would

19   offer in evidence Government Exhibit 3K, pages 1 through 4.

20        MR. GOLDSMITH:  No objection.

21        THE COURT:  Received.

22   Q    If we could publish page 1, please.  Please tell us

23   what's depicted on page 1.

24   A    Page 1, if you look at the -- that pane there, there is

25   a file 183917, and then the file name is 02CF2392.eml and

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 497 of 890
A490
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 52 of 246

Brian Braisted – Direct                461

1    that's an e-mail file that was created on the Toshiba laptop

2    on January 24th, 2009, at 11:49 a.m.  And if you look at the

3    lower pane, it shows the contents of that e-mail, and it's an

4    e-mail that was opened from the jjenkins70@rochester.rr.com

5    account, it's from a company called Idea RC Media showing

6    that jjenkins70 account is being charged $96.  There's a

7    Master Card associated with it to Joseph Jenkins.

8    Q    Were able to determine what Idea RC is?

9    A    I just did a little internet research, Idea RC appears

10   to be a company that produces advertising for small

11   businesses, kind of like the Yellow Pages, that idea.

12   Q    And if we could see page 2, please.  What's depicted on

13   page 2?

14   A    Well, page 1 showed a file that was created on the

15   Toshiba at 11:49 so I wanted to see if there was any file

16   activity on the thumb drives in close proximity to that, and

17   I found that on the same date, roughly 15 minutes after the

18   e-mail was accessed on the Toshiba, there were three video

19   files, notmycap, TayMegBrook.avi, breekelsey.avi and

20   nicolelovessteven.avi, these are all video files that were

21   saved to the 8-gigabyte thumb drive 15 minutes after the

22   e-mail was accessed.  The breekelsey.avi, I found to contain

23   child pornography.

24   Q    And if you could please display page 3.  Do you

25   recognize page 3?

Brian Braisted - Direct                                462

1   A     Page 3 is a screen shot of one of the two adolescent

2   females that are depicted in the video breekelsey.

3   Q     Was that a video that you determined was child

4   pornography?

5   A     Exactly.

6   Q     And if we can see page 4, please, and if you could

7   explain to us what page 4 depicts.

8   A     Having found the file breekelsey.avi on the 8-gigabyte

9   thumb drive, I wanted to see if there was any evidence that

10  it was ever contained on the Toshiba laptop, so I did a word

11  search for breekelsey which is the file name, and I found

12  that there were multiple instances of that file name being

13  associated with the Toshiba laptop, to include in the middle

14  screen you see that at one time a file by that name was

15  contained in the Users/Joe/Desktop path.

16  Q     How do you know that?

17  A     Because that information was contained within drive

18  free space on the Toshiba laptop.

19  Q     But the video that you observed that the screen shot is

20  contained in, page 3, you didn't find the video on the

21  Toshiba laptop, is that correct?

22  A     The video was not there, exactly.

23  Q     You did find that on the thumb drive?

24  A     Right.

25  Q     But you found evidence of that title on the Toshiba?

Brian Braisted - Direct                    463

```
1    A      Exactly.

2    Q      What did that tell you?

3    A      It tells me that that file was at one time on the Joe

4    desktop and was moved to the 8-gigabyte thumb drive.

5    Q      At this time I'm showing the witness what's been

6    previously marked as Government's Exhibit 3L.  I'm going to

7    ask you if you recognize Exhibit 3L.

8    A      Yes, I do.

9    Q      What is Exhibit 3L, please?

10   A      3L is information I found associated with the computer

11   at the -- on February 22nd of 2009.

12   Q      Are there five pages associated with this exhibit?

13   A      Yes, there are.

14   Q      And those five pages, did you produce them as a result

15   of your forensic examination in this case?

16   A      Yes, I did.

17          MS. THOMSON:  At this time, your Honor, I would

18   offer into evidence Government's Exhibit 3L, pages 1 through

19   5.

20          MR. GOLDSMITH:  No objection.

21          THE COURT:  It will be received.

22   Q      Beginning with the first page of 3L, can we publish

23   that.  Can you tell us what's depicted on the first page?

24   A      Yes.  This is a listing of file activity on the Toshiba

25   laptop computer from roughly 9:14 in the morning, up until
```

Brian Braisted - Direct                                  464

1    11:10 in the morning.  At the very top you see 9:14, an

2    e-mail is created, and there's some user activity with a

3    Power Point viewer.  Down at 10:05 a.m. a folder named Zoe is

4    created in New Folder 2 and immediately eight video files are

5    placed into the Zoe folder, and then at 11:10 a.m. an e-mail

6    is accessed on the computer.

7    Q     Beginning with the entry that you've identified as an

8    e-mail being opened, is that depicted on page 2?

9    A     Yes, it is.

10   Q     And if we could look at page 2, please.

11   A     This shows an e-mail, it came from the e-mail address

12   imrat@yahoo.com and was addressed to

13   jjenkins70@rochester.rr.com.

14   Q     And what time do you show activity for this having been

15   accessed?

16   A     This was accessed at 9:14 in the morning.

17   Q     Now after this e-mail was accessed you indicated there

18   was other activity tied back to the New Folder 2, is that

19   correct?

20   A     Exactly, at 10:05, a folder named Zoe was created in

21   New Folder 2.

22   Q     If we could see page 3, please.  Is this the contents

23   of the folder Zoe?

24   A     Yes, it is.

25   Q     Did you view the contents of the folder Zoe including

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 501 of 890
A494
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 56 of 246

Brian Braisted - Direct                                    465

1    each of the media files contained therein?

2    A     Yes, I did.

3    Q     And did you find evidence of child pornography?

4    A     Four of the files I attributed as child pornography.

5    Q     And if we could see page 4, please.  Do you recognize

6    page 4?

7    A     This is screen capture of the girl who's depicted in

8    all of the Zoe videos.

9    Q     And after the Zoe videos were created and stored on the

10   New Folder system, can you tell us what was the next user

11   activity for that date?

12   A     The next user activity was an e-mail.

13   Q     And can we see page 5, please.  Describe what you

14   found.

15   A     This is the e-mail that was accessed at 11:10 a.m. and

16   it's again from imrat@yahoo.com to the

17   jjenkins70@rochester.rr.com account.

18   Q     What time was that e-mail opened?

19   A     11:10 in the morning.

20   Q     And what time was that in relation to the first

21   activity that you observed on that date?

22   A     The first activity was at 9:14, roughly two hours

23   earlier.

24   Q     And what time was the Zoe page saved, Zoe multimedia

25   files?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 90-12 Filed 01/12/16 Page 502 of 890
A495
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 57 of 246

Brian Braisted - Direct                          466

```
1    A     The Zoe files, the folder was created and immediately

2    file saved to it at 10:05.

3    Q     At this time I'm showing the witness what's been

4    previously marked as Government's Exhibit 3M.  Like Mary.  Do

5    you recognize Exhibit 3M?

6    A     I do.

7    Q     What is Exhibit 3M?

8    A     Exhibit 3M is three pages, the first page shows file

9    activity on the Toshiba laptop computer.  Page 2 is an e-mail

10   and page 3 is a screen shot of a video.

11   Q     Did you create each of these pages as a result of your

12   forensic examination of the Toshiba laptop and other media?

13   A     Yes, I did.

14         MS. THOMSON:  At this time, your Honor, we would

15   offer into evidence Exhibit 3M.

16         MR. GOLDSMITH:  No objection.

17         THE COURT:  It will be received.

18   Q     If we could publish the first page, please.  Can you

19   tell us what's depicted on that first page?

20   A     Yes.  The highlighted line shows an e-mail was created

21   on the Toshiba laptop at 10:19 p.m., and then two lines below

22   that, a child pornography video, sierra.avi was created at

23   10:30 p.m.

24   Q     So let's start first with the e-mail.  Do you see

25   page 2, please?
```

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 503 of 890
**A496**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 58 of 246

Brian Braisted - Direct                            467

1   A      Page 2 shows the e-mail that was created at 10:19 p.m.

2   and the e-mail is from the jjenkins70@rochester.rr.com

3   account, and it's addressed to an individual known as Dave

4   Montes, it appears to be an e-mail involving electrical work

5   being done and it's signed, Joe.

6   Q      If you could just read the first line of the e-mail.

7   A      "Dave, I am researching the phase converter.  I think

8   you need a digital phase converter that is safer for

9   electronics, for the lasers anyways."

10  Q      What time was this e-mail sent?

11  A      At 10:19 p.m.

12  Q      And what was the next activity you observed?

13  A      Eleven minutes later, a video file sierra.avi which

14  contains child pornography was saved to the computer.

15  Q      And I'm showing you now page 3.  Is that a still shot

16  of the video?

17  A      Yes, it is.

18  Q      And is that a video that we already observed earlier?

19  A      Exactly.

20  Q      That video coming from the New Folder 2?

21  A      Right.

22  Q      At this time I'm handing you what's been previously

23  marked for identification purposes as Government's

24  Exhibit 3N.  I'll ask you if you recognize Exhibit 3N.

25  A      Yes, I do.

Brian Braisted - Direct                               468

1    Q      Is this a seven-page document?

2    A      It is.

3    Q      Each of the documents that are contained herein, are

4    they from your examination of the electronic media in this

5    case?

6    A      Yes, they are.

7    Q      And did you produce these documents from your

8    examination?

9    A      Yes, I did.

10          MS. THOMSON:  At this time I would offer into

11   evidence Government Exhibit 3N.

12          MR. GOLDSMITH:  No objection.

13          THE COURT:  It will be received.

14   Q    Can you tell us what you found relevant to this

15   investigation on May 22nd, 2009?

16   A      Yes.  This first screen depicts files that are

17   contained on the 4-gigabyte thumb drive.  If you look in the

18   upper left-hand box, that shows the directory structure for

19   the contents of the 4-gigabyte thumb drive.  Those yellow

20   boxes indicate that they were folders on the thumb drive and

21   down near the bottom of that box, I highlighted 052209,

22   that's the name of one of the folders, and highlighting that,

23   that opens up in the lower box, the contents of that folder,

24   so in total there were roughly 238 graphic files contained

25   within folder 052209.  They don't all fit on this screen, but

Case 5:14-cr-00088-EAW Document 103-1 Filed 01/12/16 Page 505 of 890
A498
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 60 of 246

Brian Braisted - Direct

1    one of those particular pictures is elena038.jpg which I have

2    highlighted in the lower box and when I highlight that, that

3    opens up the picture itself in the upper right-hand box on

4    the screen.

5    Q    So the image that we see, and by image I mean photo?

6    A    Exactly.

7    Q    Is that Elena?

8    A    That's elena038.jpg, the full picture does not fit

9    within the box.  If I were to scroll down, that little girl,

10   she's roughly eight years old, she's totally naked and she's

11   posed in a manner to display her genitals in a lascivious

12   manner.  At the top left-hand corner of the graphic file is a

13   caption, Lolita's Art, and www.Lolitasart.com.

14   Q    You just described the image and used a term that she's

15   exposing her genitals in a lascivious manner.  Can you tell

16   us what you mean by that?

17   A    Well, that's the -- that's one of the definitions for

18   child pornography in the federal statute basically, there are

19   such things as nudity which do not become pornography but

20   when you are focusing on the genitals, when you're posing the

21   person so that their genitals are a prominent part of the

22   picture, if the person's legs are spread or in another way

23   accentuate the genitals, that would become child pornography.

24   Q    And the image of child pornography, we just see the top

25   part, is that correct, on this exhibit?

Brian Braisted - Direct                                    470

1   A     We just see the top third of the picture, yes.

2   Q     And so if I understand you correctly, 238 graphic files

3   were saved to the 4-gigabyte at 10:25 p.m.?

4   A     Right, within a minute of each other, yes.

5   Q     All right.  If you could look at page 2, please, and

6   explain to us what page 2 shows.

7   A     Well, having found that file activity on the 4-gigabyte

8   thumb drive, I wanted to see if it was associated with the

9   Toshiba laptop so I went to the Toshiba laptop and I looked

10  for what file activity was in the surrounding time so

11  May 22nd of 2009, I started 10:25 in the evening, that's when

12  the files were created on the 4-gigabyte and I went back to

13  see when file activity began on the Toshiba.

14  Q     What did you find?

15  A     I found that there was continuous file activity on the

16  Toshiba between 8:17 and 10:25 in the evening.

17  Q     Can you describe that activity?

18  A     There were over a thousand files created during that

19  period of time to include files that would indicate to me

20  that someone was accessing the internet.

21  Q     How do you get that indication?

22  A     Well, the page we're on, if you go to page 2 of the

23  exhibit.  Appear to be a little bit out of order.

24  Essentially page 2, it won't be particularly relevant other

25  than to show that the file activity began at 8:17, page 3 is

Case 5:14-cr-00088-EAW Document 210 Filed 01/12/16 Page 507 of 890
**A500**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 62 of 246

Brian Braisted - Direct                                471

1    a little bit more relevant to us.

2    Q     Can we see page 3, please.

3    A     That's the picture that's depicted here.  Page 3, I

4    found an HTML document which would be a web page that was

5    created on the computer at 8:46 p.m. on May 22nd.  And the

6    web page itself looks like it comes from imgsrc.ru which is

7    known as Image Source, .ru, it's a Russian website that

8    shares photos.  This particular web page has a subheading

9    showing preteen and tween girls.

10   Q     And that's noted right in the title?

11   A     It's on the title of the web page, exactly.

12   Q     What significance did that have to you in your

13   investigation?

14   A     Well, preteen and tween girls would suggest to me that

15   it's child pornography or child erotica, Image Source is well

16   known as -- it's a legitimate site in the sense that it

17   shares graphic files of all sorts of topics, you can go there

18   and you can find pictures of sporting events, nature scenes,

19   et cetera, but it's also been used quite a bit by child

20   pornographers to maintain databases of child pornography

21   content.

22   Q     Is that what you've seen in other investigations as

23   well?

24   A     Yes.

25   Q     And page 4, if you could describe what's on page 4 and

Case 5:14-cr-00088-EAW Document 210-11 Filed 01/12/16 Page 508 of 890
A501
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 63 of 246

Brian Braisted - Direct                                472

1   its relevance to this investigation.

2   A      Page 4 is another HTML document so in other words,

3   another web page that was contained on the computer and was

4   created at 8:44 on May 22nd, 2009.  This is another web page

5   from imgsrc.ru and the caption for that web page is "young

6   girls braless and pokies".

7   Q      And page 5, please.

8   A      Page 5 is a graphic file that was created on the laptop

9   computer at 8:52 p.m.  It's -- it was not child pornography,

10  it was a child erotica picture contained on the computer.

11  Q      And where was that contained?

12  A      On the Toshiba laptop.

13  Q      And if you could look at page 6, please.  What did you

14  find that's depicted on page 6 that's of significance to this

15  investigation?

16  A      Page 6, I searched for the file title elena038 and I

17  found here on the top of the screen that at one time that

18  picture that I showed you initially, the little girl with the

19  Lolita's Art, that file name was contained in a path

20  Users/Joe/Pictures/052209 which would be the folder and then

21  elena038.  There you go right there.  The file that I found

22  on the 4-gigabyte thumb drive, I found that file name and

23  folder name as well on the Toshiba laptop, and at one time it

24  had been contained within the Joe Pictures folder.

25  Q      And the last page?

Brian Braisted - Direct                              473

1    A    The final page just shows the final activity for the

2    laptop computer on May 22nd, it ceases activity at 10:25 p.m.

3    which is in close proximity to when those files were created

4    on the 4-gigabyte thumb drive.  If you look also at the files

5    above there, you'll see a lot of files with the file name

6    long string of Zs and file extension of .zzz.  Those are all

7    files that had been wiped and they're indicative of action by

8    this CCleaner program.

9    Q    And so that would be wiped on the Toshiba?

10   A    Exactly.

11   Q    But then you see those files show up at 10:25 p.m. on

12   the 4-gigabyte thumb drive?

13   A    That's the time the files were saved to the 4-gigabyte,

14   right.

15   Q    During your examination of the media in this case, were

16   you able to examine to see if there was any evidence of

17   accessing websites indicative of child pornography?

18   A    Yes.

19   Q    How did you do that?

20   A    Using EnCase, I searched for the -- on the hard drives

21   for the Toshiba and the Compaq computer for internet

22   artifacts, that would be cookies, bookmarks, index, .gat

23   files and other items that would be associated with internet

24   activity.

25   Q    What did you find?

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 510 of 890
A503
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 65 of 246

Brian Braisted - Direct

474

1   A    I found search terms and things of that nature, URLs

2   that were indicative of child pornography.

3   Q    Do you recall what those were?

4   A    There was I believe a Lola sex, things along the nature

5   of Lolita, jailbait, things of that nature.

6   Q    As part of your examination of the two laptops that you

7   were asked to examine, did you review them for any markings

8   indicating where they were manufactured?

9   A    Yes, I did.

10  Q    Start with the Toshiba which is just, for the record,

11  Government Exhibit Number 3A.  What did you observe?

12  A    On the back of the Toshiba laptop there's a

13  manufacturer plate and it shows Made in China.

14  Q    Any other components to the Toshiba laptop that you

15  looked at for markings?

16  A    I removed the hard drive and hard drive has a separate

17  manufacturer marking.

18  Q    And do you recall where that was manufactured?

19  A    I do.  The hard drive was made in The Philippines.

20  Q    Where is that stamp that indicates its place of

21  manufacturer?

22  A    This is the hard drive that comes out of the laptop,

23  and it's stamped right on the face of the hard drive.

24  Q    And how about for the laptop itself?

25  A    It's right on the back of the hard -- back of the

Brian Braisted - Direct                                      475

1    computer.

2    Q      And I have the same question for the Compaq.

3           THE COURT:  Which is exhibit number?

4           MS. THOMSON:  I'm sorry.  Exhibit?

5           THE WITNESS:  Exhibit 7, sir.

6           THE COURT:  Thank you.

7    Q      Are you able to determine that?

8    A      The laptop, it was also produced in China.

9    Q      Thank you.  As part of your investigation, did you do a

10   forensic examination of the 8-gigabyte thumb drive that's

11   already been received into evidence and you've already

12   viewed?

13   A      Yes, I did.

14   Q      I'm now handing you what's packaged together as

15   Government's Exhibit 4A, 5A, and 6 and I'd like you to look

16   at Exhibit 4A, the 8-gigabyte thumb drive.  Is that the thumb

17   drive that you examined?

18   A      Yes, it is.

19   Q      How did you begin your examination of the thumb drive,

20   if you could explain that process.

21   A      The first thing I did with the thumb drive was I

22   connected to a write block which was then connected to my

23   forensic machine and I created an image of the thumb drive.

24   Q      Now you previously gave testimony with regard to the

25   write block of the Toshiba laptop; did you do the same

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 512 of 890
**A505**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 67 of 246

Brian Braisted - Direct

1    process with the 8-gigabyte?

2    A    Yes, I did.

3    Q    For the same purpose?

4    A    Exactly.

5    Q    And just briefly, what's that purpose?

6    A    The purpose is to ensure that I don't make any changes

7    to the files that are contained within the original evidence.

8    Q    What software did you use to do your examination?

9    A    I did, I used FTK and I believe I used EnCase as well

10   for these.

11   Q    What was the result of your examination with regard to

12   evidence of child pornography on the 8-gigabyte thumb drive?

13   A    The 8-gigabyte I found I believe 15 child pornography

14   graphic files, and 96 movie files.

15   Q    I'm now handing you what's been previously marked for

16   identification purposes as Government's Exhibit 4B.  Do you

17   recognize Exhibit 4B?

18   A    Yes, I do.

19   Q    What is Exhibit 4B?

20   A    These are graphic files.

21   Q    Where did those graphic files come from?

22   A    I believe this is the one from the 8-gigabyte thumb

23   drive.

24   Q    Did you have an opportunity to review Exhibit 4B?

25   A    Yes, I did.

Case 5:14-cr-00088-EAW Document 70-1 Filed 01/12/16 Page 513 of 890
A506
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 68 of 246

Brian Braisted - Direct                          477

1    Q    And did you view it to ensure that the graphic files
2    that you obtained from the 8-gigabyte thumb drive are
3    contained on Exhibit 4B?
4    A    Yes.
5    Q    On Exhibit 4B did you also add the graphic files that
6    were found from the 4-gigabyte thumb drive?
7    A    Yes.
8    Q    Was that because the examination of those two were
9    imaged and placed in the same location?
10   A    They were all in the same FTK case, yes.
11   Q    So Exhibit 4B does contain all of the graphic files
12   that you obtained from the 4 and the 8-gigabyte thumb drive?
13   A    Correct.
14   Q    And is that a copy of what you obtained from the thumb
15   drives?
16   A    Right.
17   Q    And is that copy an accurate and -- true and accurate
18   copy of the originals as you saw them on the thumb drives?
19   A    Yes, it is.
20        MS. THOMSON:  At this time, your Honor, I would
21   move into evidence Exhibit 4B.
22        MR. GOLDSMITH:  Brief voir dire?
23        THE COURT:  Go ahead.
24        VOIR DIRE EXAMINATION BY MR. GOLDSMITH:
25   Q    Agent Braisted, does that contain all of the files that

Case 5:14-cr-00088-EAW Document 70-1 Filed 01/12/16 Page 514 of 890
A507
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 69 of 246

Brian Braisted - Direct                                    478

1    you copied or some?

2    A     Well, it contains all the files that I bookmarked as

3    child pornography.

4    Q     Okay.  Let me rephrase, all the image files?

5    A     The graphic files, yes, sir.

6    Q     Did you make that particular copy you're holding in

7    your hand?

8    A     I did not.

9    Q     Did you have the opportunity to compare the disk that

10   you produced to the disk that you're holding in your hand?

11   A     Yes, sir.

12   Q     And are they the same or substantially the same?

13   A     Yes, they are.

14         MR. GOLDSMITH:  No objection.

15         THE COURT:  It will be received.

16         CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

17   Q     At this time I'm handing you what's been previously

18   marked for identification purposes as Exhibit 4C.  I'm going

19   to ask you if you recognize Exhibit 4C.

20   A     I do.

21   Q     What is Exhibit 4C?

22   A     This is video files from the thumb drives.

23   Q     From both thumb drives?

24   A     Yes.

25   Q     And the thumb drives that we're talking about are the

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 515 of 890
A508
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 70 of 246

Brian Braisted – Direct

479

1    ones that are before you in Government Exhibit 4A, 5, and 6?

2    A    Yes.

3    Q    Did you place your initials on that exhibit, 4C?

4    A    I did, yes.

5    Q    Did you review that exhibit?

6    A    Yes.

7    Q    And does that exhibit contain all of the multimedia

8    files that you recovered from the 8-gigabyte thumb drive and

9    4-gigabyte thumb drive?

10   A    The ones that I identified as child pornography,

11   exactly, yes.

12   Q    And are those true and accurate copies of the videos

13   that you obtained from those thumb drives?

14   A    Yes, they are.

15        MS. THOMSON:  At this time, I would move into

16   evidence Exhibit 4C.

17        THE COURT:  Any objection?  Voir dire?

18        MR. GOLDSMITH:  Brief voir dire, your Honor.

19        VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

20   Q    Agent Braisted, did you create the CD that you're

21   holding in your hand?

22   A    I did not.

23   Q    Did you have the opportunity to compare the CD that you

24   created with your forensic software to the CDs that you're

25   holding in your hand?

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 516 of 890
A509
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 71 of 246

Brian Braisted – Direct                     480

1   A      Yes.

2   Q      Was it the same or substantially similar?

3   A      Yes.

4          MR. GOLDSMITH:  No objection.

5          THE COURT:  It will be received.

6   CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

7   Q      At this time I'm handing the witness what's previously

8   been marked as Exhibits 4D, 4E, and 4F.  Do you recognize

9   Exhibit 4D, 4E, and 4F?

10  A      Yes, I do.

11  Q      What are Exhibits 4D through 4F?

12  A      These are three graphic files that were found on the

13  8-gigabyte thumb drive.

14  Q      And are each of those exhibits double-sided pages?

15  A      Yes, they are.

16  Q      On the front page is the file path noted for where the

17  image was located?

18  A      Exactly.

19  Q      And on the reverse side is it the image itself?

20  A      Yes.

21  Q      And are those images that were found in your

22  investigation and contained on Exhibit 4B?

23  A      Yes.

24  Q      And 4B also being the disk that you created of the

25  image files?

Case 5:14-cr-00088-EAW Document 70-12 Filed 04/12/16 Page 517 of 890
A510
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 72 of 246

Brian Braisted - Direct                                           481

1    A    Yes.

2              MS. THOMSON:  At this time, your Honor, I would

3    offer into evidence Exhibits 4D through 4F.

4              THE COURT:  Any objection?

5              MR. GOLDSMITH:  No objection.

6              THE COURT:  It will be received.

7    Q    These are contained within the jury binders so if the

8    jury could open up their binder to tab 4D.  Agent Braisted,

9    starting with the first side of 4D, can you tell us what was

10   on the first page, front side?

11   A    This is the file path where the -- this particular file

12   was located, it was on the 8-gigabyte drive and the file name

13   is -- not asterisk, !1.jpg.

14   Q    And on the reverse side?

15   A    This is the picture that constitutes the !1.jpg.

16   Q    Was that an image of child pornography?

17   A    Yes, it is.

18   Q    And if we could turn to Exhibit 4E, please.  And can

19   you tell us what's on the first page, front page of 4E?

20   A    This is a file path showing that the graphic file

21   depicted here came from the 8-gigabyte drive and it was a

22   jpeg_753664[38].jpg.

23   Q    And on reverse side?

24   A    That is the picture that reflects that file name.

25   Q    Can you just briefly describe that picture?

Case 5:14-cr-00088-EAW Document 30 Filed 01/12/16 Page 518 of 890
A511
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 73 of 246

Brian Braisted - Direct                                    482

1    A    It's a little girl seven or eight years of age, laying

2    down resting on a teddy bear, her genitals exposed.

3    Q    And if you could look at 4F, please.  Can you tell us

4    what the file path was for 4F?

5    A    4F is another graphic file that came from the

6    8-gigabyte drive and the file name is jpeg_ 8699904[467].jpg.

7    Q    And the image on the reverse side of the page?

8    A    It's an adolescent girl with her legs spread, she's

9    naked and she's exposing her genitals.

10   Q    On this image do you also see notation on the bottom

11   right corner, and if so, could you describe it, please.

12   A    Yes, it's a stamp for the file indicating it's from

13   www.bdcompany.com or.net and BD Company is a purveyor of

14   child pornography.

15   Q    Have you seen that in other investigations?

16   A    Yes, I have.

17   Q    You can put the jury binders.  I believe you indicated

18   that you created a CD or participated in the creation of a CD

19   of the multimedia files with regard to the 8-gigabyte and the

20   4-gigabyte thumb drives?

21   A    Correct.

22        MS. THOMSON:  Your Honor, at this point we would be

23   doing more videos, I don't know if the court wanted to take a

24   break while we turn things off?

25        THE COURT:  Okay, ladies and gentlemen, we're going

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Brian Braisted - Direct

483

1    to take just a brief break to set up the videos, and please

2    do not discuss the case, we'll get you back out here.

3                    (Jury Excused, 11:07 a.m.)

4            THE COURT:  We'll just make sure they're off, and

5    again, have Mr. Jenkins' monitor turned, and position

6    themselves so they can view the videos, the rest of them will

7    be seen by counsel and the jury only.  You let me know when

8    you're all set.  Is it all cued up?  You got it, know where

9    it is this time?

10           COMPUTER TECHNICIAN:  It crashed before.

11           THE COURT:  Did it?  Okay.  All right.  Let's bring

12   the jury in, please.  Ms. Thomson, we're playing a portion of

13   4C, is that right?

14           MS. THOMSON:  Yes, and that was contained also on

15   4G.

16           THE COURT:  Okay.

17                    (Jury Present, 11:12 a.m.)

18           THE COURT:  Okay, the record should reflect we have

19   the ladies and gentlemen of the jury, government's going to

20   publish part of the video from Exhibit 4C.  Go ahead.

21           MS. THOMSON:  Thank you, your Honor.

22   Q    Did you have the opportunity to view clips that were

23   taken from the videos you found on the 8-gigabyte thumb

24   drive?

25   A    Yes, I was.

Case 5:14-cr-00088-EAW Document 20-1 Filed 04/12/16 Page 520 of 890
A513
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 75 of 246

Brian Braisted - Direct                                    484

1    Q     Beginning with the first clip, is this a video that was

2    identified by title as 9YO Vicky?

3    A     Yes.

4          MS. THOMSON:  And for the record that is a video,

5    one minute and 39 seconds in length and we'll be playing a

6    short clip which is contained at 00 to 12 seconds and 1

7    minute and 7 seconds to 1 minute and 14 seconds.

8          THE COURT:  Okay.

9          (A video clip from Government's Exhibit No. 4C

10         was played.)

11   Q     As the video continues on, can you tell us what's

12   depicted in the video?

13   A     She becomes totally naked eventually.

14   Q     And if we could play the second clip.

15         (A video clip from Government's Exhibit No. 4C

16         was played.)

17   Q     How does the video continue?

18   A     She performs fellatio on the man.

19   Q     This video is -- has a file title Vicky, have you seen

20   that file title before?

21   A     I have, yes.

22   Q     In the course of doing your examinations?

23   A     Exactly.

24   Q     And if we could see the third clip, and for the record,

25   that would be the clip identified as sasha_S3, video, 4

Brian Braisted - Direct

1    minutes and 59 seconds in length, we will be playing the clip

2    at 4:42 to 4:46.

3                        (A video clip from Government's Exhibit No. 4C

4                         was played.)

5    Q     And can you tell us, did you watch the entire video of

6    sasha_S3?

7    A     Yes, I did.

8    Q     What's depicted on that video?

9    A     It's a young girl and she's totally naked and

10   displaying her genitals in a lascivious manner.

11   Q     And this clip four, which will be our third video,

12   titled 0036, length of the video 8 minutes and 14 seconds and

13   we're only showing one second, and that's contained at 3:08.

14                       (A video clip from Government's Exhibit No. 4C

15                        was played.)

16   Q     Did you watch this entire video?

17   A     I did.

18   Q     What's contained in this video?

19   A     It's two adolescents engaging in sex with each other

20   and there's an adult male having sex with them as well.

21   Q     Is there -- adolescents, male, female?

22   A     I believe one male and one female as I recall.

23   Q     Throughout the video, are they engaged in sex acts

24   throughout the entire video?

25   A     Yeah, for the preponderance of the video, yes.

Brian Braisted – Direct                                    486

1    Q      What are the total number of videos that you recovered

2    during your examination on the 8-gigabyte thumb drive?

3    A      96 videos that I classified as child pornography.

4    Q      Now if we can talk about the 4-gigabyte thumb drive

5    that is Government Exhibit 5A.  Did you do an examination of

6    that 4-gigabyte thumb drive?

7    A      Yes, I did.

8    Q      And do you have that exhibit in front of you, 5A, the

9    thumb drive?

10   A      Yes, I do.

11   Q      How did you begin your examination of this thumb drive?

12   A      I connected it to my write block and then connected the

13   write block to my forensic machine and I created a

14   bit-for-bit copy, an image file of the 4-gigabyte contents.

15   Q      What software did you use to do your analysis?

16   A      I used FTK and EnCase.

17   Q      Can you please tell us what the results of your

18   analysis was as it relates to child pornography found on the

19   4-gigabyte thumb drive?

20   A      The preponderance of the contents of the 4-gigabyte

21   thumb drive were child pornography graphic files.  I found

22   3,250 that I bookmarked as child pornography, an additional

23   16 that I bookmarked in a separate category as bondage

24   graphic files but again depicting child pornography and I

25   found I believe 10 video files also on the 4-gigabyte thumb

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 523 of 890
A516
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 78 of 246

Brian Braisted - Direct                                        487

1    drive.

2    Q    At this time I'm handing you what's been previously

3    marked as Government's Exhibits 5B, 5C, and 5D and I'm going

4    to ask you if you recognize these exhibits.

5    A    I do recognize them, yes.

6    Q    What are they?

7    A    They are graphic files that were contained on the

8    4-gigabyte thumb drive.

9    Q    Beginning with Exhibit 5B, does that contain a front

10   page that has the file path and the image on the reverse?

11   A    Yes, it does.

12   Q    And the same for Exhibit 5C and 5D?

13   A    Yes.

14        MS. THOMSON:  At this time, your Honor, I would

15   move to admit Exhibits 5B, 5C, and 5D.

16        THE COURT:  Any objection?

17        MR. GOLDSMITH:  No objection.

18        THE COURT:  It will be received.

19   Q    And if the jury could pick up your juror binder and

20   beginning with the tab that's marked 5B.  Starting with 5B,

21   can you tell us what's on the front page of the exhibit?

22   A    The front page shows the file path coming from the

23   4-gigabyte thumb drive, it was in a folder labeled 0215 and

24   the file name itself is 110.jpg.

25   Q    And the image on the reverse side.  Could you describe

Brian Braisted - Direct                                488

1    that image?

2    A    It's an adolescent female with her knees up, she's

3    naked and displaying her genitals.  On the top left there's a

4    caption, Lolly edition.

5    Q    Have you seen that Lolly edition in prior child

6    pornography investigations?

7    A    Yes, I have.

8    Q    And 5C, can you tell us what the file path for the

9    image that's contained on the reverse side?

10   A    5C came from the 4-gigabyte thumb drive, it was in New

11   Folder 54, and the file name is 1172797076831.jpg.

12   Q    And can you tell us about the image on the reverse

13   side?

14   A    It's a young girl approximately 10 years of age and

15   she's being penetrated by an adult male.

16   Q    And 5D, please, can you tell us the file path for 5D?

17   A    5D came from the 4-gigabyte thumb drive, it was in a

18   folder structure labeled 032309 and the file name is

19   1239846239242.jpg.

20   Q    And the image on the reverse?

21   A    Image on the reverse is adolescent female, she's naked

22   with her legs spread and she's tied up by the legs and also

23   apparently by the neck.

24   Q    Each of those images you classified as images of child

25   pornography?

Case 5:14-cr-00088-EAW Document 70-11 Filed 01/12/16 Page 525 of 890
A518
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 80 of 246

Brian Braisted – Direct                                489

1   A     Yes, I did.

2   Q     If I could just retrieve.  And you indicated that you

3   prepared a disk with the multimedia files together of the

4   8-gigabyte and the 4-gigabyte multimedia files that you

5   recovered?

6   A     Exactly.

7   Q     And that's been previously identified by you?

8   A     Yes.

9   Q     So we are again ready to play clips.

10          THE COURT:  And it's 4C --

11          MS. THOMSON:  Yes.

12          THE COURT:  -- that you're ready to play.

13              (A video clip from Government's Exhibit No. 4C

14               was played.)

15  Q     And for the record, what's been played is file title

16  1.avi, length of the video is 1 minute, 16 seconds and we

17  played at zero to 04 seconds.  Did you have the opportunity

18  to view the entire file?

19  A     I did.

20  Q     And can you give a description of what happens in the

21  entire video?

22  A     There's a male and a female, they're engaging in sex,

23  the girl is probably 10 or 11 years of age, the boy might be

24  anywhere from 16 to 18 years of age.

25  Q     And on -- did you have opportunity to view a second

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 526 of 890
A519
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 81 of 246

Brian Braisted - Direct                    490

1   clip also that you took of multimedia file?

2   A    Yes.

3   Q    And is that clip with regard to the Vicky file?

4   A    (Witness gesturing affirmatively.)

5   Q    Did you observe the Vicky file that you've already

6   shown today on both the 8-gigabyte and the 4-gigabyte thumb

7   drive?

8   A    Yes, I did.

9   Q    Is it the same video in content?

10  A    It is.

11  Q    And if we could just show briefly the first couple

12  seconds.

13              (A video clip from Government's Exhibit No. 4C

14              was played.)

15  Q    So that video was on both?

16  A    Right.

17  Q    The total videos that you found on the 4-gigabyte thumb

18  drive?

19  A    Ten, I believe.

20  Q    In addition to finding evidence of child pornography,

21  did you find any other evidence of forensic significance to

22  you on the 4-gigabyte thumb drive?

23  A    Yes, I did.

24  Q    What did you find?

25  A    The 4-gigabyte thumb drive had thousands and thousands

Brian Braisted – Direct                    491

1    of files, primarily graphic files or video files.  There was

2    a single text document on that 4-gigabyte thumb drive and I

3    opened it up to see what the text was and it appeared to be a

4    message from someone asking for a password to access a child

5    pornography website.

6    Q    I'm now handing you what's been previously marked as

7    Government's Exhibit 5F and 5G.  I'm going to ask you if you

8    recognize Exhibit 5F and 5G.

9    A    Yes, I do.

10   Q    Can you tell me what Exhibit 5F and 5G are?

11   A    5F is a screen shot from my FTK program showing a

12   folder and a file within that folder on the 4-gigabyte thumb

13   drive and the contents of the file is a person requesting for

14   an access to a child pornography site.  5G is a screen shot

15   of a web page that was saved to the Joe Desktop and it

16   appears to be associated as the same web page for which the

17   4-gigabyte text file is requesting access.

18   Q    Did you create Exhibits 5F and 5G from your examination

19   of the media in this case?

20   A    Yes, I did.

21   Q    In particular the 4-gigabyte thumb drive?

22   A    Yes.

23        MS. THOMSON:  At this time, your Honor, I would

24   offer into evidence Government's Exhibits 5F and 5G.

25        THE COURT:  Counsel?

Brian Braisted - Direct

492

1          MR. GOLDSMITH:  No objection.

2          THE COURT:  It will be received.

3     Q     What was the significance of your finding 5F and 5G?

4     A     Well, 5F is a text document and it's got at the top

5     caption Lolita House XXX, it's dated 09/05/12, but I believe

6     that's the European translation so really May 9th of 2012 --

7     I'm sorry, 12 -- oh, I'm sorry, it's May 12th of 2009, and

8     then it indicates letitbit.net which is a website and it's

9     asking for, "Can somebody post correct PW for me?  Doesn't

10    work.  Thanks in advance."  Then below that it shows "Sasha

11    Girl 12 year old movie."  Below that, two lines below that

12    there's pass and then there's a code which appears to be a

13    password.  Below that, a line that says, "Pass only works on

14    Russian PCs.  Look at the H tat follows the E."  And then

15    below that there's a number of lines and it looks like the

16    password, when you go about 12 to 15 characters in, the

17    letters are in Cyrillic which is the Russian alphabet,

18    wouldn't be -- you wouldn't be able to do that on an American

19    keyboard.  So apparently the user was trying to find out how

20    to access that particular web page.

21    Q     And on 5G?

22    A     This is a web page that was saved to the Joe Desktop,

23    and down in the bottom of the page to the left it shows a

24    picture of a young girl, it's not child pornography, the girl

25    is an adolescent but she's wearing a bra and it looks like

Brian Braisted – Direct                    493

1    she's taking her clothes off, it's captioned Lolita House and

2    to the right of that, you'll see there is the word pass and

3    then a long string of characters which match the password

4    that the person was asking for on the text document on the

5    4-gigabyte thumb drive.

6    Q    What significance did that have to you as it relates to

7    this investigation?

8    A    Well, it suggested to me that the person was trying to

9    access this website and wasn't able to do so because his

10   password wasn't working so he sent a message out to the

11   community trying to find out what the proper password would

12   be.

13   Q    As part of your examination in this case, did you also

14   examine other media that was handed over to you from Agent

15   Chad Willard?

16   A    I did.

17   Q    Did that include the Compaq laptop that's in front of

18   you?

19   A    Yes.

20   Q    And that would be Exhibit?

21   A    7.

22   Q    As it relates to this investigation, what findings did

23   you make, if any, on the Compaq laptop?

24   A    I didn't find any child pornography on the Compaq

25   laptop, I found CCleaner, and in residual artifacts, I found

Case 5:14-cr-00088-EAW Document 30-2 101 Filed 01/12/16 Page 530 of 890
A523
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 85 of 246

Brian Braisted – Direct                    494

1    some terms that suggested child pornography but no actual

2    files.

3    Q     Did you also conduct an examination of the 2-gigabyte

4    thumb drive that was handed over to you by Special Agent Chad

5    Willard?

6    A     Yes, I did.

7    Q     And that I believe is Exhibit?

8    A     6.

9    Q     6.   What, if any, findings did you make with regard to

10   that thumb drive?

11   A     There was no child pornography on that thumb drive.

12   Q     And did you look at Government Exhibit Number 8, the

13   camera?

14   A     I did.

15   Q     And what findings, if any, did you make with regard to

16   the camera?

17   A     No child pornography.

18   Q     And did you also attempt an examination of a Motorola

19   cell phone, Government Exhibit Number 9?

20   A     I did.

21   Q     What were the results of that examination?

22   A     I wasn't able to examine it, I wasn't -- either my

23   software wasn't working or the cell phone didn't work.

24   Q     We've talked a little bit about -- it's been a little

25   while, about hash values; did you do any hash comparisons

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 531 of 890
A524
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 86 of 246

Brian Braisted - Direct                                    495

1    between the 8-gigabyte thumb drive and the 4-gigabyte thumb

2    drive?

3    A    Yes, I did.

4    Q    At this time I'm handing you Government Exhibit 14.

5    I'm going to ask you if you recognize Government Exhibit 14.

6    A    Yes, I do.

7    Q    What is Government Exhibit 14?

8    A    Government Exhibit 14 is two pages, they're two

9    separate spreadsheets containing files from the Toshiba

10   laptop and files from the 4-gigabyte and 8-gigabyte thumb

11   drive.  What I did was I did an MD5 hash for each individual

12   file on the Toshiba laptop for files that are identified as

13   child pornography, and then I did a hash value for all of the

14   files that are contained on the 4-gigabyte and the 8-gigabyte

15   and I matched the hash values to see if in any situations

16   files that were contained on the 4-gigabyte and 8-gigabyte

17   were also contained on the Toshiba.

18   Q    What did you find?

19   A    I found 11 matches for files that were contained on

20   both the thumb drives and the Toshiba laptop.

21   Q    And Government Exhibit 14, is that a document that you

22   produced as part of your examination?

23   A    Yes, it is.

24   Q    And does that reflect the hash values that you

25   determined and compared for the 4 and the 8-gigabyte on one

Case 5:14-cr-00088-EAW Document 70-12 Filed 01/12/16 Page 532 of 890
A525
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 87 of 246

Brian Braisted - Direct                                   496

```
1    page and the Toshiba on the other page?

2    A    Yes, it does.

3             MS. THOMSON:  Your Honor, at this time I would

4    offer into evidence Government Exhibit 14.

5             THE COURT:  Counsel?

6             MR. GOLDSMITH:  No objection.

7             THE COURT:  It will be received.

8    Q    And if we could publish Exhibit 14, please.  What's

9    shown on that first page?

10   A    These are file names, file paths, create dates and MD5

11   hash values for 11 files.

12   Q    And on the second page?

13   A    That would be the same information file name, file

14   path, create date, and MD 5 hash for files that were

15   contained on the Toshiba laptop.

16   Q    At this time I'm handing you what's been previously

17   received into evidence as Government's Exhibit 5B.  It is

18   contained in the jury binder, feel free to review it if you

19   wish.  Exhibit 5B, did you find that file path on your hash

20   comparisons?

21   A    Yes, I did.

22   Q    So what does that tell you?

23   A    That it was on both the 4-gigabyte thumb drive and the

24   Toshiba laptop computer.

25   Q    In summary, during this investigation, about,
```

Brian Braisted – Direct                          497

1    approximately how many images of child pornography did you

2    find in total between the Toshiba laptop, the 8-gigabyte

3    thumb drive and the 4-gigabyte thumb drive?

4    A      Are you talking graphic files?

5    Q      Graphic.

6    A      Roughly 4,000 graphic files.

7    Q      And about how many video files?

8    A      About 116.

9    Q      And earlier in your testimony when you showed us the

10   user activity that was going on on that Toshiba laptop as it

11   related to images and videos of child pornography, all of

12   that activity that you showed us in Exhibits 3I, 3J, 3K, 3L,

13   3M, and 3N, was that activity performed by the user with

14   profile named Joe?

15   A      Exactly.

16          MS. THOMSON:  One moment, your Honor.

17          THE COURT:  Okay.

18          MS. THOMSON:  That may be all.  Just want to check

19   with counsel.

20              (Pause in Proceedings.)

21          MS. THOMSON:  That's all, your Honor.

22          MR. GOLDSMITH:  May I inquire?

23          THE COURT:  You may.

24          CROSS-EXAMINATION BY MR. GOLDSMITH:

25   Q      Special Agent Braisted, throughout your forensic

Brian Braisted – Cross                                        498

1    evaluation of the laptops and the flash drives in this

2    particular case, there were several determinations that were

3    made as to whether something qualified or not as child

4    pornography.  Did you make that determination or did someone

5    else?

6    A    I made that determination.

7    Q    As part of your training within the -- within your

8    experience working with Homeland Security, you've received

9    training and education on the determination of child

10   pornography?

11   A    I use case law and I use my experience.

12   Q    So have you had any training related to determining

13   child pornography?

14   A    I've had training on the law, the case law.  During

15   those training sessions they don't display child pornography

16   and say, this is child pornography or this is not child

17   pornography.

18   Q    So they leave it to your discretion?

19   A    Yes.

20   Q    And all of the examples that you provided and testified

21   about earlier today were based upon your discretion, correct?

22   A    Right.  Correct.

23   Q    Now you've discussed creating the forensic image hard

24   drive.  Did you create one image, forensic image hard drive,

25   for all of the media that you've discussed?

Brian Braisted – Cross                                          499

1   A      I put -- I put all the images on one hard drive, yes.

2   Q      Now, you recall testifying yesterday that upon your

3   receipt of the materials, you had also reviewed some of the

4   Canadian forensic reports, is that correct?

5   A      Not at that time.  I think later on I did review them,

6   yes.

7   Q      Do you recall when you reviewed the Canadian forensic

8   reports?

9   A      Not specifically, no.

10  Q      Now you actually -- well, withdrawn.  Do you recall if

11  it was closer in time to when you commenced your

12  investigation or further in time?

13  A      It would have been further in time.  Basically I got

14  the evidence from the case agent, Agent Willard, on the 7th I

15  came right back to the lab, I didn't receive anything more

16  from him.  Well, I'm not sure that I received anything more

17  from him until I contacted him a month later to tell him that

18  my initial exam was complete and ready for him.

19  Q      All right.  Now, you, you conduct one specific study or

20  did you perform a series of studies on the materials?

21  A      I did an initial examination on all of the evidence

22  that was submitted to me, and based on that initial

23  examination I prepared a document saying this is my findings

24  and I submitted that to the case agent.  The following year I

25  was contacted and they requested that I go into further depth

Brian Braisted – Cross                              500

1    to try to find out file activity in close proximity to the

2    child pornography images that I had identified.

3    Q     That was prompted to you by the case agent?

4    A     Yes.

5    Q     Subsequent to that review, were there other reviews

6    that you did?

7    A     As it -- as this case starts to go to trial, other

8    questions will arise and I'll continue to do additional

9    research on the hard drives.

10   Q     Do you recall approximately when your subsequent

11   examinations were?

12   A     I believe March of 2012.

13   Q     All right.  You discussed on a couple of occasions

14   during your testimony the restore point or the system volume

15   information?

16   A     Yes.

17   Q     Is that something that is readily accessible to the

18   user?

19   A     The restore point is readily accessible.  The contents

20   of the system volume information would not be readily

21   accessible.

22   Q     And in your experience with the materials and the media

23   that you examined in this particular case, were the materials

24   that were found within the system volume information

25   accessible to the user?

Brian Braisted – Cross                                              501

1   A     The only way to be accessible would be if a person went

2   and tried to do a restore.  Upon doing a restore, those files

3   would be recreated on the system.

4   Q     And you -- and did you note any attempts to restore?

5   A     No.

6   Q     So it would be fair to say that based upon your

7   examination of the evidence, anything that was found within

8   the system volume information was not accessible to the user

9   on or about May 24th of 2009?

10  A     Not accessible short of going to the restore, right.

11  Q     You also discussed the thumb cache.  Were the materials

12  that were located in the thumb cache of the computers

13  accessible to the user?

14  A     You would use -- need to use software to actually look

15  at the thumb cache.

16  Q     All right.  And your examination of the two laptops,

17  did you find presence of a software that would be necessary

18  to view a thumb cache?

19  A     No.

20  Q     So based upon your evaluation of the two laptops, is it

21  correct to say that anything that was found within the thumb

22  cache would not be accessible to the users on or about

23  April -- I'm sorry, May 24th, 2009?

24  A     Correct, it wouldn't be readily available.

25  Q     Now, you also talked about the CCleaner software.  The

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 538 of 890
A531
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 93 of 246

Brian Braisted - Cross                                        502

1    CCleaner software is software that is used to remove files

2    from the computer, correct?

3    A    It doesn't remove the files, what it does is it wipes

4    the contents of the files so the files are still there.

5    Q    So the files then sort of -- the existence of the, the

6    file is there but anything that was a part of it is not?

7    A    Exactly.

8    Q    And within your experience as a computer forensics

9    expert, are there legitimate purposes for having file wiping

10   software?

11   A    Sure, you could use it for legitimate purposes.

12   Q    And typically file wiping software is used to delete

13   information that is received from the internet, right?

14   A    Not exclusively, but a large part of that, yes.

15   Q    You touched upon in some of your testimony the word

16   cookies.  What's a cookie?

17   A    A cookie is a small text file that is left on your

18   computer when you visit an internet site.

19   Q    Is that something that the user inputs into the

20   computer?

21   A    No.

22   Q    Is that something that is automatically received from

23   points on the internet?

24   A    Yes.

25   Q    And as part of those cookies, does that help or --

Brian Braisted – Cross                              503

1    withdrawn.  As part of those cookies, do they essentially

2    provide the computer with information in redirecting the

3    internet to certain sites where the user may find similar to

4    other sites they visited?

5    A     No, the cookie is basically put on the computer by the

6    server, by the outside presence and it's so that the next

7    time that the computer user goes to that site, the cookie

8    will identify that site as having been previously visited.

9    So it's really not for the benefit of the computer user so

10   much as for the website that it's visiting.

11   Q     And so in your testimony what you're saying is that if

12   there's the presence of some of those cookies, then really

13   that's done for the benefit of whatever websites are out

14   there?

15   A     Right.

16   Q     And that helps those websites be able to more easily

17   access or be accessed by users?

18   A     No, it's keeping track of it.  My analogy of a cookie

19   is if you go to a supermarket nowdays and they have customer

20   appreciation benefits and you sign up, you get a little key

21   tag and so every time you go to the store, you give them your

22   key tag and they swipe it.  What they're doing is they're

23   taking information that you provide to them and now they're

24   seeing your user preferences, the things you buy, that kind

25   of thing, and they're storing that data and now they're

Brian Braisted – Cross                                        504

1    oriented, orient their services to what's going to benefit

2    you.  That's what a cookie does for the server is it

3    basically identifies the computer that visited.

4    Q    Okay.  Are these cookies -- are these things that can

5    help slow your computer down?

6    A    Cookie won't slow your computer down, no.

7    Q    But there are typically other software that may be

8    installed by the internet from websites that are viewed that

9    can slow your computer down?

10   A    A virus can slow your computer down, yes.

11   Q    And typically within those, as we've been discussing

12   these file wiping software, that's legitimately used to help

13   speed up the processing of the computer, correct?

14   A    I wouldn't say that it's got anything to do with the

15   speed of the computer, I would say more that it's got to do

16   with the volume, in other words, you have a hard drive that

17   is receiving a lot of files to it, those files are taking up

18   space.  If those files are considered to be extraneous by the

19   user, you might want to get rid of those files.

20   Q    So essentially it's used to help the user better

21   perform on the laptop?

22   A    Right.

23   Q    You talked about at one point icons on the computer.

24   You stated that typically these can be created in three ways,

25   is that correct?

Brian Braisted – Cross                                    505

1   A    At least three ways, yes.

2   Q    What are those three ways?

3   A    They can be installed by the system when the system

4   first installs the operating system, icons can be placed on

5   the computer.  They can be added when you add a program, as

6   you install the program it will ask you if you want to put a

7   shortcut icon on the desktop.  And if you say yes, then it

8   will put an icon on the desktop.  The user can also generate

9   desktop icons if it's a folder, he can just right-click and

10  place a new folder on the desktop.  You can click and drag

11  from another source and put it on the desktop.

12  Q    Sometimes when you're downloading information from the

13  internet, that can automatically prompt an icon on the

14  desktop, correct?

15  A    I don't -- not that I'm aware, what are you talking --

16  Q    A shortcut?

17  A    It's not going to automatically do it, it's going to

18  ask you whether you want to put it there.

19  Q    Typically when there's applications or information

20  being downloaded from the internet, there will be a prompt on

21  the computer, right?

22  A    If you're installing a program, it will prompt you and

23  ask you if you want to have a shortcut, yes.

24  Q    And typically when we see these prompts, as you said,

25  it will ask you, manufacturers and software engineers will

Brian Braisted – Cross

1   typically put in or premark those prompts, correct?

2   A     It's got to be coded obviously, yes.

3   Q     You discussed at some points the folder on the Toshiba

4   laptop entitled New Folder 2?

5   A     Yes.

6   Q     Do you recall testifying that it could be visible to

7   anyone?

8   A     Yes.

9   Q     When you said that it could be visible to anyone, by

10  simply opening up the computer or turning it on, the contents

11  of that folder is visible to anyone?

12  A     The folder itself, the icon of the folder is on the

13  desktop.  The only way to see the contents of the folder

14  would be to open that folder either by clicking the icon or

15  going into the Windows Explorer and opening the folder.

16  Q     So there was no password protection to access the

17  content of New Folder 2?

18  A     No, it's not password protected.

19  Q     On the topic of passwords, at one point you noted that

20  there was a prompt on the e-mail of the Toshiba, is that

21  correct?

22  A     Right.

23  Q     And you recall testifying about a pop-up icon that was

24  on the computer for the screen capture that you created?

25  A     Right.

Case 5:14-cr-00088-EAW   Document 102   Filed 01/12/16   Page 543 of 890
A536
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 98 of 246

Brian Braisted - Cross                           507

1    Q      And that was asking for user name and a password?

2    A      Right.

3    Q      Do you recall the prompt box underneath the user name

4    and password?

5    A      Yes.

6    Q      And you recall that that prompt box asked the user to

7    remember my credentials?

8    A      Right.

9    Q      Okay.  And that means that it's the computer saying,

10   remember the information so that the next time you don't have

11   to put it in, right?

12   A      Right.

13   Q      And if the individual did not uncheck that box while

14   they were putting their credentials in, it means that there

15   was no security to prohibit other individuals from accessing

16   the e-mail in that, for instance?

17   A      Well, because CCleaner removed all of the auto fill-in

18   information so there would be no information for the computer

19   to fill in automatically.

20   Q      So as part of the file wiping software, CCleaner would

21   also remove passwords and user names?

22   A      In this case, it was checked to remove all those, the

23   auto fill information.

24   Q      You also recall testifying about a particular screen

25   capture that you had created as part of your exam, which is a

Brian Braisted – Cross                                    508

```
 1   text file listing user names and passwords?

 2   A     Yes.

 3   Q     And that text file of user names and passwords was

 4   attributable to several e-mail accounts?

 5   A     Correct.

 6   Q     And at least one of those e-mail accounts that had

 7   attributable user names and passwords was the jjenkins e-mail

 8   account?

 9   A     Yes.

10   Q     That was the Road Runner account that you discussed

11   earlier?

12   A     I think they were all Road Runner, but yes.

13   Q     And that text file was accessible on the computer?

14   A     Yes.

15   Q     And if someone were aware of that text file, that

16   essentially would provide them with all of the credentials to

17   access those particular e-mail accounts, correct?

18   A     Correct.

19   Q     That was the RR info text document, correct?

20   A     Correct, yes.

21   Q     There was at some point a number of photographs that

22   you described which were -- appeared to be girls on a beach?

23   A     Yes.

24   Q     You described I think a series of about five or six or

25   seven images?
```

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 545 of 890
A538
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 100 of 246

Brian Braisted – Cross                               509

1    A      Seven pictures.

2    Q      And did you classify those images as pornographic?

3    A      No, I did not.

4    Q      There was also a photograph image of Mr. Jenkins with a

5    younger girl, do you recall testifying about that?

6    A      Yes.

7    Q      Did you classify that as pornographic?

8    A      No.

9    Q      Did you have any information whatsoever about the

10   identity of the girl in that photograph?

11   A      None whatsoever.

12   Q      Any information of where that photograph was taken?

13   A      No.

14   Q      Any information when it was taken?

15   A      I could find the create date, but no, I didn't record

16   that.

17   Q      You discussed on several occasions the user name of

18   Joe.  Did you find other user names on the computer?

19   A      No.

20   Q      So there was only one user name available on the

21   Toshiba laptop?

22   A      Correct.

23   Q      And the user name is -- Well, withdrawn.  Why don't you

24   describe what a user name is generically as it relates to a

25   computer.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 546 of 890
A539
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 101 of 246

Brian Braisted - Cross

510

1    A    A Windows computer can have multiple user accounts.

2    When you first set up the program and even at a later date,

3    you can create a specific user account for an individual.  In

4    this case, there was only one user account, it was labeled

5    Joe.  Some computers, for example home computers, people

6    might want to have a user account for the adults and a user

7    account for the children, and then the children can go into

8    their user account and there might be specific controls as to

9    where they can go on to the internet, would not be -- would

10   not carry over to the user account for the adults.

11   Q    Okay.  So essentially for the Toshiba laptop, is it

12   fair to say then that anyone who turned on that computer was

13   going to be routed through the Joe user name?

14   A    Yes.

15   Q    And that's because there were no other options on the

16   Toshiba laptop?

17   A    Exactly.

18   Q    So the Joe user name in and of itself does not provide

19   you with any information as to who the actual user is?

20   A    Correct.

21   Q    On the topic of any evidence of who the actual users

22   are, does the forensic software that you used, whether it be

23   the FTK or the EnCase, provide you with any evidence of who

24   the actual user was of any of the e-mail accounts that were

25   accessed in your study?

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 547 of 890
**A540**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 102 of 246

Brian Braisted - Cross                                      511

1    A    No.

2    Q    Does the presence of the informational text file

3    including the user names and the passwords for all of the

4    e-mails suggest to you that anyone who opened the computer

5    would be capable of accessing e-mail if they knew of that

6    document's existence?

7    A     If they found that document, yes, that password would

8    work for anyone.

9    Q     Within particular e-mail programs, is it possible to

10   change the settings to allow for the computer to periodically

11   check e-mail for you, whether you're actively selecting check

12   e-mail or not?

13   A     Well, no.  The way e-mail works, all of these are

14   roadrunner.com accounts so when a person sends an e-mail to,

15   there are three accounts, gjenkins, jenkinselectric, and

16   jjenkins70.  When a person sends an e-mail to any of those

17   three accounts, it will be routed to the Road Runner server,

18   the e-mail server, and it will stay right on that server, so

19   someone accessing say the jjenkins70 e-mail account, he can

20   do it one of two ways.  He can go to the internet and he can

21   go to roadrunner.com, then he can enter his password -- or

22   his e-mail address and the password and that will give him

23   the e-mails.  But those will only be visible to him on the

24   server, they don't bring it down into his computer.  In this

25   case he was using a program called Windows Mail, and Windows

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 548 of 890
A541
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 103 of 246

Brian Braisted – Cross                          512

1    Mail allows you to configure multiple user, or multiple

2    e-mail accounts and you give them the user account name and

3    the password and then at that point whenever you go on the

4    internet and you put in the security code, your user name and

5    password, it will actually bring those e-mails from the

6    server that's located presumably in Rochester to your hard

7    drive.  So that's the only reason I could see the e-mails

8    with the actual date stamp, full e-mail located on the hard

9    drive.

10   Q    And if the e-mail application had been left open while

11   the computer's running, will it continue to refresh on its

12   own?

13   A    It could if you have that Windows Mail program open and

14   running and you've put in the user name and password, that

15   could happen.

16   Q    Did you find any evidence of the laptop being

17   completely turned off within the last 24 hours prior to

18   May 24th of 2009?

19   A    No.

20   Q    Would the FTK or the EnCase software be able to

21   delineate if it had actually been turned off completely?

22   A    If I looked specifically, yes, I didn't see any of that

23   indication.

24   Q    So from your study it appears, though, that the Toshiba

25   laptop was probably left on, generally?

Brian Braisted - Cross                                   513

1   A      It was probably in sleep mode.

2   Q      Sleep mode means it's still on, correct?

3   A      Right.

4   Q      It's just sort of reserving power?

5   A      It's reserving power, there's no file activity going

6   on.

7   Q      You did testify briefly about Exhibit 3I, and you noted

8   five files ending in the -- ending in the term flv?

9   A      Yes.

10  Q      You referred to those as erotica.  Is that

11  distinguishable from pornographic material?

12  A      Yes, it is.

13  Q      So that's not pornographic material then?

14  A      No.

15  Q      The one program that you referred to in some of your

16  testimony, breekelsey, do you recall that?

17  A      It was a file name, yes.

18  Q      And you recall that you performed a word search on the

19  Toshiba for it?

20  A      Right.

21  Q      At the time that you performed your evaluation, did it

22  appear as though the breekelsey file was present and

23  accessible on the Toshiba?

24  A      No, it was not.

25  Q      Do you have an evidence notebook up there?

Brian Braisted - Cross                                    514

1    A      I do not have a binder, no, sir.

2    Q      Do you have the binder?

3    A      I do not, no.

4    Q      No.

5           MR. GOLDSMITH:  May I approach?

6           THE COURT:  You may.

7    Q      Special Agent Braisted, I've opened up a evidence

8    binder to Exhibit 3L for you, 3L as in Larry.

9    A      Okay.

10   Q      This is a series of screen captures that you discussed

11   earlier, in what was a comparison of time?

12   A      Right.

13   Q      Is that correct?

14   A      Yes.

15   Q      In other words you were comparing the time of certain

16   files being put onto the system versus other activity?

17   A      Exactly.

18   Q      On page 1 of Exhibit 3L, there are essentially three

19   columns, correct?

20   A      Right.

21   Q      The left column is -- appears to be file names, right?

22   A      Correct.

23   Q      Middle column appears to be date and time stamps?

24   A      Yes.

25   Q      And the right column would be pathway?

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 551 of 890
**A544**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 106 of 246

Brian Braisted – Cross                    515

1    A       Right.

2    Q       And the date and time stamps in the middle column,

3    those reflect when the file was accessed?

4    A       No, they were files created.

5    Q       And there was several files that you discussed having

6    been created at approximately 10:00 in the morning or shortly

7    after it; do you recall that?

8    A       Yes, uh-huh.

9    Q       And that -- and the date in which those were created

10   was February 22nd of 2009?

11   A       Correct.

12   Q       If you look at page 5 of 3L, this was an e-mail that

13   you had discussed being accessed shortly after, is that

14   correct?

15   A       Correct.

16   Q       And within the e-mail itself, there is a like a pop-up

17   box, is it fair to say?

18   A       Yeah.

19   Q       And that's -- is that something that's created by your

20   forensic equipment?

21   A       No, what that is is, you see the e-mail, the major

22   portion of it has -- well, when you look at an e-mail on your

23   screen, you'll see the data on your screen, behind that data

24   is what's called source code, and so when you right-click, it

25   will give you a pop-up and you can show source code and

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 552 of 890
**A545**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 107 of 246

Brian Braisted - Cross

1    that's the box I have in here.  This is source code for that

2    particular e-mail.

3    Q    Okay.  So in the source code for the e-mail, it has the

4    title, return path, and then next to it is an e-mail address,

5    correct?

6    A    Exactly, yep.

7    Q    And underneath that it says received and then it has a

8    series of what appears to be maybe some e-mail servers?

9    A    There, yeah, IP addresses, basically that's the routing

10   that the e-mail took to get from the person who sent it, Ron

11   Travis, to get to the server at Road Runner, rr.com.

12   Q    Okay.  And it -- then there's the e-mail address of

13   jjenkins70@rochester.rr.com?

14   A    Exactly.

15   Q    And then beneath that is the date and time stamp?

16   A    Right.

17   Q    And that date and time stamp is February 22nd of 2009,

18   the same day, correct?

19   A    Exactly.

20   Q    And that lists a time of 14:31:05, right?

21   A    Right.

22   Q    And that time is in military time, correct?

23   A    It's Greenwich mean time, yes.

24   Q    As part of your evaluations, you looked at the last

25   time many of these files that you testified about had been

Brian Braisted - Cross                                                        517

1    accessed, is that correct?

2    A     Yes.

3    Q     And as a great deal of the evidence that you discussed,

4    you were talking about files being accessed in or about days

5    or hours preceding May 24th of 2009, correct?

6    A     Correct.

7    Q     As part of your study of these materials, had you

8    reviewed the Canadian forensic reports?

9    A     I -- the written reports, yes.

10   Q     Okay.  Did you use that, the Canadian forensic reports

11   in any way to assist you with your studies?

12   A     No.

13   Q     Did you use those reports in any way to double check

14   the accuracy of your reports?

15   A     No.

16   Q     But you did review them?

17   A     I looked at them, yes.

18   Q     So essentially you reviewed them for no purpose?

19   A     I didn't have a need to look at them frankly, I stand

20   by my report.

21   Q     All right.  Do you recall any portions of the Canadian

22   forensic report detailing the finding that none of the --

23   none of the files had been accessed from the thumb drives

24   after May 16th of 2009?

25   A     I don't recall that, no.

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 554 of 890
**A547**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 109 of 246

Brian Braisted – Cross                                    518

1    Q     Now you testified that you had found approximately

2    4,000 image files on the two flash drives?

3    A     I don't think quite that many, I think that includes

4    the Toshiba laptop, I think there were 3250 graphic files on

5    the 4-gigabyte and then about 15 on the 8-gigabyte thumb

6    drive.

7    Q     So all told, between those devices, you found close to

8    4,000 graphic images?

9    A     Yes.

10   Q     And those were only -- withdrawn.  And those images

11   were images that you determined to be pornographic?

12   A     Right.

13   Q     Do you recall the Canadian forensic report finding in

14   the -- finding a number in the hundreds?

15   A     No, I don't recall that.

16         MS. THOMSON:  Your Honor, I'm going to object to

17   this line of questioning.  Number one, that examiner that

18   made the determinations was here and that was the proper

19   person to ask those questions to.

20         THE COURT:  No, it's fair cross-examination, he's

21   testified that he looked at the report so he's asking him

22   what he recalls about the Canadian report.  It's permissible.

23   Go ahead.

24         MR. GOLDSMITH:  Thank you.

25   Q     Do you recall the Canadian forensic report concluding

Brian Braisted - Cross                                    519

1    that there was no evidence of the files found on the two

2    flash drives having passed through the Toshiba laptop?

3    A     I don't recall that, no.

4              THE COURT:  Counsel, I'm going to ask you to

5    approach for a minute.

6                    (At Side Bar.)

7              THE COURT:  One of the things I am going to insist

8    on is that you have a good faith basis for these questions,

9    that they're coming from the Canadian report and not things

10   that you're just asking him does he remember.

11             MR. GOLDSMITH:  No, your Honor, I have obtained the

12   forensic report and I'm referring to notes that I made on a

13   portion of them, I do not anticipate many more if any

14   questions --

15             THE COURT:  Okay.

16             MR. GOLDSMITH:  -- based on this.

17             THE COURT:  So you're saying you have a Canadian

18   report saying there was only hundreds of images as opposed to

19   thousands?

20             MR. GOLDSMITH:  Yes, based upon my review.

21             THE COURT:  Counsel, you want to be heard?

22             MS. THOMSON:  Number one, it's not correct, and

23   number two, the witness who would have been the appropriate

24   witness to talk to about that also testified that on the one

25   form of media, he located 1600, and then, if the court

Case 5:14-cr-00088-EAW Document 78-1 Filed 01/12/16 Page 556 of 890
A549
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 111 of 246

Brian Braisted - Cross

520

1    recalls, he indicated there's a saturation point, so if he's
2    going to ask these questions --
3         THE COURT:  These are misleading questions.
4         MR. GOLDSMITH:  I don't find them to be misleading.
5         THE COURT:  You don't, I do.  Quite frankly, you
6    know, just because you're reading the report and interpreting
7    it some way, you know, there was testimony in this courtroom
8    from the Canadian expert who said, you know, I looked at
9    this, I hit a saturation point and I stopped and if you're
10   using this number and saying that the Canadian said this is
11   the number that we found, that's not accurate.
12        MR. GOLDSMITH:  No, your Honor, that is the number
13   that was put in their report.
14        THE COURT:  But again, Counsel, that is not
15   accurate with regard to the way you're asking these questions
16   and asking this witness to say, you know, assuming that the
17   Canadian report says there was only this many.  That's not an
18   accurate good faith question.
19        MR. GOLDSMITH:  Your Honor, I, I do not want the
20   court to think that I am intentionally misleading the jury or
21   in any way attempting to run afoul of the court.  If the
22   court wishes, I will withdraw those questions.
23        THE COURT:  I'm going to ask you again, is there a
24   good faith basis for these questions based on the Canadian
25   report that says that there was only a certain number of

Brian Braisted - Cross                              521

1    images found.

2              MR. GOLDSMITH:  Your Honor, I would not ask them if

3    I did not have a good faith basis.

4              THE COURT:  Okay, well, then I want to see the

5    report where it says that there was only a certain number of

6    images found.

7              MR. GOLDSMITH:  Okay.

8                   (Pause in Proceedings.)

9              MR. GOLDSMITH:  Your Honor, he's talking about

10   numbers of five images, five images, and I do recall that

11   there was a -- that there was something I read from

12   Mr. Wohlert, I think maybe in an affidavit or a warrant

13   earlier discussing the number of 500 or so.

14             MS. THOMSON:  It's loud.

15             MR. GOLDSMITH:  I'm sorry.  Continue to look

16   through the rest of the report.

17             MS. THOMSON:  Your Honor, so the court understands,

18   the classification he's asking about is contained within Kip

19   Wohlert's report because if the court recalls, he testified

20   that he receives data from Harrington, from just the imaging

21   process and he classifies that data, so the report that's

22   being referenced there is not even the report that the

23   Canadian testified to, this report is the classification, Kip

24   Wohlert classified them into categories 1 through 6, and made

25   those determinations, being one category.

Brian Braisted - Cross

522

1            MR. GOLDSMITH:  The charts.

2            MS. THOMSON:  That's the classification.

3            MR. GOLDSMITH:  Yeah.  We have no child

4    pornography, we have adult pornography, we have --

5            MS. THOMSON:  Do you know which piece of media

6    you're referring to?

7            MR. GOLDSMITH:  The C4P was the -- these were the

8    flash drives.

9            MS. THOMSON:  Okay.  The flash drives are line 66,

10    22, the PNY is -- 4-gigabyte is in the Canadian report

11    classified as 6622B1, and the 8-gigabyte is 6622B2 so which

12    one are you looking at?

13            THE COURT:  And was there a determination of number

14    of photographs for those by the Canadian?

15            MS. THOMSON:  The Canadians indicated on the

16    4-gigabyte, 1,644 to date, and 13 movie clips.

17            THE COURT:  To date meaning they went so far and

18    stopped?

19            MS. THOMSON:  He stopped.

20            THE COURT:  Which he testified to.

21            MR. GOLDSMITH:  Okay.

22            THE COURT:  So again, those questions are

23    misleading.

24            MR. GOLDSMITH:  I apologize, your Honor, I'm

25    reviewing these files, paperwork that I've been presented

Case 5:11-cr-00088-EAW Document 210 Filed 01/12/16 Page 559 of 890
A552
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 114 of 246

Brian Braisted – Cross

523

1    looking at numbers, and I will then, in this case upon the

2    showing from the government an explanation of the original

3    files that they have, I will withdraw those questions.

4            THE COURT:  Well, I think maybe a good way to

5    handle this is, you can try and clean it up on redirect.  I'm

6    going to ask you to be cautious about the questions you're

7    asking, okay, because they've been misleading, and I'll allow

8    you to get into it on redirect and clean it up and if I feel

9    it's necessary, I'll hear you about a curative instruction

10   with regard to this issue because the way the questions were

11   asked, you're suggesting that the reports from Canada only

12   had, you know, a limited number of photographs and that's

13   really not accurate.  Okay.

14           MR. GOLDSMITH:  I apologize, your Honor, I do not

15   want the court to feel that I'm being misleading with my

16   examination.

17           THE COURT:  Well, I understand based on your

18   explanation of how it could have happened so we're going to

19   clean it up.

20           MR. GOLDSMITH:  Thank you.

21           THE COURT:  Okay.

22               (Open Court.)

23   Q    I should be very brief with a couple of questions left.

24   Special Agent Braisted, do you have any software capable

25   within your experience as a forensic examiner that would

Case 5:14-cr-00088-EAW Document 70-12 Filed 01/12/16 Page 560 of 890
**A553**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 115 of 246

Brian Braisted – Cross                                524

1   indicate to you who the exact user is of a device prior to

2   your receipt of it?

3   A    No.

4   Q    Is there any way to determine based upon your

5   examination who exactly accessed the e-mail accounts that

6   you've discussed in your testimony?

7   A    No.

8   Q    Do you have anything in your -- withdrawn.  Do you have

9   any tools that would be able to accurately decipher for you

10  the individuals who were able to access the materials on the

11  thumb drives that you've testified about?

12  A    No.

13          MR. GOLDSMITH:  No further questions.

14          THE COURT:  Okay, Counsel, redirect?

15          MS. THOMSON:  Yes, your Honor.

16          REDIRECT EXAMINATION BY MS. THOMSON:

17  Q    When the cross-examination began, you were asked some

18  questions about that system volume information; do you recall

19  those questions?

20  A    Yes.

21  Q    And you indicated that's not accessible, it would not

22  be accessible to the user?

23  A    Right.

24  Q    Even if it's not accessible to the user at that time,

25  does it show that at some time, that images were accessible

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 561 of 890
A554
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 116 of 246

Brian Braisted - Redirect                           525

1    and on that Toshiba?

2    A     Absolutely.

3    Q     I want to show you Exhibit 3N, please, I'll approach

4    handing the exhibit binder, 3N.  N like Nancy.  Looking at

5    Exhibit 3N, if you could just briefly tell us what 3N, what

6    Exhibit 3N is?

7    A     3N shows contents of the 4-gigabyte thumb drive,

8    specifically the contents of the folder 052209, and it's

9    highlighting a file named elena038.jpg.

10   Q     And does that indicate the date and location where that

11   file was at, at some point resided?

12   A     It shows that it was created on the 4-gigabyte thumb

13   drive on May 22nd of 2009 at 10:25 p.m.

14   Q     And did you find evidence of that particular image on

15   the Toshiba?

16   A     I found the file name and the folder name in a panel on

17   the Toshiba, yes.

18   Q     And then that file was on the 4-gigabyte thumb drive?

19   A     Exactly.

20   Q     What determination did you make about it both having

21   evidence on the Toshiba and having presence on the 4-gigabyte

22   as noted on 5/22/09 at 10:25 p.m.?

23   A     Well, it indicates to me that it was on the Toshiba

24   laptop and then it was moved over to the 4-gigabyte thumb

25   drive.

Case 5:14-cr-00088-EAW Document 120-1 Filed 01/12/16 Page 562 of 890
**A555**
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 117 of 246

Brian Braisted – Redirect

1  Q    Was that on May 22nd, 2009?

2  A    At 10:25, exactly.

3  Q    You were also asked about Exhibit 3I, so if you could

4  turn to Exhibit 3I, please.  And I believe if I recall your

5  testimony, Exhibit 3I, the first page, that shows the date

6  that New Folder 2 was created and saved to the desktop user

7  Joe, is that correct?

8  A    Correct.

9  Q    And then immediately thereafter, can you tell us, was

10 it those five videos, the 13, 14, 15, 29, and 30.flv that

11 were immediately also saved to that New Folder 2?

12 A    Exactly.

13 Q    And those were files as you mentioned on

14 cross-examination that were child erotica?

15 A    Correct.

16 Q    And so when you say child erotica, could you just

17 describe that in relation to child pornography?

18 A    Child erotica would be depicting children, minor under

19 the age of 18 displaying themselves but it doesn't reach the

20 level of child pornography.  So the person is clothed or is

21 not gratuitously displaying their genitalia.

22 Q    And after -- did you watch all the videos together?

23 A    Yes, I did.

24 Q    And together what's their total length?

25 A    I believe they were just short of 33 minutes in length.

Brian Braisted - Redirect                                527

1    Q    And at 33 minutes after the New Folder 2 is saved to

2    the user, what happened?

3    A    An e-mail was created on the hard drive.

4    Q    And by created, does that mean that e-mail was accessed

5    by the user?

6    A    Exactly.

7    Q    And that e-mail was addressed to Joe Jenkins?

8    A    Yes.

9    Q    So about 33 minutes after New Folder 2 was created,

10   that e-mail is accessed?

11   A    Correct.

12   Q    And in between there are five child erotica videos

13   totaling almost 33 minutes in length that are saved at that

14   time?

15   A    Correct.

16   Q    You were asked some questions about whether or not you

17   reviewed the Canadian classification report with regard to

18   the items examined in this case?

19   A    Yes.

20   Q    Are you aware if that Canadian report also noted the

21   presence of child pornography on the media examined?

22   A    I believe it did note some child pornography, yes.

23   Q    With regard to that 4-gigabyte thumb drive, you were

24   asked some questions on cross-examination; are you aware if

25   the Canadians also found child pornography on the thumb

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 564 of 890
**A557**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 119 of 246

Brian Braisted - Redirect                                  528

1    drive?

2    A     I really don't remember specifically, I think that it

3    was, they did find child pornography on the thumb drive, yes.

4            MS. THOMSON:  One moment, your Honor.  That's all,

5    your Honor.

6            THE COURT:  Okay.  Any recross?  Or -- yes.

7            MR. GOLDSMITH:  One moment, your Honor.

8            (A discussion was held off the record between

9            Mr. Goldsmith and the defendant.)

10           MR. GOLDSMITH:  No, I have no further questions.

11           THE COURT:  You may step down.

12           THE WITNESS:  Thank you, Judge.

13           THE COURT:  All right.  Safe travels home.

14           THE WITNESS:  I appreciate it.

15           (The witness was excused.)

16           THE COURT:  Okay, ladies and gentlemen, it's 12:24,

17   I wanted to make sure that we completed that witness before

18   we took our lunch break.  We will take our lunch break now,

19   I'm going to ask you to be back in the jury room at 1:30, so

20   we can continue with proceedings.  Please don't discuss the

21   case with anybody, don't read, listen, or view anything

22   related to the case.  If anybody approaches you, tries to

23   talk to you about this case, I need to know about it

24   immediately.  Enjoy your lunch.

25           (Jury Excused, 12:24 p.m.)

Case 5:14-cr-00008-EAW Document 70 Filed 01/12/16 Page 565 of 890
**A558**
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 120 of 246

529

1          THE COURT: Okay. We're outside the presence of

2     the jury. Government, how many more witnesses do you

3     anticipate?

4          MS. THOMSON: Four very brief witnesses.

5          THE COURT: Four witnesses. Okay. And what we'll

6     do is I'll have my clerks put the jury charge, proposed jury

7     charge and verdict sheet on your tables over the lunch hour,

8     we'll finish those witnesses and you said they're all brief?

9          MS. THOMSON: Very.

10          THE COURT: Okay. Well, we'll finish up that

11     testimony and what I -- depending on what time it is, I'm

12     thinking I may excuse this jury for the day and let them get

13     home because the snow has continued to come, and give them a

14     lengthy period of time to make it home, but we'll see what

15     time it is. And then we'll stay here and do our jury charge

16     conference, and again, depending on what time it is, I'll

17     allow you to sum up in the morning instead of this afternoon.

18     As we go forward, just seeing what's going on, depending upon

19     what defense counsel decides to do, okay.

20          MR. GOLDSMITH: Thank you.

21          THE COURT: All right. Enjoy your lunch.

22          THE CLERK: Court's in recess.

23               (Luncheon recess, 12:25 p.m. to 1:33 p.m.)

24               (Open Court, Jury Out.)

25          THE COURT: Okay. We're in the courtroom outside

530

1    the presence of the jury, government prepared to call their

2    next witness?

3              MS. THOMSON:  Yes, your Honor.

4              THE COURT:  Okay.  Mr. Goldsmith, you're all set?

5              MR. GOLDSMITH:  Yes.

6              THE COURT:  Okay.  Please bring the jury in.

7                   (Jury Present, 1:34 p.m.)

8              THE COURT:  Okay.  The record should reflect we

9    have all the ladies and gentlemen of the jury, hopefully

10   enjoyed your lunch, and we're prepared to hear the

11   government's next witness.

12             MS. CARROLL:  Your Honor, at this time the

13   government would seek permission to recall Special Agent Chad

14   Willard to admit an exhibit that we realize we omitted during

15   his testimony originally.

16             THE COURT:  Okay, come on up.  Special Agent

17   Willard, you're still under oath, okay?

18             THE WITNESS:  Understand.

19

20             C H A D   W I L L A R D , recalled as a

21   witness and being previously duly sworn, testifies

22   as follows:

23        DIRECT EXAMINATION BY MS. CARROLL:

24   Q    Special Agent Willard, you testified previously that

25   you retrieved a number of items of physical evidence from

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 567 of 890

Chad Willard – Direct                                    531

1    Detective Constable Kip Wohlert; was that your testimony

2    earlier?

3    A     Yes, it was.

4    Q     Special Agent Willard, I'm handing you what's been

5    marked for identification as Government's Exhibit 13.  Do you

6    recognize Government's 13?

7    A     Yes, I do.

8    Q     What is it?

9    A     Ontario Provincial Police property report that was

10   provided to me at the time that I met Kip Wohlert at the Port

11   of Lansdowne, Ontario, Canada.

12   Q     How are you able to recognize that?

13   A     By the items listed in the property sheet as well as my

14   name and signature written at the bottom.

15   Q     And are you the person who affixed your name and

16   signature to that form?

17   A     Yes.

18   Q     And is the date listed on that form accurate as to the

19   date that you signed the form?

20   A     Yes, April 1st, 2011.

21         MS. CARROLL:  Your Honor, permission to admit

22   Government's Exhibit 13?

23         THE COURT:  Any objection?

24         MR. GOLDSMITH:  Brief voir dire.

25         THE COURT:  Go ahead.

Case 5:14-cr-00068-EAW Document 102-1 Filed 01/12/16 Page 568 of 890
A561
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 123 of 246

Chad Willard - Direct

532

1    VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

2    Q    Special Agent Willard, the signature at the bottom of

3    the page is your signature?

4    A    Yes, sir.

5    Q    And do you recall when you signed it?

6    A    April 1st, 2011.

7    Q    Was this document in your possession since April 1st of

8    2011?

9    A    A copy of this document, the original went back to the

10   Ontario Provincial Police.

11        MR. GOLDSMITH:  No further questions, no objection.

12        THE COURT:  It will be received.

13   CONTINUED DIRECT EXAMINATION BY MS. CARROLL:

14   Q    Special Agent Willard, at the date you -- can you go

15   ahead and publish 13.  The items of physical evidence

16   reflected on 13, could you read those, please?

17   A    Looks like line item 1 is Toshiba laptop; line item 2,

18   Compaq laptop; line item 3, Olympus camera and cards; line

19   item 4 is Verizon cell phone; and line item 5 are three jump

20   drives.

21   Q    Are those the same items that are reflected on the

22   Homeland Security custody receipt that was previously

23   admitted as Government's Exhibit 12?

24   A    Yes, they are.

25   Q    And have you had the opportunity to compare the serial

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Chad Willard - Direct                                    533

1    numbers on this property receipt form to those on the items

2    listed on Government's Exhibit 12, your property receipt?

3    A    Yes, I have.

4    Q    Do they correspond?

5    A    Yes, they do.

6    Q    What is the date that you signed this evidence out?

7    A    April 1st, 2011.

8    Q    Who did you receive the evidence from?

9    A    Kip Wohlert, detective sergeant with the Ontario

10   Provincial Police.

11   Q    Where was that evidence transfer conducted?

12   A    The Lansdowne, Ontario port of entry, Canada.

13   Q    What did you do after taking custody of the evidence?

14   A    I brought it into the United States into the Thousand

15   Islands Alexandria Bay port of entry and locked it in a

16   DHS-approved vault safe in our office.

17            MS. CARROLL:  No further questions.

18            THE COURT:  Any cross?

19            MR. GOLDSMITH:  Sure.

20            CROSS-EXAMINATION BY MR. GOLDSMITH:

21   Q    Special Agent Willard, on Exhibit 12, that is the

22   voucher that you created, correct?

23   A    Correct.

24   Q    It does not include a notation for the memory card

25   associated with the camera, correct?

Chad Willard - Cross                                    534

1    A     Correct.

2    Q     Did you have the memory card that was associated with

3    the camera at the time that you took possession and created

4    Exhibit Number 12?

5    A     Yes, and it's still in the camera today.

6    Q     Were there any notations anywhere in Exhibit Number 12

7    or elsewhere created by your office that indicate possession

8    of the memory card in the camera?

9    A     No, it's included in the camera, inside.

10   Q     Were you able to review the serial number at any point

11   from the card that was enclosed in the camera?

12   A     No, I didn't review serial number from the Olympus

13   digital camera.

14         MR. GOLDSMITH:  No further questions.

15         MS. CARROLL:  No redirect, your Honor.

16         THE COURT:  You may step down.  Thank you.

17              (The witness was excused.)

18         MS. THOMSON:  Your Honor, could we approach.

19         THE COURT:  You may.

20              (At Side Bar.)

21         MS. THOMSON:  I don't know if the court had an

22   opportunity to view, AUSA Ed Broton just entered the

23   courtroom, he handed me the following piece of paper that I

24   wanted to bring to the court's attention.  It relates to the

25   next witness who is scheduled to testify and that is Josh

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 571 of 890
**A564**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 126 of 246
535

1   Findley.  The court may recall we had intended, noticed Roy

2   Shepherd to be a witness to be testifying.  Roy Shepherd had

3   a medical emergency, couldn't be here and if you recall we

4   were able to get Josh Findley to come and testify in his

5   place because they were both involved in the investigation.

6   As soon as we realized that we were going to be doing a

7   substitution of witnesses, we did a *Giglio* request and did

8   come back positive one incidence and that incidence is

9   Officer Findley alleged -- it was alleged alcohol use by him

10  during office hours.  I don't believe it would go to his

11  credibility at this point, I did want to disclose it, let the

12  court know so that the court can make that ruling in that

13  regard but we're disclosing it.  I don't believe it's the

14  type of evidence that the court should admit for

15  cross-examination.

16              THE COURT:  Counsel?

17              MR. GOLDSMITH:  I --

18              THE COURT:  You haven't seen this, haven't had a

19  chance to digest it or anything.

20              MR. GOLDSMITH:  Not at all.

21              THE COURT:  Why don't you go ahead, do you have a

22  copy of it?

23              MS. THOMSON:  I was handed -- it was Mr. Broton's

24  impression we had already passed this witness so he didn't

25  realize, we just received it.

```
 1              (Mr. Goldsmith reviewing document.)
 2              MR. GOLDSMITH:  Do we have any information as to
 3    when this happened?  Because the note said it was a violation
 4    of probationary activity which might indicate that it was
 5    when he was first starting out.
 6              MS. THOMSON:  That's what I would believe to be,
 7    he's been an agent for at least I believe eight years.
 8              MR. GOLDSMITH:  Then in light of the circumstances,
 9    your Honor, I don't think it's relevant to the testimony.
10              THE COURT:  Not to credibility, unless there's
11    something else in the direct examination that comes,
12    something that there's some issue that it may become relevant
13    and I'll hear you.
14              MR. GOLDSMITH:  I'll reserve the opportunity if it
15    comes up in testimony.
16              THE COURT:  If there's anything that, you know, as
17    you're listening to the direct and preparing to do a
18    cross-examination, if you have some application where you
19    think it may become relevant, you let me know.
20              MR. GOLDSMITH:  Thank you.
21              MS. THOMSON:  Thank you.
22                  (Open Court.)
23              MS. THOMSON:  The government calls to the stand
24    Special Agent Joshua Findley.
25              THE CLERK:  Good afternoon.  Step up here.  State
```

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 573 of 890
A566
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 128 of 246

Joshua Findley – Direct

537

```
1    your full name, spell it for the record, please.
2              THE WITNESS:  Josh Findley, F-i-n-d-l-e-y.  Joshua.
3
4              J O S H U A   F I N D L E Y , called as a
5    witness and being duly sworn, testifies as follows:
6              DIRECT EXAMINATION BY MS. THOMSON:
7    Q    Good afternoon.
8    A    Good afternoon.
9    Q    Could you please introduce yourself to the members of
10   the jury?
11   A    My name's Josh Findley, I'm a special agent for the
12   Department of Homeland Security and I'm stationed in
13   Portland, Oregon.
14   Q    Did you have to travel to Syracuse from Portland?
15   A    I did yesterday.
16   Q    Did your luggage arrive?
17   A    My luggage did not make it and so I'm still in my same
18   clothes from yesterday so I apologize for my appearance.
19   Q    How long have you been a special agent in Portland?
20   A    I've been a special agent for a total of about 18 years
21   now and about 14 of it in Portland.
22   Q    What do you do as a special agent?
23   A    As special agent, I investigate federal felony crimes.
24   I spent about eight years of that time investigating sex
25   crimes.
```

Case 5:14-cr-00088-EAW Document 101 Filed 01/12/16 Page 574 of 890
A567
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 129 of 246

Joshua Findley - Direct                                538

1   Q      Does that include child exploitation cases?

2   A      Yes.

3   Q      And child pornography cases?

4   A      Yes.

5   Q      Are you familiar with a video series called Vicky?

6   A      Yes, I am.

7   Q      And do you know what I mean by video series?

8   A      Yeah.  We refer to child pornography series, and when

9   we get a case and we have images of child pornography, they

10  are submitted to the National Center for Missing and

11  Exploited Children and the way they catalog that is by

12  victim.  And so we refer to each victim in all the videos or

13  photographs that victim is in as a series of child

14  pornography.  And so when you say the Vicky series, it's a

15  series of images and videos that all relate to one victim,

16  even though they happened over different periods of time.

17  Q      And is there a place that keeps track of all of the

18  images and videos that are distributed or found to have been

19  distributed, possessed, received, of series?

20  A      Yeah, and so the National Center for Missing and

21  Exploited Children is the agency that most law enforcement

22  agencies, both federal and local agencies when they get

23  images of child pornography, they submit those images to the

24  National Center for Missing and Exploited Children.  The

25  National Center doesn't actually keep and maintain those

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 575 of 890
A568
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 130 of 246

Joshua Findley - Direct                                    539

1    images, but what they do keep and maintain is what's called a

2    hash value which is like a digital fingerprint that each

3    photograph has a unique, or video has a unique fingerprint so

4    to speak.  And so they'll catalog those fingerprints and so

5    when an agency submits videos or images, then the National

6    Center for Missing and Exploited Children can tell you what

7    victim, if that victim is known or if it's an unknown victim

8    and so that's the way we catalog our victims in these cases.

9    Q     Does law enforcement together with using the resources

10   of the National Center for Missing and Exploited Children try

11   to locate the victims that are portrayed in the child

12   pornographic image and videos that are recovered?

13   A     Yes.  Our agency as well as other agencies, when we

14   find unknown victims or when we find images or videos that we

15   haven't ever seen before, you know, we embark on efforts to

16   try to identify who that child is by looking at maybe clues

17   in the background, listening to voices, the languages that

18   are used, you know, we've even gone so far as to try to read

19   bar codes of bags of chips to see if we can tell where it was

20   sold, all in furtherance of just identifying children that

21   are in a bad situation so we can get them out of it.

22   Q     Were you involved in the investigation involving Vicky?

23   A     Yes, I was.

24   Q     Have you seen video files of Vicky in other

25   investigations?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joshua Findley - Direct

540

1    A    Yes, I've seen it in probably hundreds of

2    investigations.

3    Q    As part of your involvement in that investigation, did

4    you meet the young girl who is portrayed in the video?

5    A    I did.

6    Q    Is her real name Vicky?

7    A    No, it's not.

8    Q    And don't identify her by name, please.  How did it

9    come to pass that you met her?

10   A    It was one of those things like I explained earlier

11   that there was a detective in Toronto who had tried to

12   identify who she was because it had been a child pornography

13   series that he had seen a lot of and he developed clues that

14   she was in the northwest United States and requested our

15   office's assistance in finding her.  We were actually able to

16   end up tracking her down through some different

17   circumstances, but she had reported sexual abuse by her

18   father and based on that report, then we were able to match

19   her up with the series and these images that we were looking

20   to identify the child.  Based on that, I interviewed her and

21   was able to confirm that it was her in these videos.

22   Q    How old was she when you met her?

23   A    She was 17 when I met her.

24   Q    Did you review prior to your testimony today video

25   files that held the title 9YO Vicky stripping and sucking,

Joshua Findley – Direct                         541

1   and then continues, did you review those video files?

2   A     Yes, ma'am.

3   Q     Did you review them in the office of the United States

4   Attorney's office?

5   A     Yes, ma'am.

6   Q     And after reviewing them, were you able to see videos

7   that you identified as the investigation you were involved

8   with, the Vicky investigation?

9   A     Yes, ma'am, it was her.

10  Q     At this time I'm handing the witness Government's

11  Exhibit 4C and 4G and I'm going to ask you if you recognize

12  4C and 4G.

13  A     I do.

14  Q     Are those the disks that you reviewed in the United

15  States Attorney's office?

16  A     They are.

17  Q     On those disks, were you able to see a video of Vicky?

18  A     Yes.

19  Q     On each of those disks?

20  A     Yes, ma'am.

21  Q     And is that the same child you investigated with regard

22  to the images and videos of her having been involved in your

23  investigation?

24  A     Yes, ma'am, I recognize those videos as being produced

25  in eastern Washington.

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 578 of 890
**A571**
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 133 of 246

Joshua Findley – Cross                                    542

1    Q    And if we could see a clip.  We're going to show a clip

2    but it's the first portion that does not -- it contains the

3    image fully clothed.

4                    (A video clip from Government's Exhibit No. 4C

5                     was played.)

6    Q    Is that Vicky?

7    A    That is, that is her, and all the videos on both CDs

8    were the same video.

9    Q    And you met her when she was 17?

10   A    Yes.

11   Q    Were you able to view that video and see that that's

12   the same girl that you met?

13   A    Yes, absolutely.

14        MS. THOMSON:  I have no further questions.

15        CROSS-EXAMINATION BY MR. GOLDSMITH:

16   Q    Agent Findley, you were able to actually meet the

17   subject of that video?

18   A    Yes, sir.

19   Q    Personally?

20   A    Yes, sir.

21   Q    And as part of your investigation, you were able to

22   determine that that was in fact the same individual that was

23   depicted in the movie?

24   A    Yes, sir.

25   Q    And you used that by additional investigative

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 579 of 890
A572
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 134 of 246

Joshua Findley – Redirect                    543

1    techniques other than simply interviewing the subject?

2    A    Yes, sir.

3    Q    So in other words the identification was corroborated

4    by other evidence?

5    A    Yes, sir.

6    Q    And you said you met her when she was 17 years old, is

7    that correct?

8    A    Yes, sir.

9    Q    And at the time were you able to establish her age

10   relative to when the video was produced?

11   A    Yes, she was 10 and 11 when the videos were produced.

12           MR. GOLDSMITH:  No further questions.

13           THE COURT:  Anything further?

14           MS. THOMSON:  Yes, your Honor.

15           REDIRECT EXAMINATION BY MS. THOMSON:

16   Q    There were more than one video of Vicky?

17   A    There were about 13 videos in total that were created.

18   Since that time they've been distributed over the internet

19   and they've been broken up into thousands of different videos

20   and images and still shots just by different individuals who

21   have collected these and taken parts out.

22   Q    So when you indicated that you were able to view the

23   video and identify that video as the same girl that you met

24   when she was 17, had you had the opportunity to review all

25   the videos --

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 580 of 890
A573
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 135 of 246

Joshua Findley - Redirect                    544

1    A    I believe --

2    Q    -- in your possession at that time?

3    A    Oh, yes, ma'am.

4    Q    And that would be more than the one that you saw today?

5    A    Yes, ma'am.

6              THE COURT:  Anything further?

7              MR. GOLDSMITH:  No.

8              THE COURT:  Counsel?  Thank you, sir.

9              THE WITNESS:  Thank you.

10             THE COURT:  You may step down.  Good luck getting

11   back to Portland.

12             THE WITNESS:  Thank you, hopefully I'll have my

13   luggage in time.

14             THE COURT:  Maybe you can catch it on the way back.

15                 (The witness was excused.)

16             MS. THOMSON:  Government calls to the stand Special

17   Agent Chris McClellan.

18             THE CLERK:  Good afternoon.  State your full name

19   and spell it for the record, please.

20             THE WITNESS:  Christopher McClellan,

21   M-c-C-l-e-l-l-a-n.

22

23             C H R I S T O P H E R   M c C L E L L A N,

24   called as a witness and being duly sworn, testifies

25   as follows:


                JODI L. HIBBARD, RPR, CRR, CSR
                       (315) 234-8547

Case 5:14-cr-00088-EAW Document 101 Filed 01/12/16 Page 581 of 890
**A574**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 136 of 246

Christopher McClellan - Direct                          545

1    DIRECT EXAMINATION BY MS. THOMSON:

2    Q     Can you please introduce yourself to the members of the

3    jury?

4    A     Yes, my name's Christopher McClellan, I'm a special

5    agent with Homeland Security, Homeland Security

6    Investigations.

7    Q     How long have you been a special agent with Homeland

8    Security Investigations?

9    A     I've been a special agent since 2005.

10   Q     What are some of your duties as a special agent?

11   A     Some of my duties as special agent, I do more of a

12   complex criminal investigations, I had done, worked in

13   narcotics unit where -- doing international narcotics

14   smuggling, money smuggling, in and out of the country.  I

15   worked smaller resident agents office which we basically

16   handled anything that came our way, money, drugs, child

17   exploitation, pretty much everything that our agency covers.

18   Q     Do you also do cases involving child pornography?

19   A     Yes, I do.

20   Q     Did you become involved in a case regarding a KP Nancy?

21   A     Yes, I did.

22   Q     How did you become involved in that case?

23   A     I became involved in that case in August of 2010.  We

24   have our -- one of our offices, HSI office in Los Angeles,

25   California had contacted my office in New York and basically

Case 5:11-cr-00088-EAW Document 102 Filed 01/12/16 Page 582 of 890
A575
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 137 of 246

Christopher McClellan - Direct                          546

1    they had an undercover operation in which they received --

2    they were on a board where there was suspected child

3    pornography being traded and they had undercover e-mail

4    persona account set up, they were chatting with suspected

5    people trading child pornography and they had received

6    numerous videos of child pornography to their undercover

7    account.  As part of their investigation, they started to

8    realize that one of the girls, one of the victims in the

9    video they were able to trace back to the New York area which

10   was the area that I was working.

11   Q      What part of New York?

12   A      The victim they believed came back to Westchester

13   County, New York, actually town of Mount Kisco, New York.

14   Q      And so as a result of that location being narrowed

15   down, what did you do, how did you become involved?

16   A      I became involved, basically they were able to trace

17   back an IP address which is basically the internet address

18   being used by certain e-mail accounts, using that IP address

19   they were able to locate an e-mail address that had some of

20   the markings, the girl, the victim in the video had an

21   embedded image in the video KP432, using that embedded image

22   they were able to do searches on the internet for any other

23   websites, e-mail addresses that came back with KP432.  They

24   actually found a MySpace account which they sent me the

25   information on and I subpoenaed MySpace and Yahoo e-mail

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 583 of 890
A576
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 138 of 246

Christopher McClellan - Direct                    547

1    address, both MySpace and her Yahoo account had pictures

2    which looked identical to the girl in the video, so I took

3    those images of the video and girl from the MySpace accounts,

4    I made screen shots of those videos, I went to local area,

5    the school where the -- where I believed that the victim

6    lived and I identified, I was able to identify her by showing

7    the pictures to the school resource officer who positively

8    identified the girl as a student in the school.

9    Q    Was that around August of 2010?

10   A    Yes, it was.

11   Q    Did you have the opportunity to meet the person that

12   was depicted in the KP Nancy video?

13   A    Yes, I did.

14   Q    How old was she when you met her?

15   A    When I met her in August of 2010 she was 15 years old.

16   Q    And were you able to determine when the video of her,

17   how old she was when it was created?

18   A    She said she made the video approximately six months

19   earlier so that would have put her at age 14.

20   Q    We're going to show you a very brief clip from

21   Exhibit 3H that would be clip 1, if we could just hold it.

22   Do you recognize the clip that's shown before you?

23   A    Yes, I do.

24   Q    And who, without using the name, who is depicted in

25   this image?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Christopher McClellan – Direct

548

1    A    The girl depicted in this image is what -- her series

2    became known as KP Nancy.

3    Q    When you met her she was 15?

4    A    Yes.

5            MS. THOMSON:  I have nothing further.

6            MR. GOLDSMITH:  No questions.

7            THE COURT:  Thank you, sir.

8            THE WITNESS:  Thank you.

9            THE COURT:  You may step down.

10               (The witness was excused.)

11           MS. THOMSON:  United States calls its next witness

12    and that is Justin Myers.

13           THE CLERK:  Good afternoon, step up here.  Please

14    state your full name, spell it for the record, please.

15           THE WITNESS:  Justin Myers, and it's J-u-s-t-i-n,

16    M-y-e-r-s.

17

18           J U S T I N   M Y E R S , called as a

19    witness and being duly sworn, testifies as follows:

20           DIRECT EXAMINATION BY MS. THOMSON:

21    Q    Good afternoon.  Could you please introduce yourself to

22    the members of the jury.

23    A    Sure.  Justin Myers, Homeland Security Investigations,

24    I'm a special agent, been there for about 10 years.

25    Q    What do you do with Homeland Security Investigation?

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 585 of 890
A578
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 140 of 246

Justin Myers - Direct

1    A    I work criminal investigations, specifically I worked

2    child exploitation investigations for approximately six

3    years.

4    Q    Did you become involved in an investigation with regard

5    to an image series by the name of Green Bath?

6    A    Yes.

7    Q    And when I say an image series Green Bath, do you

8    understand what that means?

9    A    Yes, I do.

10   Q    And what is that?

11   A    A series is used to describe a sequence of images,

12   videos, that belong to a particular victim.

13   Q    How did you become involved in the series Green Bath?

14   A    During 2008, I was conducting a child exploitation

15   investigation involving the distribution of child pornography

16   through interstate commerce.  During the investigation I

17   executed a search warrant at a residence, which revealed the

18   presence of production of child pornography.  Upon further

19   investigation, I was able to identify the victim of that

20   child pornography as a prepubescent female who was living at

21   the residence where the search warrant was conducted and thus

22   was able to submit those -- that evidence and which became

23   part of the Green Bath series.

24   Q    When you say submit that evidence, who did you submit

25   it to?

Case 5:14-cr-00088-EAW Document 110-1 Filed 01/12/16 Page 586 of 890
A579
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 141 of 246

Justin Myers – Direct

550

1    A      To NCMEC.

2    Q      Is that the National Center for Missing and Exploited

3    Children?

4    A      Yes.

5    Q      And then does the National Center for Missing and

6    Exploited Children keep track of any image or video file that

7    comes up hash matching to Green Bath?

8    A      Yes.

9    Q      I'm handing you at this time what's previously been

10   marked as Government's Exhibit 3C and 4B and I'm going to ask

11   you if you recognize what these are.

12   A      Yes, I do.

13   Q      Did you have the opportunity prior to your testimony to

14   go to the United States Attorney's office and review graphic

15   files contained on those exhibits?

16   A      Yes, I did.

17   Q      And when you reviewed them, did you see images that

18   correspond to the Green Bath series?

19   A      Yes, I did.

20   Q      Images that are contained in Government's Exhibit 3C

21   and 4B, is that of the victim that you met pursuant to your

22   investigation on Green Bath?

23   A      Yes.

24   Q      How old was the victim when you met her?

25   A      Eleven years old.

Case 5:14-cr-00088-EAW  Document 210-1  Filed 01/12/16  Page 587 of 890
**A580**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 142 of 246

Justin Myers – Direct                                551

```
1    Q    And were you able to determine how old she was when the
2    images were taken of her?
3    A    Yes, between the ages of 8 and 10.
4    Q    I'm now handing you what's been previously marked as
5    Government's Exhibit Number D and I'm going to ask you --
6    that would be 3D, and the jury is free to open up their
7    binders to 3D if they wish.  Do you recognize Exhibit 3D?
8    A    Yes.
9    Q    And what is depicted in Exhibit 3D, without using a
10   real name?
11   A    It's the victim from Green Bath series.
12   Q    That's the child that you met?
13   A    Yes.
14   Q    And she was 11 when you met her?
15   A    Yes.
16        MS. THOMSON:  I have no other questions.
17        MR. GOLDSMITH:  No questions.
18        THE COURT:  No cross, okay.  Thank you, sir, you
19   may step down.
20        THE WITNESS:  Thank you, your Honor.
21             (The witness was excused.)
22        MS. THOMSON:  At this time, your Honor, the
23   government calls to the stand Mike Wojeski.
24        THE CLERK:  Good afternoon, sir.  Can you state
25   your full name and spell it for the record, please.
```

Case 5:14-cr-00088-EAW Document 102-1 Filed 01/12/16 Page 588 of 890
A581
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 143 of 246

Michael Wojeski – Direct                    552

1    THE WITNESS:  Michael J. Wojeski, W-o-j-e-s-k-i.

2

3         M I C H A E L   J .   W O J E S K I ,

4    called as a witness and being duly sworn, testifies

5    as follows:

6         DIRECT EXAMINATION BY MS. THOMSON:

7    Q    Good afternoon.  Could you please introduce yourself to

8    the members of the jury.

9    A    I'm Corporal Michael J. Wojeski from the Cayuga County

10   Sheriff's Department.

11   Q    How long have you worked for the Cayuga County

12   Sheriff's Department?

13   A    Fourteen years.

14   Q    What do you do?

15   A    I am a shift supervisor and phone system administrator

16   for the entire facility.

17   Q    And is that the Cayuga County Jail?

18   A    Correct.

19   Q    In the 14 years that you've been with the Cayuga County

20   Sheriff's Department, can you tell us some of the positions

21   you've held?

22   A    I started as a regular corrections officer line staff,

23   and then approximately three years ago I took the test and

24   was promoted to corporal shift supervisor, so I now run the

25   jail for my shift which is 2 to 10 in the evenings.

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 589 of 890
**A582**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 144 of 246

Michael Wojeski - Direct                          553

```
1    Q    Corporal Wojeski, you also mentioned that, some

2    responsibilities as it relates to phones, could you tell --

3    A    Correct.

4    Q    -- tell us about that?

5    A    I'm the phone system administrator, every outgoing

6    inmate phone call in the facility has to be run through the

7    digital system, Global Tel is the company's name.  I do all

8    the maintenance on the computers, not the actual repair but

9    software updates and if someone's getting calls that they do

10   not want, I can go to the system and block it so that no

11   phone calls may be made to that number anymore.

12   Q    If there were a repair that were needed for the phone

13   system, would you be notified?

14   A    Yes, I'd be notified and then I would contact the

15   actual repair person to come in.

16   Q    How long have you held that position, the phone

17   administrator?

18   A    Approximately five years.

19   Q    In 2009 you were the phone administrator?

20   A    Yeah.

21   Q    Do inmates at Cayuga County Jail have access to

22   telephones?

23   A    Yes.

24   Q    How do they have access, can you describe it?

25   A    There's -- depending on the housing units they're in,
```

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 590 of 890
A583
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 145 of 246

Michael Wojeski – Direct

554

1    there's anywhere from one pay phone to four pay phones in

2    each housing unit, and they have access when they are not in

3    lock downs, lock downs during shift change or emergencies

4    where they have to go to their cells.  And normal operations,

5    they're out and walking around, and at any time if there's a

6    phone open, they may walk over, pick it up and make an

7    outgoing call.

8    Q    Does the facility have a mechanism to record the

9    telephone calls that are made --

10   A    Yes.

11   Q    -- by the inmates?

12   A    Yes.

13   Q    Can you describe that mechanism?

14   A    It's a digital system, every phone call goes through

15   the digital system and it records their personal

16   identification number, the phone that they're calling from,

17   the phone number that they are calling, the date and time of

18   the call, and an audio recording if the call is completed and

19   the outside partner -- or outside party, excuse me, accepts

20   the charges.

21   Q    In October of 2011, was that system in place?

22   A    Yes.

23   Q    Are you familiar with how the system works?

24   A    Yes.

25   Q    Could you just explain how your system works?

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 591 of 890
A584
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 146 of 246

Michael Wojeski – Direct

555

1    A    The -- when an inmate wants to make a call, he goes to

2    the phone, like I said, he picks up the phone, enters his

3    personal identification number, it has a couple prompts

4    before that connects, it will send a digital to the receiving

5    party to tell them that they have a phone call, the inmate's

6    name, the location, and it will give them prompts to accept

7    the charges, deny the charges, block the number, add money to

8    the prepay account, and they must accept, deny, or do one of

9    the prompts.

10   Q    Where does that inmate pin number come from?

11   A    Every inmate when they enter the facility is given a

12   pin number.  The pin number is used for the telephone,

13   commissary, so they can order food, hygiene products, and

14   it's so that our system can keep track of who's who because

15   some names are so close that we need a number and a name to

16   separate who's who.

17   Q    Using the name and number system, that's how you

18   separate inmate calls?

19   A    Correct.

20   Q    And did you receive training on that phone system by

21   the manufacturer of the phone system?

22   A    Yes.

23   Q    When a call is made by an inmate, how is that paid for?

24   A    The called party would have to set up a prepaid

25   account, usually with a credit card, the first phone call

Michael Wojeski - Direct

1    out, it will instruct the called party on how to set up the

2    account and mainly use credit card, and they will set up an

3    account with their deposit of, I believe it's now 25 or $50

4    and then as it gets down, the system will prompt them to add

5    more money if they would like.

6    Q    And that adding more money, is that done over the

7    phone?

8    A    Correct.

9    Q    Is that pin number assigned to the inmate on arrival to

10   the facility?

11   A    Yes.

12   Q    When an inmate makes a phone call, is the recipient

13   advised that they're receiving a phone call from a

14   correctional facility?

15   A    Yes.

16   Q    Is there a standard recording at the beginning of every

17   inmate call?

18   A    Yes.

19   Q    And can you just give us the nature of that, the

20   standard reporting?

21   A    Global Tel Inc., you have a collect call from, blank,

22   name, an inmate at Cayuga County Jail, and then it goes into,

23   to accept the charges, press 5, I believe it is, and then to

24   deny, to add money.

25   Q    Is there an admonishment that the call is being

Case 5:14-cr-00088-EAW Document 70-10 Filed 01/12/16 Page 593 of 890
A586
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 148 of 246

Michael Wojeski – Direct                              557

1    recorded?

2    A     In the beginning of every phone call.

3    Q     And are the inmates advised that their calls are being

4    recorded?

5    A     Yes.

6    Q     Now when an inmate call is made, that call's recorded?

7    A     Yes.

8    Q     And how does the system keep track of those recorded

9    calls, how are they stored?

10   A     They're stored on hard drives in a secure room for a

11   duration of time.

12   Q     And is that stored digitally?

13   A     Yes.

14   Q     At some point can you tell us if an inmate by the name

15   of Joseph Jenkins entered your facility?

16   A     Yes, he did.

17   Q     Have you reviewed the inmate records for Joseph

18   Jenkins?

19   A     Yes, I did.

20   Q     And have you provided the U.S. Attorney's office with

21   jail -- inmate calls made from the pin number of Joseph

22   Jenkins?

23   A     Yes, I did.

24   Q     Can you describe how you did that?

25   A     I went into the computer system which I have keys to

Michael Wojeski - Direct                                    558

1    the locked room, I ran the name and the identification number

2    through the report, it shows me every phone call he made,

3    whether people accepted it, whether they denied him, if he

4    made a phone call and before it finished he hung up, it will

5    still record and let me know that he's tried, and I run the

6    report and I just download it onto a disk which I forward on

7    to the requesting agency.

8    Q    At this time I'm showing you for identification

9    purposes only Exhibit 10C and I'm going to ask you if you

10   recognize Exhibit 10C.

11   A    Yes.

12   Q    What is that?

13   A    That is the disk with the records from Mr. Jenkins that

14   I made.

15   Q    And what did you do with that disk, did you provide it

16   to someone?

17   A    Yes.

18   Q    Who did you provide that to?

19   A    To Mr. Willard.

20   Q    Did you make any alterations to the recordings or are

21   the recordings that are contained on the disk exactly as you

22   recorded them?

23   A    They are exactly as I recorded them.

24   Q    I'm now showing the witness what's been previously

25   marked as Exhibit 10A and I'm going to ask you if you

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 595 of 890
**A588**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 150 of 246

Michael Wojeski – Direct                              559

1   recognize 10A.

2   A     Yes.

3   Q     What is Exhibit 10A?

4   A     That is another copy of the phone records.

5   Q     Did you have an opportunity to listen to and review

6   Exhibit 10A?

7   A     Yes.

8   Q     As well as Exhibit 10C?

9   A     Yes.

10  Q     10A, is that a single phone call from the multiple

11  phone calls that you recorded in 10C?

12  A     Yes.

13  Q     And you reviewed yourself Exhibit 10A?

14  A     Yes.

15        MS. THOMSON:  At this time, your Honor, I would

16  move into evidence Exhibit 10A.

17        THE COURT:  Any objection?

18        MR. GOLDSMITH:  Just brief voir dire, if I may,

19  your Honor.

20        THE COURT:  You may.

21        VOIR DIRE EXAMINATION BY MR. GOLDSMITH:

22  Q     Sergeant Wojeski, you actually downloaded the material

23  from the computer system onto the disks?

24  A     Correct.

25  Q     And you provided these disks directly to the U.S.

Michael Wojeski – Direct                      560

1    Attorney's office, is that correct?

2    A     I sent the disks to Mr. Willard.

3    Q     Okay.  And the disks as they -- as you're holding them

4    in your hand today, are they the exact disk that you

5    produced?

6    A     Yes.

7              MR. GOLDSMITH:  No further questions, no objection.

8              THE COURT:  Received.

9              CONTINUED DIRECT EXAMINATION BY MS. THOMSON:

10   Q     Exhibit 10C, what time period did you save, in terms of

11   dates if you could look at Exhibit 10C and tell us what dates

12   you preserved.

13   A     This was 10/6/2011 to 4/20/2012.

14   Q     And then Exhibit 10A, again having had the opportunity

15   to review it, is that a call that was made from your facility

16   on March 6, 2012?

17   A     Yes.

18   Q     And that call was recorded?

19   A     Yes.

20   Q     The contents of that recording, are they on

21   Exhibit 10A?

22   A     Yes.

23             MS. THOMSON:  Your Honor, at this time I would seek

24   to publish Exhibit 10A.

25             THE COURT:  Go ahead.

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 597 of 890
A590
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 152 of 246

Michael Wojeski – Cross                                        561

1               (A telephone call from Government Exhibit No.

2               10A was played.)

3    Q     Agent Wojeski, did you also make a CD of calls from the

4    time period April 25th, 2012 to August 8, 2012?

5    A     Yes.

6    Q     Are those contained on Exhibit 10D?

7    A     Yes.

8    Q     Each of the instances where you provided a CD of calls,

9    was the system in operating order at the time that you

10   recorded it?

11   A     Yes.

12             MS. THOMSON:  I have no further questions.

13             THE COURT:  Any cross?

14             MR. GOLDSMITH:  Briefly.

15        CROSS-EXAMINATION BY MR. GOLDSMITH:

16   Q     Corporal Wojeski, there was just a phone conversation

17   was played in the courtroom, correct?

18   A     Yes.

19   Q     And that was a conversation that you had recorded at

20   the request of the United States government, correct?

21   A     Yes.

22   Q     And that was a conversation that you had copied from a

23   system and provided to them, right?

24   A     Yes.

25   Q     Is that the entirety of the conversation?

Case 5:14-cr-00088-EAW Document 210-1 Filed 01/12/16 Page 598 of 890
A591
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 153 of 246

Michael Wojeski - Cross

562

1   A      I don't believe so.

2   Q      Do you happen to recall if there was -- what the other

3   subject matter of that conversation was?

4   A      No, I do not recall.

5          MR. GOLDSMITH:  No further questions.

6          MS. THOMSON:  Nothing further.

7          THE COURT:  Anything further?  You may step down,

8   sir, thank you.  Travel safe.

9               (The witness was excused.)

10         THE COURT:  Have another witness?

11         MS. CARROLL:  We don't, your Honor.  The only thing

12  left for the government is to move into evidence what was

13  admitted subject to connection.

14         THE COURT:  Okay.

15         MS. CARROLL:  That consists of Exhibit 13, 13A,

16  and -- and the physical evidence, your Honor, so Exhibits 3A,

17  4A, 5A, 6, 7, 8, and 9, all of the additional --

18         THE COURT:  All that were offered and received

19  subject to connection with regard to the chain of custody?

20         MS. CARROLL:  Yes, your Honor.

21         MR. GOLDSMITH:  May I approach?

22         THE COURT:  You may.  Come on up.

23              (At Side Bar.)

24         MR. GOLDSMITH:  Your Honor, I object, can I

25  continue to object on chain of custody?  While there were a

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 599 of 890
A592
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 154 of 246

563

1    number of witnesses regarding the chain of custody in this

2    case that did provide certain vouchers related to it, we did

3    not hear from Detective Sergeant Harrington who was the

4    forensic expert and had possession of them, at least the

5    physical evidence materials for some period of time during

6    the Canadian investigation is not present.  Accordingly,

7    while I do certainly understand the chain of custody

8    arguments are viewed in light of the preponderance standard

9    and light most favorable to the government, I do think there

10   was a significant gap that was not appropriately established

11   and therefore would continue my objection and feel that the

12   evidence should not be deemed properly admissible.

13          THE COURT:  Who wants to be heard?

14          MS. CARROLL:  I can be heard.  Your Honor, we

15   actually have a completely accurately documented chain of

16   custody with no missing links.  Harrington does not appear on

17   the chain of custody forms because he was not the evidence

18   custodian.  It was signed into the forensic lab by Michel

19   Boulay, who assigned the numbers to it and it stayed in the

20   custody, during that part of the chain of custody it was only

21   logged out of the forensic lab to be stored by Paul Thompson

22   in another secure facility.  Harrington actually could not

23   provide evidence on the chain of custody because he doesn't

24   appear in it.

25          THE COURT:  So what was Harrington's role with

1    regard to the evidence?

2            MS. CARROLL:  He performed the imaging.

3            THE COURT:  Okay.

4            MR. GOLDSMITH:  He was the Canadian forensic.

5            THE COURT:  You're saying it never left the lab, it

6    was never signed out, it was always in the custody of the

7    lab.

8            MS. CARROLL:  Exactly.

9            THE COURT:  Okay.  Yeah, I'm going to overrule the

10   objection, I feel that there's sufficient factual basis to

11   establish, legally establish chain of custody that's

12   acceptable to this court to receive all the items that have

13   been received subject to connection into evidence so they

14   will be received into evidence.  Now of course the chain of

15   custody arguments that you'd like to make or choose to make

16   to this jury are still something that you can do, that's a

17   fact question for this jury as well.  You can make those

18   arguments but I find that it's legally sufficient so it will

19   be received.

20           MR. GOLDSMITH:  Thank you.

21           THE COURT:  Okay.  Anything else?  You're going to

22   rest?

23           MS. CARROLL:  Yes.

24           THE COURT:  I'll have you rest in front of the

25   jury, I'll excuse the jury, I'll let you talk to your client

Case 5:14-cr-00088-EAW Document 70-10 Filed 01/12/16 Page 601 of 890
A594
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 156 of 246

565

1    and decide what he wants to do.  Depending on what he does or

2    does not want to do, we'll make a record and then I'll bring

3    the jury back and allow you to do what you want to do.

4              MR. GOLDSMITH:  Right, thank you.

5              THE COURT:  As far as either resting or putting him

6    on, whatever you're going to do, okay.

7                   (Open Court.)

8              THE COURT:  Okay.  With those evidentiary issues

9    out of the way, and I'm going to ask that the attorneys

10   confirm with my courtroom deputy all the evidence that's been

11   received, subject to that, what does the government wish to

12   do?

13             MS. THOMSON:  At this time, your Honor, the

14   government rests.

15             THE COURT:  Okay, the government rests.  All right.

16   Ladies and gentlemen, the government's concluded their case.

17   I want them to verify some evidence issues, that everything

18   has been received so I'm going to give you a short break and

19   I'm going to get you right back out here and we'll hear from

20   defense counsel as to what they choose to do or not to do,

21   completely up to them as you've already heard, and we'll act

22   accordingly from there as to what we're going to do for the

23   rest of the day, okay.  So take a break, and please do not

24   discuss the case.

25                   (Jury Excused, 2:20 p.m.)

1          THE COURT:  Okay.  If counsel just wants to verify

2     with my courtroom deputy that all the exhibits that you

3     offered and believe are received into evidence are indeed

4     listed as received into the record, we'll accomplish that

5     task, and then Mr. Goldsmith, I'll hear from you and your

6     client as to what you'd like to do.

7          MR. GOLDSMITH:  Thank you.

8          THE COURT:  Okay.

9               (Court in recess.)

10              (Open Court, Jury Out.)

11         THE COURT:  Mr. Goldsmith?

12         MR. GOLDSMITH:  I have, excuse me, I've conferred

13    with Mr. Jenkins several times over the last couple of days,

14    and certainly during the course of today's testimony,

15    proceedings and at this time he has confirmed his desire to

16    testify.

17         THE COURT:  Okay.

18         MR. GOLDSMITH:  Before we get into that, would the

19    court prefer that I make legal applications pursuant to

20    Rule 29?

21         THE COURT:  You can do that now.

22         MR. GOLDSMITH:  Okay.  At this point, your Honor, I

23    make two arguments.  First, that the government has failed to

24    meet its burden, even in light most favorable to the

25    government as the standard is for Rule 29 applications.  The

1    evidence in this case, while it provides sufficient facts for

2    the jury to evaluate the presence of child pornography on the

3    one laptop computer and on the three -- I'm sorry, two of the

4    three flash drives, it did not in any way sufficiently

5    establish the mens rea categories and the elements of these

6    cases.  In other words, the evidence did not establish that

7    Mr. Jenkins knowingly and intentionally possessed those

8    materials.  In fact, the testimony of Special Agent Braisted

9    earlier today clearly established that there is no particular

10   device nor evidence nor conclusion that he could have made

11   based upon the evidence itself as to who the actual users

12   were logging in.  He also provided evidence of the security

13   levels, or rather, lack of security levels on the Toshiba

14   computer, the fact that there was a file, a text file

15   indicating all of the user names and passwords for all of the

16   e-mails.  That evidence does not -- withdrawn -- is not

17   sufficient to prove beyond a reasonable doubt to any

18   reasonable juror who the user was, and whether further down

19   that user actually was the defendant Joseph Jenkins.  So

20   under those circumstances I believe that the evidence is

21   insufficient to prove all of the necessary elements beyond a

22   reasonable doubt.

23          The second aspect of my motion for the case to be

24   dismissed at this point is in light of the evidence or the

25   testimony that Kip Wohlert provided yesterday.  It is a

1    reapplication of prior arguments by Mr. Jenkins that the

2    jurisdiction, the procedures are not proper in this case

3    under the U.S.-Canadian extradition treaty.  Article 17 of

4    that treaty, and I'm happy to provide the court a copy if it

5    hasn't reviewed it already, dictates that it is up to

6    executive authority of the Canadian and in this case the

7    United States government to discuss and authorize the

8    transfer of a case.  Detective Wohlert testified yesterday,

9    I'm sorry, Sergeant Detective Wohlert testified yesterday

10   that it was his discretion and his decision alone when he

11   made the phone calls to United States authorities in his

12   attempts to follow up or have the United States authorities

13   follow up in its pursuit of Mr. Jenkins after the bench

14   warrant had been issued in Canada.  For those reasons,

15   respectfully request that the court dismiss the indictment in

16   this matter.

17              THE COURT:  Thank you, Counsel.

18              MS. CARROLL:  Your Honor, first, as defense counsel

19   acknowledged, Rule 29 motions are to be construed in light

20   most favorable to the government and it is the government's

21   position they have met and sustained the burden of proof well

22   exceeding the requirements of a Rule 29 threshold.  The issue

23   that defense counsel raised was the government's failure to

24   establish sufficient proof to sustain the knowingly and

25   intentionally element of both Counts 1 and 2.

Case 5:14-cr-00088-EAW Document 30 Filed 01/12/16 Page 605 of 890
A598
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 160 of 246

569

1        First of all, on the issue of the defendant's

2   ownership of the laptop computer and the USB drives, we heard

3   testimony that the defendant explicitly acknowledged his

4   ownership of the Toshiba laptop to Officer Johnston.

5   Further, a photograph of the defendant was found on the

6   Toshiba laptop, and the defendant at no point disclaimed

7   ownership of the USB drives, the 8-gigabyte and the

8   4-gigabyte that are identified in Counts 1 and 2.

9        Beyond that, we heard testimony from certified

10  forensic examiner Braisted about an interwoven fabric of

11  activity on the Toshiba laptop and the 8-gigabyte and

12  4-gigabyte USB drives reflecting the identity of the user and

13  owner and operator of those laptops.  All of the internet

14  activity, all of the file creation activity that Agent

15  Braisted described were done by a user with the profile name

16  Joe.  The defendant's first name is Joseph.  The only user

17  profile on that computer was Joe.

18       Beyond that, Agent Braisted testified that the

19  user, who was accessing internet sites associated with child

20  pornography, the user who created New Folder 2, the user who

21  transferred child pornography into New Folder 2, the user who

22  put an 8-gigabyte and a 4-gigabyte USB drive into that

23  Toshiba laptop, the user who transferred images of child

24  pornography to the 8-gigabyte and 4-gigabyte USB drive was

25  also accessing internet accounts that were password

1    protected, and Agent Braisted testified the cleaning software

2    on that computer would have been -- there was no saving of

3    the credentials that would have allowed access to the e-mail.

4         Beyond that, the user who was accessing child

5    pornography, saving child pornography, did things like pay

6    Mr. Jenkins' Master Card bill, access e-mails from the

7    Jenkins Electronics Company.  We heard testimony that Joseph

8    Jenkins told multiple officers he operated an electronics

9    company.  He responded to e-mails, he signed e-mails with the

10   name Joe, he accessed things like travel websites and paid an

11   insurance bill, all activity interspliced with the accessing

12   and saving of child pornography.  Agent Braisted's testimony

13   on that point was more than sufficient to establish that the

14   defendant knowingly and intentionally possessed that child

15   pornography found on the USB drives and the Toshiba.

16        Finally, beyond that, there's the testimony

17   concerning the defendant's demeanor when he was confronted

18   with the fact that child pornography was found on the Toshiba

19   laptop and USB drives.  The defendant at no point expressed

20   shock or outrage, he never disclaimed ownership, his

21   responses were, not to my knowledge is there child

22   pornography on the digital media, and I don't think I've ever

23   downloaded child pornography and saved it onto my laptop.

24   Those responses in and of themselves are enough for the

25   government to meet the threshold requirements under Rule 29

1    motion as to the scienter elements of Counts 1 and 2.

2          THE COURT: Okay, Counsel, do you want to be heard

3    on the second part of counsel's argument?  He's requesting

4    once again the dismissal of the indictment based on

5    extradition treaty between United States and Canada.

6          MS. CARROLL: Your Honor, to the extent the court

7    has ruled on this issue numerous times, the government simply

8    asks the court to refer to its previous decisions and orders.

9    This was a motion that was renewed at the commencement of

10   trial, the court again denied the motion referring to its

11   previous decision.

12         THE COURT: But he's specifically referencing the

13   testimony of a witness at the trial now and is making a

14   reapplication based on that testimony.

15         MS. CARROLL: Your Honor, the basis of counsel's

16   argument, my understanding, is the extradition treaty in

17   Canada.  The extradition treaty in Canada holds no legal

18   weight and cannot provide a basis for the dismissal of the

19   indictment under United States laws.  The defendant's failure

20   to appear in Canadian court would not necessarily revoke the

21   extradition treaty but it is evidence of his consciousness of

22   guilt.  The extradition treaty holds no force and sway over

23   the indictment under which the defendant stands charged here.

24         THE COURT: Okay.  Thank you, Counsel.  The court's

25   going to deny defendant's motion and find that there is

# 14-4295

## United States Court of Appeals
## for the Second Circuit



UNITED STATES OF AMERICA,

*Appellee,*

v.

JOSEPH VINCENT JENKINS, AKA SEALED DEFENDANT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## APPELLANT'S APPENDIX
## VOLUME III OF IV (Pages A601-A880)

DANIEL DEMARIA, ESQ.
MERCHANT LAW GROUP LLP
*Attorneys for Defendant-Appellant*
26 Broadway, 21st Floor
New York, New York 10004
(212) 658-1455

STEVEN DAVID CLYMER
ASSISTANT U.S. ATTORNEY
UNITED STATES ATTORNEY'S
OFFICE FOR THE NORTHERN
DISTRICT OF NEW YORK
*Attorney for Appellee*
100 South Clinton Street
Syracuse, New York 13261
(315) 448-0672

**DICK BAILEY SERVICE** (212) 608-7666 (718) 522-4363 (516) 222-2470 (914) 682-0848 Fax: (718) 522-4024
1-800-531-2028 - Email: appeals@dickbailey.com -Website: www.dickbailey.com

# TABLE OF CONTENTS

*Pages*

District Court Docket Sheet ............................................................................. A1-A29

Indictment, dated December 21, 2011 .......................................................... A30-A33

Search and Seizure Warrant, dated July 6, 2011, with
Affidavit in Support of Special Agent Chad J. Willard ................................. A34-A61

Decision and Order of the Hon. Glenn T. Suddaby, dated
August 24, 2012 ........................................................................................... A62-A73

Decision and Order of the Hon. Glenn T. Suddaby, dated
August 7, 2013 ............................................................................................. A74-A76

Decision and Order of the Hon. Glenn T. Suddaby, dated
December 12, 2013 ....................................................................................... A77-A84

Transcript of Pretrial Conference, held on April 25, 2013 ........................... A85-A100

Transcript of Pretrial Conference, held on January 21,
2014 ........................................................................................................... A101-A125

Trial Transcript, held on February 3, 2014 ................................................. A126-A163

Trial Transcript, held on February 4, 2014 ................................................. A164-A438

Trial Transcript, held on February 5, 2014 ................................................. A439-A684

Trial Transcript, held on February 6, 2014 ................................................. A685-A797

Letter from Joseph Jenkins, dated September 21, 2014 .............................. A798-A831

i

                                                                                    *Pages*

Sentencing Transcript, held on November 12, 2014 ....................................A832-A873

Judgment Appealed From, dated November 12, 2014 ...............................A874-A879

Notice of Appeal, dated November 14, 2014 ........................................................ A880

Sentencing Memorandum Exhibits (Documents Filed
Under Seal and submitted simultaneously with filing of
Appellant's Appendix) ...............................................................................A881-A920

Presentence Investigation Report, revised May 20, 2014
(Documents Filed Under Seal and submitted
simultaneously with filing of Appellant's Appendix) ................................A921-A938

1    sufficient evidence, particularly given the standard that

2    needs to be looked -- evidence needs to be looked at in the

3    view most favorable to the government, therefore the Rule 29

4    is denied.

5            With regard to the renewed motion regarding the

6    extradition treaty between United States and Canada, the

7    court will rule the way it has previously, irregardless of

8    the testimony we heard during the trial, the court finds that

9    that has no bearing on the prior rulings that I've made with

10   regard to this case.  The fact that the defendant is residing

11   in the United States, he was arrested in the United States,

12   this case was brought and indicted here in the United States,

13   the extradition treaty between the United States and Canada

14   has no bearing with regard to this indictment and the pending

15   charges that are now before this jury.  Okay.  You've

16   indicated you'd like to put a case on?

17           MR. GOLDSMITH:  Yes, your Honor.  Mr. Jenkins will

18   be testifying as I noted earlier.  To those ends, there's one

19   issue that I think should be addressed by the court.  Earlier

20   today during the testimony of Special Agent Braisted, after a

21   lengthy side bar, examination of the Canadian forensics

22   report based upon defense counsel's beginning of a line of

23   questioning on it, the court made a ruling that we would not

24   be able to pursue questions in cross-examination of Special

25   Agent Braisted based upon Canadian forensic report.

Case 5:14-cr-00088-EAW Document 70 Filed 04/12/16 Page 612 of 890
A602
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 164 of 246

573

1          THE COURT:  That's not accurate, Counsel.  That was
2     not the court's ruling.
3          MR. GOLDSMITH:  All right.
4          THE COURT:  The court in no way precluded you from
5     examining Special Agent Braisted with the Canadian report.
6     What I precluded you from doing was asking misleading
7     questions and misstating what was in that report.  I never
8     precluded you and would not preclude you from asking
9     questions about the Canadian report.  All I did was explain
10     that you had to have a good faith basis for asking the
11     questions, the questions have to be factually correct when
12     you're referring to a report and they weren't.  And that was
13     the nature of my ruling.  You indicated that you would
14     withdraw that line of questions, I told you it wouldn't be
15     necessary at this point, I said we'll allow the government to
16     clean it up on redirect.  And that was my ruling.  In no way
17     did I ever preclude you from asking questions from that
18     report to Special Agent Braisted.
19          MR. GOLDSMITH:  Your Honor, correct, I apologize
20     for the imprecise nature of my formulating statement, but it
21     really is not the point of my commentary now.  The reason I
22     raise the issue is because the court wanted a good faith
23     basis, and at the time was questioning the results of those
24     tests given the nature of the test performed related to
25     Mr. -- Special Agent Braisted.  In light of the fact that the

1    government has introduced a telephone call in which

2    Mr. Jenkins is recorded discussing a number, or when I say

3    number, a number value of files related to those two findings

4    made by the government, I believe that Mr. Jenkins may take

5    the opportunity to try and explain what was his mindset in

6    discussing those numbers or discussing the conversation that

7    was brought into the record by the government.  And I want to

8    ensure that if Mr. Jenkins is to mention and discuss his

9    mindset in discussing or what was engaged in that

10   conversation, that the court would not find it preclusive in

11   nature.

12           THE COURT:  It's not really clear to me what you're

13   asking.

14           MR. GOLDSMITH:  In other words, I want to make sure

15   that if Mr. Jenkins discusses his mindset as to what he is

16   discussing in that phone call, in the recorded phone call,

17   that the court will permit him to discuss it.

18           THE COURT:  You want to be heard?

19           MS. THOMSON:  Your Honor, if I understand the

20   argument, it's that when he's indicating amounts, he's using

21   the Canadian report as a basis.  If the defendant does

22   testify that way, then it would be the government's

23   opportunity during cross-examination to bring out the fact

24   that there was child pornography and in some instances more

25   child pornography was categorized in Canada than it was in

1      the United States. At all times the government, besides

2      explaining the nature of the case, the way that the case came

3      to us, we've been specific not to elicit how many images from

4      Canada because he's not charged under Canadian law. The

5      categorization of child pornography is different in the

6      United States as it is in Canada so it could lead to juror

7      confusion but if this is the road the defendant goes down and

8      the court allows that road, then the United States will ask

9      him questions with regard to that.

10             THE COURT: There's no reason for me to preclude

11      anything, and let me make the record clear. With regard to

12      Special Agent Braisted, the court, over the government's

13      objection, allowed you to ask him questions about the

14      Canadian report because he had testified that he had reviewed

15      that report at some point in time during his examination and

16      the work that he'd done on this case, in viewing the

17      different electronic media that he was assigned to do. And

18      certainly, as I ruled, that area was appropriate

19      cross-examination. The only thing I indicated to counsel

20      that wasn't appropriate was to misstate or mischaracterize

21      the report in questions during cross-examination to Special

22      Agent Braisted. You have an obligation to have a good faith

23      basis for your question and not to insinuate, as the court

24      believed you were inappropriately, information that was not

25      contained in the report.

1    So if Mr. Jenkins wants to talk about his state of

2  mind with regard to his conversation or the things that he

3  said during a phone conversation, that's between you and your

4  client.  He's free to testify as he will, and of course he's

5  subject to cross-examination based on whatever direct

6  testimony he gives.

7    MR. GOLDSMITH:  Very well, your Honor.  Thank you.

8    THE COURT:  Okay.

9    MS. THOMSON:  Your Honor, would you entertain the

10  parties have an opportunity to go to the bathroom, just

11  quick?

12    THE COURT:  Go ahead, we'll take a brief break, get

13  this jury out here.  I want to keep moving because of the

14  weather situation.

15    (Pause in Proceedings.)

16    THE COURT:  Okay, we have counsel back, we're going

17  to proceed.  Mr. Goldsmith, you've indicated Mr. Jenkins

18  wishes to testify, is that right?

19    MR. GOLDSMITH:  Yes, that is.

20    THE COURT:  Mr. Jenkins, is that right, you want to

21  exercise your right to testify?

22    THE DEFENDANT:  Yes.

23    THE COURT:  Okay, we're going to have you come up

24  and get in the witness seat now before the jury comes in the

25  room.  Okay, Counsel, you ready to proceed?

Joseph Jenkins - Direct

577

1           MR. GOLDSMITH:  Ready.

2           THE COURT:  Okay?

3           MS. THOMSON:  Yes, thanks.

4           THE COURT:  Please bring the jury in.

5                (Jury Present, 2:43 p.m.)

6           THE COURT:  Okay.  The record should reflect we

7      have the ladies and gentlemen of the jury after a recess, and

8      the government has rested its case.

9           Mr. Goldsmith, you've indicated that defendant

10     intends to put a case on, correct?

11          MR. GOLDSMITH:  That's correct, your Honor.

12          THE COURT:  And you're calling your first witness?

13          MR. GOLDSMITH:  Yes, at this time defense would

14     call Joseph Jenkins to the stand.

15          THE CLERK:  Good afternoon.  Can you state your

16     full name, spell it for the record, please.

17          THE DEFENDANT:  Joseph Jenkins, J-o-s-e-p-h,

18     J-e-n-k-i-n-s.

19

20          J O S E P H   J E N K I N S , called as a

21     witness and being duly sworn, testifies as follows:

22          MR. GOLDSMITH:  May I inquire?

23          THE COURT:  When you're ready.

24          MR. GOLDSMITH:  Thank you.

25          DIRECT EXAMINATION BY MR. GOLDSMITH:

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Q Mr. Jenkins, where do you live?
A Geneva, New York.
Q And prior to your arrest, what did you do for a living?
A I'm a self-employed electrician.
Q Why don't you describe your practice a little bit.
A Um, I started the business about 1991, um, I received some training, maybe, I don't know, 600 hours locally, and um, I picked up some work. I used to -- I started out by myself, I subcontracted a lot of work up, Eastman Kodak, it was busy at the time, you know, people still used film, I worked up there for probably four, five years, on and off, and then that started to kind of slow down. So, um, we began picking up jobs around the Geneva area, you know, anywheres between Rochester and Syracuse and even down as far as Elmira, just the general area. I had, took on a couple partners for a while, and we did larger jobs like --
Q Let me stop you, what is a larger job?
A I'd call it -- well, like medium commercial work, um, banks and restaurants, we did a ton of restaurants, few banks, we've done Boy Scout camps -- actually I did that on my own, but I had partners and we just took on a lot of, you know, like small, medium commercial work, that the three of us could do. We --
Q Let me stop you for a moment. Did you have the occasion to use computers for your work?

Joseph Jenkins - Direct                                     579

1    A    Yes.  Of course all invoicing and things like that are

2    done on the computer, we -- I picked up a generator

3    franchise, probably about 10 years ago, selling service,

4    generators, residential, commercial.  We order -- use the

5    computers for diagnosing the boards in the generators.

6    Q    How do you use the computer to diagnose a problem with

7    the generator?

8    A    Um, there were CDs that we had, there were some CDs,

9    there were some programs, that's what one computer was always

10   in the vehicle for.  And it ran an older operating system, I

11   bought -- there were some computers I bought off eBay at one

12   point in time.

13   Q    Let me stop you.  When you said there was one computer

14   in your vehicle, describe a little bit more detail what you

15   mean by that.

16   A    There was a -- there was a computer in the briefcase,

17   wireless, couple of different wireless cards with it, and we

18   could -- well, you know, different applications, we could --

19   there's programs to run for generators, you can plug them

20   into the computer or, um -- well, there's just, there's just

21   CDs, you pick a generator, pick a CD, plug it in, you can

22   program the boards and diagnose them, find out what's wrong

23   with them, things like that.  You could order generators, get

24   online, order parts for them, find out what's wrong with

25   them, could order parts for them.  There was one, I used to

Joseph Jenkins – Direct                                      580

1    buy old computers because basically what we do is when we

2    hire people, they're required to have basic hand tools and

3    transportation.  If there's anything that you run above that

4    like computers, power tools, ladders, have to provide that

5    for them.

6    Q    You said -- you just mentioned that you hired people.

7    Approximately, or to the best of your ability, how many

8    people were working with or for you for your company?

9    A    I probably had up to 10.  I like to use subcontractors.

10   So I can get them on and off, employed some part-time people

11   because work is kind of up and down, it could be very busy

12   one week and, you know, there could be nothing going on

13   another week or we could have six solid months of work and

14   then a month of nothing, and so I try to, you know, employ

15   different people and I have -- there's maybe 10 different

16   contractors in our area who are all very good friends and we

17   trade labor back and forth, might be somebody we could use

18   for a particular job, and we'll trade, you know, one person

19   work out better for certain types of jobs than others.  We do

20   mainly 70 percent commercial and about 30 percent

21   residential.  So like to use certain people for certain

22   things, but for service work you would use the more

23   intelligent people because you have to troubleshoot, whether

24   it's residential, commercial or generators, things like that,

25   and we used my truck for service work because it had most of

Joseph Jenkins - Direct                           581

1   the tools in it.

2   Q     In 2009, approximately how many people worked with your

3   company?

4   A     That was about the time me and my two partners kind of

5   started to split up, I probably had about three of my own at

6   that time.

7   Q     Okay.  So there's three people in addition to you?

8   A     Yes.

9   Q     Could you describe the setting of -- withdrawn.  Other

10  than the computer that was in the truck, were there any other

11  computers that you used for that work?

12  A     I have an office set up in my basement, there's

13  probably four desks down there, um, it's accessible through

14  the garage.  Um, when we split up I moved pretty much

15  everything back to my house.  We had kind of a co-op, just a

16  building that we used to store things, me and my partners and

17  then we split up, moved most the stuff back to my house

18  because 2008, 2009 was around the time of recession and

19  things slowed down, and we were mainly doing service work for

20  a while.  And I take a lot of vacations and things so we

21  leave -- I try to leave my truck, my truck home.  If it were

22  an airport, I'll take a second -- usually a second vehicle at

23  my house, I'll drive that to the airport, leave my truck

24  there.  And anybody that's covering for me doing service

25  work, there's an access code to get in the garage, opens the

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 621 of 890
A611
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 173 of 246

Joseph Jenkins - Direct

582

1    door, and then have access to the basement, I would lock the

2    house separate.

3    Q     Let me stop you.  You just testified there was an

4    access code to enter the basement where the office was,

5    correct?

6    A     It opens the garage door, then you can walk through the

7    garage, go down into the basement.

8    Q     Did any of the individuals that you worked with know

9    the access code?

10   A     Yes.  There were -- well, quite a few people, we have

11   friends and family that check on the house, there were

12   probably two or three guys that I used that would, if I

13   wasn't there or they were doing something else, have to go

14   there and pick up materials or some sort of special tool,

15   they could go in there.

16   Q     Could you describe how your business would function or

17   operate if you were not at your home?

18   A     I would have -- mainly there were two very good guys

19   that were smart that worked for me that I could have do

20   service work.  We -- well, we're in Syracuse now, there's

21   Waterloo Premium Outlets, there's a bunch of stores down

22   there, I don't know if anybody's familiar with them, it's a

23   big strip mall and there's service companies that, um, do

24   maintenance at the stores.  There's all kinds of different

25   service companies so if there's a problem in the store,

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 622 of 890

**A612**

Joseph Jenkins - Direct

583

1    lights, anything else, cash register stops working, they call

2    these service companies and then service company would call

3    somebody like me to actually go to the store and do work.  So

4    they would send us.  This is going on like, you know,

5    probably got six or eight calls a week, to go to those

6    stores.  They'll call us, maybe two or three lights are out,

7    two or three lights are out, then they'll send us a work

8    order, either fax or e-mail, and you print that out, and the

9    prices is already negotiated with these companies, you just

10   get a form and you print it out or you pick it up at the fax

11   machine and then you go to the store, they have to sign it,

12   and that's pretty much it, then we send them in and get paid

13   once the work's completed.

14   Q    So again, could you describe how your business would

15   operate if you were away on vacation?

16   A    Oh, okay, we got off that.  I would just -- I would

17   have a couple guys I could call, I could call one of my

18   former partners, we're still friends even though we split up.

19   Like I said, I use part-time guys, some of them work nights,

20   some of them work mornings, I mix and match to get the

21   employees I need to get things done.

22             So if I didn't need my truck, I would leave

23   that there for people to use, and they would have access to

24   the garage and the basement.  Somebody would have to check

25   the e-mail or the fax machine, maybe at least once a day

Joseph Jenkins - Direct

584

1    because these work orders come in from the malls or whatever,

2    they would -- they pretty much want them done right away,

3    they have to be done in two, three days.

4              So at one point in time, sometimes I take long

5    vacations, once during winter, once during summer, go to

6    Florida for a month in the winter and I would go to Canada

7    for -- it's hard sometimes to get away in the summer, but I

8    try to get up there between two weeks and a month in the

9    summer, and basically somebody else would have to take --

10   most of the calls came to me on my cell phone, if I got a

11   call, like call somebody else or text them or whatever to go

12   do the work, they could get access to the vehicle, whatever

13   else they needed there.

14   Q    So if you're on vacation, could you describe for the

15   jury how your e-mails and faxes would get checked?

16   A    A lot of times I would bring -- normally I bring a

17   laptop with me.  I can pick up an e-mail that way.  Or if I

18   receive a phone call, normally have to coordinate the jobs,

19   I'll have to call somebody else and say, well, you know, go

20   to the house, get this, do that, or they could use their own

21   vehicle, it doesn't take much, you know, to fix lights or

22   whatever, you can take hand tools.  If it was a generator

23   service call, they'd have to go get -- I mean they're

24   basically like car motors, with electronics on them, so there

25   were a lot of parts that we stocked for those, and they would

Joseph Jenkins - Direct

585

1   have to go to the house and get those.  We get -- when I'm in

2   Florida, the generator service business was -- it's pretty

3   big especially in the wintertime, things get cold out, they

4   don't want to start, you get error codes on them, they

5   exercise once a week and, you know, you get little old ladies

6   that -- they're depending on these things, we have a lot of

7   power outages out in the rural areas and if they don't hear

8   the thing start at the same time, they get right on the

9   phone, call us, we have to go see what it is.

10  Q     Could you describe a circumstance, if any, where other

11  of the individuals who were working for you could have

12  accessed your fax and e-mail on a time where you were not on

13  vacation?

14  A     Pretty much any time.

15  Q     What do you mean by any time?  Please explain.

16  A     I mean there's a code in the garage and I'm not there.

17  Q     And how about --

18  A     There's friends and family, that code's been the same

19  for 10 years, we haven't changed it.

20  Q     Could you describe the access to your computer?

21  A     The -- the Compaq computer was always, there were a few

22  computers I had similar to that, smaller ones, Toshiba

23  computer I bought for mainly doing estimates.  We get, with

24  computers now estimates, bids, I should say bids, I do a lot

25  of bids, when you get calls for these commercial jobs, used

Joseph Jenkins - Direct                                              586

1    to be they just used blueprints, you know, old-fashioned

2    blueprints, big things, but now they save the money and they

3    put the plans on CDs, .pdf files, so basically you stick that

4    in the computer and you've got to go through and select what

5    you want to print and then just print out whatever sections

6    you want, do the estimates or you can just look at them on

7    the screen, and basically that -- there were a few desktop

8    computers.  Toshiba laptop computer was mainly in the

9    basement, at my desk, it's just smaller, you know, it's

10   easier to handle and if I wanted to -- you know, if it's nice

11   out I could take it out on the back porch, summertime, you

12   know, work on it there, work on stuff.  I don't work every

13   single day, I don't go out and do physical work, but I like

14   to stay busy.  I actually like to do the physical work, I

15   don't like the paperwork, and sometimes I delegate people to

16   do the paperwork.  We have -- I get in the truck, there's

17   always a camera, if we do estimates, mainly residential

18   estimates, I can send other people to do -- they go and like

19   if it's an electrical service on a house, pretty much

20   standard price for that, they can go with a camera, you know,

21   talk to the homeowner, take pictures and then we would know

22   what materials we needed, just by looking at the picture,

23   picture's worth a thousand words when it comes to a job, you

24   don't have to remember, you can open up the camera and take a

25   picture of it.

Joseph Jenkins - Direct                                    587

```
1   Q     Mr. Jenkins, let me focus you on, again, how the other
2   individuals who worked with or for you could access your
3   computers.
4   A     They were not password protected, they were just in --
5   they were in the office, if I wasn't there, like I said, it's
6   pretty much open 24 hours a day if I wasn't there, if I was
7   home I'd know somebody came in, but the files are -- there
8   was -- nothing was password protected.  They never had a
9   problem until 2009, the e-mail was not password protected,
10  there were three different e-mail accounts.  I mean I'd have
11  to type in -- the computers basically, we left the e-mail
12  program open all day long, and it would check for e-mail
13  every three or four minutes, it was set on automatic, and you
14  know, of course if an e-mail came in, it would make a noise
15  or some indication would be there and then we'd look at the
16  e-mail.  But there was wireless access in the house, wifi,
17  then there's three computers that are hard wired.  I probably
18  had three computers down in the basement for different
19  things.  One for doing estimates, I kept some old computers
20  that worked on like Windows XP because we have an old
21  accounting program with 3 or 400 customers' names in it and I
22  wouldn't get it to work past Windows XP so we just -- I just
23  kept that.
24  Q     So let me stop you.  The computer itself, when you
25  stated earlier was not password protected, do you mean that
```

1   anyone could access the computer itself?

2   A     Yes, there was no restriction whatsoever.

3   Q     And when you were discussing e-mail, could you describe

4   whether there was any security measures on the e-mails that

5   you had?

6   A     No.

7   Q     Why don't you describe or elaborate a little bit more

8   than no.

9   A     I mean basically you just turn on the computer, click

10  on the e-mail icon, and you can -- you could send e-mail.

11  All my -- all my computers were set up with the e-mail

12  accounts.  Other -- there was the Compaq one, one of the ones

13  in the trucks, computer in the basement -- well, whenever I

14  get them, like the computers that I bought a couple off eBay,

15  just older XP ones that -- keep them in the truck that I

16  really don't care about, employees can take them home if they

17  want.  Once in a while somebody take one home if they're

18  working on a job, something like that, that's fine, they can

19  do that.  The batteries, the ones that I buy and keep in the

20  trucks, the batteries aren't that good, we have power,

21  power -- I have a power inverter in my truck, one in the

22  front seat and one in the back that can power the computers.

23  I mean they're pretty much accessible at any time.

24  Q     Let me draw you to shortly before May 24th of 2009.

25  Could you describe what was happening at that time in your

Case 5:14-cr-00088-EAW Document 70-10 Filed 01/12/16 Page 628 of 890

Joseph Jenkins - Direct                              589

1   life.

2   A      I don't remember specific jobs.  I haven't had access

3   to these computers since this happened.  I don't really

4   remember, I know we lost some data.  All I remember was I was

5   supposed to take the trip to Canada, I was supposed to leave

6   on a Friday, and we picked up a job, three swimming pools in

7   a suburb of Rochester, was probably about an hour from the

8   house, I needed -- have a large trencher that just broke and

9   I stayed home for three days working on it, put us behind on

10  the pool jobs.  People come in with -- people buy these

11  swimming pools and the guys just come in, throw them in their

12  yard and they're just sitting there until somebody comes,

13  hooks them up, people are anxious to get them going so

14  they're usually all over us to get them done, and so we just

15  had a job that we did that, pushed it back Friday and

16  Saturday, worked long days Friday and Saturday to get -- it

17  was -- I think it was three pools, I remember, to get done,

18  and then Saturday night, I basically just cleaned out the

19  truck and threw some clothes in it and I left.  I think I got

20  up at 4:00 in the morning, I don't -- I think I left

21  somewheres around 6, 5:30, 6, to go to Canada.

22                  I just remember the swimming pool job before

23  we left.  It was, it was -- it was in a nice suburb, I

24  remember the job, people just started peeling off hundred

25  dollar bills and paying us cash, that's the only way --

A619

Joseph Jenkins - Direct                              590

1    that's why I remember that.

2    Q    A moment ago you testified that you just grabbed some

3    clothes and threw it in the truck.  Did you put anything else

4    in the truck other than clothing?

5    A    I grabbed the Toshiba computer out of the basement.  I

6    had bought it the previous summer in Canada, at the time it

7    was working slow, we thought it had a virus, had a couple

8    other guys look at it, and we figured it was either -- I

9    think figured it was kind of a combination virus and maybe it

10   needed some more memory, something like that, so I was going

11   to drop it by, put it in the original box, had the original

12   paperwork, the original receipt.  And Canada's kind of

13   different, it's not like around here, on Sunday everything's

14   closed in Canada, there's no stores open, there's nothing

15   going on, people don't travel, everything's closed on Sunday

16   in Canada.  So I couldn't have dropped it off on Sunday, so I

17   was just gonna try and maybe do something on the way back,

18   just swing by the store, it was in Ottawa, had to go through

19   Ottawa on my way to my parents' place.

20   Q    So at this point you're driving toward the border.  Why

21   don't you describe what happened next.

22   A    It was about -- I looked right at the clock, there's a

23   duty free store before the border, and once in a while my

24   parents want me to pick up a bottle of vodka or something

25   like that so I called them, I looked right at the clock, it

Joseph Jenkins - Direct                               591

1    was 9 -- 8:50, ten minutes to 9 when I passed the duty -- I

2    called them just before I got to duty free store, do you want

3    anything, they said no so I blow by it, went straight to the

4    border.

5              I noticed that there was little to no activity

6    there.  I'd been to Canada probably 40 something times, my

7    parents have always had a place up there ever since I was a

8    kid.  I've always gone at least once a year.  And I've had my

9    car searched probably four, five times going up there, there

10   wasn't anything in there that I was aware of.  My mother

11   wanted some deli meat and cheese, stuff like that, I had that

12   in the cooler, she said they'd probably take it from me if

13   they saw it, I wasn't really worried about that.

14             And I pulled up to the -- I think I was the

15   only one there, it wasn't actually -- I think one of the

16   officers up here testified, said there were only two lanes

17   open or something, there was like nobody there when I pulled

18   up there.  And -- but then I figured I was going to get

19   searched because probably, you know, lot of guys standing

20   around, nothing to do.  So sure enough when I got up there, I

21   got up to the booth, the one officer that was up here, I

22   don't recognize him but he said he was there, he'd already

23   had an inspection ticket in his hand, I figured I was going

24   to get pulled over, but I didn't really care.  And he just

25   asked me questions, writing stuff down on the ticket.  I

Joseph Jenkins - Direct                              592

1    recognized that it was -- I'd seen them before, you know, he

2    wasn't making notes, he was writing out the ticket, so he

3    said, he just asked me a few basic questions and he said, all

4    right, go in there, go inside the building so I did.  Excuse

5    me, thank you.

6              I pulled up, you kind of pull up diagonally, I

7    think it was under a roof, and I didn't really do anything,

8    just grabbed my passport, jumped out of the car.  I don't

9    remember if I left the keys in them or took them with me, but

10   the one officer that was up here, Hache, he was -- he was

11   standing up on a platform, and he was putting on a pair of

12   gloves and just walking towards me, he just asked me for the

13   keys to the vehicle and I either handed them to him or I said

14   they're in there, I don't remember if I locked it or not.

15   And he just went right to work on the vehicle, and I went

16   inside the building.

17             And I encountered that -- the one lady who was

18   up here, I think her name was Boyd, is that right?  I think

19   it was.  At the counter, she asked me couple of basic

20   questions, and she just said have a seat, you know, I know

21   they were trying to make a big deal I was nervous, this and

22   that, that wasn't true, you hear cops lie to make a case,

23   that's pretty much all that was.

24             MS. THOMSON:  Objection, your Honor.

25             THE COURT:  Yeah, that will be sustained and it

Case 5:14-cr-00088-EAW Document 79-4 2020 Filed 01/12/16 Page 632 of 890
**A622**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 184 of 246

Joseph Jenkins - Direct                    593

1  will be stricken.  Please conduct this examination with a

2  question and an answer.

3           MR. GOLDSMITH:  I will, thank you, your Honor.

4  Q    So when you proceeded in to the counter, Mr. Jenkins, I

5  believe you had testified that you were not nervous at the

6  time?

7  A    Absolutely not.  I'd been to Canada --

8  Q    What happened after you proceeded to the counter in the

9  building?

10 A    I, like I said, I was just asked a few questions and

11 she said, you know, take a seat, and --

12 Q    What happened after that?

13 A    This was probably about five minutes to 9 at this point

14 in time.  I -- I sat down for 15 or 20 minutes, I didn't -- I

15 don't know if I could see outside or not, but I -- I probably

16 just had like four, five cups of coffee, just wanted to get

17 up and walk around.  So I went outside on the platform,

18 outside the door, and they were, you know, all three of them

19 are crawling through the truck, you know, going through

20 everything.  And I stood out there for maybe 10 minutes, and

21 they were just finishing up.

22 Q    When you say they, who is they?

23 A    The three guys that were here.  Pretty much happened

24 like they described it.  The one guy, Hache, he went through

25 the driver's side, both doors in the cab on the driver's

Joseph Jenkins - Direct

594

1    side, and he had gone through.  Well, when I was -- I cleaned

2    out the truck the night before, I took all -- lot of garbage

3    out of the back, the back seat just kind of collects garbage,

4    tools and material and --

5    Q    All right, well, let me stop you.  You had said a

6    moment ago that they were about finished with the inspection?

7    A    Yeah, um --

8    Q    What happened at that point?

9    A    Well, I'd already noticed, what I was gonna say is when

10   I was cleaning out the truck the night before, it was late at

11   night, you know, because we worked late, the Compaq computer

12   was in the back seat and I think I just took it out and I

13   didn't really -- I don't remember if I looked in the bag or

14   not, but I just took it out and put it on the floor in the

15   front seat, it was up there with a cooler, little small

16   cooler with some stuff my mother wanted.  I remember Hache

17   pulled it up, he was leaning over from the driver's side,

18   opened it up on the passenger seat, opened it up, looks

19   through it, put it back, he had gone through that and the

20   side, the one -- one guy was going through, he was crawling

21   around the back going through under the cab.  The one, the

22   one guy had said he was a lawyer, I don't remember his name,

23   he had gone through like a trailer with two ATVs on it, the

24   ATVs had boxes on them, he went through the boxes and he -- I

25   think he started going through the back right passenger's

Joseph Jenkins - Direct

595

1   seat and that was when he found the Toshiba computer.

2   Q     Is that Officer Johnston?

3   A     I don't remember, I think he said he was a lawyer, I

4   think that was him, he's a lawyer now or something.

5   Q     So at that point what happened after he seemed to take

6   over the Toshiba laptop?

7   A     He came up to me, I was on the platform, he started

8   questioning me about it, is it new, is it staying in Canada,

9   I said, well, I purchased it in Canada last year, I was

10  having some problems with it, I was gonna take it back to the

11  store, see if they could, you know, make a recommendation in

12  the store what was going on with it, and I'm not really sure

13  why but he asked me like really dumb questions for like two,

14  three minutes about the computer.  He seemed to be obsessed

15  with it, I don't know why.

16  Q     What kinds of questions?

17  A     Um, tell you the truth, I don't even remember.  They

18  went on for like two or three minutes and I'm thinking like I

19  didn't really know why he was asking me all these questions.

20  I really don't remember, I -- it was five years ago, so -- he

21  just, he had some interest in it, when I bought it it was,

22  five years ago laptops were expensive, so --

23  Q     Do you recall being asked questions by any of those

24  officers about child pornography?

25  A     No, um, I mean not -- not before, or during the search,

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 635 of 890
**A625**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 187 of 246

Joseph Jenkins - Direct

596

 1   no.

 2   Q      Okay.  So what happened next?

 3   A      I don't know, he was fixated on that computer so I went

 4   back and I guess he went back to turn it on, he asked me a

 5   bunch of questions about it.  I was -- I was getting little

 6   irritated because they been crawling through the car for

 7   probably half hour, 40 minutes, and I don't know if anybody's

 8   been through a border search or not, you know, just watch

 9   your stuff get tossed, three guys, and it's -- gets a little

10   annoying after awhile.  So, and there was a lot of stuff in

11   there because it was the work truck, and there was stuff in

12   and out of the back seats and, you know, things like that.

13   So he went back and turned on -- he must have turned it on or

14   something, I couldn't see -- the windows in the truck are

15   kind of tinted, couldn't probably see what he was doing but

16   he was -- the door was open and he was in there for maybe 10

17   minutes.

18   Q      So what happened next?

19   A      I think he called -- he called another officer over,

20   maybe it was Hache, one of the other ones, and the two of

21   them looked at it for another five or ten minutes, I really

22   don't know, I lost track.  Then he just -- Hache, the guy, he

23   had already gone through the computer in the front seat, he

24   opened up the passenger's door and grabbed that whole laptop

25   bag and just, they took both computers inside.

Joseph Jenkins - Direct                                    597

1    Q       What happened after that?

2    A       Not -- I can't remember.  They -- he said he said

3    something to me when they were taking the computers, I really

4    don't remember.  I think I may have questioned them like what

5    the heck are you doing or something like that.  They didn't

6    say anything, they just walked by me.

7    Q       How long had all this been going on?

8    A       It was probably at least 9:30, 9:40, probably 9:30,

9    9:40 when they took the computers inside, somewheres around

10   there.

11   Q       Okay.  And what happened after they took the computers

12   inside?

13   A       Nothing for quite awhile.  I just sat, sat, I either

14   stood outside, sat on a bench inside, and just waited.

15   Actually I think he did come out, yeah, Hache came out, and

16   he started asking me -- yeah, he did ask me, he came out and

17   he said, you know, um, he basically asked me those questions

18   I think he testified to, have you ever -- I don't remember

19   what they were, and I said no, not to my knowledge, no, I

20   don't think so.  There was no delay, no hesitation, I just

21   said it, I didn't curl up in a ball and start crying, that

22   was a bunch of garbage.  That was, I mean I didn't -- I had

23   no knowledge of anything like that at the time on the

24   computer.  Like I said, it was just, you know, making a

25   story.

Joseph Jenkins - Direct                                598

```
 1   Q     Did there come a time when you were arrested that day?

 2   A     Yes.  Maybe 20 minutes or so after that.  I went up to

 3   him, I was like, what are you guys doing, how much longer are

 4   you going to be, and that's when they directed them to arrest

 5   me.

 6   Q     What happened after you were arrested?

 7   A     Nothing.  They wouldn't tell me anything.  They really

 8   didn't say anything, they didn't tell me what they found or

 9   where they found it or anything like that.  Um, I was trying

10   to question them, what he found, where he found it, and I

11   just didn't get any answers.  After that pretty much,

12   everything pretty much happened like they said it did, except

13   for the part, I wasn't nervous, I had my hands on the wheel

14   and I was looking forward, that was just ridiculous, all that

15   stuff, you know, I didn't curl up in a ball when he asked me

16   about the computer, that was just ridiculous.  That didn't

17   happen.

18   Q     So what happened after you were arrested?

19   A     I really don't remember the specifics, like I said,

20   pretty much what they said happened, couldn't really ...

21   Q     Did there come a time where you were released from

22   custody?

23   A     Yeah.  It was -- I think it was 24th, I called my

24   parents.  Well, that, that was the thing, I was there all day

25   without a phone call, I was anxious to call my parents,
```

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 638 of 890

Joseph Jenkins - Direct                                    599

1    they're older and -- 70s, and I had called them ten minutes

2    to 9, said you can probably expect me about 1 and they

3    wouldn't let me use the phone.  So around 4:00 I started

4    getting little irritated with them, I was like, I got to use

5    the phone, you know, my parents are -- it's a twisted

6    mountain road getting up where they are, it's a terrible

7    drive but it's a beautiful spot where they are.  And we've

8    actually, my aunt had a friend going up to visit her one

9    time, we own a few cottages on the lake up there, and she

10   actually went off the road and died, went down a ravine and

11   so when people travel up there, my parents get -- they get

12   kind of anxious and I know they're expecting me 1, 2:00 and I

13   just wanted to call them and tell them, I'm okay, I'm not

14   there but I'm okay, and you know, I just wanted to tell them

15   what happened so I was just anxious to use the phone to tell

16   them, you know, don't come looking for me or anything, so ...

17   Q    Again, was there a time where you were released from

18   custody?

19   A    Yeah, sorry.  Yes, they came down day or two later,

20   they -- they borrowed some cash money from a friend up there,

21   came down and got me out a day or two later.

22   Q    So you posted bail?

23   A    I posted $10,000 cash bail.

24   Q    All right.  And what happened after you were bailed

25   out?

Joseph Jenkins - Direct                          600

1   A      Right before I was bailed out, there was, there was

2   another inmate in the holding room with me, gave me a

3   lawyer's name, Edgley, and I don't remember if I called him

4   or my parents called him, but we retained him, he got a

5   consignment on the bail, some sort of bail consignment, big

6   leverage to get paid.  So we retained him and then -- this

7   was all in Brockville, which is maybe 45 minutes from the

8   border crossing, and then they escorted me back to the border

9   and I met my parents there and we picked up my vehicle and I

10  think I signed some paperwork, they gave me my passport back

11  and we headed back to the American border.

12  Q      So let me fast forward to the fall of 2010.

13  A      Well, there was the -- there was an incident I want to

14  mention.  On my way through the border on the way back, I was

15  immediately detained by U.S. Customs and Border Patrol.  They

16  interrogated me for an hour about what happened in Canada and

17  they proceeded to search my vehicle.  I don't know if they

18  made me empty my pockets or not, but they held me up for an

19  hour.  I was supposed to -- my parents were somewheres in the

20  area there, and I was supposed to meet them, I don't know if

21  it was maybe Watertown on the way back, I was supposed to

22  meet them someplace for dinner and I was just late, I never

23  showed up.

24  Q      Okay.  So again, let me fast forward to the fall of

25  2010.  Were there legal proceedings in Canada?

Case 5:14-cr-00088-EAW Document 79-01 2021 Filed 01/12/16 Page 640 of 890
**A630**
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 192 of 246

Joseph Jenkins - Direct

1    A    Yes.  We had -- we had received some disclosure, there

2    were several court appearances, no disclosure was made so

3    maybe March 3rd, 2010, received part of a Canadian forensic

4    report.

5    Q    Let me stop you.  Let's -- you recall that there was --

6    several witnesses testified about being in court proceedings

7    with you in the fall of 2010, here at trial?

8    A    Yes.

9    Q    And what were the purposes of those proceedings?

10    A    The purpose of the proceedings were we never received

11    disclosure.  I'd hired another attorney in Geneva on the way

12    back and he was supposed to deal with the Canadian attorney,

13    and we never received a disclosure.  We had several meetings

14    with the Geneva attorney, and we never found out what was on

15    the computer or even why they arrested me really.

16    Q    Let me stop you.  Was there a trial scheduled in

17    October of 2010?

18    A    Yes.

19    Q    Did you appear for the trial?

20    A    I did but the -- I was trying to get to that.  The

21    Canadian lawyer brought up charter motion because we never

22    received the disclosure, there was some 15- or 17-month

23    delay.  They scheduled the trial in February and I had

24    planned on -- I had the week of the 30 -- was it the 13th,

25    September, I had that scheduled for trial but they --

Joseph Jenkins - Direct

602

1    Canadians never made disclosure in time so the trial couldn't
2    go through.  My attorney applied for a stay on proceedings
3    and I guess at the time anything over eight and a half months
4    for delay for a trial was considered worthy of a stay, and
5    ten months was ridiculous so he thought we had a good chance
6    of a stay on September 13th, so he asked me to appear, he
7    sent me a notice to appear and I appeared.
8    Q    All right.  And were you aware of proceedings that were
9    going to take place in October of 2010?
10   A    We had discussed it with the attorney, he didn't make
11   it mandatory that I appear.  We -- as far as I knew, I was
12   actually looking for another attorney at the time.
13   Q    So let me stop you.  So you heard testimony at trial
14   from other witnesses about your not appearing in October of
15   2010?
16   A    Yes.
17   Q    Okay.  So is that why you didn't appear?
18   A    Well, my -- the attorney I hired, he didn't seem to
19   know what to do with the case, and at the beginning he said,
20   you know, if things go bad and they issue a warrant for your
21   arrest, he said, that -- this is just a complicated case.
22   The lawyer gave me some advice right from the very beginning,
23   he said -- which I didn't like, he said, you could just not
24   return to Canada if you want to just not deal with the
25   charge.

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 642 of 890
A632
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 194 of 246

Joseph Jenkins - Direct

603

1   Q      Let me stop you.  After the October date which you were

2   not there, did you attempt to return to Canada for the case?

3   A      No, because I wanted to find another attorney and we

4   couldn't find another attorney while we had this attorney,

5   this attorney from Brockville.  I just figured I'd wait, he

6   was gonna be done October 18th so sometime after that I was

7   going to try to hire an attorney from Ottawa, a better

8   attorney.

9   Q      After the October period of 2010, what happened next in

10  this case?

11  A      Really nothing.  When we received -- well, really

12  nothing.  I hired two attorneys to deal with it, and we

13  didn't have disclosure on the trial date, and really nothing

14  happened after that.

15  Q      When, if ever, was your next encounter with law

16  enforcement?

17  A      Well, on September 13th when I returned I had an

18  encounter.  I was detained at the U.S. border and searched

19  for two hours, which that was just harassed over a cell

20  phone.  And when Special Agent Willard was up here, I'd asked

21  Mr. Goldsmith to try to get at is, Mr. Willard was the one

22  that harassed me for over two hours on a cell phone --

23          MS. THOMSON:  Objection.

24  Q      Let me back up.

25          THE COURT:  Objection will be sustained.  I'm going

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 643 of 890
**A633**
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 195 of 246

Joseph Jenkins - Direct                                    604

1   to ask again, this is a narrative.

2              MR. GOLDSMITH:  I will try, your Honor.

3              THE COURT:  There should be a question and an

4   answer.

5   A     Well, there's some points that need to be made here for

6   the record.

7   Q     Mr. Jenkins, let me bring you back because we were just

8   discussing the appearance in Canada.  Did you willfully

9   refuse to go to Canada to evade prosecution?

10  A     Absolutely not, there just wasn't a case, the lawyer

11  hadn't prepared a case.  A defense I guess.

12  Q     Did there come a time when you were arrested in the

13  United States?

14  A     Yes.  I heard nothing, I heard nothing further from the

15  Canadian attorney, he just said I had a bench warrant in

16  Canada, and I shouldn't be bothered anymore.  That was the

17  last I heard from him.  I got a notice to appear on

18  September 17th and I never heard any more from him.  I was

19  actually working on the 18th, we scheduled work after that,

20  and I mean I showed up for the trial but the Canadians

21  screwed up the investigation, just wasn't ready for trial,

22  so --

23  Q     Mr. Jenkins, let me bring you forward.  There was a

24  photograph that was admitted in testimony of this case, a

25  photograph of you with a girl?

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 644 of 890

**A634**

Joseph Jenkins - Direct

605

1  A    My niece.

2  Q    Okay.  So that's your niece?

3  A    Yes.

4  Q    There was also testimony about wiping software.  Could

5  you describe what knowledge you had, if any, regarding wiping

6  software on the Toshiba?

7  A    Wiping software.  It was, it was CCleaner, it was a --

8  I think it's, I think C's an abbreviation for crap, crap

9  cleaner, just cleans the -- so your computer works faster,

10  just cleans up anything that builds up.

11  Q    Did you install that into the computer?

12  A    Probably, when I first -- yeah, I mean it's handy, it's

13  just --

14  Q    Why?

15  A    Just to -- it gets rid of that adware and things like

16  that.

17  Q    Is that the reason why you installed it?

18  A    Yeah, I mean there was no -- you know, any other

19  reason.

20  Q    Mr. Jenkins, there was a phone call that was recently

21  played in court.  Remember hearing the phone call?

22  A    Yes.

23  Q    Do you happen to remember that phone call other than

24  just listening to it?

25  A    I did, they edited the phone call.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Direct                                      606

1    Q      What was the phone call about?

2    A      The attorney I had at the time came in with the

3    Canadian forensic computer exam, I hadn't seen it since my

4    Geneva attorney showed it to me on March, somewheres around

5    March 2010.  It had indicated basically that there's no child

6    pornography on the computers, and it's, a small amount was

7    found on the thumb drives and the thumb drives were half

8    erased.  The only thing they found -- they wouldn't let me

9    bring the paperwork up here with me, but there was no child

10   pornography found, any live files on the computer but there

11   was under deleted or something you couldn't see,

12   inaccessible, I think.  Canadians provided full disclosure on

13   the proceeding, there were five, they classified five items

14   as child pornography on the -- just in some unallocated space

15   deleted, something.

16   Q      Is that why you were referring to different numbers?

17   A      Yes, he -- he put the paperwork down in front of me and

18   kind of spread it out, there were charts and different things

19   on it, and he said, look, here's -- we can defend you on

20   this, there's only, you know, maybe --

21   Q      Not discussing the conversation between you and your

22   attorney.

23   A      Well, that's how -- that's how this came up.

24   Q      I just, just, please, with respect to the phone call,

25   was it your belief at the time that the numbers that you

Joseph Jenkins - Direct                                    607

1    discussed on the phone -- withdrawn.  Did you have a belief

2    at the time about the conversations you were having with your

3    mother?

4    A    Yes, I was getting into that.  The attorney just put

5    down the paperwork in front of me and he said, look, there's

6    only a hundred things here, we can build up a defense for

7    this, this is just an accident.

8    Q    Just to what you understood, without what other people

9    are telling you or not telling you, is that what you

10   understood?

11   A    That's what he told -- I didn't really look at them, he

12   just put them down in front of me and I just glanced at them

13   quick, he said, look, there's maybe a hundred things here

14   that, I mean, that's just a mistake on here, I can defend you

15   on this.  He was just -- I don't even know why he --

16   Q    I want to bring you back to the -- to May 24th of 2009.

17   Did you make any statements to Canadian law enforcement?

18   A    About?

19   Q    Well, there's been testimony about questions that

20   they've asked you.  Did you make any statements to Canadian

21   law enforcement?

22   A    Just "Not to my knowledge" or "I don't think so," there

23   was no -- there was no visible child pornography on either

24   computer at the time.

25   Q    Your statement, though, what were your statements

Joseph Jenkins – Cross                    608

1   again, just your statements?

2   A      "Not to my knowledge" and "I don't think so."

3            MR. GOLDSMITH:  I have nothing further.

4            MS. THOMSON:  I didn't know if the court was going

5   to break.

6            THE COURT:  I'm sorry?

7            MS. THOMSON:  I didn't know if the court was going

8   to break, I saw you look at your watch.

9            THE COURT:  No, we're going to stop at 4 today,

10  they tell us they want us to close at 4 so we might as well

11  start your cross-examination.  We've got 20 minutes.

12           CROSS-EXAMINATION BY MS. THOMSON:

13  Q     Mr. Jenkins, let's see if there's a couple things that

14  we can agree on.  Let's start with May 24, 2009.  Did you

15  enter primary lane number 5 crossing from the United States

16  into Canada?

17  A     Yes, I don't know what lane it was, but yes.

18  Q     You came from Alex Bay in Jefferson County and you

19  crossed into Canada?

20  A     Yes.

21  Q     And when you crossed into Canada, were you driving your

22  truck?

23  A     Yes.

24  Q     Nobody else's truck?

25  A     No, it was mine.

Joseph Jenkins - Cross                              609

1    Q    And inside that truck, did you have two laptop

2    computers?

3    A    Yes.

4    Q    Handing you Government's Exhibit Number 7 and

5    Government's Exhibit Number 3A, are these the two laptops

6    that you had in your truck when you crossed into Canada from

7    the United States?

8    A    This is the first time I've seen these.

9    Q    Take all the time you need.

10   A    I believe they are, yes.

11   Q    On that day you were alone, weren't you?

12   A    I'm sorry?

13   Q    You were driving the truck?

14   A    Yes.

15   Q    No one else in the car?

16   A    No.

17   Q    You also had in the truck three thumb drives, isn't

18   that correct?

19   A    No.

20   Q    No?

21   A    I did not see those.

22   Q    These were not in the truck.  Have you ever seen these

23   before?  Why don't you take a real good look at those.

24   A    I don't think so.  I don't think so.

25   Q    So is it your testimony that when you crossed into

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 649 of 890
**A639**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 201 of 246

Joseph Jenkins - Cross                              610

1   Canada on May 24, 2009, those items were not in your truck?

2   A      I didn't put them there, no.

3   Q      That's not the question.  Were they in your truck?

4   A      No.

5   Q      So if they were found in your truck, you have no

6   knowledge of them being in your truck?

7   A      They weren't found in front of me and I have no

8   knowledge of them being there.

9   Q      You've never seen those thumb drives before?

10  A      Never.

11  Q      The Toshiba laptop, how did you have it stored?

12  A      I believe I testified to that, it was in the -- it was

13  in the original box, the original paperwork.

14  Q      And that's your Toshiba laptop?

15  A      Yes.

16  Q      The Compaq computer, you had that in a bag?

17  A      It was in -- it was in a laptop bag, that one, that one

18  always stayed in the truck.

19  Q      So the Compaq laptop was in a bag in your truck?

20  A      Yes.

21  Q      And the three thumb drives that were found in the bag

22  in your truck, you have no knowledge of?

23  A      I have no knowledge of them.  I opened up -- when I

24  moved the -- I was cleaning out the truck, I moved the

25  computer to the front seat, I believe I opened up the bag and

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 650 of 890

Joseph Jenkins - Cross                                    611

1   I just made sure the computer and the charger were in there,

2   I just looked in there and saw the computer and the charger,

3   I didn't see anything else.  There might have been some

4   paperwork, I usually have a -- a service kit made up with

5   invoices or maybe some necessary paperwork, there might have

6   been some papers in there with it that somebody could use if

7   they had to do service work, they could just grab that bag,

8   had pens, papers, business cards, anything like that would

9   have been in there.

10  Q     Did you look in the bag at the time that you prepared

11  to go for Canada -- to Canada?

12  A     The Toshiba bag, I just unzipped it and just looked in

13  there and I saw the computer and the charger.

14  Q     And that --

15  A     I didn't go through the bag, any compartments or

16  anything.

17  Q     The bag that we're talking about was the one containing

18  the Compaq laptop, because the Toshiba was in a box, right?

19  A     Yeah, I think I still have the bag, I don't think they

20  took the bag.  There was two bags in the truck actually,

21  laptop bags.

22  Q     But you did not have the Toshiba in the actual laptop

23  bag?

24  A     No it was a cardboard box.

25  Q     It was in a cardboard box.  And that cardboard box is a

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 651 of 890
A641
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 203 of 246

Joseph Jenkins - Cross                                    612

1   cardboard box that when you, as you got it, when the computer
2   was new?
3   A     Yes, it didn't have like the Styrofoam packaging in it
4   or anything like that, but it was probably -- probably had
5   the plastic bag in it or something like that, it was just
6   sitting in the box.  I may have thrown some files in there
7   with it or something like that.
8   Q     You have indicated you traveled from the United States
9   to Canada numerous times before, correct?
10  A     Oh, yes, probably at least 40 times.
11  Q     If I understand your testimony, your mom had informed
12  you that there was some deli meat and that that might get
13  taken in the car?
14  A     Yeah, she always has some special requests, they're
15  kind of -- they're kind of out in the woods up there, so if I
16  come up there, she usually asks me for things from the store.
17  Q     I believe you indicated you really weren't nervous
18  about the deli meat, is that right?
19  A     Absolutely not.
20  Q     In fact what you were nervous about is the fact that
21  you were bringing two laptops and thumb drives into Canada
22  full of child pornography, isn't that what you were nervous
23  about?
24  A     No.
25              MR. GOLDSMITH:  Objection.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 70-21 Filed 01/12/16 Page 653 of 890

**A642**

Joseph Jenkins - Cross                                         613

1          THE COURT:  It's overruled.

2    Q     You heard testimony you appeared to be nervous, is that

3    correct?

4    A     I appeared to be, that's what they said.

5    Q     Perspiring?

6    A     No.

7    Q     Giving short evasive answers?

8    A     No.  I don't get nervous, I don't -- I'm not really

9    afraid of anything, tell you the truth.

10   Q     So you agree with -- if I understand your testimony on

11   direct, you agree with the majority of the Canadian

12   testimony --

13   A     I agree with their statements.

14   Q     Sir, if you could let me finish my question.  So you

15   agree with the majority of the Canadians' testimony, you just

16   disagree with each of the officers that indicated that you

17   were nervous, evasive, that you had a tight grip on the

18   steering wheel, that you appeared not to make eye contact,

19   each officer that testified to that fact, that's what you

20   disagree with?

21   A     Yes, I do.

22   Q     You are an electrician?

23   A     Yes.

24   Q     And I believe you indicated on direct testimony that as

25   part of your job being an electrician, there are times when

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 653 of 890
A643
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 205 of 246

Joseph Jenkins - Cross                                 614

1  you produce invoices?

2  A     Yes.  They can be either handwritten -- um, lot of

3  customers like to pay you right when you're done or they can

4  just write down on a piece of paper and bill them later.

5  Q     If we could see Exhibit 3B, page 9, please.  Do you see

6  Exhibit 3B, page 9 wherein there's a Jenkins Electric header

7  and a quote on materials?

8  A     Yes.

9  Q     Do you also provide quotes?

10  A     Um, that's the -- that's the type of quote I would send

11  to a electrical distributor, if I'm bidding a job, or if I'm

12  just pricing materials to see where it's the cheapest place,

13  I would send out something like that, I would fill in -- oh,

14  whatever I wanted and they would price it and send it back to

15  me.

16  Q     That's your address, 4072 Dwyer Lane in Geneva?

17  A     Yes.

18  Q     And did you create that quote?

19  A     Probably, yes.

20  Q     Do you recognize the name for, is it Ciccino's, am I

21  saying that correctly?

22  A     Yes, that was a restaurant job, that was a restaurant

23  that we did the electrical, it was a new building, we did the

24  electrical work.

25  Q     That was one of your customers?

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 654 of 890
A644
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 206 of 246

Joseph Jenkins - Cross                                615

1   A      Yes.

2   Q      And you provided a quote to your customer?

3   A      No, that's just the material I would use for the job.

4   It's basically a blank form, I can either print it out or I

5   can type it in there and print it out and I would send that

6   to an electrical supplier and get the prices so I can do a

7   bid.

8   Q      And that form was found on your computer, correct?

9   A      Yes, that was mine.

10  Q      If we could see page 22, please.  And this also, you

11  were asked about a photograph on direct, that's you?

12  A      Yes, that was taken at our place in Canada.

13  Q      And that picture you stored on your computer?

14  A      I don't know if -- I don't know if somebody took the

15  picture or -- I don't really know how it came about.

16  Probably, I probably did.

17  Q      You probably stored that picture on your computer?

18  A      Yeah, I guess one of my parents could have done it, but

19  I probably did it.

20  Q      Do you have e-mail accounts?

21  A      Yes, three.

22  Q      Would that be jjenkins@rochester.rr.com?

23  A      Yes, I -- we had an option to set up three accounts,

24  one was for my parents, one was for me, and one was for the

25  business.

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 655 of 890
A645
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 207 of 246

Joseph Jenkins - Cross                          616

1    Q      The one that you set up for your parents, is that

2    gjenkins?

3    A      Yes.

4    Q      And did you set up one for Jenkins

5    Electric@rochester.rr.com?

6    A      Yes.

7    Q      Now that particular e-mail, did you set the password as

8    joseph70?

9    A      I don't know passwords, they were saved in the

10   computer.

11   Q      Is 70 your birth year?

12   A      Yes.

13   Q      So the gjenkins account would be something that you

14   would have set up for your father?

15   A      Yes.  Parents.

16   Q      Are you familiar with the word Lolita?

17   A      No.

18   Q      You've never heard that word before?

19   A      I couldn't give you the definition of it, no.

20   Q      You ever seen that before?

21   A      No.

22   Q      Do you know what it means?

23   A      No, I just said I couldn't give you the definition of

24   it.

25   Q      So the fact that there are sites called Great Lolita,

Case 5:14-cr-00088-EAW Document 71-20 Filed 01/12/16 Page 656 of 890
A646
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 208 of 246

Joseph Jenkins - Cross                           617

```
1    Lolita BBS, Lolly, Lolita BBS, multiple times marked as a

2    favorite on your computer, you have no knowledge of that?

3    That's a yes-or-no question, do you know whether or not you

4    had marked as a favorite on your computer items including

5    Great Lolita, Lolita BBS?

6    A     No, they looked out of place there.

7    Q     They looked out of place, did you see them yourself?

8    A     I only saw what you put on the screen, I haven't -- I

9    haven't turned these computers on in five years.  They

10   looked -- that was in with -- that was in with just work and

11   eBay stuff, it looked out of place to me.

12   Q     Well, this is your computer, right?

13   A     Right.

14   Q     And so you would use your computer for work?

15   A     Yes.

16   Q     Right, and then how about if you took a trip with your

17   ATVs, would you save pictures or save any remnants of your

18   ATV trips?

19   A     Absolutely, they were on there.

20   Q     So these items being mixed in with work items and other

21   personal items, not really out of place, are they, they're

22   right where they belong on your computer?

23   A     No, they didn't look like they belong there.

24   Q     Did you have an insurance policy through Nationwide?

25   A     Probably.
```

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 657 of 890
A647
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 209 of 246

Joseph Jenkins – Cross                              618

1   Q      And did you pay for your insurance policy online?

2   A      Probably.

3   Q      If we could see Exhibit 3B, page 20, please.  Do you

4   see Exhibit 3B, page 20 where it indicates, "Dear Joseph:

5   Thank you for making your payment using MyNationwide," is

6   that your insurance company?

7   A      It must have been at the time, switched quite a bit, I

8   price them out every year and switch them.  I'm sure it was,

9   yes, I probably did.

10  Q      Do you also use IKEA home planner, is that something

11  you use?

12  A      No, a customer actually sent the program to me, they

13  wanted an estimate for a kitchen, they bought some cabinets

14  or something.  Had something to do with a customer, I don't

15  normally use it.  It was just for one job I think somebody

16  sent it to me.

17  Q      And if they sent it to you, then that would be on your

18  computer?

19  A      Yes.

20  Q      Again, your Toshiba laptop?

21  A      Yes.

22  Q      Now you testified a little bit about some proceedings

23  that you had in Canada.  Do you remember that testimony, that

24  you had a proceeding specifically in September,

25  September 13th of 2010, do you recall that?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 79-20 Filed 01/12/16 Page 658 of 890
**A648**
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 210 of 246

Joseph Jenkins - Cross                                    619

1    A    Yes.

2    Q    And on September 13, 2010, you brought a motion before

3    the court on behalf of -- your attorney brought a motion on

4    your behalf complaining about unreasonable delay and the case

5    going forward, is that true?

6    A    Yes.

7    Q    They call that a charter motion?

8    A    Charter motion.

9    Q    Because you were asserting there was an unreasonable

10   period of delay for your trial to happen?

11   A    Right.

12   Q    And on that same date, did you ask for the trial not to

13   go forward?

14   A    No, I -- the attorney told me to show up and he was

15   going to do a motion and he just said show up and you might

16   be there for the day and go home.  That's what I did, I

17   really wasn't too aware of what was going on at the time.  He

18   just told me to show up and say a few things and go home.

19   Q    Were you also aware that on that date there were

20   witnesses that were there prepared to attend the trial of the

21   matter?

22   A    I did, I did, they were the same ones that were here.

23   Q    And that trial didn't go forward?

24   A    No.

25   Q    Now on that date, September 13, 2009 [sic], do you

Joseph Jenkins - Cross                           620

1   recall being in the courtroom and seeing Detective Constable

2   Kip Wohlert, do you recall him?

3   A      No.  I didn't until, according to the court transcripts

4   and I saw his name on there, but I couldn't have identified

5   him.

6   Q      Let me ask you this.  Do you recall that you were

7   observed with a cell phone on September 13, 2010 and you were

8   made aware that you were seen with that cell phone on that

9   date?

10  A      Yes.

11  Q      And having that cell phone violated your conditions of

12  release in Canada, isn't that correct?

13  A      No, it didn't.

14  Q      Okay, so you were permitted to have a cell phone that

15  had internet access?

16  A      It didn't have internet, it was a flip phone.

17  Q      Do you recall being told that you were observed with

18  that cell phone and that they wanted to ask you some

19  questions about that cell phone, perhaps to check to see if

20  it had internet access?

21  A      No, my attorney -- my attorney called me into a room

22  and he said, they're making a big deal about your having a

23  cell phone, just get rid of it, is what he told me.

24  Q      Your attorney told you to get rid of the phone?

25  A      Yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                                    621

1   Q     Is this the same attorney who told you not to show up

2   for a trial in October --

3   A     Yes.

4   Q     -- of 2013 [sic], advised you to break the law?

5   A     Yes.

6   Q     Your attorney advised you that on that occasion, not to

7   go to your own trial?

8   A     Yes, that's why I was looking for a new attorney.

9   Q     And your attorney told you to destroy that telephone?

10  A     I didn't destroy it.

11  Q     What'd you do with it?

12  A     I'm not sure, showed up at home, but -- few days later.

13  Q     When you were testifying on direct examination, you

14  complained about the fact that you were stopped at the

15  border, I believe you called it for two hours and subjected

16  to a search; do you recall that testimony?

17  A     I was.  I was, I found it offensive.

18  Q     Do you recall that what they were searching for was

19  that cellular telephone?

20  A     I remember they didn't find it.

21  Q     That's because you destroyed it?

22  A     No, I didn't, I still have it today, I didn't destroy

23  it.

24  Q     Okay.  Well, let's be simple here.  When you were

25  stopped, you did not have the cell phone that you had earlier

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                    622

1    that day?

2    A     They didn't find a cell phone.

3    Q     They didn't find it.  Now on September 13, you knew

4    that they were interested in the fact that you had your cell

5    phone because it was their position that that was in

6    violation of your release conditions?

7    A     They were afraid it might have internet access but it

8    didn't, I don't use internet on a phone.  It wasn't a big

9    deal, they were trying to make a big deal about it.

10   Q     It wasn't a big deal to you, but if there actually had

11   been internet access on that phone and if they had been able

12   to see that phone to verify that it did, might you have been

13   in violation of your release conditions?

14   A     I guess.

15   Q     And isn't that why you didn't return for your trial

16   date in October along with the fact that you --

17   A     It wasn't over a cell phone, no.

18   Q     And didn't you also not return for your trial date

19   because you knew you were guilty of these charges?

20   A     No, I had work to do.  I was called and -- my attorney

21   called me in August and he said, the trial's not going to go

22   through, the Canadians haven't provided the disclosure and he

23   basically told me the case was over.  And then a few weeks

24   later he said, I need you to show up on September 13th.  He

25   didn't really say why, but --

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 662 of 890
**A652**
Case 5:11-cr-00602-GTS   Document 167   Filed 05/30/14   Page 214 of 246

Joseph Jenkins - Cross

623

1    Q    How about October 18th?  Your attorney advised you to

2    show up on October 18th, right?

3    A    He did not, because all of our correspondence went

4    through the attorney in Geneva.  I have new attorney

5    paperwork to confirm that he sent me a notice to show up on

6    the 13th of September and he was really expecting a stay in

7    the proceedings because -- just gone too long, it was more

8    than over twice the amount of time it should have been for me

9    to have a trial and they still didn't have -- apparently they

10   still didn't have the forensic report done.

11   Q    Let's address that because you indicate it was more

12   than twice the time to have a trial, that motion was actually

13   denied, right, so the court found that there was nothing

14   improper about the time that it took to bring your case

15   before the court?

16   A    Well, I --

17   Q    Yes or no, sir, was it denied?

18   A    It was denied.

19   Q    And after it was denied, even though you'd been

20   complaining about the length of the delay, you in fact

21   yourself asked for an adjournment?

22   A    No, I did not.

23   Q    You didn't ask for an adjournment on October 18th?

24   A    No.

25   Q    You didn't make numerous attempts to try to get an

Joseph Jenkins - Cross                                    624

1    adjournment?

2    A      Well, I don't remember what was going on, he just told

3    me that -- he told me to show up on September 13th and that

4    was it.  We had work scheduled on October 18th, I was

5    actually -- we were actually doing some work for an attorney

6    from Syracuse, a real estate attorney had couple houses on

7    Seneca Lake and we were putting backup generators in, that's

8    what I remember.  I remember when I got -- I think the

9    attorney called me on October 18th and said that they denied

10   your stay and issued a warrant for your arrest.

11   Q      Sir, I'm approaching and handing you what's been now

12   marked as Government's Exhibit Number 19, I'm going to ask

13   you if you recognize this letter.  Do you recognize that

14   letter?

15   A      Yes, looks like mine.

16   Q      Was that letter actually --

17   A      That's from my attorney.

18   Q      Who's on the letterhead?

19   A      It's Steven J. Edgley, it's addressed to me.

20   Q      The attorney you've been referring to, and I'm going to

21   retrieve the item from you, the attorney that you've been

22   referring to is Steven J. Edgley, the attorney you've been

23   talking about who was your barrister and solicitor

24   representing you in Canada?

25   A      I didn't hear the last --

Case 5:14-cr-00088-EAW Document 79-21 Filed 01/12/16 Page 664 of 890
A654
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 216 of 246

Joseph Jenkins - Cross

625

```
1    Q     Was he your attorney in Canada?

2    A     Yes.

3    Q     And did he write you a letter on October 20, 2010,

4    indicating, "Dear Sir," addressed to you, "I am writing to

5    confirm that I attended court in Brockville on your behalf on

6    October 18, 2010.  This was the date scheduled for

7    continuation of your trial.  Your name was paged both inside

8    and outside the courtroom three times and you were not in

9    attendance."  Goes on to say, "You had instructed me to

10   request an adjournment of the trial so that you could

11   consider your options.  I made the request.  However, it was

12   denied."

13              Do you recall getting that letter?

14   A     Yes, it came over -- excuse me.

15   Q     Did you receive the letter, sir, was this something

16   that you received?

17   A     Yes, I did.

18   Q     But is it your testimony today that you were not trying

19   to get the case continued?

20   A     I don't remember how we left it, I had two attorneys I

21   hired to work on and they told me to show up on the 13th, I

22   showed up on the 13th, they never told me to show up after

23   that.

24   Q     Well, let's clarify that because I believe earlier you

25   indicated they told you not to show up; do you remember
```

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 665 of 890
A655
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 217 of 246

Joseph Jenkins - Cross                                    626

1    saying that, that your attorney told you not to show up?

2    A     I don't know what was going on, the Canadians had

3    things so screwed up, I really didn't know.  I hired two

4    attorneys to work on it, I was sent a notice to appear on the

5    13th, they schedule the trial six months in advance, it was

6    blocked off on my calendar, I showed up on the 13th.

7    Q     I'm asking you, were you instructed by your lawyer

8    Steven Edgley not to appear on October 18, 2010, as you

9    testified earlier?

10   A     Not to appear?

11   Q     Right.  Did your attorney tell you not to appear?

12   A     I wasn't told to appear, I thought he was going to

13   appear on my behalf.  I was not told to show up on the 18th.

14   He didn't -- on the 13th he said it's mandatory, I need your

15   appearance and I didn't receive any such letter on the 18th.

16   Q     We played a call in this courtroom today and I believe

17   on the call it's between you and your mother; did you

18   recognize the voices on the call?

19   A     Yes.

20   Q     That's you?

21   A     Yes.

22   Q     That's your mother?

23   A     Yes.

24   Q     And on the call, if we could play that, please.

25              (Telephone call played.)

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                                    627

1   Q      Now earlier in your testimony, it was suggested that we

2   might not have heard everything.  Do you recall that?

3   A      You left out the part about the lawyer, the lawyer'd

4   just been there.

5   Q      Why don't we play what's after that.

6               (Telephone call played.)

7   Q      Was that also you?

8   A      Yes.

9   Q      And you indicate on here that you've been telling

10  people all along and nobody chooses to believe you, so when

11  you've told people about this, no one believed you that it

12  wasn't -- nobody believes you?

13  A      I was going off the Canadian forensic report.  I hadn't

14  seen -- Jeff Parry put it in front of me and then disappeared

15  and I was trying to get ahold of it.  He put it in front of

16  me and I just saw that, um, like I said, they only found -- I

17  think they found something like five classified images as

18  child pornography, that were deleted on the computer

19  somewheres.

20  Q      When you say nobody believed you, does that include

21  your father?

22  A      I don't remember what the "believe me" part was, but my

23  parents were at that bail hearing and it was exactly what I

24  said it was, you running your mouth that there were 3800

25  pictures on there and that's not what the forensic report

Joseph Jenkins - Cross

628

1    said from Canada.

2    Q    When you say "you", are you referring to me?

3    A    I believe it was you, yes.

4    Q    So when you're saying, talking about a prosecutor

5    talking about these images, you weren't referring to the

6    Canadian process, you were referring to the American process?

7    A    I was referring to the Canadian -- well, the Canadian

8    report's a bit different from what yours was.  Quite night

9    and day different.

10   Q    Why don't we talk about that because you've mentioned

11   the Canadian report.  You've mentioned that it's different,

12   right?

13   A    It's very different.

14   Q    And are there some areas where the Canadians identified

15   more child pornography than the Americans did?

16   A    Not that I'm aware of.

17   Q    Not that you're aware of?  With regard to the

18   4-gigabyte thumb drive, do you recall that?

19   A    I honestly didn't pay much attention to the thumb

20   drives, I was only interested in what's on the computer, I

21   don't know anything about the thumb drives.

22   Q    Well, that was asked on the examination of Agent

23   Braisted, do you recall that, and you're indicating that

24   these reports are wildly different, isn't that your

25   testimony?

Joseph Jenkins - Cross                    629

1   A     Yes, they are.

2   Q     Are you aware and were you present in the courtroom

3   when Officer Wohlert indicated that he found 1,644 images of

4   suspected child pornography but that he stopped because he

5   hit a saturation point; do you recall that testimony?

6   A     Yes, I recall from Canada, too.

7   Q     Isn't it true, sir, that one of the reasons why the

8   numbers are different is because they stopped looking, they

9   had found enough images of child pornography?

10  A     They failed to complete the investigation.

11  Q     And that's the motion that you brought before the

12  Canadian authorities and they denied it?

13  A     Yeah, apparently they did.

14  Q     By they, I mean the court system considered your

15  motion, considered the arguments and denied them?

16  A     Well --

17  Q     Yes or no, sir, are you aware of whether the court

18  denied the motion?

19  A     Yes, I just read about it recently, but yes, they did.

20  Q     Compaq computer, is that your computer?

21  A     Yes.

22  Q     Are you aware, sir, that part of the Canadian report

23  found a video of child pornography on the Compaq computer?

24  A     Yes, there was one in deleted space.

25  Q     That's where they found it?

Joseph Jenkins - Cross

630

1  A     Yes.

2  Q     And when the Americans did the imaging, they didn't

3  count that video, right?

4  A     I don't know, it was my understanding it was returned

5  and it wasn't working.

6  Q     Well, sir, you have indicated that these reports are

7  different somehow; isn't it true that one of the differences

8  on the Compaq computer, they identified a video of child

9  pornography?

10  A     Apparently, that's what they said, that's what they

11  said, if they did, they did.

12  Q     In each of the other media that was analyzed, both

13  reports indicate the presence of child pornography, isn't

14  that correct?

15  A     Which ones, the Canadian?

16  Q     In all the other remaining media, the Canadian report

17  and the American report, aside from the 2-gigabyte thumb

18  drive, there's no testimony on that from either country,

19  there was child pornography found on both, on the 8-gigabyte

20  thumb drive, 4-gigabyte thumb drive, the Toshiba laptop, and

21  the Compaq laptop?

22  A     Again, I -- the thumb drives, I can't really comment

23  on.

24  Q     You can't really comment on it because of the presence

25  of child pornography on there?

Joseph Jenkins - Cross

631

1    A     I don't know anything about the thumb drives.  They
2    found adult pornography on the computers from the Canadian
3    report, you didn't include that.
4    Q     Is that not included, sir, because it's actually not
5    child pornography, is that right?
6    A     It would have been helpful, somebody looking for adult
7    pornography might not always be interested in child
8    pornography.
9    Q     So you find fault with the American report that only
10   categorized the images and videos of child pornography?
11   A     Just that you've pulled out child pornography, yes.
12   Q     They pulled out child pornography?
13   A     Well, the Canadians had to do -- the Canadians, their
14   process is different, they have to make full disclosure, so
15   they have to report everything that's on there which
16   includes, you know, personal pictures and everything else.
17   Q     Isn't that true because part of their process includes
18   classification, do you recall that testimony, that they
19   actually take all of the images as part of their process and
20   classify them, they classify them to category 1 and so on?
21   A     Yes.
22   Q     That their process --
23   A     That Wohlert testified to that, at the September 13th,
24   2010 hearing.
25   Q     And do you also recall that part of his testimony was

Joseph Jenkins - Cross                      632

1    that in that classification process where there are videos or

2    images of a child who has attained puberty, they will

3    classify that as adult pornography; do you recall that?

4    A     Yes, I believe you just said that.

5    Q     Now, you indicated on direct examination that you have

6    people that work for you, right?

7    A     Yes.

8    Q     And these people, they have access to your e-mail?

9    A     Yes.

10   Q     They have -- did they have access to your Toshiba

11   laptop?

12   A     Yes, that was in the basement.

13   Q     Was that --

14   A     At one of the desks.

15   Q     Was that part of a function of work, is that you had

16   people that worked for you so as part of working for you,

17   they would have access to your computers?

18   A     Yes, it was, I testified to that.  There's a few people

19   that have access to the garage and they can access the

20   basement.

21   Q     Okay.  And while we're talking about testimony, do you

22   recall in September of 2010, appearing in the Brockville

23   Courthouse in Brockville, Ontario?

24   A     Yes.

25   Q     And do you recall as part of the motion that you made

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                                          633

```
1    complaining of delay, that one of your bases of that

2    complaint was how the delay had impacted you; do you recall

3    giving testimony about that?

4    A     Yes.

5    Q     And do you recall when you gave testimony with regard

6    to that you indicated that there were two people, two other

7    employees that worked with you?

8    A     Yes, that -- like I was explaining before, there's -- I

9    take guys on when I need them, I don't really employ anybody

10   full -- well, there are a couple of guys, one guy I keep on

11   full time and then there's two others, I alternate, but they

12   do have access to -- three people have full access.

13   Q     Do you recall giving testimony that it was very

14   difficult for you to keep functioning in your work because

15   you had to hire somebody to do the computer work because you

16   would normally do it yourself?

17   A     Right.

18   Q     You recall giving that testimony?

19   A     Yes.

20   Q     And so when you were asked about invoicing, accounting

21   programs, and purchasing items and purchasing items on the

22   internet, you indicated that that was a function that you

23   performed?

24   A     Yes.

25   Q     And you indicated as part of your complaint of the case
```

Joseph Jenkins - Cross

634

1    not going as fast as you wanted it to go in Canada, that you

2    actually had to hire somebody because ordinarily, no one

3    would have that type of access to your computer to perform

4    those functions for you?

5    A    No, that's not true.

6    Q    All right.  Do you recall being asked -- do you recall

7    being asked, and this is the Matter of Her Majesty The Queen

8    and Joseph Jenkins, Ontario Court of Justice, and I'm

9    referring to page 65.

10         MR. GOLDSMITH:  Just a moment, your Honor.

11   Q    Do you recall being asked this question, "And so, not

12   being able to use, I'm sorry, possess or have any access to

13   the computer or the internet, has that caused any problems

14   for you in your work?"  And do you recall giving the

15   following answer:  "Yeah, it's been very difficult.  I've had

16   to get somebody else to do what I would normally do, I've had

17   to pay someone to do what I normally do myself."  Do you

18   recall that?

19   A    Yes.

20   Q    And that was your answer?

21   A    Yes.

22   Q    Was that under oath?

23   A    Yes.

24   Q    Same oath you took today?

25   A    I believe so, yes.

Joseph Jenkins - Cross                                        635

1    Q      And were you asked the question, "You've had to pay

2    somebody else to do that type of work for you?"  And giving

3    the answer, "Yeah."  Yes?

4    A      Just switching jobs, it wasn't a big deal.

5    Q      So, when you gave this testimony, it was your position

6    then that parties that would be working for you, you

7    identified two, they would not be accessing the internet on

8    your behalf, they would not be accessing your computer to

9    perform the functions of Jenkins Electric, isn't that true?

10   A      No, I mean, like I said, there's people in and out, my

11   house is like a shop, there's people in and out, they go

12   there for materials, they go there and check the e-mail.  If

13   there's one guy that wants something to do, I say go check

14   the house, check the fax machine, see if there's a work order

15   there, we get work orders on --

16   Q      So sir, is it your testimony that you actually don't

17   have to hire anybody else to do that type of work?

18   A      I -- I don't remember what I was -- in Canada.  We mix

19   and match, it's people's nature, they don't like to do

20   physical work, I like to do physical work, I like to go out

21   and climb around, you know, ceilings and dig ditches, other

22   people don't like to do that so I try and delegate it.  If

23   somebody -- if somebody wants to do paperwork, if it's a

24   basic estimate, you know, they could do it.  I'd rather go

25   out and work, I don't want to do paperwork.

Case 5:14-cr-00088-EAW Document 79-6 Filed 01/12/16 Page 675 of 890
A665
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 227 of 246

Joseph Jenkins - Cross

636

1   Q    I guess what I'm asking seems also mixed and matched.

2   Do you have to hire someone else to do your invoicing,

3   programming, and all the functions that you indicated

4   September of 2010 when you cannot do it yourself?

5   A    No, I don't have to hire anybody, I just have to --

6   rather than pay them to go out and work, I pay them to work

7   in the office, I don't remember really, what that testimony

8   was about, but --

9   Q    Well, do you remember if you told the truth or not?

10  A    I always tell the truth, lady, I don't lie.

11  Q    So which is it today?

12       MR. GOLDSMITH:  Objection.

13  A    I'm not lying, I didn't -- nothing to hide I've

14  disclosed all my paperwork from Canada, attorneys' letters,

15  transcripts.  I'm not hiding anything, I'm up here

16  testifying, what am I --

17  Q    And during your testimony didn't you indicate that it

18  was Agent Chad Willard who on September 13, 2010 subjected

19  you to a two-hour delay and search that you were quite

20  animated about; wasn't that your testimony today?

21  A    Yeah, I remember him.

22  Q    You remember Agent Chad Willard on September 13, 2010

23  stopped you at the border?

24  A    Yes.

25  Q    And was that the time that they were looking for the

Joseph Jenkins - Cross                                637

1    phone?

2    A    He wasn't -- he didn't stop me, somebody else stopped

3    me.

4    Q    But he was present?

5    A    I believe he was working the counter, yes.

6    Q    And at all times they had indicated exactly what they

7    were looking for, right, they were looking for this cell

8    phone?

9    A    Yes.

10   Q    When you were approached in Canada, and you -- when you

11   were asked if you downloaded child pornography, do you recall

12   that you indicated, not to my knowledge?

13   A    Yes, that was a true answer.

14   Q    So the first time that anyone tells you and suggests to

15   you that what they're looking at on your computer, your

16   devices, is child pornography, and you're asked about it,

17   your response was, not to my knowledge?

18   A    Yes, it was.

19   Q    You didn't say no, child pornography, are you kidding

20   me?  No, nothing like that?

21   A    I just said -- you just asked me, have you -- whatever

22   you said, said no, not to my knowledge.  I mean what -- I

23   didn't really think there was a more appropriate answer.

24   Q    Do you recall sitting down with Marie-Josee Vinette,

25   the female investigator, do you recall sitting down with her

Case 5:14-cr-00088-EAW Document 79-12 Filed 01/12/16 Page 677 of 890
A667
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 229 of 246

Joseph Jenkins - Cross

638

1  and her asking you if you knew what child pornography was?

2  A    I don't remember that, no.

3  Q    Do you recall her telling you that she found child

4  pornography on media devices in your truck and your reply

5  was, you asked to speak to your parents?

6  A    No, I don't remember that.

7  Q    Well, how about this.  Did you tell any of these

8  Canadians, listen, there are other people that have access to

9  my computers, I don't know, I don't know anything about it

10  but there are lots of other people?  Did you provide names of

11  these other people?

12  A    No, I was under arrest, why would I talk?

13  Q    So what you did is you asked to call, telephone your

14  parents?

15  A    They were expecting me, I asked to use the phone, yeah,

16  I didn't want them coming out looking for me late at night.

17  Q    Do you recall the officers who did the search of your

18  car before you were placed under arrest talking to you about

19  child pornography, saying, hey, listen, we're seeing

20  something here on the computer, do you remember that?

21  A    They never said they saw child pornography on the

22  computer.

23  Q    Do you remember they talked to you about what was

24  contained on your computer?

25  A    No.

Case 5:14-cr-00088-EAW Document 79-9 Filed 01/12/16 Page 67 of 89
A668
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 230 of 246

Joseph Jenkins - Cross

639

1   Q      Do you remember being asked have you had child
2   pornography on your computer before you were placed under
3   arrest?
4   A      I'm sorry, repeat that.
5   Q      Do you remember being asked if you had child
6   pornography on your computer before you were placed under
7   arrest?
8   A      Yes, I stated not to my knowledge or no, they -- I
9   can't remember what they said, if you've ever downloaded or
10  viewed it, whatever they said, I said no.
11  Q      And at that time, did you say, there are other people
12  that have access to my computer, it's not mine, I don't know
13  anything about this, or did you express any alarm, concern,
14  let them know where it came from or who had access to your
15  computer?
16  A      No, I wouldn't have acted like that, no.
17  Q      You just indicated, not to my knowledge?
18  A      That's what I said, there wasn't -- not to my
19  knowledge, I wouldn't think anybody would do that.
20  Q      Do you recall -- do you recall when you were in the
21  Cayuga County Jail also having conversations with your
22  father?
23  A      I called him a couple times a week, got to be more
24  specific.
25  Q      How about May 7th, 2012, do you recall talking to your

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Joseph Jenkins - Cross                     640

1  father?

2  A     Not any specific conversation.

3  Q     Do you recall talking to your father and your father

4  telling you you shouldn't have had that crap on your

5  computer?

6  A     I -- no, I don't.

7  Q     And if we were to play that call for you, would you

8  recognize your father's voice?

9  A     Yeah.

10  Q     This would be off of Exhibit 10D.

11              (A telephone call on Government Exhibit

12               No. 10D was played.)

13  A     That was probably some argument over an attorney, I was

14  getting, you know, these people, they just, they throw you in

15  jail and you don't have any access to anything, and it's very

16  frustrating, lose everything you have, you get bullied and --

17  like to go over some of that correspondence with you --

18  Q     Sir, I don't recall that question being before you.  Is

19  that your dad's voice on that call?

20  A     Yes, we --

21              MS. THOMSON:  I have nothing further.

22              THE COURT:  Counsel, any redirect?

23              MR. GOLDSMITH:  No, your Honor, I have no redirect.

24              THE COURT:  Okay.  Ladies and gentlemen, I'm going

25  to excuse you for the day.  I'm going to instruct you please

Case 5:14-cr-00088-EAW Document 79-4 Filed 01/12/16 Page 680 of 890
**A670**
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 232 of 246

641

1    don't talk about it with anybody, if anybody approaches you,

2    tries to talk to you about this case, I need to know about it

3    immediately.  Do not read, listen, view anything to do with

4    this case, and please be in the jury room to get started at

5    9:00, we'll see you then, okay.  Have a good night, travel

6    safe, please.  I think it's supposed to be okay tomorrow.

7                     (Jury Excused, 4:18 p.m.)

8              THE COURT:  Okay.  You may step down, sir.  The

9    record should reflect that the jury's left the room and the

10   defendant is leaving the stand with the jury not being

11   present in the courtroom.  Can you give us an indication,

12   Mr. Goldsmith, if you're going to call any other witnesses?

13             MR. GOLDSMITH:  No other witnesses.

14             THE COURT:  Defense is going to rest?

15             MR. GOLDSMITH:  Defense will rest.

16             THE COURT:  Okay.  I will have you rest in front of

17   the jury in the morning.  Have either of you had an

18   opportunity to review the charge?  You've had an opportunity,

19   it's been with you.

20             MR. GOLDSMITH:  I've had some opportunity to

21   review, yes.

22             THE COURT:  Okay.  So why don't we take a brief

23   break in case anybody needs to use the facilities, and I want

24   to try and do a charge conference before we break for the

25   day, so that we're prepared for tomorrow morning, defense

642

```
1    will rest, we'll do our closing arguments, and I will charge

2    the jury at the conclusion of the closing arguments.  Okay.

3    So about five, ten minutes.

4              MR. GOLDSMITH:  Thank you.

5              THE COURT:  All right.

6              THE CLERK:  Court's in recess.

7                   (Court in recess, 4:20 p.m. to 4:28 p.m..)

8                   (Open Court.)

9              THE COURT:  All right.  The record should reflect

10   we're in the courtroom without the jury, the jury's been

11   excused for the day and we're going to do a charge conference

12   with regard to the jury instructions to be given in this

13   case.

14              Counsel, what I'd like to do is, I'll go through it

15   by section, and you just indicate to me whether you have any

16   requests or objections to particular charges in the sections

17   as we go through.  I'll start with the government and then,

18   Mr. Goldsmith, I'll go to you on behalf of defendant, and I

19   find that's probably the most efficient way to go through and

20   if there's a section where you say, well, Judge, I object to

21   this or I like that, we'll deal with it as we go through,

22   okay.  So I'm going to use the table of contents and then

23   I'll flip to the section if there's a particular objection or

24   a request.

25              Starting with the introduction section which
```

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 682 of 890
A672
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 234 of 246

643

1    describes the roles of the court and the jury, the role of

2    the attorneys, and the government as a party, are there any

3    requests or objections to that section by the government?

4              MS. CARROLL:  No requests or objections.

5              THE COURT:  Okay.  Mr. Goldsmith?

6              MR. GOLDSMITH:  No requests nor objections.

7              THE COURT:  Okay.  Let's go to the nature of the

8    evidence.  It includes subsections, testimony and exhibits,

9    direct and circumstantial evidence, indictment is not

10   evidence, potential punishment is not evidence.  For the

11   government, any requests or objections?

12             MS. CARROLL:  No requests, no objections.

13             THE COURT:  Mr. Goldsmith?

14             MR. GOLDSMITH:  No requests nor objections.

15             THE COURT:  Okay.  Let's go to evaluation of

16   evidence.  It's a larger section and I'll go through the

17   subsections.  Verdict based on evidence, not sympathy,

18   improper considerations, race, religion, national origin, sex

19   or age, quality not quantity of evidence, credibility of

20   witnesses, testimony of law enforcement witnesses, pretrial

21   statements of the defendant, testimony of the defendant, use

22   of evidence obtained, expert testimony, transcript of audio

23   recording, particular investigative techniques not required,

24   and variance in dates immaterial.  For the government, any

25   requests or objections in that section?

1          MS. CARROLL:  None, your Honor.

2          THE COURT:  Mr. Goldsmith?

3          MR. GOLDSMITH:  No objection, however, we would

4    request a missing witness charge as to Detective Sergeant

5    Michael Harrington out of the Ontario Province Police.  This

6    is the individual who was the Canadian forensic expert who

7    performed the forensic studies on the computer that had been

8    referred to in testimony by special agent, Detective Agent

9    Braisted and by Mr. Jenkins today.  I believe he qualifies,

10   he was under the control -- or withdrawn.  I believe he

11   qualifies that there was not equal opportunity by the parties

12   to reach out and call him as a witness in that all of the

13   Canadian witnesses defendant did not have the opportunity to

14   subpoena and the government chose not to call him.  I think

15   that his testimony would have been relevant as to his

16   findings in that forensic evaluation and I believe that it

17   could be properly inferred that some of the evidence that he

18   could have discussed as part of his findings could have been

19   deemed to be favorable to defense.

20         MS. CARROLL:  Your Honor, in order to warrant

21   missing witness instruction, the defendant has to make out

22   the burden that the government is the cause of the witness'

23   absence; the government did something to make the witness

24   unavailable.  As this court knows, that witness is in fact

25   not within the subpoena power of this court or the United

1    States government and so it was by grace alone that the

2    Canadians agreed to appear, grace and MLATs.  The government

3    has no ability to compel Detective Harrington's testimony or

4    presence in this courtroom.

5         Beyond that, the government did nothing to make it

6    impossible for Detective Harrington to appear.  Detective

7    Harrington, as the testimony in the trial established, is on

8    long-term disability leave and is not currently working and

9    is not actually on duty and available to even Canadian

10   prosecutors at this point.  He's out on disability leave and

11   is unavailable for that reason, not because of anything the

12   government did or caused to be done.

13        THE COURT:  Okay, that request will be denied.

14   Let's go to the section burden of proof.  Any requests or

15   objections by the government?

16        MS. CARROLL:  None, your Honor.

17        THE COURT:  Mr. Goldsmith?

18        MR. GOLDSMITH:  None.

19        THE COURT:  We're going to go to section 5 which is

20   the substantive law, it has subsections of Count 1,

21   transportation of child pornography which includes

22   instructions on first, second, third, and fourth element,

23   then it goes on to subsection B, Count 2, possession of child

24   pornography and it gives first, second, third elements, and

25   then venue requirement for both counts, and it ends with the

Case 5:14-cr-00088-EAW Document 70-01 Filed 01/12/16 Page 685 of 890
A675
Case 5:11-cr-00602-GTS  Document 167  Filed 05/30/14  Page 237 of 246

646

1    forfeiture allegation instruction.  Any requests or

2    objections from the government?

3              MS. CARROLL:  One request, your Honor.  On

4    subsection 5B, actually 5, 5B, C, subsequent --

5              THE COURT:  You're looking at subsection 5C, venue

6    requirement for both counts.

7              MS. CARROLL:  Yes.

8              THE COURT:  On page 30.

9              MS. CARROLL:  Yes.  In the paragraph that begins,

10   "You are instructed that the Northern District of New York

11   includes, among other places, Syracuse, Binghamton, Oswego,

12   Watertown, Plattsburgh, Albany, and Utica, New York.  It also

13   includes the counties and land running along St. Lawrence

14   River.  The government would just request the inclusion of

15   the language, it also includes the counties and land running

16   along St. Lawrence River, including Jefferson County, period.

17             THE COURT:  Jefferson County.  Okay.  Anything

18   else?

19             MS. CARROLL:  That's it, your Honor.

20             THE COURT:  Mr. Goldsmith, any requests or

21   objections?  And I'll ask you that first and then I'll ask

22   you if you want to be heard on the government's request.

23             MR. GOLDSMITH:  I do have a request under Section

24   5A.  Section 5A, page 25, it's under the fourth element,

25   knowledge.  There is an instruction that allows for evidence

1    of flight to be inferred for consciousness of guilt.  I

2    don't -- obviously there was testimony in this trial about

3    the defendant's flight from Canada, but not flight from

4    authorities in the United States.  I think that could be

5    confusing for the jurors to try and weigh whether that was

6    appropriately admissible toward consciousness of guilt

7    because, again, we had all this testimony about him not

8    returning to Canada, but there was nothing discussed about

9    him attempting to flee at any point the United States, in

10   fact a lull, I just think it's going to confuse them and I

11   request it be stricken.

12          THE COURT:  I'm not following your argument.

13   Consciousness of guilt charge is with regard to him not

14   returning to Canada for his trial, so, and that testimony is

15   clearly in the record, I don't think you dispute that.

16          MR. GOLDSMITH:  No, I'm not disputing that.  I just

17   think that between the different -- between the discussions

18   held about him failing to appear in Canada, but there's no

19   evidence in the United States, typically this instruction is

20   used when the defendant attempts to flee from prosecution of

21   the indicted offense in the jurisdiction and I think it's

22   going to be confusing on the part of the jurors.

23          THE COURT:  You want to be heard?

24          MS. CARROLL:  Yes, your Honor.  It's actually not

25   the case that it has to be the same set of charges from which

1    the defendant flees that gives rise to the consciousness of

2    guilt instruction.  An example would be if an officer is

3    about to arrest someone for burglary and they run from the

4    officer and that person is ultimately indicted on larceny and

5    not burglary but it's the same operative set of facts, a

6    consciousness of guilt instruction would still be warranted.

7    What we're talking about here is flight based on the same

8    operative set of facts.  Whether the prosecutorial authority

9    is Canadian or United States makes no difference, we're

10   talking about a defendant fleeing a jurisdiction because he

11   was conscious of his guilt of the conduct of which he was

12   accused.  And the same operative set of facts form the basis

13   for the Canadian charges as form the basis for the U.S.

14   charges.

15            THE COURT:  And the only thing we're saying with

16   the instruction is that the jury can consider that if they

17   find facts which they deem credible that establish that fact

18   and how they should consider it should they find such facts.

19   So yeah, I don't see that it would be confusing.  I think

20   it's clear from the record, it's whether the jury chooses to

21   accept or reject that testimony as being credible.  The

22   defendant has testified and given his reasons for not showing

23   up in Canada, which the jury can choose to accept or reject

24   and also, you know, obviously the government has the right

25   and I believe based on the evidence to make the argument that

1   the reason he didn't return was because of a consciousness of

2   guilt and fear of prosecution.

3            So I think it's appropriate, I don't think it's

4   confusion -- confusing, I'm going to deny the request and

5   it's going to be charged.  Anything else, requests or

6   objections?  And then if you'd like to address the

7   government's request that Jefferson County be included in the

8   venue.

9            MR. GOLDSMITH:  Well, I'll just say I have no

10  objection to the inclusion of Jefferson County.

11           THE COURT:  And I'll tell you I'm inclined to do

12  it, I think it's appropriate.  That's what the indictment

13  alleges and certainly to point out to the ladies and

14  gentlemen of the jury in that venue area, that Jefferson

15  County is part of the Northern District of New York is

16  completely appropriate, so we're going to add that.

17           MR. GOLDSMITH:  All right.  Further in the section

18  under subsection D of the forfeiture allegation.

19           THE COURT:  Yes, sir.

20           MR. GOLDSMITH:  The first paragraph on page 31 says

21  if you found defendant guilty of the offense, I think it

22  should be, of the offense charged in Count 1 and/or the

23  offense charged in Count 2 of the indictment, you will need

24  to consider a further question.  In the pretrial conference,

25  we had discussed whether there was going to be a bifurcated

1    hearing as to the forfeiture counts.  I had indicated to the

2    court that it is my experience that a forfeiture hearing is

3    something that I would request under the circumstances, and

4    it's also something that in my experience I've experienced in

5    prior trials where forfeiture is an allegation.  Based upon

6    the language, and also based upon the proposed verdict form

7    being inclusive of both, the substantive as well as the

8    forfeiture counts, is it the court's intention to hold a

9    separate forfeiture hearing or to have the jury deliberate at

10   the time for everything together?

11            THE COURT:  It was my intention to have them

12   deliberate together, my recollection of the pretrial was

13   that's what you requested.  You did not?

14            MR. GOLDSMITH:  No, I said it was usually my

15   practice, that in my experience that we had actually

16   litigated it fully.

17            THE COURT:  Hold on a second.  Okay.  Go ahead, I'm

18   sorry to interrupt.

19            MR. GOLDSMITH:  No, I'm --

20            THE COURT:  You're done?

21            MR. GOLDSMITH:  I'm done as far as that particular

22   request.

23            THE COURT:  Government want to be heard?

24            MS. CARROLL:  Really it's of no significance one

25   way or the other to the government.  I suppose, you know, for

1    the sake of the jury, it might be nice for them to be able to

2    reach both the forfeiture allegation and the substantive

3    counts during the same deliberative process, but I'm happy to

4    defer to the defendant's request.  It would be the

5    government's intention simply to refer the jury to the

6    evidence they heard at trial and not to put on any additional

7    witnesses or testimony of any kind.

8              THE COURT:  So that would be the nature of your --

9    of a hearing, you would just request to make a statement or

10   an argument to the jury?

11             MS. CARROLL:  Yeah, we would just offer, basically

12   give a proffer to the jury.

13             MR. GOLDSMITH:  If that's the nature of their

14   hearing, then that's their decision to conduct the hearing if

15   we get there, so --

16             THE COURT:  Okay.  But what you're saying is on

17   behalf of your client, you prefer to have --

18             MR. GOLDSMITH:  I would prefer that it be

19   bifurcated and accordingly that the verdict form --

20             THE COURT:  Be changed.  Separate and changed and

21   move this instruction and unless and until they find him

22   guilty of Count 1 or Count 2 --

23             MR. GOLDSMITH:  I think so, yeah.  Or I also, I

24   mean I think that the court can charge the forfeiture as long

25   as it's -- as long as there's definitive language after the

1    comma where it says, where it has the conditional language,

2    if you have found the defendant guilty of either of those

3    offenses, then perhaps substituting some language instead of

4    you will need to consider, how about you will be asked to go

5    back and consider or separately consider, something of that

6    nature so that the court doesn't have to then issue a

7    separate forfeiture instruction prior to the forfeiture

8    hearing.

9                    (A discussion was held off the record between

10                   The Court and the law clerk.)

11              THE COURT:  Well, Mr. Goldsmith, if you're

12   requesting that it be bifurcated on Mr. Jenkins' behalf, we

13   can certainly do that.  We won't include this language, and

14   you know, we can hold a separate hearing when and if there is

15   a guilty verdict on either of the first two counts and that's

16   what we'll do.

17              MR. GOLDSMITH:  Thank you.

18              THE COURT:  The government has the burden, I would

19   say, I'm not a hundred percent convinced of what you need to

20   do in that hearing but I'm sure you can establish what you

21   need to do as far as your burden goes regarding the

22   forfeiture and we'll deal with it in that manner.  Okay.

23              MR. GOLDSMITH:  Okay, thank you.  And will the

24   court be segregating the verdict form?

25              THE COURT:  Yes.

653

1          MR. GOLDSMITH:  Thank you.  And then finally on

2   page 32, same section under forfeiture, the large paragraph

3   in the second, or the bottom half refers to controlled

4   substances.  Middle sentence, includes but is not limited to

5   property that was used or intended to be used to purchase,

6   manufacture, transport, store, conceal, or protect controlled

7   substances --

8          THE COURT:  Yeah, that's --

9          MR. GOLDSMITH:  -- used in the offense.

10          THE COURT:  That shouldn't be in there, obviously.

11          MS. CARROLL:  No objection, your Honor, if you want

12   to change it to contraband, I think that would do the trick.

13          THE COURT:  That's what we'll do.  Anything else?

14          MR. GOLDSMITH:  Nothing further.

15          THE COURT:  Okay.  There's only I believe one

16   section left and that's the conclusion.  Any requests or

17   objections in that legal instruction for the government?

18          MS. CARROLL:  None, your Honor.

19          MR. GOLDSMITH:  None, your Honor.

20          THE COURT:  Very well.  The appropriate revisions

21   will be made and you'll be provided with a new copy of the

22   charge with these changes will be placed on your counsel

23   table in the morning.  Okay?

24          MS. CARROLL:  Thank you, your Honor.

25          THE COURT:  Anything further for the government?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Case 5:14-cr-00088-EAW Document 202 Filed 01/12/16 Page 693 of 890
A683
Case 5:11-cr-00602-GTS Document 167 Filed 05/30/14 Page 245 of 246

654

1          MS. CARROLL:  Nothing.

2          THE COURT:  Mr. Goldsmith?

3          MR. GOLDSMITH:  Nothing.

4          THE COURT:  Okay, we'll see you in the morning,

5     9:00.

6          THE CLERK:  Court's in recess.

7               (Court Adjourned, 4:47 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

 4     Realtime Court Reporter, in and for the United States

 5     District Court for the Northern District of New York, DO

 6     HEREBY CERTIFY that pursuant to Section 753, Title 28, United

 7     States Code, that the foregoing is a true and correct

 8     transcript of the stenographically reported proceedings held

 9     in the above-entitled matter and that the transcript page

10     format is in conformance with the regulations of the Judicial

11     Conference of the United States.

12

13                    Dated this _____day of _____.

14

15

16                         /S/ JODI L. HIBBARD_____

17                         JODI L. HIBBARD, RPR, CRR, CSR
                           Official U.S. Court Reporter
18

19

20

21

22

23

24

25
```

```
                        VOLUME IV
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                            5:11-CR-602

JOSEPH VINCENT JENKINS,

                        Defendant.

-------------------------------------------x
```

       Transcript of a Jury Trial held on February 6,

2014, at the James Hanley Federal Building, 100

South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.


                    A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  TAMARA THOMSON, ESQ.
                           GWEN CARROLL, ESQ.

For Defendant:      AARON M. GOLDSMITH, ESQ.
                    Attorney at Law
                    225 Broadway
                    Suite 715
                    New York, New York  10007



                *Jodi L. Hibbard, RPR, CSR, CRR*
            *Official United States Court Reporter*
                   *100 South Clinton Street*
                *Syracuse, New York  13261-7367*
                      *(315) 234-8547*

656

```
1

2                    I N D E X   O F   T E S T I M O N Y

3

4    Witnesses              Direct    Cross    Redirect    Recross

5

6    Chad Willard             658       --        --          --
     recalled
7                             752       753       --          --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Open Court, Jury Out, 9:07 a.m.)

 2          THE COURT:  Good morning.  Counsel, it's still your

 3     intention to rest?

 4          MR. GOLDSMITH:  Yes.

 5          THE COURT:  Okay.  Then what we're going to do is

 6     we'll bring the jury in, we'll let you rest your case before

 7     the jury, and then we'll start with closing arguments.  Go

 8     ahead.

 9          MS. THOMSON:  We do have one very brief rebuttal

10     witness.  We have one additional witness.

11          THE COURT:  Oh, you have, you want to call a

12     rebuttal witness, okay, we can do that.  And then we'll do

13     closings.  Regarding closings, are you going to reserve time

14     for rebuttal or how do you want to --

15          MS. CARROLL:  Yes, I think so, your Honor.  Ten

16     minutes.

17          THE COURT:  Okay.  I'm not asking how much time, I

18     just want to see if you were -- okay, that's fine.  You can

19     do a rebuttal.  All right.  If everybody's ready, let's bring

20     the jury in, please.

21              (Jury Present, 9:08 a.m.)

22          THE COURT:  Good morning, ladies and gentlemen.

23     Traveling a little easier this morning?  It's good to see you

24     all here.  Hopefully you had a nice night, all rested and

25     ready to go.  Mr. Goldsmith, does the defendant wish to call
```

658

1    any more witnesses?

2            MR. GOLDSMITH:  No, your Honor.  At this time,

3    defense rests.

4            THE COURT:  Okay.  Defense has rested its case.

5    Does the government have any rebuttal witnesses?

6            MS. THOMSON:  Yes, your Honor, would the court like

7    us to call the witness at this time?

8            THE COURT:  Yes, please.

9            MS. THOMSON:  The United States calls to the stand

10   Special Agent Chad Willard.

11           THE CLERK:  You're still under oath.

12           THE COURT:  You can step right up, Special Agent,

13   I'm going to instruct you that you are still under oath.

14           THE WITNESS:  I understand that.

15           THE COURT:  Okay.

16

17           C H A D   W I L L A R D , recalled as a

18   witness and being previously duly sworn, testifies

19   as follows:

20           DIRECT EXAMINATION BY MS. THOMSON:

21   Q     Good morning.

22   A     Good morning.

23   Q     Can you tell us where you work for Homeland Security,

24   where are you physically located?

25   A     Alexandria Bay, New York, I am on the second floor of

Chad Willard – Direct                                    659

1   the port of entry there.

2   Q     When people come to the border from Canada into the

3   United States, are you part of that process, part of their

4   entry into the United States?

5   A     No, I am not.

6   Q     What function do you have at the border?

7   A     I'm a criminal investigator.  If one of the people

8   during their inspections found a violation of federal law, I

9   would be brought into the process, but I do not perform

10  inspections, I do the criminal investigations.

11  Q     Who performs those inspections?

12  A     Customs and Border Protection officers.

13  Q     On September 13th, 2010, did you encounter the

14  defendant Joseph Jenkins at the border?

15  A     No, I did not.

16  Q     Did you ever see him on that day?

17  A     No, I did not.

18  Q     When's the first time you ever saw the defendant?

19  A     On 10/4 of 2011 when I arrested him at his parents'

20  home where he resides.

21  Q     On September 13, 2010, had you opened your

22  investigation?

23  A     No, I hadn't.

24        MS. THOMSON:  I have no further questions.

25        MR. GOLDSMITH:  No questions, your Honor.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

660

1          THE COURT:  You may step down, sir.

2                  (The witness was excused.)

3          THE COURT:  Does the government have any further

4    witnesses?

5          MS. THOMSON:  No, your Honor.

6          THE COURT:  Government rests?

7          MS. THOMSON:  Yes, your Honor.

8          THE COURT:  Okay.  Ladies and gentlemen, that

9    concludes the proof in this trial, both sides have rested

10   their case.  The next step is to hear closing arguments, and

11   we're going to do that now, okay.  When you're ready,

12   Counsel.

13         MS. CARROLL:  May it please the court.

14         THE COURT:  I'm sorry?

15         MS. CARROLL:  May it please the court.

16         THE COURT:  Yes, go ahead.

17         MS. CARROLL:  At the beginning of this trial, the

18   government stood in front of you and said the proof would

19   establish beyond a reasonable doubt that on May 24th, 2009,

20   the defendant, Joseph Jenkins, transported and possessed from

21   the United States into Canada images of child pornography and

22   that he did so knowingly.  And that is exactly what the

23   evidence consistently, methodically, and for the most part

24   without any impeachment, established.

25               There are actually seven things that are really not

661

1  up for dispute.  Seven crucial facts that have not been

2  impeached, that the evidence has established, that witness

3  after witness has testified to.

4       The first one is that the person driving that 2003

5  blue Dodge Ram was the defendant.  Joseph Jenkins.  The

6  defendant himself acknowledged that, and you heard from five

7  CBSA officers who all said the defendant was the person

8  behind the wheel of that vehicle.

9       The second is that the defendant was the only

10  person in that vehicle, sole occupant, and the driver.

11       The third is that that vehicle moved from

12  Alexandria Bay in Jefferson County in the United States

13  across the foreign border into Canada to the port of

14  Lansdowne.  No dispute about that.  The evidence showed it,

15  the defendant acknowledged it.

16       The next thing the evidence established and that

17  has not been contradicted is that in the vehicle that the

18  defendant owned and was driving, there was a black Toshiba

19  computer, a black laptop bag containing a silver Compaq, an

20  8-gigabyte USB drive and a 4-gigabyte USB drive.  No dispute

21  about that.  You heard from Officers Johnston, Garrah, Hache,

22  Melany Boyd, that that is exactly what was contained in the

23  defendant's vehicle.  And further, the defendant himself

24  acknowledged it.  Yes, absolutely, that black Toshiba was in

25  the vehicle.  And do you remember when he said what the

662

1    officers said, what Tristan Garrah, what Jarret Johnston,

2    what Glen Hache said was correct, he said, yeah, they were

3    correct, except about him being nervous, but everything else,

4    everything else except about him being nervous, that was all

5    right, that was all true.  Well, each of those officers said

6    that in that defendant's 2003 Dodge Ram, there was a laptop

7    bag containing a Compaq computer and an 8-gigabyte and

8    4-gigabyte USB drive.  So that fact remains undisputed.  In

9    the car defendant owned, the defendant was driving, there

10   were those digital media items.

11           The next fact that is undisputed is that on each of

12   those digital media items, there were images and videos of

13   child pornography.  You heard from certified forensic

14   examiner Brian Braisted who examined the black Toshiba

15   computer and the 2-gigabyte and the 4-gigabyte and the

16   8-gigabyte USB drives, that he found videos and pictures of

17   child pornography on the black Toshiba, on the 8-gigabyte,

18   and the 4-gigabyte.  And that was undisputed.  In fact,

19   that's consistent with what the defendant himself

20   acknowledged.  In that jail call where the defendant says,

21   yes, the numbers are wrong, it's not actually 3800, it's more

22   like a hundred, but the defendant does not dispute the

23   presence of child pornography on the digital media found in

24   his car that he was driving over the border on May 24th,

25   2009.  And the forensics bear out the defendant's admission.

663

1    Brian Braisted testified that on the black Toshiba he found

2    594 pictures of child pornography.  594, in the system volume

3    information and in the thumb caches.  He also told you that

4    he found at least three videos of child pornograhy.

5           Now among those images and videos that Brian

6    Braisted found on the black Toshiba laptop belonging to the

7    defendant, there was a video called Vicky.  You saw a lot of

8    Vicky during this trial.  Not nearly as much as is contained

9    in the whole video clip, but you saw her through more than

10   one witness.  And you heard from Special Agent Joshua Findley

11   that Vicky is a real girl.  At the time that video was made,

12   she was 10 years old.  The video the defendant had on the

13   8-gigabyte USB drive and on the black Toshiba laptop featured

14   Vicky, at 10 years old, being abused by her father.  And you

15   heard from Joshua Findley that that was a real person, that

16   she was a minor at the time the video was taken, that he has

17   met her and that he has talked to her.  And that is the video

18   that Brian Braisted found on the defendant's computer.

19          Also on the defendant's computer, Brian Braisted

20   found something called a Green Bath series image.  You heard

21   from Special Agent Justin Myers that Green Bath is another

22   known victim.  The Green Bath has been circulated all over

23   the internet and that Green Bath, like Vicky, features a real

24   child, a girl who was between 8 and 10 years old at the time

25   that the images found on the defendant's computer were taken,

1     and that those images were taken by her father.  And Brian

2     Braisted confirmed, without impeachment, that Green Bath was

3     present on the defendant's black Toshiba laptop.

4          On the 8-gigabyte USB drive, Brian Braisted found

5     15 child pornography pictures.  15.  And there's no issue

6     there about whether they were stored in a place the defendant

7     couldn't access or if they were somehow cached because they

8     were active.  They were right there.  All you had to do to

9     find those 15 child pornography pictures was plug the USB

10    drive into a computer and double click.  Just like with the

11    Vicky video.  All you had to do was double click on the image

12    in New Folder 2 and up that video pops.  Same thing with the

13    Green Bath picture.  Same thing with the pictures found on

14    the 8-gigabyte USB drive.

15         On the 4-gigabyte USB drive, Brian Braisted

16    testified that he found 3,250 images of child pornography.

17    Sixteen of those images were sadomasochistic.  That means

18    they featured bondage.  He also found 10 video files.  Ten

19    video files readily accessible, all you had to do was plug

20    the USB drive into a computer and double click.  Brian

21    Braisted testified that among those pictures and videos was

22    the Vicky video and the Green Bath video.  The same Vicky

23    video found on the 8-gigabyte USB drive.  Earlier I said that

24    Vicky was found on the black Toshiba.  Vicky was found on the

25    8-gigabyte USB drive and on the 4-gigabyte USB drive.

665

1        On the black Toshiba was a video called KP Nancy.

2   And you heard from Special Agent Chris McClellan about what

3   KP Nancy is.  KP Nancy, yet another well-known, widely

4   circulated child pornography series, portraying a real girl.

5   Chris McClellan met her, confirmed that she was a minor at

6   the time the video was created, he knows her, she is real and

7   she was captured on the video that was captured on the

8   defendant's black Toshiba laptop.  The black Toshiba laptop

9   he fully acknowledged owning.  The black Toshiba laptop that

10  the forensics confirmed he used over and over on a regular

11  basis.  He used it to check e-mail, he used it to send out

12  work estimates, he used it to pay bills online, he used it to

13  get e-mail confirmations of Master Card charges, and he did

14  so as he was looking at images of child pornography.  He used

15  it as part of his integrated system of activity.  Used it for

16  something like a work estimate, watch child pornography,

17  check it for an e-mail, upload a video to the USB drives.

18  Both the forensics and the defendant's admission that there

19  were images of child pornography on that digital media

20  confirm the existence of child pornography on the black

21  Toshiba and the USB drives.

22        You heard a lot during this trial about the

23  Canadian forensic examination.  You heard that there may have

24  been some disparities or some confusion but I want you to

25  remember the testimony of Detective Constable Kip Wohlert.

1  Kip Wohlert, who did the examination in Canada.  Kip Wohlert,

2  who testified that he found 1600 images of child pornography

3  on the defendant's digital media and at that point he reached

4  a saturation point.  It wasn't that he found only 1600 images

5  and there's somehow an inconsistency between Brian Braisted

6  and Kip Wohlert.  No, it was that Kip Wohlert hit 1600 and

7  decided to stop because there were 10,000 more images.  And

8  as he testified, he didn't need to keep looking.  He had

9  reached the limit he needed to get to.  And so he stopped.

10  Brian Braisted kept looking and found more.  That isn't an

11  inconsistency, in fact it completely corroborates the U.S.

12  forensic examination.

13          So those six things are really not up for debate.

14  There is absolutely no factual dispute in the evidence before

15  you about those six facts.  There are, however, three open

16  questions.

17          First one came up during defendant's testimony.

18  Did those USB drives, the 4-gigabyte and the 8-gigabyte,

19  actually belong to the defendant?

20          The second question is, did the defendant knowingly

21  transport child pornography from the United States into

22  Canada?  And again, the emphasis there is on knowingly.  Did

23  the defendant know about the child pornography he was

24  bringing into Canada on those USB drives?

25          And the third open question is, did the defendant

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 707 of 890
A697
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 13 of 113

667

1    knowingly possess the child pornography on the black Toshiba

2    laptop?

3            You will find when you examine the evidence that

4    the answer to all three questions is beyond a reasonable

5    doubt yes.  Yes, the USB drives belonged to the defendant,

6    yes, he knowingly transported child pornography into Canada,

7    and yes, he knowingly possessed child pornography on that

8    black Toshiba laptop.

9            Now in a minute I'm going to talk a little bit

10   about the law and later the court will instruct you on the

11   law.  To the extent that anything I say about the law

12   contradicts or is in conflict with what the court tells you

13   about the law, the court governs.  Listen to the court's

14   interpretation and instructions on the law.  But I'm now

15   going to walk you through the statutes and the elements of

16   the offenses that the government has to establish to you

17   beyond a reasonable doubt.

18           The law is of course a little bit dry and a little

19   bit dense but it is important for you to consider it in your

20   deliberations.  The defendant is charged in Count 1 with

21   transportation of child pornography.  That offense has four

22   elements.  Four things the government has to establish for

23   you beyond a reasonable doubt.  The first of which is that

24   the defendant knowingly transported a visual depiction.  And

25   as I said earlier, there is a dispute between the parties,

Case 5:14-cr-00088-EAW Document 80-21 Filed 01/12/16 Page 708 of 890
A698
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 14 of 113

668

1    between the government and the defendant about whether the

2    defendant knowingly transported those USB drives containing

3    child pornography and knew that there was child pornography

4    on them.

5         The second element is that the visual depiction was

6    transported in or affecting interstate or foreign commerce or

7    the visual depiction was produced using materials that had

8    been transported in or affecting interstate or foreign

9    commerce.

10        That is the kind of language that makes people not

11   want to go to law school, it's the kind of language that

12   makes my daughter say she wants to be a doctor, not a lawyer,

13   but it's very simple and I'll explain to you exactly what

14   that means in just a moment.

15        The third element was that the visual depiction was

16   child pornography.

17        The fourth element is that the defendant knew of

18   the sexually explicit nature of the material and the visual

19   depiction was of an actual minor engaged in that sexually

20   explicit conduct.  Let's go to the next.

21        Element one.  A visual depiction.  The defendant is

22   charged with transporting visual depictions.  But what the

23   law requires the government to establish for you is not a

24   number of images.  We do not have to prove to you that the

25   defendant transported five videos or five pictures or five

1    images or 10 or 100 or 1000 or 3200.  What we have to

2    establish for you is the defendant transported a visual

3    depiction.  One.  That is the burden of proof that the

4    government carries.  We must establish beyond a reasonable

5    doubt a visual depiction was transported from the United

6    States into Canada.

7           You will hear from the court that an act is done

8    knowingly, in other words, the defendant knowingly

9    transported those USB drives, when it is done voluntarily and

10   intentionally and not because of an accident or mistake or

11   some other innocent reason.  I mentioned to you before that

12   one of the open questions is whether the defendant knew that

13   those USB drives were in that bag, whether those USB drives

14   actually belonged to him and that's really what that element

15   is talking about.  Let's go to the second.

16          Interstate and foreign commerce.  The language was

17   dense, it sounds complicated, it's very easy.  The government

18   has to establish that transportation affected interstate or

19   foreign commerce and we can do that by proving to you that

20   the child pornography crossed a foreign border, that the

21   transportation went from the U.S. into Canada and as I said

22   earlier, that's really not -- no debate here, we know the

23   defendant had the media with him when he was in the United

24   States, we know he drove across the bridge, we know he

25   crossed the foreign border, we know he was the only person in

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 71 of 110
**A700**
Case 5:11-cr-00602-GTS   Document 168   Filed 05/30/14   Page 16 of 113

670

1    the car, we know that no one else got into the car on the

2    bridge between United States and Canada.  Beyond a reasonable

3    doubt, the government has established the effect on

4    interstate and foreign commerce because the defendant crossed

5    a foreign border.

6            The next element is that the visual depiction was

7    child pornography.  You will hear from the court a list of

8    factors that I'm going to go over in a minute on how you can

9    decide what child pornography really is because ultimately

10   it's up to you, it is up to you to determine whether the

11   pictures in that binder, those videos you saw constitute

12   child pornography.  You heard from certified forensic

13   examiner Brian Braisted who has examined 75 different cases,

14   thousands, hundreds of thousands of images that he believes

15   he found numerous, hundreds, thousands of images of child

16   pornography on the digital media.  You heard his description

17   of the videos, you saw the videos yourself, but the

18   government does carry the burden of establishing that the

19   visual depictions were child pornography.  When you're trying

20   to answer that question for yourselves, I ask you just to

21   look at the pictures.  Just think about the videos you saw.

22   There really cannot be any dispute, the visual images were

23   child pornography.

24           It's also important for you to know that in order

25   for the government to meet its burden here, we do not have to

1   establish the exact identity of the minor.  We don't have to

2   do what we did with KP Nancy, with Vicky, with the Green Bath

3   series, we do not have to tell you the name or the exact age

4   of the child depicted in the images.  In fact, for good

5   reason, we asked the witnesses not to disclose the specific

6   real names of those victims because we are trying to honor

7   their integrity to the extent that it is possible in this

8   horrible context.  It is also important for you to know that

9   we don't have to establish anything other than the person was

10  under 18 years old.  In KP Nancy, that girl is 14, that girl

11  is a minor.  And her visual depiction constitutes child

12  pornography when it is done in a sexually explicit way.

13  These are three of the factors, there are six total, that you

14  can consider when deciding whether the images and videos

15  constitute child pornography.

16          First, whether the focal point of the visual

17  depiction is the child's genitals or pubic area.

18          Second, whether the setting of the visual depiction

19  makes it appear to be sexually suggestive.  Again, think

20  about those images, and I know they're unpleasant to think

21  about and I know you looked at them very briefly, but I think

22  it is absolutely beyond a reasonable doubt the case that

23  those are pictures that are designed to be sexually

24  suggestive.  That is their very nature.  They are designed to

25  be sexually suggestive.

1          Whether the child is displayed in an unnatural pose

2     or in inappropriate attire considering the age of the child.

3     If you think about the images with the children with their

4     hands and legs bound, that question answers itself.

5          The next factor is whether the child is partially

6     or fully clothed, or nude, although nudity is not in and of

7     itself lascivious.  You heard from Brian Braisted that he

8     didn't automatically classify every image and every video as

9     child pornography.  He went through very carefully.  He

10    decided that some images such as those images you saw of the

11    girl in the bathing suit at the beach, some of those images

12    are child erotica, they are not child pornography.  He was

13    very rigorous in setting aside what is child pornography and

14    what is not child pornography.  Nudity in and of itself --

15    not enough to be child pornography.  And Brian Braisted said

16    he considered that when he was deciding which images should

17    be considered pornographic.

18         The next factor is whether the visual depictions

19    suggest sexual coyness or willingness to engage in sexual

20    activity.

21         Finally, whether the visual depiction is intended

22    to elicit sexual response in the viewer.  Again, I think the

23    answers are found in the images themselves.

24         The fourth element is whether the defendant knew

25    the material was child pornography.  The government is

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 713 of 890
A703
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 19 of 113

673

1    required to establish the defendant knew the images that were

2    on the digital media were child pornography.  The defendant

3    cannot have it just be the case that it's voluntary or the

4    defendant cannot have it be the case that it's an accident or

5    a mistake or there's an innocent reason for that image to be

6    on the computer.  He must voluntarily and intentionally know

7    that those images are child pornography.  However, the

8    government does not have to prove the defendant has specific

9    knowledge about the identity of the performer.  In the same

10   way that the government doesn't have to establish to you who

11   that performer is, who the child is, exactly how old the

12   child is, the defendant, we do not have to prove that he knew

13   the exact age or the exact identity of the child.  We also

14   don't have to provide you with eyewitness testimony from

15   someone saying I saw him looking on the computer, I saw him

16   downloading images, I saw him on the internet.  I was there

17   with him when he uploaded things to the 8-gigabyte or

18   4-gigabyte USB drive.  We don't need eyewitness testimony.

19   We can use the kind of evidence we did, the testimony of

20   certified forensic examiners, timeline evidence,

21   circumstantial evidence.

22          And finally, the defendant's belief as to the

23   legality or illegality of the material is irrelevant.  It

24   does not matter if what he thought he was doing was legal.

25   We don't have to prove that he thought he was violating the

Case 5:14-cr-00088-EAW Document 79-10 Filed 01/12/16 Page 714 of 890
**A704**
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 20 of 113

674

1    law.

2              On Count 1, the transportation of child pornography

3    into the United States, we allege that that transportation

4    occurred using the 8-gigabyte and the 4-gigabyte USB drives,

5    and I mentioned earlier that it is an open question whether

6    the defendant actually possessed, whether they actually

7    belonged to him, that 8-gigabyte and 4-gigabyte USB drives.

8    When you're thinking about that question, I want you to

9    consider the testimony of the Officer Glen Hache, who as a

10   routine matter asked the defendant, is this your vehicle, did

11   you pack the contents of the vehicle.  And there was no

12   ambiguity in the defendant's response, he didn't say, well, I

13   don't know, this vehicle's actually one that's used by people

14   I work with and there are all kinds of different people who

15   put things in and sometimes there are supplies that go from

16   workers, I don't know.  None of that ambiguity came into the

17   defendant's response when he talked to Officer Hache.

18             What the defendant said on May 24th, 2009, and what

19   is actually consistent with the evidence is that, yes, he

20   packed the contents of that vehicle.  The vehicle that's

21   registered to him.  The vehicle he was the sole driver of.

22   The vehicle that held media he openly acknowledged he

23   possessed, like the black Toshiba laptop.  The vehicle that

24   contained a silver Compaq computer in the same bag as the USB

25   drives.  Do you remember that part of his testimony?  The

1    defendant said, you know what, actually, yeah, that silver

2    Compaq computer, that is mine, no dispute there, the Compaq

3    that didn't have child pornography on it except for the links

4    to web pages that Brian Braisted found stored deep, deep in

5    the data of the computer, that silver Compaq, that's mine,

6    and yes, that silver Compaq was in the same bag as the USB

7    drives containing child pornography, and actually, I looked

8    through the bag before I decided to cross the border, I

9    looked through the laptop bag, found the silver Compaq, found

10   some paperwork but I just -- I didn't find the USB drives.

11   Really?  Really?  He acknowledged owning the silver Compaq,

12   he acknowledged to Glen Hache that he is the person who

13   packed the contents of the vehicle.  He acknowledged that he

14   looked through that bag, and yet somehow he wasn't aware that

15   there were two USB drives containing thousands of images of

16   child pornography in that black laptop bag.  In the car he

17   owned.  In the car he was driving.  In the car registered to

18   him.

19          You also have the evidence from the USB drives

20   themselves.  You heard from Brian Braisted that the USB

21   drives are sort of different from a computer.  On the black

22   Toshiba laptop there's a serial number on the outside, right,

23   the unique identifier, like a fingerprint.  That serial

24   number means that that black Toshiba laptop is unique, that's

25   the way you mark it as being an individualized laptop.  The

1    4-gigabyte and 8-gigabyte USB drives didn't have serial

2    numbers on the outside.  But Brian Braisted told you that

3    they do have serial numbers, they're embedded electronically

4    by the manufacturer onto the USB drives.  And Brian Braisted

5    was able to tell you that the serial numbers for the

6    8-gigabyte and 4-gigabyte USB drives show up on the

7    defendant's black Toshiba laptop.  Conclusively.  Those two

8    USB drives were plugged into the Toshiba laptop the defendant

9    acknowledged he owned, he acknowledged he used, he

10   acknowledged was his and was in the vehicle with the same

11   kind of data contained on the 8-gigabyte and 4-gigabyte USB

12   drives.  We know that those were the USB drives plugged into

13   the computer because that unique serial number shows up on

14   the black Toshiba.  Not only that, but the data on the black

15   Toshiba is consistent with that on the 8-gigabyte and

16   4-gigabyte drives.

17          Brian Braisted testified, and you'll see in

18   Exhibit 14, that he did a hash value comparison between the

19   USB drives and the black Toshiba and what that means is once

20   he had sorted out on the black Toshiba what he considered to

21   be child pornography, he did a fingerprint comparison.  A

22   hash value is like the fingerprint of a video or image.  And

23   he found 11 overlaps, 11 completely identical images on the

24   8-gigabyte, 4-gigabyte, and black Toshiba.  Exactly

25   identical.  So from the computer the defendant owned, used,

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 717 of 890
**A707**
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 23 of 113

677

1    operated, was taking into Canada, in the box, his ownership

2    of that black Toshiba was so complete that he kept the

3    original box and the original receipts from its purchase, his

4    ownership of that black Toshiba was so, so incontrovertible

5    that the only user profile on it was a user named Joe.  The

6    defendant's own first name.  On that black Toshiba laptop

7    that contained images of child pornography, there were 11

8    overlapping images also found on the USB drives.  What are

9    the chances that that is just a coincidence?  What are the

10   chances that the defendant is just so unlucky that somehow an

11   8-gigabyte and 4-gigabyte USB drive got planted in his laptop

12   bag, an 8-gigabyte, 4-gigabyte USB drive that didn't belong

13   to him, that he had no knowledge of but that had been plugged

14   into his own computer, plugged into his computer and had data

15   transferred from the computer to the USB drives.  There's a

16   very interesting timeline for both of those drives that makes

17   it absolutely the case that the defendant knew that those USB

18   drives belonged to him.  Knew it and used them, used them to

19   store images of child pornography.

20           You'll remember testimony from Brian Braisted that

21   he went through the computer and constructed a series of

22   events based on the forensic data, the record of events in

23   the Toshiba and in the USB drives.

24           On January 24th, 2009 at 11:49 a.m., user Joe on

25   the black Toshiba the defendant owned opened an e-mail sent

678

1    to jjenkins70@rochester.rr.com and that e-mail was about

2    Master Card charges.  At 12:04 p.m., about 15 minutes later,

3    user Joe, the same user who opened an e-mail sent to the

4    jjenkins e-mail address, saved three child pornography videos

5    to the 8-gigabyte USB drive.  Those videos were taken from

6    the Toshiba laptop and put on the USB drive.  The USB drive

7    whose serial number shows up on the Toshiba.  It is

8    absolutely patently incredible that the defendant did not own

9    that 8-gigabyte USB drive.  Of course he owned it.  Of course

10   he owned it.  Of course he plugged it into the Toshiba, of

11   course he transferred images of child pornography from the

12   Toshiba to the 8-gigabyte USB drive.

13          On the 4-gigabyte USB drive, there is a similarly

14   damning timeline.  On May 22nd, 2009, at 8:20 p.m., the

15   forensic evidence establishes that user Joe of the black

16   Toshiba accessed the internet.  At 8:46 p.m., so about 20, 25

17   minutes later, user Joe accessed a website featuring images

18   of preteen and tween girls.  At 8:52 p.m., so a little less

19   than 10 minutes later, user Joe then accesses a website from

20   Image Source called "young girls braless and pokies" and you

21   heard from Brian Braisted that that Image Source website is a

22   known Russian website that distributes and shares images of

23   child pornography.  And finally, at 10:25 p.m., after

24   approximately two hours of internet activity, user Joe stops

25   his activity on the Toshiba and at that point in time, 238

1   images of child pornography and child erotica are transferred

2   from the black Toshiba to the 4-gigabyte USB drive.

3           They were transferred by the same person who at the

4   same time was running CCleaner on the black Toshiba laptop.

5   You heard about CCleaner.  CCleaner is wiping software that

6   is supposed to get rid of data.  So at the same time that the

7   defendant is accessing child pornography on the internet, the

8   same time that user Joe on that black Toshiba is downloading

9   images from preteen and tween websites, CCleaner is running.

10  CCleaner is getting rid of the record of that internet

11  activity and at the same time the defendant is transferring

12  the images being uploaded to the Toshiba to the 4-gigabyte

13  USB drive.  Because that's where he keeps it, right?  That's

14  where the real motherlode is.  On that 4-gigabyte USB drive,

15  3,250 images of child pornography.  Sadomasochistic images

16  and 10 videos.  It is the defendant who possessed that

17  4-gigabyte USB drive.  It is the same person who accessed his

18  e-mail, paid his Master Card bill, checked his e-mail again,

19  went to an internet website featuring child pornography and

20  uploaded images to the 8-gigabyte and 4-gigabyte USB drive.

21  These timelines don't leave room for a mysterious person to

22  come in and plant child pornography on USB drives and then

23  plant those USB drives in the defendant's laptop bag.  What

24  possible, possible credible explanation can there be for that

25  series of events other than the one that is consistent with

1    the evidence?  Other than the one that is consistent with the

2    defendant's guilt?

3           In the second count, the defendant is charged with

4    possession of child pornography.  Possession of child

5    pornography on the black Toshiba laptop.  There are four

6    elements, two of which will sound very familiar.  First, the

7    defendant knowingly possessed a visual depiction.  Second,

8    that the visual depiction was transported in interstate

9    commerce or was produced using materials transported in or

10   affecting interstate commerce.  Third, that the visual

11   depiction was child pornography.  Fourth, that the defendant

12   knew of the sexually explicit nature of the material and the

13   visual depiction was of an actual minor engaged in that

14   sexually explicit conduct.

15          The third and fourth elements of Count 2 are

16   identical to those of Count 1, that the visual depiction was

17   child pornography and the defendant knew it was child

18   pornography.  Count 2, unlike Count 1, alleges possession

19   rather than transportation.  And you will hear from the court

20   that to possess means to have something within your control.

21   It doesn't mean you have to hold it physically, to have

22   actual possession of it.  As long as the depiction is within

23   the defendant's control, he possesses it.

24          You heard a lot during the discussion of the black

25   Toshiba laptop with Brian Braisted about something called

1    system volume information.  SVI.  You heard from Brian

2    Braisted that he found 594 images containing child

3    pornography on the black Toshiba in the system volume

4    information of that computer and in thumb caches.  During

5    cross-examination, Brian Braisted was asked if the defendant

6    would have access to images stored in the system volume

7    information of the computer.  Brian Braisted's answer was

8    that all it would take was the click of a button to make

9    those files active.  The CCleaner might have tried to wipe

10   them out, the CCleaner might have tried to destroy their

11   presence on the Toshiba but all you have to do is restore and

12   those images become readily accessible.  I want you to think

13   about that when you're listening to the law on the

14   description of what possession requires.  As long as the

15   visual depiction is within the defendant's control.  As long

16   as the defendant can restore those files to life, as long as

17   he can click a button and bring them back as active data on

18   the black Toshiba laptop, he possesses them.

19           Beyond that, you'll see in the indictment when you

20   go back and review it in the jury room that the government

21   has alleged on or about May 24th, 2009, the defendant

22   possessed images on the Toshiba.  That language on or about,

23   the court will instruct you is intentionally approximate.

24   Because the government does not carry the burden of proving

25   to you that exactly on May 24th, 2009, the defendant

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 722 of 890
**A712**
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 28 of 113

682

1    possessed those images.  The government has to prove at about

2    that time, around that time.  I bring that to your attention

3    because I want you to think about Exhibit 3B which contains a

4    visual description of the Toshiba laptop and a picture of the

5    Elena file, there's an Elena file on the Toshiba laptop that

6    gets moved during that transfer of the 238 images, the Elena

7    picture that is child pornography is on the Toshiba laptop

8    and then it gets moved over to one of the USB drives.  Elena

9    is child pornography, and on May 22nd, 2009, the evidence

10   conclusively establishes it was on the laptop.  Along with

11   other images of child pornography.  On or about May 24th,

12   2009.  And we've established through Brian Braisted's

13   forensic examination that on May 22nd, just two days before,

14   on or about May 24th, there was child pornography on the

15   defendant's computer.  On that black Toshiba.  So there are

16   two different ways in which those images are possessed by the

17   defendant.  First, that he could so easily have restored them

18   if he chose to do so, and second, on May 22nd he wouldn't

19   even have had to restore them, they were active, there were

20   active images of child pornography on May 22nd, 2009.

21            And finally, the defendant is not alleged to have

22   possessed only picture as opposed to videos, he is alleged to

23   have possessed videos as well as pictures.  And you heard

24   from Brian Braisted that the videos were not buried in the

25   system volume information, the videos were not thumb caches,

1   the videos were one click on the desktop away from the

2   defendant's possession.  All he had to do was double click on

3   New Folder 2 and three video files containing child

4   pornography would suddenly be viewed.  They weren't buried,

5   they weren't wiped, they never disappeared, they were sitting

6   right there on the desktop, they were sitting right there on

7   the desktop able to be accessed by Officer Johnston, able to

8   be accessed by the defendant.  Those videos show he possessed

9   child pornography on May 24th, 2009 because he hadn't

10  bothered getting rid of them, he hadn't bothered transferring

11  those videos to a USB drive, they were sitting right there in

12  New Folder 2.

13          The second element in the possession charge is that

14  the visual depiction was transported in or affecting

15  interstate or foreign commerce, or was produced using

16  materials that had been transported in or affecting

17  interstate commerce.  I'm sure this testimony seemed a little

18  strange at the time, you know, why do we care where the

19  laptop was manufactured.  This is why we care, this is why

20  the government put that evidence before you, because the

21  Toshiba laptop, the shell of it was manufactured in China,

22  and the hard drive was manufactured in the Philippines, and

23  that means the child pornography was possessed on something

24  that was in or affecting interstate commerce.  We had to

25  bring the black Toshiba into the United States, it wasn't

1    made in New York, it wasn't made in Jefferson County, it had

2    to cross a foreign border to get here and that's material

3    that the defendant possessed using the laptop.

4            I said there was another question that was open,

5    and that was whether the defendant knowingly possessed the

6    child pornography and transported the child pornography on

7    the USB drives on the laptop.  Again, I want to refer you to

8    the timeline because the timeline provides conclusive proof

9    of the defendant's knowledge.  His knowing possession, his

10   knowing transportation.  The fact that he knew that there was

11   child pornography on all three items, the fact that he knew

12   it, he knew it when he uploaded the images and he knew it

13   when he transported it and he knew it when he possessed it

14   because the activity on that computer and the activity on the

15   USB drives doesn't leave it open for question who's actually

16   doing it, who's actually uploading the images, who's actually

17   saving them.

18           January 19th, 2009, at 6 p.m. user Joe creates New

19   Folder 2 on the desktop.  Four seconds later, user Joe saves

20   five video files of girls age 12 to 14 dancing in their

21   underwear to New Folder 2.  Those videos in total have a

22   viewing time of 32 minutes and 21 seconds.  At 6:33 p.m. just

23   slightly over 32 minutes and 31 seconds, user Joe opens an

24   e-mail sent to a password-protected e-mail account in the

25   name of jjenkins70@rochester.rr.com.  An e-mail account the

1   defendant acknowledged was his.  So at 6 p.m. New Folder 2 is

2   created, then 32 minutes' worth of videos are uploaded to New

3   Folder 2 and then 33 minutes later, just after the viewing

4   time of those videos, user Joe opens Joseph Jenkins' e-mail

5   account.  Really?  A subcontractor, an employee, one of the 2

6   or 10 or 14 or 20 people who always use this computer?  One

7   of them created New Folder 2, one of them uploaded 32 minutes

8   worth of child pornography and child erotica, one of them

9   then opened Joseph Jenkins' e-mail using a secure password?

10  That explanation strains credulity to the breaking point.

11          This evidence shows that it is the defendant using

12  that computer, it is the defendant uploading those images, it

13  is the defendant watching them, saving them, creating them,

14  and possessing them.  It is the defendant doing it, and he is

15  doing it as part of a daily routine.  He is doing it just

16  after he checks his e-mail.

17          January 20th, next day, 2009.  6:57 a.m., so early

18  morning, user Joe accesses a child pornography video called

19  meekrab.  At 7:04 a.m., user Joe accesses the IKEA home

20  planner on the computer.  Now what's interesting about this

21  is that the child pornography video is just under six minutes

22  in length and just under six minutes pass in between the time

23  that that video is accessed and user Joe accesses the IKEA

24  home planning application on the computer.  At 7:16 a.m., so

25  just over 10 minutes later, user Joe opens an e-mail sent to

1    a password-protected account in the name of Joseph Jenkins,

2    an account Joseph Jenkins said he uses, in an account he said

3    is his.  Of course it's the defendant.  Of course it's the

4    defendant opening the video, watching the video and then

5    doing what he always does.  It's part of his routine.  He's

6    doing it at 6 p.m., he's doing it at 6 a.m., he's checking

7    his e-mail, he's using the IKEA home planner, because it's

8    his collection.  He is monitoring his collection.  He's

9    treating it the way people treat stamp collections, it is

10   part of a daily, ordinary course of events for him.  It is

11   the fabric of his life to possess this child pornography.  He

12   does it the same way you check your bank account, he does it

13   the same way you book airline reservations, it's just part of

14   what he does on the internet.  It's just part of what he uses

15   his computer for.

16          On February 22nd, 2009, same kind of thing.  At

17   9:14 a.m., user Joe opens an e-mail sent to the Joseph

18   Jenkins e-mail account.  9:41, user Joe uses Power Point.

19   10:05 a.m., so about 25 minutes later, user Joe creates the

20   Zoe folder, and four videos of child pornography are

21   transferred to that folder.  There are eight files total.

22   Child erotica, child pornography, with a 43-minute viewing

23   time.  And just like always, after that viewing time lapses,

24   user Joe opens an e-mail sent to

25   josephjenkins70@rochester.rr.com.  Because that's what he

1    does.  Right?  This is his activity, this is his pattern.

2    This is his crime.  This is what he does.  He uses it, he

3    looks at it, and it becomes part of a routine.  So much a

4    part of his routine that he literally cannot leave his child

5    pornography at home to go on a week-long vacation in Canada.

6    So much a part of the daily events of his life he has to pack

7    it in a Toshiba box and bring it with him to go into Canada,

8    he can't leave it alone, clearly he can't leave it alone.  He

9    looks at videos, he checks an e-mail, he uploads videos, he

10   checks his e-mail.

11          You're also going to hear from the court there is a

12   distinct form of evidence called evidence of flight.

13   Evidence that can establish the defendant's consciousness of

14   his guilt.  You will hear that if proved, the flight of a

15   defendant after he knows he has been accused of a crime may

16   tend to prove the defendant believed he was guilty.  When

17   we're thinking about the defendant's knowledge, whether he

18   really knew about the child pornography, whether the USB

19   drives really belonged to him, I want you to think about what

20   you heard about that Canadian bench warrant because

21   originally, the defendant is charged in Canada.  He's charged

22   in Canada, he's brought to trial, and there's a delay because

23   he asks for a stay in the prosecution, he says that he wants

24   more time.  And so the court says, okay, we'll give you more

25   time, come back October 18th, 2010.  But the defendant

Case 5:11-cr-00088-EAW Document 102 Filed 01/12/16 Page 728 of 890
A718
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 34 of 113

688

1    doesn't come back on October 18th, 2010.  Witnesses are

2    there, they're ready to go, they're lined up, the trial's

3    going to start, and the defendant is nowhere to be found.

4    The court issues a warrant for the defendant because he fails

5    to appear for his own trial, and you heard all kinds of

6    excuses about that failure.  Got the time wrong or his lawyer

7    didn't tell him or his lawyer told him not to come or the

8    American lawyer didn't tell him or the lawyers didn't

9    communicate, or the Canadian investigators messed it up or

10   the Canadian prosecutor had it wrong or the court wasn't

11   clear, but the defendant didn't show up.  He didn't show up

12   for his own trial.

13         Do you remember his testimony that his lawyer told

14   him he didn't have to come to his own trial?  Really?  The

15   lawyer who wrote him a letter saying you missed your trial,

16   they paged you three times, where were you?  The defendant

17   did not appear because he knew he was guilty and he did not

18   want to stand trial for it.  The defendant knew he was going

19   to be standing trial for an offense he was guilty of in the

20   same way he knew he possessed that child pornography, in the

21   same way he knew that he transported it into Canada from the

22   United States, in the way he knows today that that child

23   pornography belonged to him, that it was on the USB drives,

24   that it was on the laptop, that he knew exactly what kind of

25   material was on that digital media.  The way he knew it then,

1    the way he knew when he didn't show up for court in Canada,

2    and the way he knows it today.

3            The court will tell you that the defendant's

4    failure to appear in court can be construed as consciousness

5    of his own guilt.  He didn't show up because he did not want

6    to face the consequences.  When you're thinking about the

7    defendant's knowledge, about whether he actually knew what he

8    was doing, whether he actually understood what the images

9    were, I want you to think about the defendant's demeanor and

10   responses, I want you to think about the defendant himself,

11   when the defendant was confronted by Officer Hache with the

12   question, is there child pornography on your computer, do you

13   have anything like that?  He paused.  Think about that.  He's

14   being told that he has some of the most offensive material in

15   Western Civilization on his computer and he pauses, he thinks

16   about it.  And then he says -- not, how dare you, that's

17   disgusting, I'm shocked, no, of course not.  What he says is,

18   pause, not to my knowledge.  That's an awfully carefully

19   calibrated answer, isn't it?  Not to my knowledge.  And then

20   Officer Hache follows up and says, well, have you ever

21   uploaded anything like that, have you ever had anything like

22   that?  And he says, I don't think so.  I don't think so.

23   Not, no, are you crazy?  Not, no, how on earth could you

24   accuse me of that?  He's not shocked, he's not angry.  Do you

25   remember during cross-examination how officer after officer

1    was asked, did defendant have any outbursts?  He remained

2    calm, right, he didn't have any outbursts, he didn't get

3    angry.  Exactly, he didn't get angry.  He was being accused

4    of a horrific, disgusting offense and he didn't get angry.

5    What he got was scared, what he got was nervous, he turned

6    red, he sweated, he curled up into a little ball.  He did not

7    express outrage.  Because how could he be outraged?  He knew

8    the truth of the question, he knew the truth of the

9    accusation.  Outrage and surprise would have had no place

10   with the defendant.  Because of course he knew about the

11   child pornography.  Of course he wasn't shocked.  Two days

12   earlier he uploaded it to one of the USB drives, it wasn't a

13   surprise to him.  It wasn't a surprise at all.

14          I also want you to think about what each and every

15   officer told you about their observations of the defendant's

16   demeanor.  The defendant starts out nervous when he gets to

17   the point of entry and he gets more and more nervous the

18   closer the Canadian officers get to that digital media.  The

19   closer they get, the worse it gets for him.  When he first

20   shows up at the point of entry, he's all right, you know,

21   he's gripping the steering wheel and staring straight ahead

22   and not making eye contact and being evasive but he's not

23   sweating yet.  But what he's doing is bad enough for Pedro

24   Sousa-Dias to notice it.  And then for Melany Boyd to notice

25   it, for Melany Boyd to notice that he's not making eye

Case 5:11-cr-00088-EAW Document 102 Filed 01/12/16 Page 732 of 890
A721
Case 5:11-cr-00602-GTS   Document 168   Filed 05/30/14   Page 37 of 113

691

1    contact.  He's not really answering her questions directly,

2    he's not looking at her and he's fidgeting with his hands,

3    right, he's nervous.  And then when Officer Hache asks him

4    the question about the child pornography, that's when he

5    really falls apart.  That's when the nervousness really

6    reaches its peak because by then he's not just fidgeting,

7    he's not just avoiding eye contact, he's turning bright red,

8    he is curling up into a little ball.  He's curling up in a

9    little ball because he's afraid because he knows exactly what

10   they're going to find on that computer, he knows what they're

11   going to find on the USB drives.  He knows because he's the

12   person who put it there.  And you can consider all of those

13   observations that the officers made about the defendant's

14   demeanor when you consider his state of mind.  When you

15   consider whether he had knowledge.

16          You can also consider the defendant's demeanor on

17   that witness stand.  You can consider how forthright he

18   seemed.  How direct his answers were.  How credible his

19   testimony was.  You can and should consider his demeanor

20   during his testimony yesterday.  Do you remember when the

21   defendant said, I always tell the truth, lady?  Let's figure

22   out if the defendant always tells the truth.  If the

23   defendant is right when he says he always tells the truth,

24   lady.

25          The defendant said that he had deli meat and cheese

692

1    in his cooler and so he thought he might get pulled over, and

2    it might get seized.  Because of that, he was a little

3    anxious because of that but then on cross-examination, no, he

4    wasn't nervous at all, he was never nervous, the officers

5    were wrong about that.  So that's inconsistent.

6          The defendant testified that the officers who

7    testified about that search were right about everything, they

8    got everything right, really no dispute with what they said.

9    Except there is a dispute about the fact that he was nervous.

10   He wasn't nervous.  He wasn't nervous at all.  So that's

11   another inconsistency.

12         The defendant testified that he always left his

13   truck at home when he went on vacation.  Right, he leaves his

14   truck there, freely accessible to the handy men and house

15   sitters and potential child pornography planters who might be

16   getting into the Dodge Ram to plant USB sticks in the laptop

17   bag containing his laptop.  He always leaves that truck

18   there, but the defendant was driving his truck on May 24th,

19   2009.  He was driving his truck to go on vacation.  So that's

20   inconsistent.

21         The defendant also testified that at no point

22   before or during the search of his vehicle and property was

23   he asked any questions about child pornography but you heard

24   from Officer Hache that he asked the defendant explicitly

25   about child pornography, he asked him that question directly

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 733 of 890
**A723**
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 39 of 113

693

1   and the defendant earlier said that the officers were right

2   about everything that happened during the search.  So how can

3   they both be right about everything during the search but not

4   right that he was asked about child pornography?

5          The defendant said that the black Toshiba laptop

6   was used by a lot of people.  The people used it for work,

7   that various people would come in and do things on it, use

8   programs, but then under cross-examination he said that he

9   was the person who owned that computer, he was the person who

10  used it, and his direct testimony bears that out, right?

11  He's the user so exclusively that it's his e-mail account

12  being accessed on that account.  Not another e-mail account,

13  his e-mail account.  He uses it so exclusively he's the

14  person who has the receipt for the computer, he is the person

15  who has the original case for that computer.

16         You also heard from the defendant that he wasn't

17  nervous at all during the examination.  That he never gets

18  nervous.  That he's not afraid of anything.  I want you to

19  think about how credible the statement the defendant never

20  gets nervous and that he's not afraid of anything is when you

21  think about his demeanor during his testimony in this court.

22  Really?  The defendant never gets nervous.  He's not afraid

23  of anything.  Then why did he backtrack?  Then why did he

24  change directions when it looked like the wall was coming

25  down, why did he change his answers?  Why did he avoid eye

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 734 of 890
**A724**
Case 5:11-cr-00602-GTS   Document 168   Filed 05/30/14   Page 40 of 113

694

1   contact?  Why did he seem to fidget in the witness stand?  He

2   never gets nervous.  The defendant was nervous yesterday when

3   he was testifying for the same reason he was nervous on

4   May 24th, 2009.  He was nervous because he knows he is

5   guilty.  And the evidence has established that beyond a

6   reasonable doubt.

7           THE COURT:  Counsel, when you're ready, please.

8           MR. GOLDSMITH:  Please the court.  "Not to my

9   knowledge."  We talked about it at the beginning of the

10  trial, spoken a lot about it today, we're going to continue

11  to talk about it, because as the government just argued for

12  several minutes to you about all of the overwhelming evidence

13  or the elements of their case, they admitted that what is in

14  dispute in this courtroom is the knowledge and the intent of

15  Mr. Jenkins.  So when he provided that answer on May 24th of

16  2009 and he provided the answer yesterday in court on the

17  witness stand, "not to my knowledge," that's what this is

18  really about, isn't it?  Did he know that the child

19  pornography was there?  Did he know that it had been on those

20  flash drives?

21          So there are several witnesses that were called at

22  this trial.  Now, Mr. Jenkins himself told you that generally

23  speaking, the three officers who performed the inspection of

24  his truck seemed to be accurate.  The government brought a

25  couple of other officers.  Officer Sousa-Dias and Officer

1    Boyd discuss the events leading up to that inspection.  The

2    government, with all of those witnesses, chooses to focus on

3    Mr. Jenkins seemed nervous.  Mr. Jenkins seemed nervous.  The

4    government brought up Officer Boyd's testimony of Mr. Jenkins

5    being nervous.  Officer Boyd, who you will recall was at a

6    counter that she testified was about 15 feet away from the

7    windows, that all of the other officers who performed the

8    inspection testified Mr. Jenkins' truck was about another 10

9    or more feet beyond that.  That all of the other officers

10   testified there was a cap on the truck.  That Officer Boyd

11   said, no, she could see right back into the bed of the truck.

12        So you want to talk about nervous, you want to talk

13   about is it that one witness that you want to rely upon, but

14   no, other witnesses said that he seemed nervous, the

15   government seems to think he seemed nervous on the stand.

16   But the government really is concerned about why wasn't he

17   nervous enough.  Why wasn't he so upset?  Why didn't he

18   scream and jump and holler when they told him at the border

19   that they thought that there was child pornography on the

20   computer?

21        Well, in part of your job in assessing credibility

22   of the witnesses, assessing the weight of the evidence in

23   this trial, you're going to look at everything and you're

24   going to make your determination as a jury.  This concern by

25   the government of why didn't he react stronger at the border,

1    think about it.  Think about a saying that's at least 400

2    years old or 300 years old, from Shakespeare.  "The lady doth

3    protest too much."  In life, somebody jumps up and down and

4    hollers and screams that they had nothing to do with it,

5    people tend to look at that person more suspiciously because

6    that is something that seems over the top, incredible.  The

7    same level of incredulity that the government wants you to

8    think you should assign because Mr. Jenkins didn't jump up

9    and down and holler.  Because he didn't scream protestations.

10   What did he do?  He said not to my knowledge.  They asked him

11   if he had done it, he said I don't think so.  Plain, simple,

12   straightforward responses.

13        There was a lot of testimony from those officers,

14   the CBSA officers from that day in May of 2009.  Talked about

15   the inspection that they performed of the vehicle, they

16   talked about the inspection that they performed on the

17   computer.  And there was some testimony about brief

18   conversations with Mr. Jenkins.  Nobody asked him who the

19   users were, and nobody asked him about passwords.  Nobody

20   asked him about the accessibility of the computer.

21        The government has argued extensively that they

22   have been able to prove by the evidence that they provided

23   that Mr. Jenkins was using the computer.  Their own expert

24   testified yesterday this forensic software, everything that

25   he uses, the equipment that he uses, his training, his

1    experience, none of that can prove who was using the

2    computers.  None of that can prove who was using an e-mail at

3    a time and accessing an e-mail.  All he can show is activity

4    on the machine.

5           Now on the subject of Special Agent Braisted, he

6    was careful to discuss with you the necessity for a write

7    block, testified about it several times.  The machine that,

8    when he's examining or studying a piece of evidence, that

9    piece of evidence, the computer, or flash drives get plugged

10   into that device, and that device then gets plugged into his

11   equipment.  Very important, very necessary because he says

12   that machine and that machine alone, make sure that whatever

13   contents of the devices being studied does not in any way get

14   altered by turning on and accessing the computer or the flash

15   drives.  Compare that to the testimony of the CBSA officers

16   when they were conducting their inspections of the machines

17   at the border check.  They didn't plug it into a write block.

18   They talked about software, remember, Special Agent Braisted

19   said, no, this is not software, this is a machine, when they

20   looked at files and accessed files on this computer.

21          Clearly everything that I argue, that the

22   government argues, are not controlling in your minds.  What's

23   controlling is your recollection of this evidence.  But I

24   want you to think about the testimony, think about repeatedly

25   Special Agent Braisted's acknowledgment that his studies

698

1    cannot confirm who's accessing and who's using the devices.

2    Then I want you to think about what the government is

3    presenting to you for several minutes.  User Joe, user Joe.

4    User Joe.  User Joe.  Because user Joe is the computer

5    profile user Joe.  User Joe is not Joe Jenkins, because user

6    Joe, a computer showed activity, but Special Agent Braisted's

7    study couldn't prove, none of the CBSA agents' testimony can

8    prove, none of the testimony and evidence in this trial can

9    prove that Joe Jenkins was on the computer when that activity

10   was going.  None of the evidence can prove that Joe Jenkins

11   was accessing the e-mail.

12          What are the two strongest indicators of that fact?

13   The government's own evidence.  Exhibit 3B, page 20.  In the

14   middle of the screen there's a prompt, pop up, it's asking

15   for the credentials, the user name and the password to get on

16   e-mail.  What's that box underneath?  The box underneath is

17   something that every one of us who's ever used a computer and

18   accessed e-mail has seen the last several years, it's the

19   prompt by the software that says, do you want me to remember

20   your password?  Do you want me to make life easier, so that

21   you don't have to punch in a user name and password every

22   time you want to log into this e-mail account?  And it's

23   checked.  It's checked.

24          Now Special Agent Braisted testified that the user

25   name and the password weren't showing, he said it could have

1    been because file wiping software was used and it would have

2    wiped out a user name and a password.  But it's there and

3    once that user name and password get plugged in, unless the

4    person unchecks that box, whoever turns that computer on,

5    whoever accesses that e-mail, goes right into that e-mail

6    account.  There's no security, there's no protection there.

7    It makes life easier but it also makes life more vulnerable

8    in that anyone can access what's on that computer or any of

9    our computers if the password is on there.

10         But even if that wasn't checked, even if the

11   password hadn't been saved onto the computer into the

12   software program for the e-mail, what's the other evidence

13   that we saw at this trial that anyone could have accessed the

14   e-mail?  Exhibit 3B, page 10.  It's a text document titled RR

15   info.  Special Agent Braisted was able to pull up, and

16   Special Agent Braisted testified and as it shows, are the

17   user names and the passwords for the e-mail accounts that

18   were on that computer.  So if someone was aware of the text

19   file, and the user name and the password prompt shows up for

20   e-mail, and they didn't remember, all they had to do was to

21   look right back up at RR info, and they'd have all the user

22   names and the passwords readily available.

23         Oh, by the way, also recall that there was no

24   password protection on the computer itself so when you turned

25   it on, it immediately went on.  You didn't have to type in a

 1   password and a user to be able to access the programs of the

 2   computer itself.  So this computer, based on the evidence

 3   that you saw at trial and the testimony that you heard from

 4   Special Agent Braisted, had no security whatsoever, was

 5   completely accessible to anyone who had physical access to it

 6   to use, physical access, which Joe Jenkins testified when he

 7   took the stand yesterday.  When he described his electrical

 8   business, and he described the people who worked with and for

 9   him, and he described for you the fact that he has a home

10   office, the fact that the people who worked with and for him

11   were given the access codes to get into his house so that

12   they could do work when he wasn't there.  The people who

13   also, once they got into that house, had access to the

14   computer.  The physical access.  Once they got to the Toshiba

15   laptop, well, the user names and the passwords were really

16   just a formality.

17           At the beginning of the trial, I asked you to

18   scrutinize the witnesses, scrutinize the evidence, scrutinize

19   every aspect of this case, look through, consider the

20   credibility of the CBSA agents, not just credibility but

21   their capacity, did they have the opportunity to see and to

22   understand everything that they testified about.  Consider

23   the progress of what happened that day, consider the aspects

24   of what they testified about for him being nervous, for him

25   preceding, all right.  Now they said he was nervous, but

Case 5:14-cr-00088-EAW Document 70-1 Filed 01/12/16 Page 742 of 890
A731
Case 5:11-cr-00602-GTS   Document 168   Filed 05/30/14   Page 47 of 113

701

1    every one of them also said that he was compliant.  The

2    inspection officers talked about Mr. Jenkins sitting or

3    standing outside while they were inspecting his truck.

4    Again, the government thinks that he probably should have

5    been jumping around, that that would have been a better

6    indication that he was surprised by what was happening.  But

7    why would he be surprised what was happening when he

8    testified that he'd been over the border numerous times and

9    he'd been searched a number of times, his car, his vehicle

10   had been searched a number of times?  Think about the

11   credibility and the capacity, what could every witness do,

12   see, had the ability to tell you.  This is almost five years

13   ago, and it's been through a number of hands.

14            There was several documents of evidence brought out

15   by several Canadian witnesses and by American witnesses about

16   chain of custody.  Where this evidence is supposed to go step

17   by step by step by step.  Who had it, what was their purpose,

18   step by step.  One witness wasn't here.  Sergeant Detective

19   Harrington, from the Ontario Police -- I'm sorry, Ontario

20   Province Police wasn't here.  Unfortunately he's ill, he

21   performed Canadian forensics searches and studies just like

22   Special Agent Braisted did here in the United States.  He

23   wasn't here to testify about what he did.  If you think that

24   that is something that should be scrutinized and should be

25   evaluated as far as the evidence goes, you should do that.

1          Think about the credibility of Special Agent

2     Braisted.  His capacity.  As an expert.  He performs studies,

3     he undergoes training and education, routinely, as part of

4     his duties.  As a law enforcement officer.  But not just any

5     kind of a law enforcement officer, someone who specializes in

6     computers and how they work.  Even he, with all of his

7     training, his expertise, his equipment to be able to perform

8     the studies, couldn't give you an answer as to one of those

9     three things that the government acknowledged were in

10    dispute.  He couldn't tell you for certain who those users

11    were.  And when we're talking about users, we're talking

12    about knowledge, which is an element of both of the crimes in

13    this case.  Knowingly possessing pornography.  Knowingly

14    transporting child pornography.  Something that was never

15    established.

16         The subject matter of this case has been

17    uncomfortable.  I asked you in opening arguments and I'm

18    reminding you again, it's uncomfortable.  But it's not -- the

19    facts and the circumstance of the case, once we move past the

20    uncomfortableness and you analyze the witnesses, and the

21    testimony herein, that's where you'll be able to make your

22    determinations.

23         There was another witness that you heard from, Joe

24    Jenkins.  The defendant in this case.  Scrutinize and you'll

25    make all the same tests and analysis of him as you will every

1    other witness that you saw here at trial.  Remember what he

2    testified about.  Compare it with what everyone else is

3    saying.  When you're making your determinations if the

4    government has proved all of the elements, if it proved that

5    he had knowledge, recall that he testified about the

6    accessibility of his computer.  Recall that he testified

7    about the number of people that had access, recall that he

8    testified that the Compaq computer was essentially a mobile

9    office for him, that there was always a computer in the

10   truck.  Recall that he testified that the Toshiba laptop was

11   put in the box with the receipt because he had purchased it

12   before and wanted to bring it back to the store where he

13   purchased it to see if it could be returned or serviced.

14   Recall that he had that knowledge of being searched before.

15   And as part of your deliberations, as part of your analysis

16   of whether Joe Jenkins knowingly possessed and trafficked

17   child pornography, does it add up?  Does it add up that

18   someone who knew that they had illegal merchandise, and who

19   knew that they were going to be putting themselves in a

20   position to possibly be searched would bring it?

21        There was also a phone call that was played for

22   you, phone call from Mr. Jenkins to his mother.  A phone call

23   where he's arguing about numbers and forensics, where he's

24   arguing about the evidence.  That phone call was played for

25   you because the government felt that it shows that he knew

1    what was on the machines.  You heard him testify.  That phone

2    call was not about what he knew was on the machines, that

3    phone call was him discussing the results of a prior test and

4    what he believed the prior results showed against what more

5    current results showed.  It was not about what he knew about

6    these machines.

7            So I want you to go back, and I want you to think

8    again.  Would someone who knew that he had child pornography

9    on a computer, would someone who knew that there was child

10   pornography on two of three flash drives, three flash drives

11   that by the way, Joe Jenkins denied having knowledge of at

12   all when he was on the stand yesterday, would someone who had

13   the knowledge that they possessed those materials driving a

14   truck into a border where he had been stopped and searched on

15   several occasions before, would he bring that to a place

16   where he thought he might get searched, or it might get

17   found?

18           The government wants to make arguments about how he

19   should have acted if he was really nervous and upset.  How

20   should he have acted if he knew that he had something

21   illegal?

22           Ladies and gentlemen of the jury, we thank you for

23   your time and attention, and it is my belief when you go back

24   into the jury room, and you discuss and you weigh the

25   evidence and the testimony that's been presented in this

1    case, you will find that the government did not prove all the

2    elements beyond a reasonable doubt, and you'll find

3    Mr. Jenkins not guilty.  Thank you.

4              THE COURT:  Any rebuttal?  Yes, okay, go ahead.

5              MS. CARROLL:  Ladies and gentlemen, I just want to

6    make sure it's clear, defendant is charged in Count 1 with

7    transportation of child pornography on the black Toshiba

8    laptop.  That includes the KP Nancy video that was in New

9    Folder 2, that was readily accessible to the defendant that

10   was there on the Toshiba laptop desktop.  It could have been

11   seen easily as soon as you opened the computer and opened New

12   Folder 2 that contained the KP Nancy video that was on the

13   black Toshiba laptop, it's the black Toshiba laptop the

14   defendant is alleged to have transported child pornography

15   into Canada containing.

16             In Count 2 the defendant is charged with possession

17   of child pornography on the 8-gigabyte and 4-gigabyte USB

18   drives.  The 8-gigabyte and 4-gigabyte USB drives, 4-gigabyte

19   contained 3,250 images of child pornography, the 8-gigabyte

20   that contained videos and images of child pornography.  It is

21   those items of digital media defendant is alleged to have

22   knowingly possessed child pornography on.

23             The defendant has offered a lot of different

24   explanations for how there was child pornography on his

25   computer on May 24th, 2009, how that pornography was found on

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 746 of 890
**A736**
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 52 of 113
706

1    the 8-gigabyte and 4-gigabyte USB drives.  When you consider

2    the credibility of those explanations, I want you to remember

3    that those explanations were testified to by the same

4    defendant who said that Chad Willard, Chad Willard was

5    present during his harassment at the border, that Chad

6    Willard was the person who ransacked his vehicle and detained

7    him for an extended period of time trying to find a cell

8    phone that they were not able to find.

9           You heard from Chad Willard this morning, he wasn't

10   there, he wasn't one of the people there.  He was not there

11   during the search of the defendant's vehicle.  He was not

12   there when the defendant was supposedly detained for this

13   extended period of time.

14          It's that kind of flat contradiction that makes the

15   defendant's statements about his possession of child

16   pornography, about the many people who might be responsible

17   for it, the many people other than him so difficult to

18   accept.  The explanation that the defendant had

19   subcontractors who worked for him, sometimes as many as 10

20   people, all of whom would have had access to his computer.

21   There might be two other people, two partners or two former

22   partners who had access to the people.  The garage was

23   unlocked so really it could have been anyone.  It could have

24   been a house sitter, there was someone who checked on the

25   house when he was out of town, maybe it was that person.

1        But when the defendant testified in Canadian court,

2    he testified about the hardship it posed on him not to be

3    able to use the internet, he was saying the delay in the

4    trial had created a great deal of difficulty for him because

5    he was the only person at his company who was able to use the

6    computer, and so because he was not allowed to use the

7    internet, he had to hire somebody.  He had to hire somebody

8    to do all the things that supposedly these 8 or 10 or 50 or

9    100 other people could have been doing during May 2009.  The

10   defendant's testimony in Canadian court was that he was the

11   only person responsible for the computer and it was a burden

12   to him because after he got arrested in Canada, after he was

13   brought to trial in Canada he had to hire somebody to do the

14   internet stuff, he had to hire somebody to use the computer.

15   It's a complete contradiction of his testimony in court

16   today.  In Canada, he testified that he was the only one who

17   ever had access to the computer and it was a real burden for

18   him not to be able to access the computer.

19       But then in court yesterday, and during the

20   argument today, you heard that actually there were two dozen

21   people who accessed that computer.  Let's think about those

22   two dozen people.  Those two dozen people were not mentioned

23   by the defendant when Glen Hache asked him if he had child

24   pornography on his computer.  Those two dozen people, that

25   infinite number of people who had access to the garage who

Case 5:14-cr-00088-EAW Document 90-2 Filed 01/12/16 Page 748 of 890
**A738**
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 54 of 113

708

1    could have put the child pornography on, he didn't name one

2    of them when Marie-Josee Vinette told him that they had found

3    child pornography on the 8-gigabyte USB drive.  The first

4    time he talked about those people, the first time he

5    mentioned that there was someone else who might have had

6    access to the computer was in court today.  And yesterday.

7    That's the first time.  And it's the first time because it's

8    not true.  It's not true that there were eight other people

9    or ten other people or house sitter who put child pornography

10   on the defendant's computer.  That explanation is exactly as

11   incredible as it sounds.  And it is flat contradicted by the

12   defendant's own previous statement in Canadian court.

13   Because there were no other people who had access to that

14   computer.  There were no other users, the defendant didn't

15   even give us a name.  Don't you think that if you thought you

16   were being accused of having child pornography on your

17   digital media, the first thing you would do if you knew that

18   other people had access, the first thing you would do is say,

19   you know what, actually John works for me, John was on my

20   computer last night.  He didn't do that on May 24th, 2009

21   with Marie-Josee Vinette, he didn't do it in Canadian court

22   in 2010.  He didn't give you a name yesterday in court when

23   he testified.  These numerous people, all of whom could have

24   framed him in an elaborate conspiracy to have him possess and

25   transport child pornography, not one of them has a name.  Not

1    one.  Because it's not a real explanation.  It's not a

2    genuine credible explanation for the evidence.  The evidence

3    that shows that at 6 in the morning, at 10 a.m., at 11 p.m.,

4    someone, user Joe, is putting child pornography on the

5    defendant's computer.  Who is it who works for the defendant

6    at 11 p.m., in an electrician company?  Who is it at 11 p.m.

7    who is accessing e-mail and then looking at child

8    pornography?  The explanation makes no sense.  It simply does

9    not hold water but it is consistent with one thing.  It's

10   consistent with the fact that when the defendant is about to

11   be held accountable for something, when the defendant is on

12   the hook for something, he looks for somebody else to blame.

13   When the defendant failed to show up for court, when a bench

14   warrant was issued for him, it was everybody else's fault but

15   his.  It was his Canadian lawyer's fault, it was his U.S.

16   lawyer's fault, his lawyer told him not to come, his lawyer

17   failed to tell him when to come, the investigation had been

18   so bungled there wasn't any point in coming, he hadn't gotten

19   full disclosure from the Canadian prosecutor, and finally,

20   finally, it's just the Canadians generally, the Canadians

21   messed it all up and that's why I didn't show up for my trial

22   in Canada.  Not because I'm guilty, but because the Canadians

23   messed it up.

24          The Canadians didn't mess up the investigation that

25   took place on May 24th, 2009.  The Canadians did not make it

1   so the defendant failed to appear for court.  The Canadians,

2   the U.S. lawyers, the U.S. prosecutor, that stupid

3   prosecutor, none of those people, not the handymen in the

4   garage, not the subcontractors, not the partners, not the

5   prosecutors, not the investigators, not the lawyers, none of

6   those people are responsible for the defendant's possession

7   and transportation of child pornography.  The defendant is

8   responsible.  The defendant is guilty beyond a reasonable

9   doubt of those offenses.  And it is no one's fault but his

10   own.

11              THE COURT:  Okay, ladies and gentlemen, that

12   concludes the closing arguments of counsel.  The next step is

13   for me to read the law to you.  I'm going give you a brief

14   break before we do that so you can use the facilities,

15   stretch, be about 10 minutes.  Okay.  Even though all the

16   proof is in, summations have been completed, very important

17   part of the case has not been given to you, so please do not

18   discuss this case yet, don't form any opinions.  Take a short

19   break and then I'm going to read you the law.  Thank you.

20              (Jury Excused, 10:34 a.m.)

21              THE COURT:  Okay, we'll take about a 10-minute

22   break but before we do that, the revised jury instructions

23   and the jury verdict forms were placed on your tables this

24   morning.  They weren't?  They should have been.  Just take a

25   quick look, there's some revisions that we agreed to make,

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 751 of 890
**A741**
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 57 of 113

1    and I'll ask you during the break to take a quick review of

2    those, and if there's any issues, let me know before we

3    start.  Okay.

4                    (Court in recess, 10:35 a.m. to 10:46 a.m.)

5              THE COURT:  All right, we're in the courtroom

6    without the jury, are we all set, had an opportunity to look

7    at everything?

8              MR. GOLDSMITH:  Yeah, your Honor, I've had the

9    opportunity to review the revised charges and I've noted the

10   corrections that we've discussed from the charge conference.

11             THE COURT:  They've all been made.  Government,

12   same thing, you're all set?

13             MS. CARROLL:  Yes, your Honor.

14             THE COURT:  Okay.  Very well.  Bring the jury in

15   when they're ready, please.

16                  (Jury Present.)

17             THE COURT:  Okay.  Jury's had a brief break, we're

18   ready to do the charge on the law in this case.  Now, I don't

19   want anybody getting nervous about the length of the

20   instructions.  A copy of what I'm going to read to you is

21   going to be sent in for you, so that if there's any questions

22   about what my instructions were, you'll have them there in

23   front of you.  And one of the first things you'll notice in

24   the jury instructions is that there's a table of contents, so

25   that if you want to get right to a particular section of the

1    law, you know, somebody has a question, hopefully you can

2    find it easily, go right to that section and you can find the

3    area that you're talking about, should that become necessary.

4           Okay.  So, first thing we're going to do is we're

5    going to talk about the roles of the court and the jury.

6           Now that you've heard all the evidence and the

7    arguments of counsel, it is my duty to instruct you on the

8    applicable law on this case.  Your duty as jurors is to

9    determine the facts of this case on the basis of the admitted

10   evidence.  Once you have determined the facts, you must

11   follow the law as I state it and apply the law to the facts

12   as you find them.

13          You are not to consider one instruction alone as

14   stating the law, but you are to consider the instructions as

15   a whole.  If an attorney has stated the legal principle

16   different from any that I state to you in my instructions, it

17   is my instructions that you must follow.  You should not

18   concern yourself with the wisdom of any rule of law.  You are

19   bound to accept and apply the law as I give it to you,

20   whether or not you agree with it.

21          In deciding the facts and applying the law of this

22   case, you must not be swayed by feelings of bias, prejudice,

23   or sympathy toward any party.  The government and the

24   defendant, as well as the general public, expect you to

25   carefully and impartially consider all the evidence in this

1    case, follow the law as stated by the court, and reach a

2    decision regardless of the consequences.

3            Nothing I say in these instructions is to be taken

4    as any indication that I have any opinion about the facts of

5    the case or what that opinion may be.  It is not my function

6    to determine the facts, that is your function.

7            Role of the attorneys.  The function of the

8    attorneys is to call your attention to those facts that are

9    most helpful to their side of the case.  What the attorneys

10   say, however, is not binding on you, and in the final

11   analysis, your own recollection and interpretation of the

12   evidence controls your decision.

13           Let me further elaborate on the role of attorneys.

14   Our courts operate under an adversary system in which we hope

15   that the truth will emerge through the competing

16   presentations of adverse parties.  It is the role of the

17   attorneys to press as hard as they can for their respective

18   positions.  In fulfilling that role, they have not only the

19   right but the obligation to make objections to the

20   introduction of evidence they feel is improper.

21           The application of rules of evidence is not always

22   clear, and the attorneys often disagree.  It has been my job

23   as the judge to resolve these disputes.  It is important for

24   you to realize, however, that my rulings on evidentiary

25   matters have nothing to do with the ultimate merits of the

1   case and are not to be considered as points scored for one

2   side or the other.

3          Similarly, one cannot help becoming involved with

4   the personalities and styles of the attorneys.  However, it

5   is important for you as jurors to recognize that this is not

6   a contest between attorneys.  You are to decide this case

7   solely based on the evidence.  Remember, statements and

8   characterizations of the evidence by the attorneys are not

9   evidence.  Insofar as you find their opening and/or closing

10  arguments helpful, take advantage of them; but keep in mind

11  that it is your memory and your evaluation of the evidence in

12  the case that counts.

13         In addition, you must not infer from anything I've

14  said during this trial that I hold any views for or against

15  either the government or the defendant, and in any event, any

16  opinion I might have is irrelevant to your decision.

17         The government as a party.  You are to perform the

18  duty of finding the facts without bias or prejudice as to any

19  party.  You are to perform your final duty in an attitude of

20  complete fairness and impartiality.  The case is important to

21  the government because the enforcement of criminal laws is a

22  matter of prime concern to the community.  It is equally

23  important to the defendant, who is charged with a serious

24  crime.

25         The fact that the prosecution is brought in the

1    name of the United States of America entitles the government

2    to no greater consideration than that afforded to any other

3    party to a litigation.  By the same token, it is entitled to

4    no less consideration.  All parties, whether the government

5    or individuals, stand as equals at the bar of justice.

6           The question before you can never be, will the

7    government win or lose the case.  The government always wins

8    when justice is done, regardless of whether the verdict is

9    guilty or not guilty.

10          Nature of evidence.  Testimony and exhibits.  As I

11   stated earlier, your duty is to determine the facts based on

12   the evidence that has been admitted in this case.  The term

13   evidence includes the sworn testimony of witnesses, both on

14   direct examination and cross-examination, and the exhibits

15   received into evidence regardless of who may have produced

16   them.

17          Regarding the first form of evidence, that is sworn

18   testimony, arguments and statements of attorneys, questions

19   to witnesses, and material excluded by my rulings, are not

20   evidence.  For example, at times during the trial, a lawyer

21   on cross-examination may have incorporated into a question a

22   statement that assumed certain facts to be true and asked the

23   witness if the statement was true.  If the witness denied the

24   truth of the statement, and if there is no evidence in the

25   record providing that the assumed fact is true, then you may

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 756 of 890
**A746**
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 62 of 113

716

1    not consider the fact to be true simply because it was

2    contained in a lawyer's question.  Similarly, at times during

3    the trial, I sustained objections to questions and either

4    prevented a witness from answering or ordered an answer

5    stricken from the record.  You may not draw inferences from

6    unanswered questions and you may not consider any responses

7    that I ordered stricken from the record.

8          Regarding the second form of evidence, that is

9    exhibits, exhibits that have been marked for identification

10   but not received may not be considered by you as evidence.

11   Only those exhibits received may be considered as evidence.

12   You should consider the evidence in the light of your own

13   common sense and experience and you may draw reasonable

14   inferences from the evidence.  However, you are to base your

15   verdict only on the evidence received in the case.  Anything

16   you may have seen or heard about this case outside the

17   courtroom is not evidence and must be entirely disregarded.

18   Stated right from the beginning, jury selection, everything,

19   the only thing, and everything you'll need is going to be

20   received in this courtroom, okay.  And that's the only thing

21   you consider.

22          Direct and circumstantial evidence.  As I explained

23   to you during my preliminary instructions to you at the start

24   of trial, the law recognizes two types of evidence -- direct

25   and circumstantial.  Now that the trial is over, more

1    elaborate instruction on that subject is appropriate.  Direct

2    evidence is evidence that proves a disputed fact directly.

3    For example, when a witness testifies to what he or she saw,

4    heard, or observed, that is called direct evidence.

5          Circumstantial evidence is evidence that tends to

6    prove a disputed fact by proof of other facts.  I will give

7    you an example other than that snow example that I gave you

8    during my preliminary instructions.  Suppose that when you

9    came into the courthouse today, the sun was shining and it

10    was a nice day, but the courtroom blinds were drawn and you

11    could not look outside.  Then later, as you were sitting

12    here, someone walked in with a dripping, wet umbrella and

13    soon after, somebody else walked in with a dripping wet

14    raincoat.  Now, on our assumed facts, you cannot look outside

15    the courtroom and you cannot see whether it's raining so you

16    have no direct evidence of that fact, but on the combination

17    of the facts about the umbrella, and the raincoat, it would

18    be reasonable for you to infer that it had begun to rain

19    based on that circumstantial evidence that you observed.

20          That is all there is to circumstantial evidence.

21    Using your reason and experience, you infer from established

22    facts the existence or the nonexistence of some other fact.

23    Please note, however, that it is not a matter of speculation

24    or guess.  It is a matter of logical inference.

25          The law makes no distinction between direct and

1    circumstantial evidence.  Circumstantial evidence is of no

2    less value than direct evidence, and you may consider either

3    or both and you may give them such weight as you conclude is

4    warranted.  And I emphasize, as I've said in my instructions,

5    common sense.  It's critical and important in your evaluation

6    of evidence.

7          The indictment is not evidence.  As I explained to

8    you during my preliminary instructions, the defendant has

9    been charged with a crime about which I will further instruct

10   you shortly.  The instrument through which he has been

11   charged is called the indictment.  The indictment is not

12   evidence.  Rather, it is merely an accusation describing the

13   charge made against the defendant.  As a result, it may not

14   be considered by you as any evidence of guilt of the

15   defendant.

16          Potential punishment is not evidence.  Similarly,

17   the question of possible punishment of the defendant should

18   be of no concern to you and should not in any sense enter

19   into or influence your deliberations.  The duty of imposing

20   sentence rests exclusively upon the court.  Your function is

21   to weigh the evidence in the case and to determine whether or

22   not the defendant is guilty beyond a reasonable doubt solely

23   upon the basis of such evidence.  Under your oath as jurors,

24   you cannot allow consideration of the punishment which may be

25   imposed upon the defendant if he is convicted to influence

719

1    your verdict in any way or in any sense let it enter into

2    your deliberations.  Okay.  Strictly prohibited.

3                    Evaluation of evidence.  Verdict based on

4    evidence, not sympathy.  Under your oath as jurors, you are

5    not to be swayed by sympathy.  You are to be guided by the

6    evidence in this case.  The crucial hard core question that

7    you must ask yourself as you sift through the evidence is

8    this.  Has the government proven the guilt of the defendant

9    beyond a reasonable doubt.

10                   It is for you alone to decide whether the

11   government has proven that the defendant is guilty of the

12   crime charged solely on the basis of the evidence and subject

13   to the law as I charge you.  It must be clear to you that

14   once you let fear or prejudice or bias or sympathy interfere

15   with your thinking, there is a risk that you will not arrive

16   at a true and just verdict.

17                   If you have a reasonable doubt as to the guilt

18   of the defendant, then you should not hesitate for any reason

19   to render a verdict of not guilty.  But on the other hand, if

20   you should find that the government has met its burden of

21   proving the guilt of the defendant beyond a reasonable doubt,

22   then you should not hesitate because of sympathy or any other

23   reason to render a verdict of guilty.

24                   Improper considerations.  Race, religion,

25   national origin, sex, or age.  Your verdict must be based

1    solely upon the evidence developed at trial or the lack of

2    evidence.

3            It would be improper for you to consider in

4    reaching your decision as to whether the government sustained

5    its burden of proof any personal feelings you may have about

6    the defendant's race, religion, national origin, sex, or age.

7    All persons are entitled to the presumption of innocence and

8    the government has the burden of proof as I will discuss in a

9    moment.

10           It would be equally improper for you to allow

11   any feelings you might have about the nature of the crime

12   charged to interfere with your decision-making process.   To

13   repeat, your verdict must be based exclusively upon the

14   evidence or the lack of evidence in the case.

15           Quality, not quantity of evidence.   The fact

16   that one party has introduced more evidence than the other

17   does not mean that you should find the facts in favor of the

18   side offering the more evidence.   It is the quality of the

19   evidence that governs, not the quantity.   As a matter of

20   fact, the defendant in a criminal case is under no obligation

21   to present any evidence.

22           Credibility of witnesses.   You have heard

23   the -- you have had the opportunity, excuse me, to observe

24   all of the witnesses.   It is now your job to decide how

25   believable each witness was in his or her testimony.   You are

1    the sole judges of the credibility of each witness and of the

2    importance of his or her testimony.

3                     In evaluating a witness' testimony, you should

4    use all the tests for truthfulness that you would use in

5    determining matters of importance to you in your everyday

6    life.  You should consider any bias or hostility the witness

7    may have shown for or against any party, as well as the

8    interest, excuse me, as well as the interest the witness may

9    have in the outcome of the case.  You should consider the

10   following:  First, the opportunity the witness had to see,

11   hear, and know the things about which he or she testified;

12   two, the accuracy of the witness' memory; three, his or her

13   candor or lack of candor; four, the reasonableness and

14   possibility -- probability, excuse me, of the witness'

15   testimony; and five, the testimony's consistency or lack of

16   consistency; and six, its corroboration or lack of

17   corroboration with other credible testimony.

18                    In other words, what you must try to do in

19   deciding credibility is to size up the witness in the light

20   of his or her demeanor, the explanations given, and all the

21   other evidence in the case.  Always remember that you should

22   use your common sense, your good judgment, and your own life

23   experience.

24                    The existence or nonexistence of a fact is not

25   determined by the number of witnesses called.  Again, your

1      concern is not the quantity, but the quality of the evidence.

2                    Testimony of law enforcement witnesses.  You

3      have heard the testimony of law enforcement officials.  The

4      fact that a witness may be employed by the government as a

5      law enforcement official does not mean that his or her

6      testimony is necessarily deserving of any more or any less

7      consideration or greater or lesser weight than that of an

8      ordinary witness.

9                    At the same time, it is legitimate for defense

10     counsel to try to attack the credibility of law enforcement

11     witnesses on the grounds that his or her testimony may be

12     colored by personal or professional interest in the outcome

13     of the case.

14                   It is your decision, after reviewing all the

15     evidence, whether to accept the testimony of law enforcement

16     witnesses and to give that testimony whatever weight, if any,

17     you find it deserves.

18                   Pretrial statements of the defendant.  There

19     has been evidence that the defendant made certain statements

20     to, or overheard by, law enforcement authorities.

21                   Evidence of these statements was properly

22     admitted in this case and may be properly considered by you.

23     You are to give the evidence of such statements such weight

24     as you feel it deserves in light of all of the evidence.

25                   Whether you approve or disapprove of the use

1      of these statements, the use of these statements may not

2      enter your deliberations.  Let me reread that so it's clear.

3      Whether you approve or disapprove of the use of these

4      statements may not enter your deliberations.  I instruct you

5      that the defendant's rights were not violated during the

6      making of these statements and the government's use of this

7      evidence is entirely lawful.

8                    Testimony of the defendant.  In a criminal

9      case, the defendant cannot be required to testify but if he

10     does choose to testify, he is of course permitted to take the

11     witness stand on his own behalf.  In this case defendant

12     decided to testify.  You should examine and evaluate his

13     testimony just as you would the testimony of any witness with

14     an interest in the outcome of the case.

15                   Use of evidence obtained.  During the trial,

16     you have heard testimony about evidence obtained by law

17     enforcement officers through searches.  You are instructed

18     that the evidence obtained from these searches was properly

19     admitted into this case, and may be properly considered by

20     you.  Such searches were entirely appropriate law enforcement

21     actions.  Whether you approve or disapprove of how the

22     evidence was obtained should not enter into your

23     deliberations, because I instruct you that the government's

24     use of the evidence is entirely lawful.

25                   In addition, the government has offered

1    evidence in the form of a recording of a telephone call

2    between the defendant and other people.  You are instructed

3    that this recording was lawfully obtained and the government

4    is entitled to use the recording in this case.

5                You must, therefore, regardless of your

6    personal opinions, give this evidence full consideration

7    along with all the evidence in the case in determining

8    whether the government has proven the defendant's guilt

9    beyond a reasonable doubt.

10               Expert testimony.  You have also heard

11   testimony from what we call an expert witness.  An expert is

12   allowed to express his opinion on those matters about which

13   he has special knowledge and training.  Expert testimony is

14   presented to you on the theory that someone who is

15   experienced in the field can assist you in understanding the

16   evidence or in reaching an independent decision on the facts.

17               In weighing the expert's testimony, you may

18   consider the expert's qualifications, his opinions, his

19   reasons for testifying as well as all the other

20   considerations that ordinarily apply when you're deciding

21   whether or not to believe a witness -- a witness' testimony.

22   You may give the expert testimony whatever weight, if any,

23   you find it deserves in light of all the evidence in this

24   case.  You should not, however, accept this testimony merely

25   because he is an expert.  Nor should you substitute it for

1    your own reason, judgment, and common sense.  The

2    determination of facts in this case rests solely with you.

3                    Transcript of audio recording.  With regard to

4    the audio recording that I mentioned earlier, a certain

5    typewritten transcript was provided to you.  This transcript,

6    which purports to identify the speakers engaged in an oral

7    conversation was provided to you for the limited and

8    secondary purpose of aiding you in following the content of

9    the conversation, as you listened to the audio recording and

10   aiding you in identifying the speakers.

11                    However, you are specifically instructed that

12   whether the transcript correctly or incorrectly reflect the

13   content of the conversation or the identity of the speakers

14   is entirely for you to determine based upon your own

15   evaluation of testimony you have heard concerning the

16   preparation of the transcript, and from your own examination

17   of the transcript in relation to your hearing of the audio

18   recording itself.  If you noticed a difference between what

19   you heard on the recording and what you read in the

20   transcript, you must rely on what you heard, not what you

21   read.  Similarly, if you could not hear or understand certain

22   parts of the recording, you must ignore the transcript as far

23   as that part, as far as those parts are concerned.

24                    Particular investigative techniques not

25   required.  In the questions and arguments of defense counsel

1    in this case, you have heard reference to the fact that

2    certain investigative techniques may not have been used by

3    law enforcement authorities.  However, there is no legal

4    requirement the government prove its case through any

5    particular means.  Law enforcement authorities have no legal

6    duty to employ in the course of an investigation all of the

7    many tools at their disposal, and the failure to use any

8    particular technique or techniques does not tend to show that

9    a defendant is not guilty of a crime with which he is

10   charged.  Thus, you are not to concern yourself with why law

11   enforcement authorities used the techniques they did, or why

12   they did not use other techniques.  Rather, your concern is

13   to determine whether or not, based on the evidence or lack of

14   evidence, the guilt of the defendant has been proven beyond a

15   reasonable doubt.

16           Variance in dates immaterial.  Please note

17   that it does not matter if the indictment charges that a

18   specific act occurred on or about a certain date and that the

19   evidence indicates that, in fact, it was on another date.

20   The law requires only a substantial similarity between the

21   dates alleged in the indictment and the date established by

22   testimony or exhibits.

23           Okay, let's talk about the burden of proof.

24   Now, before discussing the alleged crime charged here, I want

25   to remind you that the indictment here is a mere accusation.

1    It is not evidence and you are to draw no inference of guilt

2    from the mere fact the defendant has been charged.  As a

3    result, in reaching your determination of whether the

4    government has proved the defendant guilty beyond a

5    reasonable doubt, you may consider only the evidence

6    introduced or the lack of evidence.

7              The defendant has no burden of proof

8    whatsoever in this case.  He is under no obligation to

9    produce any witnesses.  He is presumed to be innocent and the

10   presumption of innocence continues through the trial and

11   during your deliberations.  The presumption of innocence is

12   overcome when and only when the government establishes the

13   guilt of the defendant by proving each element of the offense

14   you are considering beyond a reasonable doubt.

15             Now what do I mean by beyond a reasonable

16   doubt?  It is not some vague or speculative doubt.  As the

17   phrase implies, a reasonable doubt is a doubt that is based

18   upon reason, a reason that appears in the evidence or the

19   lack of evidence.  The government is not required to prove a

20   defendant guilty beyond every conceivable or every possible

21   doubt.  Nor is the government required to prove a defendant

22   guilty to an absolute mathematical certainty, because of

23   course in human affairs, that is usually impossible.  But you

24   should review all the evidence as you remember it, sift out

25   what you believe, discuss it, analyze it, compare your views

1  of the evidence with that of your fellow jurors, and if that

2  process produces in your mind some belief or conviction that

3  you would be willing to accept without further hesitation,

4  then you may say that you have been convinced beyond a

5  reasonable doubt.

6          On the other hand, if going through that same

7  process in your mind, your mind is wavering, or it is so

8  uncertain that you would hesitate before acting if it were an

9  important matter of your own, then you have not been

10  convinced beyond a reasonable doubt.

11          We're now going to go into the substantive

12  law.  The indictment in this case contains two counts.  Each

13  count is a separate offense or crime.  Each count must

14  therefore be considered separately by you, and must -- and

15  you must return a separate verdict on each count.

16          Count 1 of the indictment charges defendant in

17  this case with transportation of child pornography, in

18  violation of Title 18, United States Code, Sections

19  2252A(a)(1), and 2256(8)(A).  Specifically, Count 1 of the

20  indictment reads as follows:  "On or about May 24th, 2009, in

21  the Northern District of New York, Joseph Jenkins, the

22  defendant herein, did knowingly and unlawfully transport

23  child pornography using a means and facility of interstate

24  and foreign commerce and in and affecting interstate and

25  foreign commerce by any means, including by computer, in that

1    the defendant made entry into Canada at the Port of Lansdowne

2    Ontario, from Wellesley Island, New York, in Jefferson

3    County, transporting in a vehicle a Toshiba laptop computer,

4    serial number 78175808W, that contained one or more graphic

5    image files and multimedia files containing images of a minor

6    and minors engaged in sexually explicit conduct."

7                  Count 2 of the indictment charges the

8    defendant in this case with the possession of child

9    pornography in violation of Title 18, United States Code,

10   Sections 2252A(a)(5)(B) and 2256(8)(A).  Specifically, Count

11   2 of the indictment reads as follows:  "On or about May 24th,

12   2009, in the Northern District of New York, Joseph Jenkins,

13   the defendant herein, did knowingly possess material that

14   contained one or more images of child pornography, that had

15   been transported using a means and facility of interstate and

16   foreign commerce, and in and affecting such commerce by any

17   means, including by computer, and that was produced using

18   materials that had been shipped and transported in and

19   affecting such commerce by any means, including by computer,

20   that is:  A PNY Attache 8GB -- 8-gigabyte USB thumb drive

21   that contained one or more graphic image files and multimedia

22   files containing images of a minor and minors engaged in

23   sexually explicit conduct; and two, a PNY Attache 4GB thumb

24   drive that contained one or more graphic image files and

25   multimedia files containing images of a minor and minors

730

1   engaged in sexually explicit conduct obtained by use of the

2   internet."

3                Having read the two counts of the indictment

4   to you, I will now discuss in more detail the elements of

5   those two counts which the government must prove beyond a

6   reasonable doubt.

7                Count 1.  Transportation of child pornography.

8   Title 18, United States Code, Section 2252A and then

9   subdivision (a)(1) provides as follows:  "Any person who...

10  knowingly mails, or transports or ships using any means or

11  facility of interstate or foreign commerce or in or affecting

12  interstate or foreign commerce by any means, including by

13  computer, any child pornography ... [shall be guilty of a

14  crime]."

15               As a result, in order to satisfy its burden of

16  proof with regard to Count 1, the government must establish

17  each of the following four elements beyond a reasonable

18  doubt:

19               One, that the defendant knowingly transported

20  a visual depiction as that term will be defined;

21               Two, that the visual depiction was transported

22  using any means or facility of interstate or foreign commerce

23  or in or affecting interstate or foreign commerce by any

24  means, including by computer;

25               Three, that the visual depiction was child

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 77 of 890
A761
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 77 of 113

731

1    pornography, as that term will be defined; and

2                    Four, that the defendant knew of the sexually

3    explicit nature of the material and that the visual depiction

4    was of an actual minor engaged in that sexually explicit

5    conduct.

6                    Having briefly described these four elements,

7    I will now discuss them with you in more detail.

8                    First element.  The first element that the

9    government must prove beyond a reasonable doubt is that the

10   defendant knowingly transported a visual depiction.

11                   A visual depiction includes any photograph,

12   film, video, or picture, including undeveloped film and

13   videotape, and data stored on a computer disk or by

14   electronic means which is capable of conversion into a visual

15   image.

16                   An act is done knowingly when it is done

17   voluntarily and intentionally, not because of accident,

18   mistake, or other innocent reason.  It is not necessary for

19   the government to show the defendant personally transported

20   or shipped the depiction.  It is sufficient if the government

21   proves that the defendant knowingly caused the interstate

22   shipment to take place.

23                   Second, the second element that the government

24   must prove beyond a reasonable doubt is that the visual

25   depiction was transported using any means or facility of

1    interstate or foreign commerce or in or affecting interstate

2    or foreign commerce by any means, including by computer.

3    This means that the government may establish this element by

4    proving that the visual depiction crossed between one state

5    and another or between the United States and a foreign

6    country.

7                Third.  The third element the government must

8    prove beyond a reasonable doubt is that the visual depiction

9    was child pornography.

10               Child pornography means any visual depiction

11   the production of which involved the use of a minor engaging

12   in sexually explicit conduct, as I will explain that term to

13   you, and which portrays that minor engaged in that conduct.

14               The visual depiction must be of a real person

15   under the age of 18 engaging in sexually explicit conduct.

16   The government does not have to prove the identity of the

17   minor, or the exact age of the minor.  You may consider all

18   the evidence, including your viewing of the depiction, in

19   determining whether the depiction portrayed an actual person

20   under the age of 18 engaging in sexually explicit conduct.

21               The term sexually explicit conduct means any

22   actual or simulated sexual intercourse, including genital to

23   genital, oral to genital, anal to genital, or oral to anal,

24   whether between persons of the same or opposite sex;

25   bestiality, masturbation, sadistic or masochistic abuse; or

1    lascivious exhibition of the genitals or pubic area of any

2    person.

3                    The term lascivious exhibition means a

4    depiction that displays or brings to view to attract notice

5    to the genitals or the pubic area of children in order to

6    excite lustfulness or sexual stimulation in the viewer.  Not

7    every exposure of the genitals or the pubic area constitutes

8    a lascivious exhibition.  In deciding whether the government

9    has proved a visual depiction constitutes a lascivious

10   exhibition, you must consider the following questions:

11                   One, whether the focal point of the visual

12   depiction is on the child's genitals or pubic area, or

13   whether there is some other focal area;

14                   Two, whether the setting of the visual

15   depiction makes it appear to be sexually suggestive, for

16   example, in a place or pose generally associated with sexual

17   activity;

18                   Three, whether the child is displayed in an

19   unnatural pose or in inappropriate attire considering the age

20   of the child;

21                   Four, whether the child is fully or partially

22   clothed or nude, although nudity is not in and of itself

23   lascivious;

24                   Five, whether the visual depiction suggests

25   sexual coyness or a willingness to engage in sexual activity;

1          And six, whether the visual depiction is

2     intended or designed to elicit a sexual response in the

3     viewer.

4          It is not required that a particular visual

5     depiction involve all of these factors to be a lascivious

6     exhibition.  The importance you give to any one of the

7     factors is up to you to decide.

8          The fourth element.  The fourth element that

9     the government must prove beyond a reasonable doubt is the

10    defendant knew that the material he possessed was child

11    pornography.

12          As I stated before, an act is done knowingly

13    when it is done voluntarily and intentionally and not because

14    of accident, mistake, or for some other reason.

15          In this case, the term knowingly refers to an

16    awareness of the sexually explicit nature of the material and

17    to the knowledge that the visual depictions were in fact of

18    actual minors engaged in that sexually explicit conduct.

19          The government must show the defendant had

20    knowledge of the general nature of the contents of the

21    material.  The defendant need not have any specific knowledge

22    as to the identity or actual age of the underage performer.

23    The defendant must have knowledge or awareness that the

24    material contained a visual depiction of a minor engaging in

25    sexually explicit conduct.  Such knowledge may be shown by

1    direct or circumstantial evidence, or both.  Eyewitness

2    testimony of defendant's viewing of the material is not

3    necessary to prove his awareness of its contents.  The

4    circumstances may warrant an inference that he was aware of

5    what the material depicts.  Furthermore, the defendant's

6    belief as to the legality or illegality of the material is

7    irrelevant.

8                Finally, a few additional words are

9    appropriate regarding consciousness of guilt from flight.

10   You have heard evidence that the defendant fled after he

11   learned that he was going to be prosecuted in Canada for the

12   same conduct giving rise to the charges for which he is now

13   on trial.  If proved, the flight of defendant after he knows

14   he has been accused of a crime may tend to prove that the

15   defendant believed that he was guilty.  It may be weighed by

16   you in this connection together with all the other evidence.

17               However, flight may not always reflect

18   feelings of guilt.  Moreover, feelings of guilt, which are

19   present -- which are present in many innocent people, do not

20   necessarily reflect actual guilt.

21               You are specifically cautioned that evidence

22   of flight of a defendant may not be used by you as a

23   substitute of proof of guilt.  Flight does not create a

24   presumption of guilt.

25               Whether or not evidence of flight does show

1    the defendant believed that he was guilty and the

2    significance, if any, to be given to defendant's feelings on

3    this matter are for you to determine.  Okay.  You are the

4    judges of the facts, it's always your determination that

5    controls.

6                    Count 2.  Possession of child pornography.

7    Excuse me a second.  Title 18, United States Code, Section

8    2252A(a)(5)(B) provides as follows, in pertinent part:  "Any

9    person who...knowingly possesses,...any book, magazine,

10   periodical, film, videotape, computer disk, or any other

11   material that contains an image of child pornography that has

12   been mailed, or shipped or transported using any means or

13   facility of interstate or foreign commerce or in or affecting

14   interstate or foreign commerce by any means, including by

15   computer, or that was produced using materials that had been

16   mailed, or shipped or transported in or affecting interstate

17   or foreign commerce by any means, including by

18   computer...[shall be guilty of a crime]."

19                    As a result, in order to satisfy its burden of

20   proof with regard to Count 2, the government must establish

21   each of the following four elements beyond a reasonable

22   doubt:

23                    First, that the defendant knowingly possessed

24   a visual depiction as I have defined that term.

25                    Two, that the visual depiction has been

1    transported using any means or facility of interstate or

2    foreign commerce or in or affecting interstate or foreign

3    commerce by any means including by computer or that the

4    visual depiction was produced using materials that had been

5    shipped or transported in or affecting interstate or foreign

6    commerce by any means, including by computer;

7           And that the visual depiction was child

8    pornography, as I have defined that term; and

9           Four, that the defendant knew of the sexually

10    explicit nature of the material and that the visual depiction

11    was of an actual minor engaged in that sexually explicit

12    conduct.

13           Having briefly described these four elements,

14    I will now discuss them in more detail.

15           First, the first element that the government

16    must prove beyond a reasonable doubt is that the defendant

17    knowingly possessed a visual depiction. As I previously

18    instructed you, a visual depiction includes any photograph,

19    film, video, or picture, including undeveloped film and

20    videotape, data stored on a computer disk or by electronic

21    means which is capable of conversion into a visual image.

22           To possess something means to have it within a

23    person's control. That does not necessarily mean that the

24    person must hold it physically, that it is -- that is, have

25    actual possession of it. As long as the visual depiction is

1     within the defendant's control, he possesses it.  If you find

2     the defendant either had actual possession of the depiction

3     or that he had the power and the intention to exercise

4     control over it, even though it was not in his physical

5     possession, you may find that the government has proven

6     possession.

7               The law also recognizes that possession may be

8     sole or joint.  If one person alone possesses it, that is

9     sole possession.  However, it is possible that more than one

10    person may have the power and intention to exercise control

11    over the visual depiction.  This is called joint possession.

12    If you find the defendant had such power and intention, then

13    he possessed the depiction even if he possessed it jointly

14    with another person.

15              The government must prove that the defendant

16    possessed the depiction knowingly.  An act is done knowingly

17    when it is done voluntarily and intentionally, and not

18    because of accident, mistake, or for some other innocent

19    reason.

20              Second element.  Please note that the second

21    element of Count 2 is different from the second element of

22    Count 1 in that it contains the additional language "or that

23    the visual depiction had been produced using materials that

24    had been shipped or transported in or affecting interstate or

25    foreign commerce by any means, including by computer."

1          This means that instead of establishing this

2     element by proving beyond a reasonable doubt that the visual

3     depiction had been transported using any means or facility of

4     interstate or foreign commerce or in or affecting interstate

5     or foreign commerce by any means, the government may also

6     establish this element by proving, beyond a reasonable doubt,

7     that the visual depiction had been produced using materials

8     that had been shipped or transported in or affecting

9     interstate or foreign commerce by any means.

10          Third and fourth elements.  I have previously

11     instructed you on the third and fourth elements.  Please rely

12     on my instructions concerning those elements with regard to

13     this count as well, they are the same.

14          Before I proceed to a discussion of the venue

15     requirement, I'd like to add a few words about the knowledge

16     requirement contained in the first and fourth elements of

17     Count 1, and the first and fourth elements of Count 2.  In

18     determining whether defendant acted knowingly, you may

19     consider whether defendant deliberately closed his eyes to

20     what would otherwise have been obvious to him.  If you find

21     beyond a reasonable doubt that defendant acted with or that

22     his ignorance was solely and entirely the result of a

23     conscious purpose to avoid learning the truth of the facts

24     referenced in those elements, then this knowledge requirement

25     may be satisfied.  However, guilty knowledge may not be

1    established by demonstrating that the defendant was merely

2    negligent, foolish, or mistaken.  It is entirely up to you

3    whether you find the defendant deliberately closed his eyes

4    and any inferences to be drawn from the evidence on that

5    issue.  Okay.

6                    Venue requirement for both counts.  In

7    addition to the elements of Count 1 and 2, you must consider

8    whether any act in furtherance of the crime occurred within

9    the Northern District of New York.  You are instructed that

10   the Northern District of New York includes, among other

11   places, Syracuse, Binghamton, Oswego, Watertown, Plattsburgh,

12   Albany, Utica, New York.  It also includes the counties and

13   land running along the St. Lawrence River including the

14   Jeffer -- including Jefferson County.  In this regard, the

15   government need not prove that the crime itself was committed

16   in this district or that defendant himself was present here.

17   It is sufficient to satisfy this element if any act in

18   furtherance of the crime occurred within this district.

19   Okay.  And I told you right from the beginning of jury

20   selection when I welcomed you to District Court in the

21   Northern District of New York, Northern District is a huge

22   area, 32 of the 62 counties of the state.  I've given you a

23   brief description of the geographical area, runs along the

24   U.S.-Canadian border, over to Albany, Utica, down to

25   Binghamton, so that's what you need to decide to satisfy this

1    element if any act in furtherance of the crime occurred

2    within this district.

3                I should note that on this issue, the

4    government need not prove venue beyond a reasonable doubt,

5    but only by a preponderance of the evidence, which is a lower

6    standard than proof beyond a reasonable doubt.  A

7    preponderance of the evidence means that the government must

8    prove that it is more likely than not that any act in

9    furtherance of the charge you are considering occurred in the

10   Northern District of New York.  Thus, with respect to

11   Counts 1 and 2, the government has satisfied its venue

12   obligation if you conclude that it is more likely than not

13   that any act in furtherance of the conduct charged occurred

14   within this district.  The Northern District of New York.

15               If you find that the government has failed to

16   prove that any act in furtherance of the crime, excuse me,

17   occurred within this district, then you must acquit the

18   defendant of the charge.

19               Finally, please note that depending on the

20   verdict you reach, there may be a brief additional proceeding

21   after you have returned with your verdict.

22               In conclusion, I have now outlined the rules

23   of law applicable to this case and the process by which you

24   should weigh the evidence and determine the facts.  In a few

25   minutes you will retire to the jury room for your

1    deliberations.  Your first order of business in the jury room

2    will be to elect a foreperson.  The foreperson's

3    responsibility is to ensure that deliberations proceed in an

4    orderly manner.  This does not mean that the foreperson's

5    vote is entitled to any greater weight than the vote of any

6    other juror.

7              When you are in the jury room, listen to each

8    other and discuss the evidence and issues.  You will have at

9    your disposal all of the exhibits.  It is the duty of each of

10   you as jurors to consult with each other.  You must

11   deliberate with a view to reaching an agreement but only if

12   you can do so without violating your individual judgment and

13   conscience.  Your job as jurors is to reach a fair conclusion

14   from the law and the evidence.  The defendant, the

15   government, and the court are relying on you to give full and

16   conscientious consideration to the issues and the evidence

17   before you.

18             In order to return a verdict, it is necessary

19   that each juror agree.  Your verdict must be unanimous.

20             As you know, I have permitted you to take

21   notes during the trial.  As I explained during my preliminary

22   instructions to you, those notes are simply an aid to your

23   memory.  Because the notes may be inaccurate or incomplete,

24   they may not be given any greater weight or influence than

25   the recollections of other jurors about the facts or the

1   conclusions drawn from the facts in determining the outcome

2   of this case.  You may base your determination of the facts

3   and ultimately your verdict on the court record, rather than

4   on any juror's notes.

5          Having said that, if in the course of your

6   deliberations, your recollection of any part of the testimony

7   should fail, or if you find yourself in doubt concerning my

8   instructions, it is your privilege to return to the courtroom

9   to have the testimony read to you or my instructions further

10  explained.  Please remember that it is not always easy to

11  locate what portion of the testimony you might want, so be as

12  specific as you possibly can in requesting the portion or

13  portions of testimony that you may want.  In addition, I

14  caution you that the reading back of testimony may take some

15  time and effort.  You should therefore make a conscientious

16  effort to resolve any questions as to the testimony through

17  your collective recollections in your deliberation process.

18  Talk to each other, discuss.

19         Should you desire to communicate with the

20  court during your deliberations, please put your message or

21  question in writing.  The foreperson should sign the note and

22  pass it to the marshal who will bring it to my attention.  I

23  will then respond either in writing or orally by having you

24  returned to the courtroom.  However, do not tell me or anyone

25  else how the jury stands on the issue of the defendant's

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 784 of 890
A774
Case 5:11-cr-00602-GTS   Document 168   Filed 05/30/14   Page 90 of 113

744

1    guilt until after a unanimous verdict is reached.  In other

2    words, no indication of where you are or if there's been a

3    vote taken or anything like that.  Don't want to know

4    anything about that.  All we need to know is what your

5    question is and put it in writing and it doesn't have to be

6    the foreperson, if the foreperson's writing is not great,

7    whoever has the best writing so we can make sure we can read

8    it.  The foreperson is required to sign it, put the date on

9    it, time, and send it out.

10                During your deliberations, do not hesitate to

11   reexamine your views and change your mind.  Do not, however,

12   surrender your honest convictions because of the opinion of a

13   fellow juror or for the purpose of returning a verdict.

14   Remember, you are not partisans.  You are the judges.  Judges

15   of the facts.  Your duty is to seek the truth from the

16   evidence presented to you while holding the government to its

17   burden of proof.

18                Once you have reached a unanimous verdict,

19   your foreperson should fill in the verdict form, date it and

20   sign it and inform the Marshal that a verdict has been

21   reached.

22                A verdict form has been prepared for you and I

23   will now review it with you.  One page, very simple,

24   straightforward.  It's got the caption of the case, says

25   verdict form.  First question, as to Count 1, transportation

Case 5:11-cr-00088-EAW Document 91-2 Filed 01/12/16 Page 785 of 890
**A775**
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 91 of 113

745

1    of child pornography, how do you unanimously find the

2    defendant, guilty or not guilty?

3                    Number 2, as to Count 2, possession of child

4    pornography, how do you unanimously find the defendant,

5    guilty or not guilty?

6                    And then just foreperson, please sign in the

7    space provided below and notify the marshal that you have

8    reached a verdict.  It has a place for you, foreperson to

9    sign and for it to be dated.  And that completes my

10   instructions.

11                   Are there any questions from anybody?  And

12   again, I remind you, we'll send this all in to you so you can

13   have it as reference material.  Not telling you you have to

14   reread it but it's there if you need it.  Okay.  Lori, can

15   you swear in the marshals, please.  We need two.  Actually

16   three, right?  Our alternates, you will be taken back

17   upstairs to the jury assembly room and you'll be kept there

18   unless and until we need you at some point in the

19   deliberations, and you'll be kept apprised of what's going

20   on, if there are notes and those sort of things, be brought

21   back to the courtroom at some point if we need you or when

22   there's a verdict.  Okay.

23                   COURT SECURITY OFFICER:  He'll be here momentarily.

24                   THE COURT:  Welcome back.  State your name for the

25   record.

746

1          COURT SECURITY OFFICER:  John Conroy.

2          COURT SECURITY OFFICER:  John Estabrook.

3                    (The court security officers were duly sworn.)

4          THE COURT:  Okay.  Ladies and gentlemen, you may

5    retire to deliberate, alternates will be taken to the jury

6    assembly room, and the evidence, all the admitted evidence is

7    available for you and will be brought in to you, okay.  Go

8    ahead.

9                    (Jury excused for deliberations, 11:39 a.m.)

10          THE COURT:  Okay.  We're in the courtroom without

11    the jury.  Are there any requests or objections with regard

12    to the court's charge, from the government?

13          MS. THOMSON:  No, your Honor.

14          MR. GOLDSMITH:  I did want to clarify, I don't

15    think the transcript was admitted, was it, of the phone call?

16          MS. CARROLL:  It wasn't.

17          MS. THOMSON:  It wasn't admitted but it was shown.

18          MR. GOLDSMITH:  I just say that as a matter of

19    clarity, it's not an objection to it because I don't think it

20    bears any weight and the court was careful in its instruction

21    that the jury's recollection of the phone call itself

22    controls.

23          THE COURT:  That instruction is given because the

24    visual aid that was provided by the government when they were

25    listening to the tape recording, there was a video, video

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    transcript displayed on the screen, which had the photo of

2    the defendant and a blank for the other person and went back

3    and forth so it's important for them to understand that that

4    does not control, it's their impression and hearing of the

5    video, or of the audio recording, excuse me, the audio

6    recording that controls, and that was the purpose of that

7    instruction.  Anything else?

8             MR. GOLDSMITH:  Nothing.  Just housekeeping, do

9    you -- I'm assuming you permit them to deliberate during

10   lunch?

11            THE COURT:  Yeah, their lunch is brought to them,

12   they've already ordered their lunch, it will be brought, if

13   it's not there already, it will be there shortly, and they

14   continue to deliberate, eat their lunch, it's up to them to

15   decide if they want to break or keep deliberating while

16   they're eating.  So that's the way we handle that.

17            If you're going to be out of the courtroom, away

18   from this floor, I'm going to ask you to leave a cell number

19   with my courtroom deputy, Lori, so we can get you if there

20   are any notes so we can get everybody back assembled here in

21   the courtroom as quickly as possible to address any notes

22   that are sent from the jury.  Okay.

23            Other than that, the court thanks you for your

24   courtesies and the way you tried the case, I think we moved

25   through it expeditiously and appreciate the courtesies of

1    counsel.

2           MS. CARROLL:  Your Honor, there's really only one

3    other matter for the record and that is the defendant is

4    going to make an initial appearance on the perjury complaint

5    in five minutes in front of Magistrate Dancks.

6           THE COURT:  Yeah, that shouldn't interfere in any

7    way.  If we get a note, we'll wait for him, that's not an

8    issue.

9           MS. CARROLL:  Okay.

10          THE COURT:  Thank you.

11          THE CLERK:  Court's in recess.

12                (Court in recess for jury deliberations,

13                 11:42 a.m. to 1:30 p.m.)

14                (Open Court, Jury Out, 1:30 p.m.)

15          THE COURT:  Okay, we're in the courtroom without

16   the jury.  The jury sent out a note that they have a verdict

17   so we're going to bring the jury in, we're going to take the

18   verdict, and then once we've taken the verdict, we'll go

19   right into the next phase, if necessary.  Okay.

20          MR. GOLDSMITH:  Okay.

21                (Jury Present, 1:31 p.m.)

22          THE COURT:  The record should reflect that we have

23   the ladies and gentlemen of the jury, defendant and defense

24   counsel and government attorneys.  It is the court's

25   understanding that a verdict has been reached.  I'm going to

749

1 ask the foreperson to please stand and my courtroom deputy

2 will take that verdict.

3            THE CLERK:  In the case of the United States of

4 America versus Joseph Vincent Jenkins, case number

5 5:11-CR-602, question 1 as to Count 1, transportation of

6 child pornography, how do you unanimously find the defendant?

7            THE FOREPERSON:  Guilty.

8            THE CLERK:  Number 2, as to Count 2, possession of

9 child pornography, how do you unanimously find the defendant?

10           THE FOREPERSON:  Guilty.

11           THE CLERK:  Thank you.

12           THE COURT:  Okay.  Would either party like this

13 jury polled?

14           MR. GOLDSMITH:  Defense requests a polling, your

15 Honor.

16           THE COURT:  Very well.  We'll do that.

17           THE CLERK:  Now I'm going to ask each of you

18 individually if the verdict as I just received from the

19 foreperson is your individual verdict.  With regard to the

20 guilty verdict on Counts 1 and 2 of the indictment, Juror

21 Number 1, is that your verdict?

22           JUROR NO. 1:  Yes.

23           THE CLERK:  Juror Number 2?

24           JUROR NO. 2:  Yes.

25           THE CLERK:  Juror Number 3?

 1              JUROR NO. 3:  Yes.

 2              THE CLERK:  Juror Number 4?

 3              JUROR NO. 4:  Yes.

 4              THE CLERK:  Juror Number 5?

 5              JUROR NO. 5:  Yes.

 6              THE CLERK:  Juror Number 6?

 7              JUROR NO. 6:  Yes.

 8              THE CLERK:  Juror Number 7?

 9              JUROR NO. 7:  Yes.

10              THE CLERK:  Juror Number 8?

11              JUROR NO. 8:  Yes.

12              THE CLERK:  Juror Number 9?

13              JUROR NO. 9:  Yes.

14              THE CLERK:  Juror Number 10?

15              JUROR NO. 10:  Yes.

16              THE CLERK:  Juror Number 11?

17              JUROR NO. 11:  Yes.

18              THE CLERK:  Juror Number 12?

19              JUROR NO. 12:  Yes.

20              THE CLERK:  Thank you.

21              THE COURT:  Okay, ladies and gentlemen.  Under

22     normal circumstances, that would conclude your jury service,

23     but in this particular case, the government has brought

24     forfeiture allegations with regards to certain pieces of

25     property of the defendant.  Now you have found the defendant

1   guilty of transportation of child pornography as charged in

2   Count 1 of the indictment and possession of child pornography

3   as charged in Count 2 of the indictment.  You will now need

4   to consider a further question regarding property that the

5   indictment alleges is subject to forfeiture by the defendant

6   to the government.

7          Forfeiture means the defendant would lose any

8   ownership or interest he has or claims to have in the

9   specified property as a part of the penalty for engaging in

10  criminal activity.

11         After the parties have presented any additional

12  evidence on this subject, I will instruct you further on the

13  law with respect to forfeiture.  In considering whether the

14  property is subject to forfeiture, you should consider the

15  evidence you have already heard and any additional evidence

16  presented by the parties.  You should evaluate that evidence

17  and its credibility and then I will explain to you, as I did

18  earlier, some legal instructions.  Okay.

19         Ms. Carroll, with regard to the government, does

20  the government wish to adduce any more evidence with regard

21  to this forfeiture hearing?

22         MS. CARROLL:  Your Honor, as the court knows, it's

23  the government's position that hearsay is appropriate during

24  this phase of the trial since this is technically part of the

25  sentencing proceeding; however, the government will call

Chad Willard – Direct                                    752

1    Special Agent Willard to provide a synopsis of the evidence

2    on the forfeiture allegations.

3                THE COURT:  Okay.  Please come on up.  As this is a

4    separate hearing, Lori, I'm going to ask you to swear him in,

5    please.

6                THE CLERK:  Can you state your full name and spell

7    it for the record, please.

8                THE WITNESS:  Chad Willard, W-i-l-l-a-r-d.

9                THE CLERK:  Thank you.

10

11            C H A D   W I L L A R D , recalled as a

12   witness and being previously duly sworn, testifies

13   as follows:

14               THE COURT:  Go ahead.

15               DIRECT EXAMINATION BY MS. CARROLL:

16   Q     Special Agent Willard, were you present in the

17   courtroom during the testimony of certified forensic examiner

18   Brian Braisted?

19   A     Yes, I was.

20   Q     And did you hear the contents of his testimony

21   regarding his examination of a black Toshiba laptop,

22   8-gigabyte USB drive and 4-gigabyte USB drive?

23   A     Yes, I did.

24   Q     What did Special Agent Braisted testify about the child

25   pornography found on the black Toshiba laptop?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Chad Willard - Cross
753

1  A      That he had found three videos, 594 images of child

2  pornography and six enhancement images of child pornography.

3  Q      What was Special Agent Braisted's testimony about child

4  pornography on the 8-gigabyte?

5  A      That he found 15 images of child pornography and 96

6  videos of child pornography.

7  Q      What was Special Agent Braisted's testimony regarding

8  the child pornography on the 4-gigabyte USB drive?

9  A      That he found 10 videos of child pornography, 3,250

10  images of child pornography, and 16 enhancement images of

11  child pornography.

12          MS. CARROLL:  No further questions.

13          THE COURT:  Cross-examination?

14  CROSS-EXAMINATION BY MR. GOLDSMITH:

15  Q      Special Agent Willard, you did not conduct the forensic

16  exam, correct?

17  A      Correct.

18  Q      And your only knowledge of the forensic examination is

19  based upon -- withdrawn.  Your testimony during this

20  forfeiture hearing is based only upon the testimony that you

21  heard of Special Agent Braisted, correct?

22  A      Correct.

23  Q      It is of no personal knowledge that you have, correct?

24  A      Correct.

25          MR. GOLDSMITH:  No further questions.

Case 5:14-cr-00088-EAW Document 90-1 Filed 01/12/16 Page 794 of 890
**A784**
Case 5:11-cr-00602-GTS  Document 168  Filed 05/30/14  Page 100 of 113

754

1            THE COURT:  Anything further?

2            MS. CARROLL:  No, your Honor, the government can

3       just deliver a couple of sentences in argument.

4            THE COURT:  You may step down.

5                 (The witness was excused.)

6            THE COURT:  Does the government intend to call any

7       other witnesses?

8            MS. CARROLL:  No, your Honor, the government does

9       not.

10           THE COURT:  Go ahead.

11           MS. CARROLL:  As you'll hear in the jury

12      instructions on the forfeiture, the property that is alleged

13      in the forfeiture allegation is alleged to have been used to

14      facilitate each of the counts in the indictment.  First, that

15      the black Toshiba laptop facilitated the transportation and

16      in the second count that the two USB drives facilitated the

17      possession of the child pornography.  You heard the testimony

18      from Special Agent Braisted that was then summarized by

19      Special Agent Willard, those were the digital media on which

20      the child pornography was contained, the digital media on

21      which they were possessed and transported.

22           THE COURT:  Government rests?

23           MS. CARROLL:  Yes, your Honor.

24           THE COURT:  Counsel?

25           MR. GOLDSMITH:  Defense rests.

1          THE COURT:  Okay.  Very well.  Ladies and

2     gentlemen, I'm going to give you some further jury

3     instructions on forfeiture.

4          You have found the defendant guilty of the offenses

5     charged in Counts 1 and 2 of the indictment.  You are now

6     asked to render a verdict concerning property that the

7     indictment alleges is subject to forfeiture by the defendant

8     to the government.  In this context, forfeiture means the

9     giving up of ownership or interest in the property as a

10    penalty for committing a violation of a certain federal law.

11         In this indictment, the government alleges that

12    three items of defendant's personal property are subject to

13    criminal forfeiture pursuant to Title 18, United States Code,

14    Section 2253.  Specifically, the indictment forfeiture

15    allegation reads as follows:  "The allegations contained in

16    Counts 1 and 2 of this indictment are hereby realleged and

17    incorporated by reference for the purposes of alleging

18    forfeiture pursuant to Title 18, United States Code, Section

19    2253.  Pursuant to Title 18, United States Code, Section

20    2253, upon conviction of an offense in violation of Title 18,

21    United States Code, Section 2252A, the defendant, Joseph

22    Jenkins, shall forfeit to the United States of America:

23         First, any visual depiction described in Title 18,

24    United States Code, Sections 2251, 2251A, 2252, or 2252A, and

25    any book, magazine, periodical, film, videotape, and other

1    matter which contains any such visual depiction, which was

2    produced, transported, mailed, shipped, or received in

3    violation of Title 18, United States Code, Section -- Chapter

4    110;

5           Any property, real or personal, constituting or

6    traceable to gross profits or other proceeds contained from

7    such offenses;

8           And lastly, any property, real or personal, used or

9    intended to be used or to commit or to promote the commission

10   of such offenses and any property traceable to such

11   property."

12          The property to be forfeited includes, but is not

13   limited to, the following:  A, Toshiba laptop, serial number

14   78175808W; B, PNY Attache 8-gigabyte USB thumb drive; and C,

15   PNY Attache 4-gigabyte USB thumb drive.

16          If any of the property described above as a result

17   of any act or commission -- or omission, excuse me, of the

18   defendant cannot be located upon the exercise of due

19   diligence, and has been transferred or sold to or deposited

20   with a third party, has been placed beyond the jurisdiction

21   of the court, has been substantially diminished in value, or

22   has been commingled with other property which cannot be

23   divided without difficulty, the United States of America

24   shall be entitled to forfeiture of substitute property

25   pursuant to Title 21, United States Code, Section 853(p), as

1    incorporated by Title 18, United States Code, Section

2    2253(b), and Title 28 United States Code, Section 2471(c);"

3            Having read the forfeiture allegation in the

4    indictment, I will now discuss in more detail the elements of

5    this forfeiture allegation, which the government must prove

6    by a preponderance of the evidence.

7            Title 18, United States Code, Section 2253(a)(3)

8    provides as follows:  "A person who is convicted of an

9    offense under this chapter involving a visual depiction

10    described in Section 2251, 2251A, 2252, 2252A, or 2260 of

11    this chapter or who is convicted of an offense under Section

12    2252B of this chapter, or who is convicted of an offense

13    under Chapter 109A, shall forfeit to the United States such

14    person's interest in... any property, real or personal, used

15    or intended to be used to commit or to promote the commission

16    of such offense or any property traceable to such property."

17            I instruct you that you are bound by your previous

18    finding that the defendant is guilty of the offenses charged

19    in Counts 1 and 2 of the indictment.  As a result, in order

20    to satisfy its burden of proof with regard to the forfeiture

21    allegation, the government must establish each of the

22    following two elements by a preponderance of the evidence:

23            First, the defendant has an interest in personal

24    property specified by the government;

25            And second, the specified property was used by the

1    defendant or intended to be used by the defendant to commit

2    or to promote the commission of the offense charged in

3    Counts 1 and 2 of the indictment.

4            With regard to the first element, you should not

5    concern yourself or consider whether any person may own or

6    have an interest in the property in question.  I will resolve

7    any such claims.  Similarly, you are not to consider what

8    might happen to the property if it's forfeited.  Nor are you

9    to consider whether the property is currently available.

10           With regard to the second element, property that

11   was used or was intended to be used to commit or to promote

12   the commission of an offense means property that makes the

13   commission of the offense easier or which is used to assist

14   in the commission of the offense.  This includes, but is not

15   limited to, property that is used or intended to be used to

16   purchase, manufacture, transport, store, conceal, or protect

17   the contraband used in the offense, or the persons committing

18   the offense.  Property that was used or was intended to be

19   used to commit or facilitate the offense, excuse me, is

20   subject to forfeiture even if only a portion of it was so

21   used, or if it was also used for other purposes.

22           Please remember that the government's burden of

23   proof with regard to this forfeiture allegation is not beyond

24   a reasonable doubt but merely proof by a preponderance of the

25   evidence.  To prove something by a preponderance of the

Case 5:14-cr-00088-EAW Document 120-1 Filed 01/12/16 Page 799 of 890
A789
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 105 of 113

759

1    evidence means to prove that it is more likely true than not

2    true.  For example, if you put the credible evidence that is

3    favorable to the government and the credible evidence that is

4    favorable to defendant on opposite sides of the scale, the

5    scale would have to tip somewhat on the government's side in

6    order for you to find the property is subject to forfeiture.

7    However, if the scale tips in favor of the defendant or if

8    the credible evidence appears to be equally balanced or if

9    you cannot say on which side the credible evidence is

10   weightier, then you must find that the property is not

11   subject to forfeiture.

12          In making this determination, you should consider

13   all the evidence presented on the subject during this

14   proceeding and during the trial, regardless of who offered

15   it.  In addition, all of my previous instructions apply to

16   this special verdict and you should evaluate the evidence and

17   its credibility according to the instructions I gave you

18   earlier.

19          Finally, a few words are appropriate regarding the

20   special verdict form that has been prepared for your use.

21   With respect to each item of property in question, the

22   special verdict form asks you to determine whether the item

23   is subject to forfeiture to the government.  You may answer

24   by writing the words yes or no or writing a checkmark in the

25   space provided next to the words yes or no.  You must reach a

1  unanimous verdict as to each question on the special verdict

2  form.  Once you have reached a unanimous verdict, your

3  foreperson should fill in the special verdict form, date it,

4  sign it, and inform the Marshal that a verdict has been

5  reached.

6  　　　　And I will now review with you that special verdict

7  form.  It has the caption of the case, it has three

8  questions.  The first question:  As to the government's

9  forfeiture allegation in the indictment, has the government

10  proved by a preponderance of the evidence that the Toshiba

11  laptop, serial number 78175808W, was used or intended to be

12  used to commit or to promote the commission of the offenses

13  charged in the indictment, yes or no?

14  　　　　Question 2:  Has the government proved by a

15  preponderance of the evidence that the PNY Attache 8-gigabyte

16  USB thumb drive was used or intended to be used to commit or

17  to promote the commission of the offenses charged in the

18  indictment, yes or no?

19  　　　　And third:  Has the government proved by a

20  preponderance of the evidence that the PNY Attache 4-gigabyte

21  USB thumb drive was used or intended to be used to commit or

22  to promote the commission of the offenses charged in the

23  indictment, yes or no?

24  　　　　And like before, it has a line for the foreperson

25  to sign and date the verdict form.

1        Are there any questions from any of the ladies and

2    gentlemen of the jury about what you're to do with regard to

3    this section of deliberations with regard to forfeiture?

4    Okay.  Well, then I'm going to ask you to retire to the jury

5    room and deliberate with regard to this special verdict.

6                    (Jury excused for deliberations, 1:50 p.m.)

7            THE COURT:  Okay, the jury has left to deliberate

8    on the special verdict form.  Any requests or objections from

9    the government with regard to the instructions on the

10    forfeiture allegation?

11            MS. CARROLL:  No, your Honor.

12            THE COURT:  Mr. Goldsmith?

13            MR. GOLDSMITH:  None.

14            THE COURT:  Okay.  Thank you.  I'd say stay close

15    by.

16                    (Court in recess.)

17                    (Open Court, Jury Out, 1:58 p.m.)

18            THE COURT:  Okay, we're in the courtroom without

19    the jury, court's received a note indicating that the jury

20    has a verdict on the forfeiture allegation, so we're going to

21    bring them in and we're going to take the verdict.

22                    (Jury present, 1:58 p.m.)

23            THE COURT:  Okay.  I've received a note indicating

24    that the jury has reached a verdict with regard to the

25    forfeiture allegations.  Again, I'm going to ask the

1    foreperson to stand and my courtroom deputy will take that

2    verdict.

3                THE CLERK:  Again in case number 5:11-CR-602,

4    United States of America versus Joseph Vincent Jenkins,

5    question 1, as to the government's forfeiture allegation in

6    the indictment, has the government proved by a preponderance

7    of the evidence that the Toshiba laptop, serial number

8    78175808W, was used or intended to be used to commit or to

9    promote the commission of the offenses charged in the

10   indictment; yes or no?

11               THE FOREPERSON:  Yes.

12               THE CLERK:  Number 2, has the government proved by

13   a preponderance of the evidence that the PNY Attache 8GB USB

14   thumb drive was used or intended to be used to commit or to

15   promote the commission of the offenses charged in the

16   indictment; yes or no?

17               THE FOREPERSON:  Yes.

18               THE CLERK:  Number 3, has the government proved by

19   a preponderance of the evidence that the PNY Attache 4GB USB

20   thumb drive was used or intended to be used to commit or to

21   promote the commission of the offenses charged in the

22   indictment; yes or no?

23               THE FOREPERSON:  Yes.

24               THE CLERK:  Thank you.

25               THE COURT:  Okay, ladies and gentlemen, that's

1   going to conclude your jury service.  On behalf of the

2   attorneys and the litigants in this case, I thank you for

3   your time and attention.  It was obvious that you were

4   attentive, you traveled here in difficult weather, you were a

5   great group, you made sure you were here on time, and it's

6   much appreciated by the court and the parties.  I always

7   excuse juries personally from the jury room so I'm going to

8   ask you to retire back to the jury room, give me a couple

9   minutes, I have some legal things I need to discuss with

10  these attorneys, I'll be able to excuse you personally, thank

11  you for your service.  Go ahead.  Excuse me, before we do

12  that, and I should have asked, would either party like this

13  jury polled as with regard to the special verdict?

14          MR. GOLDSMITH:  Defense requests a polling, thank

15  you, your Honor.

16          THE COURT:  Okay, I apologize for not asking.  Go

17  ahead.

18          THE CLERK:  Same as last time, just going to ask

19  each of you if your verdict is the same as the foreperson

20  reported.  With regard to questions 1, 2, and 3 answering

21  yes, was that your verdict, Juror Number 1?

22          JUROR NO. 1:  Yes.

23          THE CLERK:  Juror Number 2?

24          JUROR NO. 2:  Yes.

25          THE CLERK:  Juror Number 3?

```
 1              JUROR NO. 3:  Yes.

 2              THE CLERK:  Juror Number 4?

 3              JUROR NO. 4:  Yes.

 4              THE CLERK:  Juror Number 5?

 5              JUROR NO. 5:  Yes.

 6              THE CLERK:  Juror Number 6?

 7              JUROR NO. 6:  Yes.

 8              THE CLERK:  Juror Number 7?

 9              JUROR NO. 7:  Yes.

10              THE CLERK:  Juror Number 8?

11              JUROR NO. 8:  Yes.

12              THE CLERK:  Juror Number 9?

13              JUROR NO. 9:  Yes.

14              THE CLERK:  Juror Number 10?

15              JUROR NO. 10:  Yes.

16              THE CLERK:  Juror Number 11?

17              JUROR NO. 11:  Yes.

18              THE CLERK:  And Juror Number 12?

19              JUROR NO. 12:  Yes.

20              THE CLERK:  Thank you.

21              THE COURT:  Okay, now you can retire to the jury

22     room and I'll be in to excuse you.  Thank you.

23                   (Jury Excused.)

24              THE COURT:  Okay.  My courtroom deputy is going to

25     return all original exhibits to counsel who presented them,
```

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 805 of 890
**A795**
Case 5:11-cr-00602-GTS   Document 168   Filed 05/30/14   Page 111 of 113

765

1    it's your responsibility to provide the Court of Appeals with

2    any exhibits that may be required.

3            I'm going to direct the probation department to

4    prepare and submit a presentence report and I'm going to

5    schedule sentencing for June 17th, 2014 at 10 a.m.  Counsel,

6    the clerk will electronically file the Northern District

7    Uniform Presentence Order.  Once the presentence report is

8    prepared, any objections to the report must be submitted in

9    writing to probation within 14 days of receipt of the report.

10           Now, appellate statute rules, Rule 29(c) motion for

11   judgment of acquittal after a discharge of a jury must be

12   filed within 14 days after the jury is discharged or within

13   such further time as the court may fix during the 14-day

14   period.

15           Rule 33, motion for new trial, motion for a new

16   trial based on the ground of newly discovered evidence may be

17   made only before or within two years after the final judgment

18   but if an appeal is pending, the court may grant the motion

19   only on remand of the case.

20           Motion for new trial based on any other grounds

21   shall be made within 14 days after the verdict or finding of

22   guilt or within such further time as the court may fix during

23   14-day period.

24           Appellate Rule 4B, appeals in criminal cases.

25   Notice of appeal must be filed within 14 days after the entry

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 806 of 890
A796
Case 5:11-cr-00602-GTS Document 168 Filed 05/30/14 Page 112 of 113

766

1    of the judgment.

2              Rule 46(c) release from custody pending sentence

3    and notice of appeal eligibility for release pending sentence

4    or pending notice of appeal or exploration of time allowed,

5    and finally, notice of appeal shall be in accordance with 18

6    U.S.C. Section 3143.  The burden of establishing the

7    defendant will not flee or pose a danger to any other person

8    or to community rests with the defendant.

9              Okay.  That concludes the court's admonishments.

10   Anything further from the government?

11             MS. THOMSON:  No, your Honor.

12             THE COURT:  Mr. Goldsmith?

13             MR. GOLDSMITH:  Sir, just in terms of the

14   sentencing, your Honor, it's about four months out.  Is that

15   typical with the time frames of probation department up here?

16             THE COURT:  Yes.

17             MR. GOLDSMITH:  All right.  Nothing further.

18             THE COURT:  Okay.  Thank you very much.  Take care,

19   travel safe.

20             THE CLERK:  Court is adjourned.

21                  (Court Adjourned, 2:03 p.m.)

22

23

24

25

```
 1                 CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official

 4     Realtime Court Reporter, in and for the United States

 5     District Court for the Northern District of New York, DO

 6     HEREBY CERTIFY that pursuant to Section 753, Title 28, United

 7     States Code, that the foregoing is a true and correct

 8     transcript of the stenographically reported proceedings held

 9     in the above-entitled matter and that the transcript page

10     format is in conformance with the regulations of the Judicial

11     Conference of the United States.

12

13               Dated this _____day of _____.

14

15

16               /S/ JODI L. HIBBARD_____

17               JODI L. HIBBARD, RPR, CRR, CSR
                 Official U.S. Court Reporter
18

19

20

21

22

23

24

25
```

9/21/14

Joseph Jenkins
103 Corporate Drive
Owego, NY 13827

District Court
PO Box 7367
Syracuse, NY 13267



Re:US v Jenkins  (5:11-cr-602)

To Whom it may concern

I request the following submission (27 pages) a supplemental memorandum be added to the court docket for/to be litigated on or about Sept,25 2014 at the defendants sentencing. It is necessary to fill in blanks and illustrate misconduct that occured in the prosecution that lawyers refused to address.

If needbe the defendant as on 9-9-14 a previous submission requests self representaion if it necessary for some reason to accept the document. It is being submitted ahead of time as a courtesy of the issues the defendant intends to address.

The defendant would understand if more time is needed to process the document or conspire replies to the issues.

The issues are well known and the documents have been seen by all parties.

Sincerely

Joseph Jenkins

Exhibits attached
A - Affadavit
B - Border Cross Records
C - Canadian Seizure Receipt

27 page Document with/including exhibits

United States   )       5:11-cr-602
                )   Document 6 pages, Exhibits A (3 pgs), B (12 pgs), C (3 pgs)
V               )
Jenkins         )

On 9-9-14 the defendant submitted a supplemental
sentencing memorandum. The defendant feels the need to elaborate
on the issues somewhat as government incompetence may impair the
defendants ability to calmly articulate issues at the upcoming
event in person.

1.   Items (#'s1,2) in the previous submission. Lack of subject matter jurisdiction (SMJ), Lack of control over (invalid seizure of) property held by the
Canadian government (held under the process of another court) means the court
(Northern District of New York) NDNY acted in the 'clear absence of all jurisdiction and without due process of law'.

The defendant feels that recusal is required because [subject judge] basically
conducted a trial about nothing. The defendant made repeated requests personally
after ridding himself of an incompetent attorny. This was when the outrageous type
of conduct began as described in the complaint. (When asked to prove jurisdiction
and official paperwork required under treatys through proper authority).

The only conclusion to be reached is that [subject judge] acted with
malicious intent or is plainly incompetent. Either way after the antics and
errors along with the motions misconduct, he has absolutely no right to cast
judgment over the defendant and should recuse/be removed.


2.   Two convictions for one offence (#5) previous submission. The defendant
argues that with the mandate one conviction must be dropped, there is insufficient evidence to sustain a conviction. Count 1 (toshiba computer) there was
no illegal content only (5 deleted pictures) in unallocated, deleted space. The
government failed to prove beyond a reasonable doubt that the multimedia files
on the laptop constitute C.P. The defendant demands a full review of the three
alleged files. The government only showed a few seconds of each. Canadians law
reguarding C.P. is essentially the same. Either the files did not exist on the
computer five years ago or under Wohlerts training they were 'mid teens' which
are classified as adult. The defendant is not a doctor nor has the government
verified any ages as such with any expert. Braisted is not an expert, he is not
even credible his examination of computers was inferior to the origional done
by the canadians, he manufactured evidence that the government (US) needed.

The second count 2 (thumbdrives) is unsustainable without the first. Also
the government alleged obtained by the use of internet, this was not proven on
any count nor by any forensic exam. The canadians report offered suggestions
as alternate that files could have been loaded onto them by others (users) and
different computers (in reguard to little to no evidence found on the two laptops
in the investigation). REASONABLE DOUBT. This is why the government did not want
to use the canadians forensic report. It was not enough to obtain an indictment.

If the court/government elects to drop the 'thumbdrives' from conviction
the defendant will move for a judgment of acquittal for lack of evidence. There
was no visible illegal content anywhere on the computer nor any proof of any
illegal activity whatsoever. Only adult pornography.

IF the court/government drops the computer from conviction there is no
proof (wasn't anyways) of knowledge of thumbdrives. Judgment of acquittal would
be appropriate in this case as well.

3.   Joint Investigations, interference, Harassment - The defendant made several
requests to have US constitutional rights applied to the Canadian proceeding due
to the fact the case was jointly investigated before being submitted to canadian
prosecutors. THESE WERE INGNORED,MISCONSTRUED AND EVADED BY BOTH COURT AND
GOVERNMENT. The defendant has a right [also] to be free of bad faith prosecutions.

On July 28,2012 Willard and Thomson((9:14-cv-338)COA(14-1486)doc#7,ex.E) or
Bates (197-204) Requested border cross information related to myself.(May 23,2009-
Jan 1,2011) This revealed that the defendant was actually part of a formal invest-
igation by US officals, along with the other DHS documents produced. These indicate
that I was flagged on two occasions, physically detained, searched vehicle and
person as well as interrogated by US agents on two different occasions for some
three hours upon returning from attending court dates in Brockville, Onatario, CA.

Trial Transcripts (p.367-) Willard was specifically asked. "No, there was not"
"No, the first investigation into Mr Jenkins was opened on March 7,2011, by
myself," "No formal investigation had opened by my office in the US" -- More
importantly -- "Lack of Origional evidence means lack of a case" -- Exactly --
There was NO EVIDENCE & NO CASE in the US.

Apparently these physical detainments on May 26, 2009 & Sept 13, 2009 (2c,c) along
with all of the searches done without warrants prior to the conclusion of the
canadian investigation/trial "were done at the behest or even with the knowledge
of United States law enforcement agents." (Doc#94p.8) Of course there was also

"No contact between Canadian law enforcement officials before Jenkins rendered the involement of the United States necessary..." It was ONLY then when ..."Canadian law enforcement officials made contact with United States law enforcement agents".

According to the government when you word things in these documents willy-nilly like Willards affadavit [also] (Doc#27-8) "In short, Double Jeopardy does not bar the prosecution of the defendant by the United States." The affadavit was drawn up in Onondaga county (obviously with tutoring) on 7-23-12 and filed on the court docket. It avoids the dates of harassment, but is totally illogical as is/ are the rest of the governments filings/responses. The court remains oblivious to these documents or ignores this conduct. Very Nice. Exhibits A, B (Border Cross Records)

Few notable items also from Document 94. (a) inre: the defendant claiming no warrant was obtained by US agents before seizing these items - "The MLAT (legal asstance treaty not invoked) ...[does not require] "canadian law enforcement officials to secure a warrant prior to the transfer of evidence to United States law enforcement officials" Because of course they did (US) obtain a warrant after the items sat in a drawer forthree months. (b) Dual Sovereign Law cases ((as defendant cited in his prior submission) (#3)) (Doc#94p.6) Reguarding Rashed,Rezaq are related to aircraft hijackings. AGAIN, The court remains oblivious. These are but a few of the examples.

4. The public defender provided Exhibits. In (A) ICE report dated 8/10/2011 was pretty much a copy of the Canadians findings by braisted, except for boosting numbers and adding some mutimedia files the Canadians did not find illegal. (Basically trying to invent a crime, where there was none)

There were also "Supplemental" Reports done in March 2012 revolving around a meeting between Defense and Prosecutors. (Done without securing an additional warrant) These are based on information "leaked" by puppet Parry (an appointed sabatour)reguarding information the defendant was going to use as a defense. They are completely uncredible compared to Canadians report and some of his testimony. The reports are dated a day before and a day after this meeting, he would have been able to pick up on such obvious descrepancies on the first exam. (File transfers, desktop icons are important items to miss on a forensic exam.) Pages 10-11 of grand jury testimony briaisted said he was unable to determine any images were received on the computer and any times, yet trial testimony he gave file creation dates. Also that his finding were his opinions. Trial he admitted he received no training in identifing C.P. Also his findings were consistant with the Canadians which they are not.

Inshort in March 2012 and thereafter he manufactured evidence and findings to the prosecutors specifications they are unsupported.

5.   Pretend Jurisdiction – (4-25-13 p.10-(Suddaby)) " The charges are about what happened in the United States. These prosecutors have no intrest, Ihave no intrest what happened two years ago in Canada, None whatsoever. That's not what this case is about. You may be obsessed about it and think that it's important. It has noth-ing to do with your case here and you've got to accept that." (5-29-13p.8-(Suddaby)) "these assistant United States Attorneys, I'm quite certain, unless they tell us otherwise, are not really intrested in what happened in Canada. They're interested in what happened at the united states border...that's what you need to focus on. Okay. Do you have any questions?" ---YES--- The only thing that happened at the US border was (#3. Joint investigations, interference, searches and harassment). The government certainly didnot seem interested in discussing those events, along with court as evident by the antics. If the case was not about what happened in Canada, why did all of the evidence and witnesses come from Canada? The Canadian bench warrant dated January 2014, the US government claims gives them jurisdiction over the Canadian events in Canadian Court?

When the defense requested a witness from Canada (Jan,21,2014 p14(Suddaby)) in reguard to jurisdictional and venue issues "I'm glad you do, because thats the biggest hurdle you have. I mean you can attempt to get this individual to appear voluntarily, but certainly I'm not going to sign something that has no legal force or effect. And which it does not. In Canada...but other wise, theres all sorts of proceedings that need to be followed, to attempt to get a witness from another country. There's MLAT proceedures and there's treaties and there's all sorts of that stuff, you know, I just cant help you with." ---REALLY!---HOW COME "that stuff" DID NOT APPLY TO THE GOVERNMENT WHEN THEY NEEDED PAPERWORK, EVIDENCE, WITNESSES. THESE ARE THE "stuff" THAT IN THE PROCESSES BETWEEN COUNTRIES WHOULD PROTECT A PERSONS RIGHTS. THAT "stuff" IS ONLY AVAILABLE THROUGH PROPER *Procedures/* PROCESSES WHICH WHERE BYPASSED TO GAIN ADVANTAGES IN PROSECUTION OVER THE DEFENDANT.

On pages 6-7 also of the "pretrial conference" [subject judge] encourages defense council not to "challange foundational type issues" --- That foundation apparently being a canadian bench warrant issued canada wide. Any time the defense refers to a treaty it is not applicable. The defense cannot scheme and bypass legal treaties as the US government and court apparently can.

[Subject Judge], his statements, conduct, bias, incompetence are evident all though this case. They are good at scheming, misconstuing, ignoring but that is the extent of it. He shows no ability to oppose the government or make them follow any proper procedures, or even act with intgrity let alone himself. This conduct makes the defendant certain he is not capable of proper judgment.

Conclusions:

1.    US prosecution in general was plain error. The government basically
stole property and manufactured incriminating evidence then presented
incomplete, inacurate, unofficial information to a grand jury to
obtain an indictment. The defendant was charged "upfront" in Canadin
proceedings. The investigation thereafter did not support their charges.
the investigation was bumbled:(a) Canadian court ruled on Oct 18,2010
that delays were "caused by the crowns oversight" and that "defense
did nothing to delay this matter" - The investigation remains incom-
plete. Wohlert testified in Canadian Court (When asked to compare this
case to cases)(Sept13,2010,p31)) "In relation to other cases I've had
the overall numbers are on the lower end." That overall the case was
not a priority.

      The closing of proceedings on Sept 13,2010 (p101) the judge(Canadian)
stated (when discussing court dates) "No, your client will not have
to attend on that date." (End of proceedings) The defendant was never
sent an appearance notice after September 13, 2010. (Will provide
attorney to attorney paperwork.)

      Proceedings did not advance on that date not because of defence
motions (as the government played out (US) at trial) but because, the
incomplete forensic report was turned over on August 31,2010 in
violation of Section 657.3(3) Canadian charter that states such
reports are requiring 30 days before trial. "Saturation Point" was
another way of saying we screwed up. Wohlert described large cases
involving images of 500,000 plus images to be sorted.

      The Final report disclosed on that date to canadian defense was
(p37) "quite extensive" (p47)"Mike Harrington competed the FINAL
FORENSIC REPORT" Which was not disclosed to the US defense. Wohlert
testified that "I remove those [images] then submitted new copies to
crown and defense." Missing CD's that were not disclosed (PDM Exh C
on page7) contained Destop and registry reports among other items.
That fact on top of Harrington being unavailable for US trial after
being the primary handler/forensics who was not the chain of custody
is Fraudulent, intentional, purposly done overlooked. Another product
of conducting a Trial out of venue and jurisdiction to gain advantages
over the defendant.

2.   Under rule 12(h)(3) - If a court determines it lacks Subject Matter Jurisdiction, it must dismiss the action. THAT IS EXACTLY WHAT THE US TRIAL PROVED. --OR-- Didn't prove in the governments case. The Canadian Court has exclusive jurisdiction over the event and property. Exhibit C

3.   Double Jeopardy clause applies. Evenif the courts/governments dual sovereignty law was applicable (a) Defendant was entilted to a complete proceeding in the first tribunal (Canadian Court) (b) government participation in the canadian investigation precludes any futher prosecution by the same sovereign (c) It is the exact same event, property, witnesses -- all of which is under the process jurisdiction of another court. (d) the double jeopardy clause also protects against prosecutorial misconduct and judicial overreach.

4.   The incompetence and malicious conduct by the ADA/NDNY has created quite a novel case. There simply is no precedent for this outrageous conduct and vigilanteism. The defendant demands that the case be properly supported by case law and documentation or dismissed. "a case for which no precedent can be found." 52 AM J1st Torts S8.

5.   Sovereign immunity is affimative defense under rule 12, deprives a federal court of jurisdiction over the subject matter. McGinty v NewYork (2001, Ca2 NY) 251 F.3d 84, 26 EBC 1257, 85 BNA FEP Cas 1493. The defendant and his property are protected under the process of the Canadian court, the action is superior to that of the United States. The court has no dominion or control over the event, cause or any property. It is totally divested of jurisdiction. It should dimiss the action.

6.   The court engaged in fraudulent conduct with the government making intentional representations, preventing the defense from presenting a complete and proper defense by conducting a trial out of proper jurisdiction/venue to gain additional advantages over the defense. Under the "Plain Error Standard" FedRCrimP(52) the case should be dismissed under the "miscarriage of justice" standard as it is (1)Plain Error under Jurisdictional Defect (2) Accumulated errors are plain (3) It affects substantial rights of the defendant (4) Seriously affects fairness, integrity and public reputation of judicial proceedings. [subject judge] Has created a certified unprecedented and malicious act by misuse of process without justification or legal excuse. The matter is a clear abuse of power (usurper) the acts are in a manner inconsistent with due process of law. THE DEFENDANT DEMANDS RECUSAL UNDER 28 USCS 144,455 and all misconduct, disability motions previously discussed to/from judgment. He is resposible/part of the fraudulent and incapable of fair judgment.

Respectfully Submitted,

Joseph V. Jenkins, Defendant

9-21-14

- 6 -

Exhibit

A

Affadavit

Doc 27-8

### AFFIDAVIT

STATE OF NEW YORK          )
COUNTY OF ONONDAGA          )
CITY OF SYRACUSE           )

    I, Chad Willard, depose and state the following:

    1.  I am a Special Agent with United States Department of Homeland Security, Immigration and Customs Enforcement (ICE) and have been so employed since August 6, 2006.  I am currently assigned to the ICE resident agent office in Alexandria Bay, NY. As part of my of my daily duties as a Special Agent with ICE, I investigate criminal violations involving child exploitation and child pornography including violations pertaining to the illegal transportation, production, distribution, receipt, and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. I have participated in investigations of persons suspected of violating child pornography laws and have had the opportunity to observe and review numerous examples of child pornography as defined under Title 18, United States Code, Section 2256, in various forms of media including computer media.

    2.  As a federal agent, your affiant is authorized to investigate violations of laws of the United States and to

Case 5:14-cr-00088-EAW Document 18-2 Filed 01/12/16 Page 817 of 890
**A807**
Case 5:11-cr-00602-GTS Document 186 Filed 09/23/14 Page 10 of 34
Case 5:11-cr-00602-GTS Document 27-8 Filed 07/23/12 Page 3 of 4

execute warrants issued under the authority of the United States.

3. On May 27, 2009, the attaché office of Homeland Security Investigations located in Ottawa, Ontario, Canada notified the Office of Homeland Security Investigations in Buffalo, New York that Canadian authorities had arrested the defendant, Joseph Jenkins, on May 24, 2009 on charges related to the possession of child pornography. Agents of Homeland Security Investigations had not participated in either the investigation or arrest of Jenkins by Canadian authorities at that point.

4. Agents of the United States had no further involvement in the Jenkins matter until October 21, 2010. On or about October 21, 2010, Detective Constable Kip Wohlert provided Homeland Security Investigations Special Agent Matthew Meyer with Ontario Provincial Police reports and forensic reports associated with the investigation of Jenkins. Because Jenkins had become a fugitive from the Canadian prosecution, Detective Constable Wohlert referred the investigation to Homeland Security Investigation agents for further action.

5. I, Special Agent Willard, have conferred with Special Agent Meyer and with Special Agent Spencer Schneider of the Homeland Security Investigations Ottawa

attaché office and attest that the Homeland Security Investigations Office in Buffalo, New York was not involved in any capacity with the arrest or prosecution of the defendant in Canada and did not become involved with the investigation of the defendant until after his arrest by the Canadian authorities.

_____
Chad Willard
Special Agent
Homeland Security Investigations

Sworn to before me this _____
day of July 23, 2012.

_____
Notary Public - State of New York

PAULA D. BRIGGS
Notary Public, State Of New York
No. 6068241
Qualified In Onondaga County
My Commission Expires 12/31/20 15

Case 5:14-cr-00088-EAW Document 82-1 Filed 01/12/16 Page 819 of 890
A809
Case 5:11-cr-00602-GTS Document 186 Filed 09/23/14 Page 12 of 34

# Exhibit

# B

Bates stamped TECS Reports
197-206

24, 25, 19, 20, 21, 91, 92

Re Joint Investigations / Border Stops



DATE: Monday, July 23, 2012

A. I HEREBY CERTIFY that the annexed documents listed or described below, as redacted to remove sensitive personal identifying information (PII) of CBP employees and/or sensitive internal security codes, are true and correct copies of official records (or extracts there from) maintained _____ TECS _____ and that I am the custodian thereof:

Information on the following for May 23, 2009 through January 01, 2011

Joseph Vincent JENKINS, DOB 01/22/1970
    Person Crossing History                      2 Records
    IO95 Inspection Report QJ034886939C07        1 copy
    Landborder Secondary Inspection Report VL008116461C07      1 copy
    Landborder Secondary Inspection Report VL012418970C07      1 copy

_____
*Signature*

**Custodian of Record**
_____
*Title*

B. I HEREBY CERTIFY that    Ronald Thornton    who signed the foregoing certificate was at the time of signing    Designated Custodian of Record    and as such, was the legal custodian of the above listed documents, and that full faith and credit should be given to such a certificate.



IN TESTIMONY WHEREOF I have hereunto set my hand, and caused the seal of the Department of Homeland Security to be affixed this _____ Twenty Third _____ day of _____ July _____ Two Thousand and Twelve.

By direction of the Secretary, U.S. Department of Homeland Security:

Case 5:11-cr-00088-EAW Document 810 Filed 01/12/16 Page 822 of 890
A811
Case 5:11-cr-00602-GTS   Document 186   Filed 09/23/14   Page 14 of 34

799 9th Street NW
Washington, DC 20229

 U.S. Customs and
Border Protection

DATE:   JUL 1 0 2012

FILE:  DIS-4-01 OT:RR:RD:PA
       H224124 AEB
       Certified Request: #2135

TO:         Resident Agent in Charge
            U.S. Immigration and Customs Enforcement
            Alexandria Bay, NY

ATTN:       Special Agent Chad J. Willard
            U.S. Immigration and Customs Enforcement
            Alexandria Bay, NY

FROM:       CBP Privacy Officer
            Office of International Trade
            Washington, D.C.

SUBJECT:    Authorization to Release Certified Records

This memorandum is in response to requests forwarded via email and supplemental information
received on June 28, and July 2, 2012, respectively (*see* attached), from Special Agent Chad J.
Willard, Homeland Security Investigations, U.S. Immigration and Customs Enforcement (ICE),
Alexandria Bay, New York, on behalf of Ms. Tamara Thomson, Assistant United States Attorney
(AUSA) for the U.S. Department of Justice, Northern District of New York, for Privacy Act
release authorization for certain certified U.S. Customs and Border Protection (CBP) records.

Specifically, ICE requests certified CBP TECS records with respect to border crossing
information and secondary inspection for the individual identified in the requests for the time
period dating from May 23, 2009, through January 1, 2011. ICE advises that any responsive
records are needed in preparation for a criminal prosecution, *inter alia*, for criminal violation of
child pornography laws (18 U.S.C. § 2252A). ICE further advises that the information is not
intended to be shared outside of any hearings or court proceedings relevant to the prosecution.

The records will be used, *inter alia*, to establish that the individual entered the United States to
flee a Canadian bench warrant for the individual's alleged violation of Canadian child
pornography laws, and accordingly whether the individual is more likely to have violated 18
U.S.C. § 2252A based on the flight from the Canadian prosecution. Accordingly, any records
with respect to the individual's entry, including CBP personnel remarks relevant to the entry,
may be presented at trial.

2

Based on the information submitted by ICE, the release of any responsive certified TECS records is authorized for the purpose described above.  Please be advised that this information is provided only for the purposes stated in the request, that it should not be employed for any other use that is not consistent with said request, and that the information provided must not be further disseminated to a third party without the express written consent of CBP.  However, ICE and the AUSA are authorized to release the requested information in furtherance of any court and/or administrative hearing proceedings that may relate to or may develop from the matters for which the information is being sought.

However, by accepting this information, ICE and the AUSA, through their representatives agree that in the event of any unauthorized release of the information, outside of presenting this information in court or in a hearing, each will intercede on CBP's behalf to assume full responsibility for any and all expenses, costs, and/or liabilities arising from such unauthorized disclosure.

Please note that the Custodian of Records will have redacted any identifiable names, marks, and/or numbers of CBP officers who are not testifying in court, as well as any computer screen codes and internal file codes.  Upon completion of the certification process, the Custodian of Records will forward the responsive records, to the attention of: U.S. **Immigration and Customs Enforcement, Homeland Security Investigations, Special Agent Chad J. Willard, 46735 U.S. Interstate 81, Alexandria Bay, NY 13607.**

Please track the release of information on a "*Privacy Act Disclosure Record*" ("DHS Form-191"), a copy of which has been attached.  The Headquarters case file number "H224124 AEB," should be listed on the form.  A copy of the completed form should be sent to Alex Bamiagis, Privacy Act Policy and Procedures Branch, via scanned e-mail attachment to Alex.Bamiagis@dhs.gov.

If you have any questions regarding this matter, please contact Mr. Bamiagis, by telephone, at the Privacy Act Policy and Procedures Branch at (202) 325-0415.

Laurence E. Castelli

Laurence E. Castelli

Attachments
cc: CBP Custodian of Records

*Homeland Security Investigations*

**U.S. Department of Homeland Security**
412 South Warren Street
Syracuse, NY 13202



**Homeland
Security
Investigations**

Doc#: 2135 Date Rec'd 6/28/ Due Date: _____
Sent To: Priv. Date: 6/29/12 Misc: _____
Sent To: _____ Date: _____ End Date: _____

Custodian of Records
Software Development Division (TECS/SEACATS)
U.S. Customs Service
7375 Boston Blvd. Suite 210
Springfield, VA 22315

Re:  Certified Records Request

Dear Custodian of Records:

This letter is for the purpose of requesting certified records. These records will be used at trial in the Northern District of New York. I am seeking certified records of passenger arrival/border crossing and secondary inspection results for the subject listed below during the time period of 05/23/2009 to 01/01/2011.

Subject:
Joseph Vincent JENKINS
DOB: ████1970

Thank you in advance for your time. If there are any questions please feel free to contact me at (716) 818-6424.

Sincerely,

*Mark Tayler*
Mark Tayler
Resident Agent in Charge

**GROUT, BABETTE E**

---

| | |
|---|---|
| **From:** | Willard, Chad J |
| **Sent:** | Thursday, June 28, 2012 11:35 AM |
| **To:** | TECS CertifiedRecords |
| **Subject:** | Request |
| **Attachments:** | JENKINS Cert Records Request001.pdf |

Please see the attached request.

Thank you for your time.

Best regards,

*Chad Willard*

SPECIAL AGENT
DEPARTMENT OF HOMELAND SECURITY
HOMELAND SECURITY INVESTIGATIONS
RA ALEXANDRIA BAY, NY
(C) 315-523-1067
(O) 315-482-3747 X1
(F) 315-482-3752
CHAD.WILLARD@DHS.GOV

```
   OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

--- PASSENGER ACTIVITY REPORT SELECTION CRITERIA ---


       CROSSING LINE TYPE :
       QUERY API ONLY      : NO
       INCLUDE API DATA    : YES

       LAST NAME           : JENKINS?
       FIRST NAME          : JOSEPH
       OTHER NAME          :
       DATE OF BIRTH       : ██████70

       DOCUMENT NUMBER     :
       DOCUMENT COUNTRY    :
       LANDBDR/AIRPRT CDE  :
       TERMINAL ID         :
       LANE NUMBER         :
       INSPECTOR ID        :
       API AIRLINE CDE     :
       API FLIGHT NUMBER   :

       DATE FROM           : 05/23/09
       TIME FROM           : 00:00
       DATE TO             : 01/01/11
       TIME TO             : 00:00

   OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY
```

```
  OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

RUN DATE = 07/12/12    RUN TIME = 16:45
NOTE: TIME SHOWN IS SYSTEM HOST TIME.

                              TECS II
                    PASSENGER ACTIVITY REPORT              PAGE NO.   1
REQUESTED BY:  ██████████          ID: ██████████
FROM 05/23/09 AT 00:00 TO 01/01/11 AT 00:00
PRINTER LOCATION: VPC27972

PASSENGER SURNAME                 FIRST NAME    OTHER NAME    BIRTHDTE
CROSS DATE/TIME    LOCA TERMID  LTYP  DOCUMENT NUMBER  CTRY  TYP  INSPECTOR
QYAGN    QYRSLT  TECS-RECORD-ID   API  ARCDE   FLNBR   ARRLC   DEPLC
SITE - DESCRIPTION             DIRECTION    AGN REF IND
JENKINS                           JOSEPH VINCENT                      ████/70
09/13/10  17:28   0708  ████      VEH   104901419       US    P    ████████
CUS     TECSHT  P8B31278600COT    N
L074 - CBP-WELLESLEY ISLAND, POE     I     C

JENKINS                           JOSEPH VINCENT                      ████/70
05/26/09  16:41   0708  ████      VEH   104901419       US    P    ████████
CUS     TECSHT  P8B31278600COT    N
L074 - CBP-WELLESLEY ISLAND, POE     I     C

  OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY
```

REQUESTED BY: █████████████

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

071212                    IO95 Inspection Results                    PAGE

TECS RECORD ID: QJ034886939C07

\*===================================================================\*

SITE: L074 CBP-WELLESLEY ISLAND, POE
                    CNVY\*: A  LIC. NBR\*: NY 19322JL

DOCPR\*: Y DOCTYP\*: P   #\*: 104901419   CTRY\*: US UNITED STATES   ST:   M/F: M
DNAME (LAST): JENKINS                    FRST: JOSEPH VINCENT   DOB: ███70

RFRD BY:   ABRAM/L-CBP OFFCR-C                    DTE: 09132010 TME: 1924
REASON:
TECS LOOKOUT ON PRIMARY


SNAME (LAST):                         FRST:                DOB:

NATIONALITY: US UNITED STATES
DISPOSITION: USC U.S. CITIZEN
ADMIT UNTIL DTE:              CCD USED: N              FIN #:
CHARGE (CODED):
DEFERRED TO POE:

SECONDARY OFFICER: ABRAM/L-CBP OFFCR-C              DTE: 09/13/2010 TME: 19:24

REFERRAL CODE:                              REFER TYP: C

COMMENTS:
JENKINS WAS IN CANADA FOR A COURT APPERANCE INVOLVING CHILD PORONGRAPHY IN
CANADA. RCMP CONTACTED ALEXANDRIA BAY POE AND SAID JENKINS MIGHT BE CARRYING
A CELL PHONE, WHICH WAS AGAINST HIS PROBATION. A POCKET DUMP AND A A SEVEN
POINT VEHCILE EXAM WAS NEGATIVE. JENKINS WAS ADMITTED USC PER SCBPO BAKER.


\*===================================================================\*
\*   R E C O R D   I N F O R M A T I O N                              \*
\*===================================================================\*
 DATE/TIME ENTERED: 09/13/10   19:27:29 LAST UPDATE: 09/13/10   19:27:29
          OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY
     REQUESTED BY: █████████████

\*===================================================================\*
\*   R E C O R D   I N F O R M A T I O N                              \*
\*===================================================================\*

 DATE/TIME ENTERED: 09/13/10   19:27:29 LAST UPDATE: 09/13/10   19:27:29

REQUESTED BY: █████████████

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

```
07/12/12           LANDBORDER SECONDARY INSPECTION              PAGE   1
TECS RECORD ID: VL008116461C07   INL INSP NBR: 001
*========================================================================*
```

```
ENTRY DATE:       05/26/2009 17:33:14        LAST UPDATE: 05/26/2009 17:41:12
INSPECTION DATE: 05/26/2009 PORT/SITE: 0708/L074 CBP-WELLESLEY ISLAND, POE
```

SITE ID:* L074   CBP-WELLESLEY ISLAND, POE              EXAM DTE: 05262009

LAST NAME:* JENKINS
   FIRST:* JOSEPH VINCENT          DATE OF BIRTH:* ████████70
DOC TYPE:  P   #: 104901419        ISSUING CNTRY:   US UNITED STATES

   GENDER:* M  RACE:* W            HISPANIC:* N (Y/N)   CONVEYANCE:* A

   LICENSE STATE:* NY  PLATE NUMBER:* 19322JL     INBOUND/OUTBOUND:* I

                 AMENDED CF-4790:       CURRENCY AMT:

REFERRING OFFICER CODE:* PRI    PRIMARY
   REASON FOR REFERRAL:* ENF    ENFORCEMENT REFERRAL
   REFER TYPE: C   CUSTOMS

REMARKS CAPTURED AT TIME OF REFERRAL:
JOSEPH VINCENT JENKINS HAS TECS HIT.
JENKINS, JOSEPH VINCENT 22 JAN 70 COB/COC: USA PP#: 104901419
NYDL#: 888554819  ADDRESS: 4072 DWYER LANE, GENEVA, NY 14456
JENKINS ATTEMPTED TO ENTER CANADA 24 MAY 09 AT LANSDOWNE, ON AND WAS
CAUGHT WITH CHILD PORN IMAGES ON HIS COMPUTER. JENKINS WAS DESTINED TO
48 CHEMIN FAUBERT, LAC DU SUR, PQ, A SECOND HOME HIS PARENTS OWN. JENKINS
ARRESTED IN CANADA AND HELD 2 NIGHTS.   JENKINS' VEHICLE WAS SEARCHED W/
NEGATIVE RESULTS. HIS COMPUTERS, CELLPHONE, AND CAMERA WAS DETAINED BY
CBSA. JENKINS WAS EXAMINED AND ICE (ON SIGHT) READ JENKINS HIS MIRANDA
WARNING WHEN ATTEMPTING TO INTERVIEW JENKINS, AND JENKINS DECLINED TO
WAIVE HIS RIGHTS. JENKINS IS SELF EMPLOYED AS AN ELECTRICIAN AND THE
VEHICLE IS HIS PERSONAL/WORK TRUCK. JENKINS HAS FBI RECORD FOR CONVICTION
OF 2ND DEGREE HARASSMENT IN 1998. JENKINS RELEASED AS US CITIZEN.

   VEHICLE SEARCH:* S       #PEOPLE IN VEH:* 01
   POS/NEG EXAM:* N (P/N/U) PERSONAL SEARCH:* N (Y/N)  EXAM START TIME:* 16 : 41
   CCD USED: N  PERSON HIT:                            COMPLETION TIME:* 17 : 30
   IOIL/SAS # :                                        INSP COMPLETE:* Y  (Y/N)

INSPECTION STATUS: COMPLETE      **  SECONDARY INSPECTION COMPLETE  **


         OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

REQUESTED BY: ▓▓▓▓▓▓▓▓

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

```
07/12/12              LANDBORDER SECONDARY INSPECTION              PAGE   1
TECS RECORD ID: VL012418970C07   INL INSP NBR: 001
*=====================================================================*
```

ENTRY DATE:       09/13/2010 19:27:42       LAST UPDATE: 09/13/2010 19:32:53
INSPECTION DATE: 09/13/2010 PORT/SITE: 0708/L074 CBP-WELLESLEY ISLAND, POE

   SITE ID:* L074   CBP-WELLESLEY ISLAND, POE              EXAM DTE: 09132010

LAST NAME:* JENKINS
   FIRST:* JOSEPH VINCENT          DATE OF BIRTH:* ▓▓▓▓70
DOC TYPE: P    #: 104901419        ISSUING CNTRY:   US UNITED STATES

   GENDER:* M  RACE:* W            HISPANIC:* N (Y/N)    CONVEYANCE:* A

      LICENSE STATE:* NY  PLATE NUMBER:* 19322JL    INBOUND/OUTBOUND:* I

                        AMENDED CF-4790:     CURRENCY AMT:

REFERRING OFFICER CODE:* PRI   PRIMARY
   REASON FOR REFERRAL:* ENF   ENFORCEMENT REFERRAL
   REFER TYPE: C   CUSTOMS

REMARKS CAPTURED AT TIME OF REFERRAL:
JOSEPH VINCENT JENKINS HAS TECS HIT.
ALEXANDRIA BAY NY POE 13 SEP 2010 1730
JENKINS,JOSEPH VINCENT (DOB:22JAN1970 COC/COR/COB:USA PP#104901419)
JENKINS WAS REFERRED TO SECONDARY INSPECTION FOR A TECS HIT ON PRIMARY.
RCMP ALSO CONTATED THE ALEXANDRIA BAY NY POE AND STATED THAT JENKINS
MAY BE IN POSSESSION OF A CELL PHONE WITH INTERNET ACCESS. CBP 6059B WAS
COMPLETED AND A SEVEN POINT VEHICLE EXAM AND A POCKET DUMP WAS PREFORMED
WITH NEGATIVE RESULTS. JENKINS WAS ADMITTED USC AND RELEASED PER SCBPO
BAKER.

   VEHICLE SEARCH:* S T      #PEOPLE IN VEH:* 01
   POS/NEG EXAM:* N (P/N/U) PERSONAL SEARCH:* N (Y/N)  EXAM START TIME:* 17 : 30
   CCD USED: N  PERSON HIT:                   COMPLETION TIME:* 19 : 00
   IOIL/SAS # :                                INSP COMPLETE:* Y  (Y/N)

INSPECTION STATUS: COMPLETE     **  SECONDARY INSPECTION COMPLETE  **

            OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY



O F F I C I A L   U S E   O N

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE   1 |
| | CASE NUMBER AB07QR11AB0006 |

TITLE: JENKINS

CASE STATUS:   INIT RPT

| REPORT DATE 040711 | DATE ASSIGNED 030711 | PROGRAM CODE YT1 | REPORT NO. 001 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
INVESTIGATIVE FINDINGS

TOPIC: CBSA ARREST OF JOSEPH VINCENT JENKINS

SYNOPSIS:
This case is predicated upon information from Canada Border Services and the Ontario Provincial Police. On May 24, 2009, Joseph Vincent JENKINS attempted to enter Canada with computers which contained child pornography. JENKINS was arrested at the Port of Lansdowne and prosecuted for Importation / Possession of Child Pornography.

This Report of investigation documents the arrest of Joseph Vincent JENKINS by Canada Border Services Agency and the turn over of the evidence from OPP to HSI.

| DISTRIBUTION: RACAB SACBU | SIGNATURE: WILLARD      CHAD      J   SPECIAL AGENT |
|---|---|
| | APPROVED: TAYLER      MARK      K   OI GRP SUPERVISOR |
| | ORIGIN OFFICE: AB ALEXANDRIA BAY, NY - | TELEPHONE: 315 482 3747 |
| | | TYPIST: WILLARD |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER AB07QR11AB0006 |
| | REPORT NUMBER: 001 |

following original evidence:

(1) Toshiba laptop bearing Serial Number (S/N) 78175808W

(1) Compaq laptop (S/N: CNF3362GPN)

(1) Attache 8GB USB thumb drive

(1) Attache 4GB USB thumb drive

(1) Attache 2GB USB thumb drive

(1) Olympus Digital Camera (S/N: 408242909)

(1) Motorola Cellular phone.


Detective Constable Kip Wohlert explained to SA Willard that JENKINS has and active warrant in Canada and has chosen not to return to Canada to face justice.


SA Willard seized the evidence for violations of Title 18, United States Code, Section 2252(a)(1) and 2252A(a)(5)(B).


The investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N ? '

| DEPARTMENT OF HOMELAND SECURITY<br>ICE | TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE   1 |
| | CASE NUMBER AB07QR11AB0006 |

TITLE: JENKINS

CASE STATUS:    INTERIM RPT

| REPORT DATE<br>070811 | DATE ASSIGNED<br>030711 | PROGRAM CODE<br>YT1 | REPORT NO.<br>002 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
SEARCH WARRANT REPORT /

TOPIC: FEDERAL SEARCH WARRANT FOR SEIZED EVIDENCE

SYNOPSIS:
This case is predicated upon information from Canada Border Services and the
Ontario Provincial Police. On May 24, 2009, Joseph Vincent JENKINS attempted
to enter Canada with computers which contained child pornography. JENKINS was
arrested at the Port of Lansdowne and prosecuted for Importation / Possession
of Child Pornography.

This Report of Investigation documents the Federal Search Warrant obtained to
search JENKINS seized property.

| DISTRIBUTION:<br>RACAB SACBU | SIGNATURE:<br>WILLARD    CHAD    J.  SPECIAL AGENT |
|---|---|
| | APPROVED:<br>TAYLER     MARK    R  OI GRP SUPERVISOR |
| | ORIGIN OFFICE: AB<br>ALEXANDRIA BAY, NY - | TELEPHONE: 315 482 3747 |
| | | TYPIST: WILLARD |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

F F I C I A L   U S E   O N J

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    2 |
|---|---|
| | CASE NUMBER AB07QR11AB0006 |
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | REPORT NUMBER: 002 |

DETAILS OF INVESTIGATION:


In March 2011, U.S. Immigration and Customs Enforcement (ICE), Resident Agent Office  (RA) Alexandria Bay, NY agents began investigating Joseph Vincent JENKINS for allegations of transporting / possession of child pornography

On July 6, 2011, ICE RA Alexandria Bay Special Agent (SA) Chad Willard applied for and was granted a federal search warrant, 7:11-MJ-281 GHL, by United States Magistrate Judge George H. Lowe.  The warrant was for the property turned over to SA Willard from the Ontario Provincial Police. The property belonging to Joseph Vincent JENKINS and was seized from him by Canada Border Services Agency on May 24, 2009. JENKINS was charged under Canada Criminal Code with Importing-Distributing Child pornography and Possession of Child Pornography. On October 18, 2010, defendant JENKINS was scheduled to appear for trial in Canada on those charges. JENKINS failed to appear and a warrant was issued.


The warrant allowed agents to search and seize items related to evidence supporting violations of Title 18 United States Code Section 2252A, Distributing, receiving, viewing or possessing child pornography.

The warrant allowed agents to search:

one (1)   Toshiba Laptop S/N: 78175808W

one (1)   Compaq Laptop S/N: CNF3362GPN

one (1)   PNY Attache 8GB thumb drive

one (1)   PNY Attache 4GB thumb drive

one (1)   PNY Attache 2GB thumb drive

one (1)   Olympus Digital Camera

one (1)   Verizon Motorola Cell phone

SA Chad Willard transported the seized evidence from the ICE Alexandria Bay safe to Computer Forensic Agent Brian Braisted for forensic analysis without incident.


O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

` F F I C I A L   U S E   O N ` '

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | CASE NUMBER AB07QR11AB0006 |
| | REPORT NUMBER: 002 |

The investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY:  WILLAR   CHAD J

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE | TECS ACCESS CODE 3 |
| --- | --- |
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE   1 |
| | CASE NUMBER OT07QL09OT0039 |

TITLE: JENKINS, JOSEPH; ARREST BY CBSA AT PORT OF LANSDOWNE

CASE STATUS:    INTERIM RPT

| REPORT DATE<br>091010 | DATE ASSIGNED<br>052609 | PROGRAM CODE<br>YH0 | REPORT NO.<br>002 |
| --- | --- | --- | --- |

RELATED CASE NUMBERS:


COLLATERAL REQ:


TYPE OF REPORT:
INVESTIGATIVE FINDINGS


TOPIC: TRIAL DATE SCHEDULED FOR 09/13/2010 IN BROCKVILLE, CANADA

SYNOPSIS:
On May 25, 2009 Investigator Marie-Josee Vinette of the Canada Border Services
Agency (CBSA) reported to HSI Attache Ottawa that Joseph Vincent JENKINS, DOB:
01/22/1970, a United States citizen, applied for admission to Canada at the
Lansdowne, Canada Port of Entry on May 24, 2009. JENKINS possessed a laptop
computer at the time of entry and CBSA inspected the laptop. Investigator
Vinette observed videos of suspected child pornography on JENKINS's computer.
CBSA arrested JENKINS for Non-report, Evading Compliance, and Smuggling Child
Porn under Sections 12(1), 153(c), and 159 Customs Act.


This report details the information received from CBSA concerning JENKINS'
trial date in Canada.


| DISTRIBUTION:<br>CAOT | SIGNATURE:<br>SCHNEIDER      SPENCER      SENIOR ICE REPRESENTA |
| --- | --- |
| | APPROVED:<br>FUENTES      ROBERT      ICE ASST ATTACHE |
| | ORIGIN OFFICE: OT<br>OTTAWA - ATTACHE | TELEPHONE: 613 688 5494 |
| | | TYPIST: SCHNEIDER |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Case 5:14-cr-00088-EAW Document 81-2 Filed 01/12/16 Page 836 of 890
**A826**
Case 5:11-cr-00602-GTS Document 186 Filed 09/23/14 Page 29 of 34

F F I C I A L   U S E   O N L

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    2 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | CASE NUMBER OT07QL09OT0039 |
| | REPORT NUMBER: 002 |

Details of Investigation:

On August 31, 2010 CBSA Investigator Marie-Josee Vinette reported to HSI Attache Ottawa that the trial for Joseph Vincent JENKINS, DOB: 01/22/1970, is scheduled for September 13, 2010 in Brockville, Canada.

Investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

Exhibit

C

Bates 137, 170, 172

Canadian Seizure Receipts

Order of Defension

MAY. 25. 2009 10:07AM    CBSA INVESTIGATIONS                    NO. 4575   P. 1

| **Canada Border Services Agency** | **Agence des services frontaliers du Canada** | Evidence seizure no. - N° de saisie de la preuve |
|---|---|---|
| | | K19 *réf.* no. - N° de réf. de la K19 |

**EVIDENCE SEIZURE RECEIPT - REÇU DE SAISIE DE LA PREUVE**

| | | Office - Bureau |
|---|---|---|
| | | **Lansdowne** |

**PROTECTED WHEN COMPLETED**

<u>Note</u>: The Information on this form is collected to enforce the law, especially as it concerns the laws relating to the importation and exportation of goods and is protected under the provisions of the *Privacy Act*. This form is stored in personal information bank, Customs Intelligence Records record no. CCRA PPU 016.

**PROTÉGÉ LORSQUE REMPLI**

<u>Nota</u>: Les renseignements que contiennent ce formulaire sont recueillis dans le but d'appliquer la loi, principalement les lois ayant trait à l'importation et l'exportation des marchandises et sont protégés par les dispositions de la *Loi sur la protection des renseignements personnels*. Le formulaire est conservé dans le fichier de renseignements personnels concernant les registres de la division des renseignements n° ADRC PPU 016.

| | |
|---|---|
| Date (Y-M-D) - (A-M-J) | **2009-05-24** |
| U.C.L. no. - N° de la LMNR | |

| Surname - Nom de famille | Given name - Prénom |
|---|---|
| **Jenkins** | **Joseph Vincent** |

| Address - Adresse |
|---|
| **4072 Dwyer La, Geneva, NY, 14456** |

Statement of evidence - Exposé de la preuve

```
One Toshiba Laptop Serial S/N 78175808W
One Compaq Laptop Serial S/N CNF3362GPN
One Attache USB Stick 8 gig marked PNY on Cap (black and blue)
One Attache USB Stick 4 gig marked PNY on Cap and Back (all black)
One Attache USB Stick 2 gig marked OPTIMAPRO (black and yellow)
Six CD's (5 staples and 1 compaq)
One BELKIN Wireless G Plus MIMO Notebook Card SN 15822C9302697
One Olympus Digital Camera S/N 408242909
One Olympus XD Picture Card S/N MXD16P3K57106SSX30421MAD
One Varizon Motorola Cellphone (silver colour)
```

| ☑ | The goods described have been seized under section 110(3) of the *Customs Act*, as it is believed on reasonable grounds that the goods will afford evidence in respect of a contravention of the *Customs Act* or the regulations. | ☐ | Les marchandises décrites ont été saisies en vertu de l'article 110(3) de la *Loi sur les douanes* puisqu'il est soupçonné, pour des motifs raisonnables, qu'elles constituent des éléments de preuve par rapport à une infraction à la *Loi sur les douanes* ou au règlement afférent. |
|---|---|---|---|
| ☐ | The goods described have been seized under section 489(2) of the *Criminal Code*, as it is believed on reasonable grounds that the goods will afford evidence in respect of an offence against the *Criminal Code* or any other Act | ☐ | Les marchandises décrites ont été saisies en vertu de l'article 489(2) du *Code criminel* puisqu'il est soupçonné, pour des motifs raisonnables, qu'elles constituent des éléments de preuve par rapport à une infraction au *Code criminel* ou toute autre loi du Parlement. |

| **Marie-Josee Vinette (Investigator)** | **19367** |
|---|---|
| Seizing officer - Agent responsable de la saisie | Badge no. - N° de l'insigne |

| **RETURN OF EVIDENCE - RENVOI DE LA PREUVE** | |
|---|---|
| The above evidence was returned on - La preuve susmentionnée a été renvoyée le | |
| Date | Location - Endroit |
| Person in receipt of evidence - Personne qui a reçu la preuve | Customs officer - Agent des douanes |

E352 (04/10)                    **CBSA COPY - EXEMPLAIRE DE L'ASFC**                    **Canada**

REPORT TO A JUSTICE / RAPPORT A UN JUGE DE PAIX

Form / Formule 5.2

Section / Article 489.1 of the / du Criminal Code / Code criminel

CANADA
PROVINCE OF ONTARIO
PROVINCE DE L'ONTARIO

Toronto

(Region / Région)

To ...stice who issued a warrant to the undersigned pursuant to section ... 487 or 487.1 of the Criminal Code, or any othe ...stice for the same territorial division or, if no warrant was issued, to any justice having jurisdiction in respect of the matter.
Je soussigné(e), ...juge de paix qui a décerné un mandat (à la) soussigné(e) en vertu de l'article 256, 487 ou 487.1 du Code criminel, ou à tout autre juge de paix pour la même circonscription territoriale ou, si aucun mandat n'a été décerné, à tout juge de paix ayant compétence en la matière.

I, **Detective Constable Kip WOHLERT** _____ have:
Je soussigné(e), (name of Peace Officer or other person making report / nom de l'agent de la paix ou autre auteur du rapport)

☒ acted under the authority of a warrant issued pursuant to ☐ section / article 256, ☒ section / article 487, ☐ Section / article 487.1 of the / du
ai exécuté un mandat décerné aux termes de l ' (check one / cocher la case appropriée)

Criminal Code, by **Her Worship AURICH - SKAPINKER** on **27 May** , yr. / an **2009**
Code criminel, par (insert name of issuing Justice / nom du juge de paix qui a décerné le mandat) le (insert date warrant issued / date à laquelle a été décerné le mandat)

at **Canada Customs - Port of Lansdowne 862 Highway 137 Lansdowne, Ontario**
à/au (insert location from which warrant was issued / inscrire le nom de l'endroit où a été décerné le mandat)

☐ acted under the authority of section 489 of the Criminal Code in the execution of a warrant issued under section (487 or 487.1)
ai agi en vertu des pouvoirs conférés par l'article 489 du Code criminel lors de l'exécution d'un mandat décerné aux termes de l'article (487 ou 487.1)

of the Criminal Code, by _____ on _____ , yr. / an _____
du Code criminel, par (insert name of issuing Justice / nom du juge de paix qui a décerné le mandat) le (insert date warrant issued / date à laquelle a été décerné le mandat)

at _____
à/au (insert location from which warrant was issued / inscrire le nom de l'endroit où a été décerné le mandat)

☐ acted otherwise in the execution of my duties under the Criminal Code or any other Act of Parliament;
ai exécuté un mandat autrement dans l'exercice de mes fonctions prévues en vertu du Code criminel ou d'une autre loi fédérale;

_____
(specify statutory authority / préciser la loi)

and have conducted a search, the specific details of which are as follows:
(specify the exact nature of the search, including the premises, place, or person searched, the specific location of the search, and the specific date and time that the search was conducted.)

et ai effectué une perquisition comme suit : (préciser les circonstances exactes de la perquisition, y compris les lieux, l'endroit ou les personnes ayant fait l'objet de la perquisition, l'endroit exact de la perquisition ainsi que la date et l'heure exactes auxquelles la perquisition s'est effectuée.)

☒

On Thursday 28 May 2009 at 2:12 pm D/CST. WOHLERT executed a Section 487 WARRANT on a business located at Canada Customs - Port of Lansdowne 862 Highway 137 Lansdowne, Ontario. During the search of this business eleven items were seized to further the investigation and these items are listed on the attached property report. These listed items have been secured in the property vault of the Electronic Crime Section for forensic examination. Charges have been laid and these listed items are required for court and a request to retain these items until the completion of the court matter is being made.

Further, in conducting this search, I have seized the following things and have dealt with them in the following way:

De plus, en effectuant la perquisition, j'ai saisi les biens suivants et en ai disposé de la façon suivante :

I have seized the following things and returned them to the persons lawfully entitled to their possession, as indicated in the attached receipts: (list items returned, where additional space is required, attach additional page(s) marked as exhibit.)

☐ J'ai saisi les biens suivants et les ai remis à la personne ayant droit à leur possession légitime, ainsi qu'en témoignent les reçus ci-joints : (inscrire chaque bien remis; au besoin, annexer une ou plusieurs pages supplémentaires et les coter).

I have seized the following things and detained them at
**777 Memorial Avenue Orillia, Ontario**
(state location at which things are being detained / préciser l'endroit où les biens sont détenus)

☐ J'ai saisi les biens suivants et les détiens à/au

to be dealt with according to law (list items detained; where additional space is required, attach additional page(s) marked as exhibit.)
**See the property report Attached**

pour qu'il en soit disposé conformément à la loi (inscrire chaque bien détenu; au besoin, annexer une ou plusieurs pages supplémentaires et les coter.)

(in the event that a warrant was issued pursuant to section 487.1 of the Criminal Code, the following portion of the report must be completed.)

(Dans le cas d'un mandat décerné aux termes de l'article 487.1 du Code criminel, remplir la partie suivante du rapport.)

Further, I, **Detective Constable Kip WOHLERT** _____ , make the following statements:
De plus, je soussigné(e), (insert name of the Peace Officer or other person making report / nom de l'agent de la paix ou autre auteur du rapport) déclare que

(in the event that the warrant was executed, complete the following.)
the following things were seized in addition to the things mentioned in the warrant:
(list all of the items seized which are not mentioned in the warrant; where additional space is required, attach additional page(s) marked as exhibit.)

(Dans le cas d'un mandat exécuté, remplir ce qui suit.)
les biens suivants ont été saisis en plus des biens mentionnés dans le mandat :
☐ (inscrire chaque bien saisi qui n'est pas mentionné dans le mandat; au besoin, annexer une ou plusieurs pages supplémentaires et les coter.)

the things which were seized in addition to the things mentioned in the warrant are being held at
_____
(specify location / préciser l'endroit)

☐ les biens saisis en plus des biens mentionnés dans le mandat sont détenus à/au

the grounds for believing that the things which were seized in addition to the things mentioned in the warrant, had been obtained by, or used in the commission of an offence: (specify the reasonable grounds for this belief; where additional space is required, attach additional page(s) marked as exhibit.)

☐ les motifs de croire que les biens qui ont été saisis en plus des biens mentionnés dans le mandat, avaient été obtenus ou utilisés en perpétrant une infraction, sont les suivants : (préciser les motifs raisonnables de croire ainsi; au besoin, annexer une ou plusieurs pages supplémentaires et les coter.)

(in the event that the warrant was not executed, complete the following.)
The warrant was not executed for the following reasons; (specify reasons;)

(En cas de non-exécution d'un mandat, remplir la partie suivante)
Le mandat n'a pas été exécuté pour les raisons suivantes : (préciser ces raisons)

July

Dated this / Fait ce **02** day of / jour de _____
, yr. / an **2009** at / à/au **City of Toronto**

_____
Signature of Peace Officer or other person
Signature de l'agent de la paix ou autre personne

**ORDER OF DISPOSITION OF ITEMS SEIZED**
*ORDONNANCE CONFÉRANT LE DROIT DE DISPOSER DES CHOSES SAISIES*
Pursu     s. 490(1) of the *Criminal Code / Conformément à l'article 490(1) du     criminel.*

Having received the Report to a Justice in Form 5.2 from   Detective Constable Kip WOHLERT
*Après avoir reçu le Rapport à un juge de paix rédigé selon la Formule 5.2 de*

pursuant to s. 489.1 of the *Criminal Code*
*en vertu de l'article 489.1 du Code criminel*

And having considered the application of   Detective Constable Kip WOHLERT
*Et après avoir pris en considération la demande de*

for an order for the detention of items seized, pursuant to s. 490(1) of the *Criminal Code*
*en vue d'obtenir une ordonnance de détention des choses saisies en vertu de l'article 490(1) du Code criminel*

### ORDER OF RETURN / *ORDONNANCE DE REMISE DES CHOSES SAISIES*

I hereby order that
*Par les présentes, j'ordonne que*

☐ all items seized; or
*toutes les choses saisies; ou*

☐ the following items seized, namely;
*les choses saisies suivantes, à savoir :*

be returned to _____ , the lawful owner, or person who is
*soient remises à* _____ , *le propriétaire légitime, ou la personne qui a*

lawfully entitled to possession of the items seized.
*droit à la possession légitime des choses saisies.*

### ORDER OF DETENTION / *ORDONNANCE DE DÉTENTION DES CHOSES SAISIES*

I hereby order that
*Par les présentes, j'ordonne que*

☒ all items seized; or                         *be detained until the trial*
*toutes les choses saisies; ou*

☐ the following items seized, namely;     *is complete*
*les choses saisies suivantes, à savoir :*

be detained in the custody of   Detective Constable Kip WOHLERT     until the   *trial is complete*   day of _____ , yr. / an _____
*soient détenues par*                                                *jusqu'au*                      *jour de*

a date not more than three months from the date of seizure or, if charges have been laid before that date, until the completion of all proceedings.
*date ne dépassant pas le délai de trois mois suivant la date de la saisie ou, si des accusations ont été déposées avant cette date, jusqu'à la fin des procédures.*

DATED at   City of Toronto _____   this   02   day of   July _____ , yr. / an   2009
*FAIT à*                                              *ce*            *jour de*

_____
A Judge or Justice of the Peace in and for the Province of Ontario
*Juge ou juge de paix dans et pour la province de l'Ontario*

CCQ-5.2-489.1 (Rev.02/97)                           179

Jenkins Joseph
Tioga County Jail
103 Corporate Dr.
Owego, N.Y. 13827

SEP 23 2014

District Court
PO Box 7367
Syracuse, NY
13261



UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNITED STATES OF AMERICA,

                          Plaintiff,

vs.                                        11-CR-602

JOSEPH JENKINS,

                          Defendant.
----------------------------------------------------x

          Transcript of *SENTENCING* held on

November 12, 2014, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York,

the HONORABLE GLENN T. SUDDABY, Presiding.

              A P P E A R A N C E S

For Plaintiff:        OFFICE OF THE UNITED STATES ATTORNEY
                      100 South Clinton Street
                      James Hanley Federal Building
                      Syracuse, New York 13261
                        BY:  TAMARA THOMSON, Esq.
                             Assistant United States Attorney

For Defendant:        OFFICE OF THE FEDERAL PUBLIC DEFENDER
                      The Clinton Exchange - 3rd Floor
                      4 Clinton Square
                      Syracuse, New York 13202
                        BY:  LISA PEEBLES, ESQ.

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 843 of 890
**A833**
Case 5:11-cr-00602-GTS Document 201 Filed 03/02/15 Page 2 of 42

2

US v. Jenkins – 11–CR–602

1           (Open court, 10:05 a.m.)

2           THE CLERK:  Case number 5:11–CR–602, United States

3   of America versus Joseph Vincent Jenkins.

4           Counsel, please note your appearance for the

5   record.

6           MS. THOMSON:  Good morning, your Honor, Tamara

7   Thomson and Gwen Carroll on behalf of the United States and

8   also in the courtroom is the case agent Chad Willard and the

9   Canadian case agent Detective Constable Kip Wohlert

10  (phonetic).

11          THE COURT:  Good morning.

12          MS. PEEBLES:  Good morning, your Honor, Lisa

13  Peebles appearing on behalf of Joseph Jenkins.  Mr. Jenkins

14  is also present.

15          THE COURT:  Good morning.

16          We're here for sentencing this morning.

17          Are counsel ready to proceed?

18          MS. THOMSON:  Yes, your Honor.

19          MS. PEEBLES:  Yes.

20          THE COURT:  Ms. Peebles, Mr. Jenkins submitted a

21  request this past week –– it was filed on November 5th ––

22  concerning a new attorney.  I don't know if you had an

23  opportunity to discuss that with him before this morning.

24          MS. PEEBLES:  Well, Judge, I had an opportunity to

25  review the document and he and I had spoken at length on the

US v. Jenkins – 11-CR-602

1   phone prior to him filing that request.  And the indication

2   that I'm getting today is that Mr. Jenkins is not satisfied

3   with the submissions that I've put in on his behalf to this

4   point.  So I'll leave it up to the Court as to what the Court

5   would like to do.

6          I know Mr. Jenkins is objecting to much of the,

7   first and foremost, the special conditions of supervised

8   release and, in addition, much of what's contained in the

9   presentence report and his belief that the Court should

10  recuse itself from hearing the sentencing in this matter and

11  he filed a supplemental sentencing submission on

12  September 9th of 2014, which I believe has been docketed with

13  the Court.  I had an opportunity to review all those

14  submissions by Mr. Jenkins.

15         I have my own objections, to some degree, and I put

16  in documents on behalf of Mr. Jenkins but, as far as what the

17  Court intends to do this morning, I would leave it up to your

18  discretion.

19         THE COURT:  Okay.  Thank you.

20         Mr. Jenkins, you've submitted this motion and

21  you've requested a new attorney.  We're at sentencing at this

22  point.  All the submissions by defense counsel have been

23  made.  You have made submissions.  I've reviewed them.

24         Are you prepared to retain counsel before

25  proceeding with sentencing?

US v. Jenkins – 11–CR–602

1          THE DEFENDANT:  I'm not really sure I can retain

2     counsel at this point.

3          THE COURT:  Well, then, at this point what we're

4     going to do is I'm going to proceed with sentencing.  All the

5     submissions have been made.  You'll have an opportunity to be

6     heard.  I reviewed all of your submissions and, if there's

7     anything else that you'd like to add this morning, certainly

8     you'll have an opportunity to do that.  So we're going to

9     proceed.

10          THE DEFENDANT:  Well, I mean, I've pretty much

11     demanded that -- I don't feel you have any right to sentence

12     me after all these antics and there's a lot of screwing

13     around here and I don't agree with it and I've repeatedly

14     asked Ms. Peebles here to file a petition to have you removed

15     and I think that there's grounds for it.  I've been going

16     over submissions the last few weeks and court transcripts.  I

17     mean, that's what I want.  I'd rather -- I mean, you've set a

18     record that -- I mean, she hasn't done what I've asked her to

19     do.  We've been going around for a few months arguing.

20          THE COURT:  Mr. Jenkins, no attorney's done --

21          THE DEFENDANT:  What's that?

22          THE COURT:  No attorney's done what you've asked

23     them to do, according to you, despite being represented by a

24     number of different counselors.  You started with Mr. Parry.

25     You referred to him as an idiot and not knowing what he was

Case 5:14-cr-00088-EAW Document 102 Filed 01/12/16 Page 846 of 890
**A836**
Case 5:11-cr-00602-GTS Document 201 Filed 03/02/15 Page 5 of 42

5
US v. Jenkins – 11–CR–602

 1    doing.  The Court sent numerous attorneys to meet with you in

 2    the jail so you could retain someone.  You made derogatory

 3    comments about the people that were very well-regarded in

 4    this community, legal community, as far as representing

 5    federal defendants.  Then we provided you with a list of CJA

 6    attorneys that are admitted to the Northern District of

 7    New York to give you an opportunity to retain somebody.  You

 8    did retain an Aaron Goldsmith out of New York who represented

 9    you at trial and then he requested to be relieved because of

10    his irreconcilable differences with you and not being able to

11    get along with you.  And then, you know, the federal public

12    defender's office was assigned by Judge Peebles and has

13    represented you, in this Court's view, in a very capable and

14    competent manner and here we are again.

15            So, sir, you can demand all you want.  You can

16    criticize.  You can blame everybody else.  You can say it's

17    the attorney's fault.  But we're at a point, sir, where we're

18    going to proceed with sentencing.  You have counsel.  You've

19    been represented well and you've had an opportunity to submit

20    everything that you've wanted to to this Court and I've

21    reviewed everything that you submitted, despite its

22    derogatory tone and comments, disrespectful comments to this

23    Court and everybody else that you've had to deal with, sir.

24            So, you'll be given a full opportunity to say

25    anything you want.  If you're not going to retain somebody,

Case 5:14-cr-00088-EAW Document 70 Filed 01/12/16 Page 847 of 890
**A837**
Case 5:11-cr-00602-GTS   Document 201   Filed 03/02/15   Page 6 of 42

6

US v. Jenkins – 11-CR-602

1    certainly this Court is not going appoint another attorney to

2    represent you at this point.  So you --

3              THE DEFENDANT:  At this point I don't --

4              THE COURT:  So you can proceed by representing

5    yourself today.  That's up to you, sir, but we're going to

6    proceed with sentencing.

7              THE DEFENDANT:  Well, at this point, then, I

8    request my other attorney, Mr. Goldsmith, be ordered back on

9    the case.

10             THE COURT:  Sir, he requested -- he requested -- to

11   be relieved because he could not get along with you and did

12   not agree with the things that you were demanding that he do.

13             THE DEFENDANT:  Because I insisted he did some

14   work.

15             THE COURT:  Okay.

16             THE DEFENDANT:  And to fix his mistakes.

17             THE COURT:  Okay.

18             THE DEFENDANT:  But I didn't agree with him being

19   released.

20             THE COURT:  Well, sir, you didn't have to agree to

21   have him released.  He requested and the Court granted him,

22   based on the motion that he made and the papers that he put

23   in in this matter.  So we're going to proceed.

24             Counsel, have you received the presentence report

25   that was dated April 11th, 2014, and the addendum which is

Case 5:14-cr-00088-EAW Document 79-2 Filed 01/12/16 Page 848 of 890
**A838**
Case 5:11-cr-00602-GTS Document 201 Filed 03/02/15 Page 7 of 42

7

US v. Jenkins – 11–CR–602

 1  dated May 20th, 2014?

 2          Government receive those?

 3          MS. THOMSON:  Yes, your Honor.

 4          THE COURT:  Ms. Peebles, did you receive those?

 5          MS. PEEBLES:  I have, your Honor, and Mr. Jenkins

 6  has just voiced his concern that he disagrees with everything

 7  that I'm doing and I'm in a bit of conundrum right now as to

 8  how I should proceed.

 9          THE COURT:  I'm just going to ask you some

10  background questions as to what you did with Mr. Jenkins and

11  then we'll let him do what he'd like to do with regard to

12  sentencing.

13          MS. PEEBLES:  Yes, Judge.

14          THE COURT:  Did you receive those documents?

15          MS. PEEBLES:  I did.

16          THE COURT:  And did you have an opportunity to

17  review them or share them with Mr. Jenkins?

18          MS. PEEBLES:  I have.

19          THE COURT:  Very well.  Thank you.

20          Mr. Jenkins, did you see those documents, did you

21  review them, the presentence report and the addendum?

22          THE DEFENDANT:  I mean, there's inaccurate

23  information in there.

24          THE COURT:  That was not my question, sir.

25          Did you see those documents and did you review

**A839**
Case 5:14-cr-00088-EAW Document 70-1 at 810-2015 Filed 01/12/16 Page 849 of 890
Case 5:11-cr-00602-GTS Document 201 Filed 03/02/15 Page 8 of 42

8

US v. Jenkins – 11-CR-602


1 them?

2          THE DEFENDANT:  The presentence report, yes.

3          THE COURT:  And did you see the addendum, sir,

4 which was dated May 20th, 2014?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Very well.

7          The Court has also received a letter from Bonnie

8 and George Jenkins, which was dated May 25th, 2014.

9          Did the government receive a copy of that

10 correspondence?

11          MS. THOMSON:  Yes, your Honor.

12          THE COURT:  Very well.

13          Does the government have any objections to the

14 facts as stated in the presentence report?

15          MS. THOMSON:  No, your Honor.

16          THE COURT:  Ms. Peebles, did you have an

17 opportunity to look at the facts as stated in the presentence

18 report and the review it with Mr. Jenkins?

19          MS. PEEBLES:  Yes, your Honor.

20          THE COURT:  Now, Mr. Jenkins, you have objections

21 to the facts as stated in the presentence report; is that

22 correct?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And do you want to make any further

25 record as to what those objections are at this point?  You

US v. Jenkins – 11–CR–602

1   submitted some things in writing.  Do you want to add

2   anything?

3            THE DEFENDANT:  I mean, I think -- I just think

4   this whole thing is ridiculous and I request a competent

5   attorney to -- this is foolish.  I mean, I don't -- I don't

6   really know what you're doing here.  I mean, I...

7            THE COURT:  My question is, sir:  Do you have

8   objections to the facts as stated --

9            THE DEFENDANT:  I object to everything.  Yes, I

10  object to everything.

11           THE COURT:  Very well.

12           Counsel for the government, any objections to the

13  offense level calculations in the presentence report?

14           MS. THOMSON:  No, your Honor, with the noted

15  addition for obstruction.  The government calculated it in

16  two ways.  It depends on whether the Court accepts that.

17           THE COURT:  The government intends to sentence with

18  the obstruction of justice?

19           MS. THOMSON:  Yes, your Honor.

20           THE DEFENDANT:  I obstructed justice?

21           THE COURT:  Ms. Peebles.

22           MS. PEEBLES:  I would like to be heard on that but

23  I'm not entirely sure whether Mr. Jenkins is wanting me to

24  speak on his behalf.

25           THE COURT:  Mr. Jenkins, would you like Ms. Peebles

US v. Jenkins – 11–CR–602

1   to be heard on the offense level calculation with regard to

2   the obstruction of justice enhancement or do you want to

3   address it yourself, sir?

4           THE DEFENDANT:  I think I probably should address

5   it myself, too, but I'd like to hear what she has to say.

6           THE COURT:  She's working with you so you're going

7   to have to give her permission, if you want her to address

8   this issue.

9           MS. PEEBLES:  Your Honor, I had an opportunity to

10  review the trial testimony.  It's my understanding that the

11  basis for this 2-level enhancement is as a result of Mr.

12  Jenkins taking the stand and testifying.  I don't see where

13  it would warrant a 2-level adjustment.

14          What I saw when I was reading through the

15  transcript, and my understanding of his testimony, was,

16  essentially, him agreeing with everything that the Canadian

17  authorities said when he was crossing the United States

18  border, aside from the fact that he was being -- acted

19  nervous and agitated.  Other than that, it appeared to me

20  that his testimony coincided with everything that the

21  Canadian authorities were testifying to during the border

22  search.

23          I didn't see anything in there where he actually

24  denied downloading or possessing or transferring child

25  pornography.  It seemed to me that he was talking about

1    various people having potential access to his computer and

2    hard drives.  Then they played a phone call for him, which my

3    understanding of the phone call was the conversation he was

4    having with his parents concerning the number of images and

5    suggesting that there weren't nearly as many images as was

6    initially portrayed.

7            I don't see, your Honor, where there's a

8    justification for a 2-level enhancement based on that

9    testimony of Mr. Jenkins.  It appeared to me that he was

10   essentially in agreement.  And I can see in cases where an

11   individual may take the stand and say something totally

12   contrary to what's being offered by the government and the

13   jury rejects that testimony.  But in this instance, I didn't

14   see it when I reviewed the trial transcript.

15           So, it seems to me that it would be unfair to

16   enhance Mr. Jenkins' sentence as a result -- or his Guideline

17   range -- as a result of the testimony that I read during the

18   trial transcripts.

19           THE COURT:  Government like to be heard on this

20   issue?

21           MS. THOMSON:  Your Honor, I did lay out in the

22   government's sentencing memorandum three particular examples

23   that the government believes were examples of the defendant

24   committing perjury and providing material and false

25   information to the Court and jury.  I can go over those

US v. Jenkins – 11-CR-602

1    examples or rest on the papers.

2           THE COURT:  Why don't you go ahead and make your

3    record.

4           MS. THOMSON:  Your Honor, with regard to the first

5    example, the defendant testified on cross-examination that he

6    did not have the three thumb drives, that the thumb drives

7    found in the trunk he knew nothing about them.  He didn't

8    have them.  They were not his.  He was asked repeatedly on

9    cross-examination whether those thumb drives were in his

10   truck and repeatedly said that they were not, that he had no

11   knowledge of them and that they were not his.

12          However, during the testimony of the forensic

13   examiner Brian Braisted, the examiner testified that those

14   thumb drives had been previously connected to the laptop that

15   was entered into evidence and, so, the defendant's claim that

16   he has no knowledge, that these were not his flies in the

17   face of the evidence that was established in the trial, not

18   to mention the fact that the thumb drives were found in his

19   truck, that he was the only one driving and in his bag that

20   he acknowledged was his.

21          The second example cited in my memorandum is that

22   on direct examination, he testified that his attorney told

23   him to get rid of his cellular phone and his attorney told

24   him to not show up for his October trial date.  He stated

25   that his attorney advised him to break the law and to not go

1    to his own trial in October.

2          However, later in his testimony, when asked again

3    whether his attorney instructed him not to appear on

4    October 18, 2010, as he had previously testified, he stated

5    that he wasn't told to appear.  It's different.  The

6    government sought use of that information in our motion in

7    limines and our pretrial discussions of the failure to appear

8    as consciousness of guilt.  So the defendant tried to tailor

9    his testimony to fit both circumstances and to try to take

10   away from the evidence establishing consciousness of guilt.

11         And, third and final, and very important during

12   this trial was the defendant testified that he had employees

13   working for his company, that those employees would come into

14   his home to obtain work orders via fax and email and they

15   would check his email and would check his fax machine at

16   least once a day when he was on vacation.  The purpose of his

17   testimony was clear, to show that other people had access to

18   his computer and had access to his home and that those other

19   people could have been responsible for the child pornography

20   that was found on his computer and on his media.

21         However, on cross-examination, the defendant

22   indicated that -- he was asked about his prior testimony in

23   Canada and in Canada when he was complaining about a delay

24   and about the negative impact that the delay and a speedy

25   trial had on him, he indicated that the work that would be

14

US v. Jenkins - 11-CR-602

1    done with the computers would be work that would be done by

2    him and that he had to actually hire people to do that work

3    because of the restriction that he had without -- that he

4    couldn't use the computer in Canada.  Clearly, he tailored

5    his testimony to fit both circumstances.

6             In Canada it would be beneficial to show how he was

7    prejudiced by not being allowed access to his computer.  So

8    in that forum he indicated, I don't have anybody else, it's

9    just me.  But during the trial, he tailored his testimony to

10   indicate that there was lots of people that checked his

11   computers.  Both of them are not true.

12            THE COURT:  Okay.  Mr. Jenkins, would you like to

13   be heard on this matter before we move on?

14            MS. PEEBLES:  Judge, if I might for a moment.

15   There were only two thumb drives that had child pornography

16   on it, my understanding was the 4 gigabyte and the 8

17   gigabyte.  And the way I read his testimony was that it

18   seemed as though he said he didn't have knowledge of the

19   thumb drive.  I did not see that there was a denial of

20   ownership of the thumb drives, only a denial of whether they

21   were actually in the truck, that he understood them to be in

22   the truck.

23            But having said that, again, as far as not showing

24   up to the Canadian appearance, the way I read from the

25   lawyer, it almost laid out three options; one which would be

US v. Jenkins – 11–CR–602

 1   if you didn't show up, they'd issue a warrant, as long as you

 2   didn't come back in the country.  That was his

 3   interpretation.  I'm not sure how that was material to the

 4   prosecution's case and how that would be a material

 5   misstatement, as it didn't have anything to do with whether

 6   or not he had child pornography on the computer or the thumb

 7   drives.

 8          And then, as far as other people in and out and

 9   having access, again, Judge, I read the testimony on

10   cross-examination and direct and, again, I don't see how that

11   was material to whether or not he actually was the person who

12   downloaded the child pornography on the hard drive, other

13   than -- I mean, to suggest for a minute that no one would

14   ever possibly have access to his computer, I don't think he

15   said that when he was in Canada trying to explain how his

16   business would be prejudiced.

17          So, again, Judge, I'm familiar with the testimony.

18   I don't see where it warrants a 2-level obstruction.

19          Thank you.

20          THE COURT:  Thank you.

21          Mr. Jenkins.

22          THE DEFENDANT:  I didn't have an opportunity to

23   write all that down.  But that search was done out of my

24   sight.  I didn't see them pull any thumb drives out of any

25   bags.  They did connect them to the computers themselves.

US v. Jenkins – 11–CR–602

 1  The government's –– the government didn't provide –– I

 2  specifically requested –– and you ignored them and the

 3  government ignored them –– the original CDs from –– that were

 4  supposed to be turned over to my Canadian attorney.  I don't

 5  know if he got them or not.  I think he did.  That was

 6  supposed to have all the information, technical information

 7  on it and I never got any of that.  Those thumb drives were

 8  not connected to the computer before the Canadian government.

 9  The whole concept is absurd.  The government didn't provide

10  the dates.  It's readily accessible information.  You don't

11  have to be a forensic scientist to figure out when it was.

12  But the government –– there should have been first and last

13  dates.  The government didn't provide them because the

14  Canadians plugged them in after my arrest.  There's files on

15  the thumb drive that are dated after my arrest.  Nothing

16  makes sense here and nothing –– none of it came out at trial.

17  That's one of the things –– that's why I demanded a new

18  attorney.  I wanted a retrial.  None of it came out.  None of

19  that came out right at trial and it wasn't done to my

20  satisfaction.  And the government suppressed ––

21          THE COURT:  Mr. Jenkins ––

22          THE DEFENDANT:  –– paperwork.  They got ––

23          THE COURT:  Mr. Jenkins, I'm asking you about your

24  trial testimony and the obstruction of justice enhancement.

25          THE DEFENDANT:  I have to ––

A848

US v. Jenkins - 11-CR-602

```
 1          THE COURT:  You'll be given an opportunity to
 2   discuss anything else afterwards.
 3          Right now, sir, do you have anything else to say
 4   about the obstruction of justice enhancement?
 5          THE DEFENDANT:  I disagree with it.   The
 6   testimony -- the government is apparently trying to
 7   misconstrue some testimony I gave in Canada, which is pretty
 8   much what they do.  I just said that we had to switch jobs
 9   around.  I didn't say I had the -- I don't remember exactly
10   what I said.  I don't believe I said I had to hire somebody,
11   but I just had to pay people.  We had to switch jobs.  I know
12   what they're trying to do.  They're just trying to
13   misconstrue it and it's...
14          THE COURT:  Okay, sir, are you done with regard to
15   that?
16          THE DEFENDANT:  Yeah, I'm done with that.
17          THE COURT:  Well, the Court heard the testimony.
18   The Court sat through the trial, obviously, and it was clear
19   to this Court that Mr. Jenkins was trying to, at several
20   points in his testimony, suggest that other people were
21   responsible.  If there was child pornography on his computer,
22   that he certainly was not responsible and that he did perjure
23   himself at different instances, including the three that the
24   government has cited and in the Court's view other instances
25   where he denied being online at certain times and he was
```

US v. Jenkins – 11–CR–602

1  challenged by the government with the forensic records of his

2  computer of times that he went on the computer and signed on

3  with certain passwords, names --

4         THE DEFENDANT:  There were no --

5         THE COURT:  -- and suggested that there was, you

6  know, a download of child pornography right after that time

7  and him denying that he had done that.

8         So there was testimony, in this Court's view, at

9  various instances throughout his testimony at trial where he

10  perjured himself.  I think it was obvious to this Court and

11  certainly obvious to the jury.

12         The criminal history computation.

13         The government have any objection?

14         MS. THOMSON:  No, your Honor.

15         THE COURT:  Ms. Peebles?

16         MS. PEEBLES:  No, your Honor.

17         THE COURT:  Mr. Jenkins, you want to be heard on

18  the criminal history computation?

19         THE DEFENDANT:  (No response.)

20         THE COURT:  Do you have any objection --

21         THE DEFENDANT:  I'm sorry?

22         THE COURT:  -- to your criminal history

23  computation?  Do you understand what that is?

24         (Discussion held off the record between defendant

25         and attorney.)

US v. Jenkins – 11–CR–602

1            THE DEFENDANT:  No.

2            THE COURT:  No objection, okay, very well.

3            The government?

4            MS. THOMSON:  Thank you, your Honor.

5            During this trial, when the defendant was

6    cross-examined with regard to a recorded phone call, a phone

7    call between the defendant and his father, I think the father

8    made a comment that does the very best job of summarizing the

9    very point that Mr. Jenkins is missing.

10           During this telephone call the defendant is arguing

11   with his father, a father who has supported him throughout

12   his case.  He continues to argue with him and the father says

13   quite poignantly:  You should have never had that crap with

14   you and squarely tells the defendant that the position that

15   he's in is of his own doing.  That is the philosophy of the

16   father in this case.

17           The philosophy of the son in this case is that he

18   wants to blame everybody else.  It's everyone else's fault

19   but his.  He wants it to be about international conspiracies,

20   about falsifying evidence, evidence that he indicates in his

21   submission on September 9, 2014, that the government's case

22   "required evidence to be falsified so their 'special fagots'

23   did as much".

24           According to the defendant, this case is about this

25   honorable Court conspiring with the government.  He indicates

1    in his November 5th, 2014, submission, "with no idiot lawyer

2    to sabotage the defense, the Court itself began harassing me

3    for several months obstructing, ignoring requests or agreed

4    with whatever incoherent nonsense the government spewed

5    issuing decisions and orders simply to prejudice and gain

6    advantages (prosecutorial) and also praised the dismissed and

7    incompetent attorney for among other things 'an outstanding

8    job'".  That's what the defendant wants it to be about.

9              We've spent a lot of time with dealing with those

10   accusations with the complaint about the double jeopardy, the

11   complaint about the case being in the United States instead

12   of Canada.  We've spent a lot of time going over multiple

13   attorneys, going over multiple proceedings.

14             At the end of the day what this case is about is a

15   man, the defendant, amassing a collection of child

16   pornography, a collection that was so dear to him he couldn't

17   even take a vacation without having it out of his sight, a

18   collection that included the rape, abuse of children.  The

19   Court saw those images and the Court only saw a small sliver

20   because that's what was presented at trial to spare the jury

21   and to spare the Court from having to look at his collection,

22   the images he was interested in.  That's what this case is

23   about.

24             The defendant, as I indicated, wants it to be about

25   all those things but he takes it a step even further, a step

US v. Jenkins – 11-CR-602

 1    that is so low it's hard to even describe.

 2         In his September 9, 2014, submission on Page 2 the

 3    defendant takes it to the level of indicating, with regard to

 4    what was on his computer, "most, by way are 'webcam' videos,

 5    they (victims) intentionally produced and broadcast

 6    (themselves) over the internet and should be prosecuted

 7    (themselves)".

 8         So now it's the children's fault.  It's their fault

 9    that he had access and made a collection of their abuse.

10    That's a low I haven't really seen yet.

11         But while we're talking about that, the defendant

12    also makes numerous claims and complaints about double

13    jeopardy, about how unfair it is that he was tried in a court

14    in the United States.  He complains that if the matter had

15    stayed in Canada, he would have had exposure that was ten

16    times less than the exposure that he has in the United

17    States.

18         Your Honor, that is akin to killing your parents

19    and crying orphan.  The matter didn't remain in Canada

20    because he chose not to show up for those charges.  That was

21    his choice and he can blame the attorneys and he can blame

22    the system all he wants but, like his father indicated, you

23    should have never had that crap with you and when you did,

24    you should have dealt with it, but he didn't, and that's why

25    we're here.

1        And after you remove all of the nonsense, all of
2   the antics, all of the baseless allegations that we've
3   listened to for years, I hope the Court goes back to the core
4   of why we're here.  We're here because of his collection of
5   child pornography and, because of that collection and because
6   of all the factors that the Court I know will consider, the
7   sentence should reflect the seriousness of the crime, afford
8   adequate deterrent and, most importantly, show the defendant
9   that he only has himself to blame.
10       The government, as noted in the sentencing
11  memorandum, is seeking a sentence within the Guideline range,
12  as well as the other imposition of restitution as the parties
13  have carefully briefed.
14       We're also seeking the imposition of a fine in the
15  amount of $20,000 and, of course, the imposition of the
16  special assessment of $200.
17       Thank you.
18       THE COURT:  Okay.  Mr. Jenkins, is it your
19  intention to allow Ms. Peebles to be heard before you're
20  heard?
21       THE DEFENDANT:  Yes.
22       THE COURT:  Go ahead, Ms. Peebles.
23       MS. PEEBLES:  Your Honor, in my sentencing
24  submission to the Court, I lay out the basis for our request
25  to ask the Court to depart or vary from the Guideline, which

US v. Jenkins – 11–CR–602

1   now has been increased by two levels for the obstruction,

2   primarily because of the culpability of Mr. Jenkins in

3   connection with the actual possession and transport of child

4   pornography.

5           I know the Court's aware of many individuals that

6   come before this Court that have been charged with similar

7   types of acts and that is the downloading and receipt of

8   child pornography.  Typically what we find are tens of

9   thousands of images, sometimes more, a hundred thousand

10  images, as a result of the peer-to-peer software sharing

11  system.  We see distribution.  We see multiple efforts at

12  sharing and chat rooms.  We don't have any of that in this

13  case.

14          Now, if we leave aside all of the, shall we

15  classify them as antics by Mr. Jenkins and where we are today

16  and some of his concerns with regard to the proceedings, if

17  we leave that aside and look at the actual conduct for what

18  he's here today to be sentenced for, I would suggest that he

19  is at a level, your Honor, on a continuum that is much less

20  than those that are typically before this Court.

21          I think, your Honor, all things considered, that

22  the sentencing enhancements as we laid out in our sentencing

23  submissions really overinflate the culpability of Mr. Jenkins

24  in the actual possession and transport of child pornography.

25          I know that there are some issues concerning,

US v. Jenkins – 11-CR-602

1   obviously, his concern with the proceeding and the process

2   and how we wound up here.  But I will say this.  I've seen

3   and I've read the letter from his Canadian attorney,

4   Mr. Edgley, and I refer to it in my sentencing submission and

5   it did say:  The third option is that you simply not return

6   to Canada, in which case there would be a bench warrant

7   issued for your arrest and if you ever tried to come to

8   Canada again, you would be subject to arrest pursuant to this

9   warrant and also the money that was posted for bail would be

10   forfeited to her Majesty the Queen and, as we discussed, he

11   would also get his lawyer fee out of that money.

12          So, he laid it out as option one, option two, and

13   option three.  Again, your Honor, I think in hindsight,

14   Mr. Jenkins would have chose to go to his trial and attend

15   the proceedings in Canada.  It would have been the better

16   choice.  But he didn't do that for, I believe, the reasons

17   set forth in the letter sent by Mr. Edgley.

18          Having said that, your Honor, I know Mr. Jenkins

19   has been held in local custody.  He's been subjected to a

20   competency evaluation.  The psychologist did find that he was

21   competent and that was before the Court.  And I don't think,

22   your Honor, that sitting in the local -- well, I believe

23   sitting in a local jail for a three-year period has been a

24   struggle for Mr. Jenkins and he's moved around from place to

25   place.  It's been a difficult three years for him.  This case

US v. Jenkins − 11−CR−602

1   has been pending literally from Canada for a five−year

2   period.  He was a reputable electrician with no prior

3   criminal history.

4          I think the fact that he had no prior criminal

5   history, your Honor, suggests that the chances that he would

6   be a recidivist is very minimal and I think, your Honor, this

7   entire process has taken its toll on him to the point where

8   we are where we are today and his ability to think clearly

9   and make articulate arguments has somewhat been clouded

10  because of the way in which the process has all unfolded.

11         I'm not, again, Judge, suggesting that there's

12  merit to some of the arguments that Mr. Jenkins wanted to

13  bring forth with but he's filed those supplemental motions on

14  his own.

15         But I do think, if the Court considers exactly what

16  he was convicted of by the jury, that a sentence of no more

17  than 5 years would be appropriate in this case because of his

18  lack of criminal history, because of the continuum where he

19  falls, and, also, your Honor, because of the circumstances in

20  which he wound up here.

21         As far as the restitution goes, your Honor, I think

22  what we've set out in our supplemental sentencing memo lays

23  down the methodology that we believe the Court should implore

24  in terms of deciding what the appropriate amount is in this

25  case, taking into account the *Paroline* factors and the basis

US v. Jenkins – 11–CR–602

1    for those arguments, the least amount would be nontrivial in

2    our opinion based on the assessment of taking into account

3    the approach that the Supreme Court suggested, looking at

4    future individual downloaders and also past downloaders in

5    combination are factors that the Court needs to consider in

6    addition to the relative culpability of Mr. Jenkins, as

7    opposed to those that produce and share and distribute those

8    images.  And we believe an amount of no more than $5,000 per

9    victim in this case would certainly satisfy the *Paroline*

10   factors and that's what we're asking the Court to consider.

11            As far as the fine amount, your Honor, $20,000 for

12   Mr. Jenkins who doesn't have the resources at this point in

13   time and the reason he didn't fill out the financial

14   affidavit --

15            THE COURT:  How do we know that?  How do we know

16   what his resources are?  He's never cooperated to fill out a

17   financial affidavit.

18            MS. PEEBLES:  Well, now he's in a catch 22 since we

19   have the perjury charges pending and, as his lawyer, we would

20   have to advise him to invoke his Fifth Amendment right, which

21   we have, and that's an issue.

22            THE COURT:  I understand that.

23            MS. PEEBLES:  Perhaps the Court could reserve

24   decision on the amount of the fine to impose until the

25   perjury charges are addressed by the district court and

US v. Jenkins – 11–CR–602

1  again, Judge, I believe Mr. Jenkins is in somewhat of a catch

2  22 on that for the --

3           THE COURT:  Situation created by who?

4           THE DEFENDANT:  You.

5           THE COURT:  There you go.

6           Go ahead, Ms. Peebles.

7           MS. PEEBLES:  Yeah.  So with that having been said,

8  your Honor, I would just ask the Court to consider our

9  submissions in that regard and, also, to impose a sentence of

10  no more than 5 years.

11          THE COURT:  Thank you, Ms. Peebles.

12          Mr. Jenkins, would you like to be heard, sir?

13          THE DEFENDANT:  Yeah, I don't think it's...

14          THE COURT:  If you want to be heard.

15          THE DEFENDANT:  I don't remember what the

16  prosecutor said now.  I kind of forgot.  I haven't been able

17  to write anything down.

18          THE COURT:  Sir, if you want to be heard, please

19  stand up and speak into the microphone.  You can be heard.

20          THE DEFENDANT:  You said a lot of stuff about

21  downloading, getting stuff on the computer.  That was never

22  proved before or after the other.  I'm just so frustrated

23  right now I can't even think.  I couldn't write stuff down

24  when she was talking.  Whatever -- whatever finances they did

25  put on this, the government said they subpoenaed that stuff.

Case 5:11-cr-00088-EAW Document 79 Filed 01/12/16 Page 869 of 890
**A859**
Case 5:11-cr-00602-GTS Document 201 Filed 03/02/15 Page 28 of 42

US v. Jenkins – 11–CR–602

1    It wasn't to be used for sentencing purposes or restitution.

2    So I object to anything that they refer to on there being

3    used that would determine restitution.  And I can't remember

4    what she said now.

5              (Discussion held off the record.)

6              THE DEFENDANT:  You know, whatever I say doesn't

7    make any difference.  You made up your mind a long time ago.

8    You made up your mind a long time ago.  This is just -- this

9    is just ridiculous.  I object to the whole thing.

10             THE COURT:  Are you done, sir?

11             THE DEFENDANT:  I'm done.

12             THE COURT:  Okay.  The Court's prepared to impose

13   sentence.

14             The Court has reviewed and considered all the

15   pertinent information, including, but not limited to, the

16   presentence investigation report, the addendum, submissions

17   by counsel, the Sentencing Guidelines manual, as well as the

18   factors outlined in 18, U.S.C., Section 3553(a).

19             The Court adopts the factual information and the

20   Guideline applications contained in the presentence

21   investigation report with the following exception:  The Court

22   finds the defendant obstructed justice, the administration of

23   justice at trial as defined in USSG, Section 3C1.1 and,

24   therefore, a 2-level enhancement for his conduct is

25   warranted.

US v. Jenkins – 11–CR–602

1          Therefore, the Guideline imprisonment range goes

2     from 168 to 210 months to a Guideline imprisonment range of

3     210 to 262 months.

4          Having been convicted at trial of Counts 1 and 2 of

5     the indictment, it is the judgment of the Court that you are

6     hereby committed to the custody of the bureau prisons to be

7     imprisoned for a total term of 225 months.

8          This term consists of 225 months on Count 1 and 120

9     months on Count 2 to run concurrently.

10         The Court finds this sentence is sufficient but not

11    greater than necessary to comply with the purposes of

12    sentencing, after considering the defendant's background, the

13    nature of the offense, and the defendant's behavior before

14    this Court.

15         This defendant has never even hinted at an

16    acceptance of responsibility, has blamed everybody and

17    everyone for his criminal activity, including the Canadian

18    law enforcement officers, the Canadian court, his attorney in

19    Canada, his attorneys who tried so desperately to help him

20    here in the United States, the prosecution, and even this

21    Court.  You've made it extremely clear that, without a doubt,

22    you accept absolutely no responsibility for your actions.

23         I couldn't disagree with your attorney more when

24    she says that you're not a threat to commit this crime again.

25    You've demonstrated that you have a total lack of respect for

US v. Jenkins – 11–CR–602

1    the law and disdain for the law.  That's in the Court's view

2    it is without question that, if given the opportunity, you

3    will do exactly what you want to do in any situation and you

4    are a very high risk to reoffend.

5            You attempted to transport thousands of images and

6    videos of child pornography into Canada and then later failed

7    to appear for your Canadian trial.  You attempted to evade

8    justice and when you were arrested in the United States, you

9    blamed Canada.  You blamed the U.S. government, law

10   enforcement for doing illegal acts to prosecute you.

11           Based on your evasion of the charges in Canada,

12   there is an active warrant for your arrest in Canada.  You

13   have since demonstrated a total disregard of the law and a

14   complete lack of respect for this Court and any of the

15   attorneys who have tried to help you.

16           Based on these factors and your large collection of

17   child pornography, the Court has imposed a sentence that

18   reflects the seriousness of your crime, that promotes respect

19   for the law, and that provides you with adequate deterrence

20   from committing further crimes, and that protects the public.

21           While in custody, the Court recommends you receive

22   mental health treatment and sex offender treatment when, and

23   if, eligible.

24           With regard to restitution, the defendant shall pay

25   to the victims of this offense pursuant to 18, U.S.C.,

Case 5:14-cr-00088-EAW Document 79 Filed 01/12/16 Page 872 of 890
**A862**
Case 5:11-cr-00602-GTS Document 201 Filed 03/02/15 Page 31 of 42

31

US v. Jenkins – 11–CR–602

1   Section 2259.  The Court finds that, based on the indictment,

2   trial evidence, jury verdict and the government's memorandum

3   of law, the defendant knowingly transported and possessed the

4   images of Vicky, L.S., Cindy and Angela.  And I'm referring

5   to docket numbers 10, 151, 152, 154, 178 and 183.

6           The Court also finds that, based on the

7   government's memorandum of law and exhibits, that each of the

8   four victims has outstanding losses caused by the continuing

9   traffic of their images in the following amounts:

10          Vicky has outstanding losses of approximately

11  $500,875.

12          L.S. has outstanding losses of approximately

13  $1,841,400.

14          Cindy has outstanding losses of approximately

15  $1,344,963.

16          And Angela has outstanding losses between 366,000

17  and 587,000.

18          The Court finds, again, based on the government's

19  memorandum of law and exhibits, that, while it is far from

20  clear that this aggregation is required by *Paroline* in the

21  United States, even assuming that this aggregation is

22  required, the losses attributed solely to the group of

23  traffickers amounts to at least half the victims losses,

24  given that appears it is likely that the public's viewing of

25  the victim's images is the cause of victims losses as it is

US v. Jenkins – 11–CR–602

1    that the victims original abusers is the cause of those

2    losses.

3              Finally, the Court finds, again, based on the

4    government's memorandum of law and exhibits, that the amounts

5    of restitution that comport with the defendant's relative

6    role in the causal process that underlies each victim's

7    general losses are as follows:

8              $3,000 for Vicky; two, $3,000 for L.S;, three,

9    $3,000 for Cindy; and, four, $3,000 for Angela.

10             The Court notes that it rendered this last finding

11   based on the careful consideration of the factors enumerated

12   in *Paroline*.

13             For example, the Court finds that the number of

14   past criminal defendants found to have contributed to the

15   victim's general losses are as follows:

16             502 with regard to Vicky, 149 with regard to L.S.,

17   123 with regard to Cindy; and 17 with regard to Angela.

18             The Court finds that there is no evidence before it

19   to support a reasonable prediction of the number of future

20   offenders likely to be caught and convicted for crimes

21   contributing to the victim's general losses, nor is there

22   evidence before it to support a reasonably reliable estimate

23   of the broader number of offenders involved.

24             The Court finds that the defendant did not

25   reproduce or distribute images of the victims.  The Court

US v. Jenkins – 11–CR–602

1   finds that the defendant has no connection to the initial

2   production of the images.

3            The Court finds the defendant possessed the

4   following number of images of the victims:

5            Three videos or 222 images of Vicky; 3 images of

6   L.S., 1 image of Cindy, and 1 image of Angela.

7            While the defendant's per capita share of Vicky's

8   total losses amounts to only approximately $500, the Court

9   finds that the amount should be increased to $3,000 due to,

10  one, the above-average number of images of her that he

11  possessed and, two, the particularly explicit and offensive

12  nature of these images.

13           While defendant's per capita share of L.S.'s total

14  losses amounts to approximately $6,138, the Court finds that

15  the amount should be diminished to $3,000 due to a

16  below-average number of images of her that he possessed; and,

17  two, the fact that the government itself has estimated the

18  defendant's share as $3,000.

19           While defendant's per capita share of Cindy's total

20  losses amounts to approximately $5,423, the Court finds that

21  the amount should be diminished to $3,000, due to the

22  below-average number of images of her that he possessed; and,

23  two, the fact that the government itself has estimated the

24  defendant's share as $3,000.

25           Finally, while the defendant's per capita share of

US v. Jenkins – 11-CR-602

1   Angela's losses amounts to between $20,333 and $32,611, the

2   Court finds that the amount should be diminished to $3,000

3   due the below-average number of images of her that he

4   possessed and the fact that the government itself has

5   estimated the defendant's share at $3,000.

6           After considering the factors outlined in 18,

7   U.S.C., Section 3664(F)(2), including your financial

8   resources, other assets, restitution is to be paid

9   immediately.

10          The Court also finds that, based on your financial

11  resources, projected earnings and your financial obligations,

12  that you do have the ability to pay a fine.  Therefore, you

13  shall pay to the clerk of court a fine in the amount of

14  $40,000, which is due and payable immediately.

15          You shall also pay a special assessment of $200,

16  which is due immediately.

17          Upon your release from imprisonment, you shall be

18  placed on supervised release for a term of 25 years on each

19  count to run concurrently.

20          While on supervised release, you shall not commit

21  another federal, state or local crime.  You shall comply with

22  the standard conditions that have been adopted by this Court.

23  You shall comply with the following special conditions that

24  have been provided to you and your attorney.

25          The Court adopts these special conditions which

Case 5:11-cr-00088-EAW Document 100-1 Filed 01/12/16 Page 876 of 890
A866
Case 5:11-cr-00602-GTS  Document 201  Filed 03/02/15  Page 35 of 42
35

US v. Jenkins – 11–CR–602

1    will be made a part of this record.

2           Ms. Peebles, did you have an opportunity to review

3    those special conditions with Mr. Jenkins prior to this

4    proceeding.

5           MS. PEEBLES:  Yes, your Honor, and we are objecting

6    to the imposition of the ten special conditions that have

7    been set forth in the addendum.

8           THE COURT:  Very well, but you did review them with

9    him?

10          MS. PEEBLES:  Yes, your Honor.

11          THE COURT:  Mr. Jenkins, you saw those special

12   conditions prior to these proceedings today?

13          THE DEFENDANT:  Yes, I believe I did.

14          THE COURT:  Well, sir, you did or you didn't?

15          THE DEFENDANT:  Yes, I think I did -- yes.

16          THE COURT:  Sir, you need to understand that you're

17   going to be required to abide by those special conditions

18   once you're released and you're on supervised release.

19

20

21                    *          *          *

22          (Special conditions distributed to defendant

23           and counsel are as follows:)

24          1.  You shall register with the state sex offender

25   registry agency in any state where you reside, are employed,

US v. Jenkins – 11–CR–602

1    carry on a vocation or are a student.

2          2.  You shall not have any direct contact with a

3    person under the age of 18 unless it is supervised by a

4    person approved of by the probation officer.  You shall not

5    have indirect contact with a person under the age of 18

6    through another person or through a device (including a

7    telephone, computer, radio, or other means) unless it is

8    supervised by a person approved of by the probation officer.

9    You shall reasonably avoid and remove yourself from

10   situations in which you have any other form of contact with a

11   minor.

12         3.  You shall not be in any area in which persons

13   under the age of 18 are likely to congregate, such as school

14   grounds, child care centers, or playgrounds, without the

15   permission of the probation officer.

16         4.  You shall participate in a mental health

17   program, which will include, but will not be limited to,

18   participation in a treatment program for sexual disorders.

19   The program shall be approved by the United States Probation

20   Office.

21          5. Your supervised release may include

22   examinations using a polygraph, computerized voice stress

23   analyzer, or other similar device to obtain information

24   necessary for supervision, case monitoring, and treatment.

25   You shall answer the questions posed during the examination,

1   subject to your right to challenge in a court of law the use

2   of such statements as violations of your Fifth Amendment

3   rights.  In this regard, you shall be deemed to have not

4   waived your Fifth Amendment rights.  The results of any

5   examinations shall be disclosed to the United States

6   Probation Office and the Court, but shall not be further

7   disclosed without the approval of the Court.

8          6.  You shall contribute to the cost of any

9   evaluation, testing, treatment and/or monitoring services

10   rendered in an amount to be determined by the probation

11   officer based on your ability to pay and the availability of

12   third–party payments.

13          7.  You shall not use or possess any computer or

14   any other device with online capabilities, at any location,

15   except at your place of employment, unless you participate in

16   the Computer Restriction and Monitoring Program.  You shall

17   permit the United States Probation Office to conduct

18   periodic, unannounced examinations of any computer equipment

19   you use or possess, limited to all hardware and software

20   related to online use, (e.g., use of the World Wide Web,

21   email, instant messaging, et cetera.)  These examinations may

22   include retrieval and copying of data related to online use,

23   and the viewing of pictures and movies which may be potential

24   violations of the terms and conditions of supervised release

25   from this computer equipment including any internal or

US v. Jenkins – 11-CR-602

1  external peripherals, internet-capable devices, and data

2  storage media.  This computer equipment may be removed to the

3  Probation Office or to the office of their designee for a

4  more thorough examination.  The Probation Office may use

5  and/or install any hardware or software system that is needed

6  to monitor your computer use, subject to the limitations

7  described above.

8          8.  If your employment requires the use of a

9  computer, you may use a computer in connection with the

10  employment approved by the probation officer, at your place

11  of employment, provided you notify your employer of:  (1) the

12  nature of your conviction; and (2) the fact that your

13  conviction was facilitated by the use of the computer.  The

14  Probation Office must confirm your compliance with this

15  notification requirement.

16          9.  You shall not incur new credit charges or open

17  additional lines of credit without the approval of the

18  probation officer.

19          10.  The defendant shall apply all monies he

20  receives from any income tax refunds, lottery winnings,

21  judgments, and/or any other anticipated or unexpected

22  financial gains to the outstanding court-ordered financial

23  obligation.

24                  *          *          *

25          THE COURT:  You shall also forfeit to the United

39

US v. Jenkins – 11–CR–602

1   States all right, title and interest in the items listed in

2   the forfeiture allegation contained in the indictment and

3   further listed in the special verdict form.

4           Both parties have a right to appeal this sentence

5   in certain limited circumstances.  You are advised to consult

6   with your attorney to determine whether or not an appeal is

7   warranted.

8           Any appeal must be filed within 14 days of the date

9   of the judgment being filed in this case.

10          Defendant will be remanded to the custody of the

11  United States Marshals in accordance with the terms of this

12  sentence.

13          (Discussion held off the record between courtroom

14           deputy and the Court.)

15          THE COURT:  I want to make it clear for the record

16  that with the obstruction of justice enhancement, the Court

17  found that the offense level was 37 and the Criminal History

18  Category was I, which gave us the Guideline imprisonment

19  range of 210 to 262 months.

20          Anything further on behalf of the government?

21          MS. THOMSON:  Your Honor, first I realize that this

22  matter has taken a great deal of the Court's time already,

23  but I would ask if the Court would just allow me to briefly

24  supplement the record with regard to the issue of

25  substitution of counsel, just in the interest of making sure

US v. Jenkins – 11–CR–602

1   that the record is complete and that the record reflects the

2   government's position with regard to the substitution of

3   counsel.

4          THE COURT:  Go ahead.

5          MS. THOMSON:  Thank you, your Honor.

6          Your Honor, the Court, to have substituted counsel,

7   must have found that there was good cause for that

8   substitution, as the defendant does not have an absolute

9   right to substitution of counsel.

10         The defendant didn't even make out a showing of

11   good cause in his submissions.  If you actually look at what

12   he wrote with regard to counsel, he indicated on Page 2 of

13   his submission, public defender's office had done a

14   better–than–average job litigating within the "pretend

15   subject matter jurisdiction" the Northern District exerts.

16         He doesn't really explain any bases for the

17   substitution of counsel, other than to go on and say it was

18   wrong for Court to order the defendant to retain private

19   counsel, which previously happened, was wrong to dismiss the

20   attorney, which the Court did at the attorney's request, and

21   that the Court was incompetent and caused financial strain

22   and the Court's CJA panel of attorneys are not qualified or

23   are easily corrupted.

24         None of the allegations that he set forth or the

25   comments that he made rise to the level of good cause, the

US v. Jenkins – 11-CR-602

1    timeliness of the motion also again with counsel here, the

2    Court having allowed him that substitution of counsel.

3            There was no actual nature of a conflict that was

4    explained, just the defendant wanted, yet again, to have

5    things delayed so that he may or may not take an action which

6    we've been down that road before.

7            THE COURT:  And, as I've indicated, all the

8    defendant's submissions are docketed and they're on the

9    record and he certainly agreed to have Ms. Peebles

10   participate this morning and so he has been represented and

11   he's had a fair and fall opportunity to represent himself and

12   the record that he would like.

13           MS. THOMSON:  Thank you, your Honor.

14           THE COURT:  I think that matter is sufficiently

15   covered.

16           Ms. Peebles, anything further on behalf of

17   Mr. Jenkins?

18           MS. PEEBLES:  No, your Honor.

19           THE COURT:  Thank you, Ms. Peebles, for your

20   representation.

21           Mr. Jenkins, anything further, sir?

22           THE DEFENDANT:  I think you're a fraud and I think

23   this whole thing's a fraud.  This is ridiculous.

24           THE COURT:  Okay, sir.  Good luck to you.

25           THE CLERK:  Court is adjourned.

42

US v. Jenkins – 11–CR–602

1          (Proceedings adjourned at 10:56 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AO 245B   NNY(Rev. 09/12) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| Northern | District of | New York |
|---|---|---|

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **V.** | |
| JOSEPH JENKINS | |

Case Number:      DNYN511CR000602-001

USM Number:      19324-052

Lisa A. Peebles
4 Clinton Square, Third Floor
Syracuse, New York 13202
315-701-0080
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

X was found guilty on count(s)    1 and 2 of the Indictment on February 6, 2014.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2252A(a)(1) & 18 U.S.C. §2256(8)(A) | Transportation of Child Pornography | 05/24/09 | 1 |
| 18 U.S.C. § 2252A(a)(5) & 18 U.S.C. §2256(8)(A) | Possession of Child Pornography | 05/24/09 | 2 |

    The defendant is sentenced as provided in pages 2 through   6   of this judgment. The sentence is imposed in accordance with 18 U.S.C. § 3553 and the Sentencing Guidelines.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 12, 2014
Date of Imposition of Judgment

_Glenn Suddaby_

Hon. Glenn T. Suddaby
U.S. District Judge

November 18, 2014
Date

JAK

AO 245B    NNY(Rev. 10/05) Judgment in a Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___6___

DEFENDANT:          Joseph Jenkins
CASE NUMBER:        DNYN511CR000602-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**225 months on Count 1 and 120 months on Count 2 to run concurrently for a total of 225 months.**

X   The court makes the following recommendations to the Bureau of Prisons:

**The defendant receive mental health and sex offender treatment when and if eligible.**

X   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

   ☐   at _____ ☐ a.m.   ☐ p.m.   on _____ .

   ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐   before 2 p.m. on _____ .

   ☐   as notified by the United States Marshal.

   ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    NNY(Rev. 10/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page   3   of   6  

DEFENDANT:     Joseph Jenkins
CASE NUMBER:    DNYN511CR000602-001

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:

**25 years on each count to run concurrently.**

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

x    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

x    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Deselect, if inapplicable.)

x    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

### STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, import, or manufacture any and all controlled substance and all controlled substance analogues, as defined in 21 U.S.C. § 802, and any paraphernalia related to any controlled substances, except that possession and use of a controlled substance properly prescribed by a licensed medical practitioner is permitted;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement;

14)  the defendant shall not possess a firearm, destructive device, or any other dangerous weapon;

15)  the defendant shall provide the probation officer with access to any requested financial information; and

16)  the defendant shall submit his or her person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by the defendant. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

| | | | | |
|---|---|---|---|---|
Judgment—Page  4  of  6

DEFENDANT:        Joseph Jenkins
CASE NUMBER:      DNYN511CR000602-001

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall not have any direct contact with a person under the age of 18 unless it is supervised by a person approved of by the probation officer. The defendant shall not have indirect contact with a person under the age of 18 through another person or through a device (including a telephone, computer, radio, or other means) unless it is supervised by a person approved of by the probation officer. The defendant shall reasonably avoid and remove himself or herself from situations in which the defendant has any other form of contact with a minor.

2. The defendant shall not be in any area in which persons under the age of 18 are likely to congregate, such as school grounds, child care centers, or playgrounds, without the permission of the probation officer.

3. The defendant shall participate in a mental health program, which will include, but will not be limited to, participation in a treatment program for sexual disorders. The program shall be approved by the United States Probation Office.

4. The defendant's supervised release may include examinations using a polygraph, computerized voice stress analyzer, or other similar device to obtain information necessary for supervision, case monitoring, and treatment. The defendant shall answer the questions posed during the examination, subject to his or her right to challenge in a court of law the use of such statements as violations of the defendant's Fifth Amendment rights. In this regard, the defendant shall be deemed to have not waived his or her Fifth Amendment rights. The results of any examinations shall be disclosed to the United States Probation Office and the Court, but shall not be further disclosed without the approval of the Court.

5. The defendant shall contribute to the cost of any evaluation, testing, treatment and/or monitoring services rendered in an amount to be determined by the probation officer based on the defendant's ability to pay and the availability of third party payments.

6. The defendant shall not use or possess any computer or any other device with online capabilities, at any location, except at his or her place of employment, unless the defendant participates in the Computer Restriction and Monitoring Program. The defendant shall permit the United States Probation Office to conduct periodic, unannounced examinations of any computer equipment the defendant uses or possesses, limited to all hardware and software related to online use (e.g., use of the World Wide Web, e-mail, instant messaging, etc.). These examinations may include retrieval and copying of data related to online use, and the viewing of pictures and movies which may be potential violations of the terms and conditions of supervised release from this computer equipment including any internal or external peripherals, internet-capable devices, and data storage media. This computer equipment may be removed to the Probation Office or to the office of their designee for a more thorough examination. The Probation Office may use and/or install any hardware or software system that is needed to monitor the defendant's computer use, subject to the limitations described above.

7. If the defendant's employment requires the use of a computer, the defendant may use a computer in connection with the employment approved by the probation officer, at the defendant's place of employment, provided the defendant notifies his or her employer of: (1) the nature of his or her conviction; and (2) the fact that the defendant's conviction was facilitated by the use of the computer. The Probation Office must confirm the defendant's compliance with this notification requirement.

8. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

9. The defendant shall apply all monies he receives from any income tax refunds, lottery winnings, judgments, and/or any other anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.


## DEFENDANT'S ACKNOWLEDGMENTOF APPLICABLE CONDITIONS OF SUPERVISION


Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

The conditions of supervision have been read to me. I fully understand the conditions and have been provided a copy of them.


_____                    _____
Defendant                                          Date


_____                    _____
U.S. Probation Officer/Designated Witness          Date

AO 245B   NNY(Rev. 10/05)Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

DEFENDANT:          Joseph Jenkins
CASE NUMBER:        DNYN511CR000602-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  200 | $  40,000 | $  12,000 |

☐   The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case* (AO 245C)  will
be entered after such determination.

X   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in
the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid
before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Victim in the Vicky series |  | $3,000 |  |
| Victim in the Jan_Feb series |  | $3,000 |  |
| Victim in the Cindy series |  | $3,000 |  |
| Victim in the Angela series |  | $3,000 |  |
| **TOTALS** | $ _____ | $ _____ 12,000 |  |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

X   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth
day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for
delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the   ☐  fine   ☐  restitution.

☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after
September 13, 1994, but before April 23, 1996.

Case 5:14-cr-00088-EAW Document 190-1 Filed 01/12/16 Page 889 of 890

A879

AO 245B    NNY(Rev. 10/05) Judgment in a Criminal Case      Case 5:11-cr-00602-GTS    Document 189    Filed 11/18/14    Page 6 of 6
Sheet 6 — Schedule of Payments

Judgment — Page   6   of   6

DEFENDANT:          Joseph Jenkins
CASE NUMBER:        DNYN511CR000602-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**  ☒  In full immediately; or

**B**  ☐  Lump sum payment of $ _____ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ D,  ☐ E,  ☐ F, or   ☐ G below; or

**C**  ☐  Payment to begin immediately (may be combined with   ☐ D,   ☐ E, or   ☐ G below); or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**E**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**F**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**G**  ☐  Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to **Clerk, U.S. District Court, Federal Bldg., 100 S. Clinton Street, P.O. Box 7367, Syracuse, N.Y. 13261-7367**, unless otherwise directed by the court, the probation officer, or the United States attorney.  If a victim cannot be located, the restitution paid to the Clerk of the Court for that victim shall be sent to the Treasury, to be retrieved if and when the victim is located.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    ☐  Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

    ☐  The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States:
**All right, title, and interest in the items listed in the Forfeiture Allegation contained in the Indictment and further listed in the Special Verdict Form dated 2/6/14.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Notice of Appeal

United States district court for the Northern District of New York

File number 5:11-cr-602

United States }
          v
Jenkins }

Notice of appeal



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
NOV 1 7 2014
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

Notice is hereby given that Joseph V Jenkins defendant in the above named case, hereby appeals to the (court) United States Court of Appeals for the Second Circuit (all) final Judgments, Orders (for restitution, fines, forfietures) including sentencing related to the above named case entered in this action on (or about) the day of November 12, 2014.

Oneida County Correctional Facility
6075 Judd Road
Oriskany, New York 13424
          or
4072 Dwyer Lane
Geneva, NY 14456

Joseph V Jenkins
Defendant
11-14-14